UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | CRIMINAL NO. 21-cr-10104-PBS |
| VLADISLAV KLYUSHIN<br>Defendant | ) ) ) ) | |

**OPPOSITION TO MEMORANDUM OF THE UNITED STATES IN SUPPORT OF DETENTION**

Now comes the defendant Vladislav Klyushin, by and through undersigned counsel, and hereby respectfully opposes the Government's Motion for Detention and respectfully requests this Honorable Court, pursuant to 18 U.S.C § 3142, to Order Mr. Klyushin's release on the strict conditions proposed herein. As detailed more fully below, Mr. Klyushin is a 41-year-old husband and father of five children (ranging from the age of 4 through 13) with absolutely no prior involvement with the criminal justice system (other than the instant charges), no history of violating any court orders, and no history of using false identifications or engaging in obstructive conduct. He has been married to Zhannetta for seven years, shares a close bond with his children, and plays a prominent role in their upbringing. Mr. Klyushin is a caring individual that goes out of his way to help others, including family and employees. Over a lifetime of good acts, he has earned the trust and respect of many. Mr. Klyushin has no history of abandoning promises, including the promises that he is prepared to make to this Honorable Court. He intends to challenge the Government's case in a lawful, professional and principled manner. In short, to whatever extent the Court believes there exists any risk of flight, the defense respectfully submits that the following conditions are sufficient to secure the release of Mr. Klyushin, a

prominent businessman with no criminal record, in a case that does not involve any allegations of violence or conduct consistent with an intent to flee:

1. To execute a bond in the amount of $2.5 million secured by $1 million in cash to be deposited with the Court and $1.5 million to be secured by an apartment located in London, United Kingdom.[1]

2. Home detention in a 1-bedroom residence that Mr. Klyushin will rent in the Seaport District with permission to leave only for counsel visits and medical appointments with prior approval by Pretrial Services.[2]

3. Agree to wear an electronic monitoring device with a Global Positioning System.

4. To surrender his passport (which is already in the Government's possession).

5. An agreement not to seek or obtain any new passport during the pendency of this matter.

6. Consent to U.S. extradition from any country and waiver of all rights against such extradition.

7. Prohibit any person from entering Mr. Klyushin's residence, other than Mr. Klyushin and his attorneys, without prior approval from Pretrial Services and/or the Court.

8. Mr. Klyushin will report daily by telephone or email to Pretrial Services (or on any other schedule the Court deems appropriate).

9. Mr. Klyushin shall not possess or use any computer, shall not possess or use any telephone with internet capabilities, and be permitted access to a single telephone to make calls only to approved numbers.

10. Mr. Klyushin shall consent for the DOJ to monitor all telephone calls of the defendant, including but not limited to attorney-client communications.

---

[1] The $1 million will be funded by a loan secured by Mr. Klyushin's real estate in Russia. Mr. Klyushin proposes to post his London, United Kingdom apartment to secure the remaining $1.5 million of the total bond. In *United States v. Roger Knox*, Dkt 18-cr-10385-NMG, Dkt. 157, the court allowed Mr. Knox to secure his bond with three real properties located in the U.K.

[2] The furnished, 1-bedroom apartment was located with the assistance of a licensed real estate agent, who informed counsel that the apartment is available for immediate occupancy. A copy of the listing, including the address, has been provided to Pretrial Services.

11. Mr. Klyushin will provide Pretrial Services and/or the Government random access to his residence.

12. Any other condition the Court deems necessary to reasonably assure Mr. Klyushin's appearance.

The fact that Mr. Klyushin is a Russian citizen certainly does not extinguish this Court's congressional mandate to order pretrial release in every case where reasonable conditions can assure the appearance of the defendant as required. Indeed, numerous courts have rejected Government requests for detention, and instead ordered pretrial release, in cases wherein the charged defendant was a non-citizen:

- *United States v. Sabhnani*, 493 F.3d 63 (2d Cir. 2007) (reversing district court order of detention of defendants, who were natives of Indonesia, and ordering release despite defendants' "strong motive to flee" because of serious charges and "strong" evidence of guilt, despite finding that defendants faced "lengthy term of incarceration" if convicted, despite finding defendants possessed "ample means to finance flight," despite finding that defendants "maintained strong family ties to their native countries as well as personal and professional ties to various locations in Europe and the Middle East," and despite finding that defendants "could, with relatively little disruption, continue to operate their highly lucrative business from any number of overseas locations");

- *United States v. Hansen*, 108 F. App'x 331 (6th Cir. 2004) (affirming district court order of pretrial release of defendant, a resident and citizen of Denmark – from where defendant could not be extradited – charged with bulk cash smuggling and forfeiture, noting that the "bail statute does not . . . require that foreign defendants be detained simply because their return cannot be guaranteed through extradition");

- *United States v. Karni*, 298 F. Supp. 2d 129 (D.D.C. 2004) (ordering release of defendant, an Israeli national who had resided in South Africa for the 18 years preceding his arrest when he landed in Colorado for a family ski trip based on allegations he violated the Export Administration Act and the International Economic Emergency Powers Act by acquiring products capable of triggering nuclear weapons and exported them to Pakistan, despite defendant's lack of any ties to the United States, despite finding that defendant had "no ties to the United States or the Washington, D.C. area," despite finding that "no evidence [was] presented establishing that Defendant has ever lived in this country, owned property here, or that he has any family or community ties in the United States," despite finding that defendant "was only in this country in order to participate in a ski vacation with his wife and daughter," and despite finding that "the weight of the evidence against Defendant is substantial").

In certain instances, foreign defendants were even permitted to live at home in a foreign country during their ongoing criminal proceedings in the United States. In *United States v. Pennings*, for example, this Honorable Court released Mr. Pennings who was a foreign national with substantial wealth and who was charged with defrauding pension funds and wealth management funds of approximately $20 million, on a $2 million secured bond and permitted Mr. Pennings to reside in United Kingdom and to travel to the Netherlands while on pretrial release. *United States v. Pennings* 16-cr-10094-LTS, Dkt. 53; [3] *see also United States v. Sidoo*, Dkt. 19-cr-10080-NMG, Dkt. 13 (D. Mass) (ordering release of a defendant, a citizen of Canada, who was charged with conspiracy to commit wire fraud, honest services fraud, and money laundering relating to the college admission scandal. The defendant, who had no status in the United States, was permitted to reside in his home in Canada during the pendency of the criminal case in the United States).

While Mr. Klyushin does not make a request to live at home during the pendency of these proceedings, these precedents underscore the fundamental principle that, in this country, there is a "strong presumption against detention." *United States v. Hanson*, 613 F.Supp.2d 85, 87 (D.D.C. 2009) (Friedman, J.). In fact, "'(i)n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.'" *Hanson*, 613 F.Supp.2d at 87, *quoting United States v. Salerno*, 481 U.S. 739, 755

---

[3] That Mr. Pennings waived his rights to extradition is not a prerequisite to bail. The Bail Reform Act requires no waivers of rights in order to secure pretrial release on "the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community…" 18 U.S.C § 3142 (c)(1)(B).

(1987). This is particularly so where, as here, the defendant has absolutely no prior criminal record.

### I. There exists a combination of conditions that will reasonably assure Mr. Klyushin's appearance in Court.

Incarceration before trial "substantially impacts the quality of the[] defense" and "increase[s] the likelihood that the detainee will be convicted, imprisoned, and subjected to prolonged deprivation of liberty, privacy, and other fundamental elements of human existence." Samuel R. Wiseman, *"Pretrial Detention and the Right to be Monitored,"* 123 YALE L. J. 1344 (2014). Accordingly, '[o]ur system of criminal justice embraces a strong presumption *against* detention." *United States v. Hanson*, 613 F. Supp. 2d 85, 87 (D.D.C. 2009) (emphasis added). "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987); *United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021) (same). Courts should refuse to release defendants on bail "[o]nly in rare circumstances," and "only for the strongest of reasons." *United States v. Motamedi*, 767 F.2d 1403, 1405, 1406 (9th Cir. 1985) (Kennedy, J.). Any "[d]oubts regarding the propriety of release should be resolved in favor of the defendant." *Id.* at 1405.

Consistent with these principles, the presumption of innocence afforded to every defendant, and the Eighth Amendment prohibition against excessive bail, the Bail Reform Act of 1984 provides that a defendant should be released pending trial on personal recognizance or "subject to the least restrictive further conditions, or combination of conditions that . . . will reasonably assure [1] the appearance of the person as required and [2] the safety of any other person and the community." 18 U.S.C. § 3142(b) and (c)(1)(B). "In common parlance, the relevant inquiry is whether the

defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 540 (D.C. Cir. 2019).

Where the government moves for detention based on flight risk, the Government must satisfy a dual burden of proof:

> First, (the government] must establish that the defendant, if released, presents an actual risk of flight. Assuming it satisfies this burden, the government must then demonstrate by a preponderance of the evidence that no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court.

*Sabhnani*, 493 F.3d at 75. In other words, "[e]ven if the Court concludes the government (proves] by a preponderance of the evidence that release on personal recognizance will not reasonably assure the appearance of the defendant as required, the law still favors pre-trial release 'subject to the least restrictive further condition, or combination of conditions, that the court determines will reasonably assure the appearance of the person as required.'" *Sabhnani*, 493 F.3d at 75; *United States v. Berrios-Berrios*, 791 F.2d 246, 250 (2d Cir. 1986) (emphasizing that the "requirement that courts expressly consider alternative conditions is central to the Bail Reform Act").

Because pretrial detention is truly a last resort, a court faced with the issue must "make explicit their findings with regard to the adequacy [or inadequacy] of possible conditions for release." *United States v. Coonan*, 826 F.2d 1180, 1186 (2d Cir. 1987). "Whatever the district court ultimately decides, it should explicate the reasons underlying its conclusion." *Berrios-Berrios*, 791 F.2d at 253.

Mr. Klyushin respectfully submits that an analysis of the relevant statutory factors supports pretrial release; even should the Court conclude the defendant presents an actual risk of flight, certainly some combination of conditions exist that will ***reasonably assure***

6

***his appearance as required***. *See Hansen*, 108 Fed.Appx. at 332 ("The structure of the bail statute mandates every form of release be considered before detention may be imposed. That structure cannot be altered by building a 'guarantee' requirement atop the legal criterion erected to evaluate release conditions in individual cases") (*quoting United States v. Orta*, 760 F.2d 887, 892 (8th Cir.1985)).

First, the crimes with which Mr. Klyushin is charged are not narcotics offenses and not crimes of violence, two factors Congress believed to be important in determining whether pretrial release is appropriate. *See* 18 U.S.C. §3142(g)(l) (nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug). The core of the charged scheme revolves around non-violent offenses such as insider trading and unauthorized access to a computer network. The fact that the Indictment alleges a significant amount of dollars at stake does not mean pretrial release is inappropriate; Congress did not impose any categorical presumptions of allegation for the instant charges. Congress is presumed to know existing law, and it has never amended the Bail Reform Act to require detention in prosecutions that routinely involve allegations of large amounts of criminal proceeds. *See* 18 U.S.C. §3142 (amended in 2003 to include various crimes to be categorized as crimes of violence); *Conroy v. Aniskojf*, 507 U.S. 511, 516 & n.10, 11 (1993) (holding that there is a presumption that Congress is aware of the relevant case law); *Chisom v. Roemer*, 501 U.S. 380, 391 (1991) (holding that if Congress had an intent to deviate from an established legal rule, "Congress would have made it explicit in the statute"). Thus, the legal presumption in this case is that Mr. Klyushin should be released.

Second, the fact that the Government will potentially seek a significant sentence if the defendant is convicted on all counts does not preclude pretrial release in this case – several courts have ordered pretrial release despite finding that the defendant faced serious charges carrying significant potential sentences. *See, e.g., Sabhnani*, 493 F .3d 63 (2d Cir.2007) (reversing district court order of detention of defendants despite finding that defendants, natives of Indonesia, faced "lengthy term of incarceration" and "strong" evidence of guilt existed); *United States v. Karni*, 298 F.Supp.2d 129 (D.D.C. 2004) (ordering release of defendant, an Israeli national who had resided in South Africa for the 18 years preceding his arrest, despite finding that "the weight of the evidence against Defendant is substantial"); *Hanson*, 613 F.Supp.2d 85 (D.D.C.2009) (Friedman, J.) (noting that charges "were serious and carried a potential for a significant period of incarceration" and that the "government has strong evidence against" the defendant "including her own statement to investigators that she smuggled the UAV autopilot components out of the United States and knew there were licensing requirements for such items").

In its memorandum, the Government posits that if Mr. Klyushin is convicted and the gain is $82.5 million (a figure that is alleged by the SEC, not the USAO) then the 2B1.1 Guideline applies and his sentencing exposure is 262 to 327 months. The Government does not explain why the potentially more appropriate Insider Trading Guideline, pursuant to 2B1.5, should not apply, which would reduce Mr. Klyushin's sentencing exposure 121 to 151 months assuming *arguendo* the same loss/gain figure applies. Regardless, in a complex financial charge such as this, it is much too early to base a detention order on a back-of-the-book Guidelines analysis. Loss calculations are

complicated in even simple fraud cases; to do so at the outset based on an Indictment with conclusory allegations is insufficient to meet the Government's burden here. Indeed, as previously mentioned, had Congress been concerned about insider trading allegations vis-à-vis pretrial detention, it would have included that charge under § 3142(g)(1) when enumerating certain offenses or under § 3142(f)(1) when enumerating charges that carry a presumption of detention. Rather, this is a case where the presumption is liberty, not detention. The Court should also bear in mind that the advisory Guidelines range is one of multiple sentencing factors and "are just that, guidelines [...] they truly are advisory." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013). This Court "may not presume that the Guidelines range is reasonable," but rather "must make an individualized assessment based on the facts presented," *Gall v. United States*, 552 U.S. 38, 50 (2007), and consider "all the [sentencing] factors listed in § 3553(a)," not just the Guidelines range. *Pepper v. United States*, 562 U.S. 476, 490 (2011). Given the lack of criminal history and Mr. Klyushin's admirable personal history, there is no reason for the Government – or Mr. Klyushin – to presume or anticipate that the Court will impose a guidelines sentence, should Mr. Klyushin even be convicted. Indeed, many cases in this district involving large, complex financial frauds have resulted in sentences significantly less that the Guidelines propose. *See e.g., United States v. Prosperi*, 1:06-cr-10116-RGS (D. Mass) (Stearns, J.) (Defendant was convicted of mail fraud and conspiracy. Defendant and his co-conspirators engaged in a years-long fraud scheme in which they provided concrete for the federally funded "Big Dig" construction project that did not meet required specifications, and created false documentation certifying compliance causing a loss in excess of $5 million. Defendant was sentences to 3 years' probation and

6-month home confinement despite a guideline of 87-108 months).  Mr. Klyushin is a young man (41 years old) and he would be subject to prosecution if he fled, which he knows carries a maximum penalty of up to ten additional years of imprisonment, 18 U.S.C. §3146(b)(l)(A)(l), and/or the real risk of an enhanced sentence by the Court in this matter if not acquitted. In essence, Mr. Klyushin would potentially risk more by attempting to flee than lawfully challenge his case as he intends to do.

It must also be emphasized that the allegations outlined within the Indictment are just that – allegations – and the defendant anticipates substantial challenges to the Government's case, including but not limited to the Government's theory that defendant's trading resulted in substantial profits. At least a preliminary review of the brokerage records belonging to Mr. Klyushin and his corporation indicate that he *lost* $3,606,712.59 on transactions involving Tesla stock between July 2018 and July 2020 – the period within which Mr. Klyushin is alleged to have material non-public information concerning multiple stocks including Tesla. Such staggering losses are the inconsistent with the Government's theory of Mr. Klyushin having advanced knowledge of material non-public stock information. Even the Government's "Weight of the Evidence Against the Defendant is Substantial" section of its memorandum outlines a gain to Mr. Klyushin and his co-conspirators in the amount of approximately $4.2 million. Furthermore, Mr. Klyushin, by education and training, lacks the skills required to hack a computer network. Indeed, Defendant Ermakov, rather than Mr. Klyushin, is alleged to be the individual that accessed the material non-public information, *see e.g.,* Indictment at ¶ 18 ("ERMAKOV used the FA 2 Employee Credentials to obtain unauthorized access…"). Whether Mr. Klyushin knew the illegal source of the information or that the information was non-

10

public will be the subject of future litigation, however, while the case is obviously at its infancy, and discovery has not yet been provided, there does appear to be significant defenses to the Indictment. In any event, the alleged strength of the Government's case is the least important factor in the bail analysis. *See. e.g., United States v. Jee Fong Low*, 2009 WL 982115, *2 (N.D.Cal.2009) ("The second factor, the weight of the evidence, is considered the least important").

Mr. Klyushin has no history of alcohol abuse or drug abuse, no criminal history (and thus no history of violating any court orders of any nature) and suffers from no significant physical impairments. *See* 18 U.S.C. §3142(g)(3). Congress specifically listed these factors as considerations for the Court, and their absence therefore should weigh in favor of Mr. Klyushin's pretrial release. Mr. Klyushin comes from a humble family background. His mother was a store clerk at a supermarket that gave birth to Mr. Klyushin when she was approximately 18 years old. Mr. Klyushin has no ties to his father, who is not even listed on his birth certificate. During his childhood, Mr. Klyushin's family was poor. He started working at the age of 13 to help provide for the family. At the age of 17, Mr. Klyushin went to college and presently holds two advanced degrees. In 2002 he graduated from the Moscow Academy of Economics and Law with a law degree. Following his graduation, he worked as an adjunct professor in the Moscow State Linguistic University while working on the U.S.-equivalent of a PhD. He was awarded the degree of Candidate of Legal Sciences in 2006 and in 2021 he received a Master's Degree in Management of State and Municipal Enterprises from the Russian Presidential Academy of National Economy and Public Administration. To this day, Mr. Klyushin continues to support his mother and his younger brother.

Mr. Klyushin married Zhannetta Kliushina in 2014. Together, the couple has three children. Mr. Klyushin also has two kids from a prior marriage. In her letter, Zhannetta describes Mr. Klyushin as "very loving husband, wonderful man and caring father." Letter of Zhannetta Kliushina, attached hereto as Exhibit 1. Others around him, including his closest friend, similarly describe Mr. Klyushin as a responsible father that never misses milestones. Letter of Anna Cherepkova, attached hereto as Exhibit 2 ("Vladislav is the best and responsible father around people I know. He never missed a single family gathering nor his children' or friends' birthday. As a father of five, he took part in preparations of every of his child 's birthday parties. He comes up with competitions and activities, makes up time plan for events. Also he decorated the house for the party."); Letter of Evgeniy Buyanov, attached hereto as Exhibit 3 ("Since then, Vladislav had four more children, and despite the fact that there were five of them, he always found time for each of them, paying attention to everyone and each individually. Despite the great personal professional workload, he knew what his children live is, what they are fond of, what victories and defeats they have, what joys and experiences. He always remained a sensitive, loving, kind husband, father, friend, and man.")

After working for the legal department of multiple companies, Mr. Klyushin founded the company M-13, which specializes in IT in the field of media monitoring. Its clients include Government entities and private corporations and it has grown to employ more than 100 people. Mr. Klyushin has no experience or specialized knowledge concerning programming. He is the founder and investor, but the company's software was developed by its employees. *See* Letter of Boris Leonov, attached hereto as Exhibit 4 ("Vladislav created the company in order to finish an information and analytical system

project, which the contractor company failed to deliver on time. But being a man of his word, and even without any actuall[y] understanding of IT industry at the time, he hired employees at his own expense and managed to complete the project.").

Mr. Klyushin treats his "employees very warmly, not even as subordinates, but as those who are near and dear to him, friends, colleagues." Exhibit 4 ("For me personally, over the years Vladislav has become more than just a company leader, but a friend on whom you can always count to give an advice or help."). Many of the people closest to him recount countless stories of his assistance in their time of need:

> In December 2015, I had an accident, I fell and the joint and several bones in my foot got fractured. I told this only to my colleague in the office and called an ambulance. A colleague passed the information to Vladislav, and he immediately sent a driver and ordered to take me to the best trauma center in our entire country. In fact, he paid out of his own funds for an expensive emergency operation and further treatment, and only thanks to his quick response and generosity, I did not become disabled and can still walk. He did all this out of the goodness of his heart. He never asked for any reimbursement of costs, and in general never touched upon the cost of treatment in our further communication.
>
> A similar situation happened with my colleague who, as a result of an epileptic seizure, received a compression fracture of the spine. It was also only thanks to Vladislav that he did not become disabled.

Exhibit 4.

> This was the case in 2018, when I asked him to assist with getting inpatient treatment for my father's oncology. This was the case last year, when, to improve my daughter's living conditions, I had to take out a mortgage loan for 5 years with a monthly payment too large for me. Having learned about this, V.D. Klyushin not only promised that the management of the company "M 13" would help me repay this mo1tgage loan ahead of schedule, but also, taking into account my conscientious attitude to work, he rewarded me several times with significant bonuses so I would be able to repay my debt to the bank as soon as possible.

Letter of Vadim Koval, attached hereto as Exhibit 5.

> The most revealing and defining story about Vladislav for me happened during my second year in the company…. One night I was awoken by a phone call from one of my colleagues who's fallen sick: he had an asthma attack and was periodically losing consciousness, he couldn't say his address or call anyone else. So the first thing I did was to call Vladislav for help. And he came through. He calmed me down, called the ER and organized the best medical care for my colleague. After that I fully understood that he wasn't someone who gave fake speeches about the importance of becoming a "work family", he really did care….

Letter of Alex Doronina, attached hereto as Exhibit 6; *see also* Letter of Olga Parshkova, attached hereto as Exhibit 7 ("I broke my leg, needed surgery. Vladislav put me in the best clinic, to the best doctor and paid for the operation and treatment. Thanks to him, I recovered. Three years ago Vladislav helped in the repair of the Sretensky Monastery in Moscow. …Vladislav repaired everything for them, of course, free of charge").

Mr. Klyushin is a deeply caring and generous person that puts others before himself. Indeed, when the global pandemic struck and businesses suffered, many let their employees go. Mr. Klyushin, however, continued to employ everyone at their prior salaries. *See* Letter of Oksana Leontieva, attached hereto as Exhibit 9 ("Vlad though about his employees first.") And, even when his company lost contracts because of his highly publicized arrest, Mr. Klyushin injected the company with his own funds to cover expenses, including employee salaries. *See* Letter of Aleksandr Badikov, CEO of M13, attached hereto as Exhibit 10.

Mr. Klyushin is simply the antithesis of a person who would abandon his commitments to anyone, including this Honorable Court. There is no evidence of any nature that Mr. Klyushin has ever been known to use or trade in false identification or aliases. Nor will the government be able to proffer any evidence that Mr. Klyushin has ever indicated any intent to flee from this investigation or any other criminal matter. Mr.

14

Klyushin challenged his extradition, consistent with his rights, which even the Government acknowledges, *see* Memorandum at 10 ("While the defendant was clearly entitled to oppose extradition…."). That, however, is not a basis to deny Mr. Klyushin pretrial release. Similarly, that the Russian Government is displeased with the extradition of its citizen is understandable. Every sovereign entity, including the United States, attempts to protect its own citizens. *See* https://www.washingtonpost.com/world/2020/01/16/us-citizens-detained-abroad-that-trump-couldnt-free/ ("Last year, President Trump claimed a winning streak for securing the release of American citizens held by foreign governments and groups. 'We are 38-0,' Trump said in September, adding that his own chief envoy on the issue had called him 'the greatest hostage negotiator of all time.'"). Attempting to protect its citizens, however, is a far cry from what the Government is attempting to suggest – that the Russian Government would forcefully remove Mr. Klyushin from this District – an argument that is not at all based on any historic precedent and an act that would likely spark an international crisis. That the Swiss authorities detained Mr. Klyushin is also of no import. Based on the undersigned's conversations with Swiss defense attorneys, detention during extradition is the norm rather than exception in Switzerland.

      Mr. Klyushin does not deny that he has assets. He fully disclosed his assets to pretrial services and proposes a bail amount that is commensurate with his wealth. Mr. Klyushin does not own any planes or helicopters and the Government has not proffered any evidence to that effect. Indeed, Mr. Klyushin was arrested after he landed in Switzerland on chartered flight. It is pure conjecture to believe that Mr. Klyushin would ever attempt to (or be successful) charter a flight out of this District. The Yacht that Mr.

15

Klyushin currently owns is likely to be handed over to creditors soon. Nor, again, would he be able to simply float away on a large Yacht in violation of all of the proposed conditions. The proposed conditions would have Mr. Klyushin living in 1-bedroom apartment next to the courthouse, under house detention, with an ankle bracelet, and would provide the Government access to extensively monitor his activities, including his phone conversations. There is simply no reason to believe that the proposed bail package would not reasonably assure Mr. Klyushin's appearance.

It is well-established that the Bail Reform Act of 1984 was created to detain only 'a small but identifiable group of persons-- it "did not signal [] a Congressional intent to incarcerate wholesale the category of accused persons awaiting trial." *US. v. Barnett*, 986 F.Supp 385, 391 (W.D.La 1997). "Rather, Congress was concerned about a small group of individuals who could not be motivated to comply with release conditions, no matter how stringent." *Barnett*, 986 F.Supp at 391. In sum, Mr. Klyushin does not fit the paradigm envisioned by Congress when it enacted the Bail Reform Act of 1984. He is not some international drug trafficker or violent mobster. To the contrary, he stands committed to lawfully defending himself in this action like he defended himself in the prior action in Switzerland.

                                                        Respectfully Submitted,
                                                        Vladislav Klyushin,
                                                        By His Attorney,

                                                        **/s/ Maksim Nemtsev**
                                                        Maksim Nemtsev, Esq.
                                                        Mass. Bar No. 690826
                                                        20 Park Plaza, Suite 1000
                                                        Boston, MA 02116
                                                        (617) 227-3700
                                                        menemtsev@gmail.com

Dated: December 21, 2021

## CERTIFICATE OF SERVICE

      I, Maksim Nemtsev, hereby certify that on this date, December 21, 2021, a copy of the foregoing documents has been served via Electronic Court Filing system on all registered participants.

                                                         **/s/ Maksim Nemtsev**
                                                         Maksim Nemtsev