UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

      v.

                                  21-CR-10104-PBS/MBB

VLADISLAV KLYUSHIN,

  a/k/a "Vladislav Kliushin"

      Defendant.

## MEMORANDUM OF THE UNITED STATES OPPOSING
## APPEAL OF MAGISTRATE JUDGE'S PRETRIAL DETENTION ORDER

      Little has changed since December 2021, when the government offered the following assessment of the defendant's risk of flight:

> Cantonal authorities arrested defendant Vladislav Klyushin in March 2021, minutes after he arrived by private jet in Sion, Switzerland. A helicopter had been waiting on the tarmac to take him and his party to Zermatt, an exclusive ski resort nearby. The defendant, who is accused of making tens of millions of dollars on illegal stock trades using financial information stolen from U.S. computer networks, was detained in Switzerland, where he vigorously opposed his extradition. So did the Russian government, a customer of the defendant's Moscow-based company, M-13, which offers services that emulate computer network attacks.
>
> Now extradited to the United States—a country with which he has no ties—the defendant faces charges and a Guidelines sentencing range that could imprison him for more than 20 years. The defendant's lack of ties to this District, the seriousness of his offense, his immense wealth, his ties to the Russian government, and that government's stated desire to return him home all combine to create a serious risk that the defendant will flee the United States, will not appear for trial, and will return to Russia—a country with which the United States has no extradition relationship. Under these circumstances, there is no combination of conditions that will reasonably assure the defendant's appearance, and the Court should detain him pending trial.

(Docket No. 23 at 1-2).

      The defendant still has no familial, professional, or community ties to the United States. All of those ties are with Russia, the country that vigorously opposed his extradition here. As

noted below, the defendant is not simply a citizen of Russia. He has significant ties to its leadership and its military intelligence community, and he claimed to a co-conspirator the ability to obtain aliases that would permit foreign travel. The defendant's significant wealth remains abroad and cannot be reliably verified. And he continues to face a lengthy term of imprisonment in a prosecution supported by substantial evidence.

For these reasons, the Court should find by a preponderance of the evidence (as Magistrate Judge Bowler did) that no condition or combination of conditions will reasonably assure the defendant's appearance at trial. *See* 18 U.S.C. § 3142(e).

I. Background

The Indictment charges the defendant and two other Russian nationals, Ivan Ermakov and Nikolai Rumiantcev, for their roles in a conspiracy to obtain unauthorized access to computer networks, and to commit wire fraud and securities fraud. (Indictment, Docket No. 8). Between approximately January 2018 and September 2020, the defendant, Ermakov, Rumiantcev, and others used stolen usernames and passwords to access the computer networks of Filing Agent 1 ("FA 1") and Filing Agent 2 ("FA 2"), and to view and download material non-public information ("MNPI") about the financial performance of publicly traded companies, before that information was filed with the Securities and Exchange Commission ("SEC") or announced to the general public. Armed with that information, the defendants and others enriched themselves by trading in the securities of those companies, generating tens of millions of dollars in profits. (Indictment, ¶ 12).[1]

---

[1] An SEC complaint charging five co-conspirators with the scheme alleged in the Indictment pegs the total profits from the hack-to-trade scheme at approximately $82.5 million. *SEC v. Klyushin et al.*, 21-cv-12088 (D. Mass. filed Dec. 20, 2021), Docket No. 1 at 2.

II.     The Defendant Has No Ties to the District of Massachusetts

As letters from the defendant's family, friends, and employees illustrate, all of his family, educational, community, professional, and charitable ties—factors the Court must consider under 18 U.S.C. § 3142(g)(3)(a)—are to Russia.  (Docket Nos. 48-1 through 48-7).  There is no comparable network of friends or family who could serve here as third-party custodians; no employment that he could be ordered to seek or maintain; and no residence to which he could be ordered confined.  Any ties to this District would be ones that the defendant purchased.  *See United States v. Acherman*, 2015 WL 4576926 (D. Mass. Jul. 3, 2015) (Sorokin, J.) (rejecting proposal that private security firm secure defendant's home confinement at a cost of approximately $35,000 per month).  Even accepting the integrity and intent of the defendant's chosen vendor, a determined adversary with the resources of a global superpower (as described below) could find a way to smuggle the defendant out of town.  *See United States v. Morrison*, 2009 WL 2973481, \*6 (E.D.N.Y. Sept. 10, 2009) ("even if I accept the often disputed proposition that a defendant's willingness to replicate a jail within his home falls within the ambit of what the Congress intended in enacting [the Bail Reform Act], defendant has not assuaged my perception that he is one of the presumably few individuals capable, both by way of ability and mind-set, of defeating such replication measures").

III.    The Defendant Claims Access to the Resources of the Russian
        Intelligence Community

On May 7, 2019, during the time of the charged conspiracy, the defendant exchanged WhatsApp messages with his co-defendant, Ermakov, regarding foreign travel.  At the time, Ermakov—himself a former Russian military intelligence officer—was subject to two indictments here in the United States that would make foreign travel risky:  one for his alleged role in a hacking and influence effort related to the 2016 U.S. elections, and a second for hacking

3

and related disinformation operations targeting international anti-doping agencies, sporting federations, and anti-doping officials. As set forth below (as translated from the Russian), the defendant suggested that it would be "Easy" for Ermakov to travel under a "different full name"; that the defendant could arrange the travel himself; and that the defendant had "checked with DVKR"—which is an acronym for the Department of Military Counterintelligence within Russia's federal security service, the Federalnaya Sluzhba Bezopasnosti ("FSB").

| From/To | Number | User | Message | Timestamp |
|---|---|---|---|---|
| 79167900085 | # TO TARGET # | lv@n | Very beautiful! | 5/7/2019 12:50:23 PM |
| 79167900085 | # TO TARGET # | lv@n | I wonder if I could do that someday! | 5/7/2019 12:50:50 PM |
| # FROM TARGET # | 79167900085 | lv@n | Easy) But under a different full name. | 5/7/2019 12:51:07 PM |
| # FROM TARGET # | 79167900085 | lv@n | I will arrange it myself. | 5/7/2019 12:51:11 PM |
| 79167900085 | # TO TARGET # | lv@n | Do you think that a different full name will do the trick? | 5/7/2019 12:51:30 PM |
| # FROM TARGET # | 79167900085 | lv@n | Yes | 5/7/2019 12:56:48 PM |
| # FROM TARGET # | 79167900085 | lv@n | 100% | 5/7/2019 12:56:52 PM |
| # FROM TARGET # | 79167900085 | lv@n | We will definitely go to Europe. | 5/7/2019 12:57:00 PM |
| # FROM TARGET # | 79167900085 | lv@n | I don't know about London or America | 5/7/2019 12:57:06 PM |
| 79167900085 | # TO TARGET # | lv@n | Well, Ok) | 5/7/2019 12:57:12 PM |
| # FROM TARGET # | 79167900085 | lv@n | I checked with DVKR | 5/7/2019 12:57:18 PM |
| 79167900085 | # TO TARGET # | lv@n | I can live with that) | 5/7/2019 12:57:28 PM |
| # FROM TARGET # | 79167900085 | lv@n | Lets not delay and start traveling now) | 5/7/2019 12:57:37 PM |
| 79167900085 | # TO TARGET # | lv@n | I got the hint and I am working in that direction) | 5/7/2019 12:58:04 PM |
| # FROM TARGET # | 79167900085 | lv@n | [thumbs up emoji] and [winking face with tongue emoji] | 5/7/2019 12:58:26 PM |

This conversation, in which the defendant claims both access to the DVKR and the ability to arrange travel under a different full name, bears directly on the risk that he will flee the United States, as the defendant himself concedes. Def. Mem. at 16 ("Evidence supporting a finding of a serious risk of flight includes skill in avoiding surveillance, prior flight from law enforcement, and use of aliases.")

Nor is the defendant's reference to the DVKR an isolated connection to Russia's government and leadership. The defendant is not simply one of Russia's approximately 144 million citizens. He holds the below-pictured Medal of Honor, awarded in June 2020 by the president of the Russian Federation, Vladimir Putin.



The defendant received a separate award from the FSB (Russia's federal security service and a successor to the KGB) on November 27, 2017. Pictured below, and as translated from the Russian, that citation states: "We express our sincere gratitude to you for the productive and effective collaboration in ensuring security of the Russian Federation in the information sphere." The award is signed by the Deputy Director of the FSB, General Colonel A.N. Kupryazhkin.



In the same image but on the right, the defendant is pictured at an event that appears to commemorate Mikhail Kalashnikov, the inventor of the rifle bearing his name. The defendant appears next to (and shaking hands with) one of Russia's First Deputy Ministers of Defense, Ruslan Khadzhismelovich Tsalikov.

5

The defendant also possessed a photo of a personally engraved lithograph depicting FSB headquarters dated the same day that he received the award above, November 27, 2017.



The defendant is accordingly an individual with significant ties to the Russian government, and, more specifically, to parts of the Russian government engaged in defense and counter-espionage. It is those ties, and not his citizenship alone or the lack of an extradition treaty with Russia, that combine with the other Bail Reform Act factors to create a serious risk that he will flee. *See*, *e.g.*, *United States v. Boustani*, 356 F. Supp.3d 246, 255 (E.D.N.Y. 2019) ("Each factor is not considered in isolation. … The combination of Defendant's alleged deceptive actions, access to substantial financial resources, frequent international travel, complete lack of ties to the United States, and extensive ties to foreign countries without extradition demonstrate defendant poses a serious risk of flight").[2]

### IV.  The Defendant's Wealth is Unaccounted For

In rejecting the defendant's application for bail, the appellate chamber of the Swiss

---

[2] Before Magistrate Judge Bowler ordered the defendant detained, the defendant produced a letter from the Russian Consulate in which that body committed not to help the defendant flee. Judge Bowler noted in ordering the defendant detained that she had not received such a consular letter in her more than 30 years on the bench. The letter, whatever its content, reinforces the government's fear that defendant Klyushin is a citizen with special access to the capabilities of the Russian government.

6

federal court noted that the 1.5 million Swiss Francs that the defendant proposed as security was "little more than one [year's] annual income of the appellant. It is not to be considered substantial."[3] The court further questioned the accuracy of the financial information that the defendant had provided it:

> In addition, it is not possible to reliably ascertain the financial capacity of the appellant since he resides abroad and does not disclose his assets in a transparent and verifiable manner.

(*Translation of Swiss Extradition Decision*, ¶ 8.3, Exhibit A hereto).

This court faces a similar challenge, as it does not appear that the defendant fully disclosed his financial affairs to the U.S. Probation Office. The bail report indicates that the defendant reported through counsel that he held in excess of $1,000,000 in securities, and that his securities and brokerage accounts had been seized by the government. The government's detention exhibits, however, establish that the defendant held more than $6.8 million in securities in an account in the defendant's name at Denmark's Saxo Bank as recently as February 29, 2020:



Additional records obtained from Saxo, marked as Government Exhibit 3 for the

---

[3] Defendant reported $1.49 million in 2020 earnings to the U.S. Probation Office.

detention hearing, revealed nearly $9 million in transfers to accounts in the defendant's name in Russia. The last two of the transfers occurred in April 2021, after the defendant was arrested in Switzerland.



Source: *Detention Hearing*, Government Exhibit 3, page 1.

Source: *Detention Hearing*, Government Exhibit 3, page 2.

      As a result—even saying nothing further about the safe full of cash and the $3.97 million luxury yacht that the defendant purchased in March 2020 (Docket No. 23 at 3-4)—it is entirely unclear how much money the defendant has, and where it sits today. Any audit that the defendant paid for (Docket No. 48 at 9 n.4) would be, as the Swiss tribunal concluded, unreliable. This is a particular concern in the current geopolitical climate, where independent accounting firms, on whom the defendant would rely to audit his financial statement, Def. Mem. at 9 n.4, are refusing to do business in Russia. *See, e.g.*, https://www.cpapracticeadvisor.com/accounting-audit/news/21259561/big-4-accounting-firms-cease-operations-in-russia (reporting that PricewaterhouseCoopers (PwC), KPMG, Ernst & Young, Deloitte, and BDO LLP had or would soon announce ceasing operations or withdrawing

from member firms within Russia) (last visited April 21, 2022). The Court cannot fashion reasonable checks on the defendant without knowing the true extent of his finances—and the true extent of his finances are impossible to know or verify. *See United States v. Anderson*, 382 F. Supp.2d 13, 17 (D.D.C. 2005) (finding significant risk of flight where millions of dollars in assets at one time controlled by defendant or his corporations "remain unaccounted for overseas").

> V.     Substantial Evidence Supports the Charges in the Indictment

The evidence in this case amply demonstrates the defendant's involvement in the conspiracy charged in the Indictment.

As set forth in the Complaint, on October 24, 2018—just hours after intruders gained unauthorized access to Tesla's draft earnings release on FA 2's network, and the same day that the defendant and a co-conspirator, Mikhail Irzak, purchased shares of Tesla in their respective brokerage accounts, the defendant sent the following message to two individuals whose investment accounts M-13 controlled (and whose accounts had traded in parallel with the defendant and Irzak): "Pay attention to shares of Tesla now and tomorrow after 16:30 and on how much they go up." The defendant sent this message when Tesla's financial results were still non-public. Tesla later reported positive third quarter results after the market closed that day. (Compl. Aff. ¶¶ 72-73).[4]

The defendant and Ermakov later congratulated each other on profits they had earned for

---

[4] It is irrelevant that the defendant claims not to know all of the other traders personally. A defendant charged with conspiracy need only share its object, not have an encyclopedic knowledge of its participants and each of its overt acts. It is nevertheless curious that the defendant claims to know the travel and financial affairs of co-conspirators whom he says he does not know. (Docket No. 48 at 10) (claiming that the government has not pursued Irzak and Sladkov, who, "upon information and belief", have travelled internationally).

the M-13 investors. In a text message exchange approximately seven months after the Tesla trading, the defendant reported to Ermakov that one investor had made profits of close to $1 million over that period, nearly tripling his investment, and that a second had made profits of close to $700,000, nearly doubling his investment. The defendant added: "They don't even ask why so anymore [smile]." (Compl. Aff. ¶ 77).

The government has also previously described text messages in which the defendant and Ermakov discuss making money not by working, but by "just turn[ing] on the computer". (Docket No. 23 at 8).

Beyond communications summarized in the charging documents, however, the voluminous evidence in this case includes communications among the conspirators over encrypted messaging platforms in which they discuss their criminal conspiracy in raw, unvarnished terms. As just one example, in the exchange set forth below, the defendant's two co-defendants, Ermakov and Rumiantcev, discuss an elaborate subterfuge to conceal the illicit source of the material non-public information on which they are trading, in order to make it seem that their trades are the product of genuine research based on "open source[s]" and "mass media analysis":

| Author | Content | Date/Time (ET) |
|---|---|---|
| Rumiantcev | Thoughts are: we have a system for the mass media analysis, which collects data from the media and social networks. **We will modify it somehow so that a third-party analyst would think the materials have been found in an open source.** Then we will look for an analyst through our acquaintances and will try to offer to him to make a forecast perhaps on ten securities. In case he will work well - **we will lure him in to work for us.** | 2/1/2019 2:32:59 PM |
| Rumiantcev | We will be adapting the raw material while preserving the essence, **but there would be no chance of passing it *AS IS*.** | 2/1/2019 2:33:59 PM |

| Rumiantcev | I think that it may work out that we will produce a test system in a couple of months. | 2/1/2019 2:34:52 PM |
|---|---|---|
| Ermakov | The main problem here is that **should he realize that the data is real, he could start using it on the side or be selling it.** | 2/1/2019 3:05:57 PM |
| Rumiantcev | I don't think one can hedge of all risks 100%. A broker resolves similar issues by signing confidentiality agreements - in fact there are managers who see all the transactions of all customers. | 2/1/2019 3:09:34 PM |
| Rumiantcev | **And if we want to really protect ourselves, we can create fake documents to mix with the real or just old ones - in this case they would lose their values; after all, only we will know what forecasts are based on real data** | 2/1/2019 3:10:38 PM |

These messages demonstrate that the conspiracy was trading on "real data", as the Indictment alleges.

In a later exchange, Ermakov and Rumiantcev warned the defendant to be more careful with his electronic communications—despite the fact that they were speaking over an encrypted messaging platform—lest he "end up as a defendant in a court room."

| Author | Content | Date/Time (ET) |
|---|---|---|
| Klyushin | So… | 7/18/2019 4:31:42 PM |
| Klyushin | What did we earn today? | 7/18/2019 4:31:50 PM |
| Klyushin | [Photograph of investor] | 7/18/2019 4:32:05 PM |
| Ermakov | About 350 and another 350 in the mind. | 7/18/2019 4:32:14 PM |
| Klyushin | [Photograph of second investor] | 7/18/2019 4:32:15 PM |
| Ermakov | Sasha [Aleksandr] the most among the rest | 7/18/2019 4:32:27 PM |
| Klyushin | Our comrades are wondering) | 7/18/2019 4:32:29 PM |
| Ermakov | Vlad, you are exposing our organization. This is bad. | 7/18/2019 4:32:41 PM |
| Rumiantcev | Vlad stop sending to [encrypted chat application] | 7/18/2019 4:32:44 PM |
| Klyushin | So sorry. | 7/18/2019 4:32:50 PM |

11

| Ermakov | And that's how they get you and you end up as a defendant in a court room. | 7/18/2019 4:32:58 PM |
|---|---|---|
| Klyushin | Removed. | 7/18/2019 4:33:02 PM |
| Klyushin | Open a chat with us already. | 7/18/2019 4:33:17 PM |
| Ermakov | Go ahead and create. | 7/18/2019 4:33:29 PM |
| Ermakov | It was a bad move now. | 7/18/2019 4:33:59 PM |
| Klyushin | Sorry | 7/18/2019 4:36:02 PM |
| Klyushin | Did a dumb thing. | 7/18/2019 4:36:15 PM |
| Rumiantcev | I suggest to re-create the chat with the deletion of attachments in [encrypted chat application] or switch to ours if ready. | 7/18/2019 4:39:28 PM |
| Klyushin | I will delete this one on my end | 7/18/2019 4:39:52 PM |

The FBI located these messages among Rumiantcev's electronic communications, and not the defendant's, which suggests that the defendant did exactly what he said he would do: delete the incriminating messages.

VI.     The Defendant Faces a Substantial Sentence Under the Guidelines

The government has not "improperly inflate[d] the gravity of the claimed offenses." The three substantive offenses with which the defendant is charged—violations of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1030(a)(4) (unauthorized access to computers), and 15 U.S.C. § 78j(b) & 78ff(a) (securities fraud)—are each referred by the Guidelines' Appendix A to U.S.S.G. § 2B1.1. The losses from these counts would group under § 3D1.2(d), as would (as the defendant points out) the substantial damage the defendant and his co-conspirators caused the Filing Agent victims. The government respectfully submits that its Guidelines estimate of 262 to 327 months is appropriate. Even under the defendant's proposed calculation, based simply on the conspiracy's gains from his trading, the defendant faces a Guidelines sentencing range of between 121 and 151 months in prison, which alone (and especially in combination with the

other Bail Reform Act factors) would create a substantial motive to flee.

  VII. <u>The Defendant Has Extraordinary Access to Counsel and Discovery</u>

As a final ground for release, the defendant argues that his pre-trial detention deprives him of access to counsel and curtails his ability to review discovery. (Def. Mem. at 22-23).

The government agrees that it has produced substantial discovery to the defendant, including electronic communications among the defendant, Ermakov, and Rumiantcev. That the discovery is substantial, however, and that defendant estimates it would take him more than twenty years to review the production, does not counsel his release.

As an initial matter, it is not realistic for any party to this case to review, page by page, each of the million-plus files produced. The government has produced an index of the discovery as required by Local Rule 116.10. It has also, at six-figure expense, contracted to re-produce the entire production in a searchable, Bates-stamped format. In the interim, while the government's contractor prepares that database (which it will share with the defense in a load-ready format), the government has also produced both searchable Cellebrite extractions and searchable spreadsheets of the defendant's, Ermakov's and Rumiantcev's electronic communications.[5] By the time of the hearing in this matter, the government will have also produced an extraction of key documents (and a further index of where within the automatic discovery production they may be found). In short, the defendant and his counsel have access to substantially all of the discovery in the same format that the government does. Where that is not the case, the defendant

---

[5] The defendant questions the accuracy of these reports (and more generally the reliability of the automatic discovery) because they contain a copy of Judge Bowler's digital signature, Def. Mem. at 25 & Exh. 12. Simply put, her signature (and the digital signature of FBI Special Agent Kang, the affiant) appear within the reports because Apple re-produced the warrant and related paperwork to the government after having been served with those documents, as part of its response to the warrant, and the government, in turn, produced them to the defense.

has made discovery requests that the government has responded to, such as by undertaking to convert pen register and trap and trace data to a searchable format.

Officials at the Plymouth County House of Corrections ("PCH") have advised that defendant has extraordinary access to both his counsel and the substantial discovery. Although PCH detainees typically receive 6 hours of access to discovery per week, PCH has provided the defendant with more than three times that amount, making available a total of 20 hours per week of discovery access time. Nevertheless, access logs indicate that, despite claiming an inability to access discovery in the case, the defendant rarely takes advantage of this additional time and has never used all of his allotted weekly hours. (Exhibit B hereto). The defendant also has and uses two hours of daily telephone access to counsel—time that is separate from what PCH provides for review of discovery. On this record, it is incorrect to suggest that the defendant is not being given a meaningful and reasonable opportunity to participate in his defense.

The defendant similarly asserts that the facility has not permitted him to use Russian translation software "or other software necessary to aid his review." PCH officials advise that they have installed both Babylon translation software (on April 15, 2022) and Sysinfo SQL Viewer, a specialized reading software needed to review SQLite databases (on March 31, 2022). As noted above, the government has also voluntarily processed and reproduced portions of the automatic discovery—including otherwise encrypted messages among the defendant and his co-conspirators—into files that can be accessed with standard Microsoft software.[6]

In summary, the defendant has been in custody in the United States for only four months. The government has produced automatic discovery; it is responding to discovery requests; and it

---

[6] PCH has, for security reasons, declined to provide the defendant with a keyboard that bears Cyrillic lettering.

has undertaken at significant expense the process of facilitating and simplifying the defendant's access to the evidence in the case. The defendant, who has access that exceeds what detainees typically receive, does not present a record on which the Court should bypass all of the risks associated with his release. *See United States v. Ho*, 2016 WL 5875005, *9 (E.D. Tenn. Oct. 7, 2016) (rejecting relationship between "complex facts and discovery" and "whether the defendant will appear").

CONCLUSION

The government respectfully submits that it has demonstrated by a preponderance of the evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance at trial.  The defendant is here against his will, and against the will of his government.  There is little to suggest that a significant bond, a location monitoring device, or a bought-and-paid for security service would adequately assure the defendant's appearance.  If the defendant flees to Russia, whether by air, sea, or land crossing, there will be no mechanism for the United States to secure his return, and none of the three defendants would face charges in this case.  *See United States v. Dermen*, 779 Fed. Appx 497 (10th Cir. 2019) (reporting district court's flight risk finding based on, among other things, the defendant's ownership of a yacht, overseas bank accounts, overseas residence, access to a private plane; and the Turkish President's public commitment not to honor extradition requests from the United States).  Under these circumstances, the Court should affirm Magistrate Judge Bowler's order of detention.

    Respectfully submitted,

    RACHAEL S. ROLLINS
    United States Attorney

    By: __/s/Seth B. Kosto_____
    STEPHEN E. FRANK
    SETH B. KOSTO
    Assistant U.S. Attorneys

    Date: April 22, 2022

CERTIFICATE OF SERVICE

       The undersigned Assistant United States Attorney hereby certifies that a true copy of the Memorandum of the United States Opposing Appeal of Magistrate Judge's Pretrial Detention Order will be served on counsel of record in this matter through the Court's Electronic Case Filing system.

                                          */s/Seth B. Kosto*_____
                                          SETH B. KOSTO
                                          Assistant United States Attorney

                                          April 22, 2022