UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 21-10104-PBS |
| ) | |
| VLADISLAV KLYUSHIN, ) | |
| ) | |
| Defendant. ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS COUNT IV AND TO PARTIALLY DISMISS COUNT I**

The government respectfully opposes defendant Vladislav Klyushin's motion to dismiss Count Four of the Indictment, charging securities fraud, and so much of Count One as charges conspiracy to commit that crime. Citing no precedent that supports his position, the defendant asks this Court to reject a 13-year-old decision of the Second Circuit Court of Appeals that has been cited in securities law textbooks and to find, as a matter of law, that the use of affirmative misrepresentations to steal material non-public information is not "deceptive" conduct under the securities fraud statute absent the breach of a fiduciary duty. The Court should decline the defendant's invitation to create new law, as the Supreme Court recently did when it denied a petition for certiorari challenging criminal liability on the very fact pattern charged in this case.

**Background**

On April 6, 2020, a federal grand jury in this District indicted Klyushin, who is the owner of M-13, a Russian information technology company. The Indictment charges one count of conspiracy to obtain unauthorized access to computers, and to commit wire fraud and securities fraud (Count One), and substantive counts of obtaining unauthorized access to computers (Count Two), wire fraud (Count Three), and securities fraud (Count Four). *See* Dkt. 8. The charges allege

that the defendant was involved, with multiple co-conspirators, in a scheme to trade in the securities of publicly traded companies on the basis of material non-public information ("MNPI") about the financial performance of those companies. *Id*. The conspirators allegedly obtained the MNPI by gaining unauthorized access to the computer networks of two U.S.-based filing agents—vendors that publicly traded companies use to file quarterly and annual financial reports with the Securities and Exchange Commission ("SEC"). *Id*.[1]

As set forth in the Indictment, Klyushin's company purports to offer a variety of cyber security services, including penetration testing—a form of simulated cyberattack that seeks out vulnerabilities in computer systems that can be exploited to gain unauthorized access to those systems. *Id*. ¶ 4. Among its purported clients are various Russian federal ministries, including the office of the President of the Russian Federation. *Id*. ¶ 5.

The Indictment alleges that Klyushin—together with M-13 employees and co-conspirators Ivan Ermakov and Nikolai Rumiantcev, and others—engaged in a scheme to defraud that involved using malicious computer software to steal the network usernames and passwords of several filing agent employees. *Id*. ¶¶ 12, 14(a)-(c). Using the stolen credentials, the conspirators allegedly misrepresented themselves as employees of the filing agents in order to access the victims' computer networks. *Id*. The conspirators allegedly sought to conceal their actions in a variety of ways, including by "leasing proxy (or intermediary) computer networks outside of Russia that obscured the origin of their attacks," and by "subscribing to email addresses and payment systems . . . in others' names." *Id*. ¶ 14(d)-(e). Once inside the filing agents' networks, the conspirators allegedly viewed or downloaded the financial disclosures of hundreds of publicly traded

---

[1] Klyushin was arrested in Switzerland in March 2021 and extradited to the United States in December 2021. Dkt. 1.

companies, including quarterly and annual reports that had not yet been filed with the SEC or disclosed to the public. *Id*. ¶¶ 12, 14(f)-(g). They then used that MNPI to trade in the securities of those companies—including by purchasing securities of companies that were about to disclose positive financial results and selling short the securities of companies that were about to report negative financial results—thereby earning illicit profits totaling tens of millions of dollars. *Id*.

As one example, the Indictment alleges that on or about October 22, 2018, Ermakov or another co-conspirator used the stolen username and password of an employee of Filing Agent 2 to gain access to the filing agent's computer network through an IP address hosted at a data center in Boston, and to view the quarterly financial results of a publicly traded company, Capstead Mortgage Corp., prior to the public announcement of those results. *Id*. ¶¶ 19, 21. The very next morning, still prior to the public announcement of Capstead's results—which lagged market expectations—Klyushin or another co-conspirator entered an order to short Capstead's shares in one of Klyushin's brokerage accounts. *Id*. ¶¶ 20-21. As a second example, the Indictment alleges that one day later, Ermakov or another conspirator used the same employee username and password to again access the computer network of Filing Agent 2, and to view the quarterly financial results of another publicly traded company, Tesla, Inc., prior to the public announcement of those results. *Id*. ¶ 22. Later that same day, prior to the public announcement of the results—which exceeded market expectations—Klyushin or another co-conspirator entered an order to purchase Tesla shares in Klyushin's brokerage account, and Klyushin sent the following message to two individuals (identified in the Indictment as Individuals 1 and 2) to whom the conspirators provided investment management services in exchange for a share of the profits: "Pay attention to shares of Tesla now and tomorrow after 16:30 and on how much they go up." *Id*. ¶¶ 6, 23. As a third example, the Indictment alleges that on or about July 28 and July 29, 2019, Ermakov or

3

another co-conspirator used stolen employee credentials to access Filing Agent 2's network and to view the earnings-related files of a third publicly traded company, SS&C Technologies, Inc. *Id*. ¶ 27.  On or about July 29, Klyushin or another co-conspirator entered an order to short SS&C shares in one of Klyushin's brokerage accounts, and the conspirators also shorted the company's shares in other accounts, including those of Individuals 1 and 2, shortly before SS&C announced that it was lowering its profit forecast.  *Id*. ¶¶ 28-29.

The Indictment alleges that the conspirators took other affirmative steps to hide their scheme from the brokerage firms they used to place their illicit trades, including by falsely advising an employee of a Danish brokerage firm that their trades were based on their analysis of publicly available information, such as historical data and social media postings. *Id*. ¶ 39.

## Argument

I.  The Charged Fraud Involved Affirmative Misstatements in Connection with
    The Purchase and Sale of Securities, in Violation of Established Precedent

Klyushin contends that the securities fraud and related conspiracy charges should be dismissed because he owed no "fiduciary-type duty . . . to any information source." Dkt. 96 at 7. Accordingly, he argues, "he could not have breached" such a duty "in connection with the purchase and sale of a security," and his alleged crime therefore "does not amount to a violation" of securities law. Klyushin thus advances the proposition that, *as a matter of law*, it does not violate securities law to (1) steal someone's identity, (2) masquerade as that person to access password-protected computer systems and to view or download the MNPI of dozens of publicly traded companies; (3) trade in the securities of those companies on the basis of that stolen MNPI; and (4) thereby earn tens of millions of dollars in illicit trading profits. That remarkable contention is contrary to longstanding precedent interpreting Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), including two Second Circuit cases, decided more than a decade apart, the first of

4

which is cited in law school textbooks as delineating an established form of securities fraud. Klyushin's argument also ignores the Supreme Court's admonition that, because a key purpose of the Exchange Act is "to insure honest securities markets and thereby promote investor confidence," Section 10(b) "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes." *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (citations and internal quotation marks omitted).

    A.    <u>Applicable Law</u>

        1.    <u>Section 10(b) and Rule 10b-5</u>

Section 10(b) of the Exchange Act makes it a crime "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of" the rules and regulations promulgated by the SEC. 15 U.S.C. § 78j(b). Those rules, in turn, provide that it is unlawful, "in connection with the purchase or sale of any security[,]"

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[.]

17 C.F.R. § 240.10b-5.

The Supreme Court has made clear that "[t]hese proscriptions, by statute and rule, are broad and, by repeated use of the word 'any,' are obviously meant to be inclusive." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972); *cf. Zandford*, 535 U.S. at 819–20 ("While the statute must not be construed so broadly as to convert every common-law fraud that

happens to involve securities into a violation of § 10(b). . . neither the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Act.") (further citations omitted).

### 2. *Dorozhko* and its progeny

More than thirteen years ago, in *SEC v. Dorozhko*, 574 F.3d 42 (2d Cir. 2009), the Second Circuit considered the case of a Ukrainian national charged with trading on the basis of MNPI obtained by hacking into a computer server maintained by Thompson Financial, Inc., an investor relations company, and downloading the quarterly earnings report of one of its publicly traded clients, IMS Health, Inc., prior to the public dissemination of that report. *Id*. at 44. Reversing the district court's conclusion that "that computer hacking was not 'deceptive' within the meaning of Section 10(b)" because "a breach of a fiduciary duty of disclosure is a required element of any 'deceptive' device" under that provision, the Second Circuit concluded that Section 10(b) does not require a breach of a fiduciary duty in cases involving affirmative misstatements (as opposed to those involving silence in the face of an alleged duty to disclose). *Id*. at 45 (further citation omitted). Accordingly, a unanimous panel of the court found, in an opinion written by Judge Cabranes, that trading on the basis of stolen MNPI *does* violate Section 10(b) where the MNPI is obtained by computer hacking that involves an affirmative misstatement: "misrepresenting one's identity in order to gain access to information that is otherwise off limits, and then stealing that information." *Id*. at 51.

In reaching its conclusion, the *Dorozhko* Court reviewed a series of Supreme Court precedents construing "deceptive" conduct within the meaning of Section 10(b) and its implementing regulations. *Id*. None of those cases, the court found, established "a fiduciary-duty requirement as an element of *every* violation of Section 10(b)." *Id*. at 48 (emphasis added).

Instead, the court noted, the cases—which involved allegations of "silence or nondisclosure," and *not* affirmative misstatements—stood for the more limited proposition that silence is actionable under Section 10(b) "only where there [is] a duty to speak, arising from a fiduciary relationship." *Id*. Stressing the distinction between cases alleging a failure to disclose and cases alleging affirmative misrepresentations, the court noted that "[e]ven if a person does not have a fiduciary duty to 'disclose or abstain from trading,' there is nonetheless an affirmative obligation in commercial dealings not to mislead." *Id*. at 49 (citing *Basic Inc. v. Levinson,* 485 U.S. 224, 240 n.18 (1988), as "distinguishing 'situations where insiders have traded in abrogation of their duty to disclose or abstain,' from 'affirmative misrepresentations by those under no duty to disclose (but under the ever-present duty not to mislead)'").

Applying its reasoning to the case before it, *Dorozhko* held that the SEC's allegations—that the defendant had "affirmatively misrepresented himself in order to gain access to material, nonpublic information, which he then used to trade"—was a "straightforward theory of fraud" cognizable under Section 10(b). *Id*. "Absent a controlling precedent that 'deceptive' has a more limited meaning than its ordinary meaning," the Court concluded, "we see no reason to complicate the enforcement of Section 10(b) by divining new requirements." *Id*. It continued: "In our view, misrepresenting one's identity in order to gain access to information that is otherwise off limits, and then stealing that information is plainly 'deceptive' within the ordinary meaning of the word." *Id*. at 51. The court remanded the matter for consideration whether the alleged hacking in fact involved "engag[ing] in false identification and masquerade[ing] as another use"—which the court found *would* be "a fraudulent misrepresentation that was 'deceptive' within the ordinary meaning of Section 10(b)"—or whether it involved some other form of intrusion, such as "exploit[ing] a weakness in [an electronic] code within a program to cause the program to malfunction in a way

7

that grants the user greater privileges," which would *not* constitute deceptive conduct under Section 10(b). *Id*. at 50-51.

Though *Dorozhko* was decided more than a decade ago, the government is unaware of any case—and the defendant cites none—in which any court has ever disagreed with its conclusions. To the contrary, the holding has literally become a textbook case for the application of Section 10(b) to computer hacking cases, and for distinguishing hacking-to-trade from other forms of insider trading based on the classical or misappropriation theories. *See, e.g.,* Stephen J. Choi and A.C. Pritchard, *Securities Regulation: Cases and Analysis* 471–75 (5th Ed. 2019) (excerpting *Dorozhko* at length and describing it as offering an alternative to the misappropriation theory).[2]

Most recently, the Second Circuit revisited a similar fact pattern, this time in a criminal context, in *United States v. Khalupsky*, 5 F.4th 279 (2d Cir. 2021), *cert. denied sub nom. Korchevsky v. United States*, 142 S. Ct. 761 (2022). In that case, the government alleged that the defendants, an investment adviser and the owner of a trading company, traded on the basis of MNPI obtained by using stolen login credentials to access the databases of three newswire companies—PR Newswire, Marketwire, and BusinessWire—and to download the pre-publication press releases of multiple publicly traded companies. *Id*. at 286. On appeal, the defendants conceded that, to the extent the credentials were stolen by spear phishing—a technique that involves sending "a misleading email to an account user in order to deceive that user into providing the hacker with his login credentials"—the conduct would be "deceptive" for purposes of Section 10(b). *Id*. at 290 n.29. But, they argued, to the extent the hackers obtained the login credentials

---

[2] The classical theory of insider trading targets trading on the basis of MNPI by a corporate insider (or tippee) in violation of "a fiduciary duty owed directly to the traded corporation or its shareholders." Choi and Pritchard, *supra*, at 471. The misappropriation theory targets trading on the basis of MNPI in violation of a "fiduciary duty, or similar duty of trust or confidence, owed to a third party source of the information." *Id.*

using a *different* technique—a so-called "SQL injection," which "enabled them to glean the architecture of the hacked computer system, identify vulnerabilities, and extract data"—the conduct would not be deceptive under the statute. *Id*. at 291. The Second Circuit, in a unanimous panel decision authored by Judge Walker, rejected that argument, finding that regardless of *how* the credentials were stolen, "the subsequent use of stolen employee login credentials to gain further system access was deceptive." *Id.* The court explained: "Every time the hackers attempted to access parts of the system by entering stolen credentials, they misrepresented themselves to be authorized users," thereby bringing their conduct within the scope of the securities fraud statute. *Id.* (citing *Dorozhko*, 574 F.3d at 51). Earlier this year, the Supreme Court rejected the defendants' petition for a writ of certiorari—one that presented arguments remarkably similar to those Klyushin presses here. *See Korchevsky*, 142 S. Ct. at 761; *see also Korchevsky, v. United States*, Petition for Writ of Cert., 2021 WL 4918121, at *23 (arguing that *Dorozhko* and *Khalupsky* "decouple[] the fraud and deception required for securities law violations from any duty that gives rise to the fraud except an esoteric duty to the general market").

    B.    The Charged Conduct Fits Squarely Within the *Dorozhko-Khalupsky* Line of Cases

Klyushin does not, because he cannot, dispute that the precedents described above directly address the conduct alleged in the Indictment. As in *Dorozhko* and *Khalupsky*, Klyushin and his co-conspirators are alleged to have affirmatively misrepresented themselves to be employees of the victim filing agents by using the employees' stolen login credentials to access the filing agents' computer networks and to view or download the financial results of dozens of publicly traded companies that had not yet been filed with the SEC or disclosed to the public. *See* Dkt. 8 at ¶¶ 12, 14(a)-(c), (f)-(g). And as in the earlier cases, the conspirators are alleged to have used that illicitly obtained MNPI to profit by trading in the securities of those companies. *Id*. The

Indictment thus alleges a "straightforward theory" of securities fraud: that the defendant and his co-conspirators used and employed deceptive devices and contrivances "within the ordinary meaning of Section 10(b)" in connection with the purchase and sale of securities. *See Dorozhko*, 574 F.3d at 51. More is not required. *See id*. at 49 ("we see no reason to complicate the enforcement of Section 10(b) by divining new requirements").

II.     Klyushin's Remaining Textual and Policy Arguments Are Without Merit

Faced with this established precedent and unable to cite any contravening authority, Klyushin invites this Court to break new ground by rejecting the *Dorozhko-Khalupsky* line of cases and to hold, as a matter of law, that securities fraud requires the breach of a fiduciary or fiduciary-like duty in all circumstances. Dkt. 96 at 15 (describing the breach of duty as "stock fraud's linchpin"). Klyushin asserts that the Second Circuit's holdings in *Dorozhko* and *Khalupsky*—penned by two judges with more than 60 years of experience on the preeminent court for securities law in the country,[3] and joined unanimously by four other judges—are contrary to the "plain language" of Section 10(b), *id*. at 10, are "unfounded [and] illegitimate," *id*. at 9, defy "simple common sense," *id*. at 11, and conflict with the rule of lenity, because—even though *Dorozhko* was decided more than 13 years ago—Klyushin "had no reason to suspect" that his conduct could be *criminally* prosecuted "in the absence of a fiduciary relationship or a similar duty of trust and

---

[3] Justice Blackmun referred to the Second Circuit as "[t]he 'Mother Court' of securities law," *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 762 (1975) (Blackmun, J., dissenting), and courts in the First Circuit have likewise acknowledged "the particular expertise of the Second Circuit in this area," *SEC v. Spivak*, 194 F. Supp. 3d 145 (D. Mass. 2016) (quoting *SEC v. Andrade*, 157 F. Supp. 3d 124, 127 (D.R.I. 2016)).

confidence," *id.* at 13.  These arguments—largely undeveloped, presented in summary fashion, and repeatedly citing the work of "commentators" (a law-school student note),[4] are without merit.

First, Klyushin contends that the *Dorozhko* court erred by "consulting applicable caselaw" in construing Section 10(b), because "absent grievous ambiguity," the court should have "start[ed] and end[ed]" its analysis with the plain language of the statute.  Dkt. 96 at 10.  Remarkably, Klyushin then goes on, in the same brief, to argue that the statute's use of the term "deceptive device" is "at least 'ambiguous.'"  *Id.* at 12; *see also Chiarella v. United States*, 445 U.S. 222, 226 (1980) ("Although the starting point of our inquiry is the language of the statute, § 10(b) does not state whether silence may constitute a manipulative or deceptive device.  Section 10(b) was designed as a catch-all clause to prevent fraudulent practices.  But neither the legislative history nor the statute itself affords specific guidance for the resolution of this case."); *United States v. McGee*, 763 F.3d 304, 313 (3d Cir. 2014) (concluding that Section 10(b) "is ambiguous because Congress declined to define the amorphous term 'deceptive device,'" and noting that the statute "does not mention insider trading at all, much less misappropriation or relationships required for liability").  In any event, the contours of securities fraud law, particularly in the context of insider trading, have long been defined by judicial interpretation, as the implementing regulations themselves make clear.  *See* 17 C.F.R. § 240.10b5-2 (noting that "[t]he law of insider trading is otherwise defined by judicial opinions construing Rule 10b–5").

Second, Klyushin argues that the text of the implementing regulation, Rule 10b-5, "equates affirmative misrepresentations and material omissions or nondisclosures, treating them as coterminous and qualitatively synonymous for purposes of securities fraud liability."  Dkt. 96 at

---

[4] *See, e.g.*, Dkt. 96 at 5 & n.21, 6 & nn.29, 31, 7 & n.33, 9 & nn.45, 47 (citing Elizabeth A. Odian, *SEC v. Dorozhko's Affirmative Misrepresentation Theory of Insider Trading: An Improper Means to A Proper End*, 94 MARQ. L. REV. 1313 (2011) (law-school student note)).

10. Accordingly, he argues, "the rule's plain language contradicts if not precludes any effort" to suggest that omissions liability requires a fiduciary-type breach, while liability for affirmative misrepresentations does not. *Id*. But the plain language of the rule does no such thing. Indeed, while Rule 10b-5 explicitly forbids affirmative misstatements (and half-truths), it does not mention pure omissions at all. And the Supreme Court itself in *Chiarella* acknowledged the distinction between misstatements and omissions, noting that "[a]t common law, misrepresentation made for the purpose of inducing reliance upon the false statement is fraudulent. But one who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so." 445 U.S. at 227–28.

The defendant's reading is also inconsistent with decades of securities law jurisprudence distinguishing between omissions—which are *not* actionable absent a duty to disclose—and misstatements, which are. *See, e.g.*, *SEC v. Pirate Investor LLC*, 580 F.3d 233, 239–40 (4th Cir. 2009) ("Section 10(b) requires that a defendant act deceptively in order to fall within the coverage of the statute. Deceptive acts include misstatements, omissions by those with a duty to disclose, manipulative trading practices, and deceptive courses of conduct.*"); SEC v. Familant*, 910 F. Supp. 2d 83, 91 (D.D.C. 2012) ("The most common forms of 'deceptive device or contrivance,' . . . are omissions by someone who has a duty to disclose and misstatements."); *In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 398–99 (D.N.J. 2004) ("Defendants can be liable for both affirmative misstatements and misleading omissions. Omissions, however, can give rise to liability only where the defendant had an affirmative duty to disclose the information in question. . . ."); *In re Kidder Peabody Sec. Litig.*, 10 F. Supp. 2d 398, 406 n.9 (S.D.N.Y. 1998) ("Fiduciary duty analysis arises in securities cases only where a claim is based on alleged omissions. In contrast, here plaintiffs allege not omissions but rather affirmative misstatements.") (further citations omitted).

Likewise, the defendant's reading contravenes the Supreme Court's mandate to interpret Section 10(b) "not technically and restrictively, but flexibly to effectuate its remedial purposes," *Zandford*, 535 U.S. at 819, and the SEC's interpretation of its own regulations, as set forth not just in *Dorozhko* but also in the SEC's parallel action against Klyushin, *see SEC v. Kliushin*, 21-cv-12088-WGY, Dkt. 1 at 1–2 (alleging that defendants violated Section 10(b) and Rule 10b-5 by engaging in a "fraudulent scheme to deceptively obtain material nonpublic pre-release earnings announcements of companies with shares of stock publicly traded on U.S. securities exchanges by hacking into the computer systems of two service-provider firms, and to use the hacked information to profit by trading in advance of the public release of the earnings information"). *See also Mayo v. Dean Witter Reynolds, Inc.*, 258 F. Supp. 2d 1097, 1109 & n.15 (N.D. Cal.), *amended*, 260 F. Supp. 2d 979 (N.D. Cal. 2003) ("The SEC's position with respect to the proper interpretation and application of the Exchange Act is entitled to great weight." ).[5]

Relatedly, Klyushin argues that the distinction between affirmative misrepresentations and omissions "defies simple common sense," because "impersonating a filing agent employee. . . may be one man's affirmative misrepresentation but another's material omission." Dkt. 96 at 11. But these are just semantic games. Masquerading as another individual is an affirmative lie—not

---

[5] Klyushin further complains that *Dorozhko* failed to address *Santa Fe Indus. v. Green*, 430 U.S. 462, 470 (1977), which he contends supports his position that Section 10(b) and Rule 10b-5 do not distinguish between affirmative misrepresentations and omissions. Dkt. 96 at 10–11. But *Santa Fe Industries* does not suggest that both affirmative misrepresentations and omissions implicate Section 10(b) only in the presence of a duty to disclose. *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 158, (2008) (noting that "only misstatements, omissions by one who has a duty to disclose, and manipulative trading practices . . . are deceptive within the meaning of the Rule"); *see also Pirate Investor*, 580 F.3d at 239–40 ("Section 10(b) requires that a defendant act deceptively in order to fall within the coverage of the statute. . . . Deceptive acts include misstatements, omissions by those with a duty to disclose, manipulative trading practices, and deceptive courses of conduct.) (citing *Santa Fe Indus.*, 430 U.S. at 473).

simply a failure to disclose one's true identity. And Klyushin's contention that *Dorozhko* is "idiosyncratic" because it suggests that not *all* forms of hacking-to-trade fall within the scope of Section 10(b), Dkt. 96 at 11, is, to say the least, inconsistent with his complaint that *Dorozhko* is a "study in overdeterrence and a recipe for overcriminalization," *id*. at 15 (citation and internal quotation marks omitted). It is, in any event, no more idiosyncratic than a system under which the question whether a fraud scheme violates federal law hinges on whether it involved an interstate wire.

Third, Klyushin invokes the rule of lenity, and complains that prior to *Khalupsky*, he "had no reason to suspect . . . that hacking a computer to extract valuable trading information, whether by impersonating an employee or by any other means, could trigger penal liability . . . in the absence of a fiduciary relationship or similar duty of trust and confidence." Dkt. 96 at 13. This argument is wide of the mark.[6] As an initial matter, Klyushin does not allege that any ambiguity in Section 10(b) and Rule 10b-5 is "grievous"—as it must be to implicate the rule of lenity. *See Muscarello v. United States*, 524 U.S. 125, 138–39 (1998) ("To invoke the rule [of lenity], we must conclude that there is a grievous ambiguity or uncertainty in the statute.") (further citation

---

[6] Aside from its legal failings, Klyushin's contention that he was unaware of the criminality of his actions is also untrue. At trial, the government intends to introduce evidence that Klyushin possessed a printout of a May 2017 Reuters article detailing a defendant's sentence to 30 months in prison in a companion case to *Khalupsky*, that Klyushin and his co-conspirators engaged in an encrypted conversation in which they specifically discussed the need to conceal their actions to avoid being criminally charged, and that the defendant apologized for being careless in his communications and promised to delete the message thread. In that conversation, one of Klyushin's co-conspirators admonished him for "exposing our organization," and warned, "[T]hat's how they get you and you end up as a defendant in a court room." The defendant responded: "Sorry. Did a dumb thing. I will delete this one on my end."

and internal quotation marks omitted).[7] To the contrary, he contends that the statute is *not* grievously ambiguous. *See* Dkt. 96 at 10 (arguing that the *Dorozhko* Court erred by consulting applicable caselaw to construe Section 10(b) "absent grievous ambiguity"). And, of course, any ambiguity was extinguished by *Dorozhko* itself, which established more than a decade before the conduct charged here that impersonating another individual to steal MNPI stored in a computer network, and then trading on the basis of that information, violates Section 10(b). Nor is the fact that *Dorozhko* was a civil enforcement action of any moment.[8] *See, e.g.*, *Salman v. United States*, 580 U.S. 39, 137 S. Ct. 420, 429 (2016) (rejecting rule of lenity argument where defendant's conduct was "in the heartland" of securities fraud as established by an earlier civil case, *Dirks v. SEC*, 463 U.S. 646 (1983)); *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 301 (S.D.N.Y. 2018) (same); *United States v. Bongiorno*, No. 05 CR. 390 (SHS), 2006 WL 1140865, at *9 (S.D.N.Y. May 1, 2006) (rejecting rule of lenity argument where defendants "assert[ed] that even if their conduct could form a basis for civil liability, the rule of lenity should prohibit criminal prosecution," and noting that "the clear language of section 10(b) and Rule 10b-5 . . . leave no doubt that fraud in connection with securities transactions is a federal crime," and "[t]he fact that the statute does not spell out the exact type of fraud alleged here is irrelevant"); *United*

---

[7] *See also Ocasio v. United States*, 578 U.S. 282, 295 (2016) (rejecting rule of lenity claim and noting, "That rule applies only when a criminal statute contains a 'grievous ambiguity or uncertainty,' and 'only if, after seizing everything from which aid can be derived,' the Court 'can make no more than a guess as to what Congress intended.'") (quoting *Muscarello*, 524 U.S. at 138–39; *Shaw v. United States*, 580 U.S. 63, 137 S. Ct. 462, 469 (2016) (same).

[8] Tellingly, Klyushin omits to note that the district court in *Dorozhko* "stated that it was 'very disturbing' that this case was not a federal prosecution." *Dorozhko*, 574 F.3d at 49 n.6. *See also SEC v. Dorozhko*, 606 F. Supp. 2d 321, 324 (S.D.N.Y. 2008) (noting that "the SEC has apparently declined, for whatever reason, to involve the criminal authorities in this case").

*States v. Hunt*, No. 05 CR. 395 (DAB), 2006 WL 2613754, at *8–9 (S.D.N.Y. Sep. 6, 2006) (rejecting rule of lenity claim where defendant argued that because the "theory of fraud as alleged in the Indictment never has been prosecuted as a crime, he had no notice of the criminality of his actions," where defendant "was on notice that his conduct was wrongful because it violated NYSE rules"). In any event, *Khalupsky* was criminally charged in August 2015—nearly *three years* before the conduct charged here—and it involved conduct that occurred several years before that. *Khalupsky*, 5 F.4th at 286–87. Accordingly, Klyushin's rule of lenity argument is without merit.[9]

## Conclusion

For the foregoing reasons, the government respectfully requests that the defendant's motion to dismiss be denied.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By: */s/ Stephen E. Frank*
    STEPHEN E. FRANK
    SETH B. KOSTO
    Assistant U.S. Attorneys

Date:   October 4, 2022

---

[9] Klyushin suggests in passing that the securities fraud charges will "needlessly prolong and complicate" his trial. Leaving aside the fact that this argument provides no valid basis for dismissal, it is also untrue. The parties have estimated that this case will require at most two weeks of trial time, and likely less. That estimate would not change in the absence of the securities fraud charges. All of the evidence relevant to those charges is likewise relevant and admissible as evidence of the nature and scope of the intrusion and wire fraud scheme, and the defendant's motive for engaging in it.

**CERTIFICATE OF SERVICE**

      I hereby certify that a copy of this document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

                                                /s/ *Stephen E. Frank*
                                                STEPHEN E. FRANK
                                                Assistant U.S. Attorney