1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
2

3     UNITED STATES OF AMERICA,          )
                                         )
4              Plaintiff                 )
                                         )
5          -VS-                          )  Criminal No. 21-10104-PBS
                                         )  Pages 1 - 58
6     VLADISLAV KLYUSHIN,                )
                                         )
7              Defendant                 )

8
                        **HEARING IN PERSON**
9

10          BEFORE THE HONORABLE PATTI B. SARIS
               UNITED STATES DISTRICT JUDGE
11

12

13
                              United States District Court
14                            1 Courthouse Way, Courtroom 19
                              Boston, Massachusetts  02210
15                            October 31, 2022, 9:50 a.m.

16

17

18

19

20

21               LEE A. MARZILLI
               OFFICIAL COURT REPORTER
22          United States District Court
            1 Courthouse Way, Room 7200
23            Boston, MA  02210
                leemarz@aol.com
24

25

1    A P P E A R A N C E S:

2        SETH B. KOSTO, ESQ. and STEPHEN E. FRANK, ESQ.,
     Assistant United States Attorneys, Office of the United States
3    Attorney, 1 Courthouse Way, Room 9200, Boston, Massachusetts,
     02210, for the Plaintiff.
4
         MAKSIM NEMTSEV, ESQ., 20 Park Plaza, Suite 1000,
5    Boston, Massachusetts, 02116, for the Defendant.

6        MARC FERNICH, ESQ., Law Office of Marc Fernich,
     800 Third Avenue, Suite Floor 20, New York, New York, 10022,
7    for the Defendant.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2      THE CLERK:  Court calls Criminal Action 21-10104,

3  United States v. Klyushin.  Could counsel please identify

4  themselves.

5      MR. FRANK:  Stephen Frank and Seth Kosto for the

6  United States, your Honor.

7      THE COURT:  Good morning.

8      MR. KOSTO:  Good morning.

9      MR. FERNICH:  Good morning, Judge.  Marc Fernich and

09:51 10  Max Nemtsev for Mr. Klyushin.

11      THE COURT:  Thank you.

12      MR. NEMTSEV:  Good morning, your Honor.

13      THE COURT:  And Mr. Klyushin is here.

14      (Interpreter Tetradze duly sworn.)

15      THE COURT:  All right, thank you.  You may be seated,

16  everybody.

17      So this morning we have two motions in front of the

18  Court, a motion to dismiss and a motion to suppress.  I don't

19  know if you have a particular order that you'd like to go in,

09:51 20  but the defense is the moving party.

21      MR. FERNICH:  Judge, do you want me to stand, sit?

22      THE COURT:  Stand.

23      MR. FERNICH:  Stand, okay.

24      THE COURT:  It's just easier for us all to hear.

25      And, Mr. Klyushin, if at any point you can't

<pre>
 1    understand -- I think the equipment is working now, right? --
 2    if there's an issue, let me know.
 3            Okay, go ahead.
 4            MR. FERNICH:  Judge, I don't really have that much to
 5    add to the papers.  Notwithstanding my friends on the other
 6    side's suggestion that the papers were sort of summary or
 7    underdeveloped, I thought that they're very well cooked, and I
 8    don't believe in rehashing what's in the papers, but I did want
 9    to point out a couple of items that are maybe outside the
10    papers to start off our discussion this morning.  And it
11    occurred to me, in reviewing the papers, that the government
12    calls *Dorozhko* -- and I don't know if I'm saying that right --
13    a textbook securities fraud case, and they repeat that a bunch
14    of times in the papers, and leaving aside the arguments that
15    we've made that the civil enforcement context is materially
16    different than the criminal context for notice purposes,
17    vagueness purposes, and due process purposes; and make no
18    mistake, that's the heart of the motion.
19            THE COURT:  Can I ask, is there any case that has gone
20    your way?
21            MR. FERNICH:  Other than the initial District Court
22    *Dorozhko* 1 case decided in the Southern District of New York
23    and -- well, I guess it was the Eastern District -- I don't
24    remember right now -- and overruled by the Second Circuit, no,
25    because, to my knowledge, those are the only three cases that
</pre>

```
 1    materially address these issues at all.  But --
 2              THE COURT:  What do you mean by three cases?
 3              MR. FERNICH:  Well, the District Court Dorozhko
 4    opinion went our way.
 5              THE COURT:  And it was reversed by the Second Circuit,
 6    right?
 7              MR. FERNICH:  Correct, correct.
 8              THE COURT:  And, to my knowledge -- I just want to
 9    make sure I'm remembering this -- no one else has really
10    addressed it, and you're drawing on language from Supreme Court
11    cases?
12              MR. FERNICH:  Yes.  That's accurate.
13              THE COURT:  All right, so in a way, if I go with the
14    Second Circuit, it's a placeholder to see if the First Circuit
15    goes the same way?
16              MR. FERNICH:  Well, you know, that's the thing, Judge.
17    It's kind of -- I'm not sure what -- and this is perhaps, you
18    know, you're here to decide cases, not divine prosecutorial
19    decision-making processes.  But I don't know what this
20    charge -- and this actually impacts the argument more
21    globally -- there's no gap to fill here, so it's not clear why
22    any, any case would need to charge this conduct as securities
23    fraud.  There's no --
24              THE COURT:  But that's -- I can't go there.  In other
25    words, it's a prosecutorial right to charge if it's a viable
```

1    claim.  And under the Second Circuit case, the *Dorozhko* case,

2    as I understand it, while it is in the civil context, it's

3    directly on point, and essentially no other case has gone

4    against it.

5              MR. FERNICH:  Right, but even if your Honor were to --

6              THE COURT:  I think that's right, right?  He cited it

7    forward.

8              MR. FERNICH:  Yes.  No, that's accurate.

9              THE COURT:  So it could potentially be that the First

09:55 10   Circuit would go a different way, I suppose, but I read

11   *Dorozhko*, and it made sense.

12             MR. FERNICH:  It may make sense in a civil context,

13   and, you know, we can talk about that, but to make the jump

14   that they did in *Khalupsky* ten years later, without any

15   discussion to apply it in the criminal context, is really the

16   crux of our argument here.  And the reason why it's the crux of

17   our argument is that there is an entirely different set of

18   considerations deriving from the Fifth Amendment that didn't

19   apply in *Dorozhko;* and the most important considerations are

09:55 20   notice, vagueness, and the ability to --

21             THE COURT:  I forget.  What year was *Khalupsky*?

22             MR. FERNICH:  Excuse me, your Honor?

23             THE COURT:  Which -- *Dorozhko* was what year?

24             MR. FERNICH:  '09.  I believe it was '09.  And then

25   *Khalupsky* --

1          *THE COURT:  Dorozhko* was 2009.

2          MR. FERNICH:  Yes.

3          THE COURT:  And when was the other one?

4          MR. FERNICH:  Well, that was in 2021, and it was

5     issued --

6          THE COURT:  2021.  So that if, allegedly, this bad

7     trade happened in January of 2020, you're saying that it wasn't

8     until -- is that what your argument is?

9          MR. FERNICH:  Yes.

09:56 10          THE COURT:  -- until *Khalupsky* that they didn't have

11    notice it would be applied criminally?

12          MR. FERNICH:  Well, that's the significant part of the

13    argument, but even if we go back to *Khalupsky* in the first

14    instance, query whether that's rightly decided without

15    grappling notice considerations that were at issue there, this

16    is a much stronger case because the *Khalupsky* decision, the

17    only decision applying *Dorozhko* in a criminal context,

18    postdates the offense conduct.

19          THE COURT:  Okay.  All right, thank you.  I mean, was

09:56 20    there anything else?

21          MR. FERNICH:  I don't think that -- I mean, your

22    Honor, I believe your Honor has it.  If there's questions --

23          THE COURT:  I've got it.  But a motion to suppress, I

24    want to spend a lot of time on that.  This is a fairly narrow

25    issue.

1          MR. FERNICH:  It is.

2          THE COURT:  Okay, thank you.

3          Who's going to pick this one up.

4          MR. FRANK:  I'm handling this one, your Honor.

5          THE COURT:  Okay, thank you.

6          MR. FRANK:  You know, *Khalupsky* obviously was a

7    criminal case, but what I would say is that the statute, the

8    underlying statute is the statute that has both criminal and

9    civil applications.  So when the court in *Dorozhko* construed

09:57 10   *Khalupsky*, it wasn't construing it -- it was a civil case, but

11   it wasn't construing it simply for civil purposes.  It was

12   construing the statute, which has a criminal application.

13          And the decision, while it arose in a novel context of

14   computer hacking, the actual construction of the statute was

15   not novel at all.  In fact, what the defense is asking for here

16   is a novel construction of the statute that would result in a

17   significant narrowing of the interpretation of Section 10(b) in

18   a way that no court has ever done.  What they're asking this

19   Court to say is that an affirmative misrepresentation is not

09:57 20   deceptive conduct for purposes of Section 10(b), unless it

21   occurs in violation of a fiduciary or fiduciary-like duty.  No

22   court has ever held that, and in fact every court that has

23   addressed the issue has gone the opposite way.  Rule 10(b)(5)

24   explicitly makes it unlawful to make any untrue statement of

25   material fact, full stop.  And all that *Dorozhko* did is apply

that, and *Khalupsky* after it, apply that in the context of a
hack and trade, to say that in certain contexts, if there is an
untrue statement of material fact in order to gain material
nonpublic information that is then used to --

THE COURT:  But here the untrue statement of fact is
the identity to get into the -- what would it be, the server?

MR. FRANK:  That's exactly right, your Honor, to get
into the network.  And so --

THE COURT:  The network.

09:58  MR. FRANK:  -- the defendant and his coconspirators
misrepresented themselves in order to gain access to the
network, to steal the materially nonpublic information, and
then they used that in connection with the purchase or sale of
a security.  So it's squarely addressed by those cases, and
those cases in turn don't really do anything new in terms of
the securities fraud statute other than apply it.

THE COURT:  So have any cases come out the other way?

MR. FRANK:  No, not to my knowledge.

THE COURT:  Okay.  Well, we couldn't find one, you
09:59  couldn't find one, so I think *Dorozhko* is controlling law and
its successor case, and I'm going to deny the motion to
dismiss.  But let's go on to the motion to suppress, which I
find a lot harder just to even understand what's happening
here, so it's more complex.

MR. NEMTSEV:  I can give a brief overview of what's

1   happening in the search warrants.

2           THE COURT:  And let me start from basics because I'm

3   having a hard time getting my head around it.  There's the

4   September warrant?

5           MR. NEMTSEV:  Yes.

6           THE COURT:  And the October warrant?

7           MR. NEMTSEV:  Yes.

8           THE COURT:  And both of you spend a lot of time on

9   both warrants.

09:59 10         MR. NEMTSEV:  Yes.

11          THE COURT:  But only the October warrant is really at

12  issue.  Do I have that wrong?

13          MR. NEMTSEV:  The October warrant yielded all of the

14  evidence.

15          THE COURT:  Okay.

16          MR. NEMTSEV:  The September warrant --

17          THE COURT:  So I just need to understand why I need to

18  slog through September, which doesn't seem to be referenced or

19  incorporated by reference in October.  So that's my big

10:00 20  starting question.  As I understand it, the September warrant

21  didn't yield anything, and neither is the government seeking to

22  introduce anything from the Google information?  Is that right?

23          MR. KOSTO:  That is correct, your Honor.

24          THE COURT:  So is this really about, just to get my

25  head around this, the October warrant and the Apple account?

1          MR. NEMTSEV:  The October warrant and the Apple

2    account are the main --

3          THE COURT:  Okay, so I want to make sure I'm

4    understanding it correctly.

5          MR. NEMTSEV:  Yes, but September, the warrant that

6    issued that --

7          THE COURT:  Could you speak into the mic.

8          MR. NEMTSEV:  I'm sorry.  The September --

9          THE COURT:  You're tall, and these mics don't do well

10   with that, okay?

11         MR, NEMTSEV:  I wish I could pick it up, your Honor,

12   and walk around a little bit.  So the September warrant leads

13   them to discover the iCloud account that then they go and get

14   an additional October warrant for, that then leads to the

15   seizure of the entire iCloud account.  So the September warrant

16   is key to getting to October.  If they don't get a lot of

17   information, the only --

18         THE COURT:  So what do they get from September?

19         MR. NEMTSEV:  From September, they get the location

10:01 20  and the identification numbers that they then search through

21   the October warrants.  If there was no September, there would

22   be no October, in essence, because they wouldn't discover an

23   additional --

24         THE COURT:  But they can't get in, right, because it's

25   locked?

1        MR. NEMTSEV:  The September one was locked, but they

2  got additional information from Apple leading them to the

3  second Apple iCloud ID that they then search in October.  Had

4  they not had the September warrant, they would have never

5  discovered the subsequent Apple ID.

6        THE COURT:  Okay, this is helpful.  So you're saying,

7  if the September warrant was bad somehow, then even if October

8  was pure as snow --

9        MR. NEMTSEV:  It would still be bad.

10:01 10        THE COURT:  -- it would still flow from that?

11        MR. NEMTSEV:  Exactly.

12        THE COURT:  Because the information was included in

13  the October?

14        MR. NEMTSEV:  Because the information was, yes, was a

15  necessary component of the October warrant.

16        THE COURT:  Was it mentioned in the October?

17        MR. NEMTSEV:  It was.  It was, your Honor.

18        THE COURT:  It was?

19        MR. NEMTSEV:  It was, it was.

10:02 20        THE COURT:  Can I just say, I'm having a little

21  trouble here because the Interpreter is right behind.  I'm just

22  trying to figure out how it can be a little softer.

23        (Discussion off the record.)

24        THE COURT:  All right, so you're saying I do have to

25  resolve the September issue?

1      MR. NEMTSEV:  You do, your Honor, you have to resolve

2  the September issue; and then if we lose on the September

3  issue, then we still have a chance on the October issue, which

4  ultimately results in the iCloud seizure.

5      THE COURT:  Okay, thank you.  All right, so are you

6  going to be arguing the motion?

7      MR. NEMTSEV:  I will, your Honor.

8      THE COURT:  Okay, good.  Thank you.  That was helpful.

9      MR. NEMTSEV:  So, as a matter of fact, I don't want to

10:03 10  spend too much time on it because I think we detailed all of

11  the allegations in there and our response to them and the flaws

12  that the --

13      THE COURT:  No, you need to.  At this point, this is

14  far more complicated than whether or not I follow the Second

15  Circuit law or not.

16      MR. NEMTSEV:  Okay.  So, your Honor, first, I'd like

17  to start off with the fact that this is novel in the sense of

18  there's no published decisions in the First Circuit or the

19  District of Massachusetts exploring iCloud search warrants.

10:03 20  And iClouds are different than a cellphone, than an email

21  account, in the sense that they contain not one image of a

22  phone or not one email address, but they can contain multiples.

23  You know, they could contain all the information from any phone

24  that you ever owned that was ever backed up and uploaded to the

25  iCloud.  The same goes for a MacBook.  The same goes for any

1     email account that's been linked with the iCloud.  And that's

2     why, when they seized Mr. Klyushin's iCloud, they got 380

3     gigabytes' worth of information, with data going back as far as

4     May of 2005.  It's a tremendous amount of information, and the

5     government has access to all of it.  They've seized all of it,

6     and they've used it, obviously, against Mr. Klyushin, and

7     they've also used it in getting subsequent warrants.

8          THE COURT:  The search warrant says that they only go

9     back till 2018 and only can look for certain kinds of

10:04 10   information.  So you're saying that they exceeded the scope of

11    the warrant?  Is that the core claim?

12          MR. NEMTSEV:  Well, my argument is one of two.  First,

13    as it relates to the warrants, there's a particularity issue.

14    The way that they describe fruits and instrumentalities, they

15    used language "including six offenses, including nineteen

16    categories."  It's not exhaustive.  It almost gives them the

17    opportunity, the way it's written, to seize the entire iCloud

18    account.  And that's what happened here, your Honor.  They did

19    seize the entire iCloud account.  And, yes, I agree that

10:05 20   there's a temporal scope of January 1, 2018, to the present;

21    but then in our bail filings, they use photographs that were

22    taken in November of 2017.  So it's an issue of both.  It's

23    either the government --

24          THE COURT:  So let's assume for a minute that was an

25    error and they shouldn't have done that because it exceeded the

1    scope of the warrant.  Let's just say that for a second.

2         MR. NEMTSEV:  Yes.

3         THE COURT:  Why is that relevant to whether or not the

4    search was valid as far as what's admissible at trial?  Let's

5    say I exclude all that stuff that preceded 2018.

6         MR. NEMTSEV:  But there's so much more there, your

7    Honor.

8         THE COURT:  Okay, go ahead.

9         MR. NEMTSEV:  They have nineteen categories, but then

10   they take thousands, tens of thousands of communications with

11   his wife, with his employees, with his kids, pictures going

12   back many, many years, 90,000, I believe, photos.  They use

13   that evidence not only to prosecute him, but they're going to

14   use it in their case in chief.  They used it in the bail

15   filings.  I'm sure they used that evidence to obtain subsequent

16   search warrants of other individuals' iCloud accounts.  There's

17   just no way to separate out what falls into the nineteen

18   categories rather than what doesn't.

19        THE COURT:  So I'm just trying to understand.  You're

20   saying there are no other cases that figure out what you're

21   supposed to do with an iCloud account?

22        MR. NEMTSEV:  There are cases, but not in the District

23   of Massachusetts or the First Circuit that were published, your

24   Honor.

25        THE COURT:  And are there any published cases from

1   other circuits or other districts?

2          MR. NEMTSEV:  Yes, there are, your Honor.  The

3   government cites one in the Southern District of New York where

4   the court had a similar issue.  But it wasn't thousands of

5   documents that were taken that were outside the scope of the

6   warrant, there were hundreds, and the court ultimately held an

7   evidentiary hearing regarding how the searches were conducted

8   by the government agents.

9          THE COURT:  Well, is there -- I'm showing my

10  ignorance -- would there have been a way for the government,

11  once I address whether or not there's probable cause, to even

12  go into the iCloud account?

13         MR. NEMTSEV:  Yes.

14         THE COURT:  Let's assume for a second I find there is,

15  but it has to do with the Avnet trade and it's cabined at 2018

16  to 2020, is there a way for the government to go into the

17  cloud, since I've never been there, and figure out, "Well,

18  we're only going to take these calendar years and these

19  categories"?

20         MR. NEMTSEV:  Absolutely, your Honor, because what the

21  government does, and what they did in this case, at least as

22  far as I can tell -- and they can represent to you whether

23  that's accurate or not -- is, when they received the entire

24  iCloud account, they loaded it into a search program called

25  Cellebrite.  It's an Israeli company that unlocks --

| | |
|---|---|
| 1 | THE COURT:  A what? |
| 2 | MR. NEMTSEV:  Cellebrite. |
| 3 | THE COURT:  All right, Celebrate? |
| 4 | MR. NEMTSEV:  Cellebrite, C-e-l-l-e-b-r-i-t-e. |
| 5 | THE COURT:  Not celebrate your birthday? |
| 6 | MR. NEMTSEV:  No, no, not celebrate. |
| 7 | THE COURT:  All right, Cellebrite. |
| 8 | MR. NEMTSEV:  Barely anyone celebrates, your Honor, |
| 9 | when they stop there, so it's located there.  But they load it |
| 10:08 10 | into that search program.  It sorts all the data.  So it's |
| 11 | messages, images, videos, notes, whatever it may be.  It |
| 12 | sorts -- |
| 13 | THE COURT:  Can it sort by year? |
| 14 | MR. NEMTSEV:  It can sort by year.  It can sort them |
| 15 | chronologically.  It can't obviously do the analysis for you, |
| 16 | meaning you can't figure out whether, you know, something is |
| 17 | relevant or not, but you can see that there's communications |
| 18 | between Mr. Klyushin and his wife; there's communications |
| 19 | between him and his children; you know, communications |
| 10:08 20 | regarding sports, extracurricular activity, school, you know, |
| 21 | things that are completely unrelated to an insider trading |
| 22 | case, unrelated to any of the nineteen categories that the |
| 23 | government says they're going to seize evidence of. |
| 24 | THE COURT:  So is this really an overbreadth case in |
| 25 | terms of their seizure is too much? |

         1          MR. NEMTSEV:  They seized way too much, your Honor,

         2    way too much.

         3          THE COURT:  Or at least -- I shouldn't say "seized"

         4    because maybe you need to give it to this Israeli company, but

         5    in terms of what they can use, you're saying I should limit it

         6    to the 2018 period?

         7          MR. NEMTSEV:  Well, I don't think there's probable

         8    cause for the 2018 --

         9          THE COURT:  All right, let's start from the basics,

10:09  10    why there's no probable cause.  And I'll focus on the

        11    government about the 2018 because that's clearly what the

        12    magistrate judge allowed, 2018 to '20, whenever the search was.

        13          MR. NEMTSEV:  To present up until Apple produced it,

        14    including any data that was created after the warrant issued,

        15    after the warrant was executed.

        16          THE COURT:  All right, so why don't we go from A to Z,

        17    okay?

        18          MR. NEMTSEV:  So from A to Z --

        19          THE COURT:  The probable cause, why wasn't there

10:09  20    probable cause?

        21          MR. NEMTSEV:  From A to Z, your Honor.  So this is an

        22    investigation that starts in September of 2019.  The SEC

        23    identifies groups of traders.  There's dozens, 20, 30, 40

        24    individuals that they identify as individuals that had

        25    suspicious trading in their accounts.  Agent Kang gets involved

1    in this investigation in November of 2019 when he gets access

2    to all of the SEC's filings.  He subsequently communicates with

3    the filing agents in January and February of 2020 where they

4    disclose to him that there might have been unauthorized

5    intrusions.

6         Mr. Klyushin comes into the picture in September of

7    2020.  There's no -- your Honor could examine the affidavit,

8    but only six paragraphs relate to Mr. Klyushin and his trading.

9    There's pages upon pages and multiple paragraphs of analyses of

10:10 10  Irzak and other traders who the government says engaged in

11   parallel trading, although there's no evidence that any of them

12   accessed a filing agent or reviewed it.  There's nothing about

13   that in the affidavit.

14        Mr. Klyushin becomes a target when the government,

15   subsequent to the September warrant, obtains a warrant for a

16   different defendant, a codefendant, Ermakov.  There they

17   realized that he has a trading app belonging to Saxo Bank on

18   his phone and locate a photograph of a January 23, 2020

19   transaction in Avnet.  They see that the account that he

10:11 20  transacted in was a transaction for contract for differences

21   rather than of purchase or sale or short sale of the shares.

22   They realize that the account that he's transacting in belongs

23   to Mr. Klyushin.  They use that information to say that

24   Mr. Klyushin is likely engaged in insider trading or parallel

25   trading, and they make the connection that the transaction in

1    Avnet is consistent with a short position in Avnet that same

2    day.  They don't detail a lot about the other --

3         THE COURT:  Let's just put a spotlight on that.  Why

4    isn't, at least with respect to that trade, there probable

5    cause?

6         MR. NEMTSEV:  Because that trade is outside the

7    heartland of insider trading, your Honor.  Let's say, as the

8    government alleges --

9         THE COURT:  Ermakov himself is a hacker, right?

10:12 10        MR. NEMTSEV:  From 2018, your Honor, that has never

11   been convicted, whose evidence, I would submit to the Court, is

12   stale.  You know, his hacking in 2018 doesn't --

13        THE COURT:  All right, I said that wrong.  There's

14   probable cause to believe he's a hacker.  There's an

15   indictment.

16        MR. NEMTSEV:  Yes, but I don't know enough about the

17   hacking, the way he --

18        THE COURT:  Well, I don't either, but at least that's

19   what the magistrate was informed about, right, that he was a

10:12 20   hacker?

21        MR. NEMTSEV:  Yes.  There are two indictments pending

22   from 2018.

23        THE COURT:  Two, so there's at least two that Ermakov

24   is a hacker?

25        MR. NEMTSEV:  Yes.

1    THE COURT:  And that the trade was just prior to the

2  release of public information?

3    MR. NEMTSEV:  The trade was prior to the release of

4  public information, two days after the alleged unauthorized

5  intrusion into that company, as well as multiple other --

6    THE COURT:  So at least with respect to Ermakov, would

7  you concede there's probable cause?

8    MR. NEMTSEV:  But they're not searching Ermakov.

9  They're searching Mr. Klyushin.

10:13 10    THE COURT:  If there's probable cause as to Ermakov --

11  I mean, I feel like I'm walking down a chain there -- but if

12  there's probable cause as to Ermakov because he's, A, a hacker,

13  and, B, there was access, and, C, he traded before the release

14  of public information, and once he trades in Mr. Klyushin's

15  account, doesn't that create probable cause as to Mr. Klyushin?

16    MR. NEMTSEV:  No, your Honor, I don't think it should

17  because that transaction, if you actually look at it, if the

18  government disclosed the details of it, it wouldn't make any

19  sense.  If you have twelve reports for twelve different

10:13 20  companies and you see a mixed earnings report where the stock

21  is --

22    THE COURT:  You're just speaking a little too softly.

23    MR. NEMTSEV:  I'm sorry.

24    THE COURT:  Do you want to sit down and just speak

25  directly into the mic?

1          MR. NEMTSEV:  Yes, maybe, because otherwise --

2          THE COURT:  It's much better now that the mic is

3     removed from --

4          MR. NEMTSEV:  Yes.

5          THE COURT:  But it's still -- I'm --

6          THE CLERK:  You can pull it closer to you.

7          THE COURT:  You can all hear me well, right?

8          (Discussion off the record between defense counsel.)

9          MR. NEMTSEV:  So just very quickly, your Honor --

10:14 10          THE COURT:  So much better.

11          MR. NEMTSEV:  Yes, I agree.  My back was starting to

12     hurt leaning over speaking into the microphone.

13          THE COURT:  So much better.

14          MR. NEMTSEV:  But just very quickly, the Avnet, if you

15     had an earnings report that said Avnet actually beat

16     expectations in one of the key metrics, why would you short the

17     stock or sell CFDs that would guarantee a loss?  And the

18     government could have expanded their analysis.  They could have

19     shown that the transaction in Avnet wasn't parallel on the way

10:15 20     out, meaning it is not sold for a loss --

21          THE COURT:  So why would you short something that was

22     doing well?

23          MR. NEMTSEV:  Exactly, why would you short something

24     that you know is doing well and thereby incurring a loss?

25          THE COURT:  So you're saying, when the eventual

1   information came out the next day --

2         MR. NEMTSEV:  The stock went up.

3         THE COURT:  -- the stock went up.

4         MR. NEMTSEV:  They lost, they lost money.

5         THE COURT:  The stock went up.  So it means anyone who

6   traded on a short lost?

7         MR. NEMTSEV:  Lost.

8         THE COURT:  I just wanted to make sure.

9         MR. NEMTSEV:  Yes.  So that would take it outside the

10:15 10  heartland, you know, of what they say is insider trading

11  because they had twelve different reports for additional

12  companies.  They could have traded in any one of them.  You

13  know, and there's no allegation, at least in the affidavit,

14  that Mr. Klyushin's account or Mr. Ermakov traded in any of the

15  other companies.  Their sole accusation was limited to Avnet.

16  And, say, even if there's probable cause as to Avnet, that's a

17  discrete transaction in January of 2020, where the hack

18  occurred January 21, 2020, the sale of CFDs occurred on the

19  23rd, and then the subsequent closing of the position occurred

10:16 20  on the 27th in Mr. Klyushin's account.  But they extrapolate

21  from that broader insider trading, broader allegations that go

22  back to 2018, and ultimately lead to the seizure of

23  Mr. Klyushin's entire iCloud account.

24        THE COURT:  Okay, thank you.  And what is your

25  position with respect to whether or not the information in the

 1    September affidavit is incorporated into the information in the

 2    October?

 3         MR. NEMTSEV:  Well, it's not incorporated by

 4    reference, your Honor.

 5         THE COURT:  I understand that.  I looked for that.

 6         MR. NEMTSEV:  Yes.

 7         THE COURT:  But is information in there properly

 8    considered in the October?

 9         MR. NEMTSEV:  Well, if the government --

10:17 10        THE COURT:  Other than I suppose finding out the

11    actual number, as you say, the fruits of it.

12         MR. NEMTSEV:  Aside from the fruits of it, it's not

13    incorporated by reference.  I don't think that the magistrate

14    looked back at the September affidavits to determine what it

15    said, but --

16         THE COURT:  I've been thinking about that because I

17    used to be a magistrate judge, and the odds of this magistrate

18    judge, who's excellent, doing a line-by-line figuring out

19    what's -- I mean, it's substantially similar, right?

10:17 20        MR. NEMTSEV:  It's substantially similar.  It removes

21    some paragraphs; it adds a couple.  It actually removes the key

22    belief statement --

23         THE COURT:  Yes, I remember that, and so I'm just

24    trying to figure out, as a practical matter...

25         MR. NEMTSEV:  I'd argue that it's not incorporated,

1    your Honor.

2              THE COURT:  That it's not incorporated?

3              MR. NEMTSEV:  That it's not incorporated.

4              THE COURT:  I think you might be right because it's

5    not incorporated.

6              MR. NEMTSEV:  Yes, it isn't.

7              THE COURT:  All right, thank you.

8              All right, I'm going to jump to the government right

9    now.

10:18 10         MR. KOSTO:  Thank you, your Honor.  So laid out in

11   these motions, there's the probable cause issue, the

12   particularity issue, and something the defense hasn't described

13   yet, the --

14             THE COURT:  The *Franks* issue.

15             MR. KOSTO:  -- the *Franks* issue and the omission of

16   the *Rajaratnam* statement.  Should I start with probable cause?

17             THE COURT:  I would like to understand -- it's a

18   little complex because the two affidavits are a little bit

19   different, but on one point that's been hotly contested, do you

10:18 20   take the position that I only look at the four corners of the

21   October?

22             MR. KOSTO:  The October affidavit doesn't expressly

23   incorporate by reference the September affidavit, but it was

24   presented to Judge Bowler two weeks after the September

25   affidavit.  If you think about the sequence, the September 29

affidavit describes the investigation.  Judge Bowler issues a

warrant.  As Mr. Nemtsev said, the information that comes back

from Apple says that the iCloud account linked to the email

address and phone number described in the September affidavit

is locked, but that there's another Apple account linked to the

phone number that's connected to the allegations in both

affidavits; and that's, as Mr. Nemtsev says, what opens the

door to applying to Apple two weeks later to get to the account

that's not locked.

THE COURT:  Well, why was the "it is believed"

sentence deleted?  Were you the attorney on that?

MR. KOSTO:  I don't believe I was the drafting

attorney, and I don't know why it was deleted, but Judge Bowler

issued the warrant without it.  It's clear she didn't rely on

that statement for probable cause.

THE COURT:  I don't know, if I were issuing -- if I

had two back-to-back affidavits that looked substantially

similar, I don't know that I'd do the side-by-side.

MR. KOSTO:  Even if you did, your Honor, the

government's position is that with respect to either the

September affidavit or the October affidavit, there was

adequate probable cause without respect to that "belief"

statement.

THE COURT:  Without respect to the --

MR. KOSTO:  If the Court takes the First Circuit law

1     on point, which is, you know, facts within the affidavit plus

2     supported opinions, the "belief" statement --

3            THE COURT:  Plus supporting --

4            MR. KOSTO:  Supported opinions, opinions of the agent

5     supported by factual background.  Our point in our opposition

6     is, there is support for that "belief" statement.  It was

7     omitted from the affidavit.  The drafters, the agent, omitted

8     it, but it's not necessary to the probable cause finding.  We

9     offered information about what the SEC had told Special

10:20  10    Agent Kang just to establish that the belief was offered in

11    good faith.  There was no attempt to hide it from the Court.

12    He was advised by the Securities and Exchange Commission that

13    Mr. Klyushin had traded in parallel with Mr. Irzak as far back

14    as the provision of that spreadsheet some ten months earlier.

15    Mr. Klyushin wasn't new to the case, because the SEC had sent

16    an email over to Special Agent Kang with a spreadsheet that

17    mentioned Mr. Irzak and Mr. Klyushin both involved in parallel

18    trading, of which Avnet was one example that is expressly

19    described, so --

10:21  20           THE COURT:  But I can't consider that because

21    Judge Bowler didn't consider it.

22           MR. KOSTO:  Correct.

23           THE COURT:  So the issue is, it was struck from

24    October, so it becomes a red herring with respect to October.

25           MR. KOSTO:  That's correct, your Honor, but you don't

need to consider the "belief" statement vis-a-vis the probable

cause statement.  We just offered that information because

there's a suggestion in the request for a *Franks* hearing that

Agent Kang deliberately or recklessly, with regard to the

truth, left out the reason for his belief.  If he had put the

reason for his belief into the affidavit, it would strengthen

probable cause, not weaken it, but --

THE COURT:  Let's jump into probable cause in the

October one.

MR. KOSTO:  Sure.

THE COURT:  So you basically have a known hacker.

MR. KOSTO:  I'd start even before that, your Honor.

You have from the SEC, from FINRA, the Financial Regulatory

Authority, and various brokerages, like interactive brokers,

you have a group of traders, Russian traders that include

Mr. Irzak, Mr. Trofimov, Mr. Stepanov, and others.

THE COURT:  But not Ermakov and not Klyushin?

MR. KOSTO:  Not Ermakov and Klyushin at the time,

correct, but the investigation begins with those referrals, and

they are timely trading ahead of public announcements of

financial performance, "earnings place" in the vernacular.  And

it's not just the stocks of any company in the broad list of

stocks.  It's only companies that are serviced by those filing

agents, Filing Agent 1 and Filing Agent 2; situations where

those filing agents are the companies that provide the data

storage before it gets released to the public.  So you have
this trading that's going on, but it's only going on in, you
know, the shares of two of the several companies that provide
these services.  It's like if every car you see driving by is a
Ford, that's not a coincidence.  They were breaking into only
Filing Agent 1 --

THE COURT:  Can I just back up for a minute?

MR. KOSTO:  Yes.

THE COURT:  I'm thinking in tandem with you.

Mr. Frank, are you the one who drafted the --

MR. FRANK:  I don't have a specific memory, your
Honor, but, actually, the way it works, Special Agent Kang's
practice is, he drafts his own affidavits and we edit them,
so --

THE COURT:  Well, I just want to make sure --

MR. FRANK:  -- it's likely that I edited that
affidavit.

THE COURT:  -- under *Brady* and all that, to your
knowledge, it wasn't deleted because it was wrong?

MR. FRANK:  Absolutely not.

THE COURT:  Okay, I'm going to ask you to go back and
talk.  And you were both involved at that time?

MR. FRANK:  We were, your Honor.  And in fact, not
only was it not deleted because it was wrong, it's actually
correct.  The statement was true.

```
 1              THE COURT:  It's just weird that it was deleted
 2     because it adds to it.  I --
 3              MR. FRANK:  I'm not sure that there was any great
 4     thought given to the -- I think it was more of an editing
 5     issue.  But the bottom line is:  The statement is true.  He had
 6     that belief, and his belief was based on a spreadsheet that was
 7     produced to him pursuant to an access request by the SEC, which
 8     we've produced to the defense; they have it.  And that
 9     spreadsheet is a list of individuals -- it does include
10:24 10     Mr. Klyushin -- and that spreadsheet is a list of individuals
11     that the SEC had determined traded in parallel.
12              THE COURT:  Well, what I'd ask you to do, just because
13     of the Brady doctrine, et cetera, is to go back.  I just am
14     curious as to why it is deleted.  And if it was because it
15     turns out to be wrong, that might be something that had to have
16     been disclosed.  So if it turns out that neither of you drafted
17     the thing, you may not know why it was.  I think, just as a
18     matter of due diligence, you need to go back and check that.
19              MR. FRANK:  Yes, your Honor.
10:24 20              MR. KOSTO:  But I think, as an answer to the Court's
21     question, in advance of the hearing, we obtained the
22     communication of Special Agent Kang, which included
23     Mr. Klyushin's name along with Mr. Irzak's.  So the statement
24     is not wrong; it just wasn't supported by the source of the
25     information.  But going back to the --
```

1          THE COURT:  It wasn't supported --

2          MR. KOSTO:  It wasn't supported by saying, "The SEC

3     provided me with a spreadsheet that lists Mr. Klyushin and

4     Mr. Irzak together as being involved in parallel trades."  That

5     would have been the grammatically correct way to write it.

6     Instead he wrote, "It is believed that the two trade in

7     parallel in other stocks."

8          THE COURT:  I just want to make sure that statement --

9          MR. KOSTO:  Yes.

10:25 10          THE COURT:  -- is accurate, and that he didn't come

11     across information in the two weeks that made it inaccurate.

12          MR. KOSTO:  I think we can represent to the Court that

13     it's accurate, but we'll go back and check.

14          THE COURT:  Well, it sounds like neither of you two

15     really did it, and so it really --

16          MR. FRANK:  Well, I believe I edited it, and so I

17     might have been the person who took out the sentence.  I

18     actually don't remember.  But the point is, we have gone back

19     and checked what the basis for the "belief" statement was --

10:25 20     we've checked it with Agent Kang and we've checked it against

21     the records -- and the basis for the "belief" statement was the

22     fact that the SEC provided Special Agent Kang with a

23     spreadsheet identifying a whole bunch of Russian traders who

24     traded in parallel in these stocks, and one of those traders

25     was the defendant.

1        THE COURT:  And was it more than the Avnet stock?

2        MR. FRANK:  So the spreadsheet which predated the

3   affidavit showed that these traders had traded in parallel in a

4   bunch of stocks, and then the affidavit identifies that he

5   traded in this particular stock.

6        THE COURT:  I see, so...

7        MR. KOSTO:  I'm sorry?  There's sort of an "aha"

8   moment here with respect to this Ermakov/Klyushin trade, your

9   Honor, and the reason is because the name wasn't completely

10:26 10   foreign to the investigation, Mr. Klyushin's name, right?  We

11   have the trading by this group of Russian traders, which

12   include Mr. Irzak, Mr. Trofimov, Mr. Stepanov.  We have the

13   fact that all of the trades seem to be connected to Filing

14   Agent 1 or Filing Agent 2, and they're coming in that window

15   after unauthorized access to the data base and before the

16   announcement of the information, "timely and suspicious

17   trading" in the words of the investigation.

18        And then, with Mr. Ermakov's information, which is

19   obtained before the September affidavit, you have this

10:27 20   screenshot of a trade in Avnet.  But it's important to keep in

21   mind, as the Court mentioned, who Mr. Ermakov is.  He's twice

22   indicted for two separate instances of obtaining unauthorized

23   access to computer networks, once in connection with the 2016

24   elections in a case out of the District of Columbia, and once

25   in connection with access into the databases of anti-doping

1    investigations out of the Western District of Pennsylvania.  So
2    you have a twice-indicted hacker who is now within the scope of
3    the investigation and is trading in Avnet; not just trading in
4    Avnet but trading in someone else's name in Avnet, which the
5    government would submit is not a typical sequence of events.
6    Why does this hacker have in his phone evidence of a trade in
7    Avnet in Mr. Klyushin's name?  And not just that but a trade
8    that fits the exact --

9              THE COURT:  Mr. Klyushin is the head of M-13, right?
10:28 10              MR. KOSTO:  He is.  That's not --
11              THE COURT:  And is Ermakov an employee?
12              MR. KOSTO:  Both of those facts are true.  Neither is
13    alleged in the affidavit, your Honor.
14              THE COURT:  Okay, all right, so I put those to the
15    side.
16              MR. KOSTO:  Correct, and those are outside the four
17    corners.  We're not asking you to go outside the four corners
18    of the affidavit to make a probable cause finding here.
19              But then you look at the timing of the Avnet trade.
10:28 20    The timing of the Avnet trade is within that window, after the
21    5th, before the announcement.  And then, because the agents
22    have Mr. Ermakov's communications from his iCloud account,
23    there's evidence that Mr. Klyushin is stored as a contact in
24    Mr. Klyushin's Apple contacts.  They know each other.  The
25    agents put up a pen register and trap and trace in May of 2020,

1    or had put up a pen register and trap and trace on

2    Mr. Ermakov's account, and it shows communications historically

3    between Mr. Klyushin and Mr. Ermakov.  So --

4            THE COURT:  Five months after the trade, though.

5            MR. KOSTO:  Five months after the trade.  That happens

6    to be when the pen register was put up.  But as soon as the pen

7    register is put up, it starts showing --

8            THE COURT:  I see, so they didn't capture whether --

9    it's not as if there were no communications before that.  It's

10:29  10   just they don't capture past communications like other kinds of

11   warrants?

12           MR. KOSTO:  The affidavit is silent on that.  It can

13   only capture communications between May when the pen is put up

14   going forward, but the fact that there were communications

15   between two men who are in each other's contacts and trading in

16   each other's accounts gives fuel, your Honor, to the probable

17   cause that there would be communications between these two men

18   in Mr. Klyushin's iCloud account.  These are two men who are

19   engaged in financial transactions involving a suspicious stock

10:30  20   in a suspicious time period, who know each other and talk over

21   WhatsApp.  And Agent Kang's affidavit sets forth the training

22   and experience that iCloud accounts store WhatsApp information

23   when backed up.

24           One quick detour on the question of what happened to

25   the stock.  Mr. Nemtsev is correct in his Exhibit 6 that the

stock initially went the opposite direction of the prediction.
It was shorted, the stock went up, but then it went immediately
down.

THE COURT:  When you say "immediately," like --

MR. KOSTO:  Within a day or two.  It looks like an
upsidedown candy cane.  The question is really one for a trial.
It's not what happens to the stock.  It is what was the bet
based on?  The bet was based on a negative financial report.
The company missed its earnings.  The shorting of the stock is
a prediction that it will go down.  The fact that it goes up
immediately just means that sometimes the market doesn't go in
the direction that the material nonpublic information that's
taken would predict.  The market is a fickle beast.

That's neither here nor there as to the determination
of probable cause because Mr. Klyushin's trading -- Mr. Ermakov's
trading in Mr. Klyushin's account is consistent, not just with
the Avnet trade but with what Mr. Irzak and Mr. Stepanov and
Mr. Mr. Trofimov are doing, as described throughout the first
ten, fifteen, twenty paragraphs of the September affidavit.

THE COURT:  If I find there's probable cause with
respect to one trade in January, 2020 -- because there's no
longer, and there really hasn't ever been, an allegation of
evidence that he was parallel trading, is that right, before
that?

MR. KOSTO:  There is.  The SEC spreadsheet lists him

1    as someone who was involved in parallel trading.

2         THE COURT:  In fact you've looked at it.  Was he

3    involved in other trades?  I asked you that before about --

4         MR. KOSTO:  Oh, it's indisputably true that he

5    traded in parallel with Mr. Irzak in security --

6         THE COURT:  Other than Avnet?

7         MR. KOSTO:  Other than Avnet.  That wasn't disclosed

8    to Judge Bowler.

9         THE COURT:  That wasn't disclosed, okay, so --

10:32 10         MR. KOSTO:  That's just untrue.

11         THE COURT:  At this point, though, the magistrate

12    judge doesn't know that, so all we have is the one trade.

13         MR. KOSTO:  And Agent Kang's statement that he

14    believed it was true based on information in --

15         THE COURT:  But that was only in the September one.

16         MR. KOSTO:  It was only in the September one.

17         THE COURT:  In October -- this is why I started off

18    with, how much do I have to consider one versus the other? --

19    all that Judge Bowler knows is one suspicious trade.  So the

10:32 20    question that I have is, assuming one bad trade, I think the

21    challenge is, why did you go back to -- is there a way in

22    which, when your team goes in to look, why does the search go

23    back to 2005?  Is there a way of just saying, "I'm only going

24    to take 2018 to the present"?

25         MR. KOSTO:  Let's talk about that for a second.

```
 1              THE COURT:  Because it is a worrisome --
 2              MR. KOSTO:  It has been the case -- this starts with
 3      Rule 41, your Honor.  Rule 41(e)(2) describes the way in which
 4      electronic evidence is seized and then searched, not just in
 5      this district and not just in this circuit but nationwide for
 6      the past couple of decades.  Rule 41(e)(2) contemplates the
 7      seizure of electronically stored information for later review,
 8      which is exactly what happened here.  The warrant directed
 9      Apple to provide the contents of the account for a date-limited
10:33 10  period, January 1, 2018, to the present.  Apple may have
11      provided more than that.  But even if the warrant had said
12      provide everything --
13              THE COURT:  Well, why didn't Apple just provide 2018
14      to the present?
15              MR. KOSTO:  I can't speak to Apple, but --
16              THE COURT:  Well, why did you take more than 2018 to
17      the present?
18              MR. KOSTO:  My take is, the cases say that it is not
19      on the Googles and Apples of the world to review the contents
10:34 20  of their subscriber's account and decide what's relevant.
21      They're not the ones going through and making relevance
22      determinations or evaluating whether something is evidence --
23              THE COURT:  For sure, but it does say, and I'm reading
24      the warrant...  I understand they're not going through to say,
25      well, what's relevant to insider trading, but it's easy to pick
```

1    up the year.

2              MR. KOSTO:  But the point is, for the agents, what the

3    agents do -- and Mr. Klyushin gets in discovery the entire

4    account because it's full of his Rule 16 statements.  All the

5    communications with his wife and his photographs, he gets them

6    because we got them, but if they're not --

7              THE COURT:  You're not trying to argue you can use

8    them, can you?

9              MR. KOSTO:  No.  We didn't seize them.  The warrant

10:34 10   permits the seizure of information that is evidence, fruits and

11   instrumentalities of six specific federal crimes.  The fact

12   that --

13             THE COURT:  I'm just saying, do you stipulate that

14   when this case goes to trial, you cannot use anything that

15   predates 2018?

16             MR. KOSTO:  Yes, with the caveat that something from

17   November of 2017, for example, could refer to the existence of

18   the relationship in 2018.  So if you have, for example --

19             THE COURT:  I'm not sure I --

10:35 20             MR. KOSTO:  If you have a document in December -- this

21   is an evidentiary question -- if you have a document in

22   December of 2017 that refers to a January, 2018 real estate

23   closing, that's not a 2017 document that can't be used in

24   connection with a 2018 --

25             THE COURT:  Well, is there such a document?

1          MR. KOSTO:  That's a -- we're not offering any

2     evidence of a real estate closing --

3          THE COURT:  But just as a general matter -- I'm not

4     saying that there may not be something which sort of like the

5     doctrine of completeness or something may let in, but on the

6     whole, I don't understand why they seized from 2005 to 2018 if

7     the warrant says 2018 forward.

8          MR. KOSTO:  Those are not seized, your Honor.  As a

9     general matter, I agree with the proposition that from

10:35 10     January 1, 2018, forward is the records and information the

11     government is going to be introducing, but Apple produced the

12     entire scope of information.  The agents searched within that

13     to find evidence, fruits and instrumentalities of --

14          THE COURT:  But they didn't start in 2018 and say to

15     Apple, "Oh, we're going to delete these"?

16          MR. KOSTO:  We didn't.

17          THE COURT:  What's it called, a filtration team?  Is

18     that what it's called?

19          MR. KOSTO:  It's not a filter team, but the agents are

10:36 20     not obli- -- the agents would be unwise to delete evidence that

21     Apple provided --

22          THE COURT:  All right, fine, but let's go from here,

23     from here.

24          MR. KOSTO:  Yes.

25          THE COURT:  I'm troubled by it.  If I said, you know,

1   you can go into, I don't know, a second-floor apartment in a

2   triple-decker and someone went into the first-floor apartment,

3   that would be suppressed.

4          MR. KOSTO:  What would be suppressed was what was

5   taken out of the first-floor apartment.

6          THE COURT:  Fine, all right, but here this was taken.

7          MR. KOSTO:  It wasn't taken when Apple sent it.  Apple

8   sent it in response to the warrant.  The government didn't send

9   from 2005 to 2018.  Apple sent that material, and the

10:36 10   government looked within it for evidence, fruits and

11  instrumentalities from 2018 forward.

12          THE COURT:  Oh, so you didn't look at anything before

13  2018?

14          MR. KOSTO:  We clearly looked at things before 2018 to

15  determine whether they were related to 2018.

16          THE COURT:  Did you go back to 2005?

17          MR. KOSTO:  No, your Honor.

18          THE COURT:  So he's saying that all this stuff was

19  introduced at the bail hearing.

10:37 20          MR. NEMTSEV:  The November, 2017, your Honor,

21  photograph regarding awards, medals, things that are unrelated

22  to insider trading in any way.

23          THE COURT:  Oh, is that the award from President Putin?

24  Is that the --

25          MR. NEMTSEV:  It was a different award but very

1   similar.  It was a photograph prominently featured --

2            THE COURT:  I don't know what the timing on everything

3   was.

4            MR. KOSTO:  But the timing of the communications that

5   the government intends to introduce at trial are the

6   communications between Mr. Klyushin and Mr. Ermakov while the

7   conspiracy is ongoing, after January 1, 2018.

8            THE COURT:  Well, actually, the conspiracy charged is

9   2019.  No?  Do I have it here?  Well, I'm just troubled by the

10:38 10   breadth; let's put it that way.  Are there cases on how you

11   think about what to do with iCloud accounts?

12            MR. KOSTO:  Absolutely, your Honor.  Let's start with

13   *United States v. Aboshady*, which is a First Circuit case.  It

14   was an appeal from a case of Judge Gorton's.  It was a fraud

15   case in which the government, much like here, was accused of

16   taking the entirety of a defendant's email account going all

17   the way back, every email from a long period of time, thousands

18   and thousands of emails, including intimate photographs -- not

19   intimate photographs but photographs of the defendant and his

10:38 20   wife in the labor and delivery room in connection with the

21   birth of the defendant's child, and the government wasn't --

22            THE COURT:  Were you involved in that case?

23            MR. KOSTO:  No, I was not.

24            THE COURT:  I thought you were all things computer.

25            MR. KOSTO:  That one predates me, your Honor.

1        THE COURT:  All right.

2        MR. KOSTO:  But what the First Circuit holds is, the

3   fact that personal pictures or communications between husband

4   and wife are obtained during the search warrant process, that's

5   not the metric.  Yes, the government obtained personal

6   communications and personal photographs of the defendant, but

7   those were not the ones seized.  They might have --

8        THE COURT:  You're saying they weren't seized.  I

9   mean, you didn't have a raid team run into somebody's room, but

10:39 10   you basically issue a warrant to Apple.  I'm constantly issuing

11   nondisclosure orders, so Apple is not telling anyone that they

12   were seized, and then you -- I didn't do it in this case, but I

13   do it as a matter of course.  And so those were effectively

14   seized.  That's the way you seize electronic information, with

15   a warrant.

16        MR. KOSTO:  This is described in the case law, your

17   Honor -- and I'll cite you to a couple cases -- as the two-step

18   process.

19        THE COURT:  Okay.

10:39 20        MR. KOSTO:  Step one is the Internet service provider,

21   the electronic communications provider, provides the entirety

22   of the content because, as the *Ray* case holds, law enforcement

23   need not rely on an email host company or any other private

24   party to sift through emails to determine what is relevant.

25        THE COURT:  I agree with that.

1          MR. KOSTO:  So everything comes over.

2          THE COURT:  But that's relevance, not timing.

3          MR. KOSTO:  Correct.  And then the government reviews

4     what is produced to identify information to seize.  It sounds

5     inapt because it's already been taken from Apple, but it's

6     Apple that sent it over.  What the government seizes is what

7     they look through and pull once they have the entirety of the

8     account.

9          THE COURT:  So did the government here look through

10:40 10    things before 2018?

11         MR. KOSTO:  The government could properly look through

12    things before 2018 to determine if they relate to things after

13    2018.

14         MR. FRANK:  If I could just give a --

15         THE COURT:  Assume your case -- you know, this is a

16    January, 2020 trade -- that maybe you could look at December to

17    see if something laid it up, but I can't see a basis for going

18    back to 2005.

19         MR. FRANK:  Your Honor, if we go into somebody's house

10:40 20    and we have a search warrant to search somebody's home office

21    for materials from 2018 on, we're allowed to search the entire

22    home office and all of the files in it, but to seize only the

23    documents from 2018 on.  But we can look at all the documents

24    to determine, are those documents from 2018 on?  Otherwise

25    there's no way to practically seize the ones from 2018 on.

1          THE COURT:  But if you had a file cabinet, just to

2    play this out, that says 2018, 2017, 2005, you would not be

3    allowed to look in the file cabinet from 2005.

4          MR. KOSTO:  You'd be justified to look --

5          THE COURT:  Anyway, I think I've got the issue.  And

6    is there any one of these cases, and we'll look further, that

7    deals with the timing issue?  But I'm not sure it matters if I

8    just chop it off; you can only introduce any evidence from 2018

9    forward.

10:41 10          MR. KOSTO:  In *Aboshady*, the case I was describing in

11   which the court held that the government's mere possession of

12   these kind of photos doesn't negate the entirety of the

13   warrant, *Aboshady* says, "The remedy in the case of a seizure

14   that casts its net too broadly is not blanket suppression but

15   partial suppression."

16          THE COURT:  Okay, all right, so I've got the nub of

17   this issue.

18          MR. KOSTO:  So that is the probable cause issue, your

19   Honor.  And you asked, well, why wouldn't it just be as to

10:42 20   Avnet?  Because the affidavit sets forth a description of a

21   scheme, a scheme that involves trading in multiple securities

22   in a timely fashion, the Avnet is one example.  Accepting for

23   the moment that the affidavit establishes probable cause to

24   believe that Avnet is part of a scheme of Russian traders who

25   are gaining unauthorized information, trading on that

information and profiting from it, it wouldn't make sense for
the government to have to go in and say, "Ah, here's Avnet.  We
found Avnet.  Let's go back to the court now and ask for the
next stock, and then come back to the court again and ask for
the next stock."  The affidavit sets forth a scheme that's
fairly consistent.

THE COURT:  Okay, thank you.  I think I've got this.
I'm going to allow defendant's counsel to -- you didn't -- I
don't know if I cut you off prematurely, but you didn't get a
chance to address the *Franks* issue, and I thought I needed to
go back and do that.

MR. KOSTO:  Sure, and before we finish that --

THE COURT:  I don't want you -- they need to address
it before you do, I think.

MR. KOSTO:  Correct, but before I finish that, I think
this is a good point to mention because the First Circuit has
chided us in the past for not raising it, but the agents would
be entitled to the good-faith exception under *Leon* for
presenting this affidavit to Judge Bowler, for having
Judge Bowler sign it, and for being the kind of affidavit that
we could have an hourlong discussion about whether or not
probable cause exists.  That's not the kind of case where
probable cause is so absent that no reasonable officer could
rely on the affidavit.

THE COURT:  Fair enough.  It's fair enough to raise

1   that.

2           MR. NEMTSEV:  And, your Honor, I would disagree with

3   my colleague.  You can't have probable cause for one transaction,

4   Avnet, and then go in and seize everything.  It is a seizure.

5           THE COURT:  But let's assume I limit it to 2018.  I'm

6   sort of leaning that way unless there's a hook that somehow

7   under the doctrine of completeness --

8           MR. NEMTSEV:  There's more than just 2018.  That's

9   just the temporal scope, but they violated blatantly by going

10:44 10   back and seizing pictures from November of 2017 and then using

11   them.  You know, yes --

12           THE COURT:  That may be, but isn't the remedy, as

13   counsel pointed out, just you lop those off from the trial?

14           MR. NEMTSEV:  Not always, your Honor.  "When executing

15   agents are considered to 'flagrantly disregard' the warrant's

16   terms where they affect a widespread seizure of items that were

17   not within the scope of the warrant and don't act in good

18   faith, then the extreme remedy of blanket suppression should be

19   imposed."

10:44 20           THE COURT:  All right, so you're urging a broader

21   remedy?

22           MR. NEMTSEV:  I am, your Honor, I am, because it's

23   such a broad seizure.  And I know they say it's not a seizure,

24   but once you get it from Apple, to me, it's a seizure.  Once

25   you start searching it and you search outside the bounds and

1    then use things that are outside the bounds of the warrant,

2    that's using evidence that you're not entitled to.

3         THE COURT:  But can I ask you this.  I understand

4    there were some pictures taken of his family and of him getting

5    some award from the Russian government.  Was there anything

6    that came in that you saw that was relevant to the charge of

7    parallel trading?

8         MR. NEMTSEV:  Very little, your Honor.

9         THE COURT:  So what you're trying to say, I think, is,

10:45 10  even if I impose that sanction, it doesn't really affect the

11   case very much?  It's not the heart of the case.  Let's put it

12   that way.  It's all post-2018.

13        MR. NEMTSEV:  Yes, your Honor, but --

14        THE COURT:  All right, so no picture of the wife, no

15   picture of the award, still the heart of the case is post-2018?

16        MR. NEMTSEV:  The heart of the case is post-2018, but

17   the heart of the case relies on the iCloud search warrant, your

18   Honor.

19        THE COURT:  Yes, yes, yes, I would still have to

10:46 20  decide probable cause, I agree.

21        MR. NEMTSEV:  You would still have to decide probable

22   cause.  You would exclude a lot of, you know, evidence.  380

23   gigabytes worth of evidence is a lot.  I mean, you know, pages,

24   that's probably 20, 30 million pages --

25        THE COURT:  Well, how many post-2018, how many pages?

```
 1              MR. NEMTSEV:  Significant amounts as well, but I think
 2    the bulk --
 3              THE COURT:  Probably a lot less, a lot less, so --
 4              MR. NEMTSEV:  I couldn't quantify it for you, your
 5    Honor.
 6              THE COURT:  Okay.
 7              MR. NEMTSEV:  I can't quantify it for you.
 8              THE COURT:  Please address the Franks issue.  You can
 9    rest on the briefs if you choose to do so, but I thought we --
10    I mean, I cut you off prematurely.  I'm sorry.
11              MR. NEMTSEV:  I just wanted to say a couple words in
12    response.  I did calculate how many search warrants Judge Bowler
13    issued in between September and October.  It was forty-five.
14              THE COURT:  How many?
15              MR. NEMTSEV:  Forty-five.
16              THE COURT:  Forty-five search warrants?
17              MR. NEMTSEV:  Forty-five other search warrants that
18    she issued.  So it's unlikely that in October she's thinking
19    back forty-five warrants or before that, "Oh, I remember that
20    there was --"
21              THE COURT:  Yes, that is unrealistic.
22              MR. NEMTSEV:  "-- belief statements."
23              THE COURT:  It's unrealistic that she went and did a
24    line-by-line comparison.  I agree with that.
25              MR. NEMTSEV:  No.  I think she just relied on the
```

1    contents of the October warrant, which excluded allegations of

2    broader parallel insider trading --

3              THE COURT:  Right, and I'll only look within the four

4    corners of the October affidavit.

5              MR. NEMTSEV:  Yes.

6              In terms of what Agent Kang was advised by the SEC, I

7    have the spreadsheet in front of me, but the spreadsheet says

8    nothing.  It's just a list.  You know, there's nothing

9    indicating that it was a list of parallel transactions, it was

10:47 10    a list --

11             THE COURT:  Do I have that?

12             MR. NEMTSEV:  No, your Honor.  I've never filed it,

13   but I could provide the Court with a copy.

14             THE COURT:  Yes, why don't you provide one and we'll

15   mark it, in case that should come up later.

16             MR. NEMTSEV:  I would just ask that it be filed under

17   seal.

18             THE COURT:  Yes, yes.

19             MR. NEMTSEV:  In the sense that so many transactions

10:47 20   took place in Filing Agents 1 and 2 or companies serviced by

21   Filing Agents 1 and 2, there's only three filing agents in the

22   United States that service public companies.  These Filing

23   Agents 1 and 2 service the bulk of the marketplace, you know,

24   and the majority, thousands of companies.  You know, the fact

25   that somebody had, you know, majority of transactions in Filing

1    Agents 1 and 2 means nothing.  It doesn't really add to the

2    calculus.  In all honesty, it's almost strange that it is

3    traded in companies serviced by Filing Agent 3, if he had

4    information coming from Filing Agents 1 and 2 relating to their

5    customers.

6              THE COURT:  Listen, just getting to the *Franks* issue,

7    I understand that the agent had been criticized ten years

8    earlier --

9              MR. NEMTSEV:  He was, Judge.

10:48 10          THE COURT:  -- in a case even I had heard about, the

11   *Rajaratnam* case.  It was very famous at the time.  So he was

12   criticized.  Ultimately, the Second Circuit didn't exclude

13   information based on *Franks*, so it's a little hard to -- the

14   First Circuit has basically said that that's not enough.

15             MR. NEMTSEV:  So slight differences.  In the Second

16   Circuit in the *Rajaratnam* case and in the First Circuit -- I

17   forget the name, your Honor --

18             THE COURT:  I do too.

19             MR. NEMTSEV:  Yes -- there was both ample probable

10:49 20  cause outside of the belief statements or misstatements or

21   omissions that were present in those cases on the agent's

22   testimony.  Here, aside from Avnet, it's only that belief.  In

23   order to issue that broad warrant, the magistrate judge had to

24   have rested on that belief, had to have --

25             THE COURT:  But can I just say, that's why I started

1    off with, which warrant do I look at?

2              MR. NEMTSEV:  The September one, your Honor.

3              THE COURT:  Yes, that's the September.  The October

4    one, the objective beliefs of Mr. Kang are beside the point.

5              MR. NEMTSEV:  Correct, for the October one, his

6    beliefs are beside the point, but for the September ones,

7    they're --

8              THE COURT:  But even if I were to exclude the "it is

9    believed" comment, the rest of it is in there.  So that's why I

10:50 10   was getting held up on the *Franks* issue.

11             MR. NEMTSEV:  The rest of it is in there, and that

12   would lead to Avnet, and that would be --

13             THE COURT:  Yes.

14             All right, anything you want to say on this?

15             MR. KOSTO:  Just I think your Honor has *United States*

16   *v. Southard*, which just is so on point --

17             MR. NEMTSEV:  That's the name.

18             MR. KOSTO:  -- that this ten-year-old allegation, that

19   actually never came to anything, wouldn't give Agent Kang a

10:50 20   reason to know he needed to disclose it.  And there's nothing

21   that the defense has pointed to in the affidavit that they

22   allege is false.  The classic *Franks* situation is, "You didn't

23   allege the cooperating witness's criminal history.  If the

24   judge had been aware of that, they would have scrutinized the

25   statement and concluded that the cooperating witness was lying

1    and that there was no drug deal."  Here, that statement is

2    disconnected, or the lack of the inclusion of *Rajaratnam* is

3    disconnected from anything in the affidavit that Judge Bowler

4    signed.  As the Court notes, there's no "belief" statement in

5    the October affidavit, and it's really extraneous to probable

6    cause for the September affidavit for all the reasons that

7    we've shared.

8              THE COURT:  Okay, all right, thank you.  So I'm going

9    to take the motion to suppress under advisement.  I've denied

10:51 10   the motion to dismiss.  The government is going to file the

11   spreadsheet under seal that you're all referencing -- I don't

12   think I have it, I think that's right, I don't have it -- and,

13   in addition, you're going to just do an inquiry of Mr. Kang if

14   he remembers why he deleted that.

15             We have a firm trial date in early January.  No, late

16   January, late January.  That's right, late January.  And do we

17   have a pretrial conference date?

18             MR. NEMTSEV:  January 5, I believe, your Honor.

19             THE COURT:  What do we think the length of this trial

10:52 20   might be?

21             MR. NEMTSEV:  No longer than two weeks, I believe.

22             THE COURT:  Two weeks half days?

23             MR. NEMTSEV:  Two weeks half days.

24             MR. KOSTO:  I agree, your Honor.

25             THE COURT:  Two weeks half days.  I'm trying to plan

1  my life in February.  All right, so --

2          THE CLERK:  And I think we're going to switch the date

3  to Monday because we're not impanelling on Tuesdays.

4          THE COURT:  Yes, we're impanelling back on Mondays

5  now, just so we can --

6          THE CLERK:  It will be the 30th instead of the 31st.

7          THE COURT:  All right, and we have a pretrial date.

8  And I understand -- I really don't want to continue it again.

9  I did understand there was so much information.  I sort of

10:52 10  wished I had held this hearing beforehand because I would have

11  chopped off everything before 2018, unless the government made

12  a particular plug for something, so --

13          MR. KOSTO:  The government doesn't expect to introduce

14  evidence from before 2018.  If there's an offhand piece of

15  evidence from before that, we'll offer justification for it and

16  why it fits within the terms of the warrant.  That's all.

17          MR. NEMTSEV:  And, your Honor, could I just address

18  that 2018 date?  I don't understand where January, 2018, comes

19  from.

10:53 20          THE COURT:  Isn't that what the warrant said, from

21  2018?

22          MR. NEMTSEV:  That's what the warrant says, but

23  Agent Kang also states in his affidavit that the earliest the

24  hack occurred was November of 2018.  Mr. Klyushin didn't have a

25  Saxo Bank account until June of 2019, and the transaction in

          1     Avnet took place in January of 2020.  It doesn't make sense to
          2     me why the start date for probable cause is January of 2018.
          3              THE COURT:  I see.  So you're saying it should be when
          4     he --
          5              MR. NEMTSEV:  It should be much later.
          6              THE COURT:  -- got the account or something like that?
          7              MR. NEMTSEV:  Yes.
          8              MR. KOSTO:  The affidavit sets forth information about
          9     parallel and suspicious trading as early as August of 2018.
10:54    10     The January 1, 2018 date is meant to capture the relationships
         11     that would lead to that trading.
         12              THE COURT:  All right, thank you.  I hadn't realized
         13     you were challenging that time period.  Was that in the brief?
         14              MR. NEMTSEV:  It was, your Honor, in the reply brief.
         15              THE COURT:  Okay.
         16              MR. FRANK:  If I could just add one thing.  Obviously
         17     Mr. Kosto has done a great job, but the only thing I would say,
         18     your Honor, is, there's no reason to chop anything off because
         19     it's been chopped off.  The search warrant exists.  It
10:54    20     authorizes a seizure from that date forward.  If we were to
         21     offer something prior to that date --
         22              THE COURT:  I just wanted -- look, Mr. Klyushin is
         23     incarcerated.  It's impossible, it's very difficult to get
         24     computer access to things.  I just want to take this off their
         25     plate that they even have to think about it.  So unless you do,

1    as you say, a special proffer or whatever, anything before

2    January 1, 2018, is off the table.

3            MR. FRANK:  Yes, your Honor.

4            THE COURT:  Okay.  But in the meantime, I've taken the

5    motion to suppress under advisement, and I think we've done

6    what we need to do today, unless there's some other issue that

7    we need to address.

8            MR. FRANK:  Not for the government, your Honor.

9            MR. NEMTSEV:  Just a question, your Honor.  We have

10:55 10   the January 5 conference.  Do you want us to file motions in

11   limine ahead of time?

12           THE COURT:  Haven't we sent out the -- I think we sent

13   out a pretrial order.  If we didn't, we should have.

14           MR. NEMTSEV:  We have one for September, but we don't

15   have one for January.

16           THE COURT:  Maybe you two confer about when the

17   updated pretrial order is.  I'm pretty flexible as long as I

18   have a chance to read the stuff.  Most people don't do much in

19   that week between Christmas and New Year's, so hopefully

10:55 20   everything will come in before that.

21           MR. FRANK:  Your Honor, I'm in trial the two weeks

22   before that.

23           THE COURT:  Are you?  Where are you on trial?  Over

24   Christmas?

25           MR. FRANK:  No.  The two weeks before Christmas.

1                THE COURT:  Who are you in front of?

2                MR. FRANK:  Before Judge O'Toole.

3                THE COURT:  Well, okay.

4                MR. FRANK:  It's some holiday season for me.

5                THE COURT:  It's going to be really busy.

6                MR. FRANK:  It will be, but we'll confer with the

7      defense on the dates.

8                THE COURT:  Yes, just confer.  But here's what you

9      can't do to me, is file everything on the 24th and assume I'm

10:56 10  going to read because I have family time too, and the 5th comes

11     right up.  So, ideally speaking, things will come in the week

12     before Christmas.

13               THE CLERK:  Do you want stipulations on the docket?

14               THE COURT:  Yes.  When can you confer and file that?

15               MR. FRANK:  We can do that this week, your Honor.

16               THE COURT:  And let me just get a sense of this.  Is

17     your trial primarily forensic computer people?

18               MR. FRANK:  It's computer people.  It's analysis of

19     the stock trading, so it's SEC people.

10:56 20          THE COURT:  So there are no live percipient witnesses?

21               MR. FRANK:  No.  It's the victims, and it's the case

22     agent testifying about communications that were seized.  It's

23     going to be a short and sweet trial from the government's --

24               THE COURT:  All right, but there may be *Daubert* or

25     something like that.

1          And from your point of view, are you having your own

2    experts?

3          MR. NEMTSEV:  We will.  We'll have a computer forensic

4    expert and a trading expert, your Honor, to --

5          THE COURT:  All right, so it's a very technical trial?

6          MR. NEMTSEV:  It is.  There's nothing interesting

7    about it.

8          THE COURT:  Well, I wouldn't say that.  It's important

9    to Mr. Klyushin.

10:57 10          MR. NEMTSEV:  It's very important but nothing

11    interesting for the jury.

12          THE COURT:  All right, well, whatever.

13          MR. FRANK:  We're going to keep them on the edge of

14    their seats, your Honor.

15          THE COURT:  What?

16          MR. FRANK:  We're going to keep them on the edge of

17    their seats.

18          THE COURT:  All right.  My biggest concern is finding

19    a jury, between COVID and -- I want to make sure it's fair and

10:57 20    impartial and any preexisting --

21          I would hope -- let me just think about this one --

22    that if there's a mention of top officials in Russia, I think

23    that would make it difficult to find a jury.  So I don't know

24    to the extent there will be evidence of that, but maybe you can

25    confer about that.

1          MR. NEMTSEV:  That was one of my anticipated motions

2     in limine, your Honor.

3          THE COURT:  I thought so.  It might make a difference

4     as to how many people we call in, so just talk and think about

5     that, okay?

6          MR. NEMTSEV:  Yes, your Honor.

7          THE COURT:  All right, thank you.  Thank you.

8          THE CLERK:  All rise.

9          (Adjourned, 10:58 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2

3

UNITED STATES DISTRICT COURT )

4   DISTRICT OF MASSACHUSETTS    ) ss.

CITY OF BOSTON                )

5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8   do hereby certify that the foregoing transcript, Pages 1

9   through 58 inclusive, was recorded by me stenographically at

10  the time and place aforesaid in Criminal No. 21-10104-PBS,

11  United States of America v. Vladislav Klyushin, and thereafter

12  by me reduced to typewriting and is a true and accurate record

13  of the proceedings.

14          Dated this 18th day of November, 2022.

15

16

17

18

19

                /s/ Lee A. Marzilli

20          _____

                LEE A. MARZILLI, CRR

21              OFFICIAL COURT REPORTER

22

23

24

25