

**U.S. Department of Justice**

*Rachael S. Rollins*
United States Attorney
District of Massachusetts

Main Reception  (617) 748-3100

John Joseph Moakley United States Courthouse
1 Courthouse Way
Suite 9200
Boston, Massachusetts 02210

December 22, 2022

ELECTRONIC MAIL

Maksim Nemtsev, Esq.
20 Park Plaza, Suite 1000
Boston, MA 02116

Marc Fernich, Esq.
800 Third Avenue, Floor 20
New York, NY 10022

Re:   *United States v. Vladislav Klyushin*
      Criminal No. 21-10104-PBS

Dear Max and Marc:

As we discussed at yesterday's status conference, please accept this supplemental disclosure under Fed. R. Evid. 702, 703, and 705, and Fed. R. Crim. P. 16(a)(1)(G) concerning Maxwell Clarke's anticipated testimony. We also enclose the data on which Mr. Clarke relied in arriving at the opinions described in our December 8, 2022 letter and below.

*Correlation Between the Conspiracy's Trading and FA1 or FA2 as the Filing Agent*

For the period January 1, 2018 through September 30, 2020, Mr. Clarke identified a universe of earnings announcements on which a trader could have traded, the SEC filings associated with those earnings announcements, and the accession number associated with each SEC filing. (An accession number is a unique identifier that the SEC assigns to individual filings to its EDGAR system, which reflects the identity of both the company reporting its earnings and the filing agent, if any, that serviced the filing).

Mr. Clarke then identified the number of earnings announcements that took place during the time that each of the eight traders was active.[1] For example, between Vladislav Klyushin's first trade in this period (July 17, 2018) and his last (September 30, 2020), there were 38,359

---

[1] As described in our December 8 letter, the traders included Vladislav Klyushin, Nikolai Rumiantcev, Aleksandr Borodaev, Igor Sladkov, M-13, Mikhail Irzak, Boris Varshaivsky, and Sergei Uryadov.

earnings announcements. 16,810 of these earnings announcements had an accession number indicating that FA1 or FA2 handled the SEC filing related to that announcement, representing approximately 44 percent of all filings in the period.[2] Mr. Klyushin traded in 356 of these 38,359 events, but 343 of his trades (or 96 percent of them) surrounded earnings events serviced by either FA1 or FA2 (per the accession number associated with the filing). Mr. Clarke's analysis shows this was extremely unlikely to occur by chance. He would opine based on a Fisher Exact test run on Mr. Klyushin's trading in this universe of earnings events that the probability that Mr. Klyushin would trade by chance almost exclusively in FA1 and FA2-serviced companies is at most 1 in a trillion, somewhat akin to flipping a coin 356 times and having the coin come up heads on 343 of the flips. The analysis for the other seven traders is similar.

*Earnings Surprises*

As previously described, Mr. Clarke is expected to testify that he compared the above investors' pre-announcement choice of trading direction (long vs. short, buy vs. sell) against the direction of "unexpected earnings outcomes". You requested further definition of the term "unexpected earnings outcomes", specifically the threshold amount by which an issuer's announcement of its financial performance (as measured by earnings per share) would have to differ from market analysts' published predictions (as reported in the Institutional Brokers Estimate System) about those earnings per share. Mr. Clarke examined all of the traders' trades in FA1 and FA2 earnings events, identified the announcements associated with them as either positive or negative earnings surprises or "no surprise", and then analyzed only the top three quartiles of positive or negative earnings surprises, based on the assumption that the most modest earnings surprises (those in the bottom quartile closest to analysts' published expectations) would have less predictable effects on the issuer's share price. As previously disclosed, Mr. Clarke used a Fisher Exact Test to conclude that chance could not explain the frequency with which the above traders consistently predicted the most significant unexpected earnings outcomes in their pre-announcement choice of trading direction, which occurred, for example, approximately 86 percent of the time in Mr. Klyushin's trades. Here, the likelihood that chance would lead to a situation where Mr. Klyushin's trading would correctly predict the most significant unexpected earnings outcomes was again less than 1 in a trillion.

Mr. Clarke's underlying data, which we are sharing with you, includes the Institutional Broker Estimate System data (i.e., the analysts' predictions and actual outcomes, the announcement dates, and the announcement times) for all eight traders' trades.

---

[2] Mr. Clarke did not use an FA1 or FA2 "client list" to determine market share because the accession number is the most precise identifier of which filing agent, if any, was involved in a particular earnings announcement. An announcing company's presence on an FA1 client list, for example, would not indicate whether the company used the filing agent for a particular announcement or not.

*FA2 Downloads and Trading in FA2-Serviced Events*

We previously disclosed that:

Mr. Clarke is also expected to testify that he analyzed the timing of the above investors' first trades in certain issuers before an earnings event, as it related to the timing of downloads of the same issuers' financial information from FA2. Specifically, he identified the above traders' first transactions in certain ticker symbols where FA2 logs revealed that those issuer's financial information had been downloaded before the earnings announcement. Mr. Clarke is expected to testify, based on a non-parametric permutation test, that there is a statistical relationship between the time of the download and the investors' first trade; that in nearly all cases, the download preceded the investors' first trade; and that that relationship cannot be explained by chance.

You requested the time period for which Mr. Clarke analyzed whether there was a correlation between the eight traders' trading and downloads from FA2's network, which was February 4, 2018 to September 30, 2020—all dates within the alleged existence of the conspiracy.

You also requested a recitation of the "statistical significance of [Mr. Clarke's] findings". Because the eight traders made 494 trades in FA2-serviced earnings events, and 491 of those trades took place after information had been downloaded from FA2 but before the public earnings announcement, Mr. Clarke would opine that the observed relationship between the timing of their first trades in FA2-serviced earnings events and the timing of the first download of information from FA2 related those events would happen by chance (*i.e.*, uncorrelated to the fact and timing of a download from FA2) less than 1 time in a million. Mr. Clarke would testify that the accepted standard for "statistical significance" is typically measured at 95 percent or 99 percent, which is either a 1-in-20 or 1-in-100 chance, and that he can therefore state with an extremely high level of confidence that the timing of the download and the timing of the eight traders' trades are correlated.

I approve this disclosure pursuant to Fed. R. Crim. P. 16(a)(1)(G)(v).

*Clarke, Maxwell*
Digitally signed by Clarke, Maxwell
Date: 2022.12.21 15:01:09 -05'00'

MAXWELL CLARKE

      We are happy to discuss the exchange of summary exhibits on a mutually agreeable schedule.

      Please contact us if you have any questions.

Very truly yours,

RACHAEL S. ROLLINS
United States Attorney

By:    */s/ Seth B. Kosto*
        SETH B. KOSTO
        STEPHEN E. FRANK
        Assistant U.S. Attorneys

Enclosures by USAFx