1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2

3        UNITED STATES OF AMERICA,            )
                                              )
4                    Plaintiff               )
                                              )
5            -VS-                             )  Criminal No. 21-10104-PBS
                                              )  Pages 1 - 53
6        VLADISLAV KLYUSHIN,                  )
                                              )
7                    Defendant               )

8
                   **FINAL PRETRIAL CONFERENCE IN PERSON**
9

10                BEFORE THE HONORABLE PATTI B. SARIS
                     UNITED STATES DISTRICT JUDGE
11

12

13
                              United States District Court
14                            1 Courthouse Way, Courtroom 19
                              Boston, Massachusetts  02210
15                            January 5, 2023, 2:52 p.m.

16

17

18

19

20

21                     LEE A. MARZILLI
                     OFFICIAL COURT REPORTER
22              United States District Court
                1 Courthouse Way, Room 7200
23                  Boston, MA  02210
                     leemarz@aol.com
24

25

```
 1    A P P E A R A N C E S:

 2         SETH B. KOSTO, ESQ. and STEPHEN E. FRANK, ESQ.,
      Assistant United States Attorneys, Office of the United States
 3    Attorney, 1 Courthouse Way, Room 9200, Boston, Massachusetts,
      02210, for the Plaintiff.
 4
           MAKSIM NEMTSEV, ESQ., 20 Park Plaza, Suite 1000,
 5    Boston, Massachusetts, 02116, for the Defendant.

 6         MARC FERNICH, ESQ., Law Office of Marc Fernich,
      800 Third Avenue, Suite Floor 20, New York, New York, 10022,
 7    for the Defendant.

 8    ALSO PRESENT:  Alex Tetradze, Russian Interpreter

 9


10                            I N D E X

11
      EXHIBITS                      PAGE
12
      A                             41
13

14

15

16

17

18

19

20

21

22

23

24

25
```

<u>P R O C E E D I N G S</u>

1

2       THE CLERK:  Court calls Criminal Action 21-10104,

3 United States v. Klyushin.  Could counsel and the Interpreter

4 please identify themselves.

5       MR. FRANK:  Stephen Frank and Seth Kosto for the

6 United States.  Good afternoon, your Honor.

7       MR. KOSTO:  Good afternoon.

8       MR. FERNICH:  Good afternoon, your Honor.  Max Nemtsev

9 and Marc Fernich on behalf of Vladislav Klyushin.

02:52 10       (Interpreter Tetradze duly sworn.)

11       THE CLERK:  And could you please state and spell your

12 name for the Court Reporter.

13       THE INTERPRETER:  Alexander Tetradze, T-e-t-r-a-d-z-e,

14 Russian interpreter.

15       THE COURT:  Thank you.  As you know, we have a hearing

16 today, and I'm sure we won't be done.  I need to finish this by

17 4:00 o'clock because of another meeting that I have, and so we

18 will do the rest of it on the 12th.  In addition, there have

19 been two motions to supplement that were filed by the defense.

02:53 20 Do you have a position on those?

21       MR. KOSTO:  We assented to him filing a motion, and we

22 don't disagree with Mr. Nemtsev updating his pleadings.  We'd

23 simply ask for an opportunity to respond once he's --

24       THE COURT:  All right, so when were you going to be --

25 I just got this morning, or last night, the motion with respect

1    to the geo-positioning methodology, and then you were going to

2    file another motion with respect to the statistics on the 9th?

3    Is that it?

4         MR. NEMTSEV:  That's right, your Honor, because we

5    have a rebuttal expert.  He's finishing his review.  It's tens

6    of thousands of line items of data.  It should be done by

7    Monday, and we'll file a supplement.

8         THE COURT:  So we will deal with the statistical

9    issues and the computer methodology issues on the 12th.  I

02:54 10   would like to begin discussing them today.  I am not familiar

11   with a lot of terminology that's been used by both sides.  You

12   assume a certain level of knowledge that I don't have.  I do

13   think we will need the 12th, one, to explain it, and I'm open

14   to the possibility of witnesses, if need be.  I'm particularly

15   concerned about geo-positioning, which I don't really

16   understand, and indeed it was a late-arriving issue.  I mean, I

17   just never heard of it till this was filed, and it turns out to

18   be an important issue for venue issue, I think primarily, but

19   nonetheless I'm worried about it enough so that I'll want to

02:55 20   spend time having a hearing at length about it.

21        Now, assuming for a minute that we can still go

22   forward the last week in January going into February, there

23   have been a couple of road bumps.  As you may have heard, one

24   of the interpreters can't make it, and, in addition, I don't

25   know that I can resolve all these complicated issues by then.

1    I don't know how hard it will be, but I'm going to try and

2    stick to that date.  I'll do my best.

3            How many witnesses is the government anticipating?

4            MR. KOSTO:  Approximately ten, your Honor.  There may

5    be a few extra, but they wouldn't be long ones.

6            THE COURT:  The ten are long?

7            MR. KOSTO:  No.

8            THE COURT:  So assuming a morning to impanel and do

9    openings, how long do you anticipate that your case in chief

02:56 10    would take, assuming whatever you have on direct, I'll double

11    it for cross, just as a rough rule of thumb?

12            MR. KOSTO:  Assuming we're working from 9:00 to 1:00,

13    somewhere between five and seven days.

14            THE COURT:  Not including impanelment, I'm assuming?

15            MR. KOSTO:  Right.

16            THE COURT:  Okay, how many witnesses do you think

17    you'll have at this point?

18            MR. NEMTSEV:  Two and four, your Honor.  It's two or

19    three experts and maybe potentially one fact witness.

02:56 20            THE COURT:  No, excuse me.  Can I say something for

21    the interpreter.  I'm sure you're doing your best, but you're

22    speaking so loudly, I'm actually having trouble hearing the

23    attorneys.  Is there a way of, like, what can I say, talking

24    more softly into the mic?

25            THE INTERPRETER:  I will try, your Honor.

             1          THE COURT:  All right.  And if you can't, Mr. Klyushin,

             2   if you can't hear him, you'll just tell me, okay?  So --

             3          (Discussion off the record.)

             4          MR. NEMTSEV:  So we anticipate two to four witnesses

             5   at most.  Most of them are going to be expert witnesses, and I

             6   can't imagine it taking more than two or three days.

             7          THE COURT:  All right, so this is a two- to three-week

             8   trial on a 9:00 to 1:00.  I might decide -- what do you think

             9   about this? -- going 9:00 to 4:00.

     02:57  10          MR. FRANK:  We're fine with that, Judge.  Our thought

            11   is, it's probably a two-week trial, and so our inclination was

            12   to say, if we could start on a 9:00-to-1:00 schedule, and if it

            13   seems like it's going slowly, we could always --

            14          THE COURT:  Well, just keep your afternoons open.  I'm

            15   sure you will anyway.  It's a difficult case.

            16          MR. FRANK:  I'm not going anywhere in the afternoon.

            17          THE COURT:  I'm thinking of going full days,

            18   especially if I'm going to lose two or three days because of

            19   interpreter issues, so just keep the afternoons open.  I may go

     02:58  20   9:00 to 4:00.

            21          MR. FRANK:  We will, your Honor.

            22          THE COURT:  In fact, I sort of prefer it, but let's go

            23   from there.

            24          So I thought we would just get going moving through

            25   the motions in limine, and I thought I'd start with

1    Mr. Klyushin's omnibus motion in limine to deal with the

2    issues.  The first has to do with illicit propensity proof.  I

3    think you're primarily relying on Mr. Ermakov's indictments,

4    right?

5            MR. NEMTSEV:  It's the indictments.  The government

6    presented in their opposition a photograph of him being on the

7    "most wanted" list for the FBI.  It's that type of evidence,

8    that he's wanted for other crimes related to hacking.

9            THE COURT:  Yes, I think you've done this in a

10   different order than they've done it, but it did strike me that

11   the -- well, are you pressing for that FBI picture?

12           MR. KOSTO:  We are, your Honor.  This is not a "most

13   wanted" picture.  It's not a list of ten.

14           THE COURT:  It looks like something out of the FBI TV

15   shows.

16           MR. KOSTO:  It is from the FBI.gov website, but, more

17   importantly, the defendant had it on his iCloud account.  And

18   the issue with it is not to prove that Mr. Ermakov engaged in

19   hacking in the past and therefore engaged in hacking in this

20   case.  The issue is to show that the defendant was aware that

21   Mr. Ermakov had been charged with hacking.  And the reason

22   that's important, we pointed the Court to a chat between the

23   defendant and Mr. Ermakov in which Mr. Ermakov says in

24   substance, "I can't travel outside of Russia under my own

25   name."

```
 1              THE COURT:  I understand there may be some relevance,
 2    but why isn't it so prejudicial?  I don't think it proves that
 3    much.  I'm not inclined to allow it in.
 4              MR. KOSTO:  But it is prejudicial in the sense that it
 5    proves Mr. Klyushin's knowledge.  And the jury could be
 6    instructed that they're not to consider either that
 7    Mr. Klyushin had any involvement in that -- that's not what the
 8    government is suggesting -- that Mr. Ermakov did or did not do
 9    those things.  The government would focus its evidence as to
10    Mr. Ermakov to what he did in this case.  There is ample
11    evidence of Mr. Ermakov engaging in unauthorized access in this
12    case.
13              THE COURT:  Well, in this case, I mean, obviously
14    you've got to put that in to make your case, but I'm not going
15    to allow in the picture.
16              MR. FRANK:  Well, Judge, if I could just chime in
17    briefly.  One of the defenses in this case is, "I,
18    Mr. Klyushin, didn't know how this information -- I thought
19    this was legitimate information.  I wasn't aware of any
20    hacking.  I'm not a computer guy."
21              THE COURT:  Well, if he takes the stand and he says
22    that --
23              MR. FRANK:  No, no, but that's --
24              THE COURT:  -- then maybe you can impeach, but --
25              MR. FRANK:  That's their defense that they're going to
```

1   present, whether or not he takes the stand.  And to the extent

2   they're saying, "I didn't know about hacking, I thought we were

3   using legitimate techniques to obtain this information," the

4   fact that the guy who's got his brokerage account app on his

5   phone, right, that guy with whom he is very extremely close,

6   that guy he knows to be a wanted hacker.  It's not a question

7   of whether he hacked for him in this case.

8          THE COURT:  I'm not disagreeing there's some

9   relevance.  I find that the prejudicial impact will overwhelm

03:01 10   the probative impact.  I will not allow the picture.  The FBI

11   picture looks like a "wanted" poster.

12          MR. FRANK:  So I guess what I would ask is, if the

13   defense, if they open on or if they seek to defend the case on

14   the grounds that he didn't know that there was hacking going

15   on, I would ask that we then be allowed to argue --

16          THE COURT:  Well, everything I do is without prejudice

17   to some new information coming up, but you cannot refer to it

18   or introduce it in your opening in any way.  Right now I am

19   allowing that motion in limine, and all of it is without

03:02 20   prejudice if something came up again.

21          Now, the next issue was under 404(b) as well as 403,

22   "Evidence of Ermakov's reputed alleged intelligence ties and

23   M-13's contract with the Russian Federation should be excluded

24   as irrelevant and unfairly prejudicial."

25          Now, anything on the website for M-13 should be

1    allowed in.  They've got to be able to show that they have the

2    technological know-how to do what they're accused of doing.

3          MR. FERNICH:  There's two issues with the website.

4    One is, it says, "We contract for media monitoring services

5    with the --"

6          THE COURT:  You know, I'm just having trouble hearing

7    you a little bit.  You know what?  You're so tall.  Would you

8    just sit down and just talk into the mic.

9          MR. FERNICH:  Sure.  Is this better?

03:03 10          THE COURT:  So much better, okay.

11          MR. FERNICH:  So there's two issues with the website.

12    The first is that it says, "We provide media monitoring

13    services to the Russian Federation, to the President of

14    Russia."  And the second issue is this penetration testing

15    advertisement that was only posted on the website on

16    September 28, 2020, which is the end of the conspiracy period,

17    quite literally two days before the alleged conspiracy ended.

18    So it's a little misleading to say that M-13 throughout the

19    entire duration of the conspiracy was offering these

03:03 20    penetration testing services or had, you know, the ability to

21    hack or penetrate.

22          THE COURT:  It's on their website.  I think that's --

23    the government to meet its burden has to have the ability to

24    show that he works for M-13, which has technological know-how

25    and used within the charged conspiracy period.

1          I suppose, if there's an earlier website that doesn't

2     show that, you could point out at the tail end -- I don't know

3     whether it was modified -- maybe something you could put in,

4     but I haven't seen that yet.

5          MR. NEMTSEV:  We cite to it.  We explain it and cite

6     it.

7          THE COURT:  That what?

8          MR. NEMTSEV:  That the earlier websites -- there's

9     this website service that keeps archives of various websites as

03:04 10   they change throughout the years --

11          THE COURT:  Well, you could put that in.  You could

12     put that in just to diminish the impact of it, but this is

13     within the conspiracy period.

14          MR. NEMTSEV:  Understood, your Honor.

15          THE COURT:  Okay.  So I'm going to allow in evidence

16     of what's on the website, who they had contracts with as

17     published.  That's different than pictures and that sort of

18     thing.

19          And the government has made the representation, and

03:05 20   I'll hold them to it, that Mr. Putin's name or the President

21     of -- any relationship that he has, getting a medal from Putin

22     or all those kinds of things, should not be mentioned at all.

23          MR. FRANK:  That will not, but the government does

24     intend to introduce from the website that M-13 provided

25     services to private corporations --

1          THE COURT:  Well, it says so on their website.

2          MR. KOSTO:  -- and state and national governments.

3          THE COURT:  It says it on the website, right?

4          MR. KOSTO:  Yes, it does.

5          THE COURT:  Just because you provided services to the

6    United States of America doesn't mean you agree with one

7    president or the other.  He's got the technological know-how to

8    provide these technological services having to do with

9    computers and hacking and that sort of thing, so I'm going to

03:06 10   allow that.

11          The next one, so the next one is denied.  That motion

12   in limine is denied, subject to the condition that you should

13   in no way mention Mr. Putin's name.

14          Okay, "Information about other Ukrainian hackers that

15   Mr. Klyushin read in an article should be excluded as

16   unrelevant and unfairly prejudicial."  I didn't quite

17   understand.  Do you have that document, or is it just a picture

18   on a table?

19          MR. KOSTO:  What we have, your Honor, is a picture

03:06 20   from Mr. Klyushin's iCloud account of that article on a table

21   in front of the photographer featured in the article.  It's in

22   our brief.  The picture is in our --

23          THE COURT:  All right, let me ask one thing:  Is this

24   something that was properly dated within the time period of the

25   conspiracy?

1          MR. KOSTO:  It was -- the image is dated within the

2     conspiracy.  Interestingly enough, the news article is about a

3     year and a half earlier, but --

4          THE COURT:  This was properly seized, in other words?

5     This isn't part of the --

6          MR. KOSTO:  Yes, this was seized.  The date of the

7     image is August of 2018, so after the time period that we were

8     discussing in the motion to suppress.  But this is an article.

9     There's no dispute as to what the contents of the article are.

03:07 10   The article talks about the conviction of a defendant in the

11     District of New --

12          THE COURT:  And why do you think it's relevant?

13          MR. KOSTO:  It's relevant because the subject matter

14     of the article is the same basic scheme that Mr. Klyushin is

15     charged with here:  the theft of information from computer

16     systems of earnings information and the profitable trading of

17     it.  What is Mr. Klyushin doing with this image on his computer

18     in the middle of the time that he's accused of doing exactly

19     that?  And why has it been placed in a sheath?  Why is it

03:08 20   featured in this picture?  Why did he choose to save it?

21          THE COURT:  I'm going to reserve on that one.  I'm not

22     sure.  Don't mention it in -- I'm going to reserve on that.

23          Did you want to say something specifically about it?

24          MR. NEMTSEV:  I did.  I think it --

25          THE COURT:  Because I think it's in the FBI's poster,

1    "wanted" poster, but it does show a concern about this issue.

2         MR. NEMTSEV:  And it could show an interest in the

3    issue.  It doesn't necessarily mean concern or awareness or the

4    fact that, you know, this is an admission that he's doing

5    something very similar.  They make a big deal out of the fact

6    that it's saved to the iCloud, but all his pictures, all 40,000

7    pictures were saved to his iCloud.  It's not like he picked and

8    he chose which one to save, which one to not.  The picture,

9    according to the government themselves, was taken by somebody

03:09 10   else.  It wasn't Mr. Klyushin's article, meaning he might have

11   taken a picture and had some interest in it, but somebody else

12   was sitting in front of --

13        THE COURT:  You think someone else --

14        MR. NEMTSEV:  Not a coconspirator.  I don't know who

15   the individual is.  So he was sitting at a table --

16        THE COURT:  It's not as if Ermakov showed it to him?

17        MR. NEMTSEV:  No, it's not Ermakov.  It's somebody who

18   is not a coconspirator -- I don't know the identity of the

19   individual -- who has this in front of him, who takes a

03:09 20   picture and --

21        THE COURT:  Do we know who gave it to him?

22        MR. KOSTO:  We do, your Honor.

23        THE COURT:  Who?

24        MR. KOSTO:  And I'm not sure we'd agree with

25   Mr. Nemtsev's characterization of the evidence.  This picture

1    was taken at a resort with an individual who appears in several

2    of the pictures.  You know, they're right in sequence.  We know

3    who was there with Mr. Klyushin.

4         THE COURT:  Who?

5         MR. KOSTO:  He is not a charged coconspirator, but

6    he's an individual -- he and Mr. Klyushin together have an

7    article that's in a saved sheet.  It's not yesterday's news.

8    It's, you know, on August 15, 2018.  It's not like they're

9    looking at the August 14 edition of the New York Times brought

03:10 10   down to the resort's table.  This is a document that refers to

11   something from a year and a half earlier.

12        THE COURT:  So the gentleman who presented the picture

13   was sitting at the table with him?  Is that it?

14        MR. KOSTO:  The picture, there's no information in the

15   picture as to who presented it to whom.  The issue is that it's

16   in Mr. Klyushin's iCloud account.  And the example we gave is

17   that if you were searching a home in connection with the

18   investigation of a bank robbery and you found designs of a

19   different bank vault, that would be relative and probative.

03:10 20   The issue of the article is:  It describes the exact crime

21   that's being committed here.

22            And it's worth noting, your Honor, that a few weeks

23   ago we were here, and there was a motion to dismiss, and the

24   argument was:  Mr. Klyushin could not have known that it was

25   illegal to trade on information that was stolen in the absence

1   of a fiduciary duty.  This evidence shows that Mr. Klyushin had

2   an article showing that one could be prosecuted in the United

3   States for stealing and trading on information from news --

4            THE COURT:  I'm going to treat this like I did the

5   other one, which is, just don't refer to it.  I'm just not

6   sure.  It has some relevance, once again.  I'm not sure whether

7   under 403, whether I'm going to allow it in.

8            MR. KOSTO:  We would submit that the Court could

9   simply say, "The defendant is not charged or accused of any

03:11 10   involvement in the subject matter of the article."

11            THE COURT:  It just may be more confusing than -- I

12   don't know what I'm going to do with that one.

13            All right, "Motion in limine to compel production of

14   expert's data and assumptions and exclude evidence under

15   *Daubert*."  I assume at this point you've got the data because

16   the government informed me that you do.

17            MR. NEMTSEV:  Yes, and we have the data, and that's

18   something that we'll supplement on Monday.

19            THE COURT:  You know, I last took statistics as an

03:11 20   undergraduate.

21            MR. NEMTSEV:  Me too, your Honor.

22            THE COURT:  So let me start there.  I haven't looked

23   at statistics -- I did some at the Sentencing Commission -- but

24   in a way that I really understand it.  Are you charging the

25   methodology?  Because I Wikipedia'd some of the methods, and

1    they're pretty tried and true back to the 1930s, so --

2           MR. NEMTSEV:  That's possibly one of the main issues

3    is the fact that they're using methods for comparing ratios

4    from 1934.  Whereas --

5           THE COURT:  Broken t and how much -- I read the whole

6    thing this morning in Wikipedia.  I mean, it's --

7           MR. NEMTSEV:  It works well for a controlled

8    experiment, meaning where you have two soils, plants grow, and

9    you see, you know, ten pots of plants each.  That one you have

03:12  10   40,000 companies and earnings --

11          THE COURT:  I thought they were only looking at 350.

12          MR. NEMTSEV:  No.  That's his trading that they're

13   looking at, 350, so they're comparing that in ratios to 16,000

14   that belong to Filing Agent 1 and 2 out of 36,000 in total.  So

15   we'll supplement this, but --

16          THE COURT:  Well, let me put it this way:  You haven't

17   explained yet to me what the problem is.  I don't understand

18   it.  I'm not promising I'll understand it by then.  Are you

19   going to bring your expert in next week?

03:13  20          MR. NEMTSEV:  Potentially, and Mr. Fernich can better

21   explain it than I can.

22          THE COURT:  Well, are you the statistics guru here?

23          MR. FERNICH:  No, Judge.  There is a threshold issue

24   that goes beyond statistical disputes, and that issue is the

25   relevance probity and prejudicial impact of the statistics

1    being proffered.  The expert, according to the government, is

2    going to compare -- is offering the jury essentially a binary

3    choice between random chance on the one hand and insider

4    trading on the other hand, and that's not how the stock market

5    works.  The stock market isn't a game of chance, as we talked

6    about in the motion to dismiss, but your Honor has upheld

7    the --

8              THE COURT:  Let me just turn to you and say --

9              MR. KOSTO:  That is absolutely not what the

03:13 10    statistical evidence would be in this case.  What the

11    government --

12             THE COURT:  What worries me is the one in a trillion.

13    Like, if I'm wrong on that, you guys can do a quick reverse,

14    come right back down here and get some other judge.  So it's

15    like with the DNA evidence:  When you say it wrong, it's just

16    all over.  I think most of what I read your expert saying

17    seemed logical to me.  I'm just really worried about that

18    number.

19             MR. KOSTO:  So let's hit that.  What we are not saying

03:14 20    and what this witness will not say is that there is a one in a

21    trillion chance that Mr. Klyushin was not involved in insider

22    trading.  That's not his testimony.  And I disagree with

23    Mr. Fernich, respectfully, that we're not setting up a binary

24    situation between random and insider trading.  What the

25    statistician does here, and I'll use one example -- you've read

1    our disclosure and you've read our brief -- he identified the

2    hundreds of thousands of filings that are made to the SEC from

3    the beginning of the conspiracy to the end of the conspiracy,

4    and he figured out using something called an "accession

5    number," kind of like a serial number for the filing, which

6    filing agent handled that filing, and he came up with a

7    percentage of those hundreds of thousands of filings --

8            THE COURT:  Right, 44 percent went to these two.

9            MR. KOSTO:  Forty-four percent were handled by these

03:15 10   two.  And the facts in the case show that Mr. Klyushin, and

11   Mr. Klyushin and his trading group, traded in the 90, 96,

12   95-plus percent of the time in two of the filing agents, the

13   victims in this case.  So the statistical question that

14   Mr. Clarke will answer is going at the question of, is there a

15   relationship between Mr. Klyushin's trading and the fact that a

16   particular U.S. company was serviced by Filing Agent 1 and

17   Filing Agent 2?  And what --

18           THE COURT:  But what I didn't understand is, they're

19   random.  Are some filing agents more likely to deal with tech

03:16 20   stock, or are some filing agents more likely to deal with East

21   Coast stock or -- I don't know the answer to this.  I do know

22   one in a trillion is a really difficult number, and I have to

23   be -- most of what you said, by the way -- just heads-up -- I

24   didn't think was a problem, you know, the odds are -- but one

25   in a trillion, I'm going to not get to this right now because I

1  haven't even seen their motion yet, but I will be focusing on

2  it; and if you want, you can have your statistician here.  I --

3       MR. KOSTO:  But I'd like to orient the Court to that

4  trillion issue before the Court --

5       THE COURT:  Yes, but I don't have much time.  I want

6  to get through everything else.

7       MR. KOSTO:  We'll get through it very quickly because

8  the last step in this process is not Mr. Clarke's statement of

9  "It's a one in a trillion chance that he was hacking."  The

03:16 10  question is, the way statistics works, if there is no

11  relationship between those two things, if there's absolutely no

12  relationship between Mr. Klyushin's trading choice and which of

13  the filing agents is involved, you would expect to see this, by

14  chance, one time in a trillion.  That's the P value.  That's

15  the stuff that goes all the way back to 1930 and is sort of the

16  staple of statistics.  It hasn't gotten --

17       THE COURT:  I don't even know what a P value is.

18  You've got to -- I learned it once, and I keep relearning it.

19  I looked that up in Wikipedia too.  But the reality is that I

03:17 20  don't know that you need it.  I think that number is easily

21  confusing to a jury, and I'm worried about it, so I'm going to

22  spend time on it next week.  I don't think it defeats the case,

23  by any means.  There are lots that you can --

24       MR. FRANK:  Your Honor, respectfully, we didn't put in

25  our evidence yet, but I will represent that is very important

```
 1   evidence for us.
 2           THE COURT:  Maybe.  I'm sure it is.  I would love to
 3   have that number too.  But let me just say this:  that I don't
 4   understand it, and I'm going to take time understanding it on
 5   the 12th --
 6           MR. FRANK:  Understood.  All these --
 7           THE COURT:  -- because I just saw your report, like,
 8   an hour ago.
 9           MR. FRANK:  Understood, and we'll figure for the 12th.
10   But the point is, he's not going to testify about some ultimate
11   issue.  All he's going to testify about is that there is a
12   statistically very significant relationship between what
13   earnings announcements the defendant traded in and who the
14   filing agent was who filed those earnings announcements.
15           THE COURT:  So far, so good.
16           MR. FRANK:  So that's it.  I mean, the one in a
17   trillion, that's the statistical significance.
18           THE COURT:  Well, can I ask you, if you -- I suppose I
19   could get a computer program -- if you flipped a coin, is the
20   example he gave --
21           MR. FRANK:  Exactly, a perfect example.
22           THE COURT:  -- Is it 1 in 2 to the 340th or something
23   like that?
24           MR. FRANK:  So that's a perfect example.  If you
25   flipped a coin a bunch of times, right, you'd expect that about
```

half the time it would come out heads and half the time it
would come out tails.  He's trading only heads.  He's flipping
the coin --

THE COURT:  Right, but where did the one trillion --
is it 1 in 2 to the 300 and --

MR. FRANK:  The odds -- so it's essentially saying --

THE COURT:  Is it 1 in 2 over 2 times 1 over 2?

MR. FRANK:  Essentially.

THE COURT:  Is that where that came from?

03:19  MR. FRANK:  It came through the math, but essentially
that's right, your Honor.  He's saying about one in a trillion
times you will come up only heads, and that's what happened
here.

THE COURT:  I just want to know where he got it from.

MR. FRANK:  That's where he got it from.  I mean, it's
essentially that --

THE COURT:  You didn't explain it in your report.  I'm
looking forward to hearing how it's explained.  It literally
may be 1 in 2 to the 340th or something, whatever the, you
03:19  know, exponential number of times that you --

Do you know if that's true, it's 1 over 2 to the
extent of his trades?

MR. FERNICH:  I don't know if that's true, but their
brief says the following:  "Mr. Clarke's analysis shows the
probability of such trading occurring by chance is less than

1    one in a trillion."  Your Honor has obviously hit upon the

2    prejudicial value of that statistic.  As an abstract matter,

3    it's overwhelming.

4         But putting that to one side, it's not like flipping a

5    coin because flipping a coin is a completely random action.

6    The stock market is not a game of chance.  *Chiarella* says this.

7    You are allowed --

8         THE COURT:  These are filing agents.  These aren't

9    people playing the market, is it?  Well, let me put it this

03:20 10   way:  I may misunderstand what a filing agent is, but I thought

11   it was just they're like ministerial people.

12        MR. FERNICH:  No.  The baseline comparator of chance

13   is misplaced, it's irrelevant, it's prejudicial in this context

14   because you can have informational advantages that don't derive

15   from inside trading.

16        THE COURT:  Well, you're going to be explaining it to

17   me because I have nothing from you yet, nothing, zero, zilch.

18   I don't understand it.  I'm going back through -- I will try

19   and focus on it on the 12th.

03:21 20        MR. FERNICH:  Sure.

21        THE COURT:  And there it is.  Now, can we just keep

22   going here.  A motion in limine -- this is by defendant

23   still -- to exclude geo-location evidence.  That's something

24   that I was concerned about, and let me just say this because I

25   don't understand it.  And this is what a lot of judges have

|   |   |
|---|---|
| 1 | been worrying about are these black box computer programs, and |
| 2 | how do I know how reliable it is?  Can you get someone here |
| 3 | from this company?  Because they've had problems.  I |
| 4 | Wikipedia'd them too, and they did have trouble, like, "what's |
| 5 | wrong with Kansas" kind of things.  So they've had some |
| 6 | problems.  And the representation from the defense is that |
| 7 | depending on the company that you go to, you get different |
| 8 | answers. |
| 9 | MR. KOSTO:  Which is why the government obtained |
| 03:22 10 | invoices related to this very relationship that show that this |
| 11 | IP was housed at a data center in Boston. |
| 12 | THE COURT:  But can I say, that may be, but I have to |
| 13 | be able to separately -- it's not just a compilation of phone |
| 14 | numbers.  That would be an unfair way of thinking about it. |
| 15 | It's computer software programs that may or may not be |
| 16 | reliable.  You know, I did look at the hearsay exception.  I |
| 17 | don't know if this qualifies under that.  I'll just need a lot |
| 18 | of evidence on it, and I think you need to have your FBI person |
| 19 | plug it into some of the other competitors and see if they're |
| 03:22 20 | coming up with the same answer, because if they're not, I'm not |
| 21 | going to put that in. |
| 22 | MR. FRANK:  You can't deal with that proactively. |
| 23 | THE COURT:  Oh, oh, oh, oh, oh. |
| 24 | MR. FRANK:  But just if I could just briefly say, what |
| 25 | the evidence will be is, what it is, it's not -- it's a |

1    database of information they gather from the endusers, from the

2    ISPs, and that they then sell as a service to people like the

3    FBI, who rely on it to determine where this information comes

4    from.  And so all we're saying is, it's one piece of evidence.

5    It's not the only evidence.

6              THE COURT:  I know, but I've got to decide it's

7    admissible.  I understand it's not the whole nine yards; it may

8    not go for broke if you don't get it in.  But I need to decide

9    it's reliable, and what the defense represented -- I quickly

03:23 10    read their pleadings, I think this morning maybe?  I do a lot

11    of fast reading --

12              MR. FRANK:  And what their evidence shows --

13              THE COURT:  They say that three or four others put it

14    somewhere else.

15              MR. FRANK:  Put it in Delaware --

16              THE COURT:  Delaware, Delaware.

17              MR. FRANK:  -- today, not in 2018 but today.

18              THE COURT:  Well, when did you run it?

19              MR. FRANK:  We ran it several years ago.

03:23 20              THE COURT:  During the period of the conspiracy?

21              MR. FRANK:  We ran it in 2020 when they still had the

22    information from 2018.

23              THE COURT:  Well, wait a minute. --

24              MR. FRANK:  But let me just explain --

25              THE COURT:  You ran it -- so during the conspiracy you

```
 1   ran it?

 2           MR. FRANK:  No.  We ran it shortly --

 3           THE COURT:  Or afterwards?

 4           MR. FRANK:  No, but we ran it shortly after.  But let

 5   me just explain --

 6           THE COURT:  How shortly afterwards?

 7           MR. FRANK:  We ran it in 2020.

 8           MR. KOSTO:  October, 2020, right after --

 9           THE COURT:  When?

10           MR. KOSTO:  Within a month of the end of the

11   conspiracy.

12           THE COURT:  Well, that's relevant, it was so soon

13   afterwards.  So that's helpful.

14           MR. FRANK:  And the other thing I'll say is, that

15   Delaware location is the corporate headquarters of the entity

16   that rented the space here in Boston.

17           THE COURT:  I know, but I need to -- don't -- well,

18   let me just say this:  I found it very confusing as to whether

19   or not it was a reliable source.

20           MR. FRANK:  I understand, so we can explain that.

21           THE COURT:  And I think you need to either have --

22   does that company still exist?

23           MR. KOSTO:  WebToGlobal still exists, yes.

24           MR. FRANK:  Well, but also the company exists that

25   compiles the data.
```

1          THE COURT:  MaxMind?

2          MR. KOSTO:  Your Honor, at risk of five minutes, I

3    prepared a very short chalk that I'd be happy to share with the

4    Court that I think will orient the issue appropriately in terms

5    of the corporations involved.

6          THE COURT:  MaxMind, you mean?

7          MR. KOSTO:  Well, there are others.

8          THE COURT:  Well, can I just put on hold because

9    that's why I have the 12th set aside, okay?  I want to get

03:25 10   through the easy stuff.  I just want to get through the easy

11   stuff.  The two hard things are the statistics and the

12   geo-location monitoring.  So we're putting on hold geo-location.

13          Evidence concerning Sladlov and Irzov, including their

14   training activity and any out-of-court statements.  As I

15   understand it -- I'm looking at the defense now -- they're not

16   putting in any statements, so isn't this, like, a moot point?

17          MR. NEMTSEV:  As to the statements, maybe, but not as

18   to the evidence from their iClouds, meaning the government

19   intends to put in pictures from outside of Mr. Klyushin's

03:25 20   trading period, which --

21          THE COURT:  I see.  So they've represented, "they" the

22   government, that they are not introducing any statements, and

23   you're saying, "Well, what about the statements in their iCloud

24   account?"  Is that it?  Are you planning on putting in

25   Sladlov's and Irzov's iCloud accounts?

```
 1            MR. KOSTO:  We plan, among other things, to put in
 2   pictures of Mr. Sladkov and Mr. Irzak in possession of the very
 3   kind of information that was stolen from FA-1 and FA-2 during
 4   the charged conspiracy.  They're charged as CC-1 and CC-2 in
 5   the indictment.
 6            THE COURT:  Can I just say, I've been a judge a long
 7   time, and I know you pooh-pooh the Petrozziello approach.  I've
 8   always followed that.  You've given somewhat of a proffer,
 9   actually, in your papers, but I do want a proffer as to what
10   you're going to prove.
11            MR. KOSTO:  Sure.
12            THE COURT:  And it will help me rule during the trial
13   on a disability and timing.  But if in fact -- I don't see what
14   they've at least, sort of in a summary fashion, said their
15   evidence is, why that isn't enough to prove that there's a
16   conspiracy, given the parallel trading.
17            MR. NEMTSEV:  Because that's the only thing they have.
18   They have the parallel trading.
19            THE COURT:  That's big.
20            MR. NEMTSEV:  But they have parallel trading with
21   nineteen other individuals that the SEC provided to them.  That
22   means -- those are uncharged coconspirators.
23            MR. FERNICH:  There's no showing in the papers, no
24   proffer that Mr. Klyushin has knowledge of any conspiracy
25   extending beyond himself, Ermakov, and Rumiantcev.  There's no
```

showing, nothing proffered to suggest that Klyushin knows it

extends to Sladkov and Irzak, or anybody beyond the three

associated directly with M-13.  That --

THE COURT:  You're saying there's a possibility

everybody had their own hackers and that it was separate?

MR. FERNICH:  They've charged the other two in a

separate indictment for a reason.  And everybody knows how

notoriously slippery the conspiracy doctrine is, and that's the

possibility of prejudice emanating from multiple conspiracies

and a wheel without a rim.  And obviously in part --

THE COURT:  A big Varsity Blues issue up before the

First Circuit.  What's the name of that case everyone --

anyway, listen, I understand the basic legal principle.  I'm

going to make the government give a proffer, but I wouldn't

count on it.  I mean, I thought the parallel trading

information, regardless of the one in a trillion issues, was

pretty powerful.

MR. FERNICH:  Yes, I understand, your Honor.  Well,

the one in a trillion is a different --

THE COURT:  That's a different issue, but the parallel

trading is pretty strong.  I mean, everybody seems to be

trading at the same time based on the same information before

it comes out publicly.  That's pretty strong.

MR. FERNICH:  That question is distinct from

Klyushin's knowledge about the scope of the conspiracy, and he

1    has to understand that he's joining the conspiracy alleged in

2    the indictment, a conspiracy extending beyond his immediate

3    cohorts.  And we know, there's no quarrel at this preliminary

4    stage with Rumiantcev and Ermakov being in a conspiracy with

5    him, but to date -- and this is in our circuit, it's the Second

6    Circuit, it's Ghini (Phon) -- it's this case with a vowel at

7    the end -- in your circuit they have to come forward with

8    something --

9         THE COURT:  I'm going to make them do a proffer, but I

03:29 10   must say, the parallel trading, I think they're all getting

11   access to the same information.  And you're just saying that

12   they didn't know about each other?  Is that it?

13        MR. FERNICH:  Well, yeah.  I mean, just the fact that

14   we've got Ermakov as the hub conspiring with multiple different

15   people doesn't establish a rim encompassing all five.

16        MR. KOSTO:  Let me say very briefly, your Honor, that

17   in this circuit, each coconspirator does not need to know every

18   other coconspirator in the conspiracy.  However, there's a very

19   important piece of information that Mr. Fernich is skipping

03:29 20   over, which is, in November of 2019, during the course of the

21   conspiracy, there is evidence that Mr. Sladkov, one of these

22   guys they're trying to push to the outside, Mr. Klyushin and

23   Mr. Rumiantcev all have a chat application in their iCloud

24   accounts, a chat application in the name of M-13, Mr. Klyushin's

25   company, the company he owns.  And the suggestion is that

1     Mr. Sladkov has nothing to do with Mr. Klyushin or his company.

2     If Mr. Sladkov has nothing to do with Mr. Klyushin or his

3     company, what's he doing with the company's proprietary chat

4     app on his phone, on top of the idea that, oh, they all

5     happened to trade in the same securities, they all happened to

6     trade in the same securities serviced by FA-1 and FA-2, they

7     all happened to trade in the same direction at the same time,

8     the parallel trading information that the Court is describing?

9     But --

03:30 10          THE COURT:  What about the other gentleman?

11          MR. KOSTO:  Mr. Irzak and Mr. Sladkov are together in

12     pictures in front of equipment that is used to show the

13     material nonpublic information that was stolen from FA-1 and

14     FA-2 that --

15          THE COURT:  Say that again.  There are pictures in

16     front of --

17          MR. KOSTO:  Mr. Irzkov and Mr. Sladkov are in

18     possession in their iCloud accounts of the same stolen

19     information from FA-1 and FA-2 that Mr. Klyushin and his

03:31 20     traders are trading with.  They have the same raw material

21     stolen from the same victims, trading in the same way, using

22     the same corporate infrastructure, M-13, the defendant's company.

23          MR. FRANK:  They have the stolen information on their

24     computer screen before it's public.

25          THE COURT:  All right, so I guess the issue would be

|  | |
|---|---|
| 1 | whether or not Ermakov is the center of the hub and they all |
| 2 | knew each other, or they didn't know each other, but you're |
| 3 | saying that the application concerning M-13 ties them together? |
| 4 | MR. FRANK:  Yes. |
| 5 | THE COURT:  That's the rim?  That's the rim? |
| 6 | MR. FRANK:  Well, part of it. |
| 7 | MR. KOSTO:  Part of it. |
| 8 | MR. FERNICH:  I agree with my friend that Klyushin |
| 9 | doesn't have to know the identity of every single member of the |
| 03:32 10 | conspiracy.  You know, that's accepted law everywhere.  He has |
| 11 | to know that the enterprise he's joining extends beyond M-13. |
| 12 | He is not properly chargeable with everything that Ermakov is |
| 13 | potentially involved in unless he knows. |
| 14 | THE COURT:  Well, Ermakov was his deputy, right? |
| 15 | MR. FERNICH:  Well, for purposes of what's going on at |
| 16 | M-13, but if Ermakov is doing stuff outside M-13 with other |
| 17 | folks, it's not properly imputable, as a threshold matter, to |
| 18 | Klyushin. |
| 19 | THE COURT:  Do you agree that Sladkov had an M-13 |
| 03:32 20 | application? |
| 21 | MR. FERNICH:  He has an application.  That doesn't |
| 22 | mean -- they haven't proffered anything to suggest that |
| 23 | Klyushin knows that Sladkov is engaged in purported insider |
| 24 | trading.  They have an application. |
| 25 | THE COURT:  Well, they've got to prove it beyond a |

```
 1   reasonable doubt, I'll give you that, but there is some
 2   evidence.
 3           MR. FRANK:  We don't actually have to prove that
 4   beyond a reasonable doubt, but I --
 5           MR. FERNICH:  No, we have to prove --
 6           MR. FRANK:  Under Petrozziello.
 7           THE COURT:  Just the charged conspiracy beyond a
 8   reasonable doubt.
 9           MR. FRANK:  Correct.  We have to prove he conspired
10   with one or more other people, yes.  That we're not disputing.
11   But, first of all, I think one thing we're missing is that this
12   evidence should come in, leaving aside the Petrozziello
13   question, the evidence should come in as evidence of the
14   information that Ermakov -- these people are in communication
15   with Ermakov, and so it comes in as evidence of what Ermakov is
16   doing with the people that are associated with him, regardless
17   of whether they're in a conspiracy with Klyushin.
18           MR. FERNICH:  No, that's not relevant unless Klyushin
19   knows about it.
20           MR. FRANK:  But it is -- he's associating with
21   Ermakov, and this is what Ermakov is doing.
22           THE COURT:  -- if that's true.
23           MR. FERNICH:  If he's aware of what Ermakov is doing,
24   then it's --
25           THE COURT:  And Ermakov is getting insider information.
```

 1    I don't think it necessarily means he has --

 2          MR. FERNICH:  No, not necessarily that -- that -- if

 3    he knows that Ermakov is -- insider information or not, if he

 4    knows that Ermakov is trading in conjunction with other people

 5    that extend beyond M-13, yeah, that's potentially relevant, but

 6    that's not what's being proffered here.

 7          MR. FRANK:  Well, what's being proffered --

 8          THE COURT:  Anyway, can I just say this:  You're going

 9    to make a proffer.  At least right now, I'm not inclined to

03:34 10    grant your motion in limine based on sort of a sketch of what

 11    such a proffer might look like, and that will be helpful to me.

 12          Evidence of Klyushin's wealth should be excluded.

 13          MR. FRANK:  We're not putting in evidence of his

 14    wealth.  We're putting in evidence of his association with

 15    Ermakov.  It happens that a couple of those pictures are where

 16    they're skiing, they're on a helicopter, they're on a boat, but

 17    it's not evidence of his wealth.  We're not making any argument

 18    about his wealth.  We're just showing them together on vacation.

 19          THE COURT:  Okay, so that's allowed without opposition,

03:34 20    and if it shows up and not focused on in a picture, there's

 21    nothing I can do about it.

 22          MR. NEMTSEV:  And, your Honor, we're willing to

 23    stipulate that he knows Mr. Ermakov, that they're close, that

 24    he knows the investors, obviously.  This isn't something that

 25    is controversial.

1          THE COURT:  I think the fact that he's being pictured

2     with Mr. Ermakov is probably a very relevant fact of the

3     closeness of the association.

4          MR. FERNICH:  In the 403 calculus, I mean, one relevant

5     factor is whether the issue is disputed.  The relationship with

6     Ermakov is not going to be disputed.  Certainly the relationship

7     with M-13's clientele is not going to be disputed.

8          THE COURT:  Not just a relationship.  Like, they were

9     besties.  They were partying together with their spouses on

03:35 10     vacation.  I mean, it's a very close relationship, and I'm open

11     to possibly cropping pictures if they seem over the top.

12          MR. FERNICH:  Okay, that's fair.

13          THE COURT:  So, anyway, the government should be

14     precluded from arguing trading is based on material nonpublic

15     information unless they can prove the trading follows an

16     unauthorized intrusion by Mr. Klyushin or a co - -- that's what

17     this case is all about.  I don't even understand that.  Of

18     course they have to prove that.

19          MR. FERNICH:  Can your Honor repeat that.  I missed

03:36 20     that.

21          THE COURT:  This is your motion.

22          MR. FERNICH:  I know.  I'm just not clear which one --

23          THE COURT:  The government should be precluded from

24     arguing trading is based on material nonpublic information

25     unless it can prove that trading follows --

1       MR. FERNICH:  Okay.

2       THE COURT:  That is their burden to prove that he's

3   doing it based on the fact that he knows that it's insider

4   information.  I don't understand what the -- of course

5   that's their burden.  Am I missing something?

6       MR. NEMTSEV:  If the issue is -- it's very similar to

7   the statistics:  Maybe there's correlation, but there's not

8   necessarily causation, meaning they have to prove that a hack

9   took place, that it was either Ermakov or Mr. Klyushin or --

03:36  10       THE COURT:  They can prove a hack took place, and they

11   can prove that there was trading, and the trading was before it

12   became public.  That's circumstantial evidence of -- I mean,

13   they've got to prove it, but that's what this case is, so I'm

14   not sure I understood this motion.

15       MR. NEMTSEV:  Meaning they have evidence of one shared

16   IP that Mr. Ermakov uses, and it appears in a filing agent log

17   file.

18       THE COURT:  No.

19       MR. NEMTSEV:  And they try to -- that's the evidence

03:37  20   of that Mr. Ermakov is the hacker, one IP that was shared.

21       THE COURT:  That may be, and there's that admin's

22   shares, and then there was subsequent other trading.

23       MR. NEMTSEV:  No.  Mr. Klyushin didn't even trade in

24   that stock that he accessed using that IP.  He didn't even have

25   a trading account for two months, until two months afterwards.

1          THE COURT:  I don't know what you're saying here.

2     Didn't the search warrant -- maybe I'm missing something here,

3     but I thought that was the whole point, that he did trade.

4          MR. NEMTSEV:  He did trade, your Honor.  He did trade

5     in Filing Agent 1 and Filing Agent 2 related stock, but the

6     issue is, can they prove extensive hacking rather than one or

7     two instances of hacking?  Meaning potentially there might have

8     been different actors; the employees might have been using and

9     accessing these --

03:38 10        THE COURT:  Well, you can argue that, but I think the

11    government can put in their information and see where it goes.

12    So to the extent I'm understanding it, it's denied at this

13    point.

14          Ermakov's employment in MS-13's -- M-13 --

15          MR. KOSTO:  Not MS-13, your Honor.

16          THE COURT:  I know, I know.

17          MR. FERNICH:  A little bit south of here probably.

18          THE COURT:  Yes -- M-13's cyber-security service

19    should be excluded.  Why isn't it directly relevant that

03:38 20   Ermakov worked at M-13?  What are you trying to exclude here?

21          MR. NEMTSEV:  Because he didn't, he wasn't employed as

22    an employee.  He might have had an affiliation with

23    Mr. Klyushin, he might have visited the headquarters of M-13,

24    but it's not like he's taking orders from Mr. Klyushin.  You

25    know, the government intends to argue that Klyushin ordered

1    Ermakov to hack and he did, and that Klyushin benefited by

2    getting the results of the hack, which are these friendly

3    reports, and trading upon them.  But there's no employment

4    relationship.  There's no relationship where Mr. --

5            THE COURT:  I thought he was listed as an employee and

6    as a deputy --

7            MR. NEMTSEV:  There's one document in April of 2020,

8    your Honor -- nothing from 2018, nothing from 2019 -- and that

9    relates to a document in order to allow Mr. Ermakov to travel

03:39  10    during the COVID bans because M-13 was a company that was

11    excluded from those bans.

12            THE COURT:  They can put in that in April of 2020, he

13    was an employee.  Is there any other information other than

14    that one listing?

15            MR. KOSTO:  He's listed as a deputy general director

16    in that directory alongside Mr. Rumiantcev, his charged

17    coconspirator.

18            THE COURT:  In April of 2020?

19            MR. KOSTO:  In April of 2020.  And then we would point

03:40  20    the Court to chats in which Mr. Klyushin and Mr. Rumiantcev are

21    talking about doing trading at Mr. Klyushin's direction in

22    October of 20 -- I don't want to give the wrong year, your

23    Honor, but I think it's October of 2019.  And we described to

24    you in our papers that Mr. Ermakov's iCloud account is being

25    updated through the IP address that belongs to M-13 in May of

1    2018, which means basically he's on the premises, as

2    Mr. Nemtsev just said, in May of 2018.  He's chatting about

3    trading.  He's on encrypted chats talking with Mr. Rumiantcev

4    about making material nonpublic information look like research

5    analysis.  Whether he's an employee or not isn't terribly

6    relevant.

7          THE COURT:  All you have to prove, really, is he's a

8    coconspirator.  You don't have to actually --

9          MR. KOSTO:  Yes.

03:40  10          THE COURT:  So I'm not inclined to exclude that

11    information, although you will have to be careful as to -- the

12    only evidence of employee, right, comes in 2020, but you have

13    other information of a relationship before that, so you should

14    be careful about that.

15          MR. KOSTO:  Yes.

16          THE COURT:  And I'm not releasing him, if that's the

17    question.

18          Now the issue that's the really hard one for me is the

19    geolocation monitoring, and if you have something that can help

03:41  20    educate me because there were two sources for your information.

21    One is -- there are a lot of articles actually written about

22    this and how much do you accept a computer software --

23          MR. FERNICH:  Judge, can I just make one comment in

24    response to what you just said and what you said earlier?  The

25    fact that this is striking your Honor, a very seasoned jurist

 1    who's seen all kinds of expert testimony and quasi-scientific

 2    testimony over the course of your Honor's career, the fact that

 3    this is striking the Court as so novel, respectfully, speaks

 4    volumes about it because it is very, very novel.  And the

 5    problem is that the government is proffering --

 6             THE COURT:  You're referring to now the

 7    geo-positioning?

 8             MR. FERNICH:  Yes, exactly.  It is very novel, and to

 9    sort of pass it off as something that's, you know, standard

03:42 10    operating procedure in the Federal Courts doesn't mesh with any

11    of the realities that we know.

12             THE COURT:  Based on standard operating --

13             MR. FERNICH:  Well, that it's a common form of

14    evidence in a criminal case.  It's an exceedingly uncommon form

15    of evidence in a criminal case.

16             THE COURT:  I have not myself reached this issue

17    before.

18             MR. FERNICH:  Right.

19             THE COURT:  Most of the cases that get it tend to be

03:42 20    in the area of personal jurisdiction with John Does opposing

21    it, so --

22             MR. FERNICH:  Right.  So I learned about copyright

23    patrols a lot in the research because that's --

24             THE COURT:  I have all these -- this adult porn

25    company.  What's it called?

         1            MR. FERNICH:  Yes.  That's where it comes up.

         2            THE COURT:  Yes, and I've seen that myself.  But

         3     that's different than this kind of a case, and that's why I'm

         4     taking it seriously.

         5            MR. FERNICH:  Right.

         6            MR. KOSTO:  Your Honor, I've put an exhibit sticker on

         7     this and marked it as Exhibit A.  I thought it would be helpful

         8     for the Court --

         9            THE COURT:  Are they the same?

03:43   10            MR. KOSTO:  I'm sorry?

        11            THE COURT:  I have two of these?

        12            MR. KOSTO:  One WAS for Ms. Molloy.

        13            THE COURT:  Oh, all right, thank you.

        14            THE CLERK:  Thank you.

        15            (Exhibit A marked.)

        16            MR. KOSTO:  What we wanted to do is just orient --

        17     there's a nest of corporations that are involved in providing

        18     the service of an IP address, and it's helpful, I think, to

        19     understand that it's not simply, you know, MaxMind that's

03:43   20     involved in this decision.  What the evidence will show, we

        21     submit, is that there is a data center in Boston right on

        22     Summer Street, probably five minutes walk from here, that's

        23     owned and controlled by an entity called Markley Group.  And

        24     Markley Group is in the business, they're a landlord for

        25     computer equipment.  They rent an empty space.  They provide an

1    Internet cable, they provide a power cable, and they provide
2    air conditioning essentially, and that's what they charge for.
3            They had a client in this case.  The client is an
4    entity called Micfo, M-i-c-f-o, out of Charleston.  And what
5    Micfo did, we expect the evidence will show, is that Micfo
6    contracted with Markley Group to put a computer in the data
7    center in Boston.  And that's what some of the invoicing that
8    you've seen reference to in the pleadings has to do with, so --
9            THE COURT:  Are you going to have someone from Micfo
03:45 10   testify?
11           MR. KOSTO:  Unlikely, your Honor.  As Mr. Nemtsev
12   points out, Micfo was convicted at trial in Federal Court in
13   South Carolina.  We have records that were seized from Micfo
14   that we can authenticate --
15           THE COURT:  How do we know they're true if we don't
16   have a custodian or some verification that they were a
17   fraudulent company?
18           MR. KOSTO:  Because our understanding of the issues at
19   play in the Micfo prosecution is that Micfo was creating shell
03:45 20   companies in different names.  In this case, Micfo was issuing
21   invoices and acting under its own name.
22           THE COURT:  Do we have someone who can say that?
23           MR. FRANK:  These are just invoices that they issued
24   to their client, StackPath, so it's not -- there's no dispute
25   that the invoices were issued to this other company for the use

1    of that server here in Boston.

2         MR. KOSTO:  And Micfo is not in the business of, in

3    this instance, is not in the business of owning the IP address

4    and deciding where to do it.  They're doing it on behalf of a

5    series of entities formerly controlled by a company StackPath.

6    So the invoices that you see between StackPath subsidiaries and

7    Micfo are, "Hey, let's put an IP address on a computer in a

8    datacenter in Boston that has this IP range," and we've

9    provided you --

03:46 10         THE COURT:  Can someone from StackPath authenticate

11   the invoices?

12         MR. KOSTO:  We have record certifications for those

13   invoices.  The issue is, they come from approximately one month

14   after the unauthorized access that's at issue in the venue in

15   this case.  So we allege, the indictment alleges that there was

16   unauthorized access through the Boston datacenter in October of

17   2018, October 24, October 22.  The invoices that have been

18   produced by the records custodians date to December of 2018,

19   approximately five weeks later.

03:46 20         THE COURT:  Can StackPath say some custodians -- did

21   they authenticate they received these --

22         MR. FRANK:  Yes.  There's no dispute about it.  We

23   have a business record certification that they've executed, and

24   if we needed --

25         THE COURT:  These are genuine invoices that they

1    received?

2             MR. FRANK:  Correct.

3             THE COURT:  Oh, all right.  Well, that's helpful.

4    That's helpful.

5             MR. FRANK:  And the invoices say "Boston,

6    Massachusetts."  The invoices are just -- they're just off by

7    five weeks, so they're one piece of evidence that at that time,

8    this computer with this --

9             THE COURT:  When you say they're off by five weeks,

03:47 10   they're in when?  They're in --

11            MR. KOSTO:  December of 2018.

12            MR. FRANK:  December of 2018.

13            THE COURT:  So why is that off by five weeks?  The

14   conspiracy is charged from January of 2018.

15            MR. FRANK:  Correct, but the only issue is that the

16   actual use of that 104 IP to perpetrate the hack occurred in

17   late October of 2018.  That's the date that the 104 IP was

18   used.

19            THE COURT:  Oh, I see.

03:47 20          MR. KOSTO:  The gold standard here --

21            MR. FRANK:  And so we have an invoice showing that in

22   December of 2018, that 104 IP was right here in Boston.

23            MR. KOSTO:  The gold standard here, your Honor, would

24   be an invoice dated October 24 saying, "This IP is being billed

25   for in this particular month, October of 2018."  What we

```
 1    have --
 2              THE COURT:  Can StackPath say that they continuously
 3    used this Micfo?
 4              MR. FRANK:  We have another invoice from Markley Group
 5    that is from October of 2018 that shows that they were
 6    invoicing Micfo for the space at that time.
 7              MR. KOSTO:  That Markley was providing space for a
 8    server to Micfo, the same space that Markley was providing to
 9    Micfo two months later that's covered by the invoice.  So the
10    reason I'm bringing the Court through --
11              THE COURT:  Well, this is very helpful.  Why do I even
12    have to worry about MaxMind and their problems in --
13              MR. FRANK:  It's just one additional piece of evidence.
14    That's why.
15              THE COURT:  I've got to make sure everything is
16    admissible, so I --
17              MR. KOSTO:  So our point, your Honor, is simply that
18    when you are considering the reliability of MaxMind, which the
19    papers concede is, you know, correct as to city approximately
20    66 percent of the time, we're not relying on that exclusively.
21    It's effectively corroborated by this invoice history.
22              THE COURT:  I see.
23              MR. FRANK:  So the point is not -- our only point is
24    that it shouldn't be a question of admissibility.  It's a
25    question of weight.  If they want to question the MaxMind
```

1    testimony and say, "Well, that's not reliable," that's fine,

2    they can raise that issue.

3              THE COURT:  This is what all the <u>Law Review</u> articles

4    worry about.  Is MaxMind able to come in and explain how they

5    come up with the data?

6              MR. FRANK:  If that's what the Court required, we

7    could have them do that, but our only point is --

8              THE COURT:  If you want to use it, you may have to.

9    Now, I'm not definitely ruling because I'm just starting to

03:49 10   understand the issue; but if MaxMind came in and said, "This is

11   how we know, and this is why it's reliable," and the FBI says,

12   "We routinely use it as something that's one piece of a

13   puzzle," but it's a black box --

14             MR. FRANK:  That's fine.

15             THE COURT:  It's a --

16             MR. FRANK:  It was a witness we were hoping to avoid

17   for the sake of time, but we can do that, and it wouldn't take

18   very long.  And our only point is, it's corroborated in three

19   different ways.

03:50 20             THE COURT:  Can I ask, does the FBI routinely use

21   MaxMind?

22             MR. FRANK:  Yes, and they will testify to that.

23             THE COURT:  And do they use others?

24             MR. FRANK:  I think their contract is with MaxMind.

25             THE COURT:  The issue really that really stuck with me

 1    was, even though it's after the time, is that three or four

 2    different kinds of programs will come up with different

 3    results.  I didn't understand that.  That worried me.

 4         MR. FRANK:  Because --

 5         THE COURT:  Even if it was today -- okay, let's assume

 6    that no one can go back in history -- even if it was today,

 7    didn't you cite three or four other competing services that

 8    might come up with a different answer?  I just need to

 9    understand that.

03:50 10       MR. FRANK:  So one of --

 11        MR. KOSTO:  That's a helpful example, your Honor,

 12   because Mr. Nemtsev's brief describes one of the assignees of

 13   the IP address as being located in Lewes, Delaware.  Lewes,

 14   Delaware, is the place of incorporation, so it -- we'll dig

 15   into this, but it's not surprising that the place of

 16   incorporation of the company would show up in the corporate

 17   database about the lessee of an IP address.

 18        THE COURT:  I thought it showed the location of the

 19   server.

03:51 20       MR. FERNICH:  Some put them in New York.  Some put

 21   them in Chicago.  I mean, it's not just Lewes, Delaware.

 22        THE COURT:  That's right.  Let me put it this way:

 23   That caught my attention.

 24        MR. FRANK:  Yes, and the point is, if we were only

 25   relying on that, then they would have a fair point to say,

1    "Well, that's not reliable."  They can cross that data.  They

2    can show that that data has questions about its reliability,

3    but that's why we're corroborating it with two different pieces

4    of evidence.

5           THE COURT:  Two different invoices?

6           MR. FRANK:  Correct.  And so we're not saying "Rely on

7    this invoice alone" or "Rely on this invoice alone" or "Rely on

8    this alone."  We're saying all three of those things --

9           THE COURT:  I just have to make sure it's reliable.

03:51 10           MR. FERNICH:  Judge, we've cited comparable criminal

11    cases addressing analogous technology.  Let's say you can admit

12    this stuff, but I have to make a preliminary reliability

13    determination based upon expert testimony.

14           THE COURT:  Yes.

15           MR. FERNICH:  None of that has been proffered here

16    and --

17           THE COURT:  Can I say, all this has just come up

18    within the last week, within a week, the last week; but for me,

19    it's all come up within the last 24 hours.

03:52 20           MR. FERNICH:  Lucky you.

21           THE COURT:  You got it to me today or something or

22    last night, so I didn't see it till --

23           MR. FRANK:  And we've cited cases where it does come

24    in and where it's corroborated --

25           THE COURT:  Yes, but those are the personal

          1    jurisdiction cases.  Yeah, I've done that.  You get an ex parte

          2    obscenity case --

          3            MR. FRANK:  Different worlds, sure, but this is

          4    a venue question.  It's not a --

          5            MR. FERNICH:  It's a reliability question.

          6            MR. FRANK:  It's a preponderance standard on venue.

          7    That's all it is.

          8            MR. FERNICH:  It has to come in in a criminal trial,

          9    and these copyright troll cases say there are no *Daubert*

03:52   10    concerns at that juncture.  All we're trying to do is --

         11            THE COURT:  I agree, they're not directly --

         12            MR. FERNICH:  It's apples and oranges.

         13            THE COURT:  That doesn't mean it's reliable or not

         14    reliable.  I have to understand it, and I may need MaxMind here

         15    and StackPath.  But StackPath, they said, filed certifications,

         16    so maybe we don't need them for business records.  What is it,

         17    901 or something?

         18            Okay, on the statistics, it looked as if the

         19    methodologies were tried and true and old, but I don't know

03:53   20    statistics.  But what I don't know is whether or not they were

         21    correctly applied, so that's really what we're going to have to

         22    address as well next week.

         23            And I think that's all we can accomplish here today,

         24    right?  I'm still hoping for January 30; I'm still really

         25    hoping.  But, as I said originally, I believe one of the

1   interpreters cannot make it for the first three days of the

2   trial, and I believe we need two interpreters to proceed to

3   trial.  So Maryellen is going to try and find another one.

4   Otherwise, what we will have to do is essentially impanel and

5   then wait until the interpreter -- so we're working on it.

6          MR. FRANK:  Can I just inquire?  I don't want to beat

7   a dead horse, but I just want to ask a question about the

8   Court's ruling on the "wanted" poster.

9          THE COURT:  You're calling it a "wanted poster."

03:54 10   That's what it looks like.

11          MR. FRANK:  Well, it says it's a wanted notice.  It

12   says "wanted."  But my question is this:  We have this chat

13   between the defendant and Ermakov in which Ermakov says he

14   can't travel outside of Russia, and the defendant understands

15   that and says, "I can help you do that," right, "under a

16   different name."

17          MR. NEMTSEV:  That's 404(b), your Honor.

18          MR. FRANK:  That's not 404(b).

19          THE COURT:  I know Ermakov.  They think he's the guy

03:55 20   who hacked into the 2016 Presidential election.  Isn't that

21   what he's indicted for?  That's all I need is a juror looking

22   it up.

23          MR. FRANK:  My question is, to give meaning to the

24   conversation, I mean, the conversation is hard to explain in

25   the absence of knowing that he is charged with a crime.  We

1   don't have to put in --

2          THE COURT:  I'm not sure that even the conversation is

3   relevant, I don't know, but it might just simply because it

4   shows a friendship between the two of them --

5          MR. FRANK:  Well, it shows that --

6          MR. KOSTO:  -- A relationship close enough that they

7   would discuss the possibility of obtaining a document in

8   another name to travel together.  That's --

9          THE COURT:  That may be, but we're not putting in the

03:55 10   picture.

11          MR. FERNICH:  And you can't bootstrap one piece of

12   inadmissible evidence on top of another.

13          THE COURT:  I've ruled definitively.  The picture is

14   not coming in.  But what's very important, and I'm not going to

15   strip the government of its ability to prove the closeness of

16   the relationship between the two men.  I take it he doesn't

17   want to come testify?

18          (Laughter.)

19          MR. FRANK:  It would be ill-advised for him to do

03:55 20   that.

21          THE COURT:  Okay.  Well, listen, let me start off by

22   saying Happy New Year to everyone.  Really, a lot has come in,

23   a lot for me to digest, and we'll see you on the 12th.  I'm

24   still hoping for that date.  It may get delayed a little bit

25   because of the interpreter problem.

1           MR. NEMTSEV:  You mean the 30th?

2           THE COURT:  Did I say -- yes, the Monday.

3           MR. NEMTSEV:  Yes.

4           THE COURT:  The Monday, we may just get bumped till --

5      when did you say she was --

6           THE CLERK:  She's emailing me, and she said,

7      "Unfortunately the earliest I can start is February 2."  So

8      February 2 is that Thursday.  Alex, the interpreter, said he

9      probably could do the impanelling himself on that Monday.

03:56 10           THE COURT:  We may lose two days.

11           MR. KOSTO:  Your Honor, I'm a glass-half-full kind of

12     person, but I have some concern that if we don't start in

13     earnest until Thursday, the 3rd or 4th of February, that school

14     vacation week is sneaking up right behind the following week.

15           THE COURT:  I have the same worry.  That's why I was

16     sort of thinking 9:00 to 4:00.  Maybe we'll get another

17     interpreter.  Let's see where we go.  I mean, if worse comes to

18     worse, I suppose we could bump it a few weeks, but I hate to do

19     that.  We're all oriented towards this time period, right?  I

03:57 20     was hoping to try it -- when was it? -- six months ago, so if

21     we have to, we have to.  I can only do -- and obviously

22     Mr. Klyushin has to have an interpreter, so --

23           Other than going 9:00 to 4:00, do you have any other

24     suggestions?

25           MR. KOSTO:  A quick course in Russian for someone.

1        MR. FERNICH:  It's a tough language.

2        THE INTERPRETER:  Your Honor, I just contacted my

3    colleague in New York who's a Federal Court certified

4    interpreter, and he's available on the 30th, 31st, and the 1st.

5        THE COURT:  Yes, let's figure out if we can pay for

6    his hotel room, et cetera.  That's a wonderful suggestion, and

7    thank you very much.  And Happy New Year to everyone.  I've got

8    to go to that 4:00 o'clock.

9        MR. KOSTO:  Thank you, your Honor.

03:58  10        MR. NEMTSEV:  Thank you, your Honor.

11        (Adjourned, 3:58 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 53 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Criminal No. 21-10104-PBS,

11 United States of America v. Vladislav Klyushin, and thereafter

12 by me reduced to typewriting and is a true and accurate record

13 of the proceedings.

14         Dated this 14th day of January, 2023.

15

16

17

18

19

20         /s/ Lee A. Marzilli
           _____
21         LEE A. MARZILLI, CRR
           OFFICIAL COURT REPORTER

22

23

24

25