1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
2

3    UNITED STATES OF AMERICA,          )
                                        )
4                 Plaintiff             )
                                        )
5         -VS-                          )  Criminal No. 21-10104-PBS
                                        )  Pages 1 - 44
6    VLADISLAV KLYUSHIN,                )
                                        )
7                 Defendant             )


8                      **HEARING IN PERSON**

9

10          BEFORE THE HONORABLE PATTI B. SARIS
               UNITED STATES DISTRICT JUDGE

11

12

13
                        United States District Court
14                      1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts  02210
15                      January 12, 2023, 9:14 a.m.

16

17

18

19

20

21

22
                          LEE A. MARZILLI
23                      OFFICIAL COURT REPORTER
                     United States District Court
24                   1 Courthouse Way, Room 7200
                        Boston, MA  02210
25                       leemarz@aol.com

1   A P P E A R A N C E S:

2       SETH B. KOSTO, ESQ. and STEPHEN E. FRANK, ESQ.,
    Assistant United States Attorneys, Office of the United States
3   Attorney, 1 Courthouse Way, Room 9200, Boston, Massachusetts,
    02210, for the Plaintiff.

4
        MAKSIM NEMTSEV, ESQ., 20 Park Plaza, Suite 1000,
5   Boston, Massachusetts, 02116, for the Defendant.

6       MARC FERNICH, ESQ., Law Office of Marc Fernich,
    800 Third Avenue, Suite Floor 20, New York, New York, 10022,
7   for the Defendant.

8   ALSO PRESENT:  Alex Tetradze, Russian Interpreter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1        THE CLERK:  Court calls Criminal Action 21-10104,
2  United States v. Klyushin.  Could counsel please identify
3  themselves and the interpreter.

4        MR. FRANK:  Good morning, your Honor.  Stephen Frank
5  and Seth Kosto for the United States.

6        MR. KOSTO:  Good morning.

7        MR. NEMTSEV:  Good morning, your Honor.  Max Nemtsev
8  and Marc Fernich on behalf of Mr. Klyushin.

9        THE COURT:  Thank you.

10        (Interpreter Tetradze duly sworn.)

11        THE INTERPRETER:  Alexander Tetradze, Russian
12  interpreter.

13        THE COURT:  Thank you very much.  I know you both
14  moved to continue this date, but we have so much to do that I
15  thought we could accomplish certain things today, particularly
16  with respect to the logistics of the hearing on the 18th.  I
17  did receive a brief yesterday afternoon from the government on
18  the statistics.  I thought today we could at least -- we were a
19  bit rushed the last time because we had so many motions in
20  limine to deal with, but I really thought we could spend some
21  time today talking me through at least some of the issues; also
22  talk about the trial date and how long it will take.

23        I noticed on the pretrial order that most of the stuff
24  doesn't come in till January 23, but we haven't really talked

1    yet about what the voir dire would look like, and that's a

2    little close up on it.  So I did approve it and you all agreed

3    on it, but I'm regretting it now, since there may be issues

4    about how to do the voir dire, et cetera.

5          So let me just start off, I'm very interested in

6    learning more about MaxMind, and who do you plan on bringing in

7    to explain it better to me?  I thought that little chart, if I

8    can find it, was useful, but I need somebody to talk to me

9    about that and the 66 percent number before it appears on the

09:16 10   stand.

11         MR. KOSTO:  Judge, we're going to propose a somewhat

12   alternate way of getting at the information that does not rely

13   on the MaxMind data, and, simply, we're pulling together the

14   records; but the invoice trail and the contract trail we

15   believe, under suitable authentication by the records

16   custodians, will show that the owner of the IP address,

17   Web2Objects, authorized the assignment of this --

18         THE COURT:  Wait a minute.  I'm trying to take notes

19   because this is different than what we talked about before.

09:17 20         MR. KOSTO:  Would it be helpful if I put the Exhibit A

21   back up?

22         THE COURT:  Yes.  Web2Objects is the owner of the IP

23   address.

24         MR. KOSTO:  So, your Honor, I've put Exhibit A back

25   up.  At the top box on the left-hand corner is Web2Objects LLC.

1    They are assigned the IP address in question from the Internet

2    registry in late May, 2018, about five months before the key

3    dates with respect to the IP address in Boston.

4              THE COURT:  Late May when?

5              MR. KOSTO:  Late May of 2018.  Web2Objects issued an

6    authorization in late May of 2018 for the IP address to be

7    published and used in Boston, so an authorization, permission

8    for it to be used there.

9              StackPath, the next entity down, leased the IP address

09:18  10   from Web2Objects and had a contract with Micfo to rent out a

11   datacenter in Boston.

12             THE COURT:  You're going to have someone from StackPath

13   talk about that?

14             MR. KOSTO:  We have the invoices from Micfo to

15   StackPath.  We also have the invoices from Markley to Micfo

16   showing that the datacenter was leased, the IP address was

17   leased, the IP address that was authorized to Boston was in

18   fact assigned to Boston.  And what we would suggest is that if,

19   under the appropriate certifications, the Court admits these

09:19  20   business records, we will have an adequate basis to satisfy our

21   preponderance burden on venue, rather than digging into a

22   gnarly issue of the MaxMind geolocation issue, because the

23   business records themselves establish what happened here.

24             THE COURT:  Well, that's your choice, and it certainly

25   avoids what I viewed as what everybody is now talking about in

1    evidence, which is, what do you do with these computer

2    programs?  It avoids that issue.

3              MR. KOSTO:  We have provided the --

4              THE COURT:  But can I just go --

5              MR. KOSTO:  Sure.

6              THE COURT:  Does 1 Summer Street still host on all

7    these servers?

8              MR. KOSTO:  1 Summer Street the government believes is

9    still a datacenter.  It's not hosting servers on behalf of

09:20 10   Micfo at the direction of StackPath.  That contract expired

11   well after the events in this case.  We have invoices through

12   at least July --

13             THE COURT:  But it's a datacenter.  Someone has

14   actually --

15             MR. KOSTO:  It's a physical place, and there are --

16             THE COURT:  Has someone like an agent seen it?

17             MR. KOSTO:  We have pictures of the computers --

18             THE COURT:  Pictures, okay.

19             MR. KOSTO:  -- in the datacenter; in fact, one labeled

09:20 20   with the same sticker that's on the invoice.

21             THE COURT:  That will be in evidence?

22             MR. KOSTO:  Under a certification, yes.  Again, we

23   don't see the need to bring in a records custodian to --

24             THE COURT:  Well, I don't know.  Normally I would a

25   hundred percent agree with you, except for the fact that the

1    defense makes much about the fact that Micfo had its share of

2    legal problems.

3            MR. KOSTO:  These aren't Micfo's records, your Honor.

4    These belong to --

5            THE COURT:  This is what I want to understand, okay.

6            MR. KOSTO:  The records that we --

7            THE COURT:  So normally you would be straight out

8    correct:  It would be a pretty straightforward thing.  What was

9    Micfo prosecuted for?

09:21 10           MR. KOSTO:  Micfo was prosecuted -- I've read the

11   press release, your Honor, and Micfo was prosecuted for opening

12   fake companies, shell companies, to convince the organization

13   that controls the IP addresses to give it more IP addresses

14   that it could then rent and sell under names of fake companies

15   with fake employees, called "channel partners" in the documents

16   about the case.  What we believe here is that Micfo, as the

17   invoices reflect, was acting as Micfo, and was issuing invoices

18   in its own name.  And ARIN, the company that assigned the IP

19   addresses to Web2Objects at the top of that chart has a record

09:22 20   from June of 2018 saying this IP address was going to be used

21   at 1 Summer Street in Boston.

22           THE COURT:  Whose record is that?

23           MR. KOSTO:  ARIN, the Association of Internet

24   Registries.  At the very top of this chart, you could imagine

25   another box --

1      THE COURT:  So that's a business record that you --

2      MR. KOSTO:  That would also be a business record that

3  would show as of June of 2018, before any of these events,

4  ARIN, not geolocation, ARIN had a record saying the IP address

5  would be used at 1 Summer Street in Boston.  So we believe that

6  we can accomplish this chain of records without relying on

7  Micfo evidence at all, Micfo records at all.  So we would rely

8  on Markley's records, a business in the ordinary course;

9  StackPath's records, a business in the ordinary course;

09:23 10  Web2Objects LLC records, a business in the ordinary course; and

11  then the records of the ultimate assigner of the IP address,

12  ARIN, which way back in June of 2018 has a record indicating

13  that the IP address was to be used at 1 Summer Street, Boston,

14  the very address of the datacenter where there's a picture of a

15  computer with the same sticker that appears on the invoice.

16      THE COURT:  All right, this is very helpful because I

17  was not going to allow in MaxMind without someone validating

18  the methodology.  So I'm not expecting an answer from you right

19  now because you haven't seen -- have they seen everything?

09:23 20      MR. KOSTO:  We have produced all of these invoices.

21  We have produced all of the certifications.

22      THE COURT:  When?  When?

23      MR. KOSTO:  Starting in late December, as recently as

24  Monday.  As we get them, we're --

25      THE COURT:  So this is going to shift in strategy with

1    respect to this.  Are you prepared to respond now, or would you

2    like to wait until next week?

3            MR. NEMTSEV:  I think we can respond primarily right

4    now, your Honor.

5            THE COURT:  It does take the uncertainty about

6    geolocation monitoring off the table.

7            MR. NEMTSEV:  And I think, your Honor, if the

8    government wants to prove venue based on these invoices and

9    pictures --

09:24 10            THE COURT:  Just a little louder.

11            MR. NEMTSEV:  If the government wants to prove venue

12    based on pictures and invoices, they can try that, but it

13    doesn't mean that MaxMind is still admissible.  At the last --

14            THE COURT:  No, no, they're pulling it off the table,

15    as I understand.  They're not going to try and admit it.

16            MR. NEMTSEV:  Oh, well, if they're not admitting --

17            THE COURT:  They're going to do it all based on

18    business records.  It may or may not meet their burden.  Maybe

19    you have things to contradict it; like, you have your own

09:25 20    geolocation.  Are you putting on anything having to do with

21    your geolocation?

22            MR. NEMTSEV:  I don't intend to.

23            THE COURT:  Okay, so that issue is off the table, and

24    it will be primarily a business records test that I don't need

25    a *Daubert* hearing on, as far as I'm concerned, so --

1          MR. KOSTO:  So long as, your Honor, the defense is not

2     contesting the authenticity or, frankly, admissibility of the

3     business records themselves, in the ordinary course, we would

4     say, "Judge, we're going to offer these records under the

5     certification --"

6          THE COURT:  They have the right to object.

7          MR. KOSTO:  And we would ask the Court to evaluate the

8     certification and admit the document as authentic.

9          THE COURT:  I don't think I've seen them yet, but it

09:25 10   seems far more straightforward than relying on a geolocation

11    device, which may be mere puffery, but they claim they're

12    correct 66 percent of the time on their website.  How do we

13    know?  I mean, it's just, like --

14         MR. KOSTO:  But for purposes of managing the length of

15    the trial and the number of witnesses, understanding if there's

16    some small risk that we would have to fly a custodian from

17    Seattle, Washington, to spend five minutes on the stand saying,

18    "These are the records of our business --"

19         THE COURT:  I don't know.  Why don't you talk.  That's

09:26 20   why I'm doing this today rather than waiting till the 18th.

21    Why don't you talk.

22         MR. KOSTO:  Thank you.

23         THE COURT:  Okay?  So that seems just, like, a more

24    traditional, straightforward way of handling the venue issue.

25    Especially if you have the registry giving you an address in

1    Boston, it seems that that would be certainly admissible.  And,

2    I don't know, unless they have reason to believe that these

3    particular documents are the kind of documents that were

4    subject to the fraud, it seems on a preponderance standard to

5    at least be an alternative way of proving this.

6              Okay, so next issue.

7              MR. KOSTO:  Thank you, your Honor.

8              THE COURT:  Thank you.  That's very helpful.  And the

9    second issue is statistics.  Is Mr. Clarke coming next week?

09:27 10              MR. FRANK:  He can, your Honor.  He's in Washington.

11             THE COURT:  All right, now, here's the question:  Is

12   your expert coming next week?

13             MR. NEMTSEV:  Yes, he is.  He's available, your Honor.

14             THE COURT:  So can I just start from a threshold

15   issue.  Who is Mr. Clarke?

16             MR. FRANK:  Mr. Clarke is a financial economist at the

17   SEC where he's worked for a number of years.  Prior to that, he

18   was in the private sector.

19             THE COURT:  Does he have training in statistics?

09:27 20              MR. FRANK:  Absolutely, your Honor.

21             THE COURT:  I didn't have a bio.

22             MR. FRANK:  Oh, I'm sorry.  That's on his resume, but

23   he's extensively trained in statistics.

24             THE COURT:  I want to know that because all I saw when

25   I Googled him -- I love Google -- all I saw is he's a financial

1  economist.  So he likely has the expertise to talk about the

2  markets, et cetera, but I didn't know whether he had enough

3  to -- I'm going to go to you in a minute -- with the guy who

4  graduated in 2019.

5      MR. FRANK:  He testified in February before Judge Young

6  as a statistical expert.

7      THE COURT:  Your guy, Clarke.  Okay, that's useful to

8  know.  See, I knew nothing about him.  *Daubert* applies equally

9  to criminal and civil, and I have to make findings about his

09:28 10  qualifications as well as the methodology, as well as the

11  reliability of the data underpinning the methodology.  It's

12  just, I know you all don't do that much of it, but I do it a

13  lot in civil, especially patent and product liability cases.

14      All right, so you're saying that he -- what is his

15  extensive training in statistics?  Does he have a Ph.D. in

16  economics?

17      MR. FRANK:  He does not have a Ph.D.  I actually don't

18  have his resume right in front of me.  Do you have it?

19      THE COURT:  Does he have specific training in

09:28 20  statistics, rather than someone like me who had an undergraduate

21  course?

22      MR. FRANK:  Yes, your Honor.

23      THE COURT:  All right, so he has training --

24      MR. FRANK:  Or someone like me who got a B plus.

25      THE COURT:  What?

|     |                                                              |
|-----|--------------------------------------------------------------|
| 1   | MR. FRANK:  I got a B plus in statistics, but --             |
| 2   | THE COURT:  I'm not putting you on the stand.                |
| 3   | MR. FRANK:  No, I should not --                              |
| 4   | MR. FERNICH:  That's more than I have.  All of it is         |
| 5   | more than I have, so you're ahead of me.                     |
| 6   | THE COURT:  I find statistics difficult, just saying.        |
| 7   | MR. FRANK:  Yes, and I understand that, your Honor.          |
| 8   | And I think part of what we were trying to do in our brief,  |
| 9   | perhaps unsuccessfully, but make clear that this is not super- |

09:29 10   complicated statistics.  It may seem that way to us, but this
11   is a --
12             THE COURT:  It will for sure seem that way to a jury.
13             MR. FRANK:  It's a very established test from decades
14   ago.
15             THE COURT:  Now, who's going to say that?
16             MR. FRANK:  He can say that.
17             THE COURT:  That's what I want to hear.  It's a
18   *Daubert* hearing.  I need, first of all, that he has
19   qualifications in statistics.  I didn't get this kind of a
09:29 20   report.  I think he dealt with the test in the last paragraph
21   of the brief you filed yesterday, but why it applies here, and
22   why the dataset is reliable.  They can attack it if they want,
23   and they're going to, but I just want to at least make sure
24   that I've got a valid technology because the figure that I'm
25   worried about is the one in a trillion, and I want to know

1    mathematically how he got there.

2              MR. FRANK:  Right.  So what I would say, your Honor,

3    is he did this test using different tests.

4              THE COURT:  I saw that.  The other two I had no idea

5    what they were.

6              MR. FRANK:  Right, but they all lead to the same

7    result, which is, there is an extraordinary -- whether it's one

8    in a trillion or whether he says it's highly statistically

9    significant, it's well past the traditional threshold.

09:30 10              THE COURT:  I would prefer the highly "statistically

11    significant" because I think under any theory that might be

12    true; but if it's "one in a trillion," I need to know how he

13    gets there and what the other two tests show.  And you said I

14    could give a limiting instruction, but I wasn't quite sure how

15    to give it.

16              MR. FRANK:  We could craft something, but what we were

17    envisioning was something along the lines -- I cited a case

18    involving DNA evidence, that the statistics can be used for the

19    purpose of showing the correlation between these two things.

09:31 20    In other words, the fact that --

21              THE COURT:  But it doesn't mean he did it?

22              MR. FRANK:  Correct.

23              THE COURT:  That's the gist of what you think it is?

24              MR. FRANK:  That's the gist.  We have other evidence

25    that he did it.

1          THE COURT:  It could be the other names, Ermakov, or

2    it could be the two who are unnamed coconspirators and that

3    sort of thing, so --

4          MR. FRANK:  Well, yeah, the statistics doesn't show

5    why the trading is correlated.  The statistics doesn't show

6    who's sitting behind the computer.  It can't be used for any of

7    those purposes.

8          THE COURT:  All right, so why don't you craft

9    something on that, but I also just want to understand the math

09:31 10   before that kind of a number.  That's what typically happens in

11   DNA.  You looked at me like a deer in headlights when I

12   mentioned DNA, but it's a similar kind of problem actually.

13         MR. FRANK:  It is, and the reason I cited that DNA

14   case is because they actually did testify in that case to one

15   in a trillion and -- and --

16         THE COURT:  But they also in the Manual For Scientific

17   Evidence, reference manual, warn judges to be careful about it

18   and how it's worded.  And so I just want to be very careful on

19   that subject.  But mostly I just want to understand the math.

09:32 20   I just want to make sure that there's a valid methodology and

21   that the dataset he's relied on is reliable.  I think defense

22   challenged the dataset a bit in terms of what transactions

23   should be counted and that sort of thing.  So I will see

24   Mr. Clarke, and he will take the stand and help me.

25         Now, let me just say, I'm not thinking of a

1    full-blown -- this isn't like him on the stand, and you may not

2    want to disclose your cards for cross.  I just need to have

3    enough of a predicate to allow him to testify.

4          Now, you are planning on putting on your witnesses, a

5    rebuttal?  Is that it at this point?

6          MR. NEMTSEV:  Yes, your Honor.

7          THE COURT:  Or are you saving your fire for trial?

8          MR. NEMTSEV:  No, your Honor.  We plan to put him on

9    as a rebuttal witness.  He could listen to Mr. Clarke's

09:33 10   testimony --

11         THE COURT:  Yes, of course he can.

12         MR. NEMTSEV:  -- and if he has opinions or --

13         THE COURT:  Okay, now, here are credentials.  He

14   graduated in 2019, so he's a kid.

15         MR. NEMTSEV:  He graduated with a master's in 2019.

16         THE COURT:  Yes, I know, so I want to understand.  I'm

17   just saying, has he ever testified before?

18         MR. NEMTSEV:  He has never testified.  He has

19   publications related to --

09:33 20         THE COURT:  No publications --

21         MR. NEMTSEV:  No, he has publications.

22         THE COURT:  Like, I don't have those.  Typically I get

23   that stuff.  Has he published in this area about this test?

24         MR. NEMTSEV:  He has, your Honor, in areas related to

25   statistics very similar to this, and the publications are

 1    listed on his resume` at the bottom.

 2          THE COURT:  Okay.  Well, maybe --

 3          MR. NEMTSEV:  And I could provide the publications if

 4    your Honor wishes to see them.

 5          THE COURT:  And they should probably have it too, the

 6    list of publications.

 7          Does your person have publications?

 8          MR. FRANK:  I don't think so, your Honor.

 9          THE COURT:  And you only had in your opposition lawyer

09:34 10    argument basically, so it will be important for me to hear your

11    expert argument.  Assuming for a minute he has a master's in

12    statistics and he's familiar with these tests that were cited

13    by Mr. Clarke, he's likely qualified to talk about the

14    methodology, but I think the primary thrust of what you were

15    saying is that, one, the methodology is inappropriate for this

16    kind of a large data pool.  Isn't that it?

17          MR. NEMTSEV:  It is.

18          THE COURT:  And, second, that the dataset was under-

19    inclusive?  Was that it?

09:34 20          MR. NEMTSEV:  It didn't account for any other variable

21    except whether FA-1 or FA-2, so meaning all of Mr. Klyushin's

22    trades are also in large-cap, highly liquid companies with big

23    market caps, you know, and it would correlate to one in a

24    trillion chance.

25          THE COURT:  I mean people who aren't charged at all in

```
 1    this.
 2              MR. FRANK:  That's not -- I don't think that's what
 3    they're arguing, Judge.  I think --
 4              THE COURT:  Are you arguing -- say it again.
 5              MR. NEMTSEV:  We're arguing the fact that in order for
 6    Mr. Clarke to get to his results, the first assumption that he
 7    has to make -- and that's the null hypothesis that he's --
 8    testing -- is whether or not his trading is by chance or
 9    whether or not it correlates to Filing Agent 1 and 2.
10              THE COURT:  Yes, that's true.
11              MR. NEMTSEV:  But he excludes -- it's not like DNA
12    where you take every chromosome and match it up.  He excludes
13    all the other variables.  He, for example, doesn't take into
14    consideration, are these tech stocks, bank stocks?  Are these
15    liquid stocks?  Are these large-cap stocks, large
16    capitalization stocks?
17              THE COURT:  Can I say, that's fair, but why would that
18    matter, in terms of him trading on the inside information,
19    whether it's large cap or small cap?  He's also just trading
20    right before the insider.
21              MR. NEMTSEV:  Because, your Honor, the correlation
22    that they're trying to argue and put together to the jury, it's
23    very easily confused for causation --
24              THE COURT:  I keep losing you.  We're going to have
25    this problem because the Interpreter is speaking behind you,
```

```
 1    and you're a bit soft-spoken, just saying.
 2           MR. NEMTSEV:  I can speak louder.  Or I could sit
 3    down.  Would that help?
 4           THE COURT:  That's fine.  I have this problem a lot
 5    with tall lawyers.
 6           MR. NEMTSEV:  I'm not even that tall, your Honor.
 7           THE COURT:  So much better right now.
 8           MR. NEMTSEV:  The issue is that the correlation that
 9    they're trying to put in, this one in a trillion correlation,
10    it's easily confused for causation.  And it's even easier to
11    confuse it for causation when you don't consider any other
12    variable that could have correlated the trading to as well.
13    You know, that's the difficult part.
14           THE COURT:  So are you saying the FA-1 and FA-2 tend
15    to trade in a certain kind of stock?
16           MR. NEMTSEV:  They do, your Honor.  We cite it in our
17    statistics.  They make up the majority of all the S&P 500
18    stocks and all the NASDAQ stocks.
19           THE COURT:  That's a lot of stocks.
20           MR. NEMTSEV:  That's a lot of stocks.  That's most of
21    the stock market.
22           THE COURT:  So if he's trading, after they get the
23    earnings reports but before it goes public, in the S&P 500 and
24    the NASDAQ, I mean, why isn't that an important correlation?
25           MR. NEMTSEV:  It's a correlation, but it's a
```

1    correlation that thousands of other traders who trade on

2    earnings would make.

3            THE COURT:  I know, but they don't know the earnings

4    yet.

5            MR. NEMTSEV:  I'm sorry?

6            THE COURT:  At least as alleged, the earnings haven't

7    become public yet, the earnings report.

8            MR. NEMTSEV:  Yes, but many traders -- our financial

9    expert who is expected to testify that it's a common trading

09:37 10    strategy.

11            THE COURT:  To what?

12            MR. NEMTSEV:  To purchase a stock right before

13    earnings, believing that the earnings report is going to be

14    positive, and to sell it after earnings.  It's a common trading

15    mechanism, trading strategy used by traders, companies, banks.

16            THE COURT:  That's a good defense for you, but it

17    doesn't undermine his philosophy, which is, no, they traded

18    immediately after the earnings came out.

19            MR. NEMTSEV:  Their philosophy is, he traded before

09:38 20    the earnings and then sold or closed the position after the

21    earnings, which is consistent with how all the other major

22    banks do it and other traders that trade on earnings.

23            THE COURT:  I just haven't --

24            MR. FRANK:  So if I could just briefly respond to the

25    that, Judge.

1          THE COURT:  Well, let me put it this way:  I'm going

2     to hear from these experts, so, I mean, I'm not ruling

3     definitively at this point.  I, at the very least, would do a

4     limiting instruction, but also I have to own the math.

5          MR. FRANK:  These issues that they're raising right

6     now are not *Daubert* issues.  These are cross issues, these are

7     rebuttal issues, but they're not *Daubert* issues.  The only

8     thing, and the reason the limiting instruction, you know, that

9     we would welcome a limiting instruction is precisely the point

09:39 10   that Mr. Nemtsev is making, which is, he's not testifying as to

11    causation.  He's not saying X caused Y.  He's just simply

12    saying the relationship between X and Y is highly correlated.

13    And so his null hypothesis, the thing he was testing, is that

14    there should be no relationship between a company's choice of

15    filing agent, which is, as your Honor pointed out last time,

16    just a ministerial function.

17         THE COURT:  By the way, are the filing agents located

18    here in Boston?

19         MR. FRANK:  The filing agents are not located here in

09:39 20   Boston.

21         THE COURT:  Are they testifying at all?

22         MR. FRANK:  They will be testifying.

23         THE COURT:  On the hack, so we'll have information

24    about the kinds of stocks they have and that sort of thing?

25         MR. FRANK:  Yes.  So what his analysis shows is, he

trades 96, 98 percent of the time in the earnings of companies
that for those particular earnings reports used these two
filing agents.  And that relationship, given that they only
filed 44 percent of all earnings reports -- he looked at every
single earnings report that was filed in the year and a half,
in the time period, in the time period of the charged
conspiracy.  He looked at each one.  They filed 44 percent of
them.  But the defendant and his coconspirators traded
98 percent of the time when they traded earnings in those
particular reports.  That relationship --

THE COURT:  I'm less worried about that than
understanding whether the methodology applies in a reliable way
and whether or not --

MR. FRANK:  Yes, and all they're saying on that front
is, he didn't consider other variables that could affect that.
But that's not a *Daubert* issue.  That's a "there are other
things that could be causing that" issue, and they're welcome
to testify to that.  He's not going to testify what caused it.
All he's going to say is:  These numbers add up in this way,
and there's a statistically significant relationship between
them.  Otherwise, you'd expect he'd only trade, you know,
roughly around 44 percent of the time in those stocks.

THE COURT:  Well, listen, I'm not going to have it all
argued now.  I would like to have you -- you will put your
expert on because I really, I'm just learning about it now, his

credentials -- and that's helpful that he testified in front of

Judge Young as an expert -- and whether he's familiar with this

methodology and any articles he's written.  It sounds like he

hasn't written any.  Or any other times he's testified, let

them know.

And similarly with you, a full resume` of the --

MR. NEMTSEV:  It's on the docket, your Honor.  His CV

is on the docket.

THE COURT:  I did see some of it.  That's how I know

he has a master's from Arizona --

MR. NEMTSEV:  Yeah, I'll ask him to expand --

THE COURT:  -- in 2019, so he may not have ever

testified before.

MR. NEMTSEV:  He has not testified, your Honor.

THE COURT:  Okay.  And I imagine one key part of it

is, at least what you said, this is an unreliable methodology

for this problem.  Is that not what he's sticking with?

MR. NEMTSEV:  No, he is, your Honor.  He's going to

say that the Fisher's Exact Test, he's going to describe what

it is, explain why it's not a useful test under these

circumstances for the facts of this case.

THE COURT:  So that's primarily what I'm worried

about, and I'm unlikely to be able to write a full opinion.

Let's just say that.  It's coming way up.  I should warn you

that I am out of town in Miami on January 26 and 27.  I'm

1   speaking at a conference on multidistrict litigation, and so

2   unfortunately -- so the 18th is going to be a big date for me.

3          I'm allowing the 18th, I'm sorry, as an alternative

4   date for the *Daubert* hearing.  Today is like a logistics thing,

5   okay.

6          So as far as I can tell right now, we're just having

7   two witnesses, is this correct, because the MaxMind has gone

8   away?  And so that's good.  That's narrow.

9          So the other things I would like to be able to discuss

09:43 10  with you on the 18th is exactly how long this trial is going to

11   be, assuming for many days -- maybe you have some personal

12   commitments with kids or doctors' appointments that you made,

13   but basically I'm thinking of going 9:00 to 4:00.

14          MR. FRANK:  If I could just address that, we've been

15   speaking about that, your Honor.  So we've done a pretty

16   conservative analysis of our direct case, and we think that

17   with equal time for the defense on cross-examination --

18          THE COURT:  That's a rough rule of thumb.

19          MR. FRANK:  And actually, in speaking with the

09:44 20  defense, I actually think it's a pretty conservative rule of

21   thumb in this case because so much of the case is law

22   enforcement agents testifying about records.  So we think our

23   case conservatively -- we assumed half days -- would be six

24   half days, and their case conservatively is one to two half

25   days.

           1            THE COURT:  Eight days?

           2            MR. FRANK:  Eight half days plus a day for jury

           3    selection.

           4            THE COURT:  Right.  What about openings and closings?

           5    What about time for deliberations?

           6            MR. FRANK:  Right, but we think -- so what we're

           7    saying, that's still under two weeks.  We have three weeks

           8    before school vacation week, which is something we had not

           9    realized.

    09:44 10            THE COURT:  You're not hearing.  If you're six half

          11    days and they're two half days, that's eight half days.

          12            MR. FRANK:  That's eight half days, right.

          13            THE COURT:  You add a half day for jury impanelment

          14    and openings, let's say.  You have a half day for jury

          15    instructions and closings.

          16            MR. FRANK:  That's ten.

          17            THE COURT:  That's two weeks, right?

          18            MR. FRANK:  Correct.

          19            THE COURT:  You assume two or three days for jury

    09:45 20    deliberations, and then you have to build in Murphy's law,

          21    which is a snowstorm, not that we've seen any snow at all.

          22    It's like snow has disappeared, but --

          23            MR. FRANK:  But that's why we think we have a cushion

          24    with the three weeks that we have, and our suggestion would be

          25    to start with half days, and then, if we need to, to go to full

1    days rather than --

2         THE COURT:  I'm happy to consider that if you're all

3    convinced that that will work.  It's easier on lawyers, I know

4    that.  It's actually easier on us because we have all this

5    stuff in the afternoon.  But what I don't want to do is back

6    into that school vacation week because I'll lose jurors.

7         MR. FRANK:  If we are three or four days in and it's

8    going slower than we expect, we're both comfortable extending

9    it.

09:46 10        THE COURT:  Okay, you want that too?

11        MR. NEMTSEV:  Yes.  I think we could do it in a

12   shorter time span than is currently estimated.

13        THE COURT:  So assuming a two- to three-week trial,

14   things to think about -- you don't have to answer me right now,

15   but it may make a difference how we do the jury pool -- do you

16   want vaccinated jurors?

17        MR. FRANK:  Yes.

18        THE COURT:  What about you all?  Have you thought

19   through that issue?  You can let me know.  Are you all

09:46 20   vaccinated?  Mr. Klyushin, did he get a vaccine?

21        MR. NEMTSEV:  Yes, he is, but we prefer a diverse jury

22   pool, your Honor, both vaccinated and unvaccinated.

23        THE COURT:  Right, if you object, I won't do it.  But

24   what I will do is -- it does add a level of complexity -- I

25   will tell people that -- I think we find out that information,

1    by the way.  We'll ask that information.  And if people want

2    to, I'll inform them that there's someone unvaccinated, and

3    they can wear masks if they want.  So it's just a little more

4    complicated, but that's fine.

5         I'm thinking I will have a problem with respect to the

6    fact that Mr. Klyushin is a Russian national, and I was trying

7    to figure out how to deal with that to make sure it's a fair

8    and impartial jury pool.  And one thought that I sometimes --

9    I'm not a big fan of lengthy questionnaires, written

09:47 10   questionnaires -- the way I do it typically all orally; but

11   then occasionally, when I think there's a particularly

12   sensitive issue, I might do a written questionnaire just on

13   that so someone can say it additionally if they're embarrassed

14   to say it in front of him, especially with what's going on

15   internationally right now.  We will never mention Putin.

16   Mr. Putin is not going to be mentioned or anything having to do

17   with what's going on right now.  But I do think that I should

18   at least -- I'm thinking -- there may be another question but

19   at least one question in writing confidentially, "Do you think

09:48 20   you can be fair and impartial given the fact that you will hear

21   that Mr. Klyushin is a citizen of Russia?"

22        MR. FRANK:  Judge, I would respectfully suggest that

23   putting one question on that issue in front of the jury

24   elevates that issue over everything else, and really makes it a

25   focal point of the jury that we would be very uncomfortable

1       with.

2               THE COURT:  I'm floating it.  I've done it before with

3       race, for example.

4               MR. FRANK:  We have no objection to, you know, a

5       question or incorporating that into a question the Court would

6       ordinarily ask, and giving jurors who have any discomfort with

7       issues of --

8               THE COURT:  Well, I could word it differently.  I

9       could ask the question early and then say, "Is there anything

09:48 10  about this case that makes you unable to serve fairly and

11      impartially?"  I'm willing to do that.  I just find that when I

12      do this on race, and I also do it sometimes on people who have

13      unfortunately had sexual experiences in child porn cases, that

14      people are embarrassed to raise their hand, so --

15              MR. FRANK:  Sure, and we think people can come to

16      sidebar for that.  I just think putting a single question about

17      that issue --

18              THE COURT:  I'm going to address that next week.  I'm

19      floating some of these big issues.  I'm thinking of getting a

09:49 20  fairly large pool for impanelling because fourteen is standard;

21      the question is whether I should get sixteen.

22              MR. FERNICH:  Judge, this is sort of, as I think your

23      Honor has recognized, this is sort of sui generis.  I mean,

24      we're in the middle of a massive war, and it strains credulity

25      to think that with news reports, you know, every day an

1    avalanche of press about this, in this climate, it's vital to

2    his right to a fair trial to be able to ferret out --

3            THE COURT:  I want you to think about it.  I'm going

4    to resolve it on the 18th on how to do it.  I am worried about

5    it, given what's going on in Ukraine, and not to mention

6    nationally, and what happened with the 2016 election, and on

7    and on, and I just want to make sure.  Anybody who's going to

8    Google his name is certainly going to Google Ermakov's name --

9            MR. FERNICH:  You've got it.

09:50 10         THE COURT:  -- is going to see stuff, so I've got to

11   make sure I --

12           MR. FRANK:  If they're Googling, we have a bigger

13   issue.

14           THE COURT:  What?

15           MR. FRANK:  If they're Googling, we have a different

16   issue.

17           THE COURT:  That's right, we have a big issue, and I

18   don't want to be there.  Too many trials are faltering on the

19   issue of people finding out about -- in Varsity Blues it's

09:50 20   happened.  In Tsarnaev it happened.  I mean, it just --

21           MR. FRANK:  No, it didn't happen in Varsity Blues that

22   people were Googling.

23           THE COURT:  In my case, there was a concern about

24   people who knew about it through social media.  Let's put it

25   that way.

1        MR. FRANK:  Sure.  So this case has got -- I mean, I

2   did those cases -- this case has gotten a lot less attention in

3   the Boston press than those cases.

4        THE COURT:  I agree.  I agree.

5        MR. FRANK:  And we just think singling out that issue

6   for special treatment is extraordinarily prejudicial and --

7        THE COURT:  Well, help me think it through because I

8   do think that there are a fair number of people concerned about

9   the war in Ukraine and other issues having to do with Russia,

09:51 10   and I want to make sure I have a fair jury of people who say

11   they can put that aside.  I'm not quite sure how to do it.

12   That's why I'm flagging this issue so you all can talk about

13   what you want.

14        MR. FRANK:  Sure.  There's going to be no suggestion

15   that this defendant has anything to do with the war in Ukraine

16   and the conduct of --

17        THE COURT:  Well, except you --

18        MR. FRANK:  The only issue is that he's Russian, and

19   we have no objection to --

09:51 20        THE COURT:  No, no, I certainly understand that you

21   won't do it.  I'm just saying people link it, or might link it.

22        MR. FERNICH:  Judge, if you don't mind, now that we're

23   here, could I just circle back to the Clarke issue for just a

24   second and put the *Daubert* concerns to one side and talk about

25   it on legal grounds for just a second, more conventional legal

1    grounds?  And I think your Honor has hit upon the primary
2    problem with this testimony, and it's an apt analogy to the DNA
3    cases.  And we don't see that many DNA cases in Federal Court,
4    but I see them a lot in State Court in New York because they're
5    gun cases.  And when the feds in New York federalize a gun
6    case, the DNA methodologies that are used in State Court get
7    litigated in Federal Court.  And I have some experience with it
8    because I did an extensive appeal on one of these from Buffalo,
9    and your Honor has hit upon it:  Once the jury hears the
09:52 10   number, one in a trillion -- whether it's methodologically
11   reliable under *Daubert* or not is a question we're going to
12   thrash out -- but the sheer intrinsic prejudicial nature -- and
13   they'll say it's highly probative, and that will depend on
14   Daubert -- but the prejudicial nature of that number is out of
15   control, and the case is functionally over once they hear that
16   because your Honor said it:  This is very complicated material.
17   Lawyers can't understand it.  Statisticians can't agree upon
18   it.  And a juror is going to hear that number; they're not
19   going to draw the fine distinctions between correlation and
09:53 20   causation, and that number is mind-boggling.  And there is a
21   way to do it, and your Honor intimated it, and as did the
22   government in other portions of their memoranda, where that
23   number is taken out of it.  You can use words, and they use it
24   in their brief, "overwhelming bulk, exceedingly unlikely,
25   substantially probable."  There are ways to do this to convey

1    the same --

2            THE COURT:  I'm open to those suggestions.  It's a

3    serious issue.

4            MR. FERNICH:  Just one more thing.

5            THE COURT:  I'm going to have the *Daubert* hearing next

6    week.  I'm not definitively ruling on it.  I am just -- I mean,

7    it is an important part of the case for them to --

8            MR. FERNICH:  I understand.

9            THE COURT:  I mean, their case, they don't have what I

09:53 10   often have in cases, like a cooperating --

11           MR. FERNICH:  It's a circumstantial case.

12           THE COURT:  -- or a wiretap transcript.  This is all

13   about forensics, statistics, forensics.  You have a few little,

14   what's it, WhatsApp conversations?

15           MR. FERNICH:  Yes.

16           THE COURT:  But not what they often have, you know,

17   where you say, "Why did this go to trial?"  You know, the

18   guy's, you know, you've got a picture of him selling the drugs.

19   It's not that kind of case.  Statistics is an important part of

09:54 20   their case, and it's just a question if it's reliable -- and

21   Mr. Clarke says it's reliable and he's qualified -- and, as I

22   say, I Wikipedia'd it, it's a standard methodology -- then I'm

23   likely to allow in his testimony; and the question of how he

24   says it we'll talk about next week.

25           MR. FERNICH:  And one more thing.  Just on the

1    limiting instruction, we all know that they're presumed

2    accurate and jurors are presumed to follow them.  I don't

3    quarrel with that proposition.  But we also know from the

4    *Bruton* context that they're not considered effective when

5    jurors are asked to perform impossible feats of mental

6    gymnastics, and this is tough material, and angels dancing on

7    the head of a pin with respect to what these numbers mean.  One

8    in a trillion?  That's a mind-boggling --

9            THE COURT:  What is your expert going to say it is?

09:55 10            MR. FERNICH:  I'll let my colleague, because he

11    understands it better than I do, speak to that.

12            THE COURT:  What's he going to say?

13            MR. NEMTSEV:  He's not going to say that he redid the

14    analysis and got a different figure.  He's going to say that

15    the P-value, whatever they're using, that's not a percentage

16    for chance.  That's just a percentage to indicate whether

17    there's a strong relationship or not.

18            MR. FRANK:  There's no dispute about that.  We're not

19    suggesting anything other than that.  That's why I'm saying

09:55 20    it's not grounds for a Daubert hearing because there is

21    literally no dispute on that issue.  He is not going to get up

22    there and testify whether or not this happened by chance.  He

23    is simply going to say that there is a very strong one in a

24    trillion statistical correlation between these two things.  And

25    the fact that it's one in a trillion they're not disputing,

1   because they haven't redone the analysis, that that's accurate,

2   and, you know --

3           THE COURT:  They're not coming up with a different

4   number.

5           MR. FRANK:  They're not, and, you know, we have to be

6   able to put in our evidence because that's --

7           THE COURT:  Right, but I also have to make 403 as to

8   how they say it --

9           MR. FRANK:  Understood.

09:56 10           THE COURT: -- you know, "statistically significant,

11   overwhelmingly unlikely," whatever words.  "One in a trillion"

12   has a different meaning.

13           MR. FRANK:  Right, and there are cases where that has

14   come in, but I understand your Honor's point on that.  But my

15   point is that this red herring about whether or not it happened

16   by chance is --

17           THE COURT:  I don't think they're pressing it right

18   now.

19           MR. FERNICH:  Well, we are, and here is why.  I mean,

09:56 20   the way they've phrased it in the papers, saying it happened by

21   chance, we're just reflecting back what was in the last proffer.

22           THE COURT:  The flip of a coin.

23           MR. FERNICH:  Well, that and also chance.  I mean,

24   chance is problematic, in my view, because exactly what we

25   said:  When you're playing the stock market, if you have no

1   idea what you're doing –– and I don't –– I'd be throwing darts,

2   you know, pinning the tail on the donkey.  But people do this.

3   They study, they learn, and they try to lawfully gain the

4   market.  So chance isn't a good comparator, but now they're

5   saying, in the absence of a relationship, that's a less-

6   confusing way to put it.

7           I mean, a lot of this stuff, assuming it gets past

8   *Daubert*, is going to come down to discretionary 403

9   determinations.  And my friend is right:  This stuff does come

09:57 10  in in the DNA context, and the DNA stuff is constantly evolving.

11  We have this thing in New York now called Starmix, S-t-a-r-m-i-x.

12  I did a whole appeal on it, and, yes, sometimes the numbers

13  come in, other judges criticize it, and you get eye-popping

14  wind shears like this.  And whether the Second Circuit throws

15  up its hands at what I write or not, it's tough for a defendant

16  to get a fair trial under that circumstance before lay jurors

17  who are not versed in this stuff; and irrespective of how in

18  what lay terms the experts try to put it, they're not going to

19  get this in a one-day trial.

09:58 20          THE COURT:  Well, come up with an alternative.  If it

21  passes *Daubert*, then something is coming in.

22          MR. FERNICH:  Yes.

23          THE COURT:  And based on what I'm hearing today, that

24  seems more likely.  I have a better sense of things.  But if it

25  doesn't pass *Daubert*, the issue is over.  If it does pass

1    Daubert, then I need to think about either cautionary

2    instructions or just another way of saying it other than "one

3    in a trillion," and I just have to think about that.

4         MR. FERNICH:  Right, and there are three, I guess --

5    and the government's papers are very helpful in this respect,

6    they really drill down into the three different kinds of ratios

7    or different types of ratios they're going to offer; and we're

8    saying, you know, number one, I get conceptually that the

9    choice of filing agent really doesn't have much to do on its

09:58 10   face with a legitimate or illegitimate informational advantage.

11   But, number two --

12        THE COURT:  It's immaterial.  It's like a --

13        MR. FERNICH:  Right.  But on Page 8, for example, in

14   the Footnote No. 1, "Outsized earning surprises and the

15   direction of the conspirators' trades," I mean, that is

16   fundamentally keyed to what the Supreme Court held lawful in

17   *Giarella*, which is that you might be able to predict that based

18   upon really diligent work, especially if that's your job at

19   M-13.

09:59 20        Now, they're going to say that's for trial, and that's

21   an argument, but the threshold determination under 401, after

22   *Daubert*, is whether that correlation is sufficiently relevant

23   to go before a jury in the first instance.

24        MR. FRANK:  That's not a *Daubert* --

25        MR. FERNICH:  It is because you have to hear the

1    experts' competing visions of whether it's a relevant

2    correlation or not, and the Court has to make a threshold

3    determination.

4            THE COURT:  All right.  Well, I'll hear you on the

5    18th on that on the *Daubert* hearing.  We will not be addressing

6    the issue of where the servers were, assuming that the invoices

7    are the way that you've just described.  That strikes me as a

8    more traditional method and --

9            MR. KOSTO:  Your Honor, *Giarella* and sophistication in

10:00 10   trading is a terrific defense to an accusation of insider

11   trading.  The government's explanation of the evidence would be

12   insider trading, but these are not *Daubert* or statistical

13   issues.  The statistical issue at play here is just that

14   there's a relationship.  They have an explanation; we have an

15   explanation.

16           MR. FERNICH:  I think that's a legitimate argument

17   that they can make, but as in the first instance, the Court has

18   to make a determination, particularly with respect to

19   Parenthetical 1 in Footnote 8, as to whether this is

10:00 20   conceptually a valid correlation for an expert to make under

21   Rule 401; and I'm arguing that it's not because it's too close

22   to the line of what is a legitimate informational advantage,

23   and that is the essence of what the Court does under *Daubert*.

24           MR. FRANK:  Those are two -- that's apples and

25   oranges, Judge.

|     |     |
| --- | --- |
| 1 | THE COURT:  All right, all right, thank you.  I'll |
| 2 | handle this on the 18th.  We've accomplished a lot today. |
| 3 | We'll have two witnesses there, as far as I'm concerned.  I |
| 4 | also have to just sort of figure out how to do the impanelment, |
| 5 | and I'll do that on the 18th in terms of any questionnaire. |
| 6 | And I will not have only vaccinated, but I will ask that |
| 7 | question.  And I think that's it for right now. |
| 8 | (Discussion between the Court and Clerk.) |
| 9 | THE COURT:  Are you available on the 18th, sir? |
| 10:01 10 | THE INTERPRETER:  Yes, ma'am. |
| 11 | THE COURT:  Thank you very much.  And is it the woman |
| 12 | or a guy from New York able to come up for the trial? |
| 13 | THE INTERPRETER:  For the 30th?  Yes, but not for the |
| 14 | 18th. |
| 15 | THE COURT:  Can you do the 18th by yourself?  I think |
| 16 | it's only going to be a couple of hours. |
| 17 | THE INTERPRETER:  Frankly speaking, it's a little bit |
| 18 | difficult, your Honor, because it's a real technical -- |
| 19 | THE COURT:  Let's see if we can get in another |
| 10:02 20 | interpreter, and if we can't, I'll just take breaks, okay? |
| 21 | THE INTERPRETER:  Thank you. |
| 22 | MR. FRANK:  Can I just inquire, your Honor, how you |
| 23 | envision it going on the 18th in terms of -- |
| 24 | THE COURT:  Mr. Clarke takes the stand, Mr. -- |
| 25 | MR. NEMTSEV:  Nemtsev? |

1          THE COURT:  No, no, no.

2          MR. NEMTSEV:  Mr. Ed Culley.

3          THE COURT:  Yes, takes the stand.  I'll take it under

4    advisement.

5          MR. FRANK:  So you just envision us, you know, asking

6    him sort of a narrow -- what do you want us to establish with

7    him is what I'm asking?

8          THE COURT:  A, he's qualified; B, it's a reliable

9    methodology; and, C, the data that he's relying on is reliable,

10:03 10   I mean, basically.  And then with respect to the defense

11   expert, he's qualified; it's not a reliable methodology, and

12   even if it is, the dataset isn't reliable.  I mean, it's a

13   classic *Daubert*, *Kumho* --

14         Did either of you work for a big firm?

15         MR. FRANK:  Yes, but not on *Daubert* issues, Judge.

16         THE COURT:  Yeah, people look at me like I'm

17   speaking -- it's standard in the civil side, but the Supreme

18   Court -- I mean, it's quite clear it applies in the criminal as

19   well.

10:03 20   MR. FRANK:  Basically an abbreviated direct exam that

21   looks at the reliability of the methodology and the data.

22         THE COURT:  Yes.  And usually what I have on the civil

23   side is actually an expert report that does a lot of this, so

24   that's why often it can be done on oral argument.  But I really

25   have sketchy statements other than lawyers' argument, non-

1  expert.

2          Now, one last thing is, you were going to give me a

3  proffer on the conspiracy?  I'm not sure I quite need it on

4  Ermakov and Rumiantcev.  It's really the unnamed ones.

5          MR. FRANK:  So I spoke with our Appellate Unit about

6  this.  We don't think that a proffer is appropriate in this

7  circumstance because this is not a *Petrozziello* issue.  This is

8  simply an issue --

9          THE COURT:  Well, I was almost with you except are you

10:04 10  putting in their WhatsApp and --

11          MR. FRANK:  We are not putting in -- so the two

12  individuals who are at issue here are Sladkov and Irzkov.  We

13  are not putting in their statements.

14          THE COURT:  I thought you were putting in their

15  emails.

16          MR. FRANK:  Not their emails.  We're simply putting in

17  evidence, photographs, trading records.  That's what we're

18  putting in as evidence.

19          THE COURT:  So if you're not putting in any statements

10:04 20  or emails or WhatsApps, it may not be relevant; but if you are

21  and you're using that as attributable to the conspiracy, that's

22  the piece of it I'm the weakest on.  I don't really --

23          MR. FRANK:  We're not putting in any statements of

24  those two individuals.  We're not.

25          THE COURT:  Either on email, either on social media

1    or --

2              MR. FRANK:  We're putting in photographs.

3              THE COURT:  What did you think they were putting in?

4    You told me there were some things you thought they were

5    putting in.

6              MR. NEMTSEV:  They're putting in their iCloud

7    information, your Honor.

8              MR. FRANK:  "ICloud information" is a broad term.

9    We're putting in photographs that were found in their iCloud.

10:05 10   We're putting in records that were found.  That's evidence.

11   That's not a statement for 801(d)(2)(e) purposes for which a

12   *Petrozziello* proffer would be appropriate.  That's simply

13   evidence of the crime.  That we are putting in, but that's not

14   the appropriate subject of a proffer.  If they want to make a

15   multiple conspiracy argument and suggest that there were

16   multiple conspiracies, they're entitled to do that; and then a

17   court may at the end of the trial decide or not decide to give

18   a multiple conspiracy instruction to the jury, but that's not

19   the appropriate subject --

10:05 20             THE COURT:  I might give a multiple conspiracy

21   instruction to the jury, but if he's not putting in

22   statements -- I thought you were saying that he was putting in

23   statements from the iCloud.

24             MR. FRANK:  We are putting in statements of Ermakov

25   and the defendant in conversation with one another and of the

1   defendant and Rumiantcev in conversation with one another.

2         THE COURT:  Of course.  That part is easy.

3         MR. FRANK:  That part is easy, but we are not putting

4   in statements of Sladkov or Irzak.

5         MR. FERNICH:  Judge, to the extent they're going to

6   seek to hold Mr. Klyushin liable under a *Pinkerton*-type

7   theory --

8         THE COURT:  I don't usually give a *Pinkerton*

9   instruction.

10:06 10         MR. FERNICH:  Okay, all right.

11         THE COURT:  I haven't in 30 years.

12         MR. FERNICH:  No.  Who does?

13         THE COURT:  If it's a jury with a trial judge, I don't

14   tend to give them.

15         MR. FERNICH:  Okay.

16         THE COURT:  And I do give multiple conspiracy

17   instructions.  However, if they're not introducing any

18   statements, I don't need to worry about this.  I thought you

19   had said from the iCloud there were going to be statements from

10:06 20   these people, and if that's not the case -- and I'll take it

21   email by email if you change your mind.  But I hear what your

22   proposition is saying.  I had misunderstood.  I thought

23   Mr. Nemtsev said without objection that you're putting in

24   statements from the iCloud accounts.

25         MR. FRANK:  The iCloud accounts contain statements,

1    and they contain photographs, and they contain other things.

2    We're not putting in the statements.  We're just putting in

3    records.

4                MR. NEMTSEV:  And, your Honor, we don't have an

5    exhibit list yet.

6                THE COURT:  I understand.

7                MR. NEMTSEV:  Our major concern is the fact that

8    they're using things that are outside of the conspiracy period

9    or outside of --

10:07 10                THE COURT:  Yes, but they get to rely on the trading

11    records.

12                MR. NEMTSEV:  I know, our client's trading records

13    make sense, but they're trying to put in pictures from Irzak

14    and Sladkov that precede the first trade of our client by

15    months, many months.

16                THE COURT:  Months means nothing.  Months?  So,

17    anyway, all right, so I think we've got a game plan here.

18                And one last thing.  I don't want to say this on the

19    public record, I don't know who's covering or not, but if in

10:07 20    fact there are reasons why this case won't go forward on that

21    day, I need to know because I'm pulling in a ton of people.

22                MR. FRANK:  We have every expectation it is going

23    forward, Judge.

24                MR. NEMTSEV:  As do we, your Honor.

25                THE COURT:  Okay, thank you.  We'll stand in recess.

1          MR. FRANK:  Thank you, your Honor.

2          MR. FERNICH:  Thank you, your Honor.

3          (Adjourned, 10:08 a.m.)

1                    C E R T I F I C A T E

2


3
     UNITED STATES DISTRICT COURT )
4    DISTRICT OF MASSACHUSETTS    ) ss.
     CITY OF BOSTON               )
5

6


7         I, Lee A. Marzilli, Official Federal Court Reporter,

8    do hereby certify that the foregoing transcript, Pages 1

9    through 44 inclusive, was recorded by me stenographically at

10   the time and place aforesaid in Criminal No. 21-10104-PBS,

11   United States of America v. Vladislav Klyushin, and thereafter

12   by me reduced to typewriting and is a true and accurate record

13   of the proceedings.

14        Dated this 14th day of January, 2023.

15

16

17

18

19
                    /s/ Lee A. Marzilli
20        _____
                    LEE A. MARZILLI, CRR
21                  OFFICIAL COURT REPORTER

22

23

24

25