1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS

2

3   UNITED STATES OF AMERICA,       )
                           )

4               Plaintiff      )
                           )

5        -VS-             )  Criminal No. 21-10104-PBS
                           )  Pages 1 - 92

6   VLADISLAV KLYUSHIN,          )
                           )

7              Defendant      )

8

                  **JURY TRIAL - DAY ONE**

9

10          BEFORE THE HONORABLE PATTI B. SARIS
             UNITED STATES DISTRICT JUDGE

11

12

13

14                   United States District Court
                   1 Courthouse Way, Courtroom 19
                   Boston, Massachusetts  02210

15                   January 30, 2023

16

17

18

19

20

21                LEE A. MARZILLI
                KATHLEEN SILVA

22           OFFICIAL COURT REPORTERS
          United States District Court

23        1 Courthouse Way, Room 7200
            Boston, MA  02210

24            leemarz@aol.com

25

1    A P P E A R A N C E S:

2        SETH B. KOSTO, ESQ. and STEPHEN E. FRANK, ESQ.,
     Assistant United States Attorneys, Office of the United States
3    Attorney, 1 Courthouse Way, Room 9200, Boston, Massachusetts,
     02210, for the Plaintiff.
4
         MAKSIM NEMTSEV, ESQ., 20 Park Plaza, Suite 1000,
5    Boston, Massachusetts, 02116, for the Defendant.

6        MARC FERNICH, ESQ., Law Office of Marc Fernich,
     800 Third Avenue, Suite Floor 20, New York, New York, 10022,
7    for the Defendant.

8    ALSO PRESENT:

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1
2          THE CLERK:  Court calls Criminal Action 21-10173,
3   United States v. Klyushin.  Could counsel please identify
4   themselves.
5          MR. FRANK:  Stephen Frank and Seth Kosto for the
6   United States.  Good morning, your Honor.
7          MR. KOSTO:  Good morning.
8          MR. NEMTSEV:  Good morning, your Honor.  Max Nemtsev
9   and Marc Fernich on behalf of Mr. Klyushin.
08:46 10          MR. FERNICH:  Good morning, Judge.
11          THE COURT:  Good morning.
12          (Interpreters duly sworn.)
13          THE COURT:  All right, thank you.  You may be seated.
14          Mr. Klyushin, welcome.  I'm glad you got your suit.
15   It's always a moment of stress for me to make sure they get the
16   clothes to you correctly.
17          So something happened on Saturday, as you know.  There
18   was an article in the <u>Boston Globe</u> about this case, above the
19   folds, big headlines.  So I wanted to discuss with you the
08:47 20   appropriate way to screen for that.  What I'm thinking is the
21   following:  I will ask all the standard questions.  We will
22   winnow it down -- you know, people who can't serve because they
23   have small children or they're sick, or whatever the reasons
24   are -- and then I will do an individual voir dire with respect
25   to any exposure to the press.  And you're welcome to follow up

         1    on that if you think I'm not asking enough questions.  My guess

         2    is we'll lose maybe 20, 30 people just because of life -- you

         3    know, they've got kids in school or whatever -- but then we're

         4    going to have a fair number of people who are going to be left.

         5    And I'll ask also all the other questions about bias and

         6    prejudice and et cetera, but I don't know how to deal with the

         7    pretrial publicity thing other than one by one because it was

         8    such a prominent article.

         9         Has anyone not had a chance to see it?  You've got it,

08:48   10    all right.  You're on top of it.

        11         MR. NEMTSEV:  In print, Judge.  I had to run around

        12    and buy all the copies before people bought them.

        13         MR. FERNICH:  So that means nobody will have seen it

        14    because he bought up all the papers.

        15         THE COURT:  So, I mean, I've had many -- I'm sort of

        16    an older judge at this point, maybe not older, maybe just old,

        17    but I've had high-profile cases.  I'm confident we can get a

        18    jury.  I just need to make sure that somebody hasn't read that

        19    through and through and can't put it aside.  I don't think just

08:48   20    because you've read it means you're necessarily off the jury,

        21    but what it does mean is, we will need to probe.  So I'll ask

        22    first, "Have you read any newspaper articles about the case?"

        23    And then if they have, I'm going to ask them what they remember

        24    about it.  And then I'm going to ask them, "Do you think that

        25    you can put that aside and just decide the case based on the

 1    evidence?"  And then you can exercise peremptories as

 2    appropriate.

 3            MR. KOSTO:  We think that's appropriate, your Honor.

 4            MR. FRANK:  Does your Honor think the first question,

 5    "Have you read anything about the case," would be asked of

 6    everybody?  Or were you going to do that --

 7            THE COURT:  I'm sorry?

 8            MR. FRANK:  Sorry.  Would you anticipate asking the

 9    first question, "Have you read anything about the case"

08:49 10    generally?

 11            THE COURT:  No, no.  I'm going to go through, "Do you

 12    know anything about this case?"  I may get certain people that

 13    way.  "Do you know any of the witnesses?"  You know, there's

 14    the standard --

 15            MR. FRANK:  Generally.

 16            THE COURT:  Yes, general.

 17            MR. FRANK:  I see.

 18            THE COURT:  Is someone biased in favor of the

 19    government?  Is someone biased against Russian nationals?  And,

08:49 20    once again, I'm not going to mention the war in Ukraine.  This

 21    is not about the war in Ukraine, but I will mention the Russian

 22    Ministry, as requested, because you're planning on putting in

 23    the website.

 24            By the way, what is the Russian Ministry?  When it

 25    says it on the website, I don't even know what that is.  Does

that just simply mean, like, you're working for the Department

of Justice?  Does anyone know?

MR. NEMTSEV:  The website I believe says, your Honor,

that there's a contract with the Office or the President of the

Russian Federation.  So it's a contract with Mr. Putin's office

to provide services to him.

MR. FRANK:  We've redacted that.

THE COURT:  Oh, you've redacted it, so I don't have to

go into it.  That's great.  That's great.

MR. FRANK:  We've redacted the portion that says "The

Office of the Presidential Administration," or whatever that

language is.  We've left in the portion that references the

government generally, since that was unobjected to.

THE COURT:  Okay.  Okay, good, that makes my job

easier.  So that's number one.  We're hoping to get around 84

people, and as I said, we're going to try and do openings

today.  We ordered lunch for the jury.  But the big surprise,

if you will, is I didn't expect that newspaper article.

So let me ask you this -- and, of course, this is

correct for all of you -- obviously no one should be talking to

the press about the case, and we'll go from there.

Now, the second thing is, I got a motion in limine

over the weekend.  I don't want you putting that in in your

opening, but I actually think it's relevant that license plates

say "13" on them, the three of them.  But the question I had

1    for you, so it isn't quite so obvious, can you blow up those

2    pictures and just show the license plates without having the

3    pictures of the full cars?

4         MR. FRANK:  It would be confusing, I think, your

5    Honor, to just have --

6         THE COURT:  Why?  I mean, people know it's a car.

7         MR. FRANK:  Because there are three license plates and

8    four cars, and it would --

9         THE COURT:  Well, if there's a way of doing it.  I

08:52 10   don't think the point is that they're Porsches.

11        MR. FRANK:  I agree with your Honor, and --

12        THE COURT:  The point is the license plates having a

13   "13" on them.  So I think what's most important is seeing the

14   license plates.  And I know on my phone, not that I'm

15   Miss Photo Genius, you can sort of expand it out to see the

16   licenses.  So see if you can do that.  That would be great.

17   But I am going to allow them to talk about the licenses.

18        MR. FRANK:  Yes, your Honor, and we were only going to

19   refer to them as cars.  We're not going to refer to them as a

08:52 20   particular model of car.

21        THE COURT:  Okay, all right, that's great.

22        MR. FRANK:  If we do that, your Honor, without making

23   it visible what kind of car it is, can we put that in the

24   opening?

25        THE COURT:  You can sort of tell.

        1            MR. FRANK:  I mean if we blow it up so that it's

        2    focused on those license plates?

        3            THE COURT:  But try and blow it up so it's focused on

        4    the license.

        5            MR. FRANK:  And then we can use it?

        6            THE COURT:  Huh?

        7            MR. FRANK:  In that case, we can use it?

        8            THE COURT:  Yes.

        9            MR. FRANK:  In the opening?

08:53  10            THE COURT:  I mean, I want to see it, but not in the

       11    opening.  I mean, you can talk about it in the opening, but

       12    don't use the pictures.

       13            MR. FRANK:  Can we use the yacht in the opening?

       14    We're not using the yacht in the opening.

       15            THE COURT:  Anything else we should deal with right

       16    now?  We should be getting the jurors.  We're the only ones

       17    impanelling today.

       18            THE CLERK:  It could be half an hour.

       19            THE COURT:  Why?

08:53  20            THE CLERK:  That's how long it takes them.

       21            THE COURT:  They may be watching the video or

       22    something?

       23            (Discussion between the Court and Clerk.)

       24            THE COURT:  You could probably go grab coffee if you

       25    wanted to, but it's probably going to be half an hour.

1    MR. KOSTO:  Since we have a few minutes, your Honor, I

2    did want to ask the Court if Special Agent Hitchcock, who's the

3    case agent from the FBI, who we do anticipate will be a

4    witness, can be in the courtroom during the course of the

5    proceedings.

6         THE COURT:  Yes.

7         MR. KOSTO:  The government will also have a summary

8    witness, Karyn Yanochko, an auditor from our office who we

9    would also ask to be present to enable -- to assist in her

08:54 10    summary testimony.  She's summarizing evidence --

11         THE COURT:  Case agents I usually allow in.  I'm less

12    firm about the summary witness.

13         MR. NEMTSEV:  Your Honor, I have concern about the

14    case agent being here as well.  It's not like he's their first

15    witness.  He's going to listen --

16         THE COURT:  Is the case agent testifying?

17         MR. KOSTO:  Yes, the case agent is testifying.

18         THE COURT:  Well, it's generally the case that there

19    is some representative from the government here, so --

08:54 20         MR. NEMTSEV:  I understand.  I just don't want them --

21         THE COURT:  I don't need two of them.

22         MR. FRANK:  Only one.

23         THE COURT:  Only one.

24         MR. NEMTSEV:  And, your Honor, I did have a follow-up

25    question about that lengthy 4,000-line exhibit.

1          THE COURT:  Yes, fair question.  So here's the thing:

2     I'm not going to read it.

3          MR. NEMTSEV:  Understood.

4          THE COURT:  But I am going to allow you to protest any

5     sections of it you think are unfairly prejudicial.  Like, my

6     law clerk saw a few lines in there that we thought were

7     inappropriate.  But otherwise it does seem relevant if this

8     discussion is between Mr. Klyushin and his investors.  So if

9     there's something that's overly prejudicial, you let me know,

08:54 10    and I'll mark it out.  But right now, it's just marked for ID.

11    And I want anything that the government is focusing on to have,

12    like -- I forget what number it is.  Do you remember?

13         MR. FRANK:  Well, there's several.  There's the

14    WhatsApp chat between Mr. Ermakov and Mr. Klyushin.  That's

15    Exhibit 151.  There's the Threema chat that involves

16    Mr. Ermakov, Mr. Rumiantcev, and Mr. Klyushin.  That's 46.

17    We're going to --

18         THE COURT:  What was the first number?

19         MR. FRANK:  The WhatsApp is 151.  The Threema is 46.

08:55 20        With respect to the investor chat, we've already

21    designated the sections that we intend to use.  There are two.

22    That's 152.

23         THE COURT:  All right, so hopefully -- I will allow

24    the -- it's only being marked for identification right now.

25         MR. FRANK:  Yes, your Honor.

     1            THE COURT:  So that to the extent you have things that

     2    you think are either irrelevant or overly prejudicial, I'll

     3    take them one by one.  That's how I'll do it.

     4            MR. NEMTSEV:  Is my understanding correct that the

     5    government would pick the excerpts they would want to use, and

     6    we'd have an opportunity to review them and object to them?

     7            THE COURT:  Yes, yes.

     8            MR. NEMTSEV:  Is my understanding also correct, your

     9    Honor, that I could use excerpts of that chat as well because

08:56 10    that's something that the government has --

    11            MR. FRANK:  No, your Honor.  That's hearsay for them.

    12            THE COURT:  Wait a minute.  It's called the "doctrine

    13    of completeness."  If there are portions of it that round out

    14    the conversation, I will allow it.

    15            MR. FRANK:  Understood, your Honor, but the doctrine

    16    of completeness then refers to the entire chat.  They can't

    17    have it both ways.  They can't say --

    18            THE COURT:  Well, you can't have it both ways either.

    19    If you want the whole thing in, I'd let them use the whole

08:56 20    thing.

    21            MR. FRANK:  I've stipulated.

    22            THE COURT:  What?

    23            MR. FRANK:  We agree with that, your Honor.

    24            MR. FERNICH:  But the doctrine of completeness refers

    25    to the adverse party.  They're trying to use the doctrine --

1       THE COURT:  Let me just say, do you want to agree to

2   the whole thing except to the extent you move to strike for

3   prejudicial, and then you can use whatever you want?

4       MR. FERNICH:  Give me one second with Mr. --

5       THE COURT:  I mean, of course I'm not going to let in

6   anything -- like, there's one that says -- I forget.  There

7   were a few things my law clerk --

8       MR. FERNICH:  There's an arguably anti-Semitic

9   reference in the Threema chat.  In the WhatsApp chat, there are

08:57 10   numerous references to Putin and various Russian government

11   agencies.

12       THE COURT:  There were some derogatory things said

13   about Americans, so, I mean, I'm happy to strike all of that.

14       MR. FERNICH:  Yes, we'll get that to your Honor.

15       MR. FRANK:  We have no objection.  We're not intending

16   to focus on those things at all, so if they want to redact

17   those, we have no objection.

18       (Discussion off the record between defense counsel.)

19       MR. NEMTSEV:  So chat number 146, the Threema chat, I

08:57 20   agree, most of that is relevant, and we could go and exclude

21   certain portions that the government would want to focus on if

22   we believe that they're prejudicial.  So I believe most of that

23   would come in.

24       The WhatsApp chat, 151, most of that is irrelevant to

25   any trading.  It's just a personal chat between Mr. Klyushin

1   and Mr. Ermakov, and there's obviously issues there as well.

2   And it's lengthy.  It's a very long chat.  It's about 3,000

3   messages.  I don't believe that --

4       THE COURT:  I didn't read it, so you're going to have

5   to tell me.  But if you don't want to agree to the whole thing,

6   fine.  They'll tell you what excerpts they're going to use, and

7   then you're going to have to squeeze into the doctrine of

8   completeness.

9       MR. NEMTSEV:  Understood, your Honor.

08:58 10      THE COURT:  Okay?

11      MR. FRANK:  Yes, and that's where we have a slight

12  objection, your Honor.  We think that the doctrine of

13  completeness then means the document comes in.  They can't pick

14  other chats that they want --

15      THE COURT:  I don't know.  I can't do it in the

16  abstract.  I guarantee you I didn't sit and read every single

17  one of them.

18      MR. FRANK:  Understood, your Honor, and that's --

19      THE COURT:  And I'm relying on you as the attorneys as

08:58 20  to what you need, what you need for the doctrine of completeness,

21  and whether or not you want to put in the whole thing so you

22  don't have to worry about it, but you'll let me know.

23      MR. KOSTO:  Your Honor, in the abstract, what we're

24  thinking about is, if Lines 10 through 20, if we offer them,

25  the doctrine of completeness talks about Lines 1 through 10 and

```
 1    21 through 30 but not 400 through 500.

 2           THE COURT:  You may be right, unless it's referring to

 3    the same subject matter.  I mean, I don't want to -- this case

 4    isn't going to rise and fall on that.

 5           So is your expert feeling better?

 6           MR. NEMTSEV:  Our expert, yes, he is.  He is, your

 7    Honor, Mr. Cullan.  He is feeling better.  And I actually had a

 8    question whether our experts could sit here and listen to the

 9    testimony of the government's experts?

10           THE COURT:  Yes.

11           MR. NEMTSEV:  All right, thank you, your Honor.

12           THE COURT:  And vice versa.

13           MR. NEMTSEV:  And vice versa, of course.

14           Oh, and, your Honor, one other question that I had,

15    the government -- and I believe your Honor ruled on this --

16    Micfo, that company that has the server in Boston, and their

17    conviction for fraud, you said that we could explore that.

18           THE COURT:  Yes.

19           MR. NEMTSEV:  Understood.  It's just the government

20    has objected to it, and I intend to reference it.  I don't

21    intend to put the indictment in but reference it during the

22    opening.

23           THE COURT:  Was it convicted of fraud?

24           MR. NEMTSEV:  It was, on ten counts, your Honor.

25           MR. KOSTO:  Your Honor, Rule 609 doesn't allow the
```

1    impeachment of, let alone a representative of Micfo.  These are

2    not Micfo documents.

3            THE COURT:  Well, as I understand, the representative

4    is impeaching the company.

5            MR. KOSTO:  But the company isn't testifying.

6    StackPath is testifying, and StackPath was not convicted.

7            THE COURT:  I'm going to allow them under the

8    liability prong because you're relying -- let me put it this

9    way:  I don't know what your alternative path was after we went

09:00 10    off from the first approach from whatever that was, the

11    software program.  I don't know what the path is, but if it's

12    on the reliability of the business records, I think they have

13    the right to say that things weren't always so reliable, so --

14            MR. KOSTO:  But the point on that, your Honor, is,

15    that doesn't mean that a press release or an indictment delving

16    into the facts of the case can come in as exhibits.

17            THE COURT:  No.  It's just a conviction.  It's like

18    a -- it's just a conviction.

19            MR. KOSTO:  But what's marked as a proposed exhibit by

09:00 20    the defense, and the government has objected to, is the

21    indictment, a long speaking indictment, the press release

22    covering the conviction --

23            THE COURT:  Yes, that's not coming in.

24            MR. KOSTO:  -- and the plea agreement.

25            THE COURT:  It's the fact that they were convicted

1    of --

2             MR. NEMTSEV:  No, your Honor.  I put it in there on

3    the list.  I don't intend to introduce it or use it, but I do

4    intend to ask the witnesses questions.

5             THE COURT:  The reliability -- I don't really know the

6    alternative path.

7             MR. FRANK:  But the issue with that, your Honor, is

8    that the issue in that case was not the reliability of their

9    billing records.  The issue in that case is that they were

09:01 10   getting too many IP addresses fraudulently.

11            MR. KOSTO:  Not that they weren't putting the IP

12   addresses where they were supposed to go.

13            MR. FRANK:  And so it's entirely misleading to suggest

14   that --

15            THE COURT:  Well, then you can rehabilitate, so --

16            MR. FRANK:  But there's no one to rehabilitate.  We're

17   not putting on a witness from Micfo.

18            MR. FERNICH:  Judge, under Rule 806, they're putting

19   on testimonial hearsay --

09:01 20            MR. FRANK:  No, we're not.

21            MR. FERNICH:  -- assertions by Micfo through

22   StackPath, which StackPath is relying on the business records

23   of Micfo for the truth of the matters asserted therein.  Under

24   Rule 806 and 608, we can cross on the stuff; and if there's a

25   denial, your Honor can determine whether it's a collateral

 1    matter.

 2              THE COURT:  I never dealt with 609 and impeaching a

 3    corporation.

 4              MR. FRANK:  We're not putting in testimonial hearsay.

 5              MR. FERNICH:  You are.

 6              THE COURT:  Anyway, this has not been -- I don't want

 7    to act on the fly on this.

 8              MR. FRANK:  Sure.  We would just ask, your Honor, that

 9    they not be permitted to open on it, the same way that we're

09:02 10    not opening with a photograph of the Porsches.

11              THE COURT:  I agree with that.  Don't open on it

12    because I don't really understand it well enough.  It does

13    strike me that if in fact the venue is being based upon a line

14    of business records, and one of the places where the business

15    records came from was from a company that had been indicted --

16    more accurately, convicted of fraud -- they should at the very

17    least be allowed to ask that question, but not the indictment.

18    And then if you want to follow up by "What was the basis for

19    the indictment?" then you can all argue.

09:02 20              MR. FRANK:  But the witness is not going to know that.

21              MR. KOSTO:  The record that's being offered is not a

22    record of the indicted company.  It's StackPath's record.

23              THE COURT:  That's why I need to hear more about it.

24    Did StackPath get it from this indicted company?

25              MR. KOSTO:  StackPath received an invoice.  They were

1    charged for the use of the IP address.  They kept it in the

2    ordinary course of business.  It's an --

3          THE COURT:  Yes, but the invoice was generated by a

4    company that was convicted of fraud, right?

5          MR. FRANK:  For something totally --

6          MR. KOSTO:  But the company was convicted of fraud for

7    something unrelated to the allegations in this case, which

8    would open up 403 --

9          THE COURT:  I don't know anything.  This has not been

09:03 10   fully vetted with me.

11          MR. FRANK:  We'll submit a brief, your Honor.

12          THE COURT:  I don't know anything, just because we

13   went off this path, right, when you weren't going to use the

14   software company?  So you had told me there were a series of --

15          MR. FRANK:  Yes, your Honor.

16          THE COURT:  -- corporate documents that were going to

17   show that the IP address was here in Boston for venue.

18          MR. FRANK:  Yes.

19          THE COURT:  Fair enough.  But if one of the key pieces

09:03 20   of documents is from a company that was convicted of fraud,

21   it's at least worth, by exploring that issue, not to exclude

22   it; just to go to the weight of the causal inferences.

23          So have you shared with the defense the documents

24   you're going to use for the first witness?

25          MR. KOSTO:  We will today, your Honor.  We had a

1    switch of order, but --

2         THE COURT:  Well, who's the first new witness?

3         MR. KOSTO:  Marc Brawner, who was the incident

4    response for Toppan Merrill.

5         THE COURT:  And that's one of the financial analysts?

6         MR. KOSTO:  No.  He is one of the technical employees

7    from a consultancy that responded to the data breach at Toppan

8    Merrill.  He'll talk about what happened at Toppan Merrill.

9         THE COURT:  All right, thank you.

09:04  10        Let me just say, I expect press coverage on all of

11   this, and one of the things that's making me just a little bit

12   nervous is how much of this gets into the press about the jury

13   voir dire.  So I'm trying to think now whether we should do it

14   from here or up at sidebar.  If we do it from here, though, I

15   may just say Juror No. 5.

16        THE CLERK:  Yes, and do you want them to go next

17   door -- it's open, the courtroom -- like we did in the Varsity

18   Blues?

19        THE COURT:  Yes.  As soon as we get through all the

09:05  20   initial questions and we get it down to about forty or fifty

21   people, we'll put people next door, and we'll bring them in and

22   we won't use their names, just their numbers.  Does everyone

23   understand that?

24        THE CLERK:  Just so you know, Judge, I can explain it.

25   Each juror when they come in will have their numbers on a sheet

1    of paper they'll be holding up, so you'll know by their number

2    who they are, okay?  You'll have a list.  You know what the

3    list looks like.  And every single juror will have a piece of

4    paper that will have their number, so if we call them up,

5    you'll know them by the number.  And then you'll refer to the

6    list, so you'll know their name.

7          THE COURT:  But it's quite possible that, you know,

8    we'll get coverage in the paper, and I don't want jurors' names

9    showing up in the paper.

09:06 10          Actually, let me see counsel for one second at sidebar

11    about that subject.

12    SIDEBAR CONFERENCE:

13          THE COURT:  Good morning to everyone.  So I just saw

14    Shelly Murphy from the Globe come in, and we've also had

15    inquiries from some Russian press.  I forget the name of it.

16    But, in any event, I'm expecting press coverage, and I want

17    to -- as you know, maybe you don't, the District Court's been

18    following this pretty closely, but at some point the press have

19    the right to addresses and towns that they live in, the names

09:07 20    and all that kind of stuff, and I'm at least going to try and

21    protect this jury during the three weeks that the trial is

22    going to last.

23          MR. NEMTSEV:  Sure.

24          MR. KOSTO:  It seems appropriate, your Honor.

25          THE COURT:  So I just wanted to flag where my sudden

1    concern came from.  So we'll bring the jurors up here.  Would

2    Mr. Klyushin like to stand up here?  The issue is --

3          THE CLERK:  If he comes up, Judge, I have to bring the

4    interpreters up too.

5          THE COURT:  Would you talk to him about it?  And we

6    have to bring the interpreter up too.  I'm happy to do that.

7    Sometimes that makes the jurors nervous, but he may want to do

8    it, so his call.  So we'll do the first traunch of questions

9    here, and then I don't know what we'll do in terms of the

09:08 10   exposure to the press.

11         MR. FERNICH:  Judge, we certainly have no objection to

12   any of the procedures the Court has outlined.  For the Court's

13   protection, so this doesn't become an issue later, to the

14   extent the press is being partially excluded from any part of

15   the jury selection, your Honor may want to place *Waller v.*

16   *Georgia* findings on the record.  There's, like, four prongs.

17         THE COURT:  Well, that's why I'm raising it.  Am I

18   better off having the person there and just doing the number?

19   It's a little less intimate.  I have some concerns about that.

09:09 20   I don't know.  I don't know.

21         MR. FERNICH:  Your Honor, we prefer the approach that

22   the Court has outlined, and there's a public issue.

23         THE COURT:  What do you all think?

24         MR. FRANK:  We defer to the Court, Judge.  I think

25   there is a procedure that your Honor -- I'd have to look at

 1    this, but in prior cases, I've had the jury being anonymized,

 2    and the press could not find out their identities.

 3              THE COURT:  Well, I don't know.

 4              MR. FRANK:  And I think in this case, that makes sense

 5    for other reasons as well, so --

 6              MR. FERNICH:  And I object to that procedure because --

 7              THE COURT:  Well, I'm not going to do that right now,

 8    but what I am worried about, if we have press coverage and we

 9    do it in the open, it's --

09:09 10              MR. FERNICH:  I think that your Honor could easily do

11    a partial, to the extent that it's a partial closure, just by

12    outlining -- I can pull up *Waller*.

13              THE COURT:  Well, I'm going to ask all the questions

14    here, and then I'm going to let people come up and talk to me

15    in private, so most of it will be open; and if I get an

16    objection, I get an objection.

17              MR. FERNICH:  Right.  I mean, it's not going to come

18    from us, obviously.

19              THE COURT:  Yes, I mean, so I'm going to ask all the

09:10 20    questions and ask each and every person that's got an

21    affirmative answer to raise their hand, and then I'll say "Come

22    on up."  And then with respect to press coverage or anything

23    else -- for example, they may be biased against a Russian

24    national -- we're going to do in a written questionnaire.

25              MR. FERNICH:  I mean, there will be a transcript

available for the press.  You know, that will obviously be an

adequate substitute to the degree that they're not having

access to the portion of the sidebar, of the voir dire that's

conducted at sidebar.

MR. KOSTO:  I've not had the experience of the press

seeking to be present and heard during a sidebar.

THE COURT:  I've been doing it for 30 years at

sidebar, but, I don't know, I mean, some of the bigger cases

like --

MR. FERNICH:  You know, we've had it a little bit at

home.  I don't expect this to be a press case like that, but we

didn't expect what happened on Saturday either.  If members of

the press make a request, I suppose we could deal with it then,

and the Court could place the *Waller* findings on the record.

MR. FRANK:  In the Varsity Blues cases, we had the

voir dire at sidebar.

THE COURT:  I've always had the voir dire at sidebar.

You get a more candid result than screaming out from the back

of the room, "Yeah, I've got a problem with Russia," or, "Yeah,

I've got a problem with --" I mean, what would be the right

word? -- whatever.  Boom, off the jury.

MR. NEMTSEV:  Russian hacking.

MR. FERNICH:  Allegations of hacking, computer hacking

by Russians.

THE COURT:  Yes, it just would be hard for them to

1    yell it out, right, across the abyss, as they say?  Okay, all

2    right, good.

3              MR. KOSTO:  We'll see you shortly.

4              THE COURT:  We'll see you shortly.

5              (End of sidebar conference.)

6              (A recess was taken, 9:12 a.m.)

7              (Resumed, 10:07 a.m.)

8              (Jury pool present in the courtroom.)

9              THE CLERK:  Court calls Criminal Action 21-10104,

10:08 10   United States v. Mr. Klyushin.  You may all be seated.  Thank

11   you.

12             THE COURT:  Good morning to everyone.  I see some

13   people crowded in the back there, so if you just -- I'm not

14   sure who that is, but you're certainly welcome.  This is an

15   open proceeding.

16             So let me begin by introducing myself.  My name is

17   Judge Saris, and this morning I will be impanelling a jury in a

18   criminal case.  In order to do that, I introduce you to the

19   attorneys, to the defendant.  I read you a list of potential

10:09 20   witnesses, and I ask you a long series of questions designed to

21   insure that you can serve in a fair and impartial manner.

22             So why don't I first ask Ms. Molloy to please put you

23   under oath.  Thank you.

24             THE CLERK:  Could you all please stand and raise your

25   right hand.

1          (Jury pool duly sworn.)

2          THE COURT:  All right, so this has multiple stages to

3     it, all right?  And the first stage is, I'm going to ask you,

4     as I mentioned, a series of questions.  If you have an

5     affirmative response, please raise your hand.  At the end of

6     all of my questions, I'm going to ask each and every person who

7     has raised his or her hand to come up and see me at sidebar.

8     Sometimes the answer is quite simple like, for example, "I

9     might know a witness," or, for example, there's a reason you

10:10 10    can't sit, maybe a health reason or whatever.  But sometimes

11    it's more complex.  Don't forget you'll be under oath here, so

12    this will be the first part of our impanelment process.

13          So why don't I begin by asking the attorneys for the

14    government to please introduce themselves.  Thank you.

15          MR. FRANK:  Thank you, your Honor.  Good morning,

16    ladies and gentlemen.  My name is Stephen Frank.  I'm an

17    Assistant United States Attorney here in Boston.

18          MR. KOSTO:  Good morning, ladies and gentlemen.  My

19    name is Seth Kosto.  I'm also an Assistant U.S. Attorney here

10:10 20    in Boston.

21          THE COURT:  Does anyone here know Mr. Kosto or

22    Mr. Frank?  Anyone here know anything about them?  Anyone here

23    work for the U.S. Attorney's Office in Boston?  Anyone here

24    have any close family members or friends who work for the U.S.

25    Attorney's Office in Boston, or I should say Worcester or

1    Springfield?  All right, a few people, so you'll remember if

2    you've raised your hands.

3          Is there anyone here who has any close family members

4    or friends who work for any prosecutor's office, federal,

5    state, or local?  All right, three or four people.  All right,

6    so you're going to remember, and when I see you at sidebar,

7    you're going to say what that relationship is.

8          Now I'm going to ask defense counsel to please

9    introduce themselves and introduce their client.  Thank you.

10:11 10          MR. FERNICH:  Good morning.  My name is Mark Fernich.

11    I'm representing, along with my colleague Mark Nemtsev,

12    Mr. Klyushin.

13          THE COURT:  All right, now, let me start off, does

14    anyone here know the defendant in this case, Mr. Klyushin?  No

15    hands raised.  Anyone know either of the two attorneys?  Anyone

16    ever been on the opposite side of any case or had been part of

17    a case that involved either of the two attorneys?  Okay, you

18    may be seated.  Thank you very much.

19          Now I'm going to tell you a little bit about the case.

10:12 20    For those of you who end up as jurors -- can you all hear me,

21    by the way?  There are a lot of you in this room.  All right,

22    for those of you who end up as jurors in the case, anything I

23    say is not evidence.  It's just giving you enough information,

24    just a smidgeon of information so you can see if you can serve

25    in a fair and impartial manner.

        1            This case involves charges that Mr. Klyushin allegedly

        2     hacked into American computer systems and used confidential

        3     information to make profitable trades in the shares of public

        4     companies.  He has pleaded "not guilty," and, of course, he

        5     starts off with the presumption of innocence.  Does anybody

        6     know anything about this case?  Maybe three or four people.

        7     Has anyone read anything about this case in the press?  Five or

        8     six or more, maybe a dozen people.

        9            This case involves charges of conspiracy to obtain

10:13  10     unauthorized access to computers and to commit wire fraud,

       11     securities fraud and securities fraud cases.  I'll give you a

       12     much more detailed description if you end up on this.  Is

       13     anyone here aware of any bias or prejudice you may have in this

       14     case or this kind of a case?  A few people.

       15            Has anyone here themselves or any close family members

       16     or friends ever been a victim of an alleged hacking?  Maybe

       17     half a dozen people, all right.

       18            Is there anyone here who, either themselves or close

       19     family members or friends, has ever been charged with unlawful

10:14  20     hacking?  No hands raised, all right.

       21            So now what I'm going to do is, I'm going to ask has

       22     anyone read anything on social media, Facebook, you know,

       23     social media?  Anyone read anything about this case on social

       24     media?  Maybe one person maybe?  Anyone here ever communicated

       25     about this case with anyone or had anyone communicate with them

 1    on social media?  No hands raised.

 2          I want to go through the very important issues that go

 3    on in this case, and I'm going to first read you, and I'm

 4    trying to get right now, the witness list.  Okay, here it goes.

 5    I'm going to read you a list of possible witnesses in this

 6    case.  Just because I read it doesn't mean that they're going

 7    to be witnesses.  I'm going to ask you if you know any of them.

 8          First, Marc Brawner from an entity called Koll,

 9    K-o-l-l.  Maxwell Clarke -- well, let me just start there.

10:15 10   Does anyone know Mr. Brawner?  Anyone know anyone at Koll?  All

11    right, no hands raised.

12          The next one is Maxwell Clarke who works at the

13    Securities and Exchange Commission.  Does anyone know

14    Mr. Clarke?  Now, listen carefully here:  Is there anyone here

15    who either themselves or close family members or friends works

16    at the SEC or the Securities and Exchange Commission?  All

17    right, no hands raised.  And once again, does anyone here know

18    Mr. Clarke or are close friends with anyone who works at the

19    SEC?  All right, no hands raised.

10:16 20   Devon Cutchins from the Markley Group?  He's from

21    Los Angeles.  Anyone know him?  Anyone know Mr. Cutchins?  No

22    hands raised.

23          Anyone know Bryan Garabo from Donnelly Financial

24    Services?  No hands raised.  And I should ask, has anyone here

25    ever worked for the Markley Group or done business with them?

How about Donnelly Financial Services, anyone?  No hands raised.

All right, so I'm going to go through them.  Daron Hartvigson from Stone Turn, anyone know him?  No hands raised. Anyone know David Hitchcock who works for the FBI?  Anyone know Mr. Hitchcock?  Anyone know, either themselves or close family members or friends, anyone who works for the FBI?  All right, no hands raised.

Mr. Han from Donnelly Financial Services, does anyone know him?  Vince Kenny from the FBI, anyone know him?  No hands raised to any of these.  Jason Lewis from Donnelly Financial Services?  No hands raised.  Florian Moschner from Web2Objects, anyone know?  Benjamin Oliver from Toppan Merrill?  Julie Soma from Donnelly Financial Services?  Eric Uitto from the FBI?  No hands raised.  Jacob Wall from StackPath?  Karyn Yanochko from the U.S. Attorney's Office?

And, once again, is there anyone here who knows anyone who is working at the U.S. Attorney's Office in Boston?  No hands raised.

Jeffrey Zorek from Saxo Bank?  David Tawil from Ocean, New Jersey?  J. Michael Robert from Corvus Forensic?  Michael Cullan from Brooklyn, New York.  Justin Baciao from Phoenix, Arizona?  No hands raised for any of those.

All right, thank you.

Now, sometimes what happens is, I've read you all

these, and you didn't recognize the name, and you see the

person on the stand and you say, "I know that person.  I went

to school with that person," or whatever.  Make sure you tell

me if you recognize the person, even if you didn't raise your

hand, because we need to know if you know any of the people

involved in the trial.

Now, I'm going to go through a series of questions

designed to make sure you can serve in a fair and impartial

manner.  So does anyone have any business or financial dealings

10:19 with any of the companies I mentioned?  No hands raised.

Is there anyone here who has been a juror in another

criminal case and does not feel that they can be fair and

impartial here?  No hands raised.

Is there anyone here who would believe the testimony

of a law enforcement officer over that of a layperson just

because the person was a law enforcement officer?  By that, I

include the SEC, the FBI, any member of the U.S. Attorney's

Office.  Is there anyone here who would believe the testimony

of a law enforcement officer over that of a layperson simply

10:20 because the person is a law enforcement officer?  Maybe one or

two people.  All right, thank you.  Remember that you've

answered that.

Is there anyone here who would not believe the

testimony of a law enforcement officer, either from the FBI,

SEC, or the other places I mentioned, simply because they're a

1    law enforcement officer?  A couple of people.  Okay, thank you.

2          Is there anyone here who is aware of any bias or

3    prejudice you might have in this case or this kind of a case?

4    Several people, all right.

5          Mr. Klyushin is a citizen of Russia.  Is there

6    anything about his national origin that would interfere with

7    your ability to be fair and impartial in this case?  Several

8    people.

9          Has anyone here ever been investigated by any members

10:21 10    of those -- either you yourself or a close family member or

11    friend or a business that you were closely involved with,

12    investigated by the FBI or the SEC?  All right.

13          Does anyone have any religious, ethical, moral or

14    philosophical beliefs that would make it difficult for you to

15    render judgment in the case?  Maybe one person.

16          You're going to hear about Mr. Klyushin's company

17    which has contracted to provide certain services in Russia.  Is

18    there anyone who would not be able to sit fairly and impartially

19    in this case?  The name of the company is M-13.  Is anyone

10:22 20    familiar with that company?

21          As I mentioned, I asked you before whether any of you

22    have heard anything about the case, either in the social media

23    or the press, and a few of you have raised your hand.  Is there

24    anyone here who would be willing to follow my instruction, if

25    you become a juror, not to read anything in the press about

1    this case?

2          All right, in this case, as in every case,

3    Mr. Klyushin is presumed innocent.  That's a constitutional

4    right.  Is there anyone who could not follow that basic

5    constitutional principle?

6          The government always bears the burden of proof beyond

7    a reasonable doubt and it never shifts to the defendant.

8    That's an important constitutional principle.  Is there anyone

9    here who could not follow that?  All right, thank you.

10:23 10          Now, at this point let me just talk to you about the

11    length of this trial.  At least right now, we are expecting

12    that this trial will go approximately three weeks, mostly half

13    days.  If we get behind at all, and sometimes we get behind,

14    there's a snowstorm -- we've had no snow this year, it's

15    unbelievable, but, anyway, we could, right?  It's still winter.

16    Sometimes we get behind because there's a snowstorm, or

17    sometimes somebody gets sick, or there's a delay for some

18    reason or another.  This case we're expecting will finish

19    before February school vacation, before President's weekend.

10:24 20    So those of you who have a great ski trip or those of you who

21    have a wonderful vacation down South, we're pretty sure we're

22    going to work to have this case done by February 17.  And we in

23    general will be sitting from 9:00 until 1:00, except today we

24    may go a full day till 4:00, and on the day or days you're

25    deliberating we'll go until 4:00.  And if we have to -- I'll

1    give you plenty of heads-up notice -- we may have to go a

2    little later into the afternoon.  But mostly we like to go 9:00

3    to 1:00 so you can pick up your kids from school, and also get

4    work done in the afternoon on other cases.  So most of the time

5    it's going to be 9:00 to 1:00, short of Murphy's law.

6         So let me tell you the parameters of how I excuse

7    people.  First, if you are the parent, mother or father, of a

8    small child and there is no childcare available for that child,

9    then I will excuse you.  I don't mean the nanny.  I don't mean

10   a daycare provider.  If you are the parent or legal guardian of

11   a preschool child and there's no childcare available, I will

12   excuse you.

13        Two, if you are sick, please leave.  Tell me about it,

14   but I'm hoping they were screening for that downstairs.  And we

15   don't require masks anymore, although I notice a few of you

16   wearing them.  You're certainly welcome to wear the masks, but

17   essentially the rule of the road will be that if anyone has --

18   of course, if they have COVID, we'll excuse them, but also if

19   you're exposed to someone who's had COVID, please let me know.

20   So I will excuse you if you are sick or you've been exposed to

21   someone who has COVID.

22        Third, I will not excuse for mere business

23   inconvenience.  I will not.  It's inconvenient for everybody,

24   but it is a very, very important constitutional right.  It's

25   one of the very few rights that's mentioned not only in the

main body of the United States Constitution but in the Bill of
Rights.  This is a right not only for Mr. Klyushin to have a
fair and impartial jury, but it's your right to sit on a jury.
It's one of our most cherished rights.  So I will not excuse
for mere business inconvenience.

I have a heart, so if you have those plane tickets to
the Caribbean, I'll let you put off your jury duty, but I won't
totally excuse you.  But if it's just a business meeting or
something like that, I will not excuse you.

So given those parameters, for how many people will
this be a substantial hardship?  I knew, I always get the most
hands up on that one.  All right, well, I'll see people on that
one.

And at this point, I also want to discuss the fact
that I expect people to be here at 9:00.  We will take a break
at 11:00, and usually I'll provide food.  And today we will
provide lunch for you all, for those who stay, because we're
going to hopefully -- hopefully do opening statements.

So let me ask, is there anything else that I think has
been -- I've been going through everybody's questions.  Is
there something I missed from anybody's point of view on the
questions?  They all, you know, sent me questions they'd like
asked.  Is there anything else anybody would like?  And, of
course, we have some follow-on approaches.

Okay, not hearing anything, all right, what I'm going

```
 1    to do is -- I will get to everyone, I promise you -- we'll go
 2    first row, second row.  Maryellen will organize it, Maryellen
 3    Molloy.  If I excuse you, you go back down to the jury room
 4    with your card, all right?  And if I don't excuse you, you need
 5    to stay here in the room because there are some other things I
 6    need to ask you about.
 7              (Discussion between the Court and Clerk.)
 8              THE COURT:  And I remind you your answers are under
 9    oath, and they're being transcribed by our court reporter.
10    (Jury voir dire, 10:30-12:20 a.m.)
11              THE COURT:  So what we'll do is swear in the jury, and
12    then we'll take a break.  Okay, all right.  I'm going to ask
13    you both publicly whether you're satisfied.  That's my
14    practice.
15              MR. KOSTO:  Yes.
16              THE CLERK:  Judge, should we collect the
17    questionnaires?
18              (Discussion off the record.)
19              THE COURT:  Is the government satisfied?
20              MR. FRANK:  We're satisfied, your Honor.
21              THE COURT:  Is the defense satisfied.
22              MR. FERNICH:  Yes, Judge.
23              THE COURT:  You are our jury.  So I'm going to ask
24    Ms. Molloy to please swear you in.
25              THE CLERK:  Will each of you all stand and then raise
```

    1    your right hand.

    2              (Jury duly sworn.)

    3              THE COURT:  Thank you.  You're our jury.  To the rest

    4    of you, thank you very much for coming in.  We'll be collecting

    5    those questionnaires, and I'll catch you in the next round.

    6              THE CLERK:  So all need to go back downstairs to the

    7    second floor to sign out through the jury coordinator.

    8              THE COURT:  Thank you very much.  Happy New Year to

    9    everyone.  Thank you.

12:20 10              (Jury pool dismissed.)

   11              THE COURT:  So it's been a really long morning.  We'll

   12    take a quick break right now.  There might be coffee and

   13    muffins or something, and we've also ordered lunch for you, so

   14    we'll have a brief break, and Maryellen will speak to you, and

   15    we'll come back in here for preliminary jury instructions.

   16    Hopefully we have time to do the first opening, but if not,

   17    we'll have lunch and then go back and do openings this

   18    afternoon.  Thank you.  We'll stand in recess.

   19              THE CLERK:  All rise for the jury.

12:20 20              THE COURT:  Anyone leave any stuff back there?

   21    Actually, can I just have one thing on the record, Lee, please.

   22    You don't know anything yet, so don't talk about the case.

   23    Talk about the Celtics, talk about anything you want, but don't

   24    talk about this case, all right, thank you.

   25              (Jury dismissed, 12:21 p.m.)

```
 1              (A recess was taken, 12:23 p.m.)

 2              (Resumed, 12:54 p.m.)

 3         THE COURT:  So good afternoon.  That went very

 4    smoothly, except one thing:  They just got lunch.  So I'm sort

 5    of thinking -- and I know a lot of people are here waiting --

 6    that what we would do is just come back in half an hour and go

 7    straight through the jury instructions and openings so that you

 8    all can grab lunch, because otherwise they're not ready yet, so

 9    they come back in 20 minutes and we break again, you haven't

12:54 10    eaten lunch.  I know a bunch of people are waiting on your

11    every word, but I'm thinking what we'll do is come back here

12    around, what do you think 1:20?  Give people about a half an

13    hour to come back, and we'll just go straight through my jury

14    instructions into the openings so everything is in one smooth

15    flow.  So that's our best bet.  I think we're the only ones

16    impanelling today, so you should all be able to get lunch, and

17    we'll come back at 1:20 and go into openings.

18              (Discussion between the Court and Clerk.)

19         THE COURT:  One of the court officers may take one of

12:55 20    the jurors out for a cigarette, and while we're at it, are

21    there anybody showing PowerPoints?

22         MR. NEMTSEV:  We are.

23         THE COURT:  Have you shown each other?

24         MR. NEMTSEV:  No, not yet.

25         THE COURT:  Well, you need to do that right now.
```

1  Okay, thank you.

2          THE CLERK:  So we'll see everyone back about 1:20.

3          (Noon recess, 12:55 p.m.).

4          (Resumed, 1:30 p.m.

5          THE CLERK:  All rise.  United States District Court is

6  now in session.

7          THE COURT:  What's the issue?

8          MR. FRANK:  Your Honor, there are a couple of slides

9  in the defense PowerPoint that are self-serving hearsay

01:31 10  statements of the defendant or his co-conspirators.  We don't

11  believe --

12          THE COURT:  Let me see them.  What are the issues?

13          MR. FERNICH:  Judge, this is from the Threema chat

14  that we discussed extensively.

15          THE COURT:  Well, these are from the thing that's

16  being marked.

17          MR. FRANK:  Correct, but it's not coming in.  It's

18  being marked for identification and then --

19          THE COURT:  I thought you were agreeing to bring it --

01:31 20  to allow it to come in.

21          MR. NEMTSEV:  We are, other than portions that are

22  403.

23          MR. FRANK:  Oh.  If they're allowing the whole thing

24  to come in, then that's fine.

25          THE COURT:  Okay, good.  Issue gone.  Let's get this

1  jury.  Let's get the show on the road.

2       THE CLERK:  All rise for the jury.

3       (Jury enters.)

4       THE COURT:  You may all be seated.  Welcome.  You're

5  now our jury.  I hope you enjoyed your lunch.  We're about to

6  go, and we're going to have the preliminary jury instructions

7  and then the opening statement.

8       The preliminary instructions are not a substitute for

9  the closing instructions of law.  I'll give you a lengthy set

01:34 10  of instructions at the close of the case.  Rather, this is a

11  brief introduction, shall we say a roadmap as to what to expect

12  over the course of the next few weeks.  Let me say that, as you

13  know by now, you're the jury and you're sworn to be fair and

14  impartial, and your job will be to decide what the facts are.

15  You and you alone decide what the facts are.  Nothing I say or

16  do is in any way intended to invade your unique and special

17  responsibility to determine what the facts are, what the truth

18  is, and to render a verdict at the end.

19       Nothing that the attorneys say can in any way invade

01:35 20  your responsibility for finding what the facts are.

21       So how are you going to decide what the facts are?

22  You decide what the facts are based on the evidence.  Evidence,

23  you'll hear sworn testimony of witnesses; you'll receive many

24  exhibits; and you'll be able to evaluate certain stipulations,

25  but, essentially, you decide the facts from the evidence in the

1    case.  But there are many things that happen over the course of

2    a trial that do not involve evidence.  You're about to hear

3    opening statements.  You all have notebooks there.  Please, if

4    you decide to take notes, your decision, please mark them as

5    opening statements, because opening statements are not

6    evidence.  Rather, they're what the attorneys expect might be

7    introduced as evidence.  But if it doesn't come in at the end,

8    you cannot consider what's in the opening statements.

9              Questions by lawyers are not evidence.  So it was

01:36 10   raining out that day, wasn't it?  You shouldn't assume that

11   because the lawyer asked the question, it was raining.  Maybe

12   it was.  Maybe it wasn't.  It's the answer of the witness that

13   is the evidence, not the question by the attorney.  Objections

14   are not evidence.  "Objection, Your Honor, hearsay."  You've

15   all heard that term, right, watching too many TV shows?

16   "Hearsay," "Leading," "Irrelevant," you've heard all these

17   terms.  And sometimes I'll just rule off the bench.  I'll say

18   "Sustained," which means I agree with that objection; or

19   "Overruled," I disagree with it.  But the objections are not

01:37 20   evidence in any way.

21             We try and work these out before you come in in the

22   morning, but sometimes I need to go to sidebar.  If I do,

23   please don't try and listen.  You have an invitation to stand

24   and stretch, you know, stretch your back, touch your toes,

25   whatever you want to do, but please don't try and listen.

1    Sometimes -- we're very inconsistent about this -- if we think

2    we're getting too noisy, I might turn on white noise.  Some

3    judges do jazz.  I haven't gone that far yet.  But please don't

4    try to listen to whatever we're doing at sidebar.

5          You will also hear at the end closing arguments, which

6    are also not evidence in the case, and you will hear my

7    instructions of law, which will be quite detailed at the end.

8    So that is basically -- those things are not evidence.  The

9    only things that are evidence are people testifying under oath,

01:37 10   exhibits that are marked and come to you in the jury room.

11   Sometimes I'll put a limitation as to what you can consider

12   evidence for.  For example, sometimes you can consider

13   someone's state of mind, but it's otherwise hearsay.  So if I

14   have a limitation on it and you're taking notes, just put a

15   little L there so you can remember that that was limited in the

16   use to which you can put it.

17          Now, I want to talk about the difference between

18   direct and circumstantial evidence.  You've probably heard

19   those terms.  Direct evidence is direct proof from someone who

01:38 20   has perceived an event with one of his or her five senses.

21   You've seen something.  The witness has seen something and

22   tells you about it.  Smell, touch.  They perceive something and

23   tell you about it, and it's your job to decide whether or not

24   they perceived it correctly.  Maybe the person wasn't wearing

25   their eyeglasses.  Maybe somebody was having a bad day and

1    wasn't remembering it correctly.  But direct evidence is

2    someone perceived something and tells you about it.

3          Circumstantial evidence is different.  Circumstantial

4    evidence is proof of facts from which you may reasonably infer

5    or conclude that other facts exist.  So, for example -- let's

6    use an old-fashioned example -- the letter carrier.  If your

7    daughter sees the letter carrier deliver the mail to the house,

8    she's seen something.  She tells you, and you have to decide

9    whether to believe her or not.  What if no one saw the letter

01:39 10   carrier deliver the mail, you come home and there's mail in

11   your mailbox or through your mail slot?  That's circumstantial

12   evidence that the letter carrier had been there.  How else

13   would the mail get into your mailbox?  Now, that said, it may

14   be the regular letter carrier, or it could be that person was

15   sick or on vacation.  So it's your job as the jury to find out

16   not only what the facts are, but what are the reasonable

17   inferences that you can draw from the facts?

18         So I'm going to go through the fact that this is a

19   constitutional case with -- I asked you about those when we

01:40 20   were doing the impanelment.  It has very important

21   constitutional rights implicated, so I want to remind you of

22   your oath to follow those.  So let me talk to you about them

23   right now.

24         A defendant is presumed innocent unless and until

25   proven guilty.  You'll hear about an indictment.  That means

1    nothing other than it's a written charge.  Everyone has a right

2    to know in writing what the charge is.  The indictment brought

3    by the government against the defendant is only an accusation.

4    Nothing more.  It is not proof of guilt or anything else.  The

5    defendant, Mr. Klyushin, starts off with a clean slate.

6         Second, the burden of proof is on the government until

7    the very end of the case.  Mr. Klyushin has no burden at all.

8    He has no burden to prove his innocence or to present any

9    evidence or to testify.

01:40  10         Third, the government must prove the defendant's guilt

11    beyond a reasonable doubt.  I'll give you instructions about

12    that extremely high burden of proof at the end of the case.

13         Now, how is this case going to go forward?  How are we

14    going to do it?  First, you're going to hear the opening

15    statements.  That's all you'll hear today.  Each of them should

16    take no more than an hour.  You'll go home.  Then we'll start

17    with witnesses tomorrow.  The government goes with its

18    witnesses, direct, cross, redirect, recross, next witness.  I

19    very rarely let it go beyond direct, cross, redirect, recross.

01:41  20    Every once in a while something surprises me and I do, but it's

21    really -- pretty much, that's how it will go.  At the end of

22    the government's case, you'll hear the government say, "The

23    government rests."  Remember, the defendant doesn't have to put

24    on any evidence at all.  At the end of all of the evidence,

25    we'll have the closing arguments and then the instructions of

1     law.

2              Now, there are certain things that I want to talk to

3     you about in terms of your conduct as jurors, which is

4     critically important.  First, there has been some press

5     coverage, as you know by now, about this case.  And there may

6     well be press coverage going forward.  So no one here should

7     read anything in the paper about this case.  No one should be

8     discussing this case on social media.  No one should be looking

9     for anything about this case on social media.  No one should be

01:42 10    talking to anyone about this case on social media or anyplace

11    else, because if you were, you jeopardize the trial.  It's

12    critical -- you're the ones who all swore to me you could be

13    fair and impartial.  We just went through this whole long

14    process.  So you cannot look at anything in the press or

15    communicate in any way, either in snail mail or social media or

16    in any way, about this case.

17             Now, here's the part that seems -- when you go home,

18    you know what's going to happen just because people are people,

19    right?  They're going to say, Wow, you were impaneled on a

01:43 20    jury.  What's it about?  Or, Oh, I'm so sorry you're stuck

21    there for three weeks.  Whatever it is, you just have to say,

22    The judge told me I cannot talk about the case.  All right?  So

23    no discussions of the case.  Blame me.  It's okay.

24             But you can't even talk about it with one another.

25    And the reason is we don't want three people deciding after the

first witness and four people after the next witness.  By the
time I send this out to you to deliberate, you will have heard
all of the evidence and all of the instructions of law, and
then you can talk to your heart's content.  So as I said
before, talk about the cold weather we're about to get or
sports or Valentine's Day, whatever you want, but not about
this case when you're back in the jury room.

Every day we will come in at around -- hopefully at
9:00.  You've heard rumors about the traffic in the Seaport.
They're understated.  Traffic is terrible.  So if you're
driving in, please give yourself that extra period of time.
And I'm about to instruct you to do something that I'm sure the
traffic police won't love me to say.  If you're stuck in a
major traffic jam, call MaryEllen on the number she gives you.
Because otherwise, we're all sitting here.  We don't know where
you are.  We don't know if someone's sick.  We don't know if
you have a flat tire.  And by the way, that's happened.  So you
need to call us if there's going to be a major delay, and let
us know where you are.  Maybe we'll just order coffee if we're
stuck here for an extra 15 or 20 minutes or something like
that, but let us know what's going on if you're going to be
late.

For that matter, in terms of -- I do want to discuss
for a minute sickness.  There was about a year there where we
weren't hearing cases at all because of COVID.  And then we

 1    were hearing cases -- you won't believe me, I was, like,

 2    encased in plexiglass, and everybody was wearing a mask.  All

 3    that has been suspended.  You are welcome to wear a mask if you

 4    want to wear a mask.  We do not require that people be

 5    vaccinated, and so -- and I know that's a smallish room there.

 6    So if you want to wear a mask, wear a mask.  You don't want to

 7    wear one, you don't have to wear one.

 8            But the one thing I will require is, if you get up in

 9    the morning and you feel sick, you know, not -- sick as in

01:45 10    COVID-type sick, call us.  We don't want you to come in and

11    possibly infect the whole jury.  If you have one of those rapid

12    tests, that would be terrific.  So you can figure out if --

13    maybe you should all just stock up on them.  And if you don't

14    have COVID, well, then -- if you have a cold, I mean, join the

15    rest of the world.  But if it's COVID, we can't take that risk

16    for anybody here, so don't come in.  Call us and let us know.

17            The harder call is if you're exposed to someone with

18    COVID, I would ask you to come in and wear a mask in case you

19    get it.  And I don't mean, you know, you're just in a room or

01:46 20    at the grocery store or something.  We all know, you know, when

21    my husband got COVID, I got it.  If you're closely exposed to

22    someone who has COVID, please don't come in, or at the very

23    least, if it's not quite so close, wear a mask.  Use your

24    judgment on the whole thing.

25            I'm asking you not to speak to anyone in this

courtroom.  You're going to feel like, you know, wow, we're
going to be two to three weeks together, right?  You're going
to feel like you know everybody, right?  But as soon as you're
down in the cafeteria line and as soon as you're down there by
the bus stop and you start talking to someone, the other side
sees it and they come dashing up to me and say, I saw a juror
talk to a lawyer.  So the instruction is be rude.  Do not talk
to them.  They know they're not supposed to talk to you.  Do
not discuss the case in any -- well, you're not supposed to
anyway.  But, certainly, you don't know who the witnesses are
or who they aren't.  You don't know.  Don't discuss the case.
It's just that simple.

     Let me make sure I haven't -- no one should in any
way, as I said, go on social media, but also no one should in
any way try and find the docket in this case, the court filing.
I'll let you know when you need to know something.

     Nobody should do any independent research on the case.
If you don't understand a term, you have a notebook, send it up
to me.  There will be some technical terms, whether it's a
statistical concept or a financial concept.  If you don't
understand a term, ask me a question, I don't understand what X
means.  However, it's their job to present things.  I don't
allow you to ask questions of the witnesses.  But if there's
something you don't understand, don't look it up by yourself.
Ask me about it, and I'll have the attorneys explain it better

1       for all of you.

2               And I was just going to encourage you to take notes.

3       You all have a notebook.  You do not get a transcript.  We have

4       fabulous court reporters, but you do not get a transcript at

5       the end of the case automatically.  We can produce them, and I

6       have produced them, but it takes a while because it's not like

7       an ATM machine when you press a button and out comes a

8       transcript.  You have to have it certified, you have to have it

9       checked.  So you don't want to be back there waiting for 24

01:49 10    hours while you're getting a transcript.  So I encourage you to

11      take notes.  At the very least, take down what's the name of

12      the witness, when did they testify, and put down -- jot down a

13      few notes like dates or something like that just to jog your

14      memory when you go into that deliberation room.

15              So at this point, what I think we're going to do is

16      we're going to -- I think that's -- I think that's about it.

17      My job is over.  It's their turn.  So at this point, we're

18      going to start with the government, which should go about an

19      hour.  We'll have you out of here by 4:00.  You may -- you know

01:49 20    what, we're going to switch court reporters, probably, so there

21      might be a brief hiatus where we'll stand and stretch.  And if

22      the defense chooses, because don't forget, the defense doesn't

23      have to do anything, the defense will have an opportunity to do

24      an opening.  Okay?  Thank you.

25              MR. FRANK:  Thank you, Your Honor.  If I could ask the

1    jurors to put their screens down so that they can follow along.

2         THE COURT:  So you're going to be putting things on

3    the screens?

4         MR. FRANK:  Yes, Your Honor.

5         THE COURT:  All right.  They look like airline tray

6    tables.  Probably Mary Ellen's most frustrating aspect of her

7    job is tech.  Are they all on?  Is anyone's off?

8         MR. FRANK:  It should say "Government's Opening

9    Statement."

01:50 10         THE COURT:  Are yours good?

11         Could you switch that around so that the public can

12    see whatever's -- I want to make sure everyone can see.  This

13    is a public trial.

14         Can you all see so you can follow along?  Great.

15    Perfect.  Okay.  Everybody's working?

16         MR. FRANK:  Thank you, Your Honor.

17         Between 2018 and 2020, that man, the defendant,

18    Vladislav Klyushin, and his associates, made close to 90

19    million dollars trading stocks.  It wasn't luck.  And it wasn't

01:51 20    because of careful financial research either.  The defendant

21    cheated.  He had access to confidential information about the

22    financial performance of the companies he traded in, secret

23    information that the public did not yet know, information that

24    would affect the company's stock prices when it came out.  The

25    defendant had tomorrow's news, tomorrow's headlines today.  And

1    he exploited it for tens of millions of dollars in profit.

2         Where did the defendant and his associates get that

3    inside information?  The evidence will show they stole it.

4    From their headquarters in Moscow, Russia, they hacked into

5    protected computer systems right here in the United States, and

6    they downloaded the information that was stored there.  And

7    then they used that confidential information to make money.

8         Hacking into computers is a crime.  So is stealing the

9    information from those computers.  Trading stocks based on

01:52 10   what's called material non-public information, secret

11   information that can move a stock's price, that's also a crime.

12   It's called securities fraud.  And it's those crimes that bring

13   us here today.

14        Good afternoon, again, ladies and gentlemen.  My name

15   is Stephen Frank, and I'm an Assistant United States Attorney

16   here in Boston.  With me at counsel table is my colleague

17   Assistant United States Attorney Seth Kosto and Paralegal

18   Jennifer Lewis.  Together, we represent the United States.  Our

19   job is to present to you the evidence that proves beyond a

01:53 20   reasonable doubt that the defendant did exactly what he is

21   charged with doing, scheming with others to hack into protected

22   computer networks, to steal confidential information from those

23   computers, and to use that information to cheat the stock

24   market and to violate the federal fraud and conspiracy laws in

25   the process.

1          The defendant is the owner of a company based in

2     Moscow called M-13.  This is the company's website.  You will

3     learn that M-13 is a technology company and it offers a number

4     of different services.  One of those services is helping its

5     clients monitor the news media and postings in social media.

6     You can see from its website -- this is the English language

7     version of its website -- M-13 sells those monitoring services

8     to clients, including both private companies and the Russian

9     government.  It also offers cyber security services, helping

01:54 10   companies protect against computer hacking.  On its website,

11    M-13 advertises that it can help companies protect against the

12    theft of confidential information.

13         Here's how the defendant's company describes what it

14    does:  Our experts imitate a full-scale targeted attack during

15    which the attacker, while trying to conceal his presence, uses

16    a wide range of actions against the organization's

17    infrastructure.

18         And here's a proposal that the defendant himself sent

19    one of his clients describing how his experts would do just

01:55 20   that.  They would exploit vulnerabilities in their targets'

21    computer systems.  They would obtain credentials from people

22    who were authorized to be on those computer networks.  They

23    would use those stolen credentials to gain unauthorized access

24    to the systems, to break in.  And once inside, they would

25    identify sensitive data stored on those networks.

1          But the evidence will show that the defendant and his

2    associates didn't just imitate hackers to test their clients'

3    network security.  They weaponized those very same techniques

4    to engage in real hacking, to break into the computer networks

5    of U.S. corporations and steal their confidential information

6    so that the defendant and his associates could trade on it to

7    the tune of tens of millions of dollars in profits.

8          And although you won't see evidence in this case that

9    the defendant himself invented this hack-to-trade scheme, the

01:56  10    evidence will show that he professionalized it.  He brought

11    money and investors to the scheme.  He put his company's

12    resources behind it.  He even used M-13 as a cover to deflect

13    suspicion when one of the brokerage firms he used started

14    asking questions about his unusually profitable trading.

15          And the evidence will show that the defendant

16    personally made more money from this scheme than almost anyone

17    else.

18          Here's how the scheme worked.  Using sophisticated

19    techniques, the hackers secretly gained access to the computer

01:57  20    networks of two American companies.  One of those companies is

21    called Donnelly Financial, or DFIN for short, and the other is

22    called Toppan Merrill, or TM.  Those two companies, TM and

23    DFIN, are what's called filing agents.  They help other

24    publicly-traded companies, companies whose stock trades on the

25    New York Stock Exchange or the NASDAQ Stock Market, file

1   financial reports with the SEC.  That's the Securities and

2   Exchange Commission.  As you'll learn, the SEC is a U.S.

3   government agency whose mission is to protect investors by

4   maintaining fair and honest securities markets, including by

5   monitoring trading in those markets.  And as you will also

6   learn, the SEC requires companies that are publicly traded in

7   the United States to file financial reports four times a year.

8   In those quarterly reports, the companies disclose how much

9   money they made or lost over the last three months.  And they

01:58 10   provide other financial information as well.

11        As you'll learn, and as your common sense probably

12   already tells you, that kind of information can be

13   exceptionally valuable to investors, because if a company

14   announces that it's doing well financially, its stock price

15   will typically go up, particularly if the market isn't

16   expecting that news.  Similarly, if a company is not doing as

17   well as the market expects, its stock price will typically go

18   down.  And as your common sense probably also tells you, if

19   someone has a sneak peek at that information, if they know it

01:59 20   before other investors know it, that can give them a huge leg

21   up when buying and selling stocks.  And that's why trading on

22   that kind of inside information is against the law, because it

23   gives the trader an unfair advantage over everybody else, over

24   all of the other investors who buy and sell shares without

25   knowing what's about to happen.  It's cheating.  And the

1     evidence will show that is exactly what happened here.

2          Once inside DFIN's and TM's computer networks, the

3     hackers were able to view and download the confidential

4     financial reports of hundreds of companies before those reports

5     were filed with the SEC and disclosed to the public.  All sorts

6     of companies in all sorts of different industries, big

7     companies and small companies, companies you've probably heard

8     of, and some you may not have.  Microsoft, Roku, SS&C

9     Technologies, Capstead Mortgage, Kohl's, Tesla, Ulta Beauty,

02:00 10    Skechers, Sprouts Farmers Market, and many, many more.  With

11    those secret financial reports in hand, the hackers knew before

12    anyone else knew which companies would surprise the market by

13    reporting better-than-expected earnings and which would

14    surprise it by reporting worse-than-expected earnings, whose

15    sales would be stronger than expected and whose would be

16    weaker, what kind of guidance they planned to offer investors

17    about their future financial performance, and other information

18    as well.  Information that, when it was released to the public,

19    could affect the prices of those stocks.

02:01 20         The hackers and their associates exploited that

21    confidential information to their advantage for big money:

22    Buying stocks they knew would surprise the market by reporting

23    blowout results, betting against companies that they knew would

24    fall short, hundreds of times over a period of less than three

25    years.

1          Now, you'll learn that even with the answer key in

2     hand, the defendant and his co-conspirators didn't always make

3     money on every single trade, because sometimes the market

4     reacts to news in unexpected ways.  And ironically, in a case

5     where the defendant and his associates made tens of millions of

6     dollars in the stock market, it turns out they weren't the

7     greatest traders because trading wasn't their business.  In

8     fact, the evidence will show that when they didn't steal the

9     information they traded on, they typically lost money or made

02:02 10     very little money in their trading.  And even when they did

11     steal earnings information, they didn't always understand it.

12     On occasion, they made mistakes, including sometimes by trading

13     in the wrong direction.

14          But on the whole, their hacking and trading scheme was

15     incredibly profitable, generating the kinds of returns that

16     actual money managers couldn't even dream about.  The evidence

17     will show that in just over two and a half years, the defendant

18     personally turned a 2-million-dollar investment into nearly 21

19     million dollars, a return of nearly 900 percent.  Together, he

02:03 20     and his associates turned about 9 million dollars into about 90

21     million dollars.  Now, by comparison, you'll learn that the

22     stock market returned only about 25 percent over that same

23     period.

24          So who were the defendant's associates?  One of them

25     was this man, Nikolai Rumiantcev.  He's in the front row with

1    the defendant behind him and to the right.  Rumiantcev was a

2    high-level employee of the defendant's company, M-13.  He

3    handled trading for the defendant and the defendant's

4    investors, and he traded for his own benefit as well.

5           Another was this man, Ivan Ermakov, one of the

6    defendant's close friends.  Here they are together in a selfie

7    taken at the World Cup.  The evidence will show that Ermakov

8    didn't trade under his own name, but along with Rumiantcev, he

9    handled trading in the defendant's accounts, and he was a

02:04 10   hacker.  In 2020, Ermakov went to work for the defendant's

11   company, M-13, as an employee.  Here you can see him taking a

12   nap with an M-13 sticker on his jacket.  But the evidence will

13   show that he and the defendant were close well before then.

14   Here are some photos and videos of Ermakov that you will learn

15   the defendant saved in his own iCloud account.  Here they are

16   together on a trip in April 2018, helicopter skiing.  And

17   here's Ermakov at the top of the mountain.  Here's a video the

18   defendant saved of Ermakov golfing.

19           (Video played.)

02:05 20           And another celebrating his birthday.

21           (Video played.)

22           You will learn that the defendant even bought Ermakov

23   an apartment to live in, and they had matching cars with

24   matching license plates with the number 13 on them, just like

25   the name of the defendant's company, M-13.

1            The defendant, Ermakov, and Rumiantcev also put other

2    people's money to work in the hack-to-trade scheme.  Here's one

3    of those investors, a man named Sergey Uryadov, with the

4    defendant and Ermakov.  And here's the defendant with two other

5    investors, Alexander Sasha Borodaev on the right and Boris

6    Varshavskiy on the left.  The evidence will show that the

7    defendant made millions of dollars for these investors through

8    hacking and trading in exchange for a cut of up to 60 percent

9    of the proceeds.  That's right.  For every dollar he made for

02:06 10   them, he took 60 cents for himself.  And you will learn that

11   there were other participants in the scheme as well.

12           So how did the scheme unravel?  You will learn that in

13   late 2019, agents at the FBI received information from the SEC

14   about suspicious trading in the brokerage accounts of several

15   Russian nationals.  The trading was timed to quarterly earnings

16   announcements.  It was highly profitable, and it was in

17   multiple companies.  As the agents investigated, they learned

18   that even though the companies that the group was trading were

19   in different businesses, they all had one thing in common.

02:07 20   They used either TM or DFIN, the two filing agents I mentioned

21   just a moment ago, to file their earnings reports with the SEC.

22           And when the agents reached out to those two

23   companies, that prompted a discovery in early 2020.  TM and

24   DFIN had been hacked.

25           Now, you'll learn that precisely because earnings

1    information is so sensitive, TM and DFIN store it in protected

2    computer systems.  Until they file those reports with the SEC

3    and release them to the public, the information is kept

4    strictly confidential.  People who work for TM and DFIN need

5    passwords to access it.  And, of course, they're not allowed to

6    trade on it.

7            You will learn that when TM looked into the situation,

8    it discovered that someone had planted malware on the company's

9    computer network.  That's a malicious computer program designed

02:08 10   to collect employees' usernames and passwords.  Similarly, DFIN

11   discovered that hackers had gained access to the place on its

12   network where usernames and passwords were stored.  And both

13   companies found that, using stolen employee credentials,

14   hackers had entered their networks again and again to view and

15   download their clients' earnings reports before those reports

16   were filed with the SEC, before the news was made public.

17           They also discovered that the hackers had taken care

18   to cover their tracks.  The access came from Internet addresses

19   called IP addresses that TM and DFIN didn't recognize.  You

02:08 20   will learn that IP addresses are a lot like phone numbers for

21   every computer on the Internet.  The hackers had rented those

22   Internet locations from companies called VPNs, virtual private

23   networks, which allow users to hide their own Internet

24   addresses by routing their Internet use through the VPN's

25   computers.  That way, neither TM nor DFIN would be able to see

1    where the unauthorized access was coming from.

2          You'll learn that the computer networks at DFIN and TM

3    were set up to keep track of every time a user logged in and

4    what the user did on the company's network.  It turned out, TM

5    only kept detailed logs that only went back a few months.  But

6    DFIN's logs were more detailed, and they went back further.

7    And when they checked those logs, DFIN's security consultants

8    found evidence that the hackers had been poking around its

9    systems and stealing its clients' confidential information

02:10 10   since at least early 2018.  TM wasn't able to trace it back

11   quite as far, but it too found evidence of the hack dating back

12   to late 2018.

13          Here's what else you'll learn.  As careful as the

14   hackers were, they left behind digital clues about who they

15   were, clues that the FBI was able to follow so that they could

16   trace the attacks back to their source, back to the defendant

17   and his associates in several different ways.

18          First, TM found malware on its computer network that

19   was programmed to communicate with a series of Internet sites

02:10 20   with domain names that sounded like real businesses but

21   weren't, domain names like www.developingcloud.info and

22   scoreyourmoney.com.  The FBI, in turn, was able to trace those

23   domain names to a company called Namecheap where the domain

24   names were registered, and to other companies from which the

25   hackers rented the computers that they used in the attacks.

 1    The FBI agents found that the hackers used cryptocurrency,

 2    Bitcoin, to pay for those domains.  And when the FBI followed

 3    the money and traced those Bitcoin transactions, they found a

 4    connection to another IP address, which came back to a company

 5    in Moscow, Russia.  Not just any company, the defendant's

 6    company, M-13; an IP address that the evidence will show the

 7    defendant himself and Ermakov and Rumiantcev all used

 8    regularly.

 9         The second way that the FBI was able to trace the

02:12 10    hacks back is this:  In January 2020, agents learned that one

11    of the IP addresses that the hackers had used to attack TM had

12    been rented from a company called AirVPN.  Agents obtained

13    court authorization to get real-time logs of the traffic to and

14    from that AirVPN IP address.  From those logs, they found that

15    on January 29, 2020, that IP address was accessed from an IP

16    address that came back to M-13, the defendant's company, the

17    same IP address that the defendant and Ermakov and Rumiantcev

18    all used.  And eventually, the agents learned that the hackers

19    had used other AirVPN IP addresses to attack not just TM but

02:13 20    DFIN as well.

21         And here's the third way that the agents were able to

22    trace the hacks back:  They found that on one particular day,

23    May 9, 2018, Ivan Ermakov, the defendant's friend, made a

24    mistake.  On that day, Ermakov backed up his own Apple iTunes

25    account from an IP address beginning with the numbers 119.  It

happened at 12:44 a.m. Pacific Standard Time.  You can see the

log right there on your screen.  That translates to 7:44 a.m.

Coordinated Universal Time.  You might hear that time zone

referred to as Zulu Time.  And you can see that IP address,

119.204.194.11, right there on your screen.  This is an excerpt

from DFIN's computer logs from that same day.  You can actually

see the hack recorded on the log at 7:48 Zulu Time.  Four

minutes after Ermakov backed up his Apple iTunes account from

the 119 IP address, DFIN's logs recorded that the company's

servers were infiltrated from that same 119 IP address using

the stolen user ID of a DFIN employee named Julie Soma --

those are her login credentials right there, RR52260 -- and to

download multiple confidential earnings reports, including, in

this particular example, the report of a company that trades on

the stock market under the symbol HZNP.  Its full name is

Horizon Pharmaceuticals.

        Members of the jury, the evidence will show that on

this day, May 9, 2018, the FBI was able to trace the hack right

back to the defendant's good friend.

        Now, you'll learn that although the defendant himself

didn't trade in Horizon Pharmaceuticals stock or the other

companies that Ermakov accessed on that day, the agents found

that that same stolen user ID belonging to Julie Soma was used,

along with a handful of other employee IDs, to gain access to

DFIN's computer servers over and over and over again.  And on a

few occasions, in the fall of 2018, those attacks were routed

through a VPN computer housed in a data center located right

here in Boston.  In fact, it's just a few blocks from this

courthouse.

From that Boston computer server, the hackers used

Julie Soma's stolen ID to download the confidential earnings

reports of companies like Tesla, the electric car company, and

Capstead Mortgage, a real estate company, and the defendant did

trade in those stocks, in accounts in his own name and in the

name of his company, M-13, trading that you will learn was yet

another way that the FBI was able to tie the defendant and his

associates to this hack-to-trade scheme.

For example, you will see from DFIN's computer logs

that on October 22, 2018 Julie Soma's user ID, RR52260, you can

see it on the log, was used to download the confidential

earnings filing of Capstead Mortgage.  You can see the document

identified on the screen that's Exhibit 99-1.  It happened via

a Boston IP address.  That's 104.238.37.190 on the log.  Just

one day later, October 23, 2018, the defendant, who owns an IT

security company in Russia, entered into a financial

transaction called a short involving shares of Capstead, a real

estate company located in Texas.

What's a short?  You will learn that it's a financial

transaction that allows you to make a profit only if the

company's shares go down in value.  It's a bet that the

company's stock will go down.

The defendant placed that trade, those trades, one day before Capstead announced that its earnings had fallen short of Wall Street's estimates, news that, in fact, caused its share price to fall when the rest of the world found out what the defendant already knew.

And the evidence will show that the same thing happened again on the morning of October 24, 2018. Julie Soma's stolen user ID RR52260 was used to download the confidential earnings report of Tesla Motors via another Boston-based IP address beginning with those same numbers 104. Later that same morning, the defendant started buying shares of Tesla, betting that they would go up.

And take a look at a WhatsApp message he sent to his friends Varshavski and Borodaev early that same afternoon. This is a graphic we've created to make the message easier to read, showing an English translation from the Russian. When it actually comes into evidence, you'll see it on a spreadsheet, which is how the agents extracted it from the defendant's iCloud account. Here's what he wrote: Take a look at Tesla's stock now and tomorrow after 16:30 and how much it grows. You'll learn that 16:30 Moscow time is 9:30 a.m. Eastern Time, when the U.S. stock market opens.

Hours later Tesla announced blowout earnings results, and when the stock market opened the next day, its shares shot

1    up.  Just days later those two men, Varshavskiy and Borodaev,

2    became investors with the defendant.

3         And here's what else you'll learn, when the FBI

4    obtained court authorization to look inside the iCloud account

5    of the defendant's friend, the hacker Ermakov, agents found

6    this:  An image from an online brokerage app for Saxo Bank, a

7    brokerage firm based in Denmark.  It's like a European version

8    of E-Trade or Charles Schwab.  The stock on the screen is of a

9    company called Avnet.  The date is January 23, 2020.  It's

02:20 10   right there in the lower left-hand corner, written in Russian.

11   And look at this number in the lower left-hand corner.  It's an

12   account number.  331453INET.  Members of the jury, the evidence

13   will show that that account number found on this screenshot in

14   a brokerage app in the iCloud account of Ivan Ermakov, that

15   account number doesn't belong to Ivan Ermakov.  It belongs to

16   the defendant.  You can see it on his Saxo Bank brokerage

17   statement right there, 331453INET.

18        On January 23, 2020, the day that that image was saved

19   in Ivan Ermakov's iCloud account, the defendant's Saxo account

02:21 20   again shorted shares of Avnet, a trade that would only be

21   profitable if the company's stock price went down.  Two days

22   before that, hackers broke into TM's network from another

23   AirVPN IP address and downloaded Avnet's confidential earnings

24   report, which had not yet been filed with the SEC.  The report

25   disclosed that Avnet's earnings per share would be 40 cents,

one penny short of what Wall Street analysts were expecting.
And here's how the stock reacted when the rest of the world
learned that news.  It ticked up on the first day, but then it
went down, earning the defendant a quick profit of close to
$5,000 on that one trade alone.

And the defendant wasn't the only one who traded on
that day.  So did Nikolay Rumiantcev and an account in the name
of M-13.  So did Sergey Uryadov, one of the defendant's
investors.  And so did two other Russian nationals, Igor
Sladkov and Mikhail Irzak.  You will learn that those two men
were two of the original participants in this hack-to-trade
scheme.  Here they are sitting at their computers.  That's
Sladkov taking a selfie and Irzak at the table facing away from
the camera.  And take a look at this sticker over the laptop
camera lens.  It has the distinctive red, white and blue logo
of the Russian Olympic Committee.  We'll come back to that
sticker in just a moment.

The evidence will show that Sladkov started trading
before the defendant but that after the defendant got involved
in the scheme, he and Sladkov and Irzak all traded many of the
same stocks in the same direction at just about the same time,
and so did Rumiantcev and M-13 and the defendant's investors.
In fact they even used the same broker for many of those
trades, Saxo Bank.  And though neither Sladkov nor Irzak was in
direct contact with the defendant, you will learn that they

1    were, in fact, connected through their hacker friend Ivan

2    Ermakov.  In fact, Sladkov even had M-13's in-house chat app

3    saved in his iCloud account, the defendant's company's chat

4    app.

5         Here's what else Sladkov had in that iCloud account, a

6    photo of that same computer we just looked at a moment ago.

7    You can see that red, white and blue sticker of the Russian

8    Olympic Committee covering the camera lens at the top of the

9    screen.

02:23 10        On the screen, the quarterly earnings report of a

11    company called Snap.  That's the company behind Snapchat.  On

12    the right-hand side of the screen is the actual report that the

13    company filed with the SEC.  You can see the text on Sladkov's

14    screen and the text of what Snap filed with the SEC are the

15    same.  The evidence will show that the photo on the left was

16    taken at 8:13 a.m. Eastern Time on February 6, 2018.  Here's

17    the thing:  The earnings report, it wasn't filed with the SEC

18    until more than eight hours after that photo was taken, at

19    4:20 p.m. on that same day.  You can see the time right there

02:24 20    on the SEC's website.  But it was downloaded from DFIN's

21    computer servers one day earlier by someone using the log-in

22    credentials of Julie Soma, the DFIN employee whose credentials

23    had been stolen.  You'll see other evidence showing that

24    Sladkov had access to similar confidential documents at least

25    as early as the fall of 2017.

1          Now, the defendant didn't trade in Snap on that

2     particular day in that particular quarter, but the evidence

3     will show that his involvement in the scheme did in fact start

4     a few months later.  And once he was in, he was all in,

5     bringing not just his own money to the table but Rumiantcev's

6     money and his investors' money as well.

7          And you will learn that almost every time the

8     defendant and his co-conspirators traded around a company's

9     earnings announcement, that earnings report was filed with the

02:25  10     SEC by one of two companies, DFIN or TM, even though, as you

11     can see on the left-hand side of your screen, those two firms

12     handled less than half of all earnings reports filed during

13     that same period, just 44 percent.  Here's why that's so

14     important:  Because you will learn that a company's choice of

15     filing agent has absolutely nothing to do with the performance

16     of the company or the value of its stock.  It's, in fact, not

17     that different from whether a company chooses to buy its office

18     supplies from Staples or Office Depot.

19          The evidence will show that if the defendant's trading

02:26  20     had nothing to do with who the filing agent was, you wouldn't

21     expect more than about 44 percent of his trades around earnings

22     would involve the earnings of companies that used DFIN or TM.

23     But you will learn that when the defendant and his co-

24     conspirators traded around earnings, they almost never traded

25     in the shares of companies whose earnings were filed by any

1    other filing agent.  The evidence will show that of the 356

2    times the defendant traded on earnings between January 2018 and

3    September 2020, 343 of those reports were filed by DFIN and TM,

4    who had just 44 percent of the market.

5         Mathematically that's not unlike flipping a coin 356

6    times and having it come up heads 96 percent of the time.  And

7    the evidence will show that that was no accident because TM and

8    DFIN were the companies they hacked.  And the defendant's

9    trades around those earnings were remarkably profitable.

02:27 10   Between January 2018 and September 2020, the conspirators

11   earned close to 100 million dollars trading around the earnings

12   of DFIN and TM clients, even though, as I mentioned, they were

13   not very good traders who either made very little money or lost

14   money on all their other trades.

15        One example of that is Tesla, which I mentioned a

16   moment ago.  You will learn that between January 2018 and

17   September 2020, the defendant personally made more than 4

18   million dollars trading around Tesla's earnings announcements.

19   That's when he had tomorrow's news today.  By comparison, the

02:28 20   evidence will show that he lost close to 6 million dollars on

21   all his other Tesla trades, trades that were unrelated to the

22   earnings reports his hackers stole from DFIN's computer

23   systems.

24        In fact, the evidence will show that the conspirators

25   were such amateurs at trading that they thought about hiring a

1    professional to help them trade more effectively and better

2    figure out how the financial reports they had stolen would move

3    the market.  But there was just one problem, they didn't want

4    that person in on their scheme.  So they came up with a cover

5    story.

6           They would tell the professional they hired that their

7    trading ideas came from a computer system that analyzed

8    publicly available information gathered from news and social

9    media sites, the kind that M-13 actually monitored for its

02:29 10   clients.  But they would hide the fact that the data that they

11   were relying on was actual real earnings reports that they had

12   stolen.  You will learn that Ermakov and Rumiantcev discussed

13   their plan in an encrypted message exchange using an app called

14   Threema, where users can message each other using anonymized

15   code that hides their identity.

16          Here I'm going to show you a graphic we created with a

17   translation of the exchange and the speakers identified by name

18   because, as the evidence will show, the FBI was able to

19   determine which anonymous code belonged to which hacker.

02:29 20          Rumiantcev proposed telling the professional they were

21   going to hire that they had developed a system for mass media

22   analysis which collects data from the media and social

23   networks.  But they would modify the data somehow so that the

24   person would think that the materials had been found in an open

25   source.  That's public information.

1        In case he will work well, we will lure him in to work

2   for us.  We will be adapting the raw material while preserving

3   the essence, but there would be no chance of passing it as is.

4        How did Ermakov respond?  The main problem here is

5   that should he realize the data is real, he would not start

6   using it on the side or be selling it.

7        And look at what Rumiantcev suggested.  If we want to

8   really protect ourselves, we can create fake documents to mix

9   with the real or just old ones.  Only we will know what

02:30 10   forecasts are based on real data.

11        In that same encrypted Threema chat, a chat that

12   evidence will show the conspirators thought no one would be

13   able to see or be able to link to them by name, they discussed

14   spreading their trades among different brokerage firms to avoid

15   arousing suspicion.  You will learn that Ermakov told

16   Rumiantcev, I already told Vlad, that's the defendant, we need

17   to think about reducing accounts.  Such a number of accounts

18   with the same securities with the same broker is a bad idea.

19   We need to talk together and assess the risks.  To collect 10

02:31 20   million is not a problem.  The problem is to manage them

21   without risks and safe for everyone without arousing suspicion.

22   And they discussed choosing brokers they thought would not

23   cooperate with the SEC.

24        Members of the jury, you will learn that approximately

25   one year after this exchange, the defendant's brokers at Saxo

 1    Bank did get suspicious about his remarkably profitable

 2    trading, and Saxo started to ask questions.  And when it did,

 3    the defendant and Rumiantcev gave the bank the exact same

 4    preplanned cover story that they were going to use to hire a

 5    professional trader about their purported system for generating

 6    trading ideas from open sources and mass media and social

 7    networks.

 8          But here's what else you'll learn.  In that same

 9    encrypted Threema chat, a chat they thought no one would ever

02:32 10   be able to see or trace back to them by name, in that chat, the

11    defendant slipped up.  He got careless and he sent Rumiantcev

12    and Ermakov these photos of their investors, Varshavskiy and

13    Uryadov.  Photos that anyone that got access to that anonymized

14    Threema chat would be able to identify.  He wrote this message:

15    What did we earn today?  Our comrades are wondering.

16          And that prompted this exchange:  Ermakov:  Vlad, you

17    are exposing our organization.  This is bad.  Rumiantcev:

18    Vlad, stop sending to Threema.  Klyushin:  So sorry.  Ermakov:

19    And that's how they get you and you end up as a defendant in a

02:33 20   courtroom.  You are exposing our organization and that's how

21    they get you, and you end up as a defendant in a courtroom.

22          Members of the jury, you will learn that Ivan Ermakov,

23    the defendant's good friend, was right to be concerned because

24    the FBI did in fact catch up with Vladislav Klyushin about 20

25    months after these text messages were exchanged on March 21,

1     2021.  On that date, the defendant was arrested at an airport

2     in Seon, Switzerland.  And you will learn that the very first

3     person his wife texted minutes after that arrest was Ivan

4     Ermakov.

5          For his actions the defendant is charged with several

6     crimes.  Judge Saris will describe those charges to you and

7     instruct you on the law in detail at the end of this case.  For

8     now I'm simply going to give you a brief overview but it is

9     Judge Saris's instructions that you must follow.

02:34 10          In Count One he's charged with conspiracy to obtain

11    unauthorized access to computers, to commit wire fraud and to

12    commit securities fraud.  Conspiracy you'll learn is simply a

13    legal word for an agreement or understanding between two or

14    more people to do something that's against the law.  The

15    agreement in this case was among the defendant, Ivan Ermakov

16    and Nikolay Rumiantcev and others to hack into protected

17    computer networks, to steal material non-public information

18    about publicly traded companies, and to trade stocks on the

19    basis of that information.

02:35 20          In addition to conspiracy, which is the agreement to

21    commit any one of those crimes, the defendant is charged in

22    Count Two with actually committing wire fraud, for stealing

23    that valuable confidential information from DFIN via that

24    Boston IP address.

25          In Count Three, with gaining unauthorized access to

1    DFIN's protected computers.

2              And in Count Four, with securities fraud for trading

3    on that inside information.

4              We're going to prove these crimes to you using various

5    different forms of evidence and we're going to ask you for your

6    patience, because the evidence has to come in in bits and

7    pieces and there will be a fair number of documents, computer

8    logs and IP records showing how DFIN's and TM's computer

9    networks were accessed and their clients' financial filings

02:35 10   were downloaded.  Photographs and other evidence from the

11   conspirators' iCloud accounts connecting them to one another

12   and to these crimes, text messages and other encrypted messages

13   like the ones we just looked at in which they talked about

14   their scheme, a recorded call between the defendant, Rumiantcev

15   and representatives of Saxo Bank in which the defendant denied

16   trading on inside information and offered that preplanned cover

17   story.

18             You'll also hear from cyber security specialist who

19   DFIN and TM hired and from employees like Julie Soma, who will

02:36 20   tell you that she didn't download all those financial reports,

21   some of which were downloaded in the middle of the night while

22   the employees were fast asleep.

23             You'll also hear from an SEC expert, who will describe

24   the remarkably profitable parallel trading by the defendant and

25   his co-conspirators, their uncanny ability to predict earnings

1    surprises, and the unusual correlation between the stocks they

2    traded and the fact that those companies used DFIN and TM to

3    file their earnings reports.  And there will be other witnesses

4    as well.

5           In the end, the evidence will show that the defendant

6    conspired with others to trade based on secret information they

7    stole from DFIN and TM, that he in fact traded on that

8    information, and that he and his co-conspirators made close to

9    90 million dollars by cheating the market and by breaking the

02:37 10   law.

11          And after you have seen and heard all of the evidence,

12   Mr. Kosto and I will have an opportunity to speak with you

13   again.  When we do, we will ask you to deliver the only verdict

14   consistent with that evidence, that the defendant, Vladislav

15   Klyushin, is guilty beyond a reasonable doubt exactly as

16   charged.  Thank you.

17          THE COURT:  Okay.  Mr. Nemtsev.

18          MR. NEMTSEV:  Good afternoon, ladies and gentlemen of

19   the jury.  It's been a very long afternoon, and I promise to

02:39 20   keep this short.

21          I always have to say --

22          THE COURT:  Please speak up so I can hear.  Maybe take

23   the mic and put it right there.

24          MR. NEMTSEV:  Sure.  My name is Max Nemtsev.

25          THE COURT:  So much better.

1                  MR. NEMTSEV:  Perfect.  Along with my co-counsel, Mark

2       Fernich, and our assistant, Timothy Picard, we have the honor

3       and privilege of representing Mr. Klyushin before you today.

4                  The evidence in this case will compellingly

5       demonstrate that Vlad is not just presumed innocent but that

6       he's factually and legally innocent of all the charges against

7       him.  This is not a case where he was driven by greed.  He was

8       financially successful long before he entered into a single

9       stock transaction.

02:40 10                 The government will put up pictures of dinners and

11      golfing and him at various events, but you'll see that that's

12      all smoke and fog to distract from reality, that they don't

13      have direct evidence, that this case is built on gaping holes

14      and inferences that don't even come close to meeting their

15      burden.  Don't fall for it.  There's nothing illegal about

16      being Russian, about having wealth, about having an IT company

17      that contracts with the government.

18                 So who's Vlad?  He's the father of five children.  He

19      owns a successful IT company that also provides cyber security

02:41 20      services.  You'll see that he has hundreds of employees.  And

21      he's not one to cut corners.  He's worked since 13 years old.

22      He put himself through law school, through business management

23      school, and worked tirelessly, day in and day out, to build a

24      successful IT company.

25                 The company's main product assists with research by

monitoring more than 40,000 publications like CNN, Fox,

Bloomberg, Facebook, Twitter and other media outlets on any

given subject that you want.  It analyzes the tone.  It takes a

look if it's positive or negative, and it's frequently used to

evaluate the effectiveness of press releases and marketing

campaigns.  And naturally the system can be adapted to review

news and publications concerning publicly traded companies,

which is exactly what Vlad set out to do.  You'll learn that he

spent significant resources building an infrastructure at his

company to analyze and review publications and news, to make

predictions and forecasts for stocks.  It's well known that

investor sentiment, meaning whether the general public believes

a stock will go up or go down, is potentially a more accurate

predictor than actual company fundamentals.  It's been

recently -- you've probably seen it in the meme stock error or

Game Stop, a company that loses revenue consistently goes to

astronomical heights.  That's what Vlad set out to do, predict

the market using resources at his disposal, to use the news

monitoring services that he had to gauge interest in a stock

and use analytics and artifical intelligence to make

predictions on whether to buy or sell stocks.

He paid for subscriptions, asked his teams to purchase

expensive Bloomberg materials, all in effort to get as much

information as possible.  His system came to be known as

Preston.  You'll see in his communications with a major Danish

1    investment bank that he created an application, that it was

2    available on the Apple store for download, that he provided

3    that access to that major Danish investment bank, that the

4    staff at that bank tested that system, that they liked it.

5    They expressed interest in it, using it internally.

6         Here's an email from one of the employees at Saxo Bank

7    saying, Our colleagues first got acquainted and were impressed

8    by the algorithm for selecting publications and mentions of the

9    company.  The goal was to use that system that he implemented,

02:44 10   all the resources that he put into it, to trade and offer that

11   research to other investors.

12        Obviously all these analytics and trading required a

13   team of people to support.  And as Vlad openly admitted in that

14   Threema chat, the secret communications that the government

15   will point you to, he said, I am a little of use in active

16   trading.  For reviewing the analytics that come from his

17   systems and executing trading strategies, Vlad relied on

18   Mr. Ermakov and Mr. Rumiantcev.  Vlad's role was not in the

19   technology or computer world.  He doesn't have a tech degree.

02:45 20   His skill was attracting investors while his team traded in his

21   accounts and through powers of attorneys that they filed with

22   these brokers and the accounts of his investors.  Everything

23   was out in the open.

24        So in this secretive chat, conspiratorial chat, Vlad

25   openly discusses with Mr. Rumiantcev what information he's

gathering and what information they're trading.  In this
example, and they just highlighted an example to you about
Tesla, Mr. Rumiantcev says, "We have the Tesla collection set
in Twitter at 100 percent.  Based on the ticker only, we get
18,000 messages per week."  That's the amount of information
they're collecting only from Twitter a week.  And Mr.
Rumiantcev says it's been difficult analyzing.  But Vlad tells
him in response, "We're trading thanks to this know-how only.
Everything is done by Nuron Networks plus monitoring."
According to the government, every single person in this chat
is a co-conspirator, somebody who's in on the scheme, but no
one tells Vlad, what are you talking about?  No one tells him,
We're not trading on our news analytics, we're trading on
hacked information.  No one says, Vlad, why are you making us
analyze 18,000 messages per week when we just have the earnings
reports at our disposal?  The government has not and will not
provide you with an answer to this pivotal question.  This,
ladies and gentlemen, is reasonable doubt.  Why hire a staff?
Why create programs?  Why monitor so much information if you
have access to the actual earnings reports that are going to be
public ahead of time?

         The government tells you that these reports by
themselves would be a gold mine.  There'd be no reason to do
all of this extra work.  And Vlad has no reason to lie to his
co-conspirators.  The government won't tell you that he has any

1    incentive to lie to these people.  They are, according to the

2    government, active participants in this scheme.

3           And Vlad's a convenient target for the government.  He

4    owns an IT company that also offers cyber security services,

5    including penetration testing, which, as they told you, is a

6    form of simulated attacks to educate companies and individuals

7    about their cyber security vulnerabilities.

8           But there will be no evidence that Vlad hacked or ever

9    requested anyone to hack Donnelly or Toppan Merrill.  And that

02:48 10   fact is almost self-evident.  Look at this timeline.  The start

11   of intrusions that the government has been able to identify per

12   review of log files is February 2018, and they just told you

13   that the intrusions could have occurred even sooner.

14          Vlad's first transaction, the first time that he had

15   an account open was five months later, in July of 2018.

16   Intrusions ended in September of 2020, but Vlad continued to

17   trade through May of 2021 until his arrest.  And he had no

18   motive, no incentive to engage in hacking or requesting

19   somebody to hack.  There will be no evidence that he received

02:48 20   any earnings report or that he ever spoke about the two filing

21   agents in this case.  Despite the enormity of the internal

22   resources of the FBI, there's zero evidence Vlad ever saw or

23   possessed an earnings report.  And if he had such access, you

24   can imagine that that would be Exhibit No. 1 in the

25   government's presentation.

1          As you will hear, as part of the investigation of this

2     case, the government obtained search warrants for the entirety

3     of Vlad's emails and iCloud accounts.  They seized a tremendous

4     amount of information going back more than 20 years, 130,000 of

5     his messages, 95,000 pictures.  And in all of that, there is

6     not a single word about the two filing agents.  There was not a

7     single earnings report that they located.  The FBI conducted

8     similar seizures of Mr. Ermakov and Mr. Rumiantcev's iCloud and

9     also found no earnings report or any reference to DFIN or

02:50 10    Toppan, the two filing agents in this case.

11          As for Mr. Sladkov and Mr. Ermakov, you'll learn that

12    they had accounts and traded long before Vlad.  You'll hear

13    that Mr. Sladkov traded as early as 2017.  I don't know how

14    Mr. Sladkov or Mr. Ermakov traded or what information they had.

15    All I can tell you is there's no evidence that Vlad ever met

16    them or communicated with them, no evidence that they shared

17    any information with Vlad.  Not a single text or email or phone

18    record showing Vlad had anything to do with their trading.

19          Mr. Ermakov was friends with Mr. Sladkov.  I don't

02:50 20    know how close they were but, again, there's no evidence that

21    the two of them shared any earnings reports or ever discussed

22    the two filing agents in this case.  There's no evidence that

23    Vlad and Mr. Ermakov spoke about Mr. Sladkov or Mr. Ermakov or

24    that Vlad even knew about their existence.

25          There also will be no evidence that Mr. Klyushin

1   willfully and knowingly, terms that I expect Judge Saris to

2   define to you, traded on insider information.  Mr. Klyushin's

3   trading itself doesn't support a finding that it was based on

4   material non-public information.  The government will present

5   to you snippets of the trading activity.  They'll put before

6   you dozens of charts, but they won't tell you that if you look

7   at the trading globally, the majority of Mr. Klyushin's

8   transactions were either not or could not have been based on

9   insider information.

02:51 10        Between July 2018 and September 2020 potentially 343

11  transactions could have been, but have not yet been proven to

12  be related to hacked information.  204 transactions simply

13  couldn't have been based on the information.  And his trading

14  after September of 2020, it continued.  The hacks ended and he

15  continued trading in much of the same companies, including

16  Tesla and Microsoft and Grubhub.

17        Now, imagine if you had access to the gold standard of

18  insider information on thousands of companies, why would you

19  ever trade any other company?  Why would you continue trading

02:52 20  after access to that information ended?  You wouldn't.

21        If you look at Mr. Klyushin's transactions as a whole,

22  much of his trades was not based on -- was not surrounding

23  earnings announcement and didn't involve the companies that

24  used the two filing agents.

25        You would also imagine that he'd be wildly successful

1    in his trading.  You can pick and choose what company you

2    trade.  You can pick and choose the earnings announcement.  The

3    government makes it seem like it's so difficult to see if a

4    number that is predicted is higher or lower, but it's not.  You

5    would imagine having this information and being able to pick

6    which earnings reports you're going to trade on and what

7    companies at what time, you would be nearly a hundred percent

8    successful at all times.  But that's not the case.  Vlad was

9    about 55 to 65 percent successful, both before and after the

02:53 10    hacks ended.  That's not indicative of insider information.

11    It's the antithesis of insider information.

12          And the government brings up Tesla as an example where

13    they say Vlad must have had insider information.  There's no

14    evidence that he had the Tesla report in his possession or that

15    anyone he spoke with had that report in their possession.  Once

16    again, if you'd take a look at these chats, you'll see how

17    Mr. Rumiantcev and Mr. Ermakov analyzed Tesla.  They say we

18    analyzed some social media, they are analyzing car sales growth

19    from June 2019 there.  And he sends a link.  EV sales went up

02:54 20    120 percent last month.  And they discuss it.  And Mr. Ermakov

21    says, they have moved the release date from August 5 to July

22    24, which is a public move that they made, meaning they told

23    the market this is what they were doing.  Such thing happened

24    last time.  Figures were better than expected.

25          You will hear from a financial analyst, from a trader,

someone who does this professionally, the October 2018
transaction that the government pointed to you, Tesla did the
same thing.  They had record-breaking production figures and
they moved up their earnings announcement date and that's why
they bought the stock and that's why he recommended and told
his investors, look at it, it's going to go up.  And that's why
that stock price went up by nine percent the day before any
earnings announcement was publicized and continued to go up
afterwards.  Everyone was buying Tesla on that information.

       The government also showed you this chat.  It's a chat
from February of 2019 and you'll see that Mr. Klyushin never
saw that chat.  He couldn't have seen that chat.  He wasn't
part of the group until three months later, in May of 2019.
It's a message out of context and I wish I could ask
Mr. Rumiantcev or Mr. Ermakov what they meant by this real or
not real data.  I'm sure Mr. Klyushin wishes he could ask them.
But he can't.  He didn't know about it and no one told him
about it.

       They also showed you a chat in response to
Mr. Klyushin sending pictures of the investors.  You'll see
earlier in that chat that he did the same thing by revealing or
sending those investors' names.  And everyone was mad at him,
not because he was disclosing some sort of hacking scheme.
It's because he was breaching the privacy of those investors
who expected that their names would not appear.  There was no

1    illegal scheme.  It was just privacy protections.

2         And there's an additional issue you should keep in

3    mind.  How did this case come before you today?  Why did the

4    government take Vlad from his home thousands of miles away and

5    put him on trial before you in Boston, Massachusetts?  And it

6    all comes down to an allegation of a single IP address out of

7    the tens of thousands that were located in DFIN's log files,

8    that that specific IP address was assigned to a server in

9    Boston, Massachusetts.  There's going to be no proof that Vlad

02:56 10    actually used that IP address.  There's going to be no proof

11    that Vlad was ever in Massachusetts or ever in Boston.

12         You'll learn about IP addresses.  They're not the

13    equivalent of a Social Security number.  They're not specific

14    to a person.  You'll hear evidence that we've run out of IP

15    addresses many years ago.  And the only way for everyone to

16    access the Internet is to share these IP addresses, these

17    limited resources.  To make matters more complicated, that

18    specific IP address belonged to a company, a VPN, and the VPN

19    provider was StackPath.  VPNs are specifically designed to

02:57 20    protect the privacy of the clients by aggregating Internet

21    traffic, aggregating multiple users, for them to use one IP

22    address.  Who's using it fluctuates every hour.  One hour could

23    be you.  The next hour it could be the rest of the courtroom.

24    There would be no evidence that Mr. Klyushin, or anyone else

25    associated with him, ever used that IP address.  Despite all of

the IP records in this case, the FBI has never been able to
associate that IP address with use by any of the individuals in
this case.

But this is just one issue.  Not only can the
government not establish that Mr. Klyushin or any of the other
defendants used that IP address, but they also can't establish
that that IP address was in Boston, Massachusetts at the time.

The company that owned the rights to the IP address,
StackPath, it had no servers in Boston.  So the only way that
it could place that IP address and put it in Boston was to rent
a server from another company, Micfo.  But there are two big
issues you should know about.  There's not a single invoice
between Micfo and StackPath confirming that StackPath actually
leased that equipment in October of 2018.  The first invoice is
in December of 2018.  And, second, no one from Micfo will tell
you that they took that IP address and placed it on one of
their servers in Boston, Massachusetts.

And while it may seem trivial, venue, the place that a
defendant is to be tried, is an important constitutional
protection.  It was intended to address the British taking
American citizens and trying them in Britain.  It's a safeguard
designed to stop the government from taking a person like Vlad
and trying him anywhere they want in the United States.

You know, just like Americans can't be extradited to
Russia when all the trades are in America, a Russian should not

1    be on trial in Boston for an offense having zero to do with

2    Massachusetts.

3           I do want you to remember one thing.  The government

4    is the only one with a burden in this case.  Neither myself,

5    Mr. Fernich or Mr. Klyushin have to say a single word in his

6    defense.  The government has pointed the finger, made the

7    allegations, and now they have to prove them to you beyond any

8    and all reasonable doubt.

9           It's easy to say beyond a reasonable doubt.  But in a

03:00 10   very real way, it requires us to go against our human nature.

11   I know myself and probably many of you have experienced someone

12   accusing us of doing something, saying something, and we all --

13   or at least I do, I have this instinct to defend myself and say

14   no, I didn't say that.  No, I didn't do this.  We try to

15   explain ourselves.  We try to disprove the allegations levied

16   at us.  But wouldn't it be nice that the accuser in our

17   everyday lives had to prove those allegations in the first

18   place?  Well, that's what the law requires.  It requires the

19   accusers, the entity that pointed the finger, to be solely

03:01 20   responsible for proving the allegations.  The government here

21   made accusations, pointed the finger.  Now they must prove them

22   to you.

23           At the end of this case I'm convinced that we'll be

24   able to stand before you with credibility and ask you to acquit

25   Mr. Klyushin of each and every charge of the indictment, not

 1    out of sympathy but out of justice.

 2              Thank you very much for your time.

 3              THE COURT:  Thank you.  All right.  We'll stand in

 4    recess.

 5              Remember, don't talk about the case.  We'll see you

 6    tomorrow at 9:00.  We'll go from 9:00 until 1:00.

 7              THE CLERK:  All rise.  You can leave your notebooks

 8    there.  If you have a question -- leave your notebooks on the

 9    chair.

03:02 10    (Jury exits.)

11              THE COURT:  Who's the first witness tomorrow?

12              MR. FRANK:  The first witness Your Honor, will be Marc

13    Brawner.

14              Your Honor, we do have an objection to one statement.

15              THE COURT:  Can I just -- so Marc Brawner.  How long

16    will he be?

17              MR. KOSTO:  Approximately an hour on direct, Your

18    Honor, maybe a little less.

19              THE COURT:  How long do you think you'll need on

03:03 20    cross?

21              MR. NEMTSEV:  Twenty to 30 minutes.

22              THE COURT:  Okay.  Who's next?

23              MR. KOSTO:  Benjamin Oliver, an employee of Toppan

24    Merrill, approximately 30 minutes on direct.

25              THE COURT:  We're now at the break.  How long do you

1      think on cross?

2            MR. NEMTSEV:  Fifteen minutes.

3            THE COURT:  We're now at quarter to 12:00.  Who's

4      next?

5            MR. KOSTO:  Daron Hartvigson, the consultant who

6      responded, or one of the consultants who responded at Donnelly

7      Financial.  Again, 45 minutes or so to an hour on direct.

8            THE COURT:  Okay.  We're getting close to the break.

9      How long do you think you'll be with him?

03:03 10           MR. NEMTSEV:  I honestly don't expect it to be a long

11      cross, 20 minutes, 30 minutes, Your Honor.

12           THE COURT:  In case it goes more quickly, is there

13      someone on deck?

14           MR. KOSTO:  Yes, Your Honor.  We'll have a fourth

15      witness here as well.

16           THE COURT:  Who would that be?

17           MR. KOSTO:  Bryan Garabo from Donnelly Financial.

18           THE COURT:  Have you given them the documents that

19      you'll be introducing through each of these people?

03:04 20           MR. KOSTO:  We'll send a note over to Mr. Nemtsev and

21      Mr. Fernich.

22           THE COURT:  I can't require you to show the docs on

23      cross, but to the extent that it's something that you're

24      planning on putting in and you don't want to spend -- if it's

25      objected to, would you please try and front it so we don't

1   spend hours at sidebar.

2         MR. NEMTSEV:  I don't think we're going to be

3   introducing much through these witnesses, if anything, Your

4   Honor.  Most of them are just employees who are going to say it

5   wasn't us.

6         THE COURT:  All right.  I just don't want to spend a

7   lot of time at sidebar.  We'll meet tomorrow morning at 8:30.

8   So if there's any objections to documents, I'll address it

9   then.

03:04  10         MR. NEMTSEV:  Thank you, Your Honor.

11         THE COURT:  What's the objection?  I'm sorry.  I just

12   wanted to get the logistics out of the way.

13         MR. FRANK:  Of course, Your Honor.

14         There was a statement just there at the end that venue

15   is important because, just as Mr. Klyushin shouldn't be dragged

16   out of Russia to be tried here in Boston, an American shouldn't

17   be dragged out of the United States and tried in Russia.

18   That's effectively the same as saying, you know, if you let him

19   be tried here, if there's venue for that here, the same thing

03:05  20   could happen to you.  And that's inappropriate argument.  The

21   cat's out of the bag now, but we do not believe that that

22   argument should be permitted in closing arguments.  It's

23   effectively a threat to the jurors that if they're not careful,

24   the same thing could happen to them and they could be pulled

25   into Russia.

1          MR. NEMTSEV:  Well, Your Honor, that's not what I

2     said.  I said just like Americans can't be extradited to Russia

3     when the trades were in America, a Russian should not be on

4     trial in Boston for an offense having zero to do with

5     Massachusetts.

6          MR. FRANK:  It's an inappropriate equivalency.

7          THE COURT:  I'm not going to do anything about it but

8     I hear your point.  We'll make sure in closing arguments we

9     tailor it more closely.  Venue is an issue here.

03:06 10          MR. FRANK:  We're not disputing that, Your Honor.

11          THE COURT:  You didn't really front it.  So, I mean,

12     they can if they want to.

13          MR. FRANK:  No dispute about that, Your Honor, but

14     they shouldn't be able to say to the jury this could happen to

15     you.

16          THE COURT:  I didn't take that away, that it could

17     happen to you.

18          MR. FRANK:  There's no real reason to mention an

19     American being tried in Russia in the context of whether

03:06 20     there's venue in Boston.

21          THE COURT:  All right.  Is there anything else we need

22     to address right now?

23          MR. KOSTO:  No, Your Honor.

24          THE COURT:  I did want to say one thing to counsel at

25     sidebar for one second.

1    **(SIDEBAR CONFERENCE AS FOLLOWS:**

2          THE COURT:  No one's fault, I'm not saying anything,

3    but Mr. Klyushin was out here for about five to ten minutes

4    before you were.  The marshals brought him out because I think

5    they thought you'd be here because we said 20 past.  I came out

6    just to make sure nothing was happening because I have a room

7    full of press and the prosecutor.

8          I think, MaryEllen, if we could make sure the marshals

9    don't bring him out before the lawyers are here.

03:07 10          THE CLERK:  Okay.

11          THE COURT:  If you're running late --

12          MR. FERNICH:  It's my bad.  I was working on the

13    objections to the things in the Threema chats.

14          THE COURT:  The what?

15          MR. NEMTSEV:  Threema chat, it's like a WhatsApp.

16          THE COURT:  I had no idea what you were talking about,

17    which shows my age.  I had no idea what a Threema chat was.

18    I'm willing to bet a few other people in this room don't

19    either, but anyway.

03:07 20          The big issue is I didn't want your client out here by

21    himself.

22          If you could mention it to the marshals not to bring

23    him out until the lawyers --

24          THE CLERK:  I will.

25          THE COURT:  -- are here.  Sometimes I'm late.  I'm not

1    perfect by any means.  It was a little awkward, let's put it

2    that way.

3             MR. NEMTSEV:  Can we leave him with Mr. Picard, if

4    necessary?

5             THE COURT:  With?

6             MR. NEMTSEV:  With our paralegal, if necessary.

7    Mr. Picard was here, I think.

8             THE COURT:  It's up to you, but it's just -- if

9    something were to happen, the press is all here.  So, okay.

03:08 10    All right.

11             MR. KOSTO:  Thank you.

12             MR. NEMTSEV:  Thank you, Judge.

13    (Court exits.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7          We, Lee A. Marzilli and Kathleen Silva, Official

8  Federal Court Reporters, do hereby certify that the foregoing

9  transcript, Pages 1 through 94 inclusive, was recorded by us

10 stenographically at the time and place aforesaid in Criminal

11 No. 21-10104-PBS, United States of America v. Vladislav

12 Klyushin, and thereafter reduced by us to typewriting and is a

13 true and accurate record of the proceedings.

14         Dated this 30th day of January, 2023.

15

16

17

18

19
   /s/ Lee A. Marzilli
20 _____
   LEE A. MARZILLI, CRR
21 OFFICIAL COURT REPORTER

22
   /s/ Kathleen Silva
23 _____
   KATHLEEN SILVA, RPR, CRR
24 OFFICIAL COURT REPORTER

25