1              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
2

3    UNITED STATES OF AMERICA,        )
                            )
4             Plaintiff       )
                            )
5       -VS-                  )  Criminal No. 21-10104-PBS
                            )  Pages 3-1 - 3-181
6    VLADISLAV KLYUSHIN,         )
                            )
7             Defendant       )

8

9                **JURY TRIAL – DAY THREE**

10

11        BEFORE THE HONORABLE PATTI B. SARIS
              UNITED STATES DISTRICT JUDGE
12

13

14
                       United States District Court
15                    1 Courthouse Way, Courtroom 19
                    Boston, Massachusetts  02210
16                    February 1, 2023, 8:50 a.m.

17

18

19

20

21                   KATHLEEN SILVA
                  LEE A. MARZILLI
22             OFFICIAL COURT REPORTERS
           United States District Court
23        1 Courthouse Way, Room 7200
              Boston, MA  02210
24             leemarz@aol.com

25

1    A P P E A R A N C E S:

2

3        SETH B. KOSTO, ESQ. and STEPHEN E. FRANK, ESQ.,
     Assistant United States Attorneys, Office of the United States
         Attorney, 1 Courthouse Way, Room 9200, Boston, Massachusetts,
4    02210, for the Plaintiff.

5        MAKSIM NEMTSEV, ESQ., 20 Park Plaza, Suite 1000,
     Boston, Massachusetts, 02116, for the Defendant.

6

7        MARC FERNICH, ESQ., Law Office of Marc Fernich,
     800 Third Avenue, Suite Floor 20, New York, New York, 10022,
         for the Defendant.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| DARON HARTVIGSEN | | 19 | 38 | |
| BRYAN GARABO | 41 | 51 | 59 | |
| HYEYOUNG HAN | 60 | 69 | 75 | |
| JULIE SOMA | 76 | 86 | | |
| JASON LEWIS | 95 | 112 | 121 | 122 |
| DAVID HITCHCOCK | 123 | | | |

| EXHIBITS | RECEIVED IN EVIDENCE | FOR ID |
|----------|---------------------|--------|
| 59 | 128 | |
| 60A | 129 | |
| 61A | 130 | |
| 62A | 131 | |
| 63A | 132 | |
| 64A | 133 | |
| 141, 141A | 133 | |
| 149 | 136 | |
| 1-8 | 140 | |
| 58, 58A | 141 | |
| 248 | 143 | |
| 13 | 144 | |
| 108 | 145 | |
| 110 | 148 | |
| 100 | 150 | |
| 151A-For ID | | 158 |
| 9, 11 | 150 | |
| 151B | 161 | |
| 151C | 161 | |
| 152-For ID | | 165 |
| 152A | 165 | |
| 152C, 152D | 166 | |
| D | 171 | |
| W | 171 | |

<u>P R O C E E D I N G S</u>

1

2      THE CLERK:  All rise.

3      Interpreters, you're still under oath.

4      THE COURT:  So what's the issue this morning, please?

5      MR. NEMTSEV:  The only issue I had is when that came

6  up yesterday about marking all of these log files as an exhibit

7  but the government not admitting them, yet the witness

8  testifying to their contents without the admission of those

9  logs.

08:50 10      THE COURT:  Well, I think the way we left it is I

11  would mark it for identification.  You would move to strike

12  anything that was either inadmissible or unfairly prejudicial.

13      MR. NEMTSEV:  No, Your Honor, I don't move to strike

14  anything.  I would --

15      THE COURT:  Are you moving to strike the whole

16  exhibit?  I'd say no.

17      MR. NEMTSEV:  No, no.  I'm not moving to strike

18  anything from the log files.

19      THE COURT:  Oh, you just want to admit it right now?

08:50 20  I don't understand what you want.

21      MR. NEMTSEV:  The log files, Exhibit 71, the lengthy

22  list of Julia Soma's account did this from this IP address,

23  from this computer.

24      THE COURT:  I'm sorry.  I'm mixing it up.  This is my

25  bad.  I thought you were referring to the texts.

```
 1              MR. NEMTSEV:  No, no.  I'm referring to the exhibit
 2    related to this witness.
 3              THE COURT:  All right.  You moved to admit one of the
 4    ones that we allowed in yesterday, the log files involving
 5    Merrill, right?  TM?  So you're saying we should be moving in
 6    the one involving DFIN.  Is that it?
 7              MR. NEMTSEV:  I think we should be moving -- or the
 8    government should have moved them all in.  How can a witness
 9    testify as to the contents of log files without actually
10    admitting the underlying log files?
11              THE COURT:  I don't remember.  Did you move --
12              MR. KOSTO:  Yesterday we moved in a number of exhibits
13    under 71, 71A, 71B, which the witness testified were the
14    contents of messaging from those logs.  What Mr. Nemtsev is
15    asking is that the entirety, the millions of rows of logs,
16    including the geolocation information that the witness
17    testified he didn't know where it came from and he didn't rely
18    on it.  What the defense wants to do is hold up the geolocation
19    information, point to it and say, It doesn't say Boston.
20              THE COURT:  Just so I understand.  The excerpts that
21    you used, you moved in yesterday?
22              MR. KOSTO:  Yes.
23              THE COURT:  Okay.  Now -- just to make it clear, you
24    want to move in the whole log file?
25              MR. NEMTSEV:  Yeah, I think it has to be, because this
```

```
 1    witness testified about hacks going from February of 2018 to

 2    August of 2020.  The snippets that they put in don't support

 3    that.  They're going to have a witness, Mr. Lewis --

 4              THE COURT:  First of all, you haven't moved them in

 5    yet.  So are you doing that now?

 6              MR. NEMTSEV:  I'm sorry?

 7              THE COURT:  You have not yet moved them in yet.

 8              MR. NEMTSEV:  The log files or the snippets?  The

 9    snippets, they moved in.

10              THE COURT:  The snippets are in.

11              MR. NEMTSEV:  Yes.

12              THE COURT:  They're in.  Do you want to move in all

13    the log files?

14              MR. NEMTSEV:  We have to, I believe, Your Honor.

15              THE COURT:  Just, are you moving them in?

16              MR. NEMTSEV:  Yes.

17              THE COURT:  The entire log files from DFIN?

18              MR. NEMTSEV:  Yes, but they want portions of them

19    redacted.

20              THE COURT:  This guy -- if -- I can't remember his

21    name -- doesn't know what that information is.  Is someone that

22    you're going to be putting on the stand going to be able to

23    verify what that is?

24              MR. NEMTSEV:  We could have our expert explain what it

25    is.  He does know what it is.  He just says, I didn't rely on
```

1    it.  He doesn't say it's unreliable.  He says it came from

2    Microsoft.

3            THE COURT:  He said he didn't know how it was

4    generated.

5            MR. NEMTSEV:  He said it came from Microsoft.  Those

6    logs were generated by Microsoft.

7            THE COURT:  Are you going to call someone from

8    Microsoft as to how they were generated?  I don't know how they

9    were generated.  I have no basis for it.

08:53 10         MR. NEMTSEV:  They were generated by Microsoft

11   consistent with -- the entire log, not just portions of it.

12   The entire log was generated by Microsoft.  Are they arguing

13   that the entire log is unreliable?

14           THE COURT:  I didn't know that.  The entire log was

15   generated by Microsoft?

16           MR. KOSTO:  No, Your Honor.  The geolocation

17   information is the issue here, and before trial, the defense

18   moved to exclude the geolocation information from MaxMind.  And

19   in arguing that -- and I'm in docket 126 right now -- the

08:54 20   defense pointed to MaxMind and then said, MaxMind is

21   unreliable.  If you look at IP2Location, another company, you

22   get one city.  If you look at IPinfo, another type of company,

23   you get a different location.  If you look at db-ip, which is

24   used by Microsoft, you get a different location.

25           THE COURT:  You did not prepare me on this.  I did not

1    understand that Microsoft would be generating information based

2    on yet another source.  So the question I have is:  This -- I

3    don't know about it.  It wasn't vetted with me.  I knew about

4    MaxMind.

5         MR. KOSTO:  And this witness has testified that beyond

6    the fact that it comes from Microsoft, he doesn't know where it

7    came from and he didn't rely on it, so the --

8         THE COURT:  Well, I'm not allowing it to come in.

9    That said, if you have some expert who can help me on that, we

08:54 10   can just mark it for ID and I will allow it to come in.  It

11   just depends on who you have.  Do you have an expert coming in

12   on it?

13        MR. NEMTSEV:  Well, we have an expert, a forensic

14   expert.  I'm sure he could testify to --

15        THE COURT:  All right.  So if he can say it's reliable

16   and the kind of thing people rely on, as I've said for a

17   million years, what's sauce for the goose is sauce for the

18   gander.

19        MR. FRANK:  Two points on that, Judge, quickly.  First

08:55 20   of all, their expert hasn't been noticed on that issue.

21        But second of all, in that, what Mr. Kosto was just

22   reading, Mr. Nemtsev argued that the Microsoft data was no more

23   reliable than the MaxMind data.  The next one he was going to

24   read was that Microsoft provides yet another source.  It's all

25   identical.  They all do the exact same thing.

                     THE COURT:  Well, right now I have no evidence from
     the defense that it's reliable.  As in zero.  If you put in
     evidence that it's reliable, I will allow you to put it in, and
     I'll allow them to rebut with the same information that we were
     fighting about in the motions in limine in rebuttal -- or not
     rebuttal, but to respond to it.  Because they can put in their
     MaxMind data, and the jury can have all the limitations on it.
     Right now I have no evidence on point.

                     MR. FRANK:  Well, it's even more than that, because
     they've actually argued it's not reliable.  This exact data
     they've argued is not reliable.

                     THE COURT:  Excuse me.  I'm not -- I don't know this
     area very well --

                     MR. FRANK:  I understand, Judge.

                     THE COURT:  -- but the argument was about MaxMind, not
     about Microsoft.

                     MR. FERNICH:  Judge, let me --

                     THE COURT:  Excuse me.

                     MR. FERNICH:  I'm sorry.

                     THE COURT:  I know nothing about Microsoft's
     reliability.  Microsoft strikes me as a reputable company,
     would we say?  So if Microsoft is relying on this data, perhaps
     it is relatively reliable.  But so far -- you won that fight.
     If you want to open up that can of worms again, your call, with
     your expert, or with him, he -- he couldn't tell you.  I mean,

1  so he didn't know.  And then the government gets to put in

2  theirs.

3       Okay.  Now, I have a question about venue now that

4  we're on it.  I started to think about putting this case

5  together.

6       THE CLERK:  Hold on, Judge.  That's the court officer.

7       THE COURT:  Don't let them in yet.

8       Because this all goes to the issue of venue, of

9  course.  What is the story with -- does venue get -- is that

08:57 10  the first question asked to the jury, and if they -- is it the

11  last question asked to the jury?

12       MR. FERNICH:  I'm sorry.  I missed that.

13       THE COURT:  I've actually not hit this issue.  So if

14  for some reason they decide there's no venue, double

15  jeopardy -- in other words, it can be retried, right?

16       MR. FERNICH:  It's before the Supreme Court right now,

17  that issue.

18       THE COURT:  Now you've got me.

19       MR. FRANK:  Judge, we dealt with this issue in the

08:57 20  Varsity Blues cases.  There was a venue instruction.  So

21  there's a standard venue instruction that they have to find by

22  a preponderance that it touched Massachusetts.

23       THE COURT:  Sure.

24       MR. FRANK:  But there's no separate -- there's no

25  separate question put to them on the -- they still have to just

1  decide the counts the way they decide the counts.  So it's just

2  an issue in the instructions, just like --

3          THE COURT:  So there's no separate question?

4          MR. FRANK:  There's no separate question.

5          THE COURT:  Are you sure?

6          MR. FRANK:  A hundred percent sure.

7          THE COURT:  That's the way Judge Gorton did it, but is

8  that the practice?  I don't know.

9          MR. FRANK:  That's the way it was dealt with in all

08:58 10  the Varsity Blues cases, and I've never heard of it being put

11  to the jury as a separate question on the questionnaire.

12          THE COURT:  So you simply say to them, if you don't

13  find the venue, you find not guilty?

14          MR. FRANK:  There's a standard instruction.  We have

15  it in our instructions.

16          THE COURT:  I know.  It wasn't helpful.  The venue

17  instructions for both sides were not particularly helpful.  I'm

18  trying to do research on it.  I had it come up in eBay, as

19  Mr. Kosto knows.  So let's assume for a minute, you didn't

08:58 20  prove by a preponderance of the evidence venue.  Is it a not

21  guilty?  Is that how it gets resolved?

22          MR. FRANK:  Yes, but I don't know that that's the

23  instruction.  The instruction we gave to the Court is the

24  standard First Circuit --

25          THE COURT:  What do you do?  You're the juror.  You

think you don't know whether it's in Prague or you don't know

whether it's in Korea.

MR. FRANK:  And it's a thing that they have to find in

order to convict, just like any other element.

THE COURT:  Excuse me.  So if you haven't proven it,

is it not guilty?

MR. FRANK:  Yes, but they --

THE COURT:  That's all I'm asking.

MR. FRANK:  Yes, but I don't know that that specific

verbiage is in the instruction.

THE COURT:  No, but it's going to be.  Either that or

I do a separate question.  Let me ask you this:  The issue

really is if there's no venue, does that trigger double

jeopardy?  When I dismiss -- it came up in eBay.  If I dismiss

on the issue of venue, you just get to try it somewhere else.

MR. NEMTSEV:  That's the issue in the Supreme Court

case right now.  The Eleventh Circuit -- the Eleventh Circuit

reversed a count for insufficient evidence on venue, and

there's a circuit split as to whether the defendant can be

retried somewhere else, and that's what they're going to

resolve in the case.

THE COURT:  Neither of you gave me verdict slip, so I

was just thinking about it last night.  What would be your

position on that?  Are you agreeing with the Eleventh?

MR. NEMTSEV:  No, we don't like the Eleventh.  The

1    Eleventh found that it can be retried, and, you know, the

2    Supreme Court is going to figure that out.  I think we are

3    going to get the answer.

4         THE COURT:  If it's simply a not guilty, I will never

5    know.

6         MR. NEMTSEV:  Well, we wouldn't want a special verdict

7    on venue.

8         THE COURT:  That's agreed, all right.

9         MR. FRANK:  Well, no, that's an issue we -- with

09:00 10   respect to the -- I think that's right, but I just want to

11   check with our appeals unit on that.

12        THE COURT:  I don't know.  I usually have venue arise

13   as a motion to dismiss the indictment.  I haven't had it arise

14   in this context.  So right now you're both agreeing, subject to

15   my hearing something else, that it's bound up in -- if you

16   don't find venue, it's a not guilty?

17        MR. FERNICH:  Yes.

18        MR. FRANK:  Yes, Your Honor, but what I do think we

19   object to is a separate instruction with respect to that one

09:00 20   issue that if you don't find it, it's a not guilty.  It would

21   be the same instruction as you give, we submit, for all the

22   elements, which is if you don't find any element, it's a not

23   guilty.

24        THE COURT:  Of course.

25        MR. FRANK:  But we don't say for each individual

 1   element, if you don't find this element, it's a not guilty.  If

 2   you don't find this element, it's a not guilty.

 3          THE COURT:  I don't know how I'll word it yet.  I'm

 4   just basically dealing with the fact of whether I need a

 5   special question on it, and you're both agreeing the answer is

 6   no.

 7          What's the name of that court case?

 8          MR. NEMTSEV:  I don't remember the name of it, but

 9   while we're going, I'll look it up.  I'll find it for you.

09:01 10        I don't think it's been argued yet.  There was a piece

11   on it in Law360 a couple weeks ago that explained it very well,

12   laid out the issues.

13          THE COURT:  It's fascinating.

14          MR. NEMTSEV:  Yeah, it's a real weird one.  I mean,

15   there obviously would be collateral estoppel implications,

16   maybe, by a special verdict.  I don't know.  It seems --

17          THE COURT:  Is the jury here?

18          THE CLERK:  Yes.

19          THE COURT:  And was somebody going to ask that

09:01 20   question for that juror?

21          THE CLERK:  Answer that question.

22          THE COURT:  I have the question.

23          MR. KOSTO:  I can take care of it, Your Honor.

24          THE COURT:  On redirect?

25          MR. KOSTO:  Sure.

```
 1              THE COURT:  All right.  I don't even understand it,
 2      so...
 3              MR. NEMTSEV:  What was the question, Your Honor?
 4              MR. KOSTO:  The question was:  Is the browser --
 5              THE COURT:  Is user agent string just different types
 6      of browsers?
 7              MR. KOSTO:  Yes.  I'm not answering the question, but
 8      that was the question.
 9              MR. NEMTSEV:  I could ask it, Judge.
10              Could I write it down?
11              THE COURT:  I don't understand it, myself.  So do you
12      want me to ask him to amplify it?
13              MR. NEMTSEV:  No, I'll ask the question as it is.
14              THE COURT:  What does it mean?
15              MR. NEMTSEV:  I assume -- when the government put in
16      the little snippets, there was browser data.  I assume that's
17      what he's asking about.  So I'll ask the witness what that
18      string means.
19              THE COURT:  All right.  And how much longer do you
20      have with the witness?
21              MR. NEMTSEV:  25 minutes.
22              THE COURT:  Okay.  And...
23              MR. KOSTO:  No more than that, Your Honor.  Probably
24      half of it, depending on what the cross is.
25              THE COURT:  Okay.
```

1          MR. FERNICH:  And the case is Smith -- unhelpfully,

2     it's Smith v. United States.  I don't have a docket number on

3     it, but I'm sure somebody could find it pretty quick.

4          THE CLERK:  One quick question.

5          (Discussion held off the record.)

6          MR. FERNICH:  Timothy Smith.

7          THE COURT:  So are you offering in the log files in

8     their entirety?

9          MR. NEMTSEV:  I'm going to ask him about the

09:03 10     reliability of the log files.  If he says they're reliable,

11     then, yes.  If he says no --

12          THE COURT:  And then you're going to object as far as

13     the reliability of those columns, and I will -- at this point,

14     I will hold on that, and we'll wait to hear what various --

15     there are various forensic experts coming in who you can ask

16     about it, and so I'll allow them in except for those, which

17     I'll mark for identification.

18          THE CLERK:  Do you have a number for that, or you'll

19     give it to me later?

09:03 20          MR. KOSTO:  Well, the log, in its entirety, is

21     Exhibit 71.

22          THE CLERK:  I know.

23          MR. KOSTO:  But if we let in Exhibit 71, the

24     geolocation information comes right in with it, which is why --

25          THE COURT:  No, it doesn't.  I just explained it

1    wasn't.  I'm not going to allow -- I'm going to hold on the

2    issue of geolocation.  They're not going to be sitting here

3    reading 71.  So -- all right?  I guarantee --

4            MR. KOSTO:  We'll prepare a version of it that redacts

5    those columns.

6            THE COURT:  All right.  And we'll see if somebody puts

7    it in as reliable, and then you can put in -- like, I don't

8    even have any information that Microsoft relies on MaxMind.  It

9    would be of interest to me if somebody as -- if a company as, I

09:04 10  don't know, big as Microsoft found it reliable.  I didn't have

11   that information before.

12           MR. FERNICH:  But, Judge, in the motion, when we took

13   the position that the MaxMind evidence shouldn't be admissible

14   in the absence of an expert proffer, Daubert-type proffer in

15   advance, we cited two cases dealing with the Microsoft

16   geolocation evidence by analogy.  One was from the Western

17   District of New York.  I think one was from somewhere out in

18   Minnesota.  It's near the back of the motion.  And in those

19   cases, the judges took the exact approach that Your Honor was

09:04 20  suggesting.  If we proffer -- they let the evidence in.  The

21   proponent in that case, the government, just -- they just made

22   the government put somebody on to say, you know, we used this

23   and it's reliable enough, and it went to the jury.  So that's

24   what we're --

25           THE COURT:  So if you get someone to say it, the

```
 1    government can put it in, and you can put it in.
 2            MR. FERNICH:  Right.  So I think Your Honor is doing
 3    it exactly in line with those two cases that we cited.
 4            THE COURT:  I just wish I had dealt with it at the
 5    front end rather than right now, but that is what it is.
 6            Is the jury here?
 7            THE CLERK:  Yes.
 8            MR. FERNICH:  The docket number of the Supreme Court
 9    case is 21-1576.
10            THE COURT:  Okay.  Good.
11            MR. KOSTO:  Should I get Mr. Hartvigsen, Your Honor?
12            THE COURT:  Yes.  Thank you.  We're going to get the
13    jury.
14            (Discussion held off the record.)
15            MR. KOSTO:  Your Honor, we did get a little feedback
16    yesterday that the sidebars were quite audible.  I don't know
17    if we could have white noise or --
18            THE COURT:  Yeah, that sounds like a good idea.
19            THE CLERK:  All rise for the jury.
20    (Jury enters.)
21            THE COURT:  Good morning to everyone.  Thank you so
22    much for showing up on time so we can get going right away.
23    Did anyone speak about this case, see anything in the press,
24    see anything on social media?  All right.  Thank you.  You've
25    complied with my instructions.  We're going to finish up.  I
```

 1    think it's on the cross-examination.

 2            And were you going to start with that question from

 3    the juror?

 4            MR. NEMTSEV:  I was, Your Honor.

 5            THE COURT:  All right.  I wasn't sure I understood the

 6    question, but he's going to try.  If that's not the right

 7    question, then you'll write it out again.  Okay?

 8            JUROR:  Yes.

 9            THE COURT:  Go ahead.  Please be seated.  You're still

09:08 10    under oath.

11                      DARON HARTVIGSEN, Previously sworn

12                      CONTINUED CROSS-EXAMINATION

13    BY MR. NEMTSEV:

14    Q.    Good morning, Mr. Hartvigsen.

15    A.    Good morning.

16    Q.    So there's one question, and I believe this relates to the

17    snippets of log files that the government showed to you

18    yesterday.

19    A.    Yes, sir.

09:08 20    Q.    And the question is:  Are the user-agent strings just

21    different types of browsers?

22    A.    The user-agent strings will document different types of

23    browsers, yes.  So if somebody uses a Firefox browser, it will

24    show up different in the user-agent string, yes.

25    Q.    And am I correct that in this instance, in almost all of

1    the log files, you determined that a Chrome browser was used on

2    a Windows laptop?

3    A.   There was different user-agent strings used across the

4    logs.

5            THE COURT:  Here's my problem.  I need to hear you.

6            THE WITNESS:  Oh, okay.

7            THE COURT:  So you're talking to him like a little

8    private conversation.  They're the audience.  Me, secondary

9    audience.  But we all need to hear.  All right?  Thank you.

09:09 10            THE WITNESS:  Yes, ma'am.

11   Q.   So am I correct that most of the log files that you

12   determined were potentially related to intrusions, that access

13   was from a Windows computer and using a Chrome browser?

14   A.   I don't know if I would characterize it as "most."

15   Q.   But many?

16   A.   Many, maybe.

17   Q.   Was that --

18   A.   I'd have to look at my notes, but...

19   Q.   Do you have your notes with you?

09:09 20   A.   No.

21   Q.   And these log files are very extensive, correct?

22   A.   Yes.

23   Q.   Going from about February of 2018 to August of 2020?

24   A.   Correct.

25   Q.   For multiple users at DFIN?

```
 1   A.   Yes.
 2   Q.   How were those log files created?
 3   A.   They were stored by the computers that created them.
 4   Q.   What system was used to create them?
 5   A.   Which log files are you referring to?
 6   Q.   Let's -- I'm going to ask you specifically about the Julia
 7   Soma log files, for example.
 8   A.   Oh, okay.  Yes.
 9   Q.   Ms. Soma's log files, what system were those created by?
10   A.   They were created by a Microsoft IIS server.
11   Q.   IIS server.  What is that?
12   A.   Internet Information Services server.  It's a way
13   Microsoft logs applications on the Internet.
14   Q.   And these logs are created automatically by the server; if
15   it senses an activity, it creates a log?
16   A.   Essentially, yes.
17   Q.   You didn't touch these log files, what you received is
18   exactly what came from the Microsoft IIS server; is that
19   correct?
20   A.   We were provided those log files by DFIN, yes.
21   Q.   And you didn't manipulate the log files in any way,
22   correct?
23   A.   No.
24   Q.   You didn't add any columns, you didn't subtract any
25   columns.  Whatever you received, that's what you relied on,
```

1    correct?

2    A.    Well, there were different versions of the analysis

3    process.  So when we received original log files, we may have

4    sorted them based on IP, as an example.

5    Q.    You may have sorted them and you may have used tools to

6    analyze them, but the logs that you received and used in this

7    case came directly from the Microsoft IIS server, correct?

8    A.    For the Julie Soma ActiveDisclosure logs, yes.

9    Q.    And in those log files, there were two columns, or three

09:12 10   columns, I believe, related to IP geolocation.  It states which

11   IP was used by the Julia Soma account and what location that IP

12   is associated with.

13         Do you remember that?

14         MR. KOSTO:  Objection.

15         THE COURT:  Overruled.

16   A.    What was the question?  I'm sorry.

17   Q.    Within the Julia Soma log files --

18   A.    Okay.

19   Q.    -- it shows Julia Soma's account connecting to DFIN's

09:12 20   server, the Microsoft IIS server, through an IP address,

21   correct?

22   A.    An IP address, yes.

23   Q.    Additionally, there are two columns or three columns that

24   show that this IP address was associated with this city name,

25   this state, this country; is that correct?

```
 1   A.   There were -- yes, there were lines in the logs that had
 2   that.
 3   Q.   You didn't touch those lines, correct?
 4   A.   I didn't add those attributes, no.
 5   Q.   Those came automatically from the Microsoft IIS system,
 6   correct?
 7   A.   I believe so.
 8   Q.   Do you believe that the Microsoft IIS system is reliable?
 9            THE COURT:  Is what?
10            MR. NEMTSEV:  Reliable.
11            MR. KOSTO:  Objection.
12            THE COURT:  Do you know one way or another?
13            THE WITNESS:  I do not.
14   Q.   So you don't know whether these log files are reliable?
15            MR. KOSTO:  Objection, asked and answered.
16            THE COURT:  Sustained.  Ask about that information.
17            MR. NEMTSEV:  I'm sorry, Your Honor, the IP
18   geolocation?
19            THE COURT:  Yes.
20   Q.   Do you know where Microsoft obtained that geolocation
21   data?
22   A.   I do not.
23   Q.   Do you believe that Microsoft typically uses reliable
24   sources?
25            MR. KOSTO:  Objection, foundation.
```

           1              THE COURT:  Sustained.

           2              MR. NEMTSEV:  I'll move on.

           3    Q.   The last time we left off, I believe we spoke about the

           4    fact that your investigation started after DFIN received an SEC

           5    subpoena; is that correct?

           6    A.   Yes.

           7    Q.   And the employee that you first focused on was Julia Soma,

           8    is that correct?

           9    A.   Yes.

09:14    10    Q.   And who told you to focus on that employee?

          11    A.   DFIN's lawyers.  That was the first lead that we had that

          12    there was unauthorized activity.

          13    Q.   And did DFIN's attorneys point you specifically to

          14    Ms. Soma?

          15              MR. KOSTO:  Objection, Your Honor, to the privileged

          16    communications.

          17              THE COURT:  Well, I'm not sure that it is.  Overruled.

          18              Who are you?

          19              MR. BUCK:  Your Honor, I'm an attorney for DFIN.

09:14    20    Communications --

          21              THE COURT:  Are you objecting?

          22              MR. BUCK:  I am objecting, Your Honor.  I would object

          23    to communications --

          24              THE COURT:  Well --

          25              MR. NEMTSEV:  This shouldn't be done in front of the

 1    jury.

 2            THE COURT:  This shouldn't be done like this.  You

 3    should have introduced yourself to me.

 4            I'll allow the general topic of whether they pointed

 5    you to a certain location.

 6    BY MR. NEMTSEV:

 7    Q.    Did DFIN point you to a certain location?  And by this

 8    location, I mean Julia Soma's account.

 9            THE COURT:  Don't tell him what exactly they said

09:15 10    about it, but did they focus you on that account?

11            THE WITNESS:  Yes.

12            THE COURT:  All right.  Next question.

13    Q.    Have you ever met Ms. Soma?

14    A.    Have I ever met Ms. Soma?

15    Q.    Yes.

16    A.    We met over phone.

17    Q.    Understood.

18          And what kind of access did Ms. Soma's account have

19    compared to, potentially, other employees at DFIN?

09:15 20    A.    Can you be more specific?

21    Q.    Was there anything specific about Ms. Soma's account

22    compared to other accounts in the ActiveDisclosure system?

23    A.    Oh.  So, yes, we uncovered unauthorized activity on her

24    account.

25    Q.    And you uncovered it by looking at what?

A.   At -- looking at logs, interviewing her about her normal

activity, those kinds of things.

Q.   Did Ms. Soma have an administrative account?

A.   Did she have an administrator account for what?

Q.   For ActiveDisclosure?

A.   No, not that I know of.

Q.   Did Ms. Soma's account have full access to all of the

companies that were serviced by DFIN in ActiveDisclosure?

A.   She had broad access, yes.

09:16 10    THE COURT:  ActiveDisclosure is what again, to remind

the jury?

THE WITNESS:  Sorry.  ActiveDisclosure is the -- it's

software that DFIN provides clients that allows them to

collaborate.  Public companies can put information in

ActiveDisclosure and then use that to report performance and

other data to SEC and others.

Q.   And do you know how many companies were serviced by the

ActiveDisclosure system?

A.   I do not.

09:17 20 Q.   Do you know how many companies, for example, Ms. Soma's

account accessed during the relevant time period?

A.   Not off the top of my head, no.

Q.   More than a hundred?

A.   I can't answer.

Q.   You also obtained access to all of Ms. Soma's other

1  electronic devices; is that correct?

2  A.   That's a -- can you define electronic devices?

3  Q.   You, for example, got access to her work computer; is that

4  correct?

5  A.   We collected her DFIN computer, yes.

6  Q.   You also collected her personal laptop, correct?

7  A.   That, I don't recall.

8          MR. NEMTSEV:  Your Honor, can I just show the witness

9  a document, potentially, through this?

09:18 10          THE CLERK:  Judge, he's going to have to hand it to

11  him.  He can't just put it on the document camera.

12          THE COURT:  Just show it to him.

13          THE WITNESS:  Okay.

14  Q.   Does that refresh your recollection as to what devices you

15  collected from Ms. Soma?

16  A.   Yes, it does.

17  Q.   So it was her work laptop, her personal laptop, and an

18  additional device; is that correct?

19  A.   Yes.  It says DFIN laptop, mobile device, and personal

09:18 20  laptop.

21          MR. KOSTO:  Your Honor, if the witness is refreshed,

22  the document is ordinarily taken away.

23          MR. FERNICH:  I'll get it from him.

24          THE COURT:  Keep going, keep asking.  I don't want to

25  slow this down.

```
 1    Q.   And you reviewed all of her activity on her mobile device,

 2    on her work laptop, her personal laptop, correct?

 3    A.   Our team did, yes.

 4    Q.   Extensive searches trying to determine whether there was

 5    any malware on her computers?

 6    A.   That's correct.

 7    Q.   Did you find any malware?

 8    A.   No, we found no malware.

 9    Q.   You also reviewed the electronic devices of other

10    employees; is that correct?

11    A.   That's correct.

12    Q.   There was an employee by the name of Ms. Han; is that

13    correct?

14    A.   Yes.

15    Q.   Mr. Lewis?

16    A.   Correct.

17    Q.   A Ms. Guevara, if I'm saying that correctly?

18    A.   I'm not sure how to pronounce her name.

19    Q.   A Mr. Storino; is that correct?

20    A.   I'd have to refresh my memory on that one.

21         MR. NEMTSEV:  Could I put that document in front of

22    him again, Your Honor?

23         THE COURT:  Is this essential?

24         MR. NEMTSEV:  No, I could move on.

25    Q.   But you also focused your investigation on two employees
```

```
 1    from the UK; is that correct?
 2    A.    We focused on two -- on laptops that were in the UK.
 3    Q.    One laptop belonged to Mark Rumbelow, correct?
 4    A.    I believe that's accurate.
 5    Q.    And another UK employee by the name of Nasreen Gaffar?
 6    A.    That name, I don't recall.
 7    Q.    You also focused your investigation on an employee from
 8    Poland; is that correct?
 9    A.    On a laptop from Poland, yes.
10    Q.    A Ms. Uryga, if I'm pronouncing it correctly?
11    A.    I'm not sure how to pronounce her name.
12    Q.    And you found no malware on any of these devices, correct?
13    A.    We found renamed versions of PowerShell on a Poland system
14    and systems in the UK.
15    Q.    And systems in the UK.
16          So that's where you focused your investigation, because
17    you found something potentially in the Polish laptop and the
18    UK-related laptop, correct?
19    A.    I don't understand that question.
20    Q.    You focused your investigation, in part, on the employees
21    located in the UK, the employee located in Poland because you
22    located some activity that came from Poland and came from the
23    UK?
24    A.    I don't know if I'd say focused our investigation, but we
25    detected renamed versions of PowerShell on systems in the UK
```

1   and Poland.

2   Q.   And Ms. Han, she was an employee of DFIN that worked in

3   South Korea, correct?

4   A.   Yes.

5   Q.   And as part of your request to her, you asked her to send

6   her laptop from South Korea to Washington, D.C.; is that

7   correct?

8   A.   That is accurate, yes.

9   Q.   And that laptop never made it to Washington, D.C.,

09:22 10   correct?

11   A.   It eventually did make it.

12   Q.   But it was lost for some time in Poland, correct?

13   A.   It was actually lost in, I believe, the DHL center in D.C.

14   Q.   Thank you.

15        Now, this PowerShell activity that you found emanating

16   from Poland and the UK, there was a modification date to the

17   PowerShell; is that correct?

18   A.   Yes.

19   Q.   And when was that PowerShell modified, or the modification

09:22 20   date?

21   A.   So one of them was September of 2017, and the other one

22   was, I believe, November of 2019.

23   Q.   And your testimony, I believe on direct, was that the

24   intrusions occurred from February of 2018 to August of 2020,

25   correct?

```
 1              MR. KOSTO:  Objection.
 2              THE COURT:  Overruled.
 3     A.   What was the question?
 4     Q.   Your testimony on direct examination was that the
 5     intrusions occurred from February of 2018 to August of 2020; is
 6     that correct?
 7     A.   I said we had logs from the 5th of February 2018, and the
 8     last we observed them in the systems was August of 2020.
 9     Q.   So there's potential that there were intrusions based on
10     your review of all the forensic evidence prior to February of
11     2018; is that correct?
12     A.   We only had logs that were available that were -- that
13     were detailed enough to go back to February 5th of 2018.
14     Q.   So you can't exclude that there were intrusions in 2017,
15     2016, 2015, correct?
16     A.   I can't say one way or the other.
17     Q.   In these log files, specifically Mr. Soma and Ms. Han,
18     you've located a number of suspicious IP addresses, correct?
19     A.   Yes.
20     Q.   And I believe that number was 110, based on what I've
21     read; is that correct?
22     A.   That sounds accurate.
23     Q.   And those --
24              THE COURT:  So there were 110 what?  Just project it
25     out.  What were there 110 of?
```

1    Q.   IP addresses, correct?

2              THE COURT:  No, what are you saying -- 110 what?

3              THE WITNESS:  Suspicious IP addresses.  So when we

4    looked at the logs, there was roughly 100 or so IP addresses

5    that were not consistent with Ms. Soma's normal use.

6    Q.   And those 110 IP addresses were associated with 26

7    different Internet service providers, correct?

8    A.   That, I don't recall.

9    Q.   They were associated with more than just one Internet

09:25 10   provider, correct?

11             THE COURT:  Give us a ballpark.  What do you remember

12   was the number of Internet service providers?

13             THE WITNESS:  I don't recall the number of Internet

14   service providers associated with those IPs.

15   Q.   More than one?

16   A.   Yes.

17   Q.   More than five?

18   A.   Yes.

19             THE COURT:  More than ten?

09:25 20            THE WITNESS:  That, I don't recall.

21             MR. NEMTSEV:  Your Honor, could I refresh the

22   witness's memory?

23             THE COURT:  Yes.

24             MR. NEMTSEV:  Thank you.

25             THE WITNESS:  Okay.

1          MR. NEMTSEV:  Could you set it aside?  Thank you.

2     Q.    Does that refresh your recollection?

3     A.    It does.

4     Q.    So there were 110 IP addresses associated with 26 Internet

5     service providers, correct?

6     A.    Yes.

7     Q.    And what is an Internet service provider?

8     A.    It is an organization or an entity that will provide

9     Internet access, kind of like Google or the like.

09:27 10   Q.    And it wasn't exclusively AirVPN IPs that were located,

11    correct?

12    A.    We were focused on VPN connections.

13    Q.    VPN connections, but AirVPN would be the ISP; is that

14    correct?

15    A.    AirVPN was a VPN connection that we saw.

16    Q.    And if you checked, would AirVPN show up as an ISP?

17    A.    It would show up as the origin of that connection.

18    Q.    So in that list of 26 --

19         THE COURT:  Could you just -- so they can understand

09:27 20   this.

21         MR. NEMTSEV:  Sure.

22         THE COURT:  So is a VPN an Internet service provider?

23         THE WITNESS:  A VPN provider is a -- is a service that

24    focuses on a private network.  An Internet service provider can

25    be much broader than just providing VPN services or virtual --

1           THE COURT:  VPN service provider is a subset --

2           THE WITNESS:  It can be, yes.

3           THE COURT:  -- of an Internet service provider; is

4   that right?  It's a kind of Internet service provider; is that

5   right?

6           THE WITNESS:  Yes.  Exactly.

7           THE COURT:  So when you said 26, does that include VPN

8   providers?

9           THE WITNESS:  Yes.

09:28 10  BY MR. NEMTSEV:

11  Q.    So AirVPN is just one of the 26 that you found, correct?

12  A.    Yes.

13  Q.    Others that you found were Datapipe; is that correct?

14  A.    Yes.

15  Q.    Quintex?

16  A.    Mm-hmm, yes.

17  Q.    Highwind Network Group?

18  A.    Highwinds, yeah.

19  Q.    I believe Korea Telecommunications?

09:28 20  A.    That one I'm not recalling as a VPN service.

21  Q.    And would you agree that a VPN -- I'm sorry.  Strike that.

22          THE COURT:  So everything he just said, are those

23  VPNs?

24          THE WITNESS:  I don't recall the Korea service

25  provider being a VPN, but...

```
 1    Q.    But all the other ones were VPNs?

 2    A.    I believe so.

 3    Q.    And would you agree that an IP address, it's not the

 4    equivalent of, let's say, a Social Security number?

 5    A.    I would agree that it's not the equivalent of a Social

 6    Security number.

 7    Q.    Correct, because a Social Security number is one number

 8    that attaches to one person for the life of that person,

 9    correct?  More or less.  You could obviously make changes, but

10    more or less, it's one number associated with one person for

11    the remainder of their life?

12    A.    Sure.

13    Q.    And an IP address is consistently changing.  You can log

14    in with one IP address today.  You can log in with a different

15    IP address tomorrow, correct?

16    A.    Depending on your service provider and the connection that

17    you have.

18          THE COURT:  So if you take one Internet service

19    provider -- it's a company, right?  It's an organization or a

20    company, right?

21          THE WITNESS:  So some companies can maintain ownership

22    of IPs over time.  So like AT&T, they own IP space, and they

23    have that IP space over time.

24          THE COURT:  But what about others?

25          THE WITNESS:  In the case of a VPN, the design of a
```

1    VPN is actually to obfuscate the origins so the IP addresses

2    are not necessarily the same.

3            THE COURT:  So does a VPN move it from physical

4    location to physical location?

5            THE WITNESS:  Physical location wasn't part of our

6    analysis.  We didn't associate that with tracking these actors.

7            THE COURT:  So you just tracked the service provider

8    but not the location of where the server was?

9            THE WITNESS:  The IP address associated -- and where

09:31 10   that was registered and who that was registered to.

11           THE COURT:  You did or didn't?

12           THE WITNESS:  We tracked the IP address and where that

13   was registered to at the time.

14           THE COURT:  Go ahead.

15   BY MR. NEMTSEV:

16   Q.   Would you agree, especially in connection with the VPNs,

17   and potentially maybe with AT&T, that ten people, a hundred

18   people could be using an IP address at the same time?

19   A.   There could be multiple users on an IP, or there could be

09:32 20   one.

21   Q.   But in the case of VPNs, which are specifically designed

22   to aggregate Internet traffic, it's much more likely, wouldn't

23   you say, that there are multiple users from various parts of

24   the world, potentially, using one IP address, correct?

25   A.   I don't know about much more likely.  In our case, we saw

1    VPN activity to the DFIN network, but we didn't do analysis on

2    how many, you know, potential users from that VPN might be --

3    Q.   Let me ask a different -- what cell phone provider do you

4    use?

5    A.   I'm sorry?

6    Q.   What cell phone provider do you use?

7    A.   Do I use?

8    Q.   Yes.

9    A.   AT&T.

09:32 10   Q.   I use AT&T as well.  If you and I both connect to the

11   Internet right now using our AT&T data, both you and I would

12   have the same IP address, correct?

13             MR. KOSTO:   Objection.

14             THE COURT:   If you know.

15   A.   I actually do not know if that would be the case.

16   Q.   Okay.  So based on all of your investigation, the twelve

17   people that assisted you, the review of multiple personal,

18   business electronic devices, were you able to determine who

19   intruded into DFIN's system?

09:33 20   A.   Who or -- are you asking about, like, a person?

21   Q.   Yeah.  Was it one person?  Was it ten people?  Was it a

22   hundred people?  Was it a million people?

23   A.   We were able to determine that there was specific IPs

24   doing specific things, accessing specific users on DFIN's

25   network.

```
 1    Q.   But you weren't able to determine who -- if it was 110, a
 2    million people on the other side of the keyboard using those
 3    IPs, correct?
 4    A.   We saw -- or -- and we documented the use of IPs and the
 5    access to DFIN's users.  That type of analysis wasn't part of
 6    our work.
 7    Q.   So you weren't able to identify a single intruder or a
 8    group of intruders, correct?  That wasn't your analysis?
 9    A.   I'm not sure I understand the question.
10         THE COURT:  Do you know who the intruders were?
11         THE WITNESS:  We know a lot about the intruders and
12    what they did.  What their names were?  That wasn't part of the
13    information that was collected by DFIN logs or --
14    Q.   And based on all the information that you collected from
15    DFIN's logs, you have no idea whether any intrusion is
16    connected to Russia or not, correct?
17    A.   That wasn't an analysis that we did.
18         MR. NEMTSEV:  Nothing further, Your Honor.
19              REDIRECT EXAMINATION
20    BY MR. KOSTO:
21    Q.   Good morning, Mr. Hartvigsen.
22    A.   Good morning.
23    Q.   Mr. Nemtsev asked you about approximately 26 IP
24    addresses -- or, excuse me, a hundred or so IP addresses from
25    approximately 26 providers, correct?
```

1    A.    Yes.

2    Q.    And several of those providers were private, virtual

3    private networks, correct?

4    A.    Yes.

5    Q.    And among them, what was the provider that featured most

6    prominently in your analysis of that group?

7    A.    AirVPN was very common in our analysis.

8    Q.    And Mr. Nemtsev asked you if there were one, ten, a

9    hundred different users who might be accessing the network over

09:36 10    a given IP address, correct?

11    A.    Yes.

12    Q.    Even where Ankura saw activity coming from different IP

13    addresses, what was common about what was happening on DFIN's

14    network, regardless of which IP address it came from?

15    A.    What was common was that the actors were logging into

16    Julie Soma's account or Ms. Han's account or Mr. Lewis's

17    account.

18    Q.    And what kinds of information was being taken from Mr. Han

19    or Mr. Lewis or Ms. Soma's account regardless of the IP that it

09:36 20    came from?

21    A.    It was information from public companies from

22    ActiveDisclosure.

23    Q.    And what times of day, relative to those employees' shift,

24    was the information coming out regardless of what IP it came

25    from?

A.    It was usually during times of day when those users were
not typically at work.

Q.    And regardless of which IP it came from, was the
information taken consistent with the employees' usage of the
machines in their jobs?

A.    That was one of the indicators where in some cases much
more was taken over time than usual, as an example.

Q.    But that indicator that you've described was true as to IP
1, IP 2, IP 3, IP 4, and so on?

A.    Yes.

Q.    What did the fact that all of the different IP addresses
were doing essentially the same thing cause you to believe
about the attacker or adversary?

A.    That the adversary was after --

        THE WITNESS:  I'm sorry.

        THE COURT:  You can answer.

A.    That the adversary was after the same information.

Q.    And if the adversary was after the same information, what
does that cause you to believe about the person or persons who
was intruding on DFIN's network?

A.    That the totality of the activity was the same person or
group.

        MR. KOSTO:  Nothing further, Your Honor.

        MR. NEMTSEV:  Nothing further.

        THE COURT:  Thank you.  Sir, you may step down.

```
 1              THE WITNESS:  Thank you.

 2              THE COURT:  Your next witness.

 3              MR. KOSTO:  The United States calls Bryan Garabo.

 4              THE CLERK:  Sir, could you raise your right hand.

 5                        BRYAN GARABO, sworn

 6              THE CLERK:  Could you please state and spell your last

 7    name for the record.

 8              THE WITNESS:  Sure.  Bryan, B-r-y-a-n, Garabo,

 9    G-a-r-a-b, as in boy, -o.

09:39 10              THE CLERK:  Thank you.

11              MR. KOSTO:  You can have a seat, Mr. Garabo.  Do me a

12    favor and pull that microphone right up to you.

13                        DIRECT EXAMINATION

14    BY MR. KOSTO:

15    Q.   And I'll do my best to keep my voice up if you would do

16    the same, okay?

17    A.   Okay.

18              MR. KOSTO:  May I proceed, Your Honor?

19              THE COURT:  Yes, please.

09:39 20    Q.   Do I have it right, Mr. Garabo, is that the pronunciation?

21    A.   That's correct.

22    Q.   What city do you work in, sir?

23    A.   New Jersey.

24    Q.   Any particular city?

25    A.   Hillsdale, New Jersey.
```

```
 1    Q.    And where do you work?

 2    A.    For Donnelley Financial Solutions.

 3    Q.    What do you call Donnelley Financial Solutions for short?

 4    A.    DFIN.

 5    Q.    How long have you been at DFIN?

 6    A.    I've been at Donnelley for nearly 40 years.  Six years at

 7    DFIN since we spun out.

 8    Q.    When you say spun out, what was DFIN called before it

 9    became DFIN?

09:40 10    A.    R.R. Donnelley.

11    Q.    And so you started with R.R. Donnelley back when?

12    A.    In the early '80s.

13    Q.    You're a lifer?

14    A.    Yes.

15    Q.    What's your title there?

16    A.    Senior vice president of service.

17    Q.    And let me direct you to the period of 2018, 2019, and

18    2020.  Okay?  What was your position then?

19    A.    Senior vice president of service.

09:40 20    Q.    And what was the senior vice president of service

21    responsible for in that window?  All my questions will be about

22    2018, '19, and '20.

23    A.    Understood.  During that time, I was responsible for what

24    we call our traditional business and our software business.

25    Q.    Can you say a word about what the traditional business is
```

1    first?

2    A.    Sure.   The traditional business is a business where

3    clients will send us their requests and we do all the work for

4    them.   They have no access to any information once we put it on

5    our system until we send it back.

6    Q.    Where do you send it once you've gotten it physically?

7    A.    Once we receive their request, we would process it

8    internally on our systems and then send it back to the clients

9    when completed.

09:41 10   Q.    And does that traditional business involve

11   ActiveDisclosure at all?

12   A.    It doesn't involve ActiveDisclosure, but what we do in the

13   traditional side of the business is what is replicated in

14   ActiveDisclosure.

15   Q.    So the traditional business still involves filing

16   financial reports, just not through the software?

17   A.    Correct.

18   Q.    Okay.   So what is the software business?

19   A.    ActiveDisclosure is a software built to allow the clients

09:42 20   to do all the work.   It's a self-service SaaS solution.

21   Q.    And does DFIN work with any particular industry for its

22   ActiveDisclosure business?

23   A.    Corporations.

24   Q.    Does it work in any particular marketplace?   Oil and gas

25   versus e-commerce?

1    A.    You know, I would say all corporations.

2    Q.    How about the size of those companies?  Big, small, and in

3    between?  What's the --

4    A.    All different sizes.

5    Q.    How many employees worked in the ActiveDisclosure business

6    when you were supervising it?

7    A.    I'd say approximately a hundred.

8    Q.    And where are those employees located?

9    A.    They're scattered out across the world.

09:42 10    Q.    Why across the world if DFIN is a U.S. company?

11    A.    Sure.  We're a globally -- a global company.  We have

12    businesses and employees in London, in APAC, Canada, so not

13    just specifically in the U.S.

14    Q.    What do companies in those countries need of a business

15    that helps file things with the SEC?

16    A.    If there are regulations that they need to file with

17    documents that have to go through the SEC, we would support

18    them in that process.

19    Q.    And what was your role specifically with respect to the

09:43 20    software business?

21    A.    I would oversee the business to make sure that once the

22    jobs were sold, that our service team was supporting the

23    clients in the way that we are expected to support them.

24    Q.    Are you familiar with the different kinds of filings that

25    are handled through the ActiveDisclosure system?

1    A.    Yes.

2    Q.    Can you explain to the jury briefly what a Form 10-K is?

3    A.    Sure.  All public companies need to file their financials

4    once a year, and that would be incorporated in the 10-K.  So a

5    yearly filing with the SEC.

6    Q.    And is there a deadline associated with that filing?

7    A.    Yes.

8    Q.    How long -- how long after the end of the year do the

9    companies have to put it on file?

09:44 10    A.    Typically around the end of March.

11    Q.    How about a Form 10-Q?

12    A.    Similar to the 10-K, it's smaller and it's done on a

13    quarterly basis with financials and filed with the SEC.

14    Q.    Are there similar kinds of information in the Forms 10-K

15    and 10-Q?

16    A.    Yes.

17    Q.    How would you describe it to a layperson?

18    A.    The financials of the company.

19    Q.    How do those two forms differ from a Form 8-K?  A

09:44 20    different number here.

21    A.    An 8-K is another filing type that is used to file

22    different types of documents.  It may include some financials,

23    but not necessarily.

24    Q.    Do Forms 8-K take place on that same quarterly or annual

25    calendar cycle?

A.    Typically, there's an 8-K earnings release that comes out
prior to the actual filings.

Q.    When are other times that Forms 8-K can show up?

A.    Sure.  If the company has an announcement to make, if
they're changing anything within the company that the public
needs to know, those 8-Ks are filed.

Q.    How about something like a change in leadership at the
company?

A.    Sure.  That would be a reason to file an 8-K.

Q.    Or the decision to sell a part of a business?

A.    That would be another reason, yes.

Q.    One last one for you.  What is an Exhibit 99?

A.    An Exhibit 99 is an exhibit that's filed, and it's kind of
a catchall exhibit for corporations to put in, you know,
different types of documents that they need to file with the
SEC.

Q.    Can you contrast for the jury what's in the form, the 8-K,
the 10-K, the 10-Q, versus what's in the exhibit, the
Exhibit 99?

A.    Sure.  The biggest contrast would be in the basis of
the -- the Ks and the Qs are all the financials, and the
exhibits are ancillary documents to support the filing of the K
or the Q.

Q.    Where would the press releases that described the
financial performance of the company show up?

```
 1   A.   Once they're filed?

 2   Q.   Where within the 10-K or 10-Q?

 3   A.   In the exhibits.

 4   Q.   In the Exhibit 99?

 5   A.   Yes.

 6   Q.   When DFIN has filing information, before it gets to the

 7   SEC, does the public know about that information?

 8   A.   No, sir.

 9   Q.   And at that time, when that information is in DFIN's

10   possession, how does DFIN treat it?

11   A.   Confidential information.

12   Q.   Are you familiar with policies at DFIN regarding the

13   confidentiality of client information?

14   A.   Yes.  Each year employees need to sign off on a

15   confidentiality agreement so they understand the business and

16   the dos and the don'ts.

17   Q.   And what are the don'ts?

18   A.   You can't speak about or use any confidential information.

19   It's just there for us to process.

20   Q.   Does DFIN have policies around trading based on that kind

21   of information?

22   A.   Yes.  You can't.

23   Q.   What do your employees, the employees that you supervise

24   in the service organization, do back in that time period?

25   A.   Sure.  There's different parts of the service
```

organization.  One part is the implementation team.  That's a

team used to train the clients on the software and make sure

they're getting up and running and understanding the software

and being there for technical support moving forward.  There's

also a full technical support team that supports the clients if

they have any technical issues with the software itself.  And

then there's a service team that kind of oversees the projects

to make sure that the clients are indeed moving in the software

the way they should.

Q.   You mentioned technical employees.  Can you explain, not

too deeply, but what's the technical piece to a bunch of words

and numbers on a page?

A.   Sure.  It's less about the words and numbers on the page,

but how the system is performing.  If there are certain buttons

that aren't working in the software, they would call the

technical support team just to see what -- and troubleshoot why

that's happening.

Q.   Are you familiar with the term "XBRL"?

A.   Yes.

Q.   And what is that?

A.   It's a tagging process that we go through for public

companies that tags specific information in documents.

Q.   Is that a form of information that the SEC is expecting to

receive from companies when they make public filings?

A.   Yes, it's a requirement.

```
 1    Q.    And what happens if a DFIN client's XBRL isn't correct?

 2    A.    The filing wouldn't go through.

 3    Q.    And so the technical employees you're describing do what?

 4    A.    Sure.  On that side of the business, they would make sure

 5    that the XBRL tagging is correct.

 6    Q.    Do all of these employees that you've described who work

 7    in your organization have access to the ActiveDisclosure

 8    network?

 9    A.    Yes.

10    Q.    And how do they obtain access in the course of their jobs?

11    A.    Through their personal log-in information.

12    Q.    In 2018, '19, and '20, did access to ActiveDisclosure

13    require a password as well?

14    A.    Yes.

15    Q.    And for clients -- for employees who supported clients,

16    how broad was their access?

17    A.    They had access to all client projects.

18    Q.    Could you explain -- have you been in ActiveDisclosure

19    yourself at the time?

20    A.    I have not.  You know, I was not logged in or, you know,

21    supporting clients.  Just the team that supports them.

22    Q.    But did you ever log in?

23    A.    Yes.

24    Q.    When you put your username and log-in password in, what

25    pops up?  Just so the jury can sort of have a picture in their
```

1    head of what an employee might see.

2    A.    Sure.  Once they get in, they're in the portal of

3    ActiveDisclosure, the software itself.

4    Q.    And how are the clients' information organized within that

5    portal?

6    A.    It's specific to each client and each project.

7    Q.    I don't know if American Airlines is a client, but if I

8    wanted to find the American Airlines information, what would I

9    have to do?

09:50 10    A.    The employee, I believe, would have specific, you know,

11    information to get into that project.  But once they log into

12    the software, they were able to access all documents that we

13    service.

14    Q.    Is each project stored separately by company client?

15    A.    Yes.

16    Q.    Do you know of an individual named Hyeyoung Han, H-a-n?

17    A.    Yes.

18    Q.    Who is she?

19    A.    She works on the operations team on the eXBureau side of

09:51 20    the platform.

21    Q.    She's one of those technical folks?

22    A.    Yes.

23    Q.    How about Jason Lewis?

24    A.    Yes.  Jason Lewis is an ActiveDisclosure salesperson.

25    Q.    So he sells the software to potential clients?

```
 1    A.    Yes.

 2    Q.    And then lastly, do you know of a Julie Soma?

 3    A.    Yes.

 4    Q.    And what is her role, 2018, 2019, and 2020, at DFIN?

 5    A.    During that time, she was likely an implementation

 6    architect.  She switched roles, so -- but implementation

 7    architect.  She would be the one setting up clients and getting

 8    them up and running in ActiveDisclosure.

 9    Q.    A person who supports clients' work?

10    A.    Correct.

11          MR. KOSTO:  No further questions, Your Honor.

12          THE COURT:  Thank you.

13          Any questions?

14                     CROSS-EXAMINATION

15    BY MR. FERNICH:

16    Q.    Good morning, Mr. Garabo.  My name is Fernich, and I'm a

17    lawyer for Mr. Klyushin over there.  We don't know each other,

18    do we, sir?

19    A.    No, sir.

20    Q.    We've never met or spoken, have we?

21    A.    No, sir.

22    Q.    Sir, you spoke with the government back on January 10th.

23    Sound about right?

24    A.    Approximately.

25    Q.    Yeah.  Have you spoken with the government since then?
```

```
 1    A.    Yes.

 2    Q.    You have?  When was the last time you spoke with them?

 3    A.    The other day.

 4    Q.    The other day.

 5          And if you know, did you speak with these prosecutors

 6    right here?

 7    A.    Yes.

 8    Q.    And maybe an FBI agent, government agent, do you know?

 9    A.    I'm not too sure who else was in the room.

10    Q.    No worries.

11          They asked you some questions?

12    A.    Correct.

13    Q.    And you gave them some answers, yeah?

14    A.    Correct.

15    Q.    All to prepare for your testimony here today in court?

16    A.    Yes.

17    Q.    And I didn't catch the exact date.  You told us you'd been

18    working for Donnelley or a predecessor since around 1988; is

19    that correct?

20    A.    '84.

21    Q.    Sorry.

22    A.    That's okay.

23    Q.    Almost 40 years, yeah?

24    A.    Yes.

25    Q.    And you're a lifer, like my friend Mr. Kosto put it, yeah?
```

```
 1    A.   I've been there 40 years, for -- close to 40 years.
 2    Q.   And what did you say, Hilldale, New Jersey?
 3    A.   Hillsdale.
 4    Q.   Oh, Hillsdale.  Where is that, what county?
 5    A.   It's North Jersey.  Bergen County.
 6    Q.   Okay.  Have you ever testified in court before?
 7    A.   No, sir.
 8    Q.   Okay.  Certainly, then, never had to testify for Donnelley
 9    in your adult life tenure there?
10    A.   No, sir, I have not.
11    Q.   Turning back to the period of 2018 through '20, you told
12    us on direct that Donnelley handled or had access to sensitive
13    financial information; is that correct?
14    A.   That is correct.
15    Q.   And you also told us that it was important to keep that
16    information confidential, right?
17    A.   Correct.
18    Q.   And it was so important that the employees had to sign
19    confidentiality agreements and were given primers on
20    confidentiality policies?
21    A.   Yes.
22    Q.   Did you have to sign one of those too?
23    A.   Yes.
24    Q.   And all of this is because Donnelley had fiduciary
25    responsibilities to its clients; is that right?
```

```
 1   A.   That is right.
 2   Q.   And speaking of clients, fair to say that Donnelley had
 3   around 300 employees dedicated to client service?  Not
 4   necessarily through the AD system, but 300 in total?
 5   A.   Yeah, I would say during that time, approximately.
 6   Q.   Right.  And those 300 employees were located all over the
 7   world?
 8   A.   Correct.
 9   Q.   Right.  And you told us with respect to the
10   ActiveDisclosure system -- I may lapse into it calling AD.  We
11   lawyers abbreviate things -- there were about 100 employees
12   using AD at the time?
13   A.   Approximately.
14   Q.   And they too were located all over the world?
15   A.   Correct.
16   Q.   And you told us, your word, I think, that the folks using
17   AD had "broad access" to client information; is that correct?
18   A.   They had access to client information.
19   Q.   Right.  Do you know any customer service employees located
20   in Russia?
21   A.   I do not.
22   Q.   Now, in fact, Mr. Garabo, some 1,600 Donnelley employees
23   and vendors had accounts with access to the DFIN computer
24   network back then.  Does that make sense?
25   A.   I couldn't confirm that number, no.
```

```
 1    Q.    Well, you worked there for 40 years, yeah?
 2    A.    Yes.
 3    Q.    A great many employees and vendors?  I mean, that's a
 4    subjective term.
 5    A.    Yes.  Certainly a lot of employees.
 6    Q.    Fair enough.
 7          Now, as of February 2020 -- you know what multifactor
 8    authentication is?
 9    A.    Yes, I do.
09:56 10   Q.    Okay.  That's where you use -- you know, when you get
11    something from a bank, maybe they'll send you a code that you
12    have to text in to make sure you're the account holder?
13    A.    Yes.
14    Q.    Back in 2020, DFIN -- none of the accounts for the
15    employees or the clients required multifactor authentication
16    back then to gain access; is that right?
17    A.    During that time, 2020, I would say, you know -- I believe
18    so.  The timeline, you know, would be a little bit unclear
19    exactly the time that we rolled that out.
09:57 20   Q.    Right.  You believed they didn't require multifactor
21    authentication back then; is that correct?
22    A.    Correct.
23    Q.    Right.  And you told us on direct that -- at least I think
24    you said, about the AD people, they'd access it by using a
25    simple username and password combination?
```

```
 1    A.    Yes, username and password.
 2    Q.    Right.  So there was, like, no special security code or
 3    enhanced security measures, nothing like that?
 4    A.    On ActiveDisclosure, during that time, no.
 5    Q.    And you know -- maybe you do, maybe you don't -- that back
 6    in February of 2020, Donnelley was considering at that time
 7    rolling out multifactor authentication in the future?
 8    A.    I do know at some point in time -- whether it was, you
 9    know, February of 2020 -- that we were rolling that out.
09:57 10    Q.    Fair enough.
11          The folks -- well, strike it.
12          The client service employees, they had mobile devices, to
13    your knowledge, mobile cell phones?
14    A.    Yes.
15    Q.    Okay.  And those devices were smartphones that would have
16    access to the Internet, presumably?
17    A.    Presumably, yes.
18    Q.    And some of Donnelley's client service employees, the 100,
19    300 or so, some of them were located in South Korea; is that
09:58 20    right?
21    A.    Correct.  There's an employee or two in that --
22    Q.    Yeah.  And I'm going to mess up this name, so I'm -- Han.
23    How about Han, does that work?
24    A.    Yeah, if it's the same person that was referenced earlier.
25    Q.    Yeah.  Yeah.  And do you know that one of the employees,
```

1    Han's laptop, was lost in transit with DHL from South Korea to

2    the Washington, D.C. area?

3    A.    No, I'm not aware.

4    Q.    You hadn't heard that?  All right.

5          To your knowledge, did DFIN employees use a suite of

6    online collaboration and productivity tools called G Suite?

7    A.    I'm not familiar with G Suite.

8    Q.    Fair enough.

9          And besides employees and vendors, you told us, I think,

09:59 10   that DFIN clients could participate and collaborate in

11   preparing their SEC filings through the AD platform?

12   A.    Correct.  That's how it's built.

13   Q.    Yeah.  It was built to allow clients to do all the work, I

14   think that's what you told us, more or less, on direct?

15   A.    Correct.

16   Q.    And about how many clients, if you know, did DFIN have

17   back in 2018 through '20?

18   A.    Yeah, I wouldn't know specific numbers on the service

19   side, you know, I'd be guessing.

09:59 20   Q.    Well, you knew that clients were located worldwide, right?

21   A.    Correct.

22   Q.    A great many clients?

23   A.    It's hard to specifically say what that means, but back in

24   '18, it was early in the software, so I wouldn't have a

25   specific number.

1    Q.   More than 100, would you say?

2    A.   I would say approximately, yes.

3    Q.   More than 500?

4    A.   During that time, I don't know if we had 500 clients on.

5    Q.   Okay.  Each client, they weren't limited to just one

6    account on the AD system, were they?

7    A.   Each account -- each client?

8    Q.   Some clients had more than one account?

9    A.   Correct.

10:00 10   Q.   At some point were there -- have you heard within the

11   company that there were 6,000 client accounts total back then?

12   A.   No, that wouldn't be information that would come to me.

13   Q.   Okay.  And do you know if suspicious activity was

14   identified on different IP addresses in DFIN's system between

15   2018 and 2020?  Do you know anything about that?

16   A.   No, sir.

17   Q.   Okay.  Do you know if in 2018 through 2020, DFIN was

18   working on increased cyber hygiene as part of a previous

19   corporate strategy?  Did you know that?

10:01 20   A.   In general, it's been a focus for us as a company and all

21   companies.

22   Q.   Well, you don't know about all companies personally --

23   A.   Correct.

24   Q.   -- that's just your supposition, yeah?

25   A.   Correct.

1             MR. KOSTO:  Objection.

2             MR. FERNICH:  Okay.  Nothing further.  Thank you very

3      much.

4             THE WITNESS:  All right.  Thank you.

5             THE COURT:  Anything else?

6                         REDIRECT EXAMINATION

7      BY MR. KOSTO:

8      Q.   Mr. Garabo, when the clients were doing the work with the

9      software on their own, where was the information stored?

10:01 10     A.   In our software.

11     Q.   And the term "earnings filings," does that mean anything

12     to you?

13     A.   Sure.  Yes.

14     Q.   What are earnings filings?

15     A.   Companies will --

16            MR. FERNICH:  Objection, beyond the scope.

17            THE COURT:  Overruled.

18            Do you know?

19            THE WITNESS:  Earning filings are, you know, exactly

10:02 20    what they are.  They're reported earnings that the company has

21     closed on.

22     Q.   How do they relate to Forms 10-K and 10-Q?

23            MR. FERNICH:  Objection, beyond the scope.

24            THE COURT:  Overruled.

25     A.   Those financials are in the 10-K and the quarterly

```
 1    reports.
 2             MR. KOSTO:  Nothing further, Your Honor.
 3             THE COURT:  Anything else?
 4             MR. FERNICH:  No, ma'am.
 5             THE COURT:  Thank you.  Thank you for coming.
 6             Next witness.
 7             MR. KOSTO:  The United States calls Hyeyoung Han.
 8             Your Honor, she was in the café.  She's coming right
 9    upstairs.
10:03 10         THE COURT:  So why don't we stand and stretch, then.
11             Good morning.
12             THE CLERK:  Could you raise your right hand.
13                        **HYEYOUNG HAN, sworn**
14             THE CLERK:  You can be seated.  Could you please state
15    and just spell your last name.
16             THE WITNESS:  Han, H-a-n.
17             THE CLERK:  Thank you.
18                         DIRECT EXAMINATION
19    BY MR. KOSTO:
10:05 20  Q.   What is your first name, Ms. Han?  And go ahead and spell
21    it too.
22    A.   Hyeyoung, H-y-e-y-o-u-n-g.
23    Q.   Good morning.
24    A.   Good morning.
25             MR. KOSTO:  May I proceed, Your Honor?
```

```
 1            THE COURT:  Yes.
 2   Q.    What city do you work in, Ms. Han?
 3   A.    Now, I'm working in Ulsan, South Korea.
 4   Q.    And what company do you work for?
 5   A.    DFIN Solutions.
 6   Q.    What is DFIN?
 7   A.    Like, you mean my company?
 8   Q.    Yes.  What does DFIN do?
 9   A.    Yes.  We are helping the public companies filing their
10   financial statements to SEC.
11   Q.    And how often does that take place?
12   A.    There are quarterly filings and annual filings.  So every
13   three months we have filings.
14   Q.    Are there filings that take place during other times of
15   the year as well?
16   A.    Yes.  There are 8-Ks, like -- when they have some kind of,
17   like, event to report to the public, they have 8-Ks.
18   Q.    Can that include earnings and financial information?
19   A.    No, it only have a cover page and the event.
20   Q.    Okay.  Have you always worked in -- how long have you been
21   with DFIN?
22   A.    I've been working in DFIN 13 years.
23   Q.    Have you always worked in Korea for DFIN?
24   A.    No.  I worked in the Rockville, Maryland until 2013, and I
25   moved back to Korea in 2013.
```

```
 1    Q.   Can you tell the jury what ActiveDisclosure is?

 2    A.   ActiveDisclosure is our -- so our company's software

 3    helping clients to -- like, public companies to file their

 4    financial statements in electronic form.

 5    Q.   And what role do you have at DFIN for ActiveDisclosure?

 6    A.   I was like -- I was a data analyst.  We are helping

 7    clients, like, preparing the electronic filing form.  We are --

 8    it's called tagging or mapping.  So the SEC provided accounting

 9    concepts of taxonomy and we are --
```
10:07 10          THE COURT:  I'm having a little trouble following you,
```
11    so just slow down a little bit.  What did you do as a data

12    analyst?

13          THE WITNESS:  Okay.  So as a data analyst, we are

14    helping clients preparing their electronic form of filings.

15    Q.   I'm sorry to interrupt.  Were you part of the content of

16    the filings or the technical aspects of the filings?

17    A.   Contents.  I have an accounting major, and I am a, like,

18    licensed CPA.  So I'm -- I tag -- like, I find like concepts --

19          THE COURT:  You're a tech?
```
10:08 20          THE WITNESS:  No, it's not tech.  Tag.
```
21          THE COURT:  A tag?

22          THE WITNESS:  Yes.

23          THE COURT:  All right.

24    Q.   You apply electronic tags, t-a-g --

25    A.   Yes.
```

```
 1   Q.    -- to documents?

 2   A.    Yes.

 3   Q.    And do you work with a system called -- or a language

 4   called XBRL?

 5   A.    Yes.

 6   Q.    Is that part of your job to convert documents into XBRL

 7   format?

 8   A.    Yes.  So --

 9   Q.    And that's --

10   A.    Yeah.

11   Q.    Go ahead.

12   A.    The SEC provides accounting tags in taxonomy, and we

13   find --

14            THE COURT:  What's taxonomy?

15            THE WITNESS:  It's made of all the tags SEC created.

16   So we find, like, a tag for each number.  So we find the --

17   like, so tag represents the number.

18            MR. KOSTO:  So if -- if I could help, Your Honor.

19   Q.    If there is an earnings portion of the reports, does that

20   have a tag?

21   A.    Yes.  So, like, every numbers in the financial statements

22   can be tagged, like revenue, expense, income tax, or like that.

23   Q.    And does each one of those components of the report have a

24   different tag?

25   A.    Yes.
```

Q.   And your job is to find the right tag and apply it to the
right part of the report?

A.   Yes.

Q.   And when you say "taxonomy," is that a menu of tags that
you can choose from?

A.   Yes.

Q.   Okay.  What's the time difference between here in Boston
and Ulsan, South Korea where you work?

A.   Usually -- during the Daylight Savings Time, it's 13 hours
difference.  Without it, it's 14 hours difference.

Q.   Do you typically travel for work?

A.   No.

Q.   When was the last time before this week that you were in
the United States?

A.   2016.

Q.   Directing your attention to the period 2018, 2019, and
prior to COVID in 2020, March 2020, where did you typically
work?

A.   I stayed at home most of the time.  Like, I need two
monitors for my work, so I always work from home.

Q.   Would you go to an Internet café or a Starbucks to do your
work with ActiveDisclosure?

A.   No.

Q.   Why not?

A.   As I said earlier, I need two monitors to compare and

1   stuff.  So it's really hard to work with just a laptop.

2   Q.   Can you tell the jury -- let me ask you this:  Did your

3   work hours stay the same all the way through the year?

4   A.   No.  Like, we -- because the filings happens end of

5   quarter and we have a peak time and non-peak time.

6   Q.   Are peak times right after the end of the -- in the

7   lead-up to the filing deadline?

8   A.   Yes.  After -- like, when the quarter ends, like,

9   companies have to file in -- file their statements in 45 days.

10:11 10  So...

11  Q.   And so during peak times, what was your work shift?

12  A.   During peak time, I worked 11:00 a.m. to 7:00 a.m. Eastern

13  Time.

14  Q.   And what time was that, depending on the time of the year,

15  approximately, in Korea?

16  A.   That means, like, 12:00 p.m. to 8:00 p.m. in Korea.

17  Q.   And how about non-peak times?

18  A.   Non-peak, I work, like, my morning shift.  So it is, like,

19  7:00 p.m. to, like, 3:00 a.m. Eastern Time.

10:12 20  Q.   And local time for you, when it's non-peak?

21  A.   It's 8:00 p.m. to -- 8:00 a.m. to 4:00 p.m.

22  Q.   When you're not working on your shift, those eight -hour

23  periods that you're describing, did you ever log into

24  ActiveDisclosure to look at documents?

25  A.   No.

1    Q.   Who handles the work when you're not working?

2    A.   My teams, like, we work -- because I'm outside of U.S., I

3    was working -- like, my morning shift becomes night shift here,

4    so I cover the night shift.  And there are other two shifts in

5    morning and, like, evening times that they did the job.

6    Q.   How frequently do you download press releases as part of

7    your work in XBRL?

8    A.   No, we don't download press release.

9    Q.   Is there coding to do in press releases?

10:12 10  A.   No.

11   Q.   Is there coding to do in exhibits?

12   A.   No.

13   Q.   Do you work directly with clients?

14   A.   No.

15   Q.   When you logged into ActiveDisclosure back then, how did

16   you get access?

17   A.   When a client assigns, like, a task, we get an automatic

18   email and it has a link in it, so I just click and the site

19   pops up.

10:13 20  Q.   Do you need a username and password in addition to the

21   link?

22   A.   Yes.

23   Q.   When you log in from home, do you use the company's VPN?

24   A.   Yes.

25   Q.   Do you ever use private VPNs to log into ActiveDisclosure?

1    A.    No.

2    Q.    Have you ever heard of AirVPN?

3    A.    No.

4    Q.    Do you use AirVPN to log into ActiveDisclosure?

5    A.    No.

6    Q.    Have you ever used a company called Quintex Alliance

7    Consulting to log into ActiveDisclosure?

8    A.    No.

9    Q.    What's the username that you use to log into

10:13 10   ActiveDisclosure?  Don't tell us your password, but just the

11   username.

12   A.    It's my employee ID, so it's rr146363.

13   Q.    How often -- do you have access with your username and

14   password to all of the DFIN clients in ActiveDisclosure?

15   A.    Yes.

16   Q.    And you mentioned -- or you testified that you didn't

17   download press releases.  When did you download documents as

18   part of your job?

19   A.    So we get multiple, like, threads of documents, and we

10:14 20   need to compare with the current version and the previous

21   version, so only for comparison we download the documents.

22   Q.    What kind of documents did you download to compare?

23   A.    I think it's, like -- it's called 10-K or 10-Q, like,

24   there's only one type of document on the, like, main page of

25   the activity's quarter.  So I download it there.

1    Q.    And would you only do those tasks if you got an email with

2    a link --

3    A.    Yes.

4    Q.    -- for a particular client?

5    A.    Yes.

6    Q.    Did you make a habit of logging into clients when you

7    didn't have an email assigning you something?

8    A.    No.

9    Q.    Did you ever log into ActiveDisclosure and look at one

10:15 10    client after another after another after another over the

11    course of an hour?

12    A.    No.

13    Q.    Are you familiar with DFIN's policies and practices

14    regarding confidentiality?

15    A.    Yes.

16    Q.    What are they?

17    A.    Since we are seeing, like, companies' information before

18    they release to the public, so we are not allowed to share it

19    or disclose to anybody else.

10:15 20    Q.    Are you allowed to make investing decisions based on that

21    information?

22    A.    No, we are not allowed.

23    Q.    Why not?

24    A.    It's, like, kind of inside information.

25    Q.    Do you know an employee at DFIN named Julie Soma?

1    A.    I heard about her name, but not really, not in person.

2    Q.    Have you ever worked in the same place?

3    A.    No.

4    Q.    Have you ever shared a computer with her?

5    A.    No.

6    Q.    Have you, to your knowledge, ever shared an IP address

7    with her?

8    A.    No.

9              MR. KOSTO:  No further questions.

10                        CROSS-EXAMINATION

11   BY MR. FERNICH:

12   Q.    Good morning, Ms. Han.

13   A.    Good morning.

14   Q.    I'm Marc.  I'm one of the defense lawyers in this case.

15   We don't know each other, do we?

16   A.    No.

17   Q.    We haven't met or spoken, correct?

18   A.    No.

19   Q.    You have spoken with the government lawyers in this case;

20   is that right?

21   A.    Yes.

22   Q.    And you spoke with them on January 13th, a couple weeks

23   ago?  Does that sound right?

24   A.    I've talked to them, but I don't remember the date.

25   Q.    Okay.  Have you spoken to them in the last week?

```
 1   A.    I'm not sure about the date.

 2   Q.    Okay.  Well, do you think you spoke to them after New

 3   Year's?

 4   A.    Yes.

 5   Q.    Okay.  And when you spoke to them, the lawyers asked you

 6   some questions, the government lawyers, yes?

 7   A.    Yes.

 8   Q.    And you gave them some answers?

 9   A.    Yes.

10   Q.    And the purpose of that exchange was to prepare for your

11   testimony here today?

12   A.    Yes.

13   Q.    And you told us, ma'am, that you've been working for DFIN

14   for about 13 years; is that correct?

15   A.    Yes.

16   Q.    And, of course, you are still working there now, right?

17   A.    Yes.

18   Q.    Let me follow Mr. Kosto's lead and direct your attention

19   back to around 2018 through '20.  Okay?

20   A.    Okay.

21   Q.    You and DFIN were handling private client financial

22   information back then?

23   A.    Yes.

24   Q.    And as you told us, the information was considered

25   confidential, correct?
```

Line timestamps: 10:17 at line 10; 10:18 at line 20.

```
 1    A.   Yes.
 2    Q.   And there was a policy against disclosing that information
 3    to outsiders, right?
 4    A.   Yes.
 5    Q.   And do I have this right, you work remotely, not in a
 6    physical office?
 7    A.   During 2018 to '20, like, yes.
 8    Q.   Sure.  Sure.  In fact, you were actually working from home
 9    during that time?
10    A.   Yes.
11    Q.   Do you live alone, or do you live with anybody else?
12    A.   I have -- like, I'm living with my husband and kids.
13    Q.   Okay.  So there's how many other people in the house?
14    A.   Three.
15    Q.   Okay.  And you told us that through the ActiveDisclosure
16    network, you had, at least potentially, access to all clients
17    in the network; is that correct?
18    A.   Yes.
19    Q.   And all you had to do to access the ActiveDisclosure
20    system back then was follow a link that you were given, yes?
21    A.   Yes.
22    Q.   And enter a password and a user ID; is that about right?
23    A.   Yes.
24    Q.   Okay.  And nothing else you had to do, no special security
25    code to enter?
```

10:18 (line 10)
10:19 (line 20)

1    A.    Back then, yes, only ID and password.

2    Q.    Okay.  And back then -- I'm still talking about 2018

3    through '20 -- now and then, every once in a while, you even

4    used WiFi to access the system occasionally?

5    A.    I used, like, home WiFi, but it's secured, and I always

6    turn on my VPN.

7    Q.    Okay.  Did you ever use any WiFi networks outside the

8    home?

9    A.    No.

10:20 10   Q.    Okay.  Fair enough.

11          At one point, you recall -- well, strike that.

12          Do you have any mobile devices like a cell phone, a

13   smartphone?

14   A.    Yes.

15   Q.    And the smartphone, naturally, has Internet access,

16   correct?

17   A.    Yes.

18   Q.    And at one point, DHL -- do you know DHL is a -- well,

19   what's DHL, do you know?

10:20 20   A.    No.

21   Q.    Do you know that DHL is a --

22   A.    The delivery system?

23   Q.    Yeah.

24   A.    Yeah.

25   Q.    It's a large international shipping company; is that

```
 1   right?
 2   A.   Yes.
 3   Q.   And at one point, DHL lost a laptop of yours in transit
 4   from South Korea to around the Washington, D.C. area?
 5   A.   I don't remember.
 6   Q.   You don't recall -- go ahead.  I'm sorry.
 7   A.   When was it?
 8   Q.   Well, I'm sort of trying to ask you that.
 9        Do you recall that happening?
10   A.   No.
11   Q.   You don't recall having lost a laptop, or not you having
12   lost a laptop, but it being lost in transit?
13            MR. KOSTO:  Objection, Your Honor.
14            THE COURT:  Overruled.
15            Do you remember sending your laptop back to the United
16   States?
17            THE WITNESS:  I don't remember.
18   Q.   Okay.  Fair enough.  We won't go any further with that.
19        As part of your job, when you were on assignment, you'd
20   open documents to help out with coding.  Do I have that right?
21   A.   Yes.
22   Q.   And sometimes you would download those documents?
23   A.   Yes.
24   Q.   And you also worked on financial statements; is that
25   correct?
```

```
 1   A.   Yes.
 2   Q.   And as part of that process, you would compare current
 3   versus draft versions; am I right?
 4   A.   Yes.
 5   Q.   And to do that, you sometimes downloaded something called
 6   a master file or master files?
 7   A.   Yes, master clean files.
 8   Q.   Master?
 9   A.   Clean.
10   Q.   Clean?
11   A.   So our ActiveDisclosure is based on the Word documents, so
12   it has tagging in it.  So for the compare purpose, we need a
13   clean file.
14   Q.   Yeah.  And just when you mentioned taxonomy on direct, we
15   weren't talking about birds and stuffing animals, stuff like
16   that?  Do you know what taxonomy is?
17   A.   Me?
18   Q.   Yeah.
19   A.   Yes.
20   Q.   There's another use for the word "taxonomy."
21   A.   Oh, okay.  I didn't know that.
22        MR. FRANK:  I believe that's "taxidermy."
23   Q.   Sometimes drafts -- these drafts that you downloaded or
24   looked at, sometimes the drafts would change before final
25   versions were filed with the SEC?
```

1    A.   Like, in the initial period, like, they change a lot, but

2    at the end, it's almost settled, only a few changes.

3    Q.   But prior to filing, they could change a lot in a short

4    period of time?

5    A.   Yes.

6    Q.   And the information in those documents, in other words,

7    might change some before it was released to the SEC; is that

8    correct?

9    A.   Yes.

10:23 10   Q.   Now, Ms. Han, as you sit here today, you personally have

11   no idea who, if anyone, might have used your log-in credentials

12   without permission to access DFIN's computer system; is that

13   right?

14   A.   No.

15         MR. FERNICH:  Okay.  Nothing further.  Thank you.

16         THE COURT:  Anything?

17         MR. KOSTO:  Just one question, Your Honor.

18         THE COURT:  Stay right there.

19                    REDIRECT EXAMINATION

10:23 20   BY MR. KOSTO:

21   Q.   Ms. Han, did you ever download Exhibits 99.1, 99.2, or

22   99.3 for XBRL coding as part of your job?

23   A.   No.

24         MR. KOSTO:  No further questions, Your Honor.

25         THE COURT:  Thank you.  Have a nice trip back.

```
 1              Next witness.
 2              MR. FRANK:  Thank you, Your Honor.  The government
 3     calls Julie Soma.
 4              THE CLERK:  You can take the stand and just remain
 5     standing and raise your right hand.
 6                        JULIE SOMA, sworn
 7              THE CLERK:  You can be seated.  And please state and
 8     spell your last name.
 9              THE WITNESS:  Hi, I'm Julie Soma.  J-u-l-i-e S-o-m-a.
10:25 10        THE CLERK:  Thank you.
11              MR. FRANK:  I've never said this before, Ms. Soma, but
12     that might be a little too loud.  If you could just move the
13     mic just a little further away.
14              THE WITNESS:  Test, test.
15              MR. FRANK:  Perfect.
16              THE WITNESS:  Okay.  Thank you.
17              MR. FRANK:  Thank you so much.
18                        DIRECT EXAMINATION
19     BY MR. FRANK:
10:25 20   Q.   Welcome.  Where do you live, Ms. Soma?
21     A.   Seattle, Washington.
22     Q.   And are you currently employed?
23     A.   Yes.
24     Q.   Where do you work?
25     A.   At Donnelley Financial Solutions.
```

1    Q.    Is that sometimes referred to as DFIN?

2    A.    Yes.  It's a mouthful, so DFIN.

3    Q.    And in a sentence, what does DFIN do?

4    A.    We are a document management and printer to companies that

5    are public or private.  So we manage their documents.

6    Q.    How long have you worked there?

7    A.    Coming up on 27 years this spring.

8    Q.    And could you tell us, how far did you go in school?

9    A.    Undergraduate college.

10:26 10   Q.    And what did you study?

11   A.    Political science and speech communications, liberal arts.

12   Q.    What's your title at DFIN?

13   A.    My title is implementation program manager or architect.

14   Q.    Again, in a sentence or two, what does that involve?

15   A.    Well, it involves onboarding clients to our different

16   platforms, also working on process documentation.  I do a lot

17   of PowerPoint and Visio Maps and testing of our products.

18   Q.    Do you, from time to time, work with ActiveDisclosure?

19   A.    Yes, I do.

10:26 20   Q.    What do you do with respect to ActiveDisclosure?

21   A.    Implementation architect, historically, for

22   ActiveDisclosure, onboarding and training clients to use it,

23   helping them troubleshoot their documents from a style and how

24   they can use the product to best gain efficiencies with their

25   process.  Also helping my colleagues help their clients.  So a

1    lot of internal troubleshooting, research, or diagnostics, I

2    would say.

3    Q.   I want to direct your attention to the time period 2018 to

4    2020.

5    A.   Yes.

6    Q.   Do you have that time period in mind?

7    A.   Yes, we can.

8    Q.   Where were you working between 2018 and 2020?

9    A.   I was working remotely from home, starting in January of

10:27 10    2018.  In October of 2018, I moved to southeastern Washington,

11    to a little town called Richland, Washington.  So I was

12    primarily working from home during those two timelines.

13    Q.   And did you, from time to time, do any work travel?

14    A.   Yes, I did.  I did -- my most prominent reason for

15    business travel was to travel to our Phoenix, Arizona office

16    for sometimes a week to two weeks at a time for training.

17    Other times, not on business trips, I would frequently go stay

18    with my parents and --

19    Q.   And that was also in the Phoenix area?

10:28 20    A.   It was, later in 2019.  My parents were originally in Lake

21    Chelan, Washington, and then my mom relocated there at the end

22    of August 2019 for her retirement, part two.

23    Q.   I want to ask you a few questions about your work habits.

24    A.   Okay.

25    Q.   You mentioned that you worked from home.  Did you

1    typically work from home or in the office?

2    A.   I typically worked from home, when I was working from

3    home.

4    Q.   And other than that, you would be in the office?

5    A.   Correct.  And it would be infrequent for me to go to the

6    office.  It was once or twice a year, maybe.

7    Q.   And when you were working from home, what hours did you

8    typically work?

9    A.   Typically, since I'm West Coast -- Seattle's three hours

10:29 10   behind East Coast -- typically, I'd work -- definitely between

11   7:00 and 2:30 and 3:00, and then there's other days where I

12   may, you know, start a little earlier or a little later, just

13   depending on projects and the needs of the day or the week.

14   Q.   Did you ever work overnights?

15   A.   No.

16   Q.   What are you typically doing between the hours of about

17   midnight and 7:00 a.m., when you start work?

18   A.   Well, beauty rest, hopefully, but sometimes Netflix binge

19   watching.

10:29 20   Q.   I won't ask you which programs.

21        When you log into DFIN's computer network from home, how

22   do you do it?

23   A.   Well, it requires Internet access, so I always need my

24   WiFi.  So I have my Internet, and then Donnelley provisions a

25   proprietary VPN, which is a private network or connection to

1  Donnelley's stuff.

2  Q.   Do you use any -- again, during this time period of 2018

3  to 2020, did you use any sort of credentials to log in?

4  A.   Yes.  My company provides me with my login.  So I have to

5  use that to get in.

6  Q.   So -- so you would use a username and a password?

7  A.   That is correct.

8  Q.   Okay.  And again, during that 2018 to 2020 time period,

9  did you typically log in from places like cafés or libraries?

10:30  10  A.   No, not very -- no, never a library.  Very rarely, a café.

11  When traveling on business, spot-check email, but I would be on

12  my phone usually.

13  Q.   So you wouldn't be logging into the ActiveDisclosure

14  database from a café?

15  A.   No.

16  Q.   Do you ever use, when you logged in, a third-party VPN to

17  log in?  Not the Donnelley VPN, but a third-party VPN?

18  A.   No.

19  Q.   Have you ever heard of a company called AirVPN?

10:31  20  A.   No.

21  Q.   Did you ever use AirVPN?

22  A.   No.

23  Q.   When you were working from your mother's home after she --

24  her second phase of her retirement, in the Phoenix area, how

25  did you log in?

```
 1   A.   Using WiFi and then my Donnelley credentials.

 2   Q.   So similarly, you'd use the Donnelley VPN?

 3   A.   Correct.

 4   Q.   Not a third-party VPN?

 5   A.   Correct.

 6   Q.   You mentioned using your username and password.  I'm not

 7   going to ask you for your password, but I am going to ask you

 8   if you could tell us what your username was on the system?

 9   A.   rr, and then my employee number, 52260.

10   Q.   rr52260?

11   A.   Yes.

12   Q.   During this time period, 2018 to 2020, were you

13   responsible for specific clients?

14   A.   Early in the 2018 -- I kind of phased out my clients, up

15   to, like, two total, but at the first part of 2018, yes.

16   Q.   How many at that time?

17   A.   Probably up to six.

18   Q.   Do you recall which ones they were?

19   A.   Well, a private company that nobody would know the name

20   of, Weyerhaeuser, Picar, a paper company in Spokane, Clearwater

21   and Potlatch.

22   Q.   Okay.  As part of your job, would you have broad access to

23   the ActiveDisclosure platform?

24   A.   Broad access?

25   Q.   Did you have general access to ActiveDisclosure?
```

10:31 (line 10)
10:32 (line 20)

```
 1    A.    Yes.
 2    Q.    What types of documents would you typically access in
 3    ActiveDisclosure?
 4    A.    Well, it depends on what clients needed or, internally,
 5    what the matter was.  The document could be any type.  The
 6    predominant documents on our system are proxy statements,
 7    annual reports, collaboration documents, and Form 8-Ks.
 8    Q.    You mentioned annual reports.  Are you referring to
 9    Form 10-Ks?
10    A.    Yes.  There's 10-Ks, 20-Fs and 40-Fs.
11    Q.    Okay.  And you mentioned 8-Ks?
12    A.    Correct.
13    Q.    Are you familiar with an attachment to 8-Ks called a 99 or
14    a 99.1 or a 99.2?
15    A.    Yes.  Those are SEC provision naming conventions for what
16    are called exhibits that go with an 8-K document.
17    Q.    And what are those -- what do those particular exhibits
18    deal with?
19    A.    Typically Exhibit 99.1 or 2 is a press release that
20    contains a narrative written description from the company of an
21    announcement of the company.  And within that, there could also
22    be tabular disclosures.  So companies will typically do what's
23    called an 8-K earnings release once a quarter to announce and
24    notify the public of their quarterly earnings, how they did,
25    how they performed.
```

```
 1    Q.    So they'd file a quarterly earnings press release with an
 2    8-K and an Exhibit 99?
 3    A.    Correct.
 4    Q.    And then they would also file a 10-Q?
 5    A.    That is correct.
 6    Q.    And you would, from time to time, access those types of
 7    documents?
 8    A.    That is correct.
 9    Q.    For what reasons might you do that?
10:34 10    A.    If a company needed help with the style of their document
11    or how to manage it, you know, with a technical system there
12    could be some nuances, and users sometimes need help
13    troubleshooting so they can make their edits.  Sometimes they
14    would need help running compares.  Or if they had a particular
15    question about a version of the document, you would have to go
16    in and look at the version and it would -- a lot of it was
17    diagnostics too.
18    Q.    How often would you download documents like an 8-K or a
19    10-Q?
10:34 20    A.    Infrequently.  It would be on a demand basis based on
21    circumstances, if a client needed help or, internally, if
22    somebody needed a compare, or if the document -- we couldn't
23    physically technically finish their document on that platform.
24    It would be kind of rare.  But if we had to transition it over
25    to another platform, it would have to leave the system to go
```

1    there.

2    Q.    But that was infrequent?

3    A.    It was infrequent, yes.

4    Q.    How often, if at all, would you go from document to

5    document or client to client to download documents?

6    A.    Never.  Infrequently, if anything.  Never.

7    Q.    Would you ever go from client to client and alphabetically

8    access those types of documents?

9    A.    No.

10:35 10   Q.    And again, what kinds of information is in those documents

11   that we just discussed?

12   A.    Well, the different -- there's the annual reports.  Those

13   taken annual year-to-date performance for the prior fiscal

14   year, and then the quarterly reports or the 8-K earnings would

15   contain a financial snapshot of that three-month duration and

16   would give information about how the company fared, if they

17   exceeded or did not exceed the expectations.  So if they did

18   well or didn't do very well.

19   Q.    What is your understanding about whether that type of

10:36 20   information is publicly available at the time that it's in the

21   DFIN system?

22   A.    It is not publicly available.  It's private until the

23   company does two things:  They file a news wire with the

24   communication agencies, like the news wires, and they file it

25   via the SEC system.  So it becomes public at those two events.

1    Q.   And what's the name of that SEC system where it's filed?

2    A.   It is called EDGAR, and it stands for electronic data

3    gathering and retrieval, analysis, EDGAR.

4    Q.   And that's an online filing system?

5    A.   It is an online system.  Companies will file the documents

6    electronically with the SEC on the EDGAR system, and it's all

7    privately disseminated.  And then the SEC will take the data

8    and publish it on their website.

9    Q.   Are you familiar with DFIN's policies and practices with

10:37 10   respect to that kind of information when it's in the DFIN

11   system?

12   A.   It is confidential and sacred.

13   Q.   And just backing up for one moment.  The EDGAR system, to

14   your knowledge, does it track the date and time of the filing?

15   A.   Yes, it does, because when it files, there's a date and

16   time stamp associated with when the SEC receives it.  And then

17   there's a public dissemination date and time stamp as well,

18   because sometimes something can get filed and it gets published

19   the next morning at 6:00 a.m. Eastern.

10:37 20   Q.   And you mentioned that when the information is within the

21   DFIN system -- I believe the words you used were "confidential

22   and sacred"?

23   A.   Yes.

24   Q.   What's your understanding of why it's confidential and

25   sacred?

1    A.   Because it's not supposed to be public until the company

2    intends to finalize the document and make it go public.

3    Q.   Under DFIN's policies, are you permitted to use that

4    information to make trading decisions?

5    A.   No.

6    Q.   What's your understanding of why not?

7    A.   Because it could influence your decision to purchase or

8    sell stocks or things that you own.

9    Q.   Why is that?

10:38 10   A.   Because how a company has fared the prior quarter, if they

11   did well, then if you previously owned the stock, you could

12   make money.  And then if you had earnings that were not per the

13   expectations and didn't meet performance that were set by the

14   management team, then you wouldn't want to own that stock

15   because you could lose money.

16         MR. FRANK:  Thank you, Ms. Soma.  No further

17   questions.

18         THE WITNESS:  Okay.

19                          CROSS-EXAMINATION

10:39 20   BY MR. NEMTSEV:

21   Q.   Good morning, Ms. Soma.  My name is Max Nemtsev.  I'm an

22   attorney for Mr. Klyushin.

23   A.   Good morning.

24   Q.   Good morning.  We've never met before or spoken, correct?

25   A.   No.

```
 1   Q.   And you've spoken to Mr. Kosto, Mr. Frank, and other
 2   government agents prior to this?
 3   A.   Yes.  I met them.
 4   Q.   When was the last time that you met them?
 5   A.   On Monday.
 6   Q.   And before that, you met them on January 12th as well; is
 7   that correct?
 8   A.   January -- no.
 9   Q.   Did you speak to them over the phone?
10   A.   On the phone.  It might have been that date, but yes, one
11   other time this month.
12   Q.   And that meeting, the one on Monday and the prior phone
13   call on January 12th, that was in order to discuss your
14   testimony today, correct?
15   A.   Yes.
16   Q.   They gave you questions, you gave them answers to prepare
17   you for today's testimony, correct?
18   A.   Yes.
19   Q.   You and I, we've never rehearsed or scripted or prepared,
20   correct?
21   A.   No.
22           MR. FRANK:  Objection to "rehearsed" or "scripted,"
23   Your Honor.
24           THE COURT:  Overruled.
25   Q.   You and I have never rehearsed, scripted, or prepared,
```

1   correct?

2   A.    No.

3   Q.    Thank you.

4        And you've been with DFIN, or Donnelley Financial

5   Solutions, for 27 years, correct?

6   A.    Yes.

7   Q.    Through every single version of ActiveDisclosure that

8   there was, essentially, correct?

9   A.    Yes.

10:40 10   Q.    And from 2018 to 2020, you primarily worked from home; is

11   that right?

12   A.    Yes.

13   Q.    And at one point, I think you mentioned that you worked in

14   Phoenix, Arizona?

15   A.    Yes.

16   Q.    Did you ever meet a Mr. Jason Lewis while you worked

17   there?

18   A.    The name sounds familiar, but...

19   Q.    How many employees are there in Phoenix, Arizona, to your

10:41 20   knowledge?

21   A.    In Phoenix, I couldn't venture to guess, but no more than

22   100 to 200 in the Phoenix area, potentially.

23   Q.    And how many employees are there at DFIN in general?

24   A.    I couldn't say for sure, because we spun off from another

25   company a few years ago, like five years ago.  I don't know how

1    many total employees there are.

2    Q.    Fair enough to say it's above a thousand employees?

3    A.    Potentially, but I can't say for sure.

4    Q.    Public companies hire DFIN and use their ActiveDisclosure

5    system in order to file documents on this system called EDGAR,

6    correct?

7    A.    That is correct.

8    Q.    And I think you said that these documents are sacred, but

9    you don't mean in the sense that they're gospel or anything --

10:42 10    A.    No, no, I didn't mean that.  I just meant they're private

11    and the only people that should have access are the company --

12    is the company and who is supporting them.

13    Q.    And the reason why they should remain private is because,

14    like you explained yourself, if you, for example, see an

15    estimate of earnings and you have this document in your hand

16    and the results are better, the price of the stock would likely

17    go up; if they're worse, the price of the stock would likely go

18    down, correct?

19    A.    That is correct.

10:42 20    Q.    It wouldn't be a difficult analysis to perform, if you

21    have the estimate --

22              MR. FRANK:  Objection as to how difficult it would be.

23              THE COURT:  Well, do you know?

24              THE WITNESS:  Pardon?

25    Q.    It wouldn't be very difficult for you, let's say, to look

1    at an estimate and see if the results are better than the

2    estimate or worse than the estimate, and somehow confidentially

3    predict whether the price would go up or go down, correct?

4    A.    No.  I would disagree, because the content is very

5    accounting-like, and I'm not an accountant.  I'm more

6    interested in the style of the document and the page breaks

7    than I am the content, to be quite frank.

8    Q.    So you focused your assistance to DFIN's clients with

9    formatting, coding; is that correct?

10:43 10    A.    Well, it's a lot of different things.  It's the style of

11    their document, how they upload it to the system to meet the

12    SEC's criteria.  There's some technical specifications that go

13    along with that.  A lot of questions about, like, do they have

14    to file?  What time do they have to file?  What are their

15    deadlines to file?  How do they use the system?

16    Q.    And it requires you to have access to every single DFIN

17    company, or DFIN contractor company, correct?

18    A.    When you have access, you have access to whatever clients

19    are on there.

10:43 20    Q.    And how many clients does DFIN's ActiveDisclosure system

21    serve?

22    A.    I couldn't say for sure, but I think at one time it was

23    near a thousand.

24    Q.    Near a thousand.

25          And all of those, to your knowledge, were publicly traded

1    companies?

2    A.    No, a lot of them weren't public.  We have a lot of

3    private entities that use our software for their document

4    management.  They never have to file via EDGAR.

5    Q.    So they just hold documents with DFIN, but they don't

6    necessarily file them with any public authorities; is that

7    right?

8    A.    That's correct.

9    Q.    And while you were working and assisting DFIN's clients,

10:44 10    were there times when the versions and the content within these

11    documents would change from draft to final?

12    A.    There's always -- until it actually files with the SEC,

13    it's never considered final.  As to the extent of how many

14    rounds of changes a company would make, it would depend on the

15    lifespan that their document was on the system.  Because

16    sometimes a company would have something, and they would draft

17    it for four months, potentially.

18    Q.    So potentially, a lot of changes with these documents from

19    the first time that they're uploaded to the time that they

10:45 20    ultimately get filed with EDGAR?

21    A.    You know, usually with the roll forward, that's where most

22    of the changes go.  Once the company has dropped in numbers, I

23    wouldn't say there's significant changes.  They're usually just

24    wordsmithing at that point or dropping in signatures, conformed

25    signatures.  And if they don't know the date they want to file

1    with the SEC, they'll drop in the date.  And sometimes if

2    they're printing a document, they'll make more style changes

3    than content.

4    Q.    Thank you.

5          Taking you back to 2018-2020, what did you need to do in

6    order to access your DFIN account?

7    A.    You need to go online.  You need to have Internet access,

8    and then put in your credentials and your password.

9    Q.    And that Internet access could come from anywhere?  Could

10:46 10   it be from a hotel, a WiFi hotspot, whatever it is, correct?

11   A.    That's true.  Internet -- as long as you have Internet

12   access.  I primarily worked from home or the office.

13   Q.    And sometimes you worked from your mother's house or

14   sometimes you worked from a hotel, correct?

15   A.    More infrequently, but yes.

16   Q.    There was no requirement for multifactor authentication or

17   any additional security measures, correct?

18   A.    We have MFA.  As far as to what date and time Donnelley

19   implemented that years ago, I cannot recall.

10:46 20   Q.    Did you need to use a DFIN laptop in order to log in?

21   A.    No, not to ActiveDisclosure.

22   Q.    Did DFIN provide you with a laptop?

23   A.    Yes.

24   Q.    Am I correct that it's a Dell laptop?

25   A.    That's correct.

```
 1   Q.   A Windows PC?

 2   A.   Yes.

 3   Q.   And you typically use a Chrome browser to log in?

 4   A.   That is correct.

 5   Q.   Did you ever use any commercially available VPN providers?

 6   A.   No.  Donnelley has a VPN, but there's no commercial VPNs.

 7   Q.   So you've used VPNs before?

 8   A.   Donnelley has a VPN, so I use that one.

 9   Q.   Did you ever use a VPN for yourself when you go on

10:47 10   vacation?

11   A.   No.  Always WiFi.

12   Q.   Did you ever go on a trip to Mexico where you used a

13   commercially available VPN to log in to the Internet?

14   A.   My sister had a -- Internet, but she had a U.S. VPN, but I

15   don't think I had to log into it.  I still used just her

16   Internet in Mexico.

17   Q.   So you used her Internet in Mexico, and you believe that

18   she was using a VPN at the time, correct?

19   A.   Right.

10:47 20   Q.   And it essentially made it appear, while you were in

21   Mexico, that you were in the U.S., correct?

22   A.   Correct.

23   Q.   And it helps with watching Netflix, for example -- I don't

24   know if you -- strike that.

25        You said you like watching Netflix, correct?
```

```
 1    A.    I am a Netflix person, yes.
 2    Q.    Me too.  I completely agree.
 3          When you go on vacation internationally, outside of the
 4    U.S., do you sometimes watch Netflix at night before going to
 5    bed?
 6    A.    Well, I don't think it matters where I am.  I just like
 7    Netflix.
 8    Q.    But if you're in Mexico, for example, some content is
 9    blocked on Netflix, correct?
10:48 10   A.    Yes, I think so.
11    Q.    And sometimes you can use a VPN in order to unlock that
12    content, correct?
13          MR. FRANK:  Objection to foundation, Your Honor.
14          THE COURT:  If you know.
15          THE WITNESS:  What?
16          THE COURT:  Did you ever use a VPN in Mexico to use
17    Netflix?
18          THE WITNESS:  Not Netflix.
19    Q.    Did you use it to access other news that may not be
10:48 20   available or websites that may not be available because you're
21    in Mexico?
22    A.    No, I don't think so.
23    Q.    And you said your sister purchased this commercial VPN?
24    A.    I don't know how she got it.  I was only there for one
25    week in November of 2017, which I believe is before this
```

```
 1    timeline.  And I also was there over Christmas and New Year's,

 2    in Mexico at my sister's.  It was the year after my mom passed

 3    away, so it was in December of 2020.  And that was it.  And I

 4    didn't really work a whole lot on vacation.  We were doing

 5    other things on vacation.

 6    Q.   I'm sorry to hear about your mother.

 7              MR. NEMTSEV:  Thank you.  I have nothing further.

 8              THE WITNESS:  Okay.  Thank you.

 9              MR. FRANK:  Nothing further, Your Honor.  Thank you.

10    THE COURT:  Thank you for coming.

11              THE WITNESS:  Thank you.  Can I leave now?

12              THE COURT:  Yes.

13              THE WITNESS:  Okay.

14              THE COURT:  You can stay.

15              MR. KOSTO:  United States calls Jason Lewis, Your

16    Honor.

17              THE CLERK:  Sir, can you remain standing and raise

18    your right hand.

19                      **JASON LEWIS, sworn**

20    THE CLERK:  You can be seated.  Could you please state

21    and spell your name for the record, your last name.

22              THE WITNESS:  Jason Lewis, J-a-s-o-n L-e-w-i-s.

23              THE CLERK:  Thank you.

24              MR. KOSTO:  May I proceed, Your Honor?

25              THE COURT:  Yes.
```

10:49 (line 10)
10:50 (line 20)

```
 1                    DIRECT EXAMINATION

 2   BY MR. KOSTO:

 3   Q.   Good morning, Mr. Lewis.

 4   A.   Good morning.

 5   Q.   What city do you work in?

 6   A.   Houston.

 7   Q.   Welcome to Boston.

 8        What company do you work for?

 9   A.   Donnelley Financial.

10:51 10 Q.  How long -- what do you call Donnelley Financial for

11   short?

12   A.   DFIN.

13   Q.   How long have you worked for DFIN?

14   A.   Nine years.

15   Q.   So 2013, 2014?

16   A.   2014, yes, sir.

17   Q.   And what do you do for DFIN?

18   A.   I'm a director of ActiveDisclosure.

19   Q.   What does a director of ActiveDisclosure do?

10:51 20 A.  I am in charge of increasing revenue for the platform and

21   for a particular territory.

22   Q.   It sounds like you sell the product?

23   A.   Yes, sir.

24   Q.   Are you a sales guy?

25   A.   Yes, sir.
```

1    Q.   And when you say "the product," when you introduce that

2    product to potential clients, how do you describe it?

3    A.   It's a cloud-based application for collaboration, allowing

4    multiple people to collaborate on a document together, filing

5    to the SEC.

6    Q.   A lot in there.  Collaboration means?

7    A.   Multiple people working in a document together.

8    Q.   And then you said cloud-based?

9    A.   Yes, sir.  So off of all -- off of Google Chrome or

10:52 10   Internet Explorer, all web-based.

11   Q.   And the software is used to do what?

12   A.   File documents with the SEC.

13   Q.   You mentioned, I think, you had a sales territory.  What

14   is it?

15   A.   I cover South Texas and Louisiana.

16   Q.   What are the major cities in that group?

17   A.   Houston, Baton Rouge, New Orleans, Shreveport.

18   Q.   Are all of your sales -- do you call them targets or

19   relationships?

10:52 20   A.   Relationships, targets.

21   Q.   Are all of your sales relationships in South Texas and

22   Louisiana?

23   A.   Yes, sir.

24   Q.   And do you sell the product to any particular kind of

25   company?

1      A.    Particularly oil and gas.  Due to Houston nature, that's
2      particularly what the companies are, oil and gas.
3      Q.    A lot of oil and gas down there?
4      A.    Yes, sir.
5      Q.    Do you typically travel outside of South Texas and
6      Louisiana for work?
7      A.    No, sir.
8      Q.    Would you occasionally go to a sales conference?
9      A.    I would.
10:53 10    Q.    Where would that be?
11     A.    Possibly Florida or New York.
12     Q.    And would that be -- how many times per year would you do
13     that?
14     A.    Maybe once a year.
15     Q.    For a week or so?
16     A.    Yes, sir.
17     Q.    What's the time zone you work in most frequently?
18     A.    Central.
19     Q.    And what percentage of your work do you do in the Houston
10:53 20    area?
21     A.    Probably 90 percent.
22     Q.    I want to point you to the time before COVID.  So March --
23     whatever it was -- 13th, 2020.  Where did you work physically
24     before COVID?
25     A.    We had an office at -- on Shepherd in Houston, Texas, and

1    then we moved that office to Kirby, which is another street in

2    Houston.

3    Q.   Did you have the ability to work from home if you needed

4    to?

5    A.   I did.

6    Q.   And you certainly took sales calls at potential client

7    sites?

8    A.   Yes, sir.

9    Q.   What were your typical hours in 2018, 2019, and 2020 for

10:54 10   your sales work?

11   A.   Typically, 9:00 to 5:00.

12   Q.   If you had an 8:30 client meeting, could you do that?

13   A.   Absolutely.

14        THE COURT:  Is that 9:00 to 5:00 Central Time?

15        THE WITNESS:  Yes, ma'am.  Yes, Your Honor.

16   Q.   And when you weren't selling or meeting with potential

17   clients, did you access ActiveDisclosure at all?

18   A.   No, sir.

19   Q.   Did you ever access ActiveDisclosure in the middle of the

10:55 20   night, Central Time?

21   A.   No, sir.

22   Q.   In selling ActiveDisclosure as a product, did you have

23   reason to access live client information?

24   A.   No, sir.

25   Q.   When I say live client information, what do you understand

1    that to be?

2    A.    A live document that could potentially be filed to the

3    SEC.

4    Q.    How did you demonstrate how ActiveDisclosure worked

5    without accessing the live material?

6    A.    We were in a demo production site that I've had demo

7    documents that we've worked on for a number of years.

8    Q.    So what's in the demo production site?

9    A.    Prefiled documents that don't pertain to really anything

10   other than, you know, they show a workflow of how

11   ActiveDisclosure would work.

12   Q.    Does it relate to any particular company?

13   A.    No, sir.

14   Q.    Fair to call it a dummy document or a sample?

15   A.    Yes, sir.

16   Q.    Does it say it's a sample somewhere on it?

17   A.    I don't -- I couldn't answer that.  I've never really read

18   the entire document, to be honest with you.

19   Q.    Where did you keep -- where was that information kept,

20   this sort of sample information?

21   A.    So I had a foldering system inside of ActiveDisclosure

22   that all my information was stored in that location.

23   Q.    And what kind of information did you keep inside of your

24   folder to sell ActiveDisclosure?

25   A.    There would have been some 8-Ks, some 10-Qs, some 10-Ks,

```
 1    proxy, and then maybe just a blank document just for -- I did
 2    work with some private companies as well, and just to
 3    demonstrate that.
 4    Q.   To be clear, live documents or demo documents?
 5    A.   All demo documents.
 6    Q.   What was your username at DFIN?  Don't tell us your
 7    password.
 8    A.   rr202440.
 9    Q.   To access the demo area, did you need a password?
10    A.   Yes, sir, I did.
11    Q.   If a client that you sold to needed help with
12    ActiveDisclosure or the coding or the tagging or filing, is
13    that something you would help with?
14    A.   No, sir.
15    Q.   Did you ever hop on to ActiveDisclosure to help someone
16    you'd previously sold the product to?
17    A.   I wouldn't have access to that.
18    Q.   When you did access the demo area, did you do so through
19    DFIN's VPN?
20    A.   Not all the time.
21    Q.   When would you not use the DFIN VPN?
22    A.   If I was on a company website or if I was at home, or WiFi
23    of -- or if I was at my home WiFi.
24    Q.   If you were at a client's site, how would you access the
25    Internet?
```

```
 1    A.    I would get onto their WiFi.

 2    Q.    And then you'd use your username and password to go where?

 3    A.    Into ActiveDisclosure.

 4    Q.    The live area or the demo area?

 5    A.    My demo environment.

 6    Q.    How frequently did you work remotely from a café or a

 7    Starbucks or an Internet location?

 8    A.    I would never access ActiveDisclosure from that.

 9    Q.    Did you ever access ActiveDisclosure by way of a private

10    VPN company?

11    A.    No, sir.

12    Q.    Did you use AirVPN?

13    A.    No.

14    Q.    Did you use a company called Dedicated.com?

15    A.    No, sir.

16    Q.    Did you use OneProvider.com?

17    A.    No, sir.

18    Q.    What's your understanding about the information in the

19    live side of ActiveDisclosure and whether it's available to the

20    public?

21    A.    To my knowledge, it was not available to the public.

22    Q.    Is it there before or after that information is announced

23    through the SEC?

24    A.    It's there before.

25    Q.    Are you familiar with DFIN's policies and practices around
```

1    the confidentiality of client information?

2    A.   Yes, sir.  We all have non-disclosures.

3    Q.   Why is that?

4    A.   Because there is potentially information that could be

5    shared that is pre-public information.

6    Q.   Under DFIN's policies, are you permitted to use that

7    information to make trading decisions?

8    A.   No, sir.

9    Q.   Did you have -- did you work with prefiling information in

10   your job at DFIN?

11   A.   No, sir.

12   Q.   Did you work with active live client data in your job at

13   DFIN?

14   A.   No, sir.

15   Q.   Did you have occasion to download active live client data

16   in your job at DFIN?

17   A.   No, sir.

18   Q.   Why is that?

19   A.   I was always on a production site.

20   Q.   Because you sold the product, right?

21   A.   I sold the product.  I wasn't into support.

22        MR. KOSTO:  Nothing further, Your Honor.

23        THE COURT:  Any questions?

24        MR. FERNICH:  Yeah.  We're about a minute before

25   11:00.  Do you want me to go forward now?

 1              THE COURT:  It depends how long you have.

 2              MR. FERNICH:  Fifteen minutes.

 3              THE COURT:  Okay.  We'll take our break.  Thank you.

 4              THE CLERK:  All rise.

 5    (Jury exits.)

 6              THE COURT:  Thank you.  Can I see the attorneys just

 7    for a second at sidebar to talk about the rest of the day.

 8    **(SIDEBAR CONFERENCE AS FOLLOWS:**

 9              MR. FRANK:  Yes, Your Honor.

11:01 10          THE COURT:  So this morning we made a lot of progress.

11    How many more witnesses do you have today?

12              MR. FRANK:  Well, this was the final scheduled

13    witness.  Our next witness is available.  We're flying much

14    faster than we --

15              THE COURT:  Bring him in.  Who's the next witness?

16              MR. FRANK:  Special Agent Hitchcock.  He's here.

17              There's a couple evidentiary issues we need to talk

18    about.  There's many undisputed exhibits, but there's a few

19    exhibits that are disputed that are part of his testimony.

11:01 20          MR. NEMTSEV:  We don't know what exhibits they're

21    planning on putting in because they haven't provided a list.

22              THE COURT:  Sure, because it's going faster.  Maybe

23    you can do that over the break.  I don't want to lose the time.

24    At the rate you're going, when do you finish your case if it's

25    9:00 to 1:00?

1          MR. FRANK:  Monday, Tuesday.

2          THE COURT:  So you're thinking we don't have to go

3     into full days next week?

4          MR. FRANK:  At this rate, absolutely not.

5          MR. FERNICH:  I think the next witnesses will probably

6     be longer than these.  These were rapid fire.

7          THE COURT:  Yes.

8          MR. FRANK:  Special Agent Hitchcock is definitely the

9     longest witness, and the witness after that is a recording, so

11:02 10    that will take some time.

11          THE COURT:  Can we do the recording instead of the

12    agent?

13          MR. FRANK:  He's not in town yet.

14          THE COURT:  Okay.

15          MR. FRANK:  There's no big evidentiary issues.

16    There's a few, though.

17          THE COURT:  So maybe you all grab coffee and stuff and

18    then realistically -- what I'm thinking --

19          MR. NEMTSEV:  We could close next week.

11:02 20    THE COURT:  I don't know.  I mean, that's really your

21    call.  It sounds like the government's going to finish in the

22    6th, 7th time frame.  What I'm mostly worried about is I have

23    to get the charge ready.  As you know, I've started working on

24    it.  And we need a charge conference.  If you're going to rest

25    and you're going to rest, that means it could potentially go to

```
 1    the jury in the vicinity of the 8th or 9th.

 2              But you probably have witnesses, right?

 3              MR. NEMTSEV:  Probably the experts because of the

 4    reliability and all of that.

 5              THE COURT:  I understand that.  I'm just trying to

 6    figure out when I need to be ready, because sometimes defense

 7    just rests and then I'm flatfooted in terms of, oh, I have to

 8    get the charge ready.  What you're thinking is we'll probably

 9    not need to go more than half days?

11:03 10          MR. NEMTSEV:  No, definitely not more than half days.

11              THE COURT:  Okay.  So we'll plan on a charge

12    conference midweek next week.  Does that make sense?

13    Potentially, we could be going to the jury here or here.

14    (Indicating.)

15              MR. FRANK:  Or here.

16              THE COURT:  Yeah.  I'd like to get --

17              MR. KOSTO:  I think we'll know more when we know

18    Agent Hitchcock has gotten off the stand.

19              THE COURT:  I did receive a motion in limine at 10:00

11:03 20    last night.  I skimmed it while I was listening to testimony.

21    My bad.  But, anyway, I think this --

22              MR. FRANK:  Was this Mr. Kosto's witness or mine?

23              THE COURT:  I don't know.  They flew by so quickly.

24              But the 803(6) is really what I'm thinking about, the

25    issue of the invoice.  The others -- it's not so much a 609
```

1    issue or an 807 issue.  It's has it met the -- so if you could

2    look at those rules and see -- and I think almost all of them

3    qualify, except one, which is the invoice.  And the question

4    is, it was kept in the ordinary course of business of one

5    company, but do I allow it in for the truth if they didn't

6    generate it?  So it may be allowed in for a limited purpose.

7    Just think of it that way.  It's not so much a 609 issue, as

8    I'm thinking of it, but maybe I'm wrong.

9         MR. KOSTO:  The mention of a conviction would raise a

11:04 10   609 issue.  That's our concern.

11         THE COURT:  Perhaps, but you have to establish

12   reliability.  So the question is in order to get it in for the

13   truth of the matter asserted, i.e., that there was an invoice

14   for a certain amount.  Let me -- just think about it that way.

15   Okay?

16         MR. FRANK:  There is a business record certification.

17   The fact that it's a business record of StackPath has not been

18   disputed.

19         THE COURT:  Right, but then the question is do I allow

11:05 20   it in for the truth.  I'm just focusing you on that issue.

21   Okay?  We all need a break, so I'm not prepared to argue it,

22   but I did skim your motion in limine.

23         I noticed something, that with the guys you said, "I'm

24   Fernich," but with the women, you said, "I'm Marc."

25         MR. FERNICH:  Because of their language.

            1            THE COURT:  I see.

            2            MR. NEMTSEV:  He's flirting.

            3            THE COURT:  Just saying.

            4            MR. FERNICH:  I did that on purpose.

            5            MR. FRANK:  Just to close out that last point, Your

            6    Honor, if I may ask, because it's relevant for this witness --

            7            MR. FERNICH:  Yeah.

            8            MR. FRANK:  So may I assume they're not going to be

            9    able to inquire about the conviction?  Because if they are,

11:05  10    that's relevant.

           11            MR. FERNICH:  Let me ask you something.  With respect

           12    to the tape, you're planning on playing the whole Saxo --

           13            MR. FRANK:  Not the whole recording.

           14            MR. FERNICH:  Do you need Zorek for that?

           15            MR. FRANK:  Yes.

           16            MR. FERNICH:  I mean, we could stip to it.

           17            THE COURT:  Do we need what?

           18            MR. FRANK:  The witness.

           19            MR. KOSTO:  There's a witness.

11:06  20            MR. FERNICH:  You don't want to put the tape on today?

           21            MR. NEMTSEV:  It's an hour-and-44-minute tape.

           22            MR. FRANK:  We're not playing the whole tape.

           23            MR. FERNICH:  I don't want to compromise the order of

           24    your case.  You don't want to put it in today?

           25            MR. FRANK:  Right.

          1            THE COURT:  So let me just let us all have a break.

          2            But this is not a 609 impeachment situation, because

          3    the witness is an agent, and it's an 803(6) issue.  Is it a

          4    business record.  And if so, can I allow it in for the truth of

          5    the matter or just the fact that they received the invoice?  I

          6    can allow it in for the fact they received the invoice but not

          7    for --

          8            MR. NEMTSEV:  For the fact the services were

          9    performed.

11:06    10            THE COURT:  The fact the services were performed.

         11    That's how I'm thinking of it.

         12            MR. KOSTO:  May I add one caveat to that?

         13            THE COURT:  Yeah.

         14            MR. KOSTO:  Consistently, in Mr. Fernich's exam on an

         15    admitted exhibit, he referred to the location written in the

         16    document and said, "You don't see Russia here, this came from

         17    New York, this came from Minnesota."  That's the exact same

         18    issue.

         19            THE COURT:  You have other documents that show Boston.

11:07    20            MR. KOSTO:  That document has the IP address on it.

         21    It has the name of the data center on it.  And that was created

         22    in the ordinary course of Micfo's business.  Before we throw

         23    this invoice out as unreliable --

         24            THE COURT:  I haven't ruled.  I'm not thinking of it

         25    as a 609 issue or an 807 issue.

1          MR. KOSTO:  But in the absence of a 609 issue, there

2     would be no reason to keep it out.

3          THE COURT:  It's a company -- excuse me.  You don't

4     have a custodian from that company saying, we generated these

5     service documents in the ordinary course, but it could be

6     sufficient for the address.  So I just need to think it

7     through.  It's just a business record issue, a run-of-the-mill

8     business record issue.  So what's the name of that company?

9          MR. FRANK:  StackPath.

11:07 10          THE COURT:  Received an invoice from someplace called

11     such and such, which lists this address.  There's no reason to

12     believe the address is fraudulent.  Whether the dates are

13     truthful, I'm not sure you've established a custodian who kept

14     those dates in the ordinary course.  So think about it from

15     that vantage point and --

16          MR. FERNICH:  But it goes beyond that because there's

17     a confrontation issue as well.  They're offering it to -- to

18     the extent they're offering it to prove the truth of the matter

19     asserted, I've got no issue on the custodian part of it, but

11:08 20     they want to offer the assertions within the document for their

21     truth.  And this was an LLC.  It's not a situation where it's

22     IBM or Arthur Andersen or some person that has nothing to do

23     with it.

24          THE COURT:  I'm not deciding the issue, because I'm

25     tired and I'm sure the court reporter is tired.  I received

```
 1    this at 10:00 last night.  It was sort of going down a path I

 2    wasn't going on a 609, so you were a little bit -- I see why

 3    they were worried, but let's talk about it later.  Okay?

 4         MR. FRANK:  At some point, Your Honor, we do need to

 5    address the exhibits for Mr. Hitchcock, though.

 6         MR. FERNICH:  You're talking about the Threema -- 46

 7    and 151?

 8         THE COURT:  We can't do it right now.

 9         (A recess was taken, 11:09 a.m.)

10    (Resumed, 11:39 a.m.)

11         MR. FRANK:  Your Honor, would you like us to call the

12    next witness when this is over, or do you want to take a break?

13         THE COURT:  No.  We'll call the next witness.  We'll

14    get it going.

15         MR. FRANK:  We're going to get to an objection pretty

16    quick.

17         THE COURT:  Well, what's the objection to?

18         MR. FRANK:  Some of the photographs.

19         THE COURT:  Well, I thought we went through the

20    photographs.

21         MR. NEMTSEV:  They still want to put in the objected

22    to ones.  There's a few that we --

23         THE COURT:  Not the seven -- are these the objected-to

24    photos?

25         MR. FRANK:  I don't know what your Honor has.  I have
```

1    them pulled here, and then there's the one with the cars, which

2    we've now redacted the Porsche insignia.  I don't know what

3    your Honor is looking at.

4            THE CLERK:  Judge, they gave me a pile of exhibits

5    that were objected to, and each one has a letter on it.

6            MR. KOSTO:  These are mainly photos that the Court

7    reserved on, but here we are.

8            THE COURT:  Excuse me.  I haven't seen most of these.

9    I've only seen one of them.

11:41 10            THE CLERK:  Judge, these are for the next -- okay,

11    sorry.

12            THE COURT:  I know.

13            (Pause.)

14            THE COURT:  What's taking so long?

15            (Discussion between the Court and Clerk.)

16            THE CLERK:  Okay, let me just bring them in right now.

17            All rise for the jury.

18            (Jury enters the courtroom.)

19            THE COURT:  Thank you.

11:43 20            THE CLERK:  You can be seated, everyone.  Thank you.

21            MR. FERNICH:  Judge, may I proceed?

22            THE COURT:  Yes.

23    CROSS-EXAMINATION BY MR. FERNICH:

24    Q.   Good morning, Mr. Lewis.  My name is Mark Fernich.  I'm a

25    lawyer for the defendant, Mr. Klyushin.  We don't know each

1    other, sir, do we?

2    A.    No, sir.

3    Q.    We've never met or spoken, have we?

4    A.    No, sir.

5    Q.    And you spoke with the government back on January 18, a

6    couple weeks ago?

7    A.    That's correct.

8    Q.    Have you spoken with the government since that time?

9    A.    I spoke with them last night as well.

11:44 10   Q.    Did you speak with these prosecutors, Mr. Frank and

11   Mr. Kosto?

12   A.    That's correct.

13   Q.    And they asked you some questions?

14   A.    Yes, sir.

15   Q.    And you gave them some answers?

16   A.    Yes, sir.

17   Q.    And the purpose of that was to prepare for your testimony

18   here today, correct?

19   A.    That's correct.

11:44 20   Q.    Now, Mr. Lewis, you told us on direct that you'd been --

21   you've been working for DFIN, I should say, since around 2014;

22   is that right?

23   A.    Yes.

24   Q.    So nine years or so?

25   A.    Yes, sir.

1    Q.   And you told us that DFIN -- I'm paraphrasing -- handles

2    confidential client financial information; is that correct?

3    A.   Yes, sir.

4    Q.   And you and other employees -- well, strike "you."

5    Employees of DFIN are required to sign nondisclosure agreements,

6    correct?  You testified to that?

7    A.   Yes, sir, including myself.

8    Q.   Yes.  Okay, thank you for that.  And there are formal

9    policies in place at DFIN to protect the sensitive information,

11:45 10   correct?

11   A.   Yes, sir.

12   Q.   And among those are the provisions dealing with

13   nondisclosure, right?

14   A.   Yes, sir.

15   Q.   Now, basically you're in sales?  That's your job, right?

16   A.   Yes, sir.

17   Q.   And you're in sales around the ActiveDisclosure system,

18   correct?

19   A.   That is correct.

11:45 20   Q.   And you covered the South Texas and Louisiana areas back

21   in 2018 through '20; is that right?

22   A.   Yes, sir.

23   Q.   And you told us that some of your clients are oil and gas

24   companies?  Yes?

25   A.   Yes, sir.

1    Q.   Naturally, being from Texas, that's a big industry there,

2    right?

3    A.   Correct.

4    Q.   And some of those are large oil and gas companies, to your

5    knowledge?

6    A.   Yes, sir.

7    Q.   Can you tell me the names of some of the larger ones that

8    me, as a Northeasterner, might be familiar with.

9    A.   ConocoPhillips, BP, Exxon, Shell.

11:46 10    Q.   Okay, some real big oil and gas companies, correct?

11    A.   Yes, sir.

12    Q.   And I think you told us on direct that, as part of your

13    job, you have used the ActiveDisclosure system in something

14    called the demo environment.  That's right?

15    A.   Yes, sir.

16    Q.   And in fact, the entire sales team nationwide had access

17    to that platform; is that right?

18    A.   Yes, sir.

19    Q.   And you worked principally out of an office in Houston?

11:46 20    A.   That's correct.

21    Q.   But you also had the ability to work remotely, you told

22    us, correct?

23    A.   That's correct.

24    Q.   And you could work from home specifically, if needed?

25    A.   That's correct.

1    Q.    Right.  And, sir, do I have this right that -- we're

2    talking about 2018 through '20 now -- that's the period that's

3    at issue in this case -- you traveled to Florida sometime

4    during that period?

5    A.    I don't recall if I did, but it's very possible.

6    Q.    Okay, to New York?

7    A.    Very possible.

8    Q.    And how about to Arizona?  You told us that you traveled

9    to Arizona?

11:47 10    A.    Very possible, yes, sir.

11    Q.    Okay.  And was that for group training work in Arizona?

12    A.    Yes, sir, it would have been.

13    Q.    Tell me about the group training a little bit.  How many

14    DFIN employees attended something like that?

15    A.    It would have been three or four, not very many.

16    Q.    Just a few?

17    A.    Yes, sir.

18    Q.    And how many times or how many group trainings did you

19    attend in Arizona during that period?

11:47 20    A.    I believe just one.

21    Q.    And how long would that group training session have

22    lasted?

23    A.    Two or three days.

24    Q.    A couple of days.  Do you know somebody at DFIN called

25    Julie Soma?

         1    A.   Yes, sir.

         2    Q.   And was she at that same group training session?

         3    A.   No, she wasn't.  "No" was the answer.

         4    Q.   She wasn't.  When you were there, did you use a laptop at

         5    the group training?

         6    A.   Yes, I did.

         7    Q.   Did you use a smartphone there?

         8    A.   Yes, I did.

         9    Q.   And so you had access to the Internet there through those

11:48   10    devices, correct?

        11    A.   That's correct.

        12    Q.   Okay.  And back then in 2018 through '20, all you had to

        13    do to access the system was enter a user and password

        14    combination; is that right?

        15    A.   That is correct.

        16    Q.   Do you know what multifactor authentication is?

        17    A.   I do now.

        18    Q.   And that wasn't in place back then at DFIN, was it?

        19    A.   That's correct.

11:48   20    Q.   There was no special security code that you have to enter?

        21    A.   That's correct.

        22    Q.   No other enhanced security measures, just the user and

        23    password combination?

        24    A.   To my knowledge, that's correct.

        25    Q.   And as part of your job, you would visit client sites in

1    the sales territory?

2    A.   Yes, sir.

3    Q.   And when you were visiting client sites, sometimes you

4    told us you would use Wi-Fi to access the system?

5    A.   Yes, sir.

6    Q.   Did you visit any oil and gas company client sites during

7    that period?

8    A.   I don't -- I don't understand the question.

9    Q.   Sure.  Among the client sites that you visited, were some

11:49 10   of them oil and gas companies?

11   A.   Yes, sir.

12   Q.   And some of them were large oil and gas companies?

13   A.   Yes, sir.

14   Q.   Like the ones that you mentioned a couple minutes ago?

15   A.   Correct.

16   Q.   You had a smartphone during that time period?

17   A.   Yes, sir.

18   Q.   And the smartphone naturally had Internet access; is that

19   correct?

11:49 20   A.   That's correct.

21   Q.   And sometimes you would also access -- use wifi to access

22   the system from home?

23   A.   That's correct.

24   Q.   I'm going to ask you a little bit about the

25   ActiveDisclosure platform.  To your knowledge, AD3, what's AD3?

1    A.    It is the previous platform that we're discussing at this

2    time.

3    Q.    Okay.  And it was a cloud-based solution for building and

4    filing SEC documents; is that fair to say?

5    A.    Yes, sir.

6    Q.    And to your understanding -- excuse me, I'm sorry.  Can

7    you hear me?

8    A.    Yes.

9    Q.    -- cloud computing involves the delivery of computing

11:50 10   services over the Internet?  Yes?

11   A.    That's not how I would describe it, but, yes.

12   Q.    Well, tell me in your own words.

13   A.    A cloud-based application is just something that sits on a

14   web application and works -- is not a hard desktop application.

15   Q.    Right, it works through the Web.  Yeah?

16   A.    Yes, sir.

17   Q.    And that's in contrast to, say, setting up an on-site data

18   center with servers and other physical infrastructure, is that

19   right, to your understanding?

11:51 20   A.    To my understanding, yes, sir.

21            MR. KOSTO:  Objection to foundation.

22            MR. FERNICH:  I'm asking about his knowledge of it.

23   He works on the system.

24            THE COURT:  Do you know?

25            THE WITNESS:  I'm not aware.  I -- I -- I don't know

1    if it sets up servers or what it does.  I don't --

2    Q.    It doesn't do that, correct?

3    A.    I wouldn't know that.

4    Q.    Well, you told us on direct that it was a cloud-based

5    platform.  You testified to that, right?

6    A.    Right, but I don't know what the workings of the back end

7    of the application do or don't do.

8    Q.    Fair enough, but you told us it works over the Web, which

9    is really all I'm getting at.  Yes?

11:51 10          MR. KOSTO:  Objection.

11          THE COURT:  To your knowledge, does it work through

12    the Web?

13          THE WITNESS:  Yes, your Honor, it works through the

14    Web.

15    Q.    And you sort of anticipated my next question.  The Web is

16    short for the World Wide Web; is that correct?

17    A.    To my knowledge, yes, sir.

18    Q.    And that's because people all over the world can access

19    and connect to it; is that right?

11:52 20    A.    That's correct.

21    Q.    Now, turning specifically to the AD system, I think you

22    told us on direct that multiple people can collaborate on

23    documents through the ActiveDisclosure system?  Yes?

24    A.    That's correct.

25    Q.    And in fact, that's the whole point of the ActiveDisclosure

1  system, isn't it?

2  A.   Not the whole point --

3  Q.   But a point?

4  A.   Yes, sir, a point.

5  Q.   And you have some general knowledge -- I'm not talking

6  about, you know, the specific granular technical aspects of it,

7  but you sold it, so you have some general knowledge of how the

8  product works; is that right?

9  A.   That's correct.

11:52 10  Q.   So let me ask you something?  Do you know -- and if you

11  don't, you don't -- what if you were logged onto the

12  ActiveDisclosure system and somebody uses your credentials to

13  log on, would the original person be kicked out in that

14  instance?  Do you know?

15  A.   I'm not aware.

16  Q.   I'm almost done.  This is the last question.  As you sit

17  here today, you have no idea who, if anyone, might have used

18  your log-in credentials without permission to access DFIN's

19  computer system; is that correct?

11:53 20  A.   That's correct.

21       MR. FERNICH:  Okay.  Thank you very much.

22  REDIRECT EXAMINATION BY MR. KOSTO:

23  Q.   In order to collaborate, Mr. Lewis, on a document, do you

24  need a DFIN password and a DFIN username?

25  A.   Yes, sir.

```
 1    Q.   Nobody in the world can collaborate without that, right?

 2    A.   That's correct.

 3    Q.   Just because it's on the World Wide Web doesn't mean it's

 4    open to anyone who doesn't have a password or a username?

 5    A.   To my knowledge, there is still security around it.

 6              MR. KOSTO:  Do you need that one again?

 7    Q.   Just because it's on the World Wide Web, Mr. Lewis, that

 8    doesn't mean you don't need a username and a password to

 9    collaborate on a DFIN document?

10    A.   That's correct.  To my knowledge, there is still security

11    around it.

12              MR. KOSTO:  Thank you.

13    RECROSS-EXAMINATION BY MR. FERNICH:

14    Q.   But there wasn't multifactor authentication, right?

15    A.   No, sir, not at the time.

16    Q.   There wasn't a special security code beyond the username

17    and password?

18    A.   That's correct.

19    Q.   There weren't any enhanced security measures to protect

20    this confidential information?

21    A.   That I don't -- I wouldn't know that.  To my knowledge,

22    there was additional securities that was behind it.  I just

23    wasn't aware, but we had a soft-compliance staff.

24    Q.   Okay, but not the multifactor authentication that's

25    provided?
```

```
 1   A.    That's correct.
 2           MR. FERNICH:  Okay.  Thank you very much.
 3           THE COURT:  Thank you.  You may step down.
 4           (Witness excused.)
 5           THE COURT:  Next witness?
 6           MR. FRANK:  The government calls Special Agent David
 7   Hitchcock.
 8                         DAVID HITCHCOCK
 9   having been first duly sworn, was examined and testified as
10   follows:
11           THE CLERK:  Could you state and then spell your last
12   name.
13           THE WITNESS:  David Hitchcock, H-i-t-c-h-c-o-c-k.
14           MR. FRANK:  May I proceed, your Honor?
15           THE COURT:  Yes.
16           MR. FRANK:  Thank you.
17   DIRECT EXAMINATION BY MR. FRANK:
18   Q.    Good barely morning, Special Agent.
19   A.    Good morning.
20   Q.    Where do you work?
21   A.    The FBI.
22   Q.    How long have you worked at the FBI?
23   A.    Since 2006.
24   Q.    What is it that you do at the FBI?
25   A.    I'm a special agent.
```

1    Q.    How long have you been a special agent?

2    A.    Since March of 2009.

3    Q.    What did you do before, between 2006 and 2009 at the FBI?

4    A.    I was an IT specialist.

5    Q.    Are you currently assigned to a specific squad?

6    A.    Yes.

7    Q.    What squad are you assigned to?

8    A.    The Major Cybercrime Squad.

9    Q.    How long have you been assigned to the Major Cybercrime

11:55 10   Squad?

11    A.    Since March of 2009.

12    Q.    Tell us a little bit about your educational background.

13    How far did you go in school?

14    A.    I have a bachelor's in science and computer science.

15    Q.    And when did you obtain that?

16    A.    In 2005.

17    Q.    What did you do between the time you graduated from

18    college and joined the FBI?

19    A.    I was a software engineer.

11:56 20   Q.    Upon joining the FBI, what kind of specialized training

21    did you receive?

22    A.    General law enforcement and specialized cyber training.

23           THE COURT:  What did you do as a private software

24    engineer?

25           THE WITNESS:  I worked for various industries,

1    manufacturing, healthcare.  I was an architect of databases and

2    software that would run on top of those databases.

3                THE COURT:  So not cybersecurity?

4                THE WITNESS:  No, ma'am.

5    Q.   Since being assigned to the Major Cybercrime Squad, what

6    kinds of cases have you been involved in?

7    A.   Financially motivated computer intrusions.

8    Q.   What are financially motivated computer intrusions?

9    A.   They involve access, unauthorized access to sensitive data

11:57 10   and information, and then on the other side of that, how that

11   information is monetized.

12   Q.   When you say "monetized," you mean what?

13   A.   So if it's stolen bank account information, how those bank

14   accounts could be liquidated, account takeover.  If it's stolen

15   data, how it could be sold, bought, or traded.  Those are --

16   Q.   How people take it and make money?

17   A.   By either using the information themselves if it's a

18   stolen credit card, or in this case, if it were stolen

19   financial information, they might make a decision based on that

11:57 20   stolen data.

21   Q.   Did there come a time when you were assigned to an

22   investigation involving the defendant, Vladislav Klyushin?

23   A.   Yes.

24   Q.   And when was that?

25   A.   The fall of 2019.

```
 1   Q.   What was your role in the investigation?

 2   A.   I was a co-case agent.

 3   Q.   And just so the jury understands, what does it mean to be

 4   a co-case agent?

 5   A.   I co-led an investigative team that was comprised of

 6   computer scientists, linguists, and other FBI personnel.

 7   Q.   How did the investigation begin?

 8   A.   We received a referral from the United States Securities

 9   and Exchange Commission.

10   Q.   What was the nature of the referral that you received from

11   the SEC?

12   A.   Several Russian nationals were identified as trading at

13   the same time, in the same company names, very profitably,

14   right before news releases related to the financial earnings

15   and statements for those said companies.

16           MR. NEMTSEV:  Objection, your Honor, to "several."

17           THE COURT:  To what?

18           MR. NEMTSEV:  Several, the quantity several.  It's not

19   definitive.

20           THE COURT:  Overruled.

21   Q.   What were your next steps upon receiving that referral

22   from the SEC?

23   A.   We looked to identify a relationship amongst the

24   individuals that had been named.  We also looked to identify a

25   single source or something common amongst all of the companies
```

        1    that were identified as being traded because they span such a

        2    wide variety of industries and sectors.

        3    Q.   Why did the fact that they span a wide variety of

        4    industries and sectors cause you to look for a common

        5    denominator among them?

        6    A.   Because one individual trading in that many different

        7    companies at a very opportune time right before news is

        8    released to the public, and it not being limited to one

        9    industry, one single source, a person or an insider at that

12:00  10    particular company, was very suspicious.

       11    Q.   What, if anything, did you find out about the companies

       12    that were the subject of the trading?

       13    A.   We learned that the companies that were being traded by

       14    these individuals all filed their SEC filings through two

       15    filing agents.

       16    Q.   What were those two filing agents?

       17    A.   Toppan Merrill and Donnelly Financial.

       18    Q.   What did you do next?

       19    A.   We reached out to those companies.

12:00  20    Q.   Why did you do that?

       21    A.   To see if they had been hacked.

       22    Q.   As part of your investigation, did there come a time when

       23    you reviewed documents associated with a company called M-13?

       24    A.   Yes.

       25    Q.   And as part of that, did there come a time when you

```
 1   reviewed M-13's publicly available website?

 2   A.    Yes.

 3   Q.    When did you review M-13's publicly available website?

 4   A.    Sometime after the arrest of Vladislav Klyushin.

 5   Q.    And when was that arrest?

 6   A.    That arrest occurred on March 21 of 2021.

 7   Q.    Why didn't you review the website prior to arresting the

 8   defendant?

 9   A.    We were investigating a very sophisticated group of

10   hackers and --

11         MR. FERNICH:  Objection.

12         THE COURT:  Sustained.

13   Q.    What language or languages is the website in?

14   A.    The M-13 website had both a Russian language and English

15   language version.

16         MR. FRANK:  If we could have -- well, your Honor, how

17   would you like me to proceed with respect to exhibits, for the

18   witness only and then introduce them one by one?

19         THE COURT:  Yes.  If they're unobjected to, you can

20   just introduce them.

21         MR. FRANK:  Okay, thank you, your Honor.  If we could

22   have Exhibit 59, and I would offer it.

23         MR. NEMTSEV:  No objection.

24         (Exhibit 59 received in evidence.)

25   Q.    What is this document, Special Agent?
```

```
 1   A.    This is the Russian language version of the M-13 homepage.

 2   Q.    And you see at the top there's two tabs.

 3         MR. FRANK:  I'm not sure if I can indicate on my

 4   computer.  Ms. Molloy, can I indicate on my computer?

 5         THE CLERK:  No, that is not working, but Jen can.

 6         MR. FRANK:  Jen, could you indicate -- exactly.  You

 7   read my mind.

 8   Q.    Do you see those two tabs there?

 9   A.    I do.

10   Q.    So this is the Russian language tab?

11   A.    Yes.  You can note the oval around the letters "RUS."

12         MR. FRANK:  I'd offer Exhibit 60A.

13         THE CLERK:  60A as in apple?

14         MR. FRANK:  Yes.

15         (Exhibit 60A received in evidence.)

16   Q.    What is Exhibit 60A?

17   A.    This is the M-13's English version of the website.

18   Q.    And this is a particular page from that website?

19   A.    Yes, sir.

20   Q.    Could you read it for the record, please.

21   A.    "Monitoring and analysis of mass media and social media,

22   M-13 Company specializes in IT solutions for media monitoring,

23   and employs a staff of more than 100 developers, linguists,

24   media analysts, and other experts who have necessary skills and

25   expertise in creating powerful and commercially successful
```

1   automated tools for monitoring and media analysis.

2   IT solutions developed by the M -13 are used by the [redacted]

3   the Government of the Russian Federation, federal ministries

4   and agencies, regional state executive bodies, commercial

5   companies and public organizations."

6   Q.   Thank you, Special Agent.

7        MR. FRANK:  Could we have Exhibit 61A, please, and I'd

8   offer it.

9        (Exhibit 61A received in evidence.)

12:04 10   Q.   Special Agent, is this another page from the English

11   language version of the M-13 website?

12   A.   Yes.

13   Q.   Could you read the first heading and the bullet points,

14   please.

15   A.   "Research and information system for online media

16   monitoring.  News displayed in online mode.  Express analysis

17   of information field.  Rapid detection of information attacks.

18   Performance evaluation of press services and promotional

19   events."

12:04 20   Q.   And I neglected to ask you if you could just read the

21   heading at the top of this page.

22   A.   Katyusha.

23        MR. FRANK:  Could we have 62A, please, and I'd offer

24   it.

25        (Exhibit 62A received in evidence.)

1   Q.   Special Agent, is this another page from the English

2   language version of the M-13 website?

3   A.   Yes.

4   Q.   Could you read the heading at the top and the top half of

5   the page, please.

6   A.   "Cybersecurity.  Cybersecurity audit.  Ensuring the

7   cybersecurity of its infrastructures is a priority of any

8   company.  Hacker attacks can lead to huge ramifications.  Major

9   financial and reputational damage.  Industrial cyber espionage.

12:05 10  Blackmail of company management or random employees.  Theft and

11   leakage of confidential information, company's solutions and

12   know-hows.  Risk of costs and massive data losses while being

13   unable to restore backups in case of hackers using the

14   encryption software.  M-13 provides a comprehensive service

15   package in cybersecurity.  If you need a consultation or have

16   any questions, please contact us by email:  Mis@m-13.ru."

17   Q.   And that .ru, are you familiar with that suffix on an

18   email address?

19   A.   Yes.  It refers to the Russian top-level domains.

12:06 20  Q.   And under the heading "Services we provide," could you

21   read bullet points 2, 3, and 4, please.

22   A.   "Penetration testing (white box, black box) advanced

23   persistent threat (APT) emulation.  Conducting the 'instant

24   response' exercises between blue team and red team."

25        MR. FRANK:  Could we have Exhibit 63A, please, and I'd

1    offer it.

2         (Exhibit 63A received in evidence.)

3    Q.   Special Agent, is this another page from the M-13 English

4    language version of the website?

5    A.   Yes.

6    Q.   Could you read what it says under "Penetration testing,"

7    please.

8    A.   "Penetration testing.  Penetration testing is meant to

9    detect security vulnerabilities.  Classic penetration testing

12:07  10   methods include:  White box (white box method).  Targeted

11   software testing, which assumes that the internal

12   structure/implementation of the system is known in advance.

13   Black box (black box method).  Targeted testing, which assumes

14   no prior knowledge of the structure/implementation of the

15   tested system."

16        MR. FRANK:  And, Ms. Lewis, if we could go to the next

17   portion of the page, "Advanced persistent threat emulation."

18   Q.   Special Agent, could you read that, please.

19   A.   "Advanced persistent threat (APT) emulation.  The most

12:07  20   sound and modern method of testing and analyzing the

21   infrastructure security.  Our experts imitate a full-scale

22   targeted attack, during which the attacker, while trying to

23   conceal his presence, uses a wide range of actions against the

24   organization's infrastructure."

25        MR. FRANK:  Could we have Exhibit 64A, please, and I'd

1    offer it.

2             (Exhibit 64A received in evidence.)

3    Q.   Special Agent, is this a continuation of this section of

4    the M-13 website in English?

5    A.   Yes.

6    Q.   I'd like you to please read for the jury the section under

7    "Instant response exercises."

8    A.   "On average, the detection of system penetration takes

9    from 6 months to a year.  During this period, an intruder is

12:08 10   able to inflict significant damage.  We offer a security

11   response check, which helps to train the security team and

12   fine-tune all the available security features."

13   Q.   Special Agent, in addition to the pages that we just

14   reviewed, did you and your team review the rest of the M-13

15   website?

16   A.   Yes.

17   Q.   Was there anything in the pages that we just reviewed or

18   on the rest of the website dealing with money management or

19   investing?

12:09 20   A.   No.

21             MR. FRANK:  Could we have Exhibit 141 on the left and

22   141A, please, on the right, and I'd offer these two exhibits.

23             (Exhibits 141 and 141A received in evidence.)

24   Q.   Special Agent, what are Exhibits 141 and 141A?

25   A.   141 is a Russian language version of 141A, which is an FBI

1    translation of 141.

2    Q.   And if you could please read from the translated version

3    what this document is.

4    A.   "Redteam-company campaign for corporate information system

5    of Avilex LLC.  Technical and commercial proposal," and it's

6    dated 2019.

7         MR. FRANK:  Ms. Lewis, if we could at 141A go to

8    Page 4, please.

9    Q.   Special Agent, could you please read under "Services

12:10 10   offered" what it says under bullet point 1, "External

11   penetration testing."

12   A.   "External penetration testing aimed at finding ways the

13   external intruder penetrates the customer's local area network

14   (LAN) using vulnerabilities and errors in network devices's

15   configurations, as well as network services and applications

16   accessible through the Internet.  Work is carried out in the

17   following order:  Obtaining preliminary information about the

18   network perimeter based on the sources of information available

19   to the potential offender (search engines, news, conferences,

12:11 20   et cetera).  Scanning network perimeter nodes.  Identifying

21   types of devices, operating systems, and applications that

22   react to external impact.  Identifying network service

23   vulnerabilities.  Security analysis of network infrastructure

24   and email services.  Instrumental testing.  Initial results

25   analysis.  Manual vulnerability verification.  Manual analysis

1  of the security of obtainable resources (including analysis of

2  the possibility of exploitation of known vulnerabilities of old

3  versions of software and network services).  Identification of

4  sensitive data stored in open form.  Detection of unsafe

5  configurations of network equipment and servers.  Analysis of

6  security of external corporate Web applications by the black

7  box method; that is, from intruder's end that has neither

8  information nor the logical access to the system.  Exploitation

9  of the most dangerous vulnerabilities in order to breach the

12:12 10  network perimeter (including exploitation of known

11  vulnerabilities of outdated versions of software and network

12  services).  Obtaining credentials to access servers, network

13  equipment, database management systems, Web applications.

14  Identification of sensitive data stored in open form.  Use of

15  unsafe configurations of network equipment and servers.

16  Identification of possible countermeasures for the customer's

17  specialists, as well as reaction measures for intrusion

18  detection and prevention systems."

19  Q.   Special Agent, where did you find this proposal?

12:13 20  A.   This was communication sent -- well, where it was found

21  specifically was in Vladislav Klyushin's Apple account.

22  Q.   And we'll get to how you obtained it there in just a

23  moment, but you were about to say where it was sent and by

24  whom.

25  A.   And this was found within the WhatsApp communications

1    between Vladislav Klyushin and an individual associated with

2    the Avilex LLC document, which was on the cover page, and a

3    person with the name Sergey Uryadov.

4    Q.   This was communicated to the defendant by Sergey Uryadov?

5    A.   Yes.

6              MR. FRANK:  Could we have Exhibit 149, please, and I'd

7    offer it.

8              (Exhibit 149 received in evidence.)

9    Q.   As part of your investigation, Special Agent, did you

12:14 10   review M-13's publicly available Facebook page?

11   A.   Yes.

12   Q.   What is Exhibit 149?

13   A.   This is a screenshot of that Facebook page.

14   Q.   And if I could direct your attention to the right-hand

15   side of the Facebook page, do you see under the entry "M-13"

16   there's a date?

17   A.   March 21, 2019.

18   Q.   And then there is several paragraphs in Russian.  Do you

19   see that?

12:14 20   A.   I do.

21   Q.   And then there is a section in English.  Do you see that?

22   A.   Yes.

23   Q.   Was that an FBI translation or something else?

24   A.   This is machine translation offered by Facebook.

25   Q.   Could you read into the record, please, the first

1   paragraph of the English translation and then the first two

2   sentences of the second paragraph.

3   A.   "Information security plays a key role in modern business.

4   The consequences of hacking attacks can be huge.  M-13 provides

5   a list of information security services for large companies and

6   small businesses."

7   Q.   And if you could just continue the first two sentences of

8   the next paragraph.

9   A.   "We are contacted by clients with various inquiries.  Most

12:15 10   often, they concern red team campaigns.  We completely simulate

11   the actions of a cyber crime group."

12   Q.   Thank you.

13        MR. FRANK:  Ms. Lewis, you can take that down.  Thank

14   you.

15   Q.   Special Agent, a moment ago you mentioned obtaining

16   documents from the defendant's iCloud account, and I'd like to

17   ask you a few questions about that.  As part of the

18   investigation, did there come a time when the government

19   obtained search warrants?

12:15 20   A.   Yes.

21   Q.   What is a search warrant?

22   A.   A search warrant is a court-authorized order that allows

23   for the seizure and search of a thing.  It can be a house.  It

24   can be a filing cabinet at a business.  It can be an email

25   account.

```
 1   Q.   And who authorizes the search warrant?

 2   A.   A federal judge.

 3   Q.   What kinds of search warrants -- well, did the government

 4   obtain search warrants in this case?

 5   A.   Yes.

 6   Q.   What kinds of search warrants did the government obtain?

 7   A.   Email accounts, social media accounts, Apple iCloud

 8   accounts.

 9   Q.   What can you search in an Apple iCloud account?

10   A.   The items that have been backed up to the Apple iCloud

11   account.

12   Q.   What kinds of items are those?

13   A.   It can be documents.  It could be photos, communications

14   like email or chat communications.

15   Q.   Do you always find all of those things when you search an

16   Apple iCloud account?

17             MR. FERNICH:  Objection.

18             THE COURT:  Sustained.

19   Q.   Did you find all of those things in the iCloud accounts

20   that you searched in this case?

21   A.   No.

22   Q.   Each of the accounts?

23   A.   No.

24   Q.   Based on your training and experience, why not?

25             MR. FERNICH:  Objection.
```

12:16 (line 10)
12:17 (line 20)

```
 1              THE COURT:  Sustained.
 2    Q.   Special Agent, are you familiar with how backing items up
 3    to the iCloud works?
 4    A.   Yes.
 5    Q.   How does it work?
 6              MR. FERNICH:  Objection.
 7              THE COURT:  Overruled.
 8    A.   Items can be backed up based on a variety of circumstances.
 9    In certain instances, items are backed up automatically by the
12:17 10    operating system of the device.  It can be the specific things
11    that a user has chosen to be backed up.  In certain instances,
12    things are backed up and a user decides to delete them, so you
13    wouldn't expect to --
14              MR. FERNICH:  Objection.
15              THE COURT:  Yes, this is just going too far afield.
16    Only ask about this case.
17    Q.   What were some of the iCloud accounts that you -- that the
18    FBI searched as part of this investigation?
19    A.   Could you repeat the question, sir.
12:18 20    Q.   What were some of the iCloud accounts that the FBI searched
21    as part of its investigation?
22    A.   Vladislav Klyushin, Igor Sladkov, Ivan Ermakov, Mikhail
23    Irzak, Nikolai Rumiantcev, Olga Opukhovskaya, and others.
24    Q.   You mentioned a name we hadn't heard before, Olga
25    Opukhovskaya.  Who's that?
```

1          MR. FERNICH:  Objection, foundation.

2          THE COURT:  Do you know who it is?

3          THE WITNESS:  Yes, ma'am.

4          THE COURT:  Overruled.

5    A.    Olga Opukhovskaya is Igor Sladkov's cohabitant.

6    Q.    Do they have children together?

7    A.    They do.

8    Q.    Did you personally review each and every document in all

9    of those iCloud accounts, or were there others involved?

12:19 10    A.    We obtained a voluminous amount of information from

11   various email accounts and Apple iCloud accounts, and the

12   investigative team reviewed those, and I was a part of that

13   team.

14   Q.    Prior to coming to court today, have you had an

15   opportunity to review certain exhibits that were obtained by

16   means of those iCloud search warrants?

17   A.    Yes.

18          MR. FRANK:  I'd like to offer Exhibits 1, 2, 3, 4, 5,

19   6, 7, and 8.  And, Special Agent, I'm going to take you through

12:19 20   each of those in turn beginning with Exhibit 1.

21          (Exhibits 1-8 received in evidence.)

22   Q.    What is this?

23   A.    This is a picture of Vladislav Klyushin's passport.

24   Q.    Exhibit 2?

25   A.    This is a picture of Nikolai Rumiantcev's passport.

```
 1   Q.   Exhibit 3?

 2   A.   This is a picture of Ivan Ermakov's passport.

 3   Q.   Exhibit 4?

 4   A.   This is a picture of Boris Varshavkiy's passport.

 5   Q.   Exhibit 5?

 6   A.   This is a picture of Sergey Uryadov's passport.

 7   Q.   Exhibit 6?

 8   A.   This is a picture of Alexander Borodaev's passport.

 9   Q.   And based on your investigation, does he go by another

10   name?

11   A.   Sasha.

12   Q.   Exhibit 7?

13   A.   This is a picture of Mikhail Irzak's passport.

14   Q.   Exhibit 8?

15   A.   This is a picture of Igor Sladkov's passport.

16   Q.   Thank you, Special Agent.

17        MR. FRANK:  Ms. Lewis, you can take that down.  If we

18   could call up on the left Exhibit 58 and on the right

19   Exhibit 58A, and I'd offer those two exhibits.

20        (Exhibits 58 and 58A received in evidence.)

21   Q.   Special Agent, what are we looking at in Exhibits 58 and

22   58A?

23   A.   This is both a Russian language version and an FBI

24   translated into English version of a list of employees involved

25   in a construction project.
```

1    Q.    Where was this document found?

2    A.    This was found both in Vladislav Klyushin and Nikolai

3    Rumiantcev's Apple accounts.

4    Q.    Directing your attention to Exhibit 58A, could you read

5    the heading on the page, please.

6    A.    "The list of employees involved in the construction of --"

7    and then there are several letters making an acronym.

8    Q.    Thank you.  And if you look at the list, Special Agent, do

9    you see that under "Employer" there are two entities listed?

12:22 10    A.    Yes.

11    Q.    I'd like to ask you some questions about some of the

12    individuals listed under LLC M-13.  In English, what does "LLC"

13    translate to?

14    A.    Limited liability corporation.

15    Q.    Directing your attention to Item 13, do you see there's an

16    entry there?

17    A.    Yes, Vladislav Klyushin.

18    Q.    Okay.  And he's listed under M-13?

19    A.    Yes.

12:22 20    Q.    What is the title that's listed?

21    A.    First Deputy Director General.

22    Q.    Item 14?

23    A.    Zhannetta Klyushina.

24    Q.    And how is Ms. Klyushina listed?  What is her title?

25    A.    Advisor to the Director General.

```
 1    Q.   Directing your attention to Item 18.

 2    A.   Ivan Ermakov.

 3    Q.   He's also listed under M-13?

 4    A.   Yes.

 5    Q.   What is his title?

 6    A.   Deputy Director General.

 7    Q.   Item 27?

 8    A.   Nikolai Rumiantcev.

 9    Q.   He's also listed under M-13?

 10   A.   Yes.

 11   Q.   What is his title?

 12   A.   Deputy Director.

 13   Q.   Thank you.

 14        MR. FRANK:  Ms. Lewis, if you could now put up

 15   Exhibit 248, and I'd offer it.

 16        (Exhibit 248 received in evidence.)

 17   Q.   Special Agent, you see this is a group photo?

 18   A.   I do.

 19   Q.   I'd like to ask you about the individual about four in

 20   from the right -- Ms. Lewis, if you could indicate him --

 21   wearing a suit and a brown tie.

 22   A.   This is Nikolai Rumiantcev.

 23   Q.   And who is the individual behind him and to the right in

 24   the corner?

 25   A.   The defendant, Vladislav Klyushin.
```

1            MR. FRANK:  Ms. Lewis, if you could call up

2       Exhibit 13, please, and I'd offer it.

3            (Exhibit 13 received in evidence.)

4       Q.   Special Agent, who's depicted in this photograph?

5       A.   Ivan Ermakov.

6            MR. FRANK:  And, Ms. Lewis, if you could enlarge the

7       portion of the photograph.

8       Q.   Can you read what it says on that sticker on Mr. Ermakov's

9       shirt?

12:24 10     A.   It has the M-13 logo.

11      Q.   Where was this photograph of Mr. Ermakov wearing a sticker

12      with the M-13 found?

13      A.   In the iCloud account of Vladislav Klyushin.

14      Q.   Sitting here today, do you have a memory of what the date

15      of this photograph was, as indicated in the iCloud account?

16      A.   Yes.  It was December 26, 2019.

17      Q.   Did you find other photos of Mr. Ermakov in Mr. Klyushin's

18      iCloud account?

19      A.   Yes.

12:25 20          MR. FRANK:  The first of these, your Honor, is

21      Exhibit O.

22           MR. NEMTSEV:  That's objected to, your Honor.

23           THE COURT:  Let me take a look.  Well, why don't you

24      identify it.  What is it?

25           MR. FRANK:  He doesn't have it in front of him, your

```
 1   Honor.  Let me --
 2            THE COURT:  He doesn't?
 3            MR. FRANK:  May I approach?
 4   Q.   Special Agent, could you tell the Court who is depicted in
 5   Exhibit O.
 6   A.   This is Ivan Ermakov.
 7   Q.   Where did you find it?
 8   A.   This was located in Vladislav Klyushin's Apple account.
 9            MR. FRANK:  I'd offer it.
10            MR. NEMTSEV:  Your Honor, we objected to it.
11            THE COURT:  Overruled.
12            THE CLERK:  Can I get the next number?
13            MR. FRANK:  108.
14            THE CLERK:  Oh, you're going to put it in as 108.
15   Thank you.
16            (Exhibit 108 received in evidence.)
17   Q.   Special Agent, tell us what we're looking at.
18   A.   This is a picture of Ivan Ermakov at the 2018 World Cup.
19            MR. NEMTSEV:  Objection.
20            THE COURT:  What are we talking about now, 118?
21            MR. FERNICH:  Objection.
22            MR. FRANK:  108.
23            MR. FERNICH:  Objection to the characterization and
24   description.
25            THE COURT:  How do you know that?
```

```
 1              THE WITNESS:  There's a logo on the red shirt which is
 2    the logo for the --
 3              MR. FERNICH:  Objection.
 4              THE COURT:  How do you know this?
 5              THE WITNESS:  It's -- it's the logo for the 2018 World
 6    Cup at Sochi.
 7              THE COURT:  Overruled.
 8              THE WITNESS:  There's also a logo on the lanyard,
 9    which is also for that same event.
12:27 10              THE COURT:  I'll allow it as so described.  They can
11    draw whatever inferences they want from it.
12    Q.   Were you also able to date this photograph?
13    A.   Yes.
14    Q.   And how did the date correspond to the World Cup in Sochi?
15    A.   It corresponded with the event.
16    Q.   And, again, this photo was found where?
17    A.   In the Apple account of Vladislav Klyushin.
18              MR. FRANK:  Could we have Exhibit 123, please.
19    Q.   What are we looking at in Exhibit 123?
12:28 20    A.   This is a picture of Ivan Ermakov sitting next to
21    Vladislav Klyushin at the same event.
22    Q.   Does this appear to be a selfie?
23    A.   It is, yes.
24    Q.   And again this was also found in the same location?
25    A.   Yes.
```

1    Q.   Exhibit 109, please.  Special Agent, was this photograph

2    taken at the same event on a different day?

3    A.   Yes.  You'll notice the red shirts in the background, the

4    lanyards with the same logo, and it's within the date frame of

5    the same event.

6    Q.   Beginning on the left, can you identify the individual on

7    the far left?

8    A.   Yes.  That is Zhannetta Klyushina.

9    Q.   We saw Ms. Klyushina's name on that list of employees a

12:29 10   moment ago?

11   A.   Yes.

12   Q.   How is she affiliated with the defendant?

13   A.   That is Vladislav Klyushin's wife.

14   Q.   And who is standing with his arm around her?

15   A.   That is Vladislav Klyushin.

16   Q.   Who is the individual next to Mr. Klyushin on the other

17   side?

18   A.   Sergey Uryadov.

19   Q.   A moment ago we looked at a red team proposal document?

12:29 20   A.   Yes.

21   Q.   And I believe you told us -- well, tell us again, who sent

22   that document to whom?

23   A.   Vladislav Klyushin sent that proposal to Sergey Uryadov.

24   Q.   And then jumping over the person in the middle, can you

25   identify the person who's second from the right?

```
 1   A.    Ivan Ermakov.
 2   Q.    Could we look at Exhibit 110, please.  Special Agent --
 3         MR. FRANK:  Well, I'd offer 110, and, Ms. Lewis, if
 4   you could play 110, and I'm going to ask you to stop it shortly
 5   before the end.
 6         (Exhibit 110 received in evidence.)
 7         (Video played.)
 8         MR. FRANK:  I'm afraid we're missing the audio.  Can
 9   you pause it, please.  We're still having audio problems.  Can
10   we pause it?
11   Q.    While we're paused, Special Agent --
12         MR. FRANK:  Ms. Lewis, if we could actually briefly
13   call up Exhibit 3.
14   Q.    Do you see there's a date of birth listed --
15   A.    Yes.
16   Q.    -- on Mr. Uryadov's passport?
17   A.    Yes.
18   Q.    What is his date of birth?
19   A.    April 10, 1986.
20         MR. FRANK:  And, Ms. Lewis, with apologies for that,
21   could you take us back to Exhibit 110.
22         (Video played.)
23         MR. FRANK:  We still appear to be having audio issues.
24         THE COURT:  Well, is the audio important to you?
25   Q.    Well, Special Agent, can you tell us whether you were able
```

12:30 (line 10)
12:31 (line 20)

1    to identify what was happening, audio-wise, in this video?

2    A.    Yes.  The individuals at the table were singing Happy

3    Birthday in Russian.

4    Q.    You could tell from the melody?

5    A.    Yes.

6    Q.    The same melody we're familiar with in English?

7    A.    Yes.

8    Q.    And what was the date?  Do you recall the date of the

9    photograph?

12:32 10    A.    April 10, 2018.

11    Q.    Okay, and if we could just play the video.

12          (Video played.)

13          MR. FRANK:  Can we pause it.

14    Q.    Special Agent, who's the individual on the right of the

15    screen with the birthday cake in front of them?

16    A.    Ivan Ermakov.

17    Q.    And who is the male individual sitting across the table

18    from him?

19    A.    That is Sergey Uryadov.

12:32 20    Q.    Thank you.

21          MR. FRANK:  Ms. Lewis, you can continue.

22          (Video played.)

23    Q.    Where was this video found?

24    A.    This was found in Vladislav Klyushin's Apple account.

25          MR. FRANK:  Could we have Exhibit 100, please, and I'd

1    offer it.

2              (Exhibit 100 received in evidence.)

3              (Video played.)

4              MR. FRANK:  The next exhibit is Exhibit P, your Honor.

5    May I approach the witness?

6              THE COURT:  Yes.

7              (Discussion between the Court and Clerk.)

8              THE COURT:  Do we have the right --

9    Q.    Special Agent, are you able to identify the individual in

12:34 10   Exhibit P?

11   A.    I am.

12   Q.    Who is it?

13   A.    This is Ivan Ermakov.

14   Q.    Where was this photo found?

15   A.    In Vladislav Klyushin's Apple account.

16             MR. FRANK:  I offer it.

17             MR. NEMTSEV:  We object, your Honor, for the reasons

18   we stated.

19             THE COURT:  Sustained.

12:34 20   Q.    Could we take a look at Exhibit 120, please.  Special

21   Agent, taking a look at Exhibit 120, who are the individuals on

22   the far right sitting -- well, who's the first individual on

23   the far right in the front?

24   A.    The female is Zhannetta Klyushina.

25   Q.    Who is sitting next to her making a V for victory sign?

```
 1   A.   That is Vladislav Klyushin.

 2   Q.   Who's the individual next to him?

 3   A.   Ivan Ermakov.

 4   Q.   Who's the individual across from him, also making a V for

 5   victory sign?

 6   A.   Sergey Uryadov.

 7   Q.   Could we look at Exhibit 122, please.

 8           (Video played.)

 9   Q.   Special Agent, was this video from the same location as

12:35 10   the prior photograph?

11   A.   Yes.

12   Q.   Who are the individuals depicted?

13   A.   On the right is Vladislav Klyushin, and on the left is

14   Ivan Ermakov.

15   Q.   And can you for the record describe what's happening.

16   A.   Yes.   The two are --

17           MR. FERNICH:   Objection.

18           THE COURT:   Sustained.

19           MR. FRANK:   Could we have Exhibit 119, please.

12:36 20   Q.   What are we looking at, Special Agent?

21   A.   This is a picture of Ivan Ermakov on the top of a

22   mountain.

23   Q.   Is this on the same day?

24   A.   It is.

25   Q.   Where was this photo obtained?
```

1    A.    Vladislav Klyushin's Apple account.

2    Q.    Can we look at Exhibit 107, please.  Where was this photo

3    obtained?

4    A.    This was in Vladislav Klyushin's Apple account.

5    Q.    Who is the individual on the right with his back to the

6    camera?

7             MR. FERNICH:  Objection.

8             THE COURT:  Sustained.

9    Q.    Were you able to identify that photo based on other photos

12:36 10    found nearby?

11   A.    Yes.

12   Q.    I'd ask the question again:  Were you able to identify

13   that individual?

14   A.    I was.

15   Q.    Who was it?

16   A.    Nikolai Rumiantcev.

17   Q.    Okay.  And directing your attention to this individual

18   that Ms. Lewis is indicating across the table, who is the

19   individual with a red circle around him across the table from

12:37 20   Mr. Rumiantcev?

21   A.    Ivan Ermakov.

22             MR. FRANK:  Could we have Exhibit 106, please.

23   Q.    Where was this photo obtained?

24   A.    In the Apple account of Vladislav Klyushin.

25   Q.    Who is the individual on the left in a blue sweatshirt?

1      A.    Ivan Ermakov.

2      Q.    Who's the individual opposite him on the right in a gray

3      sweatshirt?

4      A.    Sergey Uryadov.

5      Q.    Could we have Exhibit 124, please.  So where did you find

6      this photograph?

7      A.    In the Apple account of Vladislav Klyushin.

8      Q.    Who is the individual on the left?

9      A.    In the white shirt, Ivan Ermakov.

12:38 10    Q.    Who is the individual in the middle?

11     A.    Sergey Uryadov.

12     Q.    Could we have Exhibit 125, please.  Where did you find

13     this photograph?

14     A.    In the Apple account of Vladislav Klyushin.

15     Q.    Who's the individual on the right?

16     A.    Ivan Ermakov.

17     Q.    Who is the individual next to him?

18     A.    Sergey Uryadov.

19     Q.    Could we have Exhibit 127, please.  Who are the

12:38 20    individuals -- well, who are the two males depicted in this

21     photograph?

22     A.    The individual on the left in the foreground is Ivan

23     Ermakov.

24     Q.    Who is the male on the right?

25     A.    Vladislav Klyushin.

```
 1   Q.   And who's in between them?

 2   A.   Klyushin's wife, Zhannetta.

 3   Q.   I'd like to show you some other photographs from that same

 4   event.

 5        MR. FRANK:  Can we have 128, please.

 6   Q.   Special Agent, who's on the left?

 7   A.   Vladislav Klyushin.

 8   Q.   Who's next to him?

 9   A.   Anslem Shmucki.

10   Q.   Who's on the right?

11   A.   Zhannetta Klyushina.

12        MR. FRANK:  Could we have 147, please.

13   Q.   Beginning on the left, who's that individual?

14   A.   Alexander Borodaev.

15   Q.   Who's the individual in the middle?

16   A.   Vladislav Klyushin.

17   Q.   Who's the individual on the right?

18   A.   Boris Varshavksiy.

19   Q.   The next exhibit is Exhibit B and D, and actually W also

20   goes with it.

21        MR. FRANK:  May I approach, your Honor?

22        THE COURT:  Yes.

23   Q.   Special Agent, could you tell the Court who the individual

24   is in Exhibit B.

25        THE COURT:  I'm not sure I have D.  Oh, B, B.  All
```

1   right.  All right.

2   Q.   Special Agent, who's the individual in Exhibit B?

3   A.   This is Anslem Shmucki.

4        MR. FERNICH:  Objection, foundation.

5        THE COURT:  Sustained.

6   Q.   Special Agent, how do you know who the individual is in

7   Exhibit B?

8   A.   Because of communications sent between Vladislav Klyushin

9   and Anslem Shmucki.

12:40 10       MR. FERNICH:  Objection, foundation.

11        THE COURT:  Sustained.  Why don't we deal with this at

12   the break.

13        MR. FRANK:  Yes, your Honor.

14   Q.   Special Agent, as part of your review of the Klyushin

15   iCloud backup, did you find any communications between the

16   defendant and Mr. Ermakov?

17   A.   Yes.

18   Q.   Are you familiar with a messaging platform called

19   "WhatsApp"?

12:41 20   A.   Yes.

21   Q.   What is WhatsApp?

22   A.   WhatsApp is a communications platform that can be

23   installed on mobile devices, like a smartphone, and allows for

24   encrypted exchange of text or audio.  Messages could be sent

25   between as well as audio.  Think of it as a telephone call

```
    1   between the two, two parties, two or more parties.
    2   Q.   And how are you able, if at all, to identify who the
    3   parties are who are parties to a WhatsApp communication?
    4   A.   By the telephone number.
    5   Q.   And before coming here today, did you have an opportunity
    6   to review what has previously been marked as Exhibit 151?
    7   A.   Is it on the --
    8   Q.   It's not on the screen, but did you have an opportunity to
    9   review WhatsApp communications between the defendant and
12:42 10   Mr. Ermakov?
   11   A.   Yes.
   12   Q.   Okay.  And you mentioned a moment ago that WhatsApp
   13   communications are encrypted.  Were the communications that you
   14   reviewed able to be read?
   15   A.   Yes.
   16   Q.   Can you explain that.
   17   A.   We found the communications in an unencrypted form that
   18   were backed up to Vladislav Klyushin's Apple account.
   19            MR. FRANK:  Your Honor, I'm not sure how you'd like me
12:42 20   to proceed with these.  We have them individually designated
   21   from the larger communication.
   22            THE COURT:  All right.
   23            MR. NEMTSEV:  Your Honor, we've never seen the
   24   designations.
   25            THE COURT:  You received all these, though, right?
```

         1          MR. NEMTSEV:  The specific spreadsheet, yes, but not
         2     the specific portions.
         3          THE COURT:  Well, do you have them in a way that he
         4     can see them first before showing them?
         5          MR. FRANK:  If there were a way to show them for
         6     counsel only, yes, but I understand the computer is not
         7     working.
         8          THE COURT:  Well, you don't have them printed out in
         9     any way?
12:43 10          MR. FRANK:  We do not.  If counsel wants, we can show
        11     them to him on Ms. Lewis' computer.
        12          THE COURT:  Yes.  Why don't you walk over there?
        13          (Pause.)
        14          THE COURT:  You don't have to show them everything.
        15     Okay, let's go.
        16     Q.   Okay, special Agent, directing your attention -- well, if
        17     we could call up 151A, please, do you recognize 151A?
        18     A.   Yes.
        19     Q.   Directing your attention to the date/time, was this the
12:44 20     first of the WhatsApp communications that you found?
        21     A.   Between Ivan Ermakov and Vladislav Klyushin, yes.
        22     Q.   What is the date?
        23     A.   October 29, 2018.
        24     Q.   And do you recall when the last date was of the iCloud
        25     communications that you found between the defendant and

1    Mr. Ermakov?

2    A.   October of 2020.

3           MR. FRANK:  And just for the record, I'd offer all of

4    Exhibit 151A for identification only.

5           (Exhibit 151A for identification.)

6    Q.   And then, Special Agent, as to 151A, which I've offered

7    into evidence, I'd like you to please -- well, let me ask you

8    one prefatory question.  When you found the messages, what

9    language were they in?

12:45 10   A.   Russian.

11   Q.   And so we see a translation in the middle of the page.

12   Who prepared that translation?

13   A.   The FBI.

14   Q.   Okay.  Could you please read for the record the English

15   translation of this excerpt.

16          THE COURT:  First of all, who's speaking?  Do you

17   know?

18          THE WITNESS:  I can tell from this exchange.

19          THE COURT:  Yes?

12:46 20         THE WITNESS:  Yes.

21   Q.   So, Special Agent, tell us again how you can tell who's

22   speaking.

23   A.   The WhatsApp communications were backed up in a form that

24   denoted a "from" and a "to" recipient by phone number, and the

25   phone number to two names were also found within the chat

1    content.

2    Q.    Okay.  And did you find other records indicating the phone

3    numbers of Mr. Ermakov and Mr. Klyushin?

4    A.    Yes.  The Apple subscriber information corroborated that

5    information.

6    Q.    And why don't we just take a moment to look at that right

7    now, Exhibit 9.  What is Exhibit 9?

8    A.    These are the Apple subscriber records for Vladislav

9    Klyushin's Apple account.

12:46 10   Q.    Okay.  And if we could move over just a bit toward the

11   right, do you see a number there?

12   A.    I do.

13   Q.    What are the last four digits?

14   A.    The last four digits are repeated by other members

15   associated with Klyushin's family, so I'll -- I'll read a few

16   more.

17   Q.    You see those four digits?

18   A.    I do.

19   Q.    Okay.  And were those the digits that you used to identify

12:47 20   the WhatsApp communications?

21   A.    Yes.

22   Q.    Okay.  And if we could look at Exhibit 11.  What is this?

23   A.    These are the Apple subscriber records for Ivan Ermakov.

24   Q.    And if we could move all the way to the right, again do

25   you see a phone number there under the --

1    A.    Yes, I do.

2    Q.    And what are the last four digits?

3    A.    0085.

4          MR. FRANK:  And just to be clear, I offer 9 and 11.

5          (Exhibits 9 and 11 received in evidence.)

6    Q.    If we could now go back to 151A.  And, Special Agent, do

7    you see that under the "from" column, there's a number ending

8    in 0085?

9    A.    Yes.

12:48 10  Q.    Whose number is that?

11   A.    Ivan Ermakov.

12   Q.    Okay.  And then under the "to" column, you see there's a

13   number ending in those four digits?

14   A.    1413, yes.

15   Q.    And whose phone number is that?

16   A.    Vladislav Klyushin.

17   Q.    Thank you.  Could you now read for the record the English

18   language translation of this exchange identifying, as to each

19   line, who the speaker is.

12:48 20  A.    "Ermakov:  Hi, I changed the number.  Ivan.

21         "Klyushin:  Hi.  What did Igor bring me as a present?

22         "Ermakov:  Hi.  I didn't understand the question.  Did he

23   not give it to you?

24         "Klyushin:  No, but I am testing you.

25         "Ermakov:  That or you are testing me?

 1          "Klyushin:  Who knows who is writing?  Alright.

 2          "Ermakov:  The hoodie and the L-sized Tesla logo black

 3     T-shirt.

 4          "Ermakov:  Thumbs-up emoji.  Greetings, greetings."

 5              MR. FRANK:  Thank your, Special Agent.

 6              If we could now have 151B, and I'd offer it.

 7              (Exhibit 151B received in evidence.)

 8     Q.   Special Agent, could you tell us the date of this

 9     exchange.

12:49 10    A.   November 21, 2018.

11     Q.   Could you read it for the record and identify the

12     speakers, please.

13     A.   "Klyushin:  Good morning.  How about we go to sauna at

14     1700 today?  And head home earlier?

15          "Ermakov:  I won't make it by 17:00.  Let us try by at

16     least 1730.  That, or be there by 17:00 and I will come later.

17          "Klyushin:  Okay, no problem.  I just don't want it to be

18     too late.

19          "Ermakov:  I concur.  I think 17:30 is fine.

12:50 20    "Klyushin:  Okay."

21              MR. FRANK:  Could we have 151C, and I'd offer it.

22              (Exhibit 151C received in evidence.)

23     Q.   Special Agent, what is the date of this exchange, and

24     could you read it for the record, please?

25     A.   December 3, 2018.

1          "Ermakov:  I won't be able to call you back.  I forgot my
2     phone at work.
3          "Klyushin:  Hi.  I want to hear how is your trading, since
4     Kolya is on vacation.
5          "Ermakov:  Our shares grew a bit.  I will be closing some
6     today.  On others we will wait longer.  They fell too much,
7     need to wait more."
8     Q.   Thank you.
9          MR. FRANK:  Your Honor, the next exchange is objected
12:51 10    to.  I can skip over it, but then counsel will need to review a
11    few more exchanges.
12          THE COURT:  All right.
13          (Pause.)
14          MR. FRANK:  Okay, Ms. Lewis, if you could show us
15    151F, please.
16          THE CLERK:  F?
17          MR. FRANK:  F as in Frank.
18          THE CLERK:  Thank you.
19    Q.   Special Agent, if you could identify the date of this
12:53 20    exchange.
21    A.   May 25, 2019.
22    Q.   And could you read the English language version,
23    identifying the speaker, please.
24    A.   "Klyushin:  I did the math for Boris, starting November 1,
25    2018, ending May 25, 2019.  The profit comes to 198%.

1            "Ermakov:  How about Sasha?

2            "Klyushin:  One second.  69.3 percent.  (Three tears of

3      joy emoji.)  Boris earned $989,000 on $500,000.  Sasha $693,000

4      on $1 million.  They don't even ask why anymore.  I told them

5      that there are different strategies and we are still looking

6      closely.

7            "Ermakov:  (Thumbs up emoji followed by three tears of joy

8      emoji)."

9      Q.   Special Agent, did you find any other references to Boris

12:54 10     and Sasha in Mr. Klyushin's iCloud account?

11     A.   I did.

12           MR. FRANK:  For identification only, we'd mark 152.

13           (Exhibit 152 for identification.)

14     Q.   And for you, Special Agent, I'd offer 170 on the left and

15     170A on the right.  As part of your investigation, did you find

16     a WhatsApp communication involving the defendant, Boris

17     Varshavksiy, and Alexander Borodaev, or Sasha Borodaev?

18     A.   Yes.

19     Q.   And what are we looking at here in 170 and 170A?

12:55 20     A.   This is a screenshot of a contact card for Alexander

21     Borodaev associated with the specific telephone number.

22     Q.   Okay.  And where did you find this?

23     A.   This was found in --

24     Q.   You looked in Mr. Klyushin's account?

25     A.   Yes.

```
 1    Q.    Okay.  And if we could take a look at 152A, please, who's
 2    involved in this exchange?  Is this the group exchange you
 3    referenced a moment ago?
 4    A.    Yes.  This is between Vladislav Klyushin, Alexander
 5    Borodaev, and Boris Varshavksiy.
 6    Q.    And, again, Alexander Borodaev, his other name?
 7    A.    Sasha.
 8    Q.    Could you identify the date, please.
 9    A.    October 24, 2018.
12:56 10   Q.    Could you read it and identify the speaker, please.
11    A.    "Vladislav Klyushin:  Take a look at Tesla stock now and
12    tomorrow after 16:30 and how much it grows."
13    Q.    And I'm just going to stop you right there, Special Agent.
14    You see that the time stamp there is October 24 at 13:28?
15    A.    Yes.
16    Q.    Okay.  And you see that the next entry is at a later time?
17    A.    I do.
18    Q.    What time is the second entry?
19    A.    16:18.
12:56 20   Q.    Okay.  And do you see there is a JPEG file that was
21    transmitted?
22    A.    I do.
23    Q.    Were you able to identify that file in the iCloud account?
24    A.    Yes.
25    Q.    Okay, we'll call that up in just a moment.  Could you read
```

1   the next entry at 16:19.

2   A.   "It was 288 and after closing became 308, and tomorrow it

3   will most likely reach 330 and that's 10 percent, and with the

4   leverage of 2-3 times, it's almost 25.  But there are not many

5   transactions like this in the quarter."

6          THE COURT:  Now, who's saying that?

7          THE WITNESS:  This is Vladislav Klyushin to the other

8   individuals, Alexander Borodaev and Boris Varshavksiy, who are

9   the other participants in this group communication.

12:57 10   Q.   And directing your attention to the top line where

11   Mr. Klyushin says, "Take a look at Tesla stock now and tomorrow

12   after 16:30 and how much it grows."

13          What is 16:30 Moscow time in Eastern Time?

14   A.   At this time of year, 16:30 Moscow local time was 9:30

15   Eastern, when the market opens.

16          MR. FRANK:  Can we look at 152C and 152D, please.  One

17   moment, Special Agent.

18          To the extent it was unclear, I offer that,

19   Ms. Molloy.

12:58 20          THE CLERK:  Okay, thank you.

21          (Exhibit 152A received in evidence.)

22   Q.   Special Agent, we have an issue displaying Exhibit 152C,

23   but I'm going to show you 152D, and I believe 152C is

24   stipulated, so we offer that as well?

25          (Exhibits 152C and 152D received in evidence.)

1    Q.   And let me show you -- 152D is what, Special Agent?

2    A.   This is an FBI translation from -- words appearing in

3    Russian translated into English.

4    Q.   And 152C was the original Russian version?

5    A.   Yes.

6    Q.   Okay.  And what are we looking at in 152D?

7    A.   This is the stock chart for Tesla that was communicated in

8    the chat exchange that we were looking at.

9    Q.   Okay.  And what is the price indicated at this particular

12:59 10   moment in time?

11   A.   $288.50.

12   Q.   Could we have 152B, please.  Who are the speakers -- who's

13   communicating here?

14   A.   This is, again, another excerpt of the group chat between

15   Vladislav Klyushin, Sasha Borodaev, or Alexander Borodaev, and

16   Boris Varshavksiy.

17   Q.   What is the date of this communication?

18   A.   This is March 11 of 2019.

19   Q.   Could you read the communication in the first box.

01:00 20   A.   Yes.

21        "Klyushin:  Good morning.  I am back, had a good vacation,

22   ready to work.  Congratulations to Boris, he showed super

23   result for the four-months period and made $632,000.

24   Alexander's is a little worse, $461,000.  Also, OpenBroker

25   created a new function and you could follow the value of your

portfolio online.  I will send you the log-in password below.
You could look at it at any time.  There will be no bids until
April 15, so if you want, you can withdraw extra funds."

Q.   And then you see there is a log-in and password for each
individual by the initials BV.  Who's BV?

A.   BV is initials for Boris Varshavksiy.

Q.   And then there is the log-in and password for the
individual with the initials AB?

A.   Alexander Borodaev.

01:01 Q.   Okay.  And the date on this exchange where Mr. Klyushin is
indicating these returns is what?

A.   March 11, 2019.

Q.   And just for the sake of comparison, if we could just
quickly call up 152A again.  What was the date in which
Mr. Klyushin asked Mr. Varshavkiy and Mr. Borodaev to look at
Tesla stock now and tomorrow after the market opens and how
much it grows?

A.   October 24, 2018.

Q.   So that was about five months earlier?

01:02 A.   Yes.

          MR. FRANK:  Your Honor, is this a good spot?

          THE COURT:  Yes.  It's a good time.  See you tomorrow.

          THE CLERK:  All rise.

          (Jury excused.)

          THE COURT:  I'll see counsel at sidebar.  Everybody

         1    else can be seated.

         2         You can step down, sir.  Thanks.

         3    SIDEBAR CONFERENCE:

         4         THE COURT:  Do you need to speak to your client

         5    afterwards, or should he leave?

         6         MR. NEMTSEV:  I'd like to speak to him.

         7         THE COURT:  Okay, good.  All right, so let me say I'm

         8    having a hard time following some of this, and my guess is the

         9    jury is too.  The names are strange to us.  We haven't really

01:03   10    heard much about Varshavkiy, Borodaev -- I don't even know all

        11    the other names.  We don't know who they are.  I don't know who

        12    they are.  They're not charged conspirators, and so it's just

        13    hard to follow.  And the other guy, what was his name who was

        14    the strange name?

        15         MR. FRANK:  Shmucki.

        16         THE COURT:  Shmucki or whatever, yeah.  I have no idea

        17    who these people are.  You know, I didn't get them in a -- so

        18    I'm trying to understand it, and my guess is, they are too.

        19    For starters, I think it wouldn't hurt to have a list of the

01:04   20    names for people.  Like, I don't know Boris and Sasha.  I just

        21    don't know these people.  I only know Mr. Klyushin, and I know

        22    Mr. Ermakov, a little less so than the -- but at least those

        23    names are listed in the indictment.  Sladkov and Irzak, at

        24    least I've heard those names.  These other people I don't know.

        25    So I don't know what to do about that.

```
 1            MR. FRANK:  We're going to make it clear through the
 2   testimony, your Honor.  The three names that you're
 3   identifying, Varshavksiy, Borodaev, and Uryadov are the
 4   defendant's three investors, so that's going to become very,
 5   very clear, and that's why he's talking to them about their
 6   return.  But I can clear that up with Special Agent --
 7            THE COURT:  All right, but I have not found that they
 8   are coconspirators.
 9            MR. NEMTSEV:  They're not alleged to be.
10            THE COURT:  They're not alleged to be.  And so it was
11   just, with all the pictures and stuff, I didn't know whether --
12            MR. FRANK:  We're not even introducing their
13   communication.  We're introducing Mr. Klyushin's communications
14   to them and their responses for context.
15            THE COURT:  I understand.  I'm just saying, you've got
16   to explain it to me, never mind them.
17            MR. KOSTO:  If it would be helpful, your Honor, we can
18   print on an 81/2-by-11 piece of paper each of the names that
19   have come up without any ornamentation, just so that --
20            THE COURT:  We can see what the names are.
21            MR. KOSTO:  -- you can see the name as it comes up.
22            THE COURT:  That would be useful.  All right, now --
23            MR. FRANK:  The sole reason to identify him is to show
24   that he's an associate of the defendant who's in that
25   paragraph, which is with the --
```

01:04 (line 10)
01:05 (line 20)

1          THE COURT:  So, all right, B, is there an objection to

2   B?

3          MR. NEMTSEV:  Yes, because --

4          THE COURT:  Sustained.

5          So here's this one.  I've already ruled that that's

6   in.  That's D, which is the Ukrainian press release.  That's on

7   his phone, right?

8          MR. FRANK:  Yes.  That's in his iCloud, yes.  And the

9   only reason we offered B is just to show that they're together.

01:05  10          THE COURT:  He's just an investor.  That's why I

11   needed to know who these people were, so --

12          MR. FRANK:  He's not an investor.  He's an associate

13   of the defendant's.  But it's irrelevant who he is.  It's just

14   that they're together when this photo was taken, and that's

15   what the special agent will say.

16          THE COURT:  I don't think it has much relevance, but --

17          MR. FRANK:  Otherwise, it's just a photo divorced of

18   any context.

19          THE COURT:  But it's on his phone, I'm assuming you're

01:06  20   saying?

21          MR. FRANK:  It is on his phone.

22          THE COURT:  I'll allow that and give a limiting

23   instruction.

24          (Exhibit D received in evidence.)

25          THE COURT:  No one is alleging that he had anything to

```
 1    do with the Ukrainian hacker.
 2              MR. FRANK:  Understood, understood.  And then there's
 3    the article that is depicted, which is I think Exhibit W or
 4    Y --
 5              THE CLERK:  You said B, D, and W.
 6              MR. FRANK:  -- if I may, your Honor.
 7              THE COURT:  I'll allow that.
 8              (Exhibit W received in evidence.)
 9              MR. FRANK:  Maybe you just read the first sentence so
10    that it's clear what it is.
11              THE COURT:  I haven't read it, so I don't know if
12    there's anything in particular in there that's offensive,
13    but...
14              MR. NEMTSEV:  Just the fact that they pled guilty.
15              THE COURT:  If anything, it's going to give them a
16    sense of what the punishment is, but, anyway --
17              In any event, now, what is all this?
18              MR. FERNICH:  That's a great question.
19              MR. FRANK:  This is only offered to explain the
20    WhatsApp communication that they're objecting to between the
21    defendant and Mr. Ermakov.  That's the WhatsApp communication
22    where Mr. Klyushin sends the defendant these photographs, says,
23    "I'm having a great time," and Mr. Ermakov says, "I wish I
24    could travel," and Mr. Klyushin says, "I can help you out by
25    getting you documents in another name that will allow you to
```

1    travel."

2          THE COURT:  I think that that's a stretch, and I'm

3    excluding all of them.  All right, now, what's --

4          MR. KOSTO:  Photos of the chat itself.

5          THE COURT:  I'm not talking about the chat, just the

6    photos.

7          MR. FRANK:  He can describe the photos without us

8    putting in the photos.

9          THE COURT:  But the photos are --

01:07 10       MR. NEMTSEV:  Describing the photos?

11          MR. FRANK:  Just describing that they are photos of a

12   vacation is all he would describe so the chat makes sense.

13          THE COURT:  Maybe, but not eight photos of people

14   having a great time.  That beautiful woman, was that his wife?

15          MR. NEMTSEV:  That's his wife.  I'll tell her you said

16   that.

17          THE COURT:  Can I say, he looks a lot older now than

18   he did in those pictures.

19          (Cross-talk.)

01:08 20       THE COURT:  The pictures are not in.

21          THE CLERK:  So I have B is out, D is in, and W is in,

22   correct, just for the record?

23          MR. FRANK:  So there's the WhatsApp chat that

24   surrounds those photographs.  That's the chat.

25          THE COURT:  I'm not ruling on it.  I'm just saying the

```
 1   pictures are out.
 2           MR. FRANK:  Understood.
 3           THE COURT:  Okay, all right, these pictures are out.
 4           Now, these, this is the heart of it.
 5           MR. FRANK:  We're going to get to the chat long before
 6   we get to that.
 7           THE COURT:  That is the Micfo which is R.  So,
 8   actually, I've never seen these before actually.
 9           MR. KOSTO:  Can I direct you to the page that's most
10   relevant?  There's no dispute that it's paid, I don't believe.
11           MR. NEMTSEV:  This is the relevant one, right?
12           MR. KOSTO:  A November 24, 2018 invoice, and the IP
13   usage in this case was in late October and early November,
14   2018, so we're about three, four weeks afterward.  And the
15   invoice is produced by Micfo sent to StackPath, the company
16   that controlled the IP address, and it covers a bill for one IP
17   address.
18           THE COURT:  Who -- I understand you have an affidavit
19   under oath at 9:01?
20           MR. KOSTO:  From StackPath, the 80:36.
21           THE COURT:  They can only say they received this and
22   it was kept in the ordinary course, right?
23           MR. KOSTO:  Absolutely.
24           THE COURT:  They can't say that they generally did it
25   and it was accurate.  That's what I'm trying to deal with now.
```

01:09 (line 10)
01:09 (line 20)

 1    I'm trying to figure out -- I think under the business records

 2    rule you can fairly put in that they received that.

 3          MR. KOSTO:  And kept it in the ordinary course.

 4          THE COURT:  That doesn't necessarily mean all the

 5    information in it is accurate.  That's what I'm struggling

 6    with.

 7          MR. NEMTSEV:  And this is the information that we're

 8    concerned about because it's testifying what IP, what location,

 9    what computer, what server.

01:10 10          MR. KOSTO:  This is an intangible thing, this IP

11    address, and the way to prove that it was assigned to an IP

12    address on a certain date is how the parties paid and how the

13    documents relate to the IP address for him.  I can't bring an

14    IP address into court and show it to you, but I can show you

15    that Micfo billed StackPath for it, and StackPath saved this in

16    the ordinary course.  And there are no indicia of

17    untrustworthiness --

18          THE COURT:  That's what I need to find out.

19          MR. KOSTO:  What our submission is --

01:10 20          THE COURT:  Well, who knows anything about it?  Is

21    there anyone from StackPath who knows?

22          MR. NEMTSEV:  There is.  There's the owner of the

23    company.

24          MR. KOSTO:  The owner of StackPath will testify that

25    it received this in the ordinary course of business.  What

1    Mr. Nemtsev is getting at is, the owner of Micfo was convicted.

2    But the cases we tried to refer you to this morning, and I know

3    it's not a 609(a)(2) issue, but the memo talks about the fact

4    there has to be some connection between the conviction and

5    what's on this invoice for it to have any relevance to

6    whether --

7         THE COURT:  -- the business records rule, skipping the

8    conviction, the business records rule to allow it in for the

9    truth of the matter, it has to be --

01:11 10         MR. KOSTO:  It does not have to be introduced by the

11    sender.  Let me give you a case, your Honor.

12         THE COURT:  This is the issue.

13         MR. NEMTSEV:  And we're proceeding under (e) because

14    we can have the opportunity to challenge the reliability of it.

15         MR. FRANK:  What Mr. Kosto is pointing to --

16         THE COURT:  Can I just stop for one minute here?

17    Where's the 901 --

18         MR. KOSTO:  I don't think there's any dispute about --

19         THE COURT:  "The record was made at or about the time

01:12 20    someone with knowledge..."  So you'd at least say that he

21    received the -- the company received that invoice but didn't

22    pay it.  Okay, that part -- they did or they didn't?

23         MR. FRANK:  They did.

24         THE COURT:  Why does it say "unpaid"?

25         MR. FRANK:  Because the version that they happened to

1    keep in their files happened to say "unpaid," but all the

2    subsequent --

3            MR. KOSTO:  We provided the bank records to

4    Mr. Nemtsev that showed that the invoice was paid by StackPath.

5            THE COURT:  I mean, that's helpful to me, actually,

6    because if it was unpaid, I don't know much about it, so --

7            MR. KOSTO:  I don't think we have a dispute there.

8            THE COURT:  It says "unpaid."  I wouldn't know that.

9    And so the question is, so there is a paid invoice that was

01:12 10  kept in the ordinary course of business.  Making a record, I

11   suppose here it's -- we don't know much about whether it was a

12   regular course of activity, but I'm assuming for a minute at

13   least paying the invoice was.  "All of these conditions are

14   shown by the testimony of a custodian under Rule 902," right?

15   We keep that.  So now the challenge is under (e):  "The

16   opponent does not show that the source of the method or

17   circumstances of preparation indicate a lack of trustworthiness."

18   so that's where this controversy is hinging, I think.

19           All right, so I understand Lee's been at this all day,

01:13 20  but what is the challenge -- what were they indicted for?

21   Convicted of, I should say.

22           MR. NEMTSEV:  They were convicted of creating fake

23   businesses and fake business records to submit to ARIN,

24   which --

25           THE COURT:  What's ARIN?

1           MR. NEMTSEV:  ARIN is this, in short, registry that

2     hands out IPs for creating fake businesses and fake records,

3     submitting them to ARIN to get those IPs, and then selling them

4     off without the knowledge.  That was the conviction.

5           MR. KOSTO:  May I?

6           THE COURT:  Yes.

7           MR. KOSTO:  ARIN is the national organization in the

8     United States that assigns all the IP addresses.  What Micfo

9     did -- and ARIN controls a limited supply of them.  What Micfo

01:14 10    did, because it had run out of their supply -- and this is in

11    the indictment -- between 2014 and 2019, covering this

12    period --

13          THE COURT:  I don't know.

14          MR. KOSTO:  But before you continue, your Honor, what

15    Micfo did was make up a shell company, Jones Company, and

16    submitted an application to ARIN on behalf of Jones Company

17    saying, "We are entitled to more IP addresses."  And ARIN, not

18    knowing that it was Micfo, gave them more IP addresses.  But

19    the case does not involve Micfo failing to sell them, failing

01:14 20    to assign them, failing to send them to data centers, failing

21    to do the work and invoicing for it.  There's no connection

22    between the invoicing here --

23          MR. FRANK:  The whole point was that they wanted more

24    of these addresses that they could sell and actually supply

25    their customers with.  It's not that they were pretending to

         1   have addresses or pretending to put addresses on server

         2   computers.  That was never the allegation.

         3           THE COURT:  I don't know.  Let me think about it.

         4           MR. FRANK:  They weren't faking these records.  Just

         5   because JP Morgan fakes a record in its mortgage lending

         6   business doesn't mean that it's ATM records.

         7           THE COURT:  You know what?  I'll think about it.

         8           MR. FERNICH:  If it were JP Morgan, it would be a

         9   different story, but this is basically a one-man show.

01:15   10           THE COURT:  Let me think about it.  I think I've ruled

        11   on everything else.

        12           MR. NEMTSEV:  Except the chat, the chat associated

        13   with those pictures biking and the wife, where he says, "I'll

        14   give you a fake identity."

        15           THE COURT:  To --

        16           MR. FRANK:  He says to Ermakov, "I will help you

        17   travel under a fake name."

        18           THE COURT:  All right, we can skip that.  We don't

        19   need that.

01:16   20           MR. FRANK:  Your Honor, that's critical to the

        21   criminal --

        22           THE COURT:  Why?

        23           MR. FRANK:  Because who would you talk to about that?

        24   The whole point that they're trying to do is say that these

        25   guys are acquaintances.  What we're trying to do is show that

1    they're not just people who hang out together.

2          MR. NEMTSEV:  They're in a sauna together.

3          MR. FRANK:  They're people who have an exceptionally

4    close relationship.

5          MR. NEMTSEV:  Agreed.

6          MR. FRANK:  They are the people who the defendant

7    trusts enough, he trusts --

8          THE COURT:  I sustain that objection.  It's not

9    critical.  They're in the sauna together naked.  That's as

01:16 10   close as it gets.

11         MR. FERNICH:  That's the bonding.

12         THE COURT:  All right, but let me just say this:  How

13   much longer is he?

14         MR. FRANK:  Probably a couple hours.

15         THE COURT:  Okay, fair enough.  Does he put in the

16   Micfo?

17         MR. FRANK:  Yes.

18         THE COURT:  He does.  How long do you think you'll

19   need with him?

01:16 20         MR. NEMTSEV:  An hour, an hour and a half.

21         THE COURT:  All right, so he's most of tomorrow.

22         MR. NEMTSEV:  He's most of tomorrow.

23         THE COURT:  Okay, who's next?

24         MR. FRANK:  Probably Jeffrey Zorck who's with Saxo

25   Bank, and he's going to put in a recording that will take some

```
 1    time.

 2              THE COURT:  He's from Copenhagen?

 3              MR. FRANK:  He just moved to Sarasota.

 4              THE COURT:  All right, but let me tell you, I'd rather

 5    be in Sarasota than here the last couple of days.

 6              MR. KOSTO:  Your Honor, can I give you a case?

 7              THE COURT:  That would be helpful.  Did you tell them

 8    what it is?

 9              MR. KOSTO:  I did.  It has to do with the receiving

10    company of an invoice --

11              MR. FRANK:  Your Honor, I'd ask to be able to try and

12    persuade you on the WhatsApp communications because that is

13    really -- the closeness of this relationship, it's more than

14    just --

15              THE COURT:  There's no dispute about it.  They're

16    besties.

17              MR. FRANK:  But there's a difference.

18              THE COURT:  Excuse me.

19              MR. FRANK:  We also have to deal with the Porsche

20    photo.

21              THE COURT:  I'm allowing in the license plates but not

22    the --

23              MR. NEMTSEV:  But not the cars, right?

24              THE COURT:  Not the blown-up --

25              MR. FRANK:  What we've done is -- and I can show your
```

1    Honor -- we've redacted the hood ornament, so you can't tell

2    that it's a Porsche.

3              THE COURT:  What's wrong with that?  Can I tell you,

4    when Porsche comes to shove, this is not going to change this.

5              (Laughter.)

6              (End of sidebar conference.)

7              (Adjourned, 1:18 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )

5

6

7            We, Lee A. Marzilli and Kathleen Silva, Official

8  Federal Court Reporters, do hereby certify that the foregoing

9  transcript, Pages 3-1 through 3-181 inclusive, was recorded by

10 us stenographically at the time and place aforesaid in Criminal

11 No. 21-10104-PBS, United States of America v. Vladislav

12 Klyushin, and thereafter reduced by us to typewriting and is a

13 true and accurate record of the proceedings.

14           Dated this 1st day of February, 2023.

15

16

17

   /s/ Kathleen Silva
18 _____
   KATHLEEN SILVA, RPR, CRR
19 OFFICIAL COURT REPORTER

20

21 /s/ Lee A. Marzilli
   _____
22 LEE A. MARZILLI, CRR
   OFFICIAL COURT REPORTER

23

24

25