1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
2

3    UNITED STATES OF AMERICA,          )
                                        )
4              Plaintiff               )
                                        )
5         -VS-                         )  Criminal No. 21-10104-PBS
                                        )  Pages 1 -175
6    VLADISLAV KLYUSHIN,               )
                                        )
7              Defendant               )

8
                    **JURY TRIAL - DAY 4**
9

10        BEFORE THE HONORABLE PATTI B. SARIS
              UNITED STATES DISTRICT JUDGE
11

12

13
                         United States District Court
14                       1 Courthouse Way, Courtroom 19
                         Boston, Massachusetts  02210
15                         February 2, 2023, 8:47 a.m.

16

17

18

19

20
                 DEBRA M. JOYCE, RMR, CRR, FCRR
21                KATHLEEN SILVA, RMR, CRR
                   OFFICIAL COURT REPORTERS
22               United States District Court
                 1 Courthouse Way, Room 7200
23                  Boston, MA  02210
                      Leemarz@aol.com
24

25

```
 1                    A P P E A R A N C E S:

 2
          SETH B. KOSTO, ESQ. and STEPHEN E. FRANK, ESQ.,
 3   Assistant United States Attorneys, Office of the United States
     Attorney, 1 Courthouse Way, Room 9200, Boston, Massachusetts,
 4   02210, for the Plaintiff.

 5        MAKSIM NEMTSEV, ESQ., 20 Park Plaza, Suite 1000,
     Boston, Massachusetts, 02116, for the Defendant.
 6
          MARC FERNICH, ESQ., Law Office of Marc Fernich,
 7   800 Third Avenue, Suite Floor 20, New York, New York, 10022,
     for the Defendant.
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2       WITNESS

3

4       DAVID HITCHCOCK

5          Continued Direct Examination                    27
           By Mr. Frank
6

7                        E X H I B I T S

8

        Exhibit No.                                  Received
9

10         CCC                                           27

11         55                                            32

12         56 and 56A                                    33

13         57 and 57A                                    36

14         183A and 183B
                                                         40
15         151G                                          41

16         151I                                          42

17         151J                                          43

18         19                                            45

19         151L and 151M                                 48

20         264 and 264A                                  48

21         151N and 151O                                 52

22         34                                            53

23         150                                           54

24         129                                           57

25         266                                           56

| | | |
|---|---|---|
| 1 | 16 | 58 |
| 2 | 15 and 14 | 59 |
| 3 | 136 and 137 | 61 |
| 4 | 155 and 155A | 61 |
| 5 | 148 | 63 |
| 6 | 133 | 64 |
| 7 | 265 | 65 |
| 8 | 265A | 65 |
| 9 | 171 and 171A | 68 |
| 10 | 30 | 70 |
| 11 | 24 | 71 |
| 12 | 81 | 72 |
| 13 | 24, 30, 81, 249 | 75 |
| 14 | 82 | 76 |
| 15 | 249I | 78 |
| 16 | 262 | 79 |
| 17 | 261 | 81 |
| 18 | 78 | 85 |
| 19 | 97 | 86 |
| 20 | 134 and 134A | 87 |
| 21 | 94 | 88 |
| 22 | 94, 95, 96 | 89 |
| 23 | 68 | 89 |
| 24 | 187 and 187 | 90 |
| 25 | 79 | 90 |

| 1  | 242                      |                                     | 93  |
| 2  | 242, 243, 244            |                                     | 94  |
| 3  | 230, 231, 232            |                                     | 95  |
| 4  | 227, 228, 229            |                                     | 98  |
| 5  | 222, 223,                |                                     | 9   |
| 6  | 224, 225, 226            |                                     |     |
| 6  | 173C-M                   | .................................... | 112 |
| 7  | 177, 178 and             | .................................... | 122 |
|    | 180                      |                                     |     |
| 8  | 188                      | .................................... | 126 |
| 9  | 173B                     | .................................... | 127 |
| 10 | 181                      | .................................... | 129 |
| 11 | 173A                     | .................................... | 130 |
| 12 | 182                      | .................................... | 130 |
| 13 | 130                      | .................................... | 132 |
| 14 | 163 and 163A             | .................................... | 133 |
| 15 | 218                      | .................................... | 135 |
| 16 | 196 and 196A             | .................................... | 136 |
| 17 | 220                      | .................................... | 137 |
| 18 | 219                      | .................................... | 140 |
| 19 | 221                      | .................................... | 141 |
| 20 | 195A                     | .................................... | 142 |
| 21 | 249B                     | .................................... | 143 |
| 22 | 249D                     | .................................... | 144 |
| 23 | 249E                     | .................................... | 145 |
| 24 | 191                      | .................................... | 151 |
| 25 | 249H                     | .................................... | 152 |

1    249G        ..................................    152

2    249I        ..................................    153

3    249J        ..................................    154

4    140         ..................................    155

5    142         ..................................    158

6    142A        ..................................    160

7    142D        ..................................    160

8    176         ..................................    162

9    267         ..................................    163

10   46          ..................................    166

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  (P R O C E E D I N G S)

 2            THE CLERK:  All rise.

 3            The United States District Court is now in session.

 4            You may all be seated.

 5            Judge, we have 10 jurors here; we're waiting for six.

 6            THE COURT:  All right.  Good morning everybody.  I'm

 7      told there are a myriad of issues.

 8            MR. NEMTSEV:  It's not that bad, your Honor.

 9            MR. KOSTO:  Can I start with a couple of simple ones?

10            THE COURT:  Simple is good.

11            MR. KOSTO:  What we talked about at sidebar yesterday,

12      with Ms. Lewis' help, we just made a very simple chalk with the

13      names of the individuals who are coming up in testimony.  I

14      don't think the defense objects, and we propose to leave this

15      basically here.

16            THE COURT:  Also, it's critical, since I didn't

17      understand, so for sure they didn't understand, who are the

18      named and unnamed conspirators that you're charging.

19            MR. FRANK:  Your Honor, there are only three named

20      conspirators charged in the count.

21            THE COURT:  I understand that, and then there are two

22      others.

23            MR. FRANK:  Two others that were involved in the

24      scheme, they are Sladkov and Irzak; we haven't really discussed

25      them yet.
```

```
 1              THE COURT:  You haven't discussed them at all.  Are
 2     they in on of those pictures?
 3              MR. FRANK:  They are.  They are coming up in the
 4     testimony.
 5              THE COURT:  And then there are others that are just
 6     investors.
 7              MR. FRANK:  They're on there, and we're in the middle
 8     of discussing them.  So we're going to identify them on the
 9     exhibit and further discuss them.
10              THE COURT:  That's fine.  And then you'll take it down
11     when the government agent is off the stand.
12              MR. FRANK:  When he's off the stand, sure.
13              THE COURT:  It was just very difficult to follow
14     yesterday who all the pictures were and why they mattered.
15              Did you have a problem with it?
16              MR. NEMTSEV:  No.
17              MR. KOSTO:  On that theme of trying to make things
18     simpler in connect with Agent Hitchcock's testimony, we've
19     provided the Court with two proposed chalks, illustrations, to
20     aid the jury in understanding Special Agent Hitchcock's
21     testimony.  There will be a moment -- there will be a segment
22     of Mr. Frank's examination of Agent Hitchcock when Agent
23     Hitchcock is introducing records from a variety of companies.
24     And the chalk puts the names of those companies in front of the
25     jury so that Agent Hitchcock can explain what those company do,
```

 1    and that when the exhibits come in, the jury will see a name,

 2    for example, we'll be introducing records from Namecheap.

 3              THE COURT:  So it's just a chalk.

 4              It's just a chalk.

 5              We provided it to it the defense; they object.

 6              THE COURT:  Why?  I don't know enough to know if it's

 7    accurate enough, but it's just a chalk.

 8              MR. NEMTSEV:  We'll live with it.

 9              THE COURT:  Fine.

10              MR. KOSTO:  And we're --

11              THE COURT:  You need to make copies of these for

12    Maryellen to put in for the appellate record.

13              MR. FRANK:  She can have those, and as we speak,

14    they're being blown up into that size exhibit.

15              THE COURT:  Thank you.

16              MR. KOSTO:  The next one, your Honor, from the

17    government's perspective, I anticipate that Mr. Frank will ask

18    Special Agent Hitchcock about some summary exhibits under Rule

19    1006 that were provided to defense well in advance of trial.

20    The defense is objecting on the grounds that the evidence that

21    they summarize, the voluminous logs from DFIN, are not admitted

22    into evidence.

23              The government cited United States v. Apollon, among

24    many other cases and the rule itself state that the information

25    summarized needs to be admissible.

1          THE COURT:  But they want to admit it, what's the
2     problem?
3          MR. KOSTO:  What's that?
4          They want to admit the geolocation information.
5          THE COURT:  We're back to the same old same old.
6          If they want to admit it and it's admissible, it can
7     come in.
8          MR. KOSTO:  But at the moment there's no requirement
9     for the government to admit --
10          THE COURT:  There's no requirement that the government
11     put it in as long as it's admissible, but if they want to put
12     it in, they can put it in.
13          MR. KOSTO:  Assuming an appropriate foundation for the
14     information.
15          THE COURT:  Yes.
16          MR. NEMTSEV:  Okay.
17          THE COURT:  Now, let me just say this.  I did do a lot
18     of research even before I got your fiery memos in the middle of
19     the night.
20          I did find, or, more accurately, my law clerk found
21     the Doe case last night, which is a 1st Circuit case, which
22     seems to allow this to come in on one condition, that it's got
23     to be undisputed that the bills were paid.
24          MR. KOSTO:  I don't think there's any dispute that
25     those bills were paid, and I think Mr. Nemtsev agrees with me.

1          THE COURT:  Is that right?

2          Are you going to put that in through this agent?

3          MR. FRANK:  Yes.

4          MR. NEMTSEV:  I don't dispute that those bills were

5     paid, your Honor.

6          THE COURT:  Then it seems to me --

7          MR. NEMTSEV:  I just dispute that those services were

8     provided, which is what the record says.

9          THE COURT:  I think the way it works, it's my job to

10    make a gateway finding of reliability.  The thing that had

11    thrown me was that it said "unpaid," which would suggest that

12    they weren't reliable because somehow they were unpaid.  Had a

13    big stamp on them says "unpaid."  I don't know what that's

14    about, and who put the "unpaid" on there.

15         MR. KOSTO:  There are two copies of that invoice, your

16    Honor.  The one that we obtained from StackPath from its

17    records says "unpaid."  The copy that the government obtained

18    from Micfo, for which there is no records custodian, is marked

19    "paid."  The bank records from StackPath show the amounts on

20    the invoice were paid from StackPath's bank to Micfo.

21         THE COURT:  And do you have those records that will be

22    admitted?

23         MR. KOSTO:  We weren't planning to admit the bank

24    statements if there's no issue about payment.

25         If you'd like Mr. Frank to ask Special Agent Hitchcock

1    if they were paid, he can so testify, because he saw the bills.

2    They're not disputed.

3              THE COURT:  Do we have those bills?

4              MR. KOSTO:  We do.

5              THE COURT:  Why don't we just put those in?

6              Because I think that's what threw me.  Because if you

7    have a company that no longer exists for reasons that are

8    unsavory, and then you have "unpaid," it doesn't provide me

9    with the external indicia of reliability.

10             If they're paid, it means that someone felt that it

11   was accurate enough, and that's where Doe went with it.

12             It's about -- it's about the fact that they were paid

13   so that there was enough -- plus, you have other indicia of

14   reliability having to do with Boston that you outlined in your

15   memo.  I've read your brief.

16             The question you have is are they allowed to attack it

17   at all, by showing, A, you don't have the custodian; the

18   original bill says "unpaid" and the company is out of business

19   because of a conviction.  They should be able to attack to

20   reliability, but I'm going to allow in the records; that's

21   where we're going to go.

22             MR. FRANK:  Just to clarify, they're not disputing

23   that it's paid.

24             THE COURT:  That's right.  That it was paid, and if

25   they want to attack the reliability of the fact that -- of the

1    information in there, they need to be able to do that.  I can't

2    stop them from doing that.

3           But you can't introduce extraneous evidence under any

4    of these rules.  It's simply a question to the agent:  Is the

5    company now in existence?  Why not?

6           MR. FRANK:  They can't attack it on the grounds that

7    it was unpaid because they don't have a good faith basis for

8    it.

9           THE COURT:  I agree.  But it does create -- that's

10   what stopped me, I have to be honest, is I didn't -- how could

11   you have a company that doesn't exist and it says "unpaid"; I

12   have no indicia of reliability.

13          They have now proffered that in their memorandum last

14   night, which was very helpful, this was never a 609 issue, it's

15   a business records issue --

16          MR. KOSTO:  But if it's not a 609 issue, your Honor,

17   609 doesn't permit the use of a corporate conviction to impeach

18   the records custodian on the nature of the invoice.

19          THE COURT:  He's not impeaching the records custodian.

20   The issue is -- the records custodian, they paid the invoice.

21          MR. KOSTO:  Putting --

22          THE COURT:  Excuse me, I'm going to let them ask the

23   agent why don't we have the records custodian from Micfo, but

24   you cannot put in extraneous information.

25          They have to put in their case.  I can't stop them

1    from putting in their case.

2         MR. NEMTSEV:  Thank you, your Honor.

3         THE COURT:  That's where I'm going with that.

4         What's next?

5         MR. KOSTO:  Just so we're clear, they can't go into

6    the details of --

7         THE COURT:  Right.

8         MR. KOSTO:  Or introduce extraneous evidence.

9         THE COURT:  No.  We never can under 608(b) or

10   equivalent.  We're not having a trial within a trial.

11        MR. FRANK:  Understood, your Honor.

12        My question is how that's going to happen.

13        THE COURT:  You're going to say to the agent:  Does

14   Micfo still exist?  No.

15        Is there -- was it convicted of a crime in 2019, or

16   whatever that was based on information -- you'll come back to

17   say it had nothing to do with this case, right, right.  That's

18   where it's going to end up.  And then they can argue how

19   reliable it should be.

20        MR. FRANK:  On crime.

21        THE COURT:  Whatever the crime was.

22        MR. NEMTSEV:  Wire fraud.

23        MR. FRANK:  The concern that we have --

24        THE COURT:  I understand you have a concern, you want

25   this to be a slam dunk.  But I have a bigger concern than any

1   of this, which is, I read the Solicitor General's brief going

2   up to the Supreme Court on the issue of venue.  That's one heck

3   of an issue.  So the issue that I want you all to focus on as

4   I'm doing my verdict form is should I say not guilty by reason

5   of lack of venue?

6           MR. FRANK:  We do not -- I've checked this, your

7   Honor, with our appeals unit, and we do not believe special

8   verdict forms like that are favored in this district; they are

9   disfavored.

10          THE COURT:  They are disfavored, and I've actually

11  never done one.  That said, this is very -- issue is teed up.

12  So if I get a not guilty, we will not know whether it was going

13  to trigger double jeopardy or whether or not it was for lack of

14  venue that could arguably have it retried in Denver -- Chicago

15  or Minnesota.

16          MR. FERNICH:  Russia.

17          THE COURT:  So I'm going to instruct them, if there's

18  a lack of venue, it's a not guilty.

19          What is your desire?

20          MR. NEMTSEV:  That's our desire.

21          I think that's consistent with their desire as well.

22          MR. FRANK:  Our desire is that they be instructed that

23  if any element is not met, they must acquit, but not that there

24  be a special instruction for venue --

25          THE COURT:  I'm sorry, venue is not a element.  That's

1    the one thing that's clear from all these cases.  It's a

2    separate constitutional requirement.

3           I'm going to say if any element is not met or you find

4    there's no venue --

5           MR. FRANK:  That's fine.  Yes, we just object to

6    having a special instruction highlighting venue within the

7    instruction as a reason to acquit.  So if there's a general

8    instruction --

9           THE COURT:  I'll give you my instructions, but I have

10    to give you venue.  I think you're both wrong.

11           I think the Supreme Court is going to say it's not an

12    element.  I think they're going to say double jeopardy does not

13    exist for venue.

14           MR. FERNICH:  I think you're right.

15           THE COURT:  I think that's what's going to happen, and

16    I think we're not going to know if there's a not guilty, the

17    basis for it.

18           But since you are the masters of your destiny, if you

19    both agree, I agree.

20           MR. NEMTSEV:  Thank you.

21           THE COURT:  So watch what you wish for.

22           So --

23           MR. FRANK:  There are still some disputed exhibits.

24           MR. FERNICH:  Judge, in reading the briefs, did they

25    brief Blockburger on its continued vitality in the SG's brief?

```
 1            THE COURT:  Yes.
 2            MR. FRANK:  Maybe we should go one by one.
 3            THE CLERK:  Do you want to read them --
 4            THE COURT:  Excuse me, these are objected or not --
 5            MR. FRANK:  Objected to.
 6            THE COURT:  So I do need to see them.
 7            MR. FRANK:  It may be easier if we all look at them on
 8    the screen.
 9            THE CLERK:  Do you want a hard copy?
10            THE COURT:  One of the things I have not liked, this
11    is also being selfish on my part, but I imagine for all of you
12    and junior staff, is a lot of this seems to get litigated
13    between 10 and midnight.
14            MR. FRANK:  We stipulate that we don't like that
15    either.
16            THE COURT:  So is there a way of -- I gave you the
17    afternoon so this wouldn't have to happen.
18            MR. FRANK:  Judge, I think we -- this is the witness
19    who has the most exhibits, so I think we're sort of at the end
20    of that.
21            THE COURT:  All right.
22            MR. FRANK:  Jen, call up 151H.
23            THE CLERK:  What did you say?
24            MR. FRANK:  151H.
25            This is from the WhatsApp communications between
```

```
 1   Mr. Klyushin and Mr. Ermakov.
 2           THE COURT:  We've already heard about the sauna.  Is
 3   there more sauna?
 4           MR. FRANK:  Another time they go to the sauna.
 5           THE COURT:  Does it matter timewise?
 6           MR. FRANK:  The fact that they go to the sauna often
 7   is more probative than the fact that they've been to the sauna
 8   once.
 9           MR. NEMTSEV:  Relevance and 403.
10           THE COURT:  Sustained.
11           What's the next question?
12           MR. FRANK:  151J.
13           MR. NEMTSEV:  This is the boat.
14           MR. FRANK:  This is not about the boat, your Honor.
15   This is about the relationship between the defendant and
16   Mr. Ermakov.
17           THE COURT:  Excuse me, somebody just knocked.
18           THE CLERK:  Hold on one second.  It's probably the
19   jury and they're probably all here.
20           (Discussion off the record.)
21           MR. FRANK:  In this exchange, Mr. Klyushin says to
22   Mr. Ermakov, My pleasure is the boat and trading.
23           And then he says, Honestly, I get a bigger kick when I
24   check apartments for you with you.  The fact that we can walk
25   home together and have a beer or play golf or simply send
```

1    everyone to hell knowing that you are close.

2        Mr. Ermakov responds:  This truly sounds like a

3    declaration of love to a girl.

4        Mr. Klyushin responds:  We spend a lot of time

5    together, I feel good and calm, everyone does their job, does

6    his own work.

7        THE COURT:  All right.  This is not repetitive.

8        I'll allow this in.

9        What's next?

10        MR. NEMTSEV:  Just the first text, At this point I

11    want nothing except the boat.

12        Like, this boat is going to be the centerpiece of this

13    trial at this point, your Honor.  He's going to testify --

14        THE COURT:  I'll allow that in.

15        The sauna one was repetitive.  This one is different.

16        MR. FRANK:  151K is going to go with the single

17    photograph of the boat that we're putting in, just to show that

18    there were other photographs.  Those are not coming into

19    evidence, but we're just showing that there were multiple

20    photographs.

21        The reason that's relevant is because the special

22    agent is going to say that there were also multiple photographs

23    of the boat found in Mr. Sladkov's account.  We're not showing

24    the photographs, it's just the quantity.

25        MR. NEMTSEV:  Object.

1          THE COURT:  Sustained.  Objection sustained.

2          What's the next one?

3          But you'll allow the one picture of the boat.

4          MR. NEMTSEV:  One picture we're fine with.

5          THE COURT:  The boat, there's a picture of a boat that

6     was sent to Ermakov.

7          MR. FRANK:  Can we at least elicit there were multiple

8     photographs?

9          THE COURT:  Sure.  But we're not going to --

10         MR. FRANK:  The next is 151N.

11         In this exhibit, they're discussing Mr. Ermakov buying

12    an apartment, which he ultimately does, with Mr. Klyushin's

13    money.  And when they discuss how to earn the money,

14    Mr. Klyushin says -- Ermakov says, I better go to work.

15         And Klyushin says, No need to, just turn the computer

16    on and think about it.

17         That is direct evidence --

18         THE COURT:  Yes, that's direct.  I'll allow that.

19         What's the next one?

20         MR. FRANK:  They're objecting --

21         THE COURT:  You couldn't work these out?

22         MR. NEMTSEV:  What?

23         THE COURT:  You guys couldn't work this out?

24         Maybe you were too tired last night.

25         MR. NEMTSEV:  We worked out some.

```
 1              MR. FERNICH:  There's a lot more.

 2              THE COURT:  I'm not spending all morning -- how many

 3    more do you have?

 4              MR. FRANK:  Only a few more.

 5              THE COURT:  The jury is waiting.

 6              MR. FRANK:  163 and 163A, they're objecting -- these

 7    are business records of a company called AirVPN, and they were

 8    produced -- I'm sorry, Quintex, which is a reseller of AirVPN,

 9    and it was produced with a business records certification.  I'm

10    not sure what the grounds for the objection is.

11              MR. NEMTSEV:  802, your Honor.

12              THE COURT:  You know, you throw out 802.  What are you

13    talking about?

14              MR. NEMTSEV:  It's a letter to Special Agent Hitchcock

15    saying, Here are the answers, this and this and this and this.

16              MR. FRANK:  That's how they produce a record of IP

17    addresses.

18              THE COURT:  I can't do this on the fly.  You'll have

19    to give it to me and I'll have to read it.

20              MR. KOSTO:  While he's pulling it up, Judge, when

21    Facebook responds and says, This is our subscriber, this is

22    what it looks like.

23              MR. FRANK:  No different.

24              THE COURT:  I have never seen this before.  I can't

25    just read it and speed read for you.
```

```
 1              MR. KOSTO:  We had a stipulation.

 2              MR. FRANK:  We had a stipulation all these business

 3     records were coming in --

 4              THE COURT:  Did you stipulate that they came in?

 5              MR. NEMTSEV:  I stipulated that they're authentic.

 6              MR. KOSTO:  You did stipulate that all IP addresses

 7     that were stipulated as business records come in.

 8              THE COURT:  Did you?

 9              MR. NEMTSEV:  I don't recall that.

10              THE COURT:  Do you have that?

11              MR. KOSTO:  I participated in that conversation as

12     well, we took that conversation away.

13              THE COURT:  It's just it's oral.

14              I have to read it.

15              All right.  What's the next one?

16              MR. FRANK:  The next one are the summary charts that

17     Mr. Kosto was describing.  These are -- I believe your Honor

18     has just ruled on these the summary --

19              MR. NEMTSEV:  We can use summaries, they can use

20     summaries.

21              MR. KOSTO:  So this is actually one issue.  They

22     propose to put in their exhibits and their summaries through

23     our witness, which we think is completely inappropriate and not

24     proper cross-examination.

25              THE COURT:  I'll let them do it if he can do it.  If
```

1    he's never seen it before, he can't do it.

2            MR. NEMTSEV:  It's things he could have seen before.

3            THE COURT:  I don't know, you'll have to give him a

4    copy.

5            I'm not going to pop it on him.

6            MR. NEMTSEV:  Okay.

7            MR. FRANK:  Are you still objecting to 267, the Cogent

8    records?

9            MR. NEMTSEV:  The typed message, yes.

10           MR. FRANK:  So we obtained orders from a company

11   called Cogent.  Cogent is an internet backbone company.  They

12   route all the traffic on the internet.  We obtained records

13   from them yesterday, which we produced with a business records

14   certification, that they routed the traffic to Boston.

15           THE COURT:  You got it yesterday?

16           MR. KOSTO:  Well, when this became an issue, we

17   reached out to this company, which we didn't know existed

18   before, and they are a ginormous company --

19           THE COURT:  You've got to give them enough time to

20   respond.

21           MR. KOSTO:  They are responding.

22           THE COURT:  For them to respond.

23           MR. KOSTO:  Yes, and they've responded that they

24   object to --

25           THE COURT:  I understand, but it's just -- it's a lot

```
 1    to come in the night before.  This case has been pending for
 2    over a year.  I don't know --
 3              MR. FRANK:  Judge, these are critical records --
 4              THE COURT:  I understand, but it came in last night at
 5    midnight.  That's why we have discovery rules.
 6              I don't know what I'm going to rule, but I need to
 7    look at them.  I've not seen them and the jury is outside.  And
 8    let me look at it and let me look at the Facebook thing.  And
 9    this is what's not supposed to happen at midnight the day of
10    trial you're planning on introducing them.  You may have to
11    call this agent back if we can't figure it out.
12              MR. NEMTSEV:  Your Honor, can we show you just one
13    exhibit we worked on last night?  It's the Porsches.  I worked
14    on it all night.
15              THE CLERK:  I switched over to Tim.
16              THE COURT:  Why did you work on the Porsches all
17    night?
18              MR. FRANK:  Your Honor, this is an issue that he's
19    raising now that's been decided.
20              I want to take two seconds to address an issue that's
21    about to come up, which I think can be readily addressed, and
22    that is, it's an authentic business record of a major United
23    States company that routed internet traffic to Boston.  The
24    fact that that happened is indisputable, it's authentic.  It
25    has nothing to do --
```

1          THE COURT:  I understand.  It's the issue -- I'm not

2     denying it, I need to read it.  I need to hear argument on it.

3     It's 10 past 9 and the jury is standing outside.  This is why

4     we have rules of discovery so that we don't surprise the other

5     side.

6          I may end up going with you, just like I did on

7     business records when I understand it.  You can't do it this

8     way.

9          So I'll deal with it either at the break.  I'll have

10    copies of the two sets of records.

11          MR. NEMTSEV:  Does that work for the Porsches?

12          THE COURT:  Do you like this picture of the Porsches?

13          MR. FRANK:  We do not stipulate to the picture of the

14    Porsches.  This is entirely misleading.  Mr. Ermakov was the

15    only employee out of a company of over 100 employees who got a

16    car that matched the defendant's car that had matching plates.

17          The fact that the cars match is not visible from this

18    photograph.

19          These are -- it is --

20          THE COURT:  Well, let me see your version.

21          MR. FRANK:  Our version removes the logo from the car

22    so it's not identifiable.

23          THE COURT:  Let me see it.

24          (Pause.)

25          MR. FRANK:  We've removed the logos.

```
1              MR. FERNICH:  Come on.
2              (Laughing.)
3              MR. FRANK:  Your Honor, I can't identify the make of
4    that car.  I can see that they match.
5              MR. FERNICH:  I can identify the make of the car.
6              THE COURT:  I don't know about cars, don't care about
7    cars, but you can tell they're pretty fancy.
8              MR. FRANK:  But that's the point.  That's the point,
9    your Honor.
10             THE COURT:  I don't know.  I don't have a serious
11   problem -- I don't like yours and I don't like yours.  Can't we
12   just --
13             MR. FERNICH:  How about a middle ground.
14             MR. FRANK:  Judge, we're sanitizing the relationship
15   between the defendant --
16             THE COURT:  I'm sorry, when you say, You're talking to
17   me like a girl, that's not sanitizing a relationship.
18             MR. FERNICH:  That's a bromance.
19             THE COURT:  That's a bromance.
20             Let's bring this jury in.
21             MR. FRANK:  This is literally about to come up.
22             THE COURT:  I'm going to allow in the government's
23   picture.
24             Can I have the pictures, please, that are -- not the
25   picture, I'm sorry, the disputed exhibits I haven't ruled on.
```

```
 1              (Discussion off the record.)
 2              MR. FRANK:  Exhibits 9 and 11 I put in yesterday.  I
 3     don't know that they were reflected.
 4              THE CLERK:  I think they were.
 5              MR. FRANK:  I just want to make sure.
 6              THE CLERK:  Yes, I remember 9 and 11.  I don't know
 7     why, but I do.
 8              Is the agent here?
 9              MR. FRANK:  Yes, he's right there.
10              You can get up on the stand.
11              THE CLERK:  All rise for the jury.
12              (Jury entered the courtroom.)
13              THE COURT:  Good morning.  Sorry for the slight delay.
14     We've been going through some issues in the trial.
15              So anybody speak about the case or read anything in
16     the press?
17              I find the jury has complied.
18              You've been terrific showing up on time, thank you.
19              THE CLERK:  Judge, can I just swear one of the
20     interpreters in.
21              (Interpreter sworn in by the clerk.)
22              THE CLERK:  Thank you.
23              Sir, you're still under oath.
24              THE WITNESS:  Yes, ma'am.
25              THE CLERK:  You may all be seated.
```

```
 1              MR. FRANK:  May I, your Honor?

 2              THE COURT:  Yes.  Continue.

 3              MR. FRANK:  Can all of the members of the jury see

 4    that exhibit?

 5              THE COURT:  I would put it up.

 6              It is going to block me, but my experience in this

 7    courtroom, which is not ideally designed for this purpose, is

 8    to put it right there.  And maybe you just walk it across so

 9    they can all see.

10              MR. KOSTO:  May I?

11              THE COURT:  Yes, please.

12              This is what we quaintly call a chalk.  In olden days

13    we used blackboards, and when people would draw pictures --

14    this is to help you understand everybody's name because there

15    were a lot of names that came at you yesterday.

16              We put it up here, as you're mentioning someone and

17    trying to figure out where it fits with the pictures, this

18    might be helpful.

19              So we're going to mark that as Exhibit -- not exhibit,

20    for identification.

21              THE CLERK:  CCC.

22              THE COURT:  CCC.

23              (Exhibit CCC marked for identification.)

24         MR. FRANK:  Thank you, Mr. Kosto.

25              THE CLERK:  CCC are the pictures.
```

```
 1           DAVID HITCHCOCK, having been previously duly sworn by
 2   the Clerk, was further examined and testified as follows:
 3                    CONTINUED DIRECT EXAMINATION
 4   BY MR. FRANK:
 5   Q.   Good morning, Special Agent.
 6   A.   Good morning.
 7   Q.   Just to orient the jury, since there were a lot of names
 8   that came at us yesterday, and -- can you see the chalk?
 9   A.   Would it be helpful if I --
10           MR. FRANK:  Could the special agent approach the
11   chalk?
12           THE COURT:  I have to ask Debbie.
13           It would be hard to hear -- perhaps what we can do is
14   pick up that thing and just have him stand and hold it.
15           My eyes might not be able to capture all that.
16           MR. KOSTO:  May I approach Special Agent Hitchcock?
17           MR. FRANK:  Mr. Kosto is playing the role of Vanna
18   White today.
19           MR. FERNICH:  She's better looking.
20           MR. KOSTO:  Stipulated.
21           Just to orient the jury --
22           THE COURT:  And then it will come back over here.
23   Because the reason is, the court reporter has to hear it
24   through the mic in order to take it down, so --
25   BY MR. FRANK:
```

1    Q.    On the top left, who is that individual?

2    A.    The defendant, Vladislav Klyushin.

3    Q.    And we were in the midst of discussing some photographs of

4    another individual that were found in the defendant's iCloud

5    account and WhatsApp messages between Mr. Klyushin and another

6    individual.  Who is that individual?

7    A.    Ivan Ermakov in the red to the right of Mr. Klyushin in

8    this chart.

9    Q.    And then we discussed an employee list that we took a look

10   at involved various M-13 employees.  Do you recall that

11   testimony?

12   A.    Yes.

13   Q.    And do you recall that Mr. Klyushin was on that list, as

14   was his wife?

15   A.    Yes.

16   Q.    And Mr. Ermakov was on that list?

17   A.    Yes.

18   Q.    And then there's a third individual to the right of

19   Mr. Ermakov.

20          Mr. Kosto, if you could just indicate Mr. Rumiantcev.

21          Who is that individual?

22   A.    Nikolai Rumiantcev.

23   Q.    And he was on that list?

24   A.    Yes.

25          THE COURT:  As you'll see, those are the three

```
 1    named -- the allegations are against those three named alleged
 2    co-conspirators, so those are -- all right.
 3              So now move on to the next ones.
 4    BY MR. FRANK:
 5    Q.   We are about to discuss these individuals this morning,
 6    but we have not really discussed them yet, but could you
 7    identify by name the next two individuals?
 8              MR. FRANK:  And, Mr. Kosto, if you wouldn't mind
 9    indicating.
10    A.   Igor Sladkov.
11    Q.   And on the bottom left?
12    A.   Mikhail Irzak.
13    Q.   At the exact moment that we broke yesterday, and we'll be
14    resuming testimony about three individuals, who are those
15    individuals?
16    A.   Starting with the individual on the left, Boris -- this is
17    Alexander Borodaev.
18    Q.   I'm sorry?
19    A.   Alexander Borodaev.
20    Q.   Is that mislabeled on the chart?
21    A.   Yes.
22    Q.   Oh, that's helpful.
23              Okay.  So that's Alexander Borodaev.
24              THE COURT:  What's it say on the chart?
25              MR. KOSTO:  Those two names are swapped.
```

```
1              THE COURT:  Why don't you just do arrows so no one
2   gets confused here.
3              You've seen these pictures yesterday, but --
4   BY MR. FRANK:
5   Q.   Okay.  So that is, in fact, Alexander Borodaev?
6   A.   Yes, on left.
7   Q.   And the next individual?
8   A.   Boris Varshavksiy.
9   Q.   And the last individual?
10  A.   Sergey Uryadov.
11  Q.   And how were those three individuals related to what we've
12  been talking about?
13  A.   Investors of Vladislav Klyushin.
14             THE COURT:  So they're not charged in any way.
15  They're alleged investors, all right.
16             (Discussion off the record.)
17  BY MR. FRANK:
18  Q.   If we could pick up, you left off at Exhibit 152B.
19             Again, a moment ago we were talking about
20  Mr. Varshavksiy and Mr. Borodaev.
21  A.   Yes.
22  Q.   Also known as Alexander Borodaev?
23  A.   Correct.
24  Q.   So just to take us back to where we were, what is 152B?
25  A.   A group chat communication amongst Vladislav Klyushin,
```

1    Alexander Borodaev, and Boris Varshavksiy.

2    Q.    And again, those two individuals are --

3    A.    Investors.

4    Q.    Okay.  And what does Mr. Klyushin say?

5    A.    Good morning, I am back, had a good vacation, ready to

6    work.  Congratulations to Boris, he showed super result for the

7    4-months period and made $632,000.  Alexander's is a little

8    worse, $461,000.  Also, open broker created a new function and

9    you could follow the value of your portfolio online, I will

10   send you the log in password below, you could look at it at any

11   time.  There will be no bids until April 15, so if you want you

12   can withdraw extra funds.

13   Q.    And then there's a login and password for "bv"?

14   A.    Correct, for Boris Varshavksiy.

15   Q.    And then a login and password for "ab"?

16   A.    For Alexander Borodaev.

17   Q.    And a link to a website called openbroker.com?

18   A.    Correct.

19              MR. FRANK:  Ms. Lewis, you can take that down.

20              And if we can now look at Exhibit 55 and 55A.

21   Q.    Special Agent, on the left, Exhibit 55 --

22              MR. FRANK:  And I offer this, Ms. Molloy.

23         (Exhibit 55 received into evidence.)

24   Q.    What is Exhibit 55?

25   A.    55 is a Russian language original version, it's a

1    screenshot of an email found in Vladislav Klyushin's Apple

2    account.

3    Q.    And what is 55A?

4    A.    The FBI English translation.

5    Q.    And who is the email from?

6    A.    nr@m13.ru.

7    Q.    Who is the email from?

8    A.    We identified this email account to belong to Nikolai

9    Rumiantcev.

10   Q.    Could you read the text of the subject line of the email

11   and the body of the email.

12   A.    Documenting profit at the end of 3rd quarter of 2020 for

13   brokerage account of Alexander Borodaev (draft).

14          Greetings, the company M-13 has finished 3rd quarter

15   of 2020 and plans to record profits based on trade results.

16   Details provided in the table.

17   Q.    And what does it indicate as the investment?

18   A.    10,013,068 U.S. dollars.

19   Q.    And the portfolio value as of September 17, 2020?

20   A.    11,324,505 U.S. dollars.

21   Q.    And the profit?

22   A.    1,311,437 U.S. dollars.

23   Q.    In the quarter, correct?

24   A.    Correct.

25   Q.    And what does this email indicate the client receives

1  percentage-wise of that amount?

2  A.    Forty percent, and an additional tax is included in what

3  they received to cover their tax liability.

4  Q.    And the amount?

5  A.    478,000 U.S. dollars.

6  Q.    And what does the email indicate Mr. Klyushin's company,

7  M-13, receives of that amount?

8  A.    Sixty percent.

9  Q.    And the amount?

10  A.    522,000 U.S. dollars.

11        MR. FRANK:  Ms. Lewis, could we look at 56, and 56A,

12  please.

13  Q.    What is Exhibit 56, Special Agent?

14  A.    This is another screenshot of an email that was identified

15  and located in the Vladislav Klyushin Apple account.

16  Q.    And who --

17        MR. FRANK:  The government offers 56 and 56A.

18        (Exhibits 56 and 56A received into evidence.)

19  BY MR. FRANK:

20  Q.    And who is this email from?

21  A.    This is from Nikolai Rumiantcev to Vladislav Klyushin.

22  Q.    Subject?

23  A.    Regarding documenting profit at the end of 3rd of 2020 for

24  the brokerage account of Sergey Uryadov (draft).

25  Q.    Okay.  We can skip over the text that's on the screen.

```
 1              What's the investment capital?
 2    A.    5 million U.S. dollars.
 3    Q.    What's the portfolio value as of September 17, 2020?
 4    A.    6,125,274 U.S. dollars.
 5    Q.    How much of that did the client receive according to this
 6    email?
 7    A.    Forty percent plus tax, the tax liability.
 8    Q.    The amount?
 9    A.    406,300 U.S. dollars.
10    Q.    And how much was allocated to Mr. Klyushin's company?
11    A.    Sixty percent.
12    Q.    The amount?
13    A.    443,700 U.S. dollars.
14              MR. FRANK:   Could we have 57 and 57A, please.
15    Q.    What is 57?
16    A.    A third screenshot of an email from Nikolai Rumiantcev to
17    Vladislav Klyushin found in the Vladislav Klyushin's Apple
18    account.
19    Q.    And, Special Agent, I note that the screenshot appears to
20    be cut off on the right-hand side.  Is that how it was found?
21    A.    Yes.
22    Q.    And if we could just -- if I could direct your attention
23    to 57A.
24              Who is the email from and to?
25    A.    Nikolai Rumiantcev to Vladislav Klyushin and two others.
```

1    Q.   What does it say?  What's the subject line?

2    A.   Report on June to July 2020.

3    Q.   What's the text?

4    A.   Greetings, I am sending over information on yesterday's

5    trading, as well as a non-fixed profit for BURL for the end of

6    past quarter.

7    Q.   And are you familiar with a company that has the stock

8    symptom BURL?

9    A.   Yes.

10   Q.   Is that Burlington Coat Factory?

11   A.   Yes.

12   Q.   And directing your attention to the accounts listed below,

13   can you just tell us what the accounts are identified as on

14   this chart?

15   A.   Yes.  Starting at the top, VK_SAXO.

16   Q.   Whose initials are "VK"?

17   A.   Vladislav Klyushin.

18   Q.   The next?

19   A.   AB_Saxo.

20   Q.   Whose initials are "AB"?

21   A.   Alexander Borodaev.

22   Q.   The next?

23   A.   USS_Saxo.

24   Q.   Were you able to determine whose initials that corresponds

25   to?

1    A.    Sergey Uryadov.

2    Q.    The next?

3    A.    NR.

4    Q.    Whose initials are those?

5    A.    Nikolai Rumiantcev.

6    Q.    The next?

7    A.    M-13.

8    Q.    The next?

9    A.    VK5.

10   Q.    And the next?

11   A.    VK_BCS.

12   Q.    What is "BCS"?

13   A.    Broker Credit Services.

14   Q.    That's a different brokerage firm?

15   A.    Correct.

16   Q.    Thank you.

17         MR. FRANK:  You can take that down, Ms. Lewis.

18         I believe I offered that, Ms. Molloy.

19         THE CLERK:  You did.

20         (Exhibits 57 and 57A received into evidence.)

21         MR. FRANK:  I'd like to offer for identification only

22   Exhibit 183, and then I'd like to offer from Exhibit 183 a

23   couple of excerpts, 183A and 183B.

24   Q.    Special Agent, what is Exhibit 183A?

25   A.    This is a chat between Vladislav Klyushin and Boris

1    Varshavksiy.

2    Q.   So -- and Boris Varshavksiy, again, is one of those

3    investors we just talked about?

4    A.   Yes.

5         MR. FRANK:  Ms. Lewis, just for a moment, if we could

6    blow up as you were just trying to do, the text.

7         If you could just go a little further so we could just

8    see the dates.

9    Q.   What is the date of this communication?

10   A.   August 27 of 2020.

11   Q.   What does the first line indicate?

12   A.   An image was sent.

13   Q.   And what image was sent?

14   A.   The image on the right of the four vehicles was sent from

15   Vladislav Klyushin to Boris Varshavksiy.

16   Q.   That's 183B, that image?

17   A.   Yes.

18   Q.   And what does Mr. Klyushin write?

19   A.   "Only you, the investor, is missed here."

20   Q.   How does Mr. Varshavksiy respond?

21   A.   "Are all of these yours?"

22   Q.   And how does Mr. Klyushin respond?

23   A.   "Uryadov, Ivan, and two that are mine."

24   Q.   And what's on the next line?

25   A.   Tears of joy emoji.

1    Q.    That's from Mr. Varshavksiy?

2    A.    Correct.

3    Q.    And then what does Mr. Klyushin write?

4    A.    "Stop by for a visit today.  Delivered to all of us at the

5    same time."

6    Q.    And how does Mr. Varshavksiy respond?

7    A.    "Beautiful."

8    Q.    Directing your attention to the line above the tears of

9    joy emoji, who's Uryadov?

10   A.    Uryadov is Sergey Uryadov.

11   Q.    Who is Ivan?

12   A.    Ivan Ermakov.

13   Q.    So directing your attention to the Exhibit 183B on the

14   left, which is the vehicle that the defendant attributes to

15   Mr. Uryadov?

16   A.    The far left vehicle.

17   Q.    Which is the vehicle that he attributes to Mr. Ermakov?

18   A.    The blue vehicle.

19        MR. FERNICH:  Objection.

20        THE COURT:  Well -- sustained.

21   BY MR. FRANK:

22   Q.    Which is the vehicle he attributes to Ivan --

23        MR. FERNICH:  Objection.

24        THE COURT:  Sustained.

25        MR. FRANK:  Directing your attention to the three

 1  vehicles on the right, Ms. Lewis, could you enlarge the license

 2  plates?

 3  Q.   Special Agent, what do those three license plates have in

 4  common?

 5  A.   The number --

 6           MR. FERNICH:  Objection.

 7           THE COURT:  Overruled.

 8           THE WITNESS:  May I finish.

 9           THE COURT:  Yes.

10  A.   013.

11  Q.   What is the name of the defendant's company?

12  A.   M-13.

13           MR. FRANK:  The car on the far left, Ms. Lewis, if you

14  could enlarge its license plate.

15  Q.   Does that car have the number 13 in its license plate?

16  A.   No.

17  Q.   Thank you.

18           MR. FRANK:  Ms. Lewis, you can take this down.

19           And I offer that, Ms. Molloy.

20             (Exhibits 183A and 183B marked for identification.)

21           MR. FRANK:  Could we take a look at Exhibit 60A in

22  evidence.

23           THE COURT:  Can we mark that for ID?

24           I had an idea.  We can haven't it at the break.

25           MR. FRANK:  Yes, your Honor.

1   BY MR. FRANK:

2   Q.   This is Exhibit 60A in evidence.  We looked at it

3   yesterday.

4   A.   Yes.

5   Q.   From the defendant's company's website, can you read how

6   many employees M-13 has?

7   A.   It employs a staff of more than 100 developers, linguists,

8   media analysts and other experts.

9   Q.   Did you see any evidence in --

10            MR. NEMTSEV:  Objection.

11            THE COURT:  I haven't heard the question yet.

12   BY MR. FRANK:

13   Q.   Did you see any evidence in the iCloud returns that you

14   searched about other employees with cars matching the

15   defendant's?

16            MR. NEMTSEV:  Objection.

17            THE COURT:  Overruled.

18   A.   Could you repeat the question, please?

19   Q.   Did you see any evidence in the iCloud returns that you

20   searched of any other M-13 employees with cars that matched the

21   defendant's?

22   A.   No.

23   Q.   Okay.  Special Agent, I now want to return to some

24   excerpts from the WhatsApp chat that we were looking at

25   yesterday between the defendant and Mr. Ermakov.

```
 1              MR. FRANK:  Ms. Lewis, if you could call up Exhibit
 2    151G.
 3              And I'd offer it.
 4              (Exhibit 151G received into evidence.)
 5    Q.   What is the date of 151G?
 6    A.   June 12th of 2019.
 7    Q.   Can you read it for the record and identify the speakers,
 8    please?
 9    A.   Vladislav Klyushin:  Hi.  Did you watch the final episode
10    of Billions?
11              Ermakov:  Hi, no, I stopped on the 6th.
12              Klyushin:  That episode is cool.
13              Ermakov:  I'll watch it.
14              Klyushin:  Kolya's stocks grew.
15    Q.   And you see the last entry is at a different date and time
16    than the prior entries?
17    A.   June 13.
18    Q.   And what is Kolya a nickname for?
19    A.   Nikolai.
20    Q.   And whose name in this investigation is Nikolai?
21    A.   Nikolai Rumiantcev.
22    Q.   And are you familiar with the American television show
23    "Billions"?
24    A.   I am.
25    Q.   What is it about?
```

```
 1                 MR. FERNICH:  Objection.

 2                 THE COURT:  Sustained.

 3                 MR. FRANK:  Could we look at Exhibit 151I.

 4                 And I'd offer it.

 5                  (Exhibit 151I received into evidence.)

 6    BY MR. FRANK:

 7    Q.    Special Agent, can you identify -- read the date of

 8    Exhibit 151I.

 9    A.    February 9 of 2020.

10    Q.    And can you read the exchange and identify the speakers.

11                 The first line appears to be a website?

12    A.    Correct.

13    Q.    And could you go on from there, please.

14    A.    Ermakov:  This one -- strike that.

15                 Ermakov:  This one.

16                 Klyushin:  When do you want to collect it?

17                 Ermakov:  It can be done either on Tuesday or on

18    Wednesday.

19                 Klyushin:  How about Thursday?  If you need me I'm

20    available on Thursday.  In case you don't need me I can make

21    organize a meeting with a realtor on either Tuesday or

22    Wednesday.  That, or as an option, to leave work at 13:00 on

23    Wednesday, check a few properties and then head to sauna.

24                 Ermakov:  Option for Wednesday sounds good.

25    Q.    And that website that's transmitted above, does that
```

1  appear to be a real estate website?

2  A.   Correct.

3          MR. NEMTSEV:  Objection.

4          THE COURT:  You need to hold on a second when there's

5  an objection.

6          THE WITNESS:  I apologize.

7          THE COURT:  Overruled.

8          MR. FRANK:  If we could call up Exhibit 151J, and I'd

9  offer it.

10          (Exhibit 151J received into evidence.)

11  BY MR. FRANK:

12  Q.   Special Agent, taking a look at 151J, a continuation of

13  the WhatsApp chat between the defendant and Mr. Ermakov, can

14  you fell us the date?

15  A.   February 12, 2020.

16  Q.   Can you read this one for the record, please.

17  A.   Vladislav Klyushin:  At this point I want nothing except

18  the boat.  This I want very much.

19          Ermakov:  Then you need nothing.  Enjoy your life.

20  You have everything.

21          Klyushin:  Thumbs up emoji.

22          I am fucking tired rushing all the time.  Need a rest.

23          Ermakov:  I've read somewhere that if you keep buying

24  while you have everything, it means you're unhappy.  And this

25  is not about shares.

1           Klyushin:  My pleasure is the boat and trading.

2           Ermakov:  Well, then, this is super.

3           Klyushin:  I am really enjoying it.  But not ones from

4     Tesla.

5           Ermakov:  Well, this depends on timing.  When it goes

6     as predicted, then it is fine.  It's not so much when it acts

7     unpredictably.

8           Klyushin:  Honestly I get a bigger kick when I check

9     apartments for you, with you, the fact that we can walk home

10    together and have a beer, or play golf, or simply send everyone

11    to hell, knowing that you are close.

12          Ermakov:  This truly sounds like a nice declaration of

13    love, like a declaration of love to a girl.

14          Klyushin:  We spend a lot of time together, I feel

15    good and calm, everyone does their job, does his own work.

16    Smart asses like Sergei Mikolayevich make me mad.  Here, we

17    work quietly and do not bother anybody.  We will learn how to

18    have a great time, we'll ban talks about work and everything

19    will being outstanding.

20          Ermakov:  I agree, restrictions are important.

21    Q.    Special Agent, the first line of this exchange references

22    a boat.  Do you see that?

23    A.    Yes.

24    Q.    Did you see photos of a boat exchanged between

25    Mr. Klyushin and Mr. Ermakov?

1    A.    Yes.

2    Q.    And was that in the days after this exchange?

3    A.    Yes.

4    Q.    Was there one photo of a boat or were there multiple

5    photos?

6    A.    There were 29 photos.

7              MR. FERNICH:  Objection.

8              THE COURT:  Sustained.

9              MR. FERNICH:  Move to strike.

10             THE COURT:  Yes.

11   BY MR. FRANK:

12   Q.    Was there more than one photo?

13             MR. FERNICH:  Objection.

14             THE COURT:  Overruled.

15   A.    Yes.

16   Q.    Showing you now Exhibit 19.  What is Exhibit 19?

17   A.    A picture of a boat.

18             MR. FRANK:  The government offers 19.

19             THE COURT:  Allowed.

20          (Exhibit 19 received into evidence.)

21   BY MR. FRANK:

22   Q.    Was this one of the photographs that was transmitted?

23   A.    Yes.

24   Q.    By whom?

25   A.    Vladislav Klyushin to Ivan Ermakov.

```
 1   Q.   Did you find any of the boat images that Mr. Klyushin
 2   transmitted to Mr. Ermakov anywhere else?
 3   A.   Yes.
 4   Q.   Where?
 5   A.   Mr. Sladkov's, Igor Sladkov's Apple account.
 6   Q.   We're going to get to Mr. Sladkov in a minute, but is he
 7   the individual that was referenced earlier in the top right of
 8   that poster board?
 9   A.   Yes.
10   Q.   And did you find one image of the boat in Mr. Sladkov's
11   iCloud account or more than one image?
12   A.   Twenty-nine.
13            MR. FERNICH:  Objection.
14            THE COURT:  You know, I strike that.
15            So there was more than one picture of the boat.
16   That's all that's in evidence.
17   BY MR. FRANK:
18   Q.   Were you able to determine how those photos of the boat
19   were transmitted to Mr. Sladkov?
20   A.   WhatsApp.
21   Q.   Were you able to determine by whom?
22   A.   Ivan Ermakov --
23            MR. FERNICH:  Objection to these questions.  The
24   answers are not responsive to the question.
25            MR. FRANK:  The question was by whom.
```

 1          THE COURT:  Ask the question again, please.

 2          MR. FERNICH:  Could the court reporter just read the

 3   questions back, please?

 4              (Record read.)

 5          THE COURT:  I'll allow that.

 6          Go ahead.

 7          MR. FRANK:  Thank you.

 8   BY MR. FRANK:

 9   Q.   Were you able to see the substance of the associated

10   messages between Mr. Ermakov and Mr. Sladkov?

11   A.   No.

12   Q.   Why not?

13   A.   That content was not identified or located.

14          MR. FRANK:  Could we go back to Exhibit 151 and look

15   at the excerpt 151L, please.

16   Q.   What is the date of Exhibit 151L?

17   A.   February 21, 2020.

18   Q.   Could you read this exchange for the record, please.

19   A.   Klyushin:  Let me help you with Saxo, if you need it,

20   otherwise I have nothing to do.

21          Ermakov:  I'll do it myself.

22          Klyushin:  Okay.

23          Ermakov:  Thank you.

24   Q.   And what is Saxo?

25   A.   Saxo is an online brokerage firm.

```
 1              MR. FRANK:  Could we look at Exhibit 151M, please.
 2    Q.    Special Agent, what is 151M?
 3    A.    This is an -- a reference to a document that was passed
 4    between Vladislav Klyushin and Ivan Ermakov.
 5    Q.    What is the date?
 6    A.    The date is March 3, 2020.
 7              MR. FRANK:  I offer 151L and M.
 8              (Exhibits 151L and 151M received into evidence.)
 9    BY MR. FRANK:
10    Q.    And were you able to locate this document?
11    A.    Yes.
12              MR. FRANK:  Could we have on the left 264 and on the
13    right 264A.
14              And I offer them.
15              (Exhibits 264 and 264A received into evidence.)
16    Q.    What is Exhibit 264?
17    A.    264 is a Russian language version of a loan agreement.
18    Q.    And what is 264A?
19    A.    The FBI translation of the loan agreement.
20    Q.    Okay.  And what is the date of the loan agreement?
21    A.    March 3, 2020.
22    Q.    Could you read the first paragraph, please?
23    A.    Citizen of the Russian federation Yermakov, Ivan
24    Sergeyevich, further referred to as the borrower, the party
25    one, and citizen of the Russian federation Klyushin, Vladislav
```

```
 1   Dmitrievich, further referred to as the lender, the party two,
 2   collectively be known herein as the parties and separately as
 3   the party, made an agreement (further referred to as the
 4   agreement, with the following terms.
 5   Q.   And directing your attention to the first provision of the
 6   agreement, what does it say, 1.1?
 7   A.   The lender agrees to give the borrower the loan as per
 8   borrower's written request, and the borrower agrees to repay
 9   the principal amount of the loan, together with the interest on
10   the amount of the loan in accordance with the terms and
11   conditions set forth in the agreement.
12   Q.   And what does 1.2 indicate?
13        MR. FRANK:  Ms. Lewis, you can just enlarge 1.2
14   through 1.6.
15        Thank you.
16   Q.   What does 1.2 indicate?
17   A.   The loan amount is 100 million rubles.
18   Q.   And what is 100 million rubles at this time in March of
19   2020 in dollars?
20        MR. FERNICH:  Objection.
21   A.   Approximately --
22        THE COURT:  You know, when there's an objection -- I'm
23   not an ATM machine, I just need to think one second.
24        THE WITNESS:  I apologize, Judge.
25        THE COURT:  The question is:  Do you know how much in
```

1    dollars that is at this point?

2              THE WITNESS:  Yes, ma'am.

3              THE COURT:  I'll allow the answer.

4              Go ahead.

5    A.   Approximately one-and-a-half millions U.S. dollars at the

6    time of this exchange.

7    Q.   Thank you.

8              1.3, Special Agent.

9    A.   The lender shall make the payment of the loan amount to

10   the borrower within five business days from the moment of

11   receiving the borrower's written request.

12   Q.   Special Agent --

13             MR. FRANK:  Ms. Lewis, if we could go to the last page

14   of these two exhibits.

15             MR. FERNICH:  Judge, we're going to request a limiting

16   instruction on this material, and we can discuss it at sidebar,

17   if that's better for your Honor; whatever the Court wants.

18             THE COURT:  I don't know what it is.

19             MR. FERNICH:  The material that just came in.  That's

20   ongoing right now.  We can do this at 11:00, if your Honor

21   prefers.

22             THE COURT:  We'll do it later, all right.

23   BY MR. FRANK:

24   Q.   Special Agent, do you see that there are signatures on the

25   left?

1    A.    Yes.

2    Q.    And indicating on the translation on the right, whose

3    signatures are those?

4    A.    Ivan Ermakov and Vladislav Klyushin.

5          MR. FRANK:  Thank you.  You can take that down,

6    Ms. Lewis.

7          Could we have excerpt 151N, please.

8    Q.    Special Agent, what is the date of this exchange?

9    A.    June 30, 2020.

10   Q.    Could you read it for the record.

11   A.    Klyushin:  The apartment is cool.

12         Ermakov:  Winking smiley face emoji.

13         Klyushin:  We will earn the money and then we can buy.

14         Ermakov:  Then I better get to work.

15         Klyushin:  No need to, just turn the computer on and

16   think a little bit.

17         Ermakov:  I already gave it a thought yesterday.  I

18   will be thinking more today.

19         Klyushin:  Four crying tears of joy emoji.

20         MR. FRANK:  Could we have 151O, please.

21   Q.    What is 151O?

22   A.    Another exchange on August 17, 2020 between Ivan Ermakov

23   and Vladislav Klyushin.

24         MR. FRANK:  The government offers N and O, 151N and O.

25             (Exhibits 151N and 151O received into evidence.)

1   Q.   Could you read this for the record, please.

2   A.   Ermakov:  Signed everything, need to pay for it.  I will

3   ask Tatayana to send you.

4        Klyushin:  I congratulate you.  Tatayana will send you

5   scans of all the documents and we will pay.  They won't pass

6   anything without documentation.

7        Ermakov:  I will send them to you later.  I have them.

8        Klyushin:  I've got it, but it can wait until

9   tomorrow, isn't it?

10        Ermakov:  Thank you very much, yes, we have three

11   days.

12        Klyushin:  This is a good apartment.  Good job.

13        Ermakov:  I concur.  And the judge is very nice.  I

14   would even classify it as a pretty one.

15        Klyushin:  This is great.  Were you acting in

16   Klyushin's role?  I am happy for you, you got the apartment you

17   need.  No matter how many kids you'll have, this one is comfy

18   to live in.

19        Ermakov:  No.  I was in my role.

20        Klyushin:  Suits you perfectly.

21        Ermakov:  In addendum it say I am the signer and you

22   are the owner.  It will be destroyed on the of signing.

23        Klyushin:  Got it.

24   Q.   Thank you, Special Agent.

25        MR. FRANK:  You can take this down, Ms. Lewis.

1    Q.   Yesterday we looked at a series of photos that were found

2    in Mr. Klyushin's iCloud account.  Do you recall that

3    testimony?

4    A.   Yes.

5    Q.   I'd like to show you one more photo.

6              MR. FRANK:  Could we have Exhibit 34, please.

7              And I offer it.

8              (Exhibit 34 received into evidence.)

9    Q.   Where was this photo found?

10   A.   In Klyushin's Apple account.

11   Q.   And do you recall the date of this photograph or the date

12   and month?

13             Was this from the summer of 2020?

14             MR. NEMTSEV:  Objection.

15             THE COURT:  Overruled.

16             Do you know?

17             THE WITNESS:  Yes.

18             THE COURT:  Do you remember yourself?

19             THE WITNESS:  Yes, I reviewed these documents.

20   A.   Yes, it was from the summer of 2020.

21   Q.   And what is depicted in the plastic sleeve on the table?

22   A.   Inside the document protector is an article, a hard copy

23   of an article inside the document protector.

24             THE COURT:  Make it clear, this has nothing to do with

25   Mr. Klyushin or anyone else mentioned in terms of this person

 1    who allegedly was the Ukrainian hacker.

 2            So this has nothing to do with the current case.

 3    BY MR. FRANK:

 4    Q.   And this photograph that you found in the defendant's

 5    iCloud account, this article in the plastic sleeve, can you

 6    read the headline of the article?

 7    A.   "Ukrainian Hacker Gets Prison in U.S. Insider Trading

 8    Case."

 9    Q.   Were you able to locate this article?

10    A.   Yes.

11            MR. FRANK:   Ms. Lewis, if you could put Exhibit 150 on

12    right, please -- and I'd offer 150.

13            (Exhibit 150 received into evidence.)

14    Q.   What is 150?

15    A.   This is the article that was depicted in the photograph.

16    Q.   And could you just read the first paragraph of the

17    article?

18    A.   A Ukrainian computer hacker was sentenced on Monday to

19    2 1/2 years in prison over his role in a global scheme to

20    conduct insider trading based on stolen, yet-to-be-published

21    corporate news releases, U.S. prosecutors said."

22    Q.   This article about the hacker and the insider trading

23    scheme on stolen news releases, this was found in

24    Mr. Klyushin's iCloud account that's dated from the summer of

25    2020?

```
 1   A.   Yes.

 2            MR. FRANK:  Ms. Lewis, if you could enlarge the top,

 3   very top date on the article.

 4   Q.   What was the date that this article in the plastic sleeve

 5   was published?

 6   A.   May 22, 2017.

 7   Q.   How long is that before the date of the photograph?

 8            MR. FERNICH:  Objection.

 9   BY MR. FRANK:

10   Q.   With the article in it?

11            MR. FERNICH:  Objection.

12            THE COURT:  Excuse me, objection to --

13            MR. FERNICH:  Speaks for itself.

14            THE COURT:  That's the date.

15   BY MR. FRANK:

16   Q.   What is the gap between the date of the article and the

17   date of the photograph of the article?

18            MR. FERNICH:  Yes, objection.

19            THE COURT:  Overruled.

20   A.   This is three years later.

21   Q.   I'm sorry, Special Agent.  The article is May 22, 2017?

22   A.   Yes.

23   Q.   And the photograph was August of 2018?

24   A.   I'm sorry --

25            THE COURT:  All right --
```

```
 1              MR. FRANK:  Now I'm confused.
 2   A.   It was the summer -- the photograph with the document
 3   protector is the summer of 2018.  The article is from May of
 4   2017.  It was August versus May, so it's a year and several
 5   months, a year and a few months later.
 6   Q.   I apologize, I confused that, Special Agent.
 7              THE COURT:  Well --
 8   BY MR. FRANK:
 9   Q.   Special Agent, I now want to ask you some questions --
10              MR. FRANK:  And Ms. Lewis, you can take that down.
11   Q.   I now want to ask you some questions about connections
12   between Mr. Sladkov, the individual on the top right of the
13   poster board; Mr. Ermakov; Mr. Klyushin, and M-13.  Okay?  Do
14   you have those individuals in mind?
15   A.   Yes.
16              MR. FRANK:  Ms. Lewis, if we could call up Exhibit 3
17   in evidence.
18   Q.   Special Agent, remind us again, what is Exhibit 3?
19   A.   This is a photograph of Ivan Ermakov's passport.
20   Q.   We looked at this photograph yesterday.  But now I would
21   like to ask you, where was this photograph found?
22   A.   The Apple account of Igor Sladkov.
23   Q.   Did you find other photos of Mr. Ermakov in Mr. Sladkov's
24   iCloud account?
25   A.   Yes.
```

```
 1              MR. FRANK:  Could we have Exhibit 129, please.

 2              And I offer it.

 3                 (Exhibit 129 received into evidence.)

 4    BY MR. FRANK:

 5    Q.    What is Exhibit 129?

 6    A.    This is a photograph of Ivan Ermakov at a restaurant.

 7    Q.    And where was this found?

 8    A.    Igor Sladkov's Apple account.

 9    Q.    Sitting here today, do you recall the year that this

10    photograph was taken?

11    A.    Yes.

12    Q.    What was the year?

13    A.    2016.

14              MR. FRANK:  Could we see Exhibit 266.

15              And I'd offer it.

16                 (Exhibit 266 received into evidence.)

17    Q.    What is Exhibit 266?

18    A.    This is a photograph that was located within Igor

19    Sladkov's Apple account.

20    Q.    Who is it?

21    A.    Ivan Ermakov.

22              MR. FRANK:  Ms. Lewis, could you put up Exhibit 119 in

23    evidence side by side.

24    Q.    Yesterday we looked at Exhibit 119.  Do you recall that,

25    Special Agent?
```

1    A.   Yes.

2    Q.   Where was Exhibit 119 on the right found?

3    A.   Vladislav Klyushin's Apple account.

4    Q.   And 266 was in Mr. Sladkov's iCloud account?

5    A.   Yes.

6    Q.   Were you able to determine when these photographs were

7    taken?

8    A.   Yes.  On the birthday of Ivan Ermakov.

9    Q.   Both photographs?

10   A.   Yes.

11   Q.   On the same day?

12   A.   Yes.

13   Q.   Other than these photographs that you found in

14   Mr. Sladkov's iCloud account and the photograph of

15   Mr. Klyushin's yacht, did you see any direct communications

16   between Mr. Sladkov and Mr. Klyushin?

17   A.   No.

18        MR. FRANK:  Could we take a look at Exhibit 16,

19   please.

20        And I'd offer it.

21        (Exhibit 16 received into evidence.)

22   Q.   What is Exhibit 16, Special Agent?

23   A.   This is a directory listing of folders and certain files

24   provided by Apple regarding the Apple account for Vladislav

25   Klyushin.

1   Q.   And what does this directory listing from Mr. Klyushin's

2   iCloud account depict?

3   A.   That there is a folder named app domain-su.m13.chat.

4   Q.   And what is app domain-su.m13.chat?

5   A.   Folders with this naming convention refer to an

6   application on an Apple device, and this indicates that there

7   was an m13.chat application.

8   Q.   On Mr. Klyushin's iCloud account?

9   A.   Yes.

10  Q.   Did you find an m13.chat application on any other iCloud

11  accounts?

12  A.   Yes.

13  Q.   Whose?

14  A.   Nikolai Rumiantcev and Igor Sladkov.

15  Q.   Showing you Exhibit 15, what is Exhibit 15?

16  A.   This is a screenshot of the directory listing and certain

17  files found within the Apple account of Nikolai Rumiantcev as

18  provided by Apple.

19  Q.   And what does it indicate about that m13.chat app?

20  A.   That it was also installed on a device that was associated

21  with Nikolai Rumiantcev's Apple account.

22          MR. FRANK:  And I'd offer Exhibit 15.

23          And now I'd offer Exhibit 14.

24          (Exhibits 15 and 14 received into evidence.)

25  Q.   What is Exhibit 14?

```
 1   A.    A similar screenshot of a directory listing of certain
 2   files for -- for Igor Sladkov's Apple account.
 3   Q.    Okay.  And what does this directory listing indicate?
 4   A.    That there was also an m13.chat app installed on a device
 5   associated with the Sladkov Apple account.
 6   Q.    Were you able to review any communications over the
 7   m13.chat application?
 8   A.    No.
 9   Q.    Why not?
10         MR. NEMTSEV:  Objection.
11         THE COURT:  Overruled.
12   A.    No communications were located.
13   Q.    Did you locate any graphical depictions of the m13.chat
14   app on any of these iCloud accounts?
15   A.    Yes.
16         MR. FRANK:  Could we look at 136 and 137 side by side,
17   please.
18   Q.    Were these two of the graphical depictions that you
19   located on those iCloud accounts?
20   A.    Yes.
21         MR. FRANK:  I offer them.
22         (Exhibits 136 and 137 received into evidence.)
23   Q.    What do they depict for the record?
24   A.    Two chat bubbles with a lock.
25   Q.    What does that indicate to you?
```

 1            MR. FERNICH:  Objection.

 2            THE COURT:  Do you know?

 3            THE WITNESS:  In my experience --

 4            THE COURT:  Do you know what this logo means?  Have

 5     you seen it before?

 6            THE WITNESS:  Only within the context of this

 7     investigation.

 8            THE COURT:  Sustained.  The objection is sustained.

 9            MR. FRANK:  You can take that down, Ms. Lewis.

10     Q.   Special Agent, I'd now like to show you Exhibit 155 and

11     155A side by side, and I'd offer them.

12            (Exhibits 155 and 155A received into evidence.)

13     Q.   What is Exhibit 155?

14     A.   155 is the Russian language version of a product marketing

15     slide deck, is the best description.

16     Q.   Okay.  And what is 155A?

17     A.   An FBI translation of that slide deck.

18     Q.   And just for the record, can you read what it says on the

19     cover here?

20     A.   LAVR, "LAVR analysis system for large volumes of data and

21     relationships therein."

22            MR. FRANK:  And if we could go, Ms. Lewis, to page 26

23     of that document.

24     Q.   And could you read the email address at the bottom?

25     A.   lavr@m13.su.

1    Q.    Where was this document concerning the LAVR product found?

2    A.    Igor Sladkov's Apple account.

3    Q.    Sitting here today, do you recall the date that it was

4    saved to Mr. Sladkov's iCloud account?

5    A.    I do.

6    Q.    What is it?

7    A.    That was September 4th of 2019.

8           MR. FRANK:  Ms. Lewis, if you could leave Exhibit 15

9    on the left and put up Exhibit 148 on the right.

10          And I'd offer 148.

11          (Exhibit 148 received into evidence.)

12   Q.    What is Exhibit 148?

13   A.    This is a screenshot of the M-13 Facebook account.

14   Q.    And what is the date of the screen -- of the paragraph

15   that's depicted on the M-13 Facebook page?

16   A.    October 28, 2020.

17   Q.    And is that the Facebook translation of the Russian at the

18   bottom of the screen?

19   A.    Yes.

20   Q.    Could you read the first sentence of the English

21   translation?

22   A.    Tomorrow our IT team will speak at the IDC security

23   digital forum 2020 to present M-13's new product, the LAVR

24   analytics platform.

25   Q.    And could you read the second paragraph.

1    A.   LAVR enables users to combine, structure, and analyze

2    large quantities of data, as well as allocate links to

3    previously uploaded information.  LAVR helps investigate

4    sensitive information leaks, detect malicious attacks on your

5    corporate network, manage vulnerabilities and conduct pentest

6    or redteam campaigns.

7    Q.   Approximately how long before the product was publicly

8    announced was that document found on -- was that document saved

9    to Mr. Sladkov's account?

10   A.   Over a year and one month.

11             MR. FRANK:  If we could look at --

12             MR. FERNICH:  Object to that.  Foundation.  I don't

13   recall testimony that this document was saved to the Sladkov

14   iCloud account.  I could be wrong.

15             MR. FRANK:  He just testified to that.

16             THE COURT:  Do you remember that for sure?

17             THE WITNESS:  Moments ago I testified to the LAVR

18   slide deck on the left -- I can't see the Exhibit Number --

19             MR. FRANK:  155.

20             THE WITNESS:  September 4th of 2019, this file appears

21   in Igor Sladkov's account.  And one year and one month and a

22   little bit longer later, this M-13 Facebook post appears on the

23   internet.

24             MR. FERNICH:  Okay.

25             THE COURT:  All right.

1    BY MR. FRANK:

2    Q.   Thank you, Special Agent.

3         Did you see any images shared between Ivan Ermakov and

4    Igor Sladkov regarding securities trading?

5    A.   Yes.

6         MR. FRANK:  Could we have Exhibit 133, please.

7         And I'd offer it.

8         (Exhibit 133 received into evidence.)

9    Q.   What is Exhibit 133?

10   A.   This is trading for the KSS ticker symbol, which refers to

11   Kohl's.

12   Q.   Kohl's the department store?

13   A.   Yes.

14   Q.   What is the -- do you recall sitting here today the date

15   of this screenshot?

16   A.   This is in May -- do you have anything that would refresh

17   my recollection of the year?

18   Q.   Sure.

19        MR. FRANK:  For identification only, could we show the

20   witness 133A, please.

21   Q.   Does this refresh your recollection on the date that this

22   exhibit was shared between Mr. Ermakov and Mr. Sladkov?

23   A.   Yes.

24   Q.   What was the date?

25   A.   May 21, 2019.

1    Q.   Okay.  And so this exhibit from May 21 -- if we could go

2    back to 133, this depicts trading in which security?

3    A.   Kohl's.  KSS is the ticker symbol.

4         MR. FRANK:  If we could leave 133 up on the left and

5    look at 265 on the right.

6         And I'd offer 265.

7         (Exhibit 265 received into evidence.)

8    Q.   What is 265?

9    A.   265 is the first page of an OTK or OTkritie brokerage

10   account in the name of Vladislav Klyushin.

11        MR. FRANK:  I'd like to now -- Ms. Lewis, can you just

12   highlight Mr. Klyushin's name on that document.

13   Q.   I'd like to now show you an excerpt from these brokerage

14   records, 265A on the right.

15        And I'd offer it.

16        (Exhibit 265A received into evidence.)

17   Q.   Special Agent, do you see Exhibit 265A?

18   A.   I do.

19   Q.   And what is 265A depicting?

20   A.   This is trading in the Kohl's name.

21   Q.   Okay.  And what is the date of the initial trade in Kohl's

22   and all of the trades on this page?

23   A.   May 20, 2019.

24   Q.   So that's the day before that screenshot was sent?

25   A.   Yes.

1    Q.   And if we could look at the next page.

2         Do you see there's additional trades on May 20th?

3    A.   Yes.

4    Q.   Okay.  And then do you see there's a series of trades in

5    the opposite direction starting on the following day, May 21st?

6    A.   Yes.

7    Q.   And that continues --

8         MR. FRANK:  Ms. Lewis if you could show us.

9         THE COURT:  What do you mean in the opposite

10   direction?

11   BY MR. FRANK:

12   Q.   Special Agent, can you explain?

13   A.   Yes.  Whenever  whatever an individual shorts a stock,

14   then -- then the reference to the opposite direction is the

15   other side of the transaction.  Sold them short and then the

16   other side of the transaction.

17   Q.   Bought them back the next day?

18   A.   Bought them back the next day.

19   Q.   So on May 20th, Mr. Klyushin sold shares of Kohl's?

20   A.   Yes.

21   Q.   And on May 21st, he bought shares of Kohl's?

22   A.   Correct.

23   Q.   And what had happened to the price of Kohl's stock in

24   between the time he sold it and when he bought it back?

25   A.   It had gone down.

1    Q.   And that leads to what?

2    A.   A profit.  It's a -- if I could add --

3              MR. NEMTSEV:  Objection.  No question pending.

4    BY MR. FRANK:

5    Q.   What were you going to say, Special Agent?

6    A.   It's a bet, you're placing --

7              MR. NEMTSEV:  Objection.

8              THE COURT:  What are you explaining right now, what

9    selling short means?

10             THE WITNESS:  To follow on to your question, Judge.

11             THE COURT:  What does selling short mean?

12             THE WITNESS:  You're placing a bet that the certain

13   share price of a company will go down.

14             MR. NEMTSEV:  And I object, your Honor.  He's not an

15   expert witness.

16             THE COURT:  Overruled.

17   BY MR. FRANK:

18   Q.   Did you also find references to Mr. Sladkov in

19   Mr. Ermakov's iCloud account?

20   A.   Yes.

21   Q.   As a general matter, did you find the content of any

22   communications in Mr. Ermakov's iCloud account?

23   A.   No, sir.

24   Q.   Showing you 171 and 171A --

25             MR. FRANK:  And I'd offer them.

 1              (Exhibits 171 and 171A received into evidence.)

 2              MR. FRANK:  And I'm not sure, Ms. Molloy, if I offered

 3     those last exhibits.

 4              133, 265, and 265A; and now I'm offering 171 and 171A.

 5              THE CLERK:  Thank you.

 6     BY MR. FRANK:

 7     Q.   Special Agent, what is 171?

 8     A.   You'll see that this is a Russian version of a -- the

 9     Cyrillic representation of a name and associated contact found

10     within the Apple account.

11     Q.   And on the right, 171A?

12     A.   An FBI translation of the name portion only.

13     Q.   Okay.

14              THE COURT:  "Cyrillic" means what?

15              THE WITNESS:  It's the character set that is

16     associated with -- of one -- the Russian language.

17              THE COURT:  It's the alphabet for the Russian

18     language.

19              THE WITNESS:  Yes, Judge.

20     BY MR. FRANK:

21     Q.   Whose contact card is this in Mr. Ermakov's iCloud

22     account?

23     A.   Igor Sladkov.

24     Q.   Do you see it lists his birthday?

25     A.   December 30, 1978.

1   Q.   And directing your attention to the bottom of the screen,

2   can you tell us what date this indicates the contact card was

3   created?

4   A.   November 16, 2016.

5           MR. FRANK:  Thank you.

6           Ms. Lewis, you can take that down.

7   Q.   As part of your investigation, Special Agent, did there

8   come a time when you obtained what's called a pen registration

9   and trap and trace device on a WhatsApp account used by Igor

10  Sladkov?

11  A.   Yes.

12  Q.   Can you tell the jury what a pen register and a trap and

13  trace is?

14  A.   It is a court order signed by a federal judge allowing for

15  the equivalent of caller ID on a WhatsApp account, so who is

16  communicating with you.

17  Q.   Can you actually see content with a pen register?

18  A.   No.

19  Q.   What, if anything, did the pen register and trap and trace

20  device show about contacts between Mr. Ermakov and Mr. Sladkov

21  by WhatsApp?

22  A.   Could you repeat the question?

23  Q.   What did it show about contacts, if anything, between

24  Sladkov and Ermakov?

25  A.   That they were in communication.

1    Q.    Okay.  And did that include texts?

2    A.    Yes.

3    Q.    Did it include images?

4    A.    It did.

5    Q.    Did it include documents?

6    A.    Yes.

7    Q.    Okay.  And do you recall the date that you had that up?

8    A.    I do not.

9    Q.    Did you review any other images concerning securities

10   trading from Mr. Sladkov's iCloud account?

11   A.    Yes.

12   Q.

13             MR. FRANK:  Can we start with Exhibit 30.

14             And I'd offer it.

15             (Exhibit 30 received into evidence.)

16   Q.    Special Agent, what is Exhibit 30 in evidence?

17   A.    This is a picture that appears to be a selfie of Igor

18   Sladkov with Mikhail Irzak in the background.

19   Q.    Mr. Sladkov is facing the camera?

20   A.    Yes.

21   Q.    Mr. Irzak is facing the computer screen?

22   A.    Yes.

23   Q.    And this photo was found in Mr. Sladkov's iCloud account?

24   A.    Yes.

25             MR. FRANK:  Ms. Lewis, can you please enlarge the

1    laptop computer that is over Mr. Sladkov's shoulder.

2    Q.   Special Agent, do you see something covering the lens of

3    the laptop computer?

4    A.   Yes.

5    Q.   What is it?

6    A.   That is either a Band-Aid or a sticker that bears the

7    distinct logo of the Russian Olympic Committee.

8         MR. FRANK:  Could we leave this up on the left and

9    take a look at Exhibit 24.

10        And I'd offer it.

11        (Exhibit 24 received into evidence.)

12   Q.   What is Exhibit 24?

13   A.   This is a screenshot or -- a screenshot of that same

14   laptop that was found within the Apple account of Igor Sladkov.

15   Q.   And how do you know that this screenshot is from the same

16   laptop?

17   A.   The very distinctive Band-Aid or sticker covering the

18   camera of the laptop.

19        MR. FRANK:  And, Ms. Lewis, if you could take down 30

20   and move Exhibit 24 to the left.  We're going to test your

21   Dexterity on the Trial Director.

22   Q.   And Special Agent, do you recall when sitting here -- off

23   the top of your head, do you recall the date and time of this

24   image?

25   A.   No.  Do you have something that would --

1              MR. FRANK:  Could we have, for identification only,

2    Exhibit 24A, please.

3    Q.   Does that refresh your recollection about the date and

4    time that this image was taken?

5    A.   Yes, it does.

6    Q.   What was the date and time?

7    A.   February 6, 2018 at 8:13 a.m. eastern time.

8              MR. FRANK:  And, Ms. Lewis, if you could just

9    highlight that in the middle there.

10             Exactly.

11   Q.   February 6, 2018 at 8:13 a.m. eastern time?

12   A.   Correct.

13             MR. FRANK:  If we could go back to Exhibit 24.

14   Q.   Were you able to locate the document that is depicted on

15   the screen of Mr. Sladkov's computer in Exhibit 24?

16   A.   Yes.

17             MR. FRANK:  Ms. Lewis, can you call up Exhibit 81,

18   please.

19             And I'd offer it.

20             (Exhibit 81 received into evidence.)

21   BY MR. FRANK:

22   Q.   Special Agent, what is Exhibit 81?

23   A.   This is a filing, it is a screenshot of the filing in the

24   EDGAR database.

25   Q.   This is a document that was filed with the SEC?

1    A.    Yes.

2    Q.    Do you see at the top right it says Exhibit 99-1?

3    A.    Yes.

4    Q.    Could you read the headline of the document?

5          MR. FRANK:  Ms. Lewis, if you could highlight that.

6    Q.    What does that say?

7    A.    "Snap Inc. reports fourth quarter and full year of 2017

8    results."

9    Q.    And what does the first sentence -- what is the date and

10   the first sentence?

11   A.    The date February 6, 2018.  Snap Inc. New York Stock

12   Exchange SNAP ticker today announce financial results for the

13   quarter and full year ended December 31, 2017.

14   Q.    And SNAP, is that the company behind Snapchat?

15   A.    Yes.

16         MR. FRANK:  Ms. Lewis, could you please highlight the

17   operational highlights and just a little bit above that, the

18   paragraph 2 above that, all the way to the bottom.  And enlarge

19   those, please.

20   Q.    Special Agent, I'd like to compare these documents.

21         Do you see the first bullet point under "Operational

22   Highlights" on the screenshot on Mr. Sladkov's computer?

23   A.    Yes.

24   Q.    Could you read that bullet?

25   A.    Daily active users.  Daily active users (DAU) increased

1   8.9 million or 5% sequentially to 187 million, representing the

2   highest net adds since Q3 2016.  DAUs increased 28.8 million or

3   18% year over year.

4   Q.   Do you see the same text in the document that was filed in

5   the document with the Securities and Exchange Commission?

6   A.   Yes.

7   Q.   On the right?

8   A.   Yes.

9   Q.   Could you read the first few words of the second bullet on

10  the left?

11  A.   Revenue was $285.7 million in Q4 2017.

12  Q.   Do you see that same text in the second bullet in the

13  document on the right?

14  A.   Yes.

15  Q.   Do the other bullets also appear identical to you?

16  A.   Yes.

17  Q.   Were you able to determine when the SNAP 8K was actually

18  filed with the SEC over the EDGAR system?

19  A.   Yes.

20       MR. FRANK:  Could we look -- Ms. Lewis, if you could

21  take down the exhibit on the right, and if we could look at

22  Exhibit 249A on the right.

23  Q.   What is Exhibit 249A?

24  A.   This is a screenshot of the SEC filing to include date

25  information for the 8K we were looking at, the 99-1 moments

1    ago.

2    Q.   A moment ago you testified, Special Agent, that the

3    screenshot from Mr. Sladkov's computer was taken on February 6,

4    2018 at 8:13 a.m. eastern time.  Do you recall that testimony?

5    A.   Yes.

6    Q.   When was the document filed with the SEC, according to the

7    EDGAR system?

8    A.   4:20 p.m. that same day, eastern.

9    Q.   How many hours was that after it appeared on Mr. Sladkov's

10   computer screen?

11   A.   Eight.

12        MR. FRANK:  Could we look at Exhibit 26, please.

13   Q.   Special Agent, what is Exhibit 26?

14   A.   This is another screenshot that was located within the

15   Sladkov Apple account.

16        MR. FRANK:  I offer, to the extent I didn't, I

17   apologize, Ms. Molloy, I offer Exhibits 24, 30, 81, and now

18   249 -- I'm sorry, 249A and now 26.

19        (Exhibits 24, 30, 81, 249 received into evidence.)

20        THE CLERK:  Thank you.

21   BY MR. FRANK:

22   Q.   This was found -- another screenshot found in

23   Mr. Sladkov's iCloud account?

24   A.   Yes.

25   Q.   And sitting here today, do you recall the date and time of

1    this photo?

2            Or would you like to look at some metadata.

3    A.   Metadata, please.

4            MR. FRANK:  Could we have, for identification only,

5    Exhibit 26A.

6    Q.   Does this refresh your recollection about the date and

7    time of this image?

8    A.   Yes.

9    Q.   And what is it in eastern time?

10   A.   October 31, 2018 at 2:42 p.m. eastern.

11   Q.   Were you able to locate -- if we could go back to 26 --

12   the document depicted on Mr. Sladkov's screen?

13   A.   Yes.

14           MR. FRANK:  Could we have on the right Exhibit 82,

15   please.

16   Q.   What is Exhibit 82?

17   A.   This is the 99-1 exhibit associated with SSNC.

18           MR. FRANK:  And I offer 82.

19             (Exhibit 82 received into evidence.)

20           THE COURT:  All right.

21   BY MR. FRANK:

22   Q.   What is the headline on this 99-1?

23   A.   SS&C Technologies reports Q3 2018 results.

24   Q.   What is the date of the document?

25   A.   October 31, 2018.

1    Q.   Would you read the first sentence, please.

2    A.   SS&C Technologies Holdings, Inc., NASDAQ ticker SSCN, a

3    global provider of investment and financial software-enabled

4    services and software, today announced its financial results

5    for the third quarter ended September 30, 2018.

6            MR. FRANK:  Ms. Lewis, could you take us, please, to

7    page 3 of the 8K, the 99-1.

8    Q.   Special Agent, do you see that there's a table there under

9    "Guidance"?

10   A.   I do.

11   Q.   Okay.  Could you -- if we look at the --

12           MR. FRANK:  Ms. Lewis, could you enlarge that so we

13   could see that as well.

14           Thank you.

15   Q.   If you look at the image on Mr. Sladkov's computer screen,

16   what does it indicate adjusted revenue will be for the fourth

17   quarter of 2018?

18   A.   1,075-1,085.

19   Q.   Does that indicate it's in millions?

20   A.   Yes.

21   Q.   Do you see what's in the actual 99-1 that was filed with

22   the SEC?

23   A.   Identical.

24   Q.   What about adjusted net income in millions in the document

25   on Mr. Sladkov's screen?

1   A.   210 to 220.

2   Q.   What about the document that was filed with the SEC?

3   A.   Same.

4   Q.   Were you able to determine, Special Agent, when the actual

5   8K was filed with the Securities and Exchange Commission?

6   A.   Yes.

7        MR. FRANK:  Ms. Lewis, if you could take down the

8   enlargements, leave up Exhibit 26 on the left.  And now on the

9   right, if we could call up Exhibit 249I.

10       And I'd offer it.

11       (Exhibit 249I received into evidence.)

12  Q.   What is Exhibit 249I?

13  A.   This is a screenshot of the 8K that was filed on October

14  31, 2018 at 4:13 p.m.

15  Q.   I believe you said it's a screenshot of the 8K.  Do you

16  mean it's a screenshot of the EDGAR indicating when the 8K was

17  filed?

18  A.   Yes.

19  Q.   And when was that date and time?

20  A.   October 31, 2018 at 4:13 p.m.

21  Q.   And I believe you testified a moment ago the screenshot is

22  October 31 at 2:42 p.m.?

23  A.   Correct.

24       MR. FRANK:  Ms. Lewis, you could take that down.

25       And I'd like to show Exhibit 262.

```
 1              And I'd offer it.

 2                 (Exhibit 262 received into evidence.)

 3              THE COURT:  How many more of these do you have?

 4              MR. FRANK:  This is the last set of these, your Honor.

 5              THE COURT:  Okay.  And then we'll stand up and

 6      stretch, because this is a lot.

 7              Okay, thank you.

 8      BY MR. FRANK:

 9      Q.   What is Exhibit 262?

10      A.   This is a screenshot found within the Olga Opukhovskaya

11      Apple account.

12      Q.   Remind us, I believe you testified yesterday about who

13      Olga Opukhovskaya is.

14      A.   The individual that lives with Igor Sladkov and shares

15      children with Igor Sladkov.

16      Q.   And could you read the heading of this document that's

17      depicted on the screen.

18      A.   "Entry Into a Material Definitive Agreement."

19      Q.   And the first sentence.

20      A.   On October 18, 2017, certain subsidiaries of Tesla, Inc.

21      that are respectively parties to an amended and restated loan

22      and security agreement (the A and R 2016 warehouse agreement)

23      and a loan and security agreement (the 2017 warehouse agreement

24      and together with the A and R 2016 warehouse agreement, the

25      warehouse agreements) each dated August 17, 2017 with Deutsche
```

```
 1    Bank AG, New York branch as administrative agent and the other
 2    parties named therein, entered into an amendment to each of the
 3    warehouse agreements.
 4    Q.   Special Agent, what does the screenshot indicate was the
 5    date that this photograph was taken?
 6    A.   On the bottom of the screenshot it's October 19, 2017.
 7    Q.   Were you able to find this filing on the SEC's website?
 8    A.   Yes.
 9         MR. FRANK:  Ms. Lewis, if we could call up on the
10    right, 261.
11             And I'd offer it.
12             If I didn't offer 262, I offer that as well.
13             (Exhibit 261 received into evidence.)
14    Q.   What is 261?
15    A.   This is the supporting document for the 8K for Tesla
16    reporting that same entry into a material definitive agreement.
17             MR. FRANK:  Could we go to the next page, please.
18    Q.   Do you see the same text that we just looked at in the
19    screenshot in the actual filing?
20    A.   Identical language, yes.
21             MR. FRANK:  Could we have 261A, please.
22             And, Ms. Lewis, if you could leave -- I'm sorry, if
23    you could leave 262 on the left, do 261A on the right.
24    Q.   What is the date that the document was filed with the
25    Securities and Exchange Commission?
```

1    A.    October 20, 2017.

2    Q.    And what was the date that the screenshot appeared in the

3    Apple iCloud account of Olga Opukhovskaya?

4    A.    The day prior, October 19.

5              MR. FRANK:  Thank you, Special Agent.

6              Ms. Lewis, you can take that down.

7              THE COURT:  Why don't you stand and stretch for a

8    minute.  I'll see the attorneys on a small issue.

9              (At sidebar on the record.)

10             THE COURT:  First of all, I just thought everyone

11   needed a stretch.  It's very dense.  It's very dense.

12             How much longer do you have with him?

13             MR. FRANK:  Quite a bit, your Honor.  It's going to

14   be -- it's tough to estimate, but I would say at least again

15   what we've done, so probably another hour and a half, two

16   hours.

17             THE COURT:  Oh, my goodness.

18             I have to leave a little early in terms I have a phone

19   call at 11:00, so I'll probably break at five of 11 to get

20   there.  I know we have a few things to go through.

21             First of all, I thought your paralegal actually did a

22   great job that neither of you two did.

23             MR. KOSTO:  That's usually the case.

24             THE COURT:  Which is we can blow up the license

25   plates, so part of the car without -- yours was like you needed

```
1    to have special glasses to see it, and yours was the whole car.
2    So I thought her screenshot picked up the fact that they looked
3    like similar cars plus the license plates.  So I thought that
4    was a good solution, the Goldilocks solution.  So that's that.
5              Second of all --
6              MR. FRANK:  May I ask, do you propose to change the
7    exhibit?
8              THE COURT:  I can't.  I just marked it for ID, if you
9    remember.
10             So, yes, so what she did I thought was brilliant.
11             You said could you blow up the license plates and it
12   showed part of the car, and you could tell they were similar
13   cars without accentuating --
14             MR. KOSTO:  We'll find a way --
15             THE COURT:  I thought she did a great job.
16             Yours was too hard to read, and yours was the
17   full-blown -- you can maybe know that it was a Porsche, but you
18   could sure tell they were fancy cars.
19             Let me ask about it -- I can't understand the document
20   that came in at midnight last night.
21             I'm looking at it, I don't understand it.  So have you
22   had a chance to even look at it?
23             MR. NEMTSEV:  I just noticed that it was a message
24   with something, I actually didn't even read it.
25             THE COURT:  It's unfair to do that.  Given the fact
```

1    that you have the half hour during the break, could you at

2    least look at it, see if you object, and if you do, we will

3    have to hold some sort of -- we'll start on cross but I may

4    allow with him to deal with it on redirect if there's a

5    question as to what it means.

6            MR. KOSTO:  May I just say that we sent the document

7    at 7:00 p.m., not midnight.  And certainly we've had a chance

8    to talk about it with Mr. Nemtsev and its content, and we'd be

9    glad to address the substance of the document with the Court

10   when the Court is ready.

11           It only came up because the venue issue has really

12   changed --

13           THE COURT:  We've known about venue from the get-go.

14   We've known about it from the get-go.  With that said, I'm not

15   saying I'm precluding it, I think it's bad form to give --

16           THE CLERK:  Bathroom break for a juror.

17           THE COURT:  Sure.

18           THE CLERK:  Let me hit the door, one second.

19           MR. KOSTO:  We totally understand.  We're not

20   challenging that.  We'd like to advise that we learned of the

21   existence of the document and we got the document within the

22   hour that we turned it over to the defense.

23           THE COURT:  I'm not trying to say that you were hiding

24   the ball.  I'm just simply saying we need to understand it.

25           MR. KOSTO:  Absolutely.

```
1              THE COURT:  This is hard sledding, okay.
2              MR. KOSTO:  And one of the reasons -- one of the
3     reasons that it came up is the Court had questions about --
4              THE COURT:  I'm not challenging its relevance.  I am
5     simply -- I don't understand it.  They got it at 7:00.  I'm not
6     prepared to rule on the fly.  When you explain things to me,
7     it's great.  All right.
8              MR. KOSTO:  We'll be ready to do that.
9              THE COURT:  All right.  Now one last thing, not one of
10    them is taking notes, okay.  Is there some -- let's assume for
11    a minute Mr. Sladkov is insider trading, let's just assume that
12    for a minute.  That doesn't necessarily mean -- is there going
13    to be like a flow chart as to who you're talking about and
14    Sladkov isn't even a named conspirator?
15             MR. FRANK:  He is an unindicted co-conspirator.
16             THE COURT:  He's not a named defendant.
17             MR. FRANK:  Correct.
18             THE COURT:  Are you going to have some big chart --
19             MR. FRANK:  We're going to put it all together in
20    closing, because we don't have a cooperating witness we have to
21    put in the evidence.
22             THE COURT:  I'm not faulting you, I'm simply saying
23    not one of them is taking notes.
24             MR. FRANK:  Hopefully because it's crystal clear.
25             THE COURT:  Let's --
```

1          THE CLERK:  A few people had to step away, including

2     the witness, Judge, to go to the men's room.

3          (Discussion off the record.)

4          (End of sidebar discussion.)

5          THE COURT:  Okay.  Let's go.  We're going to break at

6     five of, because I have a call at 11, for our real break.

7          Is the food out there yet?

8          THE CLERK:  Not yet.  It will be.

9          THE COURT:  Let's go.

10          MR. FRANK:  Just for the record, your Honor, we've

11     replaced the chalk with a chalk with the names correctly

12     identified.

13     Q.   Special Agent, I want to ask you now about Exhibit 78, and

14     if we could call that up and I'd offer it.

15          (Exhibit 78 received into evidence.)

16     Q.   What is Exhibit 78?

17     A.   This is a screenshot.

18     Q.   And where did you find it?

19     A.   Ivan Ermakov's Apple account.

20     Q.   So you didn't find content of communication, but you did

21     find this screenshot?

22     A.   Yes.

23     Q.   And what is the -- if we could enlarge the top left --

24     what is the app that this screenshot is of?

25     A.   The SaxoTraderGO app.

1   Q.   And is there a security of a particular company depicted

2   on the screenshot?

3   A.   Avnet.

4        MR. FRANK:  And, Ms. Lewis, if you could enlarge the

5   lower left --

6   Q.   Were you able to determine the date of the screenshot?

7   A.   Yes.

8   Q.   What is it?

9   A.   January 23, 2020.

10  Q.   So that's in Cyrillic, but it's January?

11  A.   It's the abbreviation for January, yes.

12  Q.   And that number on the lower left, 331453INET, what is

13  that number?

14  A.   That is the account number associated with a Saxo account.

15  Q.   And again, this screenshot was found in whose iCloud

16  account?

17  A.   Ivan Ermakov.

18       MR. FRANK:  Could we call up Exhibit 97 on the right.

19       And I'd offer it.

20       (Exhibit 97 received into evidence.)

21  Q.   What is Exhibit 97?

22  A.   This is the first page of a financial statement for a Saxo

23  account in the name of Vladislav Klyushin.

24       MR. FRANK:  And, Ms. Lewis, can you enlarge the

25  account number in the middle of the page, please.

1    Q.   How does the account number of Mr. Klyushin's account

2    compare with the account number depicted in the image of the

3    SaxoTraderGO app found in Mr. Ermakov's iCloud account?

4    A.   The same.

5    Q.   Besides Mr. Ermakov, did you learn of any other

6    individuals who had the ability to access Mr. Klyushin's

7    iCloud -- Saxo account?

8    A.   Yes.

9    Q.   Who was that?

10   A.   Nikolai Rumiantcev.

11        MR. FRANK:   Could we look at Exhibits 134 and 134A,

12   please.

13             And I'd offer these.

14        (Exhibits 134 and 134A received into evidence.)

15   Q.   What is Exhibit 134?

16   A.   This is a power of attorney for a Saxo Bank account.

17   Q.   And what is 134A?

18   A.   The Russian language version.

19   Q.   And who -- whose account does this involve?

20   A.   Vladislav Klyushin.

21   Q.   And who did Mr. Klyushin give power of attorney over the

22   Saxo account?

23   A.   Nikolai Rumiantcev.

24   Q.   Besides Mr. Klyushin, as part of your investigation, did

25   you learn that any other individuals also had brokerage

1  accounts at Saxo Bank?

2  A.   Yes.

3  Q.   Before we move on, what is power of attorney, if you tell

4  us?

5  A.   This gives an individual the ability to have access to the

6  account.  There are certain -- there are different kinds of

7  power of attorney, but this would allow for access to the

8  account.

9  Q.   And who were the other individuals who you determined also

10  had brokerage accounts at Saxo Bank that we've discussed?

11       Rather than test your memory, why don't we just look

12  at the documents.

13       MR. FRANK:  Can we look at 94, please.

14       And I'd offer it.

15       (Exhibit 94 received into evidence.)

16  Q.   What is 94?

17  A.   This is a financial statement for a Saxo account in the

18  name of Alexander Borodaev.

19       MR. FRANK:  Could we look at 95, please.

20  A.   This is similar for Mikhail Irzak.

21  Q.   And 96.  What is this?

22  A.   Similar for Sergey Uryadov.

23       MR. FRANK:  So the government offers 94, 95 and 96.

24       (Exhibits 94, 95, 96 received into evidence.)

25  Q.   So all three of those individuals had accounts at Saxo?

```
 1    A.    Yes.
 2              MR. FRANK:  Could we look at 68, please.
 3              And I'd offer it.
 4              (Exhibit 68 received into evidence.)
 5    Q.    What is Exhibit 68?
 6    A.    This is the download portion of an Apple subscriber record
 7    for Ivan Ermakov denoting a certain download of the
 8    SaxoTraderGO app.
 9    Q.    What does Exhibit 68 indicate about when Mr. Ermakov put
10    the SaxoTraderGO app on his device?
11    A.    October 30, 2019.
12    Q.    What does the exhibit indicate about the IP address that
13    Mr. Ermakov used when he downloaded the SaxoTraderGO app to his
14    device?
15    A.    It was 89.107.124.42.
16    Q.    As part of your investigation --
17              By the way, did you -- were you able to determine
18    whether Mr. Ermakov himself had an account at Saxo?
19    A.    We did not locate an account in the name of Ivan Ermakov
20    at Saxo.
21    Q.    As part of your investigation, did you obtain records for
22    the 89.107.124.42 IP address that Mr. Ermakov used to download
23    the SaxoTraderGO app to his device?
24    A.    Yes.
25              MR. FRANK:  Could we look at 186 and 187, please.
```

```
 1   Q.   What are these documents --
 2            MR. FRANK:  And I'd offer them.
 3               (Exhibits 187 and 187 received into evidence.)
 4   A.   These are records from DomainTools.
 5   Q.   What is DomainTools?
 6   A.   A commercial registry for domains and IP addresses.
 7   Q.   Directing your attention to 187 on the right, do you see
 8   an IP address depicted at the top of that document?
 9   A.   Yes.
10   Q.   Is that the same IP address that we just looked at,
11   89.107.124.42, that Mr. Ermakov used when he downloaded the
12   SaxoTraderGO app to his device?
13   A.   Yes.
14   Q.   Who does that IP address resolve to?
15   A.   M-13.
16   Q.   Mr. Klyushin's company?
17   A.   Yes.
18   Q.   And at 186, I'd like to look at a similar document for a
19   similar IP address.  What is the IP address depicted in 186?
20   A.   89.107.124.39.
21   Q.   And who does that 89.107.124.39 IP address resolve to?
22   A.   M-13.
23   Q.   Special Agent, I'd now like to show you a series of
24   exhibits depicting the use of these IP addresses.  Okay?
25   A.   Yes.
```

```
 1              MR. FRANK:  Ms. Lewis, could we begin with Exhibit 79.
 2    Q.   What is Exhibit 79 --
 3              MR. FRANK:  And Ms. Molloy, I'd offer it.
 4              (Exhibit 79 received into evidence.)
 5              THE CLERK:  Thank you.
 6    A.   Facebook subscriber records for the M-13 Facebook account.
 7              MR. FRANK:  And if we could start actually at the very
 8    back of the document, Ms. Lewis.
 9    Q.   So at the bottom of the page, the name of the account is
10    M-13; is that correct?
11    A.   Yes.
12    Q.   And what does it indicate is the registration IP for this
13    account?
14    A.   The 89.107.124.39 IP.
15    Q.   Okay.  And that's the same M-13 IP that we just looked at?
16    A.   Yes.
17    Q.   And you see it's also depicted at the top of the page?
18    A.   Yes.
19    Q.   And what does that indicate?
20    A.   That was access to the M-13 Facebook account from the 89
21    IP ending in .39.
22    Q.   If we could just slowly scroll up through this document,
23    page 5.
24              Do you see that IP address on page 5?
25    A.   Repeated access, yes.
```

1    Q.   Page 4, do you see that IP address on page 4?

2    A.   Yes.

3    Q.   By the way, the first entries were in 2017; is that

4    correct?

5    A.   Yes.

6    Q.   And these entries are in what year?

7    A.   2018.

8    Q.   And if we go up, another page.

9         Do you see that IP address again?

10   A.   Yes.

11        MR. FRANK:  Could we go up another page.

12   Q.   And now on page 2, Special Agent, I want to direct your

13   attention to the middle.

14        Do you see another 89 IP address indicated there?

15   A.   Yes.

16        MR. FRANK:  Ms. Lewis, if you could just highlight it.

17        Thank you.

18   Q.   Is that the other M-13 89 IP address that we just looked

19   at?

20   A.   Yes.

21   Q.   And where did you get these records?

22   A.   Facebook.

23   Q.   And if we go to the top, what's the latest entry that's

24   depicted on this particular record?

25   A.   November 8, 2019.

1           MR. FRANK:  Could we now look at Exhibit 242.

2           And I'd offer it.

3           (Exhibit 242 received into evidence.)

4   Q.    What is Exhibit 242?

5   A.    This represents the use of the M-13 89 IP used to access

6   the Ivan Ermakov iCloud account.

7   Q.    Okay.  I'm sorry --

8   A.    The records were spanning the time period January 1, 2017

9   to June 23, 2020.  And below you see the specific dates that

10  the 89 -- the M-13 89 IP accessed the Ivan Ermakov account and

11  with what frequency on that day.

12  Q.    So this is a summary of records?

13  A.    Yes.

14  Q.    And the underlying records were obtained where?

15  A.    From Apple.

16  Q.    And so just to clarify, on May 11, 2018, it looks like the

17  IP address was used four times to access the iCloud account?

18  A.    Yes.

19  Q.    And then on June 15, 2020, how many times was that same IP

20  address used to access Mr. Ermakov's iCloud account?

21  A.    Between five and ten, closer to ten.

22  Q.    I'm sorry, June 15, 2020.

23  A.    Closer to 30 on that last entry.  It spiked.

24          MR. FRANK:  Could we look at 243, please.

25  Q.    What does this chart depict?

1    A.    The use of the same M-13 89 IP used to access Nikolai

2    Rumiantcev's iCloud account.

3    Q.    And what was the date range depicted in this chart?

4    A.    The dates provided by Apple span May 1, 2017 through

5    January of 2021, but down in the bottom, these are the specific

6    dates that the M-13 89 IP were accessed, were used to access

7    the Nikolai Rumiantcev Apple account.

8    Q.    And just to clarify, why are the dates for the Apple

9    records slightly different in each of these charts?

10   A.    They were obtained from Apple at different points in time.

11   Q.    And what does this chart indicate about the trend of the

12   frequency?

13   A.    There's a spike, an increase in the -- later 2020 time

14   frame.

15            MR. FRANK:  And I offer 242 and 243, and now I offer

16   244.

17            (Exhibits 242, 243, 244 received into evidence.)

18   Q.    What does 244 indicate?

19   A.    Use of both of the M-13 89 IPs used to access Vladislav

20   Klyushin's Apple iCloud account.

21   Q.    And what is the date range of this exhibit?

22   A.    The Apple records spanned January of 2018 to October of

23   2020.  And then down below you'll see the specific dates that

24   those two IPs were used to access the Klyushin Apple account.

25   Q.    Now I'd like to talk to you about Exhibits 230 through

1    232.

2              MR. FRANK:  And I'd offer those beginning with 230.

3              (Exhibits 230, 231, 232 received into evidence.)

4    Q.    What is depicted in Exhibit 230?

5    A.    This is use of the same M-13 89 IP used to access Ivan

6    Ermakov's WhatsApp account.

7    Q.    And what's the date range?

8    A.    The overarching date range is May 2020 to May 2021, and

9    the access occurred between June 8th of 2020 using that IP and

10   spanned to April 2021.

11   Q.    Okay.  And so, for example, on June 8th, there's very few

12   accesses of the WhatsApp account from that IP address?

13   A.    Correct.

14   Q.    What about on November 23, 2020?

15   A.    It increases.  There are over 140, it looks like closer to

16   150, accesses on that day.

17   Q.    And again, those are accesses of Mr. Ermakov's WhatsApp

18   account from the M-13 IP?

19   A.    On specific days.

20             MR. FRANK:  Could we look at 231, please.

21   Q.    What are we looking at in 231?

22   A.    Similar chart.  This time for the M-13 89 IP address

23   accessing Nikolai Rumiantcev's WhatsApp account.

24   Q.    And do you see a similar increase in 2021?

25   A.    Yes.

1          MR. FRANK:  Could we look at 232, please.

2    Q.    What is depicted in Exhibit 232?

3    A.    Use of the M-13 89 IP address used to access Vladislav

4    Klyushin's WhatsApp account.

5    Q.    And what's the date range?

6    A.    It spans October 2020 to April 2021.

7    Q.    And again, why are these the particular dates that are

8    depicted?

9    A.    The dates in the bottom?

10   Q.    The dates at the top.

11   A.    The dates at the top are the dates that pen collection was

12   obtained from Apple.

13   Q.    So this data in the WhatsApp charts that we've just looked

14   at came not from Apple but from --

15   A.    WhatsApp.

16   Q.    From a WhatsApp pen?

17   A.    Yes.

18   Q.    Again, remind us what that is, a pen register.

19   A.    We -- it is the caller ID, the "to" and a "from" for a

20   particular WhatsApp account, in this case Vladislav Klyushin's.

21   Q.    So why are there no hits on the pen register before

22   October 2020 for Mr. Klyushin?

23   A.    Because we didn't have a court order authorizing us to

24   have that information.

25   Q.    And going back to 231, similarly, you obtained a pen

1    register for Mr. Rumiantcev in November of 2020?

2    A.   Correct.

3    Q.   And 230.  You obtained a pen register for Mr. Ermakov in

4    May of 2020?

5    A.   Correct.

6    Q.   Could we look at -- well, withdrawn.

7         MR. FRANK:  You can take that down, Ms. Lewis.

8    Q.   At any time did the FBI obtain records from brokerage

9    firms about IP addresses to access brokerage accounts for

10   Mr. Klyushin, Mr. Rumiantcev or any of the M-13 investors that

11   we've talked about?

12   A.   Yes.

13   Q.   And did you obtain those records from Saxo?

14   A.   Yes.

15   Q.   And from OTK?

16   A.   Yes.

17   Q.   And that's OTKritie broker we looked at earlier?

18   A.   Yes.

19        MR. FRANK:  Beginning with Exhibit 227 -- and I'm

20   going to offer, Ms. Molloy, 227, 228, and 229, and I believe I

21   just offered 230 through 232.

22        (Exhibits 227, 228, 229 received into evidence.)

23   Q.   Beginning with 227, what does 227 depict?

24   A.   This is the use of the two M-13 89 IPs to access Alexander

25   Borodaev's Saxo account between October 28, 2019 and September

1    6 of 2020.

2    Q.    So both of those 89 M-13 89 IPs were used to access

3    Mr. Borodaev's account during that time period?

4    A.    Consistently.

5    Q.    Again, why that time period?

6    A.    That's when the records were obtained.

7          MR. FRANK:  And could we look at 228, please.

8    Q.    What does 228 depict?

9    A.    This is use of the two M-13 89 IPs used to access the

10   Sergey Uryadov Saxo account between October 24, 2019 and

11   September 6th of 2020.

12   Q.    And what does it depict?

13   A.    That there's consistent access from those two IPs from

14   account creation until the end of the records provided.

15   Q.    And Mr. Uryadov, again, who's that?

16   A.    One of the investors.

17         MR. FRANK:  Could we look at 229, please.

18   Q.    What does this depict?

19   A.    Use of the two M-13 89 IPs to access the Vladislav

20   Klyushin Saxo accounts.

21   Q.    Now, there are a lot of colors in this chart.  Why is

22   that?

23   A.    There were two different individuals -- remember we looked

24   at earlier a power of attorney form allowing Nikolai Rumiantcev

25   to access Klyushin's Saxo account.  So here we have two

```
 1   different individuals that were accessing those certain
 2   accounts from the two M-13 IP addresses.
 3   Q.   And these underlying -- the underlying records that are
 4   being summarized here, who provided those records?
 5   A.   Saxo.
 6   Q.   And how were you able to determine which of the accesses
 7   over the M-13 89 IP to the Klyushin Saxo account were
 8   attributable to Mr. Klyushin and which were attributable to
 9   Mr. Rumiantcev?
10   A.   Saxo assigned Nikolai Rumiantcev his own user ID.  They
11   could track which user accessed which account.
12   Q.   Finally, I'd like to turn to OTK, OTKritie broker.
13            MR. FRANK:  And if we could look at Exhibits 222
14   through 226.
15            Which I offer, beginning with 222.
16            (Exhibits 222, 223, 224, 225, 226 received into
17          evidence.)
18   Q.   What's in Exhibit 222?
19   A.   Use of the two M-13 89 IP addresses to access Alexander
20   Borodaev's OTK account.
21   Q.   So this is different brokerage where these individuals
22   also had brokerage accounts.
23   A.   Correct.
24   Q.   And what does it depict is occurring between 2018 to 2019?
25   A.   From account opening spanning this time period, both IPs
```

1    access it and the -- the .42 picks up toward the middle of date

2    range.

3    Q.    And Mr. Borodaev, again, is who?

4    A.    An investor.

5          MR. FRANK:  Could we look at 223, please.

6    Q.    What are we looking at in 223?

7    A.    The two M-13 IP addresses used to access the Boris

8    Varshavksiy OTK account.

9    Q.    He's another of the investors?

10   A.    Yes.

11         MR. FRANK:  And could we look at 224, please.

12   Q.    What's depicted here?

13   A.    Use of the two M-13 89 IP addresses to access the Nikolai

14   Rumiantcev OTK account.

15   Q.    So Mr. Rumiantcev had a personal account at OTK brokerage?

16   A.    In his name.

17   Q.    And Mr. Rumiantcev, again, is who?

18   A.    An employee of M-13.

19   Q.    Okay.  And he was the individual with power of attorney

20   over Mr. Klyushin?

21   A.    Klyushin's account.

22         MR. FRANK:  And could we look at 225, please.

23   Q.    What are we looking at in 225?

24   A.    Use of the two M-13 89 IP addresses to access Sergey

25   Uryadov's OTK account.

1   Q.   He's the third investor we've been speaking about?

2   A.   Yes.

3   Q.   And the date range?

4   A.   April 22, 2019 to November 18 of 2019.

5        MR. FRANK:  And 226, please.

6   Q.   What does 226 of depict?

7   A.   Use of the two 89 IP addresses associated with M-13 used

8   to access Klyushin's OTK account between June 29, 2018 and May

9   20 of 2021.

10  Q.   And why are these lines so small?

11  A.   Mr. Klyushin was arrested March 21 of 2021.

12  Q.   Thank you, I was actually asking you a slightly different

13  question, which is why are they so narrow?

14  A.   So this spans several years, and if you were to zoom in on

15  a particular section, you would see that there was access on

16  individual dates; but when it is zoomed out, it appears all as

17  one line.

18  Q.   There's a lot of dates in which these IPs were used to

19  access the OTK account?

20  A.   Yes.

21       THE COURT:  I'm going to need to --

22       MR. FRANK:  I have magically come to the end of that

23  section, your Honor.

24       THE COURT:  All right.  So we'll be back here at

25  11:30, thank you.

```
 1              THE CLERK:  All rise.

 2                (Recess taken.)

 3              THE CLERK:  All rise.

 4   (Court enters.)

 5              THE COURT:  How long do you think you're going to be?

 6              MR. FRANK:  It's going a little slower than I'd hoped,

 7   Your Honor.  I hope to finish.

 8              THE COURT:  Finish it today?

 9              MR. FRANK:  I hope so.  It's our entire case, Your

10   Honor.

11              THE COURT:  What?

12              MR. FRANK:  This is the main part of the case.

13              THE COURT:  Let me ask you this.  By accident, someone

14   wrote on the -- is this the original that you gave me?

15              MR. KOSTO:  No, that's just a color copy.

16              THE CLERK:  Copy for you.  I'll write "copy" on it so

17   you don't get confused.

18              THE COURT:  We weren't sure if it was the original.

19              THE CLERK:  No, that won't go in the book, no.

20              MR. KOSTO:  I can't remember the last time I've held

21   an original anything, Your Honor.

22              THE COURT:  I just wanted to make sure, because it

23   looked like the signature was in ink.

24              Do you know whether you're going to be opposing the

25   introduction of this Cogent material?
```

1          MR. NEMTSEV:  I will, Your Honor, especially

2     considering the fact that I briefly spoke with our expert on

3     this subject matter and he says whatever the government told

4     me, they're overstating what that record says.  It does not

5     state that Cogent put an IP -- that IP onto a server in Boston.

6     All it says, that document, is Micfo got authorization to

7     advertise that this IP address is in Boston.  And Cogent saw

8     that authorization from the owner of the IP and said that's

9     okay.  But it did not say --

10          THE COURT:  So with that limitation, are you opposing

11     it?

12          MR. NEMTSEV:  He can cross on that, but the

13     document --

14          THE COURT:  No, just with that limitation, is there an

15     opposition to it?

16          MR. NEMTSEV:  I mean, the only opposition I have is

17     it's 802, Your Honor, because it's a message.  It's a customer

18     service ticket back and forth between Cogent and Micfo, but

19     that's about it.  I think if somebody wants to testify to what

20     it actually says, then they would have to come into court and

21     explain it.

22          THE COURT:  That's a different story, but the

23     threshold issue is they did the certificate, and it looks like

24     it's a business record.

25          MR. NEMTSEV:  It does look like it's a business record

```
 1    or it does look like it's authentic.  I have no doubts about
 2    the authenticity.
 3              THE COURT:  All right.
 4              THE CLERK:  All rise for the jury.
 5    (Jury enters.)
 6              THE COURT:  All right.
 7              MR. FRANK:  Thank you, Your Honor.
 8              Your Honor, may I put another chalk up on the easel?
 9              THE COURT:  Which one is it?
10              MR. FRANK:  This is this one.
11              THE COURT:  Okay, yes.
12              MR. FRANK:  Okay.
13              THE COURT:  I want to make sure that the defense gets
14    to see it.
15              MR. NEMTSEV:  We've seen it, Your Honor.
16              THE COURT:  Okay.
17    BY MR. FRANK:
18    Q.   Okay.  Special Agent, this next section of the examination
19    is going to involve some complicated discussions of IP
20    addresses.  So we've prepared this demonstrative to help the
21    jury understand.  Can you see it from where you're sitting?
22    A.   I can.  It's a little difficult, but I can.
23    Q.   I'll describe it to you.
24              THE COURT:  If he can, he's got a rubber neck
25    because --
```

 1              THE WITNESS:  Do we have a hard copy that you could

 2     share with me?

 3              THE COURT:  Can we put one on the doc camera?

 4              THE CLERK:  Yeah.  Or Jenn could put it up.  We can do

 5     the doc camera.  Whatever you want.  Just tell me if you want

 6     me to switch up.

 7              MR. FRANK:  Yes, please.

 8              THE CLERK:  Do you want to do the doc camera?

 9              MR. FRANK:  Just for a moment.

10              THE CLERK:  Okay.  It just takes a second.

11              MR. FRANK:  It's the latest in 1970s technology.

12              THE CLERK:  It does take a second.

13              THE COURT:  It is so frustrating.  I can't even tell

14     you.

15              THE CLERK:  I always play with the buttons.  Is it up?

16              MR. FRANK:  Can everyone see?  Okay.

17     Q.   All right.  Special Agent, before we go through the

18     documents, if you could just take a moment and help us

19     understand the various entities that we're going to be talking

20     about.  So beginning on the left under "filing agent," that's

21     the company we've been talking about, Toppan Merrill?

22     A.   Yes.

23     Q.   Then there's a column "domain names," and there's an

24     entity called Namecheap.  What is Namecheap?

25     A.   Namecheap is a domain registrar.  They allow the general

1    public to buy domain names.

2    Q.   So they sell domain names?

3    A.   Yes.

4    Q.   So like www.developingcloud.info or smartfinancelist.com,

5    those kinds of things you could buy from Namecheap?

6    A.   Yes.

7    Q.   And then below that there's an arrow, and there's a little

8    symbol for Bitcoin and then there's an entity called BitPay.

9    What is that depicting?

10   A.   BitPay is a payment processor that allows one to pay for

11   services such as a do -- or a product.

12          MR. FERNICH:   Judge, I'm going to object to this under

13   702.  It's not the right witness for this, in our view.

14          THE COURT:   How do you know this?

15          THE WITNESS:   Over the course of the investigation, I

16   obtained records from these companies and learned what type of

17   businesses they conduct.

18          THE COURT:   All right.   Overruled.

19   Q.   What is BitPay?

20   A.   BitPay is a payment processer that allows for the payment,

21   by way of Bitcoin, for something like a name -- Namecheap

22   domain.

23   Q.   And then what is -- do you see the column that says

24   "virtual server companies"?

25   A.   Yes.

```
 1    Q.    What are those entities, Vultr and Digital Ocean?
 2    A.    They resell, to the general public, access to virtual
 3    servers.
 4    Q.    How are virtual servers used in connection with domain
 5    names?
 6    A.    A domain name will be assigned an IP address.  The IP
 7    address will be assigned to a server.  So in this case, we saw
 8    Namecheap domains purchased and put onto the servers at Vultr
 9    and Digital Ocean.
10    Q.    So just like you can buy a domain name, you can rent space
11    on a virtual server, somebody else's server --
12               THE COURT:  Let's go from base.  What is a virtual
13    server as opposed to a server?
14               THE WITNESS:  A virtual server is when you have a
15    physical server and you slice it up into little pieces, and
16    each of those individual pieces are then turned into a virtual
17    server.  So --
18               THE COURT:  I thought a server was a machine.
19               THE WITNESS:  It is.
20               THE COURT:  All right.
21               THE WITNESS:  And a virtual server is a server within
22    a server, so it allows you to take a very --
23               MR. FERNICH:  Respectfully, same objection.
24               THE COURT:  Overruled.
25               THE WITNESS:  It allows you to take a very powerful
```

1    computer and use its resources and share it amongst other

2    servers that are inside of the server.  So a good analogy --

3              THE COURT:  Are these two companies used in this case?

4              THE WITNESS:  Yes, ma'am.

5    Q.   So can you rent space on a server from Vultr or Digital

6    Ocean and put your IP address there?

7    A.   Yes.

8    Q.   And then in the next column there are virtual server

9    resellers, and there's two companies listed there, 99Stack and

10   BitLaunch.  What do they do?

11   A.   They take the virtual machines from Vultr and Digital

12   Ocean and resell.  They're a man in the middle that is making a

13   profit off of reselling those same services.

14   Q.   So that's like you could buy Kellogg's cereal or you could

15   buy the Whole Foods brand that's also made by Kellogg's?

16   A.   Yes.

17             MR. FERNICH:  Objection.

18             THE COURT:  Yeah.  Sustained.  That metaphor was --

19             MR. FERNICH:  It's telling me something I don't know.

20             THE COURT:  If I can understand it, then it's not a

21   good analogy.

22             So they're reselling the little slices of the machine?

23             THE WITNESS:  Yes.  Yes, Your Honor.

24             THE COURT:  But are they physically part of the

25   machine?

```
 1              THE WITNESS:  Yes.
 2              THE COURT:  All right.
 3    Q.   Is it space on the machine?
 4    A.   Yes.  If we think of it as a hard drive, it's a piece of
 5    the hard drive, a sliver of it.
 6    Q.   Okay.  With that as background, in the course of the FBI's
 7    investigation, did the FBI obtain records from Namecheap?
 8    A.   Yes.
 9    Q.   And where is Namecheap based?
10    A.   The United States.
11    Q.   For which domain names did the FBI obtain records from
12    Namecheap?
13    A.   Toppan Merrill provided domain names that they observed in
14    the intrusion, and we requested records for those domain names
15    from Namecheap.
16    Q.   And did there come a time when you ultimately also
17    obtained records for domain names provided by DFIN?
18    A.   Yes.
19    Q.   Okay.
20              MR. FRANK:  Ms. Molloy, if we could now switch.
21              THE COURT:  Well, there's still another one.
22              MR. FRANK:  We're going to have to go back and forth,
23    Your Honor, because we're now introducing some exhibits for
24    which I need the computer.
25              THE CLERK:  Okay.  I'm back to Jenn's, but it takes a
```

 1    second when I toggle.  Hopefully it will work.

 2    Q.   Have you previously had an opportunity to review

 3    Exhibits 173C through 173M?

 4    A.   Yes.

 5    Q.   What are they?

 6    A.   Namecheap subscriber records.

 7              MR. FRANK:  The government offers 173C through 173M.

 8              **(Exhibits Nos. 173C-M received into evidence.)**

 9              MR. FRANK:  And I don't believe we marked this chalk

10    for identification.  I think the last one was CC.

11              MR. KOSTO:  This is AAA.

12              MR. FRANK:  Oh, this is AAA?

13              THE CLERK:  This is AAA.  Thank you.

14    Q.   If we could begin with -- and 173C through 173M, those are

15    the domain names that you received from -- predominantly from

16    Toppan Merrill, but also from DFIN?

17    A.   Yes.

18    Q.   If we could look at 173C.  And if you could --

19              MR. FRANK:  Ms. Lewis, if you could enlarge that.

20    Q.   And, Special Agent, if you could tell us what we're

21    looking at.

22    A.   This is the Namecheap account for Malika Ellis.

23    Q.   And if we could look at page 2.  What domain name was this

24    account for Malika Ellis associated with?

25    A.   developingcloud.info.

1    Q.    Okay.  And what is the email address that is associated

2    with Malika Ellis?

3    A.    First name, last name, followed by two numerical digits

4    @inbox.lv.

5    Q.    And inbox.lv, that suffix, what country is that from?

6    A.    Latvia.

7    Q.    And if we could now go to page 1.  And do you see on the

8    right-hand side of the screen it says "latest transaction,

9    latest login, login IP"?  What does that represent?

10   A.    This is the IP address that last logged in.

11   Q.    Can you read that IP address for the record?

12   A.    89.238.166.235.

13   Q.    Now, before the break we were talking about two M-13 IP

14   addresses beginning with the digits 89.

15         Do you recall that testimony?

16   A.    Yes.

17   Q.    This is a different IP address, correct?

18   A.    Yes.

19   Q.    And this IP address, does this come back to M-13?

20   A.    No.

21         THE COURT:  This goes back to Latvia?

22         THE WITNESS:  No, the email address inbox.lv, the

23   ".lv" is the country code for domains associated with the

24   country Latvia, the lv.

25   Q.    Do you have to be in Latvia to have an inbox.lv email

1    address?

2    A.    No.

3    Q.    Okay.

4          MR. FRANK:  Could we look at 173D in evidence, please.

5    And if we could go to page 2.

6          THE COURT:  Just so it's not confusing.  That 89

7    address is not one we've seen before?

8          THE WITNESS:  No, ma'am.  This is a new one.

9    Q.    What is this document, which domain is this document for?

10   A.    smartfinancelist.com.

11   Q.    And who is the registrant for this domain name?

12   A.    magnoliafreeda20@inbox.lv.  So first name, last name,

13   followed by two numerical digits @inbox.lv.

14   Q.    If we could go to page 1.  Under "last login," what is the

15   IP address that's depicted?

16   A.    89.238.166.235.

17   Q.    And was this another domain name associated with Toppan --

18   with a hack on Toppan Merrill?

19   A.    Yes.

20         MR. FRANK:  Could we go to 173E, please.  Could we go

21   to page 2, please.

22   Q.    What domain name is this for?

23   A.    scoreyourmoney.com.

24   Q.    And this was another one associated with a hack on Toppan

25   Merrill?

1    A.   Yes.

2    Q.   What is the email address associated with the registrant

3    for this domain name?

4    A.   lienroberto99@inbox.lv.  First name, last name, followed

5    by two numerical digits @inbox.lv.

6         MR. FRANK:  If we can go to page 1, please.

7    Q.   Could you tell us what the IP address associated with the

8    last login is?

9    A.   The same 89.IP.

10        MR. FRANK:  Could we look at 173F, please, page 2.

11   Q.   What is the domain name for this record?

12   A.   fnwallinform.info.

13   Q.   Is this yet another domain name that you obtained from

14   Toppan Merrill?

15   A.   Yes.

16   Q.   What is the email address of the registrant for this

17   domain name?

18   A.   First, last, two numerical digits @inbox.lv.

19        MR. FRANK:  Could we go to page 3 of this record,

20   please.

21   Q.   What is page 3?

22   A.   This is the login history for that account.

23   Q.   Do you see the same 89.IP in this login history?

24   A.   Yes.

25        MR. FRANK:  Ms. Lewis, could you highlight it, please.

1    Q.   And I want to direct your attention to the IP address

2    above that one.  What is that IP address?

3    A.   64.42.179.59.

4    Q.   Thank you.

5         MR. FRANK:  Could we look at 173G, please.  Page 2.

6    Thank you.

7    Q.   What is the domain name for this record?

8    A.   cloudapifinance.info.

9    Q.   What is the email address of the registrant?

10   A.   First, last, two numerical digits @inbox.lv.

11        MR. FRANK:  Ms. Lewis, can you please take us to

12   page 3.

13   Q.   This is the login history again?

14   A.   Yes.

15   Q.   Do you see an IP address that you recognize?

16   A.   The 89.238 IP.

17   Q.   235?

18   A.   Yes.

19        MR. FRANK:  Could we look at 173H, please.  Page 2.

20   Q.   Which domain name is this the Namecheap record for?

21   A.   financecloudapi.com.

22   Q.   This is another one that you obtained from Toppan Merrill?

23   A.   Yes.

24   Q.   What is the email address of the registrant?

25   A.   First, last, two numerical digits @inbox.lv.

1          MR. FRANK:  Could we look at page 1, please.

2    Q.   Do you recognize an IP address on page 1?

3    A.   The 89.238 IP.

4    Q.   Does it indicate -- oh, 89.238.166.235?

5    A.   Yes.

6    Q.   Thank you, Special Agent.

7          MR. FRANK:  Could we look at 173I, please.  Page 2.

8    Q.   What domain name is this record for?

9    A.   finshopland.me.

10   Q.   What is the email address of the registrant?

11   A.   First, last, followed by two numerical digits @inbox.lv.

12   Q.   Was this yet another domain name you obtained from Toppan

13   Merrill?

14   A.   Yes.

15         MR. FRANK:  Could we go to page 3, please.

16   Q.   Special Agent, I want to direct your attention to another

17   IP address.  Could you read the last IP address in this column?

18   A.   199.249.230.17.

19   Q.   Thank you.

20         MR. FRANK:  193J, please, page 2.

21   Q.   What domain name is this record for?

22   A.   shopservice.live.

23   Q.   What is the email address of the registrant?

24   A.   First, last, followed by two numerical digits @inbox.lv.

25         MR. FRANK:  Could we go to page 3, please.

1    Q.   Do you see an IP address that you recognize?

2    A.   199.249.230.17.

3    Q.   Is that the one we just looked at that was associated with

4    finshopland?

5    A.   Yes.

6         MR. FRANK:   Could we look at 173K, please.   Page 2.

7    Q.   What domain name is this record associated with?

8    A.   appfinreport.info.

9    Q.   What is the email address?

10   A.   First, last, followed by numerical digits at inbox.lv.

11        MR. FRANK:   And could we go to page 3, please.

12   Q.   Do you recognize the 89 IP address on this record?

13   A.   Yes.

14   Q.   You also see the 64 IP address that we looked at a moment

15   ago?

16   A.   Yes.

17        MR. FRANK:   173L, please.

18   Q.   Now, this record, if we go to page 2, was this one of the

19   domain names you received from DFIN?

20   A.   Yes.

21   Q.   What is the domain name?

22   A.   finauditsolutions.com.

23   Q.   What is the email address associated with this domain

24   name?

25   A.   First, last, followed by two numerical digits at inbox.lv.

1           MR. FRANK:  Could we go to page 3, please.

2    Q.   Do you recognize any of those domain names?  I'm sorry, IP

3    addresses.

4    A.   I do.

5    Q.   Which one?

6    A.   89.238.166.235.

7    Q.   Did we also see that IP address associated with the domain

8    names that you obtained from Toppan Merrill?

9    A.   Yes.

10           MR. FRANK:  Could we look at 173M, please, page 2.

11   Q.   What domain name is this record for?

12   A.   investmentcomp.com.

13   Q.   Was this one of the domain names you received from DFIN?

14   A.   Yes.

15           MR. FRANK:  Could we go to page 3, please.  I'm sorry.

16   Could we go back to page 2.

17   Q.   What is the email address of the registrant?

18   A.   First, last @inbox.lv.

19           MR. FRANK:  Could we go to page 3, please.

20   Q.   Do you recognize any of the IP addresses that were

21   associated with the domain names you obtained from Toppan

22   Merrill on this domain name record that you obtained --

23   associated with the domain name that you obtained from DFIN?

24   A.   I do.

25   Q.   Which one?

1    A.    89.238.166.235.

2    Q.    Each of those records, Special Agent, had an email

3    registrant with a first name, last name and an inbox.lv suffix?

4    A.    Yes.

5    Q.    And we saw several of the same -- common IP addresses?

6    A.    Yes.

7    Q.    What does that indicate to you?

8    A.    That the --

9          MR. NEMTSEV:  Objection.

10         THE COURT:  Was that an objection?

11         MR. NEMTSEV:  Yes.

12         THE COURT:  Overruled.

13   A.    Could you repeat the question, please.

14   Q.    What does that indicate to you?

15   A.    That the same individual or group of individuals

16   administered these Namecheap accounts.

17   Q.    Okay.

18         MR. FRANK:  You can take that down, Ms. Lewis.

19         Your Honor, could I just have Special Agent Hitchcock

20   write the exhibit numbers under domain names on the chalk, for

21   the jury's reference?

22         THE COURT:  I'm not sure it's worth taking the time

23   right now.  I'd like to finish at least the direct by lunch.

24   So maybe we'll add them later.  We can talk about it.

25         MR. FRANK:  Okay.

1    Q.   Beginning with two of the domain names,

2    smartfinancelist.com and scoreyourmoney.com, were you able to

3    determine what computers those domain names were assigned to?

4    A.   Yes.

5    Q.   Where were those domain names assigned to computers?

6    A.   Digital Ocean.

7    Q.   So looking again at our chalk, Digital Ocean was one of

8    the two virtual server companies that we discussed?

9    A.   Yes.

10   Q.   Did the FBI obtain records from Digital Ocean in relation

11   to the Namecheap domains smartfinancelist.com and

12   scoreyourmoney.com?  Those were Exhibits 173D and 173E in the

13   Namecheap records.

14   A.   Yes.

15   Q.   Where did you obtain those records from?

16   A.   From Digital Ocean.

17   Q.   Was there also a company called BitLaunch involved?

18   A.   Yes.

19   Q.   Okay.  And tell us about the connection between Digital

20   Ocean and BitLaunch?

21   A.   So in order to identify that BitLaunch was the third-party

22   reseller, we reached out to Digital Ocean.  Digital Ocean

23   points us to BitLaunch as a customer --

24             MR. FERNICH:  Objection.

25             THE COURT:  Sustained as worded.

```
 1              Part of a record that he got?
 2              MR. FRANK:  The record is about to come in, Your
 3   Honor.
 4              THE COURT:  What?
 5              MR. FRANK:  I'm about to put in the record.  I'll just
 6   put it in.
 7              THE COURT:  All right.
 8   Q.   Did you ultimately obtain records connected to those two
 9   domain names, smartfinancelist and scoreyourmoney, from
10   BitLaunch?
11   A.   Yes.
12   Q.   And what was BitLaunch's role in selling that server
13   space?
14   A.   They resold Digital Ocean's virtual servers to a third
15   party.
16   Q.   Okay.  So they're all the way on the right on our chalk,
17   correct?
18   A.   Yes.
19              MR. FRANK:  Let's start with Exhibit 180, and I'd
20   offer it, and I'm going to offer 177, 178 and 180.
21              (Exhibits Nos. 177, 178 and 180 received into
22   evidence.)
23   Q.   What is Exhibit 180?
24   A.   BitLaunch subscriber records associated with those two
25   domains.
```

1   Q.   Were those two domains on the same BitLaunch account?

2   A.   Yes.

3   Q.   What is the email address of the BitLaunch subscriber who

4   controlled that account?

5   A.   neumann@dr.com.

6   Q.   I'm going to come back to that in just a moment, Special

7   Agent.

8        MR. FRANK:  Could we look at Exhibit 178, please.

9   Q.   What is Exhibit 178?

10  A.   These are the IP addresses of the servers that were

11  leased.

12  Q.   Okay.  And I want to direct your attention to two of these

13  IP addresses in particular.

14       Do you see there's an IP address 104.248.76.218?

15  A.   Yes.

16  Q.   And do you see there's an IP address 206.189.195.244?

17  A.   Yes.

18  Q.   Could we look on the --

19       MR. FRANK:  If you could put this on the right,

20  Ms. Lewis, and on the left put Exhibit 77A in evidence.

21  Q.   Special Agent, do you recall the testimony about this list

22  of IP addresses that the FBI obtained from Toppan Merrill?

23  A.   Yes.

24  Q.   Do you see that 104.248.76.218 IP address associated with

25  the BitLaunch virtual servers on the list obtained from Toppan

1    Merrill?

2    A.   Yes.

3    Q.   What about the 206.189 IP address?

4    A.   Also there.

5         MR. FRANK:   Thank you, Ms. Lewis.

6    Q.   Special Agent, did there come a time when you were able to

7    obtain copies of those computer servers?

8    A.   Yes.

9    Q.   How?

10   A.   Court-authorized search warrant.

11        MR. FRANK:   I'd now like to move to Exhibit 177 in

12   evidence.

13   Q.   What is Exhibit 177?

14   A.   These are logs associated with the BitLaunch account, the

15   neumann@dr.com BitLaunch account.

16   Q.   When you say these are logs associated with that Neumann

17   account at BitLaunch, what do you mean by that?

18   A.   These are IP addresses that would have accessed the

19   account and performed certain actions.

20   Q.   Okay.  And if I could direct your attention to page 6.  Do

21   you see an 89 IP address on this page?

22   A.   Yes.

23   Q.   Are you familiar with that IP address?

24   A.   Yes.

25   Q.   How?

1   A.   It's the same 89.238.166.235 associated with the Namecheap

2   accounts that we referred to earlier.

3   Q.   What about a 64 IP address?

4   A.   Yes, it's the same.  64.42.179.59.

5   Q.   What does the presence of those two IP addresses in this

6   BitLaunch record indicate?

7   A.   The same individual or individuals that subscribed to the

8   Namecheap account and purchased those domains also subscribed

9   to the neumann@dr.com BitLaunch account and oversaw those

10  servers.

11  Q.   Were the other -- where were the other Namecheap domains

12  assigned to computers?

13  A.   Vultr.

14  Q.   And, again, looking at our chalk, what is Vultr?

15  A.   A company very similar to Digital Ocean that resold access

16  to virtual servers.

17  Q.   Was the FBI able to determine who Vultr's customer was for

18  the other domain names?

19  A.   Yes.

20  Q.   Who was Vultr's customer?

21  A.   99Stack.

22  Q.   And 99Stack, looking at our chalk, what is that?

23  A.   That's a company like BitLaunch that resells, in this

24  case, Vultr's virtual machines.

25  Q.   And where is 99Stack located?

```
 1   A.    Sweden.

 2   Q.    Was the FBI able to obtain records from 99Stack?

 3   A.    Yes.

 4         MR. FRANK:  Could we look at Exhibit 188, and I'd

 5   offer it.

 6         (Exhibit No. 188 received into evidence.)

 7   Q.    What is Exhibit 188?

 8   A.    The subscriber records for those virtual servers that were

 9   associated with those particular domains.

10   Q.    So those domains also came back to a common account?

11   A.    Yes.

12   Q.    At 99Stack?

13   A.    Yes.

14   Q.    And who -- what was the subscriber email for that account?

15   A.    neumann@dr.com.

16   Q.    And the name is -- associated with it is Andrea Neumann?

17   A.    Yes.

18   Q.    And if you look at the registration IP, do you recognize

19   the IP address that was used to register this Neumann account?

20   A.    Yes.

21   Q.    What is it?

22   A.    89.238.166.235.

23   Q.    What does that indicate to you?

24   A.    That the same individual or group of individuals that

25   subscribed to the Namecheap account and purchased those domains
```

 1   also bought the servers at BitLaunch, also bought the servers

 2   at 99Stack.

 3   Q.   And what does that indicate with respect to the intrusions

 4   at Toppan Merrill and DFIN, if anything?

 5   A.   Those domains and IP addresses were identified by Toppan

 6   Merrill and DFIN involved in the intrusion.  So this indicates

 7   that it's one and the same.

 8   Q.   Now, these Neumann records were obtained, on the right of

 9   our chalk, correct, from 99Stack and BitLaunch?

10   A.   Could you repeat the question?

11   Q.   These Newman records were obtained, on the right-hand side

12   of our chalk, not from Namecheap?

13   A.   Correct.

14   Q.   Did you at some point go back to Namecheap to inquire

15   about the -- about Andrea Neumann?

16   A.   Yes.

17        MR. FRANK:  Could you look at 173B, please, and I'd

18   offer it.

19        **(Exhibit No. 173B received into evidence.)**

20   Q.   Special Agent, what is 173B?

21   A.   These are the subscriber records for the neumann@dr.com

22   Namecheap account.

23   Q.   And what is the IP address that was used to log into the

24   Neumann Namecheap account as indicated in this record?

25   A.   The same 89.238.166.235 that we saw everywhere else.

1   Q.   So the Neumann email address was used for the accounts at

2   Vultr and Digital Ocean?

3   A.   Yes.

4   Q.   And it was also associated with this Namecheap account?

5   A.   Yes.

6   Q.   And it was also associated with this 89.238 IP address?

7   A.   Yes.

8         MR. FRANK:  Could we look at page 4, please.

9   Q.   From this record you obtained from Namecheap, were you

10  able to determine how the Neumann account was paid for?

11  A.   Yes.

12  Q.   What were you able to determine?

13  A.   In the third -- or fourth column from the left, the very

14  last row underneath "Deposit," it says "BitPay."

15  Q.   What is BitPay?

16  A.   BitPay is a payment processor that allows an individual to

17  use Bitcoin, in this case, to buy a Namecheap domain.

18  Q.   So again, if we look at our chalk, you see that there is

19  an arrow under Namecheap indicating BitPay?

20  A.   Yes.

21  Q.   And there's a little logo for Bitcoin?

22  A.   Yes.

23  Q.   And what is Bitcoin?

24  A.   Bitcoin is a virtual currency, a digital currency.

25  Q.   Was the FBI able to obtain payment records for the Bitcoin

1    that was used to pay for the Neumann account?

2    A.   Yes.

3    Q.   Where did you obtain those records from?

4    A.   From BitPay.

5            MR. FRANK:  Could we look at Exhibit 181, and I'd

6    offer it.

7            **(Exhibit No. 181 received into evidence.)**

8    Q.   What is Exhibit 181?

9    A.   These are transactions showing payment by BitPay for

10   Namecheap accounts.

11   Q.   And the first account indicated on these BitPay records is

12   in the name of neumann@dr.com?

13   A.   Yes.

14   Q.   Okay.  There's also a second account listed on these

15   BitPay records.  Do you see that?

16   A.   Yes.

17   Q.   We're not going to talk about that account right now, but

18   I want to just ask you one or two quick questions about it.

19   What is the name associated with that account?

20   A.   Wan Connie.

21   Q.   Okay.  And what is the suffix of the email address?

22   A.   inbox.lv.

23          MR. FRANK:  Ms. Lewis, if you could scroll all the way

24   to the right, Column S.

25   Q.   Do you see that there's an 89 IP address associated with

1    the Wan Connie email account -- or the Wan Connie BitPay

2    account?

3    A.    Yes.

4    Q.    What is that 89 IP?

5    A.    This is one of the M-13 89 IPs, 89.107.124.42.

6    Q.    Okay.  We'll come back to that, Special Agent.

7          Did the FBI obtain additional Namecheap records for any

8    accounts associated with the Wan Connie identity?

9    A.    Yes.

10         MR. FRANK:  Could we look at Exhibit 173A, please, and

11   I'd offer it.

12         **(Exhibit No. 173A received into evidence.)**

13   Q.    What is 173A?

14   A.    Namecheap records for the Wan Connie account.

15   Q.    And do you see the IP address recorded on the right?

16   A.    Yes.

17   Q.    What is it?

18   A.    The M-13 89 IP.  89.107.124.42.

19         MR. FRANK:  Could we look at Exhibit 182, please.  And

20   I'd offer it.

21         **(Exhibit No. 182 received into evidence.)**

22   Q.    What is Exhibit 182?

23   A.    These are BitPay records.

24   Q.    Okay.

25         MR. FRANK:  And if you could scroll, Ms. Lewis.

1    Q.   Do you see that these BitPay records are associated with

2    yet another email address?

3    A.   Yes.

4    Q.   And what address is that?

5    A.   kevinspender@mail.com.

6    Q.   Okay.  We're going to not deal with that email address

7    right now, but what did you do with the BitPay records that

8    we've just looked at for this Kevin Spender account, for the

9    Neumann account, and the Wan Connie account?

10   A.   I provided those records to an FBI virtual currency

11   expert.

12   Q.   And who was the virtual currency expert at the FBI that

13   you provided the records to?

14   A.   Mr. Vincent Kenney.

15   Q.   Why did you give the records to Mr. Kenney?

16   A.   He has specialized training and skills to be able to --

17            MR. NEMTSEV:  Objection.

18   Q.   What were you asking him to do?

19            THE COURT:  You gave them to somebody with specialized

20   skills.  What's the next question?

21   Q.   And do you expect him to testify in this case?

22   A.   Yes.

23   Q.   Okay.

24            MR. FRANK:  We can take that down.

25   Q.   Special Agent, as part of your investigation, did you

1   obtain information from Toppan Merrill about an IP address with

2   the first three digits 185 from which its servers were

3   accessed?

4   A.   Yes.

5   Q.   Were you able to obtain additional information about the

6   185 IP address?

7   A.   Yes.

8        MR. FRANK:  Could we look at Exhibit 130, please.  And

9   I'd offer it.

10       **(Exhibit No. 130 received into evidence.)**

11  Q.   What is Exhibit 130?

12  A.   This is the DediPath subscriber information for the

13  185.228.19.146/29 block, but our request was for the

14  185.228.19.147.

15  Q.   Okay.  So what is a block?

16  A.   It is a group of IPs.

17  Q.   So that IP address that you mentioned ending in .147,

18  would that be contained within this IP block?

19  A.   Yes.

20  Q.   And what is DediPath?

21  A.   DediPath is a U.S.-based hosting provider.

22  Q.   And what do these DediPath records indicate about the

23  185.288.19.147 IP address that you obtained from Toppan

24  Merrill?

25  A.   That AirVPN in Italy subscribed to those IPs.

1    Q.   And what is AirVPN?

2    A.   AirVPN is a VPN provider, a virtual private network

3    provider.

4    Q.   And that's a commercial third-party VPN?

5    A.   Yes.

6    Q.   With respect to this 185.288.19.147 IP address, what, if

7    any, action did the FBI take?

8    A.   We obtained a pen register for this IP.

9    Q.   And you testified about this earlier, but just to remind

10   the jury, what is a pen register?

11   A.   It is the caller ID of who is communicating with that IP

12   address.

13   Q.   And who authorizes that?

14   A.   A federal judge.

15   Q.   For what period of time was the pen register on the 185 IP

16   active?

17   A.   January and February of 2020.

18   Q.   Besides the 185 IP, did you obtain information from TM or

19   DFIN about any other IP addresses that were used to access

20   their systems that were associated with AirVPN?

21   A.   Yes.

22        MR. FRANK:  I'd like to call up 163 and 163A, and I'd

23   offer them.

24        **(Exhibits Nos. 163 and 163A received into evidence.)**

25   Q.   What are these records?

1    A.   If you look in the bottom left, these are subscriber

2    records that go back to Quintex Alliance.

3    Q.   And what is Quintex Alliance?

4    A.   Quintex Alliance is a U.S.-based hosting provider.

5    Q.   And I want to direct your attention, in particular -- do

6    you see the 199.249 series of IPs?

7    A.   Yes.

8    Q.   In both of these records?

9    A.   Yes.

10   Q.   Tell us about that IP address.

11   A.   This IP address was observed in the intrusions into the

12   filing agents.

13   Q.   And what IP address does that -- what company is that IP

14   address associated with?

15   A.   AirVPN in Italy.

16        MR. FRANK:  And if we could leave up 163 on the left

17   and put up 173 in evidence on the right.

18        I'm sorry, 173I in evidence.  And if you could go to

19   page 2.

20   Q.   Do you see that this is the Namecheap record we looked at

21   earlier for the finshopland domain?

22   A.   Yes.

23        MR. FRANK:  Could we go to page 3.

24   Q.   Do you see a 199.249.230.17 domain here?

25   A.   Yes.

1    Q.   And based on the record from Quintex on the left, who does

2    that domain come back to?

3    A.   AirVPN.

4    Q.   I'm sorry, that IP address.  I'm sorry.

5    A.   AirVPN.

6    Q.   Special Agent, did you do further analysis of the 185 IP?

7    A.   Yes.

8         MR. FRANK:  Could we call up Exhibit 218, and I'd

9    offer it.

10        **(Exhibit No. 218 received into evidence.)**

11   Q.   What is Exhibit 218?

12   A.   This is an entry in the activity -- I described it as

13   caller ID.  This shows that the M-13 89 IP address

14   89.107.124.42 accessed the AirVPN 185.228.19.174 on January 29

15   of 2020.

16   Q.   So just to be clear, the dates at the top of the summary

17   chart are January 28th, 2020, to February 23rd, 2020.

18        Do you see that?

19   A.   Yes.

20   Q.   What do those dates represent?

21   A.   The date range of the caller ID being set up on the 185

22   IP.

23   Q.   That's when you had the pen register?

24   A.   Yes.

25   Q.   And so on the day after you set up the pen register, there

1    was a hit from the M-13 IP on the AirVPN IP?

2    A.    Correct.

3    Q.    On January 29th at 4:59 PST?

4    A.    Yes.

5         MR. FRANK:  Ms. Lewis, if you could leave up

6    Exhibit 218 on the left, and if we could put up Exhibit 196 on

7    the right.  And I offer it, along with 196A, which we'll come

8    to in a moment.

9         **(Exhibits Nos. 196 and 196A received into evidence.)**

10   Q.    What is Exhibit 196 on the right?

11   A.    It is an image that was found inside the Vladislav

12   Klyushin Apple account.

13   Q.    Did you have that image translated?

14   A.    Yes.

15        MR. FRANK:  Could we look at 196A in evidence, please.

16   Q.    What is the image?

17   A.    The image is a screenshot of a Russian Standard Bank

18   application that was identified in an exchange with an

19   individual at the bank.

20   Q.    An exchange between whom and an individual at the bank?

21   A.    Vladislav Klyushin and an individual that was at the bank.

22   Q.    Mr. Klyushin had a communication with an individual at

23   this bank and this image was exchanged?

24   A.    Correct.

25   Q.    What is the date that the image indicates of the last

```
 1    login -- the last access to online banking at Russian Standard
 2    Bank?
 3    A.    January 29, 2020.
 4    Q.    How does that compare with the date of the -- of the M-13
 5    IP address's access to the AirVPN IP?
 6    A.    It's the same day.
 7    Q.    What IP address did Mr. Klyushin use to access Russian
 8    Standard Bank?
 9    A.    The M-13 89 IP address.
10    Q.    Ending in .42?
11    A.    Correct.
12    Q.    Which is the M-13 IP address that was used that same day
13    to access AirVPN?
14    A.    The same 89.107.124.42.
15    Q.    Thank you.
16          MR. FRANK:  Could we look at Exhibit 220, please.
17    Q.    What is Exhibit 220?  And this is multiple pages?
18    A.    Yes.
19    Q.    What is it, Special Agent?
20          MR. FRANK:  And I'd offer it.
21          (Exhibit No. 220 received into evidence.)
22    A.    This is common IP addresses used to access the Ivan
23    Ermakov iTunes account, as well as the 185 AirVPN IP address.
24    Q.    So to the extent that this chart depicts IP addresses that
25    were used to access Mr. Ermakov's iTunes account, where did
```

1    those records come from?

2    A.    Apple.

3    Q.    And to the extent that this summary chart indicates access

4    to the AirVPN IP, where did those records come from?

5    A.    DediPath.

6    Q.    So just -- and that was pursuant to the pen register?

7    A.    That was the caller ID on that 185 AirVPN IP.

8    Q.    Okay.  So just to walk through this chart.  You see that

9    there's a 31 IP address?

10   A.    Yes.

11   Q.    When was that 31 IP address used, generally, to access

12   Mr. Ermakov's iTunes account?

13   A.    Early 2017.

14   Q.    When was that same IP address used to access AirVPN?

15   A.    Three years later, in February of 2020.

16   Q.    What about the next one, the 79 IP?  When was it used to

17   access Mr. Ermakov's iTunes account?

18   A.    February of 2018.

19   Q.    When was it used to access AirVPN?

20   A.    Two years later, February in 2020.

21   Q.    When was the 80 IP address listed below used to access

22   Mr. Ermakov's iTunes account?

23   A.    December of 2019.

24   Q.    When was that same IP address used to access the AirVPN

25   185 IP?

1    A.    Several months later, in February of 2020.

2    Q.    And just to be clear, how long were you up on that AirVPN

3    IP using a pen register?

4    A.    January and February of 2020.

5          MR. FRANK:  Could we go to the next page.

6    Q.    When was the 94 IP address depicted used to access

7    Mr. Ermakov's iTunes account?

8    A.    February of 2020.

9    Q.    When was it used to access the AirVPN 185 IP?

10   A.    February of 2020.

11   Q.    What about the 109 IP depicted next, when was it used to

12   access Mr. Ermakov's iTunes account?

13   A.    June 2020.

14   Q.    When was it used to access the 185 AirVPN IP?

15   A.    Four months earlier, in February of 2020.

16   Q.    What about the 109 IP depicted next, Special Agent?  When

17   was it used by Mr. Ermakov to access iTunes?

18   A.    May of 2020.

19   Q.    When was it used to access the AirVPN 185 IP?

20   A.    Earlier that year, in February of 2020.

21   Q.    What about the 176 IP depicted next, when was it used to

22   access Mr. Ermakov's iTunes account?

23   A.    June 2019.

24   Q.    When was it used to access the AirVPN 185 IP?

25   A.    Months later, in February of 2020.

1    Q.    When was the 213 IP depicted at the bottom of the page

2    used to access Mr. Ermakov's iTunes account?

3    A.    May 2019.

4    Q.    When was it used to access the AirVPN 185 IP?

5    A.    February of 2020.

6    Q.    Thank you, Special Agent.

7          MR. FRANK:  Could we look at Exhibit 219, please.  And

8    I'd offer 219.  I'm not sure I offered 220, but I offer it now.

9          THE CLERK:  You did.

10         MR. FRANK:  Thank you.

11         **(Exhibit No. 219 received into evidence.)**

12   Q.    What is 219?

13   A.    This is use of the other 89 IP, 89.238.166.235, used to

14   access the AirVPN IP.

15   Q.    So just to be clear, this is the 89 IP that does not come

16   back directly to M-13?

17   A.    Yes, that's correct.

18   Q.    This is the 89 IP that we looked at on those Namecheap and

19   virtual server records?

20   A.    Correct.

21   Q.    And this 89 IP -- these records are derived from your pen

22   register?

23   A.    Yes, the AirVPN caller ID.

24   Q.    So during the one-month period that you were up on the

25   AirVPN 185 IP, what do these records depict?

1   A.   That there were numerous access to the 185 pen,

2   approximately 20 hits.

3   Q.   What was the first date -- so you went up on the AirVPN

4   pen register on January 28th?

5   A.   Yes.

6   Q.   What was the first date that this 89 IP connected with the

7   AirVPN 185 IP?

8   A.   The next day.

9   Q.   And the pen register was terminated on February 23, 2020?

10  A.   Yes.

11  Q.   What was the last date that the 89 IP connected with the

12  AirVPN 185 IP?

13  A.   The day prior, February 22.

14       MR. FRANK:   Thank you, Ms. Lewis, you can take this

15  down.  And could you please call up Exhibit 221, and I'd offer

16  it.

17       **(Exhibit No. 221 received into evidence.)**

18  Q.   What is Exhibit 221?

19  A.   This is use of the IP address 119 -- the 119 IP,

20  119.204.194.11, to access the Ivan Ermakov iTunes.

21  Q.   So this is an -- a different IP address that was used to

22  access Mr. Ermakov's iTunes account on May 9th, 2018; is that

23  correct?

24  A.   Yes.

25  Q.   What time in Pacific Time did the -- Mr. Ermakov access

1    iTunes from the 119 IP?

2    A.   May 9, 2018, at 12:44 a.m. Pacific.

3    Q.   And what does that translate to in Coordinated Universal

4    or Zulu Time?

5    A.   May 9, 2018, 7:44 a.m.

6    Q.   For that same day, did you obtain any records from DFIN

7    about IP addresses from which its servers were accessed?

8    A.   Yes.

9         MR. FRANK:  Could we call up Exhibit 195A, please.

10   And I'd offer it.

11        **(Exhibit No. 195A received into evidence.)**

12   Q.   What is Exhibit 195A?

13   A.   This is when certain files were downloaded, by way of the

14   Julie Soma account, from the 119.204.194.11, the 119 IP

15   address.

16        MR. FRANK:  Ms. Lewis, if you would put this on the

17   right and put Exhibit 221 in evidence on the left, or vice

18   versa.

19   Q.   Directing your attention to May 9, in the summary chart of

20   the DFIN logs.

21        Do you see that?

22   A.   Yes.

23   Q.   At what time, Zulu Time, was the 119 IP used to download

24   files from DFIN using the Julie Soma user ID?

25   A.   Beginning at 7:48, ending on 7:56 Zulu.

1    Q.   Okay.  And that's --

2    A.   Universal Coordinated Time.

3    Q.   And that's between 48 minutes after midnight and 56

4    minutes after midnight, Pacific Time?

5    A.   Yes.

6    Q.   How many minutes was that first download after Mr. Ermakov

7    used that same IP address to access his personal iTunes

8    account?

9         MR. NEMTSEV:  Objection.

10        THE COURT:  Overruled.

11   A.   44 to 48 is four minutes.

12   Q.   But just to be clear, at 12:44 a.m. Pacific Time, there

13   was an access to Mr. Ermakov's iTunes account from the 119 IP?

14   A.   Yes.

15   Q.   Four minutes later, that same IP address shows up at DFIN

16   using the Julie Soma user ID to download files associated with

17   Horizon Pharma?

18   A.   Yes.

19        MR. FRANK:  Could we, on the right, look at 249B,

20   please, and I'd offer it.

21        **(Exhibit No. 249B received into evidence.)**

22   Q.   What is 249B?

23   A.   This is a screenshot of a filing for Horizon Pharma on May

24   9, 2018.

25   Q.   And you see that it's an 8-K?

1    A.    Yes.

2    Q.    What time was the Horizon Pharma 8-K filed with the SEC on

3    May 9, 2018?

4    A.    7:06 a.m. Eastern.

5    Q.    How does that compare with the time in Pacific Time that

6    Horizon Pharma's file was downloaded from the -- from DFIN?

7    A.    It's 3:00 a.m. versus 7:00 a.m.

8    Q.    So the download was before or after the filing?

9    A.    The download occurred hours before the filing happened.

10          MR. FRANK:  Could we look at 249D on the right.  And

11   I'd offer it.

12          **(Exhibit No. 249D received into evidence.)**

13   Q.    What is 249D?

14   A.    This is an SEC filing screenshot from the EDGAR system.

15   Q.    And this reflects the 10-Q of a company called Puma --

16   A.    Yes.

17   Q.    -- Biotechnology?

18         What time -- what day was the Puma Biotechnology 10-Q

19   filed?

20   A.    The next day, May 10th.

21   Q.    I think you jumped the gun on me there, Special Agent.

22         What day was it filed with the SEC?

23   A.    May 10, 2018.

24   Q.    And if we look at the chart on the left, what day was

25   there a download from Puma -- from DFIN for files associated

1    with Puma Biotechnology?

2    A.    The day prior, May 9.

3          MR. FRANK:  And, Ms. Lewis, could you just make the

4    chart on the right a little bit smaller?

5    Q.    And what was the document that was downloaded from DFIN?

6    A.    PBYI 10-Q master.

7    Q.    And what was the document that was filed with the SEC?

8    A.    The 10-Q.

9          MR. FRANK:  Could we look at Exhibit 249E on the

10   right, please.  I'd offer it.

11         **(Exhibit No. 249E received into evidence.)**

12   Q.    What is 249E?

13   A.    This is an SEC filing for CytomX Therapeutics.

14   Q.    And what is the filing?

15   A.    An 8-K.

16   Q.    And what is the date and time that the CytomX 8-K was

17   filed with the SEC?

18   A.    The 8-K and the 99 were filed on May 9th, 2018.

19   Q.    And Exhibit 99.1?

20   A.    The accompanying 99.1 was filed at the same time on May

21   9th, 2018.

22   Q.    At what point?

23   A.    4:05 p.m. Eastern.

24   Q.    What does the chart on the left indicate about when

25   Exhibit 99 for CytomX Therapeutics was downloaded from DFIN?

1    A.    12:53 Pacific, which would have been 3:53 Eastern, a.m.

2    Q.    So before or after the filing?

3    A.    Before, prior.

4         MR. FRANK:  Could we look, finally, at 249F on the

5    right.

6    Q.    What is 249F?

7    A.    A screenshot from the EDGAR database of a Synaptics 8-K.

8    Q.    And there's an Exhibit 99.1 as well?

9    A.    And accompanying exhibits, yes.

10   Q.    And what is the date and time that the Synaptics filings

11   were filed with the SEC?

12   A.    May 9, 2018, at 4:22 p.m.

13   Q.    And directing your attention to the chart on the left,

14   when was there a download of Synaptics documents from DFIN?

15   A.    May 9, 2018, at 12:56 a.m. Pacific, which would be 3:56

16   a.m. Eastern.

17        MR. FRANK:  Thank you, Ms. Lewis, you can take this

18   down.

19   Q.    Special Agent, for the next portion of your direct exam,

20   I'd like to introduce another chalk.

21        MR. FRANK:  This is marked as BBB.

22        THE COURT:  Do you want to stand and stretch for a

23   minute?  You can see why a full day might be a lot.

24        MR. FRANK:  Your Honor, I wasn't sure if there was a

25   juror question.

```
 1            THE COURT:  Oh, was there?  I'm sorry.  I missed that.
 2            THE CLERK:  That was my fault.  I was doing other
 3   work.
 4            THE COURT:  I'll give this to them.  We're not going
 5   to finish him today.  I'll give it to the attorneys after we
 6   break.
 7            THE CLERK:  I can make copies of it.
 8            THE COURT:  She'll make copies and give it to them.
 9   We'll finish, hopefully, the government's direct today, but not
10   the whole --
11            MR. FRANK:  Maybe not quite, but close.
12            THE COURT:  Okay.  Let's see if we can finish the
13   direct.  Thank you.  Don't forget, we have cross.
14            MR. NEMTSEV:  I will not be nearly as long, Your
15   Honor.
16            THE COURT:  What?
17            MR. NEMTSEV:  I will not be nearly as long, I promise.
18   BY MR. FRANK:
19   Q.   Special Agent, I've put up a chalk of a number of
20   different companies, and I'd like you to walk the jury through
21   what each of those companies are.
22        Beginning at the top of the chalk, there's an entity
23   referred to as ARIN, A-R-I-N.  What is ARIN?
24   A.   The American Registry of Internet Numbers.
25   Q.   What is it?
```

1    A.    It is a registry of IP blocks and to whom they are

2    associated.

3    Q.    So it's an IP address registry?

4    A.    Yes.

5    Q.    The next entity down is a company called Web2Objects.

6    What is Web2Objects?

7    A.    It is a company that leases IP blocks to the public.

8    Q.    So you can get an IP block from Web2Objects and pay for

9    it, and it will be registered with ARIN?

10   A.    Correct.

11   Q.    The next company down is called StackPath.  What is

12   StackPath?

13   A.    StackPath is a parent company of several VPN providers.

14   Q.    And are you familiar with a company called Mudhook

15   Marketing?

16   A.    Yes.

17   Q.    Is that a subsidiary of StackPath?

18   A.    Yes.

19   Q.    What about StrongVPN?

20   A.    StrongVPN, yes.

21   Q.    And there are others?

22   A.    IPVanish is another one.

23   Q.    IPVanish?

24   A.    Yes.

25   Q.    Okay.  So how does StackPath relate to Web2Objects on this

1  chalk?

2  A.    Web2Objects leased StackPath certain IP blocks.

3  Q.    And then below StackPath, there's a company called Micfo.

4  What is Micfo?

5  A.    Micfo procures rack space, which is a cage inside of a

6  building to put computer hardware.

7  Q.    And do they also lease server space as well for IP

8  addresses?

9  A.    They do.

10 Q.    And what was the relationship that we're going to talk

11 about in a minute between Micfo and StackPath?

12 A.    Micfo provided that storage space within a rack and a cage

13 to StackPath.

14 Q.    Is Micfo still in existence?

15 A.    No.

16 Q.    What happened to Micfo?

17 A.    They were indicted in 2019.

18 Q.    And were they convicted of a crime?

19 A.    The company, yes.

20 Q.    Did that crime have anything to do with what we're talking

21 about in this --

22         MR. FERNICH:  Objection.

23         MR. NEMTSEV:  Objection.

24         THE COURT:  Sustained.

25 Q.    Do you know what that crime was?

1    A.    Yes.

2    Q.    Was it related to the events we're discussing here?

3    A.    No.

4    Q.    Below Micfo, there's a company called Markley.  What is

5    Markley?

6    A.    Markley is a datacenter that is located a few blocks from

7    the courthouse.

8    Q.    So it's a company that owns a building?

9    A.    Yes, the real estate where these servers would be housed.

10   Q.    And that building is on Summer Street in Boston?

11   A.    Yes.

12   Q.    Okay.  And so what relationship did Markley have with

13   Micfo?

14   A.    Markley provided a temperature-controlled -- a powered-on

15   environment for high-powered servers to be safely secured and

16   have 24/7 operation.

17   Q.    So Micfo rented space from Markley?

18   A.    Yes, real estate.

19   Q.    And Micfo rented server space to StackPath?

20   A.    Correct.

21   Q.    And StackPath procured IP addresses from Web2Objects?

22   A.    Yes.

23   Q.    And those were registered with ARIN?

24   A.    Yes.

25   Q.    Now, off to the left, there's an entity called Cogent.

1  What is Cogent?

2  A.   Cogent is a backbone Internet provider.  They route these

3  IPs we were talking about all over the world.

4  Q.   Okay.  Thank you, Special Agent.

5       MR. FRANK:  I'd now like to call up Exhibit 191, and I'd

6  offer it.

7       **(Exhibit No. 191 received into evidence.)**

8  Q.   What is Exhibit 191?

9  A.   These are downloads for the Julie Soma account from an

10 entire IP block, 104.238.2 -- strike that.  104.238.37.

11 Q.   And what period were those downloads?

12 A.   October 2018 to November of 2018 was the entire range that

13 was examined.

14 Q.   Okay.  And these -- this summary came from records you

15 obtained from where?  Are these from DFIN records?

16 A.   These records are from Donnelley Financial, yes.

17 Q.   And so, to be clear, these summarize instances in this

18 time period when the 104.238.37 IP was used to download files

19 using Julie Soma's user ID?

20 A.   That is correct.

21 Q.   Okay.  I'd like to direct you to the entry under

22 Capstead -- do you see there's two entries for Capstead

23 Mortgage?

24 A.   I do.

25 Q.   What are the documents that were downloaded?

1    A.    The 99.1 exhibit and the Q3 2018 press release workbook.

2    Q.    And what time and day were they downloaded?

3    A.    October 22, 6:21 a.m. Pacific.

4          MR. FRANK:  And if we could put this exhibit up on the

5    left and 249H on the right.  And I'd offer 249H.

6          **(Exhibit No. 249H received into evidence.)**

7    Q.    What is 249H?

8    A.    This is the SEC screenshot for a Capstead Mortgage 8-K.

9    Q.    And it's also an Exhibit 99.1.  Do you see that?

10   A.    And the accompanying exhibit, yes.

11   Q.    When were these documents filed with the SEC?

12   A.    October 24 at 5:00 p.m. Eastern.

13   Q.    When was the download of Exhibit 99.1 and the Q3 2018

14   press release from DFIN's servers using Julie Soma's IP --

15   Julie Soma's user ID over the 104 IP address?

16   A.    Two days prior, on October 22nd, 2018.

17         MR. FRANK:  Could we go to page 2 on the left,

18   Ms. Lewis.  And on the right, could we call up Exhibit 249G,

19   and I'd offer it.

20         **(Exhibit No. 249G received into evidence.)**

21   Q.    Directing your attention to the exhibit on the left, the

22   summary chart, Special Agent, do you see there's an entry for

23   Tesla?  And what is the document that was downloaded?

24   A.    The 99.1 exhibit.

25   Q.    Okay.  And if you look at that chart, what is the date and

1    time?

2    A.   October 24th, 2018, at 2:18 a.m. Pacific.

3    Q.   Directing your attention to 249G on the right, what date

4    and time did Tesla file its 8-K and Exhibit 99.1 with the SEC?

5    A.   That same day, October the 24th at 4:27 p.m.

6    Q.   Was the download before or after the filing with the SEC?

7    A.   The download occurred before the filing.

8         MR. FRANK:   Could we look on the left at page 3,

9    please, and on the right at Exhibit 249I, and I'd offer it.

10        **(Exhibit No. 249I received into evidence.)**

11   Q.   On the summary chart on the left, do you see an entry in

12   the middle of the page for SS&C Technologies?

13   A.   Yes.

14   Q.   What is the document that was downloaded?

15   A.   The 99.1 exhibit.

16   Q.   What is the date?

17   A.   October 26, 2018.

18   Q.   What is the time?

19   A.   6:13 Pacific.

20   Q.   On 249I, when did SS&C file its 8-K and Exhibit 99.1?

21   A.   October 31 at -- October 31, 2018, at 4:13 p.m.

22   Q.   How many days before the filing was the download?

23   A.   Four.  Or five, rather.

24        MR. FRANK:   Could we look at the summary chart, the

25   next page, page 4.  And on the right, could we call up 249J,

1    and I'd offer it.

2            **(Exhibit No. 249J received into evidence.)**

3    Q.   Special Agent, looking at the summary chart, do you see an

4    entry at the top of the page for a company called Roku?

5    A.   Yes.

6    Q.   And do you also see an entry at the bottom of the page for

7    Roku?

8    A.   Yes.

9    Q.   What were the documents that were downloaded on those two

10   instances?

11   A.   Exhibit 99.

12   Q.   And when was the first download?

13   A.   November 6, 2018, at 1:05 a.m. Pacific.

14   Q.   Looking at the exhibit on the right, when did Roku file

15   its 8-K and Exhibit 99.1?

16   A.   The next day, November the 7th, 2018, at 4:10 p.m.

17   Q.   Were the downloads on the left before or after the filing

18   of the 8-K and 99.1 on the right?

19   A.   Yes.  They were before.

20        MR. FRANK:  Thank you.  You can take this down.

21   Q.   This IP address, this 104 IP address from which these

22   downloads occurred, were you able to identify any records

23   concerning the location of that IP address?

24   A.   Could you put the IP address back up?

25        MR. FRANK:  Put up 191, please.

1    Q.    Do you see that IP block 104.238.37?

2    A.    I do.

3    Q.    Were you able to identify records associated with it?

4    A.    Yes.  This is the 104 IP address.

5    Q.    Yes.

6          MR. FRANK:  Could we look at Exhibit 140, please.  And

7    I'd offer it.

8          **(Exhibit No. 140 received into evidence.)**

9    Q.    What is Exhibit 140?

10   A.    This is a Micfo invoice referencing the same block of

11   104.238.37.0/24, that IP block.

12   Q.    And who is Micfo invoicing?

13   A.    Mudhook Marketing, which we have associated to StackPath.

14   Q.    Okay.  So looking at our chart, this is Micfo, second from

15   the bottom, invoicing StackPath -- or a subsidiary of

16   StackPath, Mudhook Marketing, for the 104 IP block?

17   A.    Correct.

18   Q.    And what does the invoice indicate about the location of

19   the block?

20   A.    Boston, Massachusetts.

21   Q.    And what does it indicate about the server space where

22   that particular server is located?

23   A.    U-07.

24   Q.    Now -- and what is the address for Mudhook Marketing

25   that's on this invoice?

1    A.    1920 McKinney Ave., 7th floor, Dallas, Texas.

2    Q.    And this invoice, what is the date of it?

3    A.    The date is July 25, 2019.

4    Q.    Now, this exhibit consists of several invoices.

5          MR. FRANK:  I'd like to go to page 5 of the exhibit.

6    Q.    Now, do you see page 5 of the exhibit, Special Agent?

7    A.    Yes.

8    Q.    And what is page 5?

9    A.    Another Micfo invoice to Mudhook Marketing.

10   Q.    And what is the date of this invoice?

11   A.    The invoice date, November 24, 2018.

12   Q.    Now, a moment ago we looked at that download chart,

13   Exhibit 191.

14         MR. FRANK:  Ms. Lewis, could you call it up on the

15   right, please, and go to page 4.

16   Q.    That Roku download on page 4, the one at the top and the

17   one at the bottom, what dates did those occur?

18   A.    November 6 and November 7 of 2018.

19   Q.    And this invoice on the left is dated?

20   A.    November 24th, 2018.

21   Q.    Okay.  And if you look below, what is the IP address block

22   referenced there?

23   A.    This is the 104.238.37.0/24, the same IP block.

24   Q.    Okay.  What is the period for which Mudhook

25   Marketing/StackPath is being invoiced?

1    A.    December 1 of 2018 through December 31 of 2018.

2    Q.    And what is the server space where the server housing that

3    IP address is located?

4    A.    U-07.

5    Q.    And this invoice at the top is -- it indicates it was

6    unpaid?

7    A.    Yes.

8    Q.    Have you been able to establish whether it was, in fact,

9    paid?

10   A.    It was paid.

11   Q.    And how do you know that?

12   A.    The company, StackPath, indicated --

13   Q.    Do you have bank records indicating that?

14   A.    I believe we do.

15   Q.    And did you seek to obtain earlier invoices for that IP

16   from StackPath?

17   A.    Yes.

18   Q.    What happened?

19   A.    They were unable to locate anything earlier than this time

20   period.

21   Q.    And were you able to determine whether Micfo, in fact,

22   leased datacenter space in Boston in October and November 2018?

23   A.    Yes.

24   Q.    I'm showing you now Exhibit 142.

25          MR. FRANK:  And I'd offer it.

1          **(Exhibit No. 142 received into evidence.**)

2  Q.   What is Exhibit 142?

3  A.   This is a contract between Markley Boston, the datacenter,

4  and Micfo.

5  Q.   So Markley's at the bottom of our chalk?

6  A.   Yes.

7  Q.   And Micfo's one up?

8  A.   Yes.

9  Q.   So this is a contract between Micfo and Markley?

10 A.   Yes.

11          MR. FRANK:   Can we go to page 2, please.

12 Q.   What's the date of the contract?

13 A.   December 2015.

14          MR. FRANK:   And, Ms. Lewis, if you could expand a

15 little further to the building.

16 Q.   What is the building that this contract references?

17 A.   1 Summer Street, Boston, Mass.

18          MR. FRANK:   Could we go to page 7, please.

19 Q.   And do you see signatures there?

20 A.   Yes.

21 Q.   And those are representatives of which companies?

22 A.   Markley Boston and Micfo.

23          MR. FRANK:   Could we go to page 63, please.

24 Q.   What is 63?

25 A.   63 is an invoice from Markley Boston to Micfo.

1    Q.    And what is the invoice date?

2    A.    September 14th, 2018.

3          MR. FRANK:  And could we go to page 65, please.

4    Q.    And what is 65?

5    A.    Another Markley Boston invoice made out to Micfo.

6    Q.    And what is the date?

7    A.    October 1 --

8    Q.    Is that October 11?

9    A.    October 11, 2018.

10         MR. FRANK:  And if we could back out.

11   Q.    What is the period indicated, beginning?

12         MR. FRANK:  Down below that, Ms. Lewis.

13   A.    The period is November -- if we could zoom in, please.

14         MR. FRANK:  Ms. Lewis, could you zoom in just below

15   that.

16   A.    November 1, 2018.

17   Q.    And if you recall on those Micfo invoices to Mudhook

18   Marketing, they reference the server in spot 7.

19         Do you recall that?

20   A.    Yes.

21   Q.    Were you able to determine whether there was, in fact, a

22   server in spot 7 in October of 2018?

23   A.    Yes.

24         MR. FRANK:  Could we look at Exhibit 142A, please, and

25   I'd offer it.

1              **(Exhibit No. 142A received into evidence.)**

2    Q.   What is Exhibit 142A?

3    A.   This is a picture that Markley Boston provided to Micfo.

4    Q.   And what is the -- do you see there's -- there's some

5    stickers on these machines?

6    A.   Yes.

7    Q.   I'm directing your attention to the sticker that I'm

8    indicating.  What does it say?

9    A.   BOS-SVR-7.

10   Q.   Okay.  And directing your attention now to the blue

11   sticker, do you see there's some letters and a -- it looks like

12   a serial number?

13   A.   Yes.

14   Q.   What are the first two letters?

15   A.   ST.

16   Q.   And what are the first two letters of StackPath?

17   A.   ST.

18              MR. FRANK:  Could we look at Exhibit 142D, please, and

19   I'd offer it.

20              **(Exhibit No. 142D received into evidence.)**

21   Q.   What is 142D?

22   A.   The metadata associated with this photo depicting when it

23   was taken.

24   Q.   When was this photo depicting a server in spot 7 taken?

25   A.   September 13th, 2018, 9:06 a.m.

1    Q.    Were you able to determine, Special Agent, whether Micfo

2    had an authorization for the 104 IP address in October of 2018?

3    A.    Yes.  They'd had it for months by then.

4              MR. FRANK:  Could we look at Exhibit 145, please.

5    Q.    What is Exhibit 145?

6    A.    A May 30, 2018 letter of authorization.

7    Q.    And who is it from?

8    A.    It's from Web2Objects.

9    Q.    So that's the company above StackPath?

10   A.    Yes.

11   Q.    And what does it say?  If you could read the first

12   sentence, and the beginning of the next sentence.

13   A.    "Web2Objects authorizes Micfo to announce or readvertise

14   the following IPv4 prefix."

15   Q.    And what is the first IPv4 prefix indicating?

16             THE COURT:  First of all, what is an IPv4 prefix?

17             THE WITNESS:  It is a reference to the version number

18   of these IPs, and so the prefix would be 104.238.37.0/24.

19   Q.    That's the block?

20   A.    That's the block.

21   Q.    And what does it indicate about where that block is

22   located?

23   A.    It is preceded by the word "Boston."

24   Q.    Showing you now Exhibit 176.

25             MR. FRANK:  And I'd offer it.

1              **(Exhibit No. 176 received into evidence.)**

2    Q.    Where did you obtain Exhibit 176?

3    A.    ARIN.

4    Q.    That's the registry at the top of our chalk?

5    A.    Yes.

6    Q.    And what IP blocks does this reference?

7    A.    The 104.238.37.0/24.

8    Q.    Okay.  And you see that it also references Web2Objects?

9    A.    Yes.

10   Q.    Okay.  And Web2Objects is one entity down from ARIN on our

11   chalk?

12   A.    Yes.

13              MR. FRANK:  And could we go to page 2, please.

14   Q.    Could you read the first sentence?

15   A.    "On June 18, 2018, at 20:36:55, Web2Objects LLC reassigned

16   104.238.37.0/24 to the following organization."

17   Q.    What is the organization it was assigned to?

18   A.    Strong Technology, LLC.

19   Q.    And Strong Technology, LLC, is a subsidiary of what

20   company?

21   A.    StackPath.

22   Q.    And directing you to the billing address at the bottom, do

23   you recognize that billing address?

24   A.    I do.

25   Q.    Is that the same billing address we saw on the Micfo

1    invoice?

2    A.    For Mudhook Marketing.

3    Q.    Okay.  And what is the address associated with the IP at

4    the top of the page?

5    A.    1 Summer Street, Boston, Mass.

6         MR. FRANK:  Could we look at Exhibit 267, please, and

7    I'd offer it.

8         **(Exhibit No. 267 received into evidence.)**

9    Q.    What is Exhibit 267?

10   A.    If we could zoom in, please.

11        This is a May 30th, 2018, email sent from aditishah@micfo

12   to the netops email address -- I'm sorry.  Let me start over.

13        This is an email from Cogent to aditishah@micfo and

14   netops@micfo.com describing that work had been completed.

15   Q.    Okay.  Let's start at the bottom of the chain.

16        MR. FRANK:  Ms. Lewis, if you could take us to the

17   bottom of this document.

18   Q.    Do you see there's an attachment, Special Agent?

19   A.    Yes.

20   Q.    Do you recognize this attachment?

21   A.    Yes.  This is the attachment to an email sent to Cogent.

22   Q.    Do you recognize this particular document?

23   A.    Yes.

24   Q.    Is this the letter of authorization from Web2Objects we

25   looked at a moment ago?

1    A.    The same letter of authorization, yes.

2    Q.    And if we then move up the document, do you see that

3    there's an email dated May 30, 2018, from aditishah@micfo?

4    A.    Yes.

5    Q.    Okay.  And what does it say?

6    A.    "Hello, Cogent.  We have some IPv4 prefix filter updates.

7    Please find attached the relevant LOA for the same.  Please see

8    the details below."

9    Q.    And the first location?

10   A.    Boston.

11   Q.    And the second location?  I'm sorry.  Before we get to

12   that second location, could you indicate -- what is the IPv4

13   prefix assigned to Boston?

14   A.    104.238.37.0/24.

15   Q.    And that's the same block we've been talking about?

16   A.    Yes.

17   Q.    And do you see that, as the email goes on, there are other

18   IP blocks for other cities?

19   A.    Yes.

20   Q.    Cleveland, Denver?

21   A.    Yes.

22   Q.    Milwaukee and St. Louis?

23   A.    Yes.

24   Q.    And to whom did Ms. Shah at Micfo send this request?

25   A.    support@cogentco.com and copied netops@micfo.com.

1   Q.   Okay.  And if we go to the top of the document, do you see

2   this is the response from Cogent?

3   A.   Yes.

4   Q.   And what is the date?

5   A.   The same date -- or -- can we go back to the other?

6        And your question again, sir?

7   Q.   What is the date that Cogent responded to Micfo?

8   A.   May 30, 2018.

9   Q.   Okay.  And could you read what Cogent wrote back?

10  A.   "Dear Cogent customer, your BGP prefix list addition has

11  been completed."

12  Q.   Okay.  If we go down the list, you see there's a whole

13  series of Internet -- of IP addresses?

14  A.   Yes.

15       MR. FRANK:  Could we go to the second page, please.

16  And, Ms. Lewis, could you highlight.

17  Q.   Do you recognize the IP block that Ms. Lewis has

18  highlighted?

19  A.   Yes.

20  Q.   What is it?

21  A.   The 104.238.37.0/24.

22  Q.   And so Cogent is that company on the left on our chalk?

23  A.   Yes.

24  Q.   Thank you, Special Agent.

25       MR. FRANK:  Your Honor, I have one last section, but

1    I'm not going to be able to complete it in the next couple of

2    minutes.

3            THE COURT:  We have two minutes.

4            MR. FRANK:  I'm happy to start, but.

5            THE COURT:  Yes.

6            MR. FRANK:  Okay.

7    Q.    Special Agent, in addition to the WhatsApp messages we

8    reviewed earlier, did the FBI find any messages on other

9    messaging services in the iCloud backups you reviewed?

10   A.    Yes.

11           MR. FRANK:  Ms. Lewis, could we call up Exhibit 46,

12   and I'd offer it.

13           **(Exhibit No. 46 received into evidence.)**

14           And, Ms. Molloy, did I offer 176 and 267?

15           THE CLERK:  Mm-hmm.  They're in.

16           MR. FRANK:  Thank you.

17           THE CLERK:  You're welcome.

18   Q.    What is Exhibit 46?

19   A.    This is the Threema chat content located in the Nikolai

20   Rumiantcev Apple account.

21   Q.    What is Threema?

22   A.    Threema is a chat program that allows two or more

23   individuals to message back and forth.

24   Q.    And is Threema encrypted or unencrypted?

25   A.    Encrypted.

1   Q.   If Threema is encrypted, how were you able to obtain the

2   unencrypted content of the Threema chat that was backed up to

3   Mr. Rumiantcev's iCloud account?

4   A.   It existed in an unencrypted state within the Apple backup

5   for Nikolai's account.

6   Q.   Now, earlier you testified about a WhatsApp chat that was

7   found on Mr. Klyushin's iCloud account.

8        Do you recall that testimony?

9   A.   Yes.

10  Q.   And on WhatsApp, how were you able to identify senders and

11  recipients?

12  A.   Phone number.

13  Q.   Are Threema accounts registered using phone numbers?

14  A.   No.

15  Q.   So how are the communications identified in a Threema

16  chat?

17  A.   An alphanumeric string.

18  Q.   So are you able to identify who the senders and recipients

19  are based on those alphanumeric strings?

20  A.   If that's all you had, no.

21  Q.   Were you able to do that in this case, were you able to

22  identify the speakers in this chat in this case?

23  A.   Yes, we were able to identify which code -- which

24  alphanumeric code was associated with what individual.

25  Q.   How were you able to do that?

1    A.    We analyzed these communications, along with other

2    communications that we've previously discussed.  The WhatsApp

3    communications -- for one, the WhatsApp communications between

4    Vladislav Klyushin and Ivan Ermakov.

5              THE COURT:  This might be a good time to break.

6              MR. FRANK:  Thank you, Your Honor.

7              THE COURT:  I'll see you tomorrow.

8              THE CLERK:  All rise.

9    (Jury exits.)

10              THE COURT:  So I will not consider any documents that

11    you give to them after 5:00 this afternoon.  So just get it

12    going.  I mean, if they already have it, that's one thing, but

13    new documents, it's just too much.

14              Now, how much longer do you have with him?

15              MR. FRANK:  I have the Threema chat and the closing

16    section.  I would say probably about a half hour.

17              THE COURT:  So how long do you think you're going to

18    have?

19              MR. NEMTSEV:  I'm going to try to make it an hour.

20              THE COURT:  Who's next?

21              MR. FRANK:  Jeff Zorek from Saxo Bank.  His testimony

22    is probably an hour or less.

23              MR. NEMTSEV:  Aren't we playing an hour-and-40-minute

24    call?

25              MR. FRANK:  Not the entire call.  I'm going to

1   introduce the entire call, and I'm going to have him describe
2   the first part of the call, and then the second part of the
3   call where he's asking questions and getting answers is going
4   to be played.
5           THE COURT:  We don't have to do that in front of me
6   right now, but let me just say that -- how long, do you have
7   any idea, on cross?
8           MR. FERNICH:  I might be a bit.
9           THE COURT:  The rest of the day?
10          MR. FERNICH:  So you said it would be a half hour.
11  Yeah, I think that will take up tomorrow.
12          THE COURT:  These people are all people from out of
13  town?
14          MR. FRANK:  Yes.
15          THE COURT:  Do you know if any of them will have
16  trouble getting here?
17          MR. FRANK:  He has -- what is tomorrow?
18          MR. KOSTO:  Tomorrow is Friday.
19          MR. FRANK:  We do need to get him home tomorrow, but I
20  don't --
21          THE COURT:  MaryEllen was whispering to me it's our
22  typical rule if there's a snowstorm and there's no school in
23  Boston, we don't have court.  There's not going to be a
24  snowstorm tonight, but there is going to be record cold.  So
25  there's a chance some of the schools will be closed.  So

1    there's sort of a gray area about what we do.  So I wanted to

2    know whether or not it would be a hardship because some of

3    these people are flown in from out of town and I didn't want to

4    pop that on you.

5            MR. FRANK:  I could take him out of order.  We're at a

6    point in the direct examination of Special Agent Hitchcock

7    where we could pause, put on Mr. Zorek and get him out of here

8    and then conclude Special Agent Hitchcock.

9            THE COURT:  How do you feel about that?

10           MR. NEMTSEV:  I have no preference.  If Mr. Zorek

11   needs to be home, I understand.

12           THE COURT:  Well, let him know either way.  Even

13   though it's our normal rule, no school in Boston, no court, the

14   reality is that's geared toward snowstorms as a proxy for

15   whether you can get here or not, but I think tomorrow is just

16   supposed to be cold.

17           MR. KOSTO:  Did the Court see any hands for whether it

18   would be an issue?

19           THE COURT:  Yes, but she said it wouldn't be an issue.

20   It's designed for snowstorms, is the thing.

21           So in any event, here's the juror question.

22           MR. FRANK:  I can ask this tomorrow.

23           THE COURT:  Okay.

24           Let me also say, at some point I just need to figure

25   out the jury instructions.  So if, in fact, we finish Saxo --

1    the Saxo representative and this agent tomorrow, what does that

2    look like for Monday?

3            MR. KOSTO:  The government has four more witnesses

4    after Mr. Zorek, a summary witness, Ms. Yanochko from our

5    office who's going to testify to some summary information, and

6    then two technical witnesses beyond Agent Hitchcock, and then

7    an SEC witness.  And that's it.

8            MR. NEMTSEV:  Mr. Clarke.

9            THE COURT:  All right.  But when does that bring us

10   to?  I'm trying to figure out when I need to have a charge

11   conference.

12           MR. FRANK:  Probably through Tuesday.

13           THE COURT:  It will bring you through Tuesday.  So if

14   we did a charge conference, perhaps, Tuesday afternoon,

15   potentially Wednesday afternoon, depending how it goes.  Do you

16   have a sense yourself right now?

17           MR. NEMTSEV:  I think we'd be done in one day.

18           THE COURT:  That's what worries me.  You've listed all

19   these people.

20           MR. NEMTSEV:  I listed only three people, and two

21   experts will testify.  I don't know if I need --

22           THE COURT:  So it could go to the jury, say, Thursday

23   or Friday?

24           MR. NEMTSEV:  Potentially.

25           THE COURT:  Potentially, at least.  I'm just trying to

1    figure out --

2          MR. NEMTSEV:  We could push it to Monday, if that's

3    what Your Honor prefers.

4          THE COURT:  I'd prefer to finish it sooner rather than

5    later because I lose people from COVID, but they've been

6    terrific.

7          If you understand this question, ask it.  Go ahead.

8    It's a little more detailed than some of the other ones.

9          MR. NEMTSEV:  I'm not quite sure this is the right

10   witness for this question, but.

11         MR. FRANK:  He can answer the question.

12         MR. KOSTO:  He can answer this question.

13         THE COURT:  Let me also say, like I did with the

14   pictures, I'm scribbling away.  There's no way they're going to

15   remember all these different IP addresses.

16         MR. NEMTSEV:  I lost it halfway through.

17         THE COURT:  I'm being -- you know -- I'm scribbling

18   104, 185 --

19         MR. KOSTO:  It will be our job in closing to bring

20   this together for the jury.

21         THE COURT:  I know, but I need to understand it for

22   directed verdict.  And, also, people aren't -- maybe there are

23   a few who have photographic memories, but they've got to

24   remember it.  They've got to be able to link it all together,

25   and so -- as do I.  I finally heard the connection with Ermakov

1    with the iTunes account, but, you know, like you don't want

2    them to do just a big lump everything together kind of thing.

3    Same for you, are you going to be doing anything like that?

4         MR. NEMTSEV:  I'll point out some issues with the

5    connections, but that's about it.

6         THE COURT:  I'm just saying you're assuming a lot of

7    memory on their part on the numbers and what connects to what.

8    You know, today was an important day, I understand that.  There

9    were a couple of immediate links, especially to Ermakov, but

10   how are they going to remember all those numbers?

11        MR. FRANK:  Judge, I don't know what to say to that.

12   We're going to link it together in closing.  I think we

13   established very clearly today that the M-13 IP address was

14   directly connected to the hack, and Mr. Ermakov and

15   Mr. Rumiantcev and Mr. Klyushin all used that IP address.

16        THE COURT:  Let me say, you can argue that.  I am

17   simply saying, you are assuming a lot of memory, especially

18   going over a weekend, and it's very useful to have someone

19   write down to teach what are the different numbers so that --

20   it may be that they'll convict -- they'll want to convict, say,

21   Ermakov, but it may be they're -- they may have trouble linking

22   it to Klyushin.  Or they may find that the whole M-13 is

23   involved, but, whatever, it's a lot of numbers you've been

24   using.  That's all I'm saying.

25        MR. FRANK:  I don't know what Your Honor is

1    suggesting.  We're doing our best.  We've tried to move it

2    along.  We have summary charts and we've tried to be as

3    pedantic as we can.

4         THE COURT:  Whatever you think you are, I would like a

5    memo on directed verdict linking it all together when we get to

6    that point, just to make sure that I understand, rather than

7    before I get to closings, because I'm sure I will have a motion

8    for directed verdict, and I think I need from you, if you're

9    moving for directed verdict, why it is that there are gaps.

10        MR. NEMTSEV:  Okay.  That's easy.

11        THE COURT:  It may not be easy, but -- so someone -- I

12   know this may be weekend work, but it would be very useful to

13   have a brief on the inevitable motion for directed verdict that

14   sets out how you get to reasonable doubt.  I actually think

15   today the venue issue sort of dissipated, but I haven't heard

16   your cross yet.

17        MR. FERNICH:  One more question.  Have we worked out

18   on the Threema chat the 403 objections?  Or if we are going to

19   take Zorek out of order, maybe it can wait.

20        MR. FRANK:  We can talk about it.  I don't have

21   concerns about most of the redactions you requested.  To the

22   extent you have hearsay objections to a chat that you're

23   introducing -- you want to introduce hearsay from, I do -- we

24   are not going to agree on that.

25        MR. NEMTSEV:  This would be an unidentified

1    co-conspirator.

2              MR. FRANK:  We're not going to do this in the

3    abstract, counsel.

4              THE COURT:  I don't know, but I'll see you at 8:30

5    tomorrow morning.

6    (Proceedings adjourned at 1:12 p.m.)

1                    C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )

5

6

7          We, Lee A. Marzilli and Kathleen Silva, Official

8  Federal Court Reporters, do hereby certify that the foregoing

9  transcript, Pages 1 through 175 inclusive, was recorded by us

10 stenographically at the time and place aforesaid in Criminal

11 No. 21-10104-PBS, United States of America v. Vladislav

12 Klyushin, and thereafter reduced by us to typewriting and is a

13 true and accurate record of the proceedings.

14         Dated this 2nd day of February, 2023.

15

16

17

18

19

20 /s/ Debra Joyce
   _____
21 DEBRA M. JOYCE, RMR, CRR, FCRR
   OFFICIAL COURT REPORTER

22

23 /s/ Kathleen Silva
   _____
24 KATHLEEN SILVA, RPR, CRR
   OFFICIAL COURT REPORTER

25