1               IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS
2

3   UNITED STATES OF AMERICA,        )
                           )
4            Plaintiff         )
                           )
5       -VS-                )  Criminal No. 21-10104-PBS
                           )  Pages 5-1 - 5-98
6   VLADISLAV KLYUSHIN,          )
                           )
7            Defendant         )

8                   **JURY TRIAL - DAY FIVE**
9

10           BEFORE THE HONORABLE PATTI B. SARIS
            UNITED STATES DISTRICT JUDGE
11

12

13
                      United States District Court
14                  1 Courthouse Way, Courtroom 19
                 Boston, Massachusetts  02210
15                  February 3, 2023, 8:53 a.m.

16

17

18

19

20

21                  LEE A. MARZILLI
              KELLY A. MORTELLITE
22           OFFICIAL COURT REPORTERS
          United States District Court
23         1 Courthouse Way, Room 7200
            Boston, MA  02210
24            leemarz@aol.com

25

A P P E A R A N C E S:

     SETH B. KOSTO, ESQ. and STEPHEN E. FRANK, ESQ.,
Assistant United States Attorneys, Office of the United States
Attorney, 1 Courthouse Way, Room 9200, Boston, Massachusetts,
02210, for the Plaintiff.

     MAKSIM NEMTSEV, ESQ., 20 Park Plaza, Suite 1000,
Boston, Massachusetts, 02116, for the Defendant.

     MARC FERNICH, ESQ., Law Office of Marc Fernich,
800 Third Avenue, Suite Floor 20, New York, New York, 10022,
for the Defendant.

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JEFFREY ZOREK | | | | |
| By Mr. Frank: | 10 | | | |
| By Mr. Fernich: | | 37 | | |
| By Mr. Frank: | | | 82 | |
| By Mr. Fernich: | | | | 90 |

| EXHIBITS | RECEIVED IN EVIDENCE |
|---|---|
| 156 | 32 |
| 70A | 47 |
| 327A, 328A | 75 |

<u>P R O C E E D I N G S</u>

1

2      THE COURT:  Good morning.  We're still missing one

3  juror, but I hope you got my e-mail last night.  Because of the

4  freezing temperatures, what I was hoping to do was just take

5  the gentleman from out of town, get him home, and then send

6  everyone home.  Is that an acceptable way of proceeding?

7      MR. NEMTSEV:  Yes, your Honor.

8      MR. FRANK:  Yes, your Honor.

9      THE COURT:  And the agent is from around here, right?

08:53 10      MR. FRANK:  No, but he's here.

11      MR. FERNICH:  Well, Judge, it might be an acceptable

12  way of proceeding, and that's why I have the issue that I

13  wanted to raise.

14      THE COURT:  Say it --

15      MR. FERNICH:  Sorry.  It might be an acceptable way of

16  proceeding, and that relates to the issue that I wanted to

17  raise before we started.

18      THE COURT:  Okay.

19      MR. FERNICH:  The centerpiece of the upcoming

08:53 20  witness's testimony is a one-hour and 41-minute conference call

21  recording between this witness, Zorek, and other employees of

22  Saxo Bank, on the one hand, and our client and Mr. Rumiantcev,

23  on the other hand.  And my understanding is that the government

24  seeks to proceed by going straight to the latter 45 minutes of

25  the conversation and introducing snippets of those latter

1    portions, and we object to that as misleading and inappropriate.

2    Basically, the way the conversation unfolded is in two halves.

3    The first half of the conversation largely to requests for

4    enhanced banking services that Mr. Klyushin and Rumiantcev were

5    seeking, and, by design, as the text of the conversation makes

6    clear, the bank also had some concerns about their --

7         THE COURT:  Well, why can't -- let me put it this way:

8    Are you putting in the whole conversation?

9         MR. FRANK:  We're going to introduce the entire

08:54 10    recording, and then we're going to ask him to summarize what

11    happened in the first part and play some excerpts from the

12    second part, but the jury will have the entire recording.

13         THE COURT:  Well, in yours, you can play the first

14    half if you want.

15         MR. FERNICH:  That's fine, as long as we're

16    entitled --

17         THE COURT:  What are we talking about time-wise?  I'm

18    trying to -- I'm worried a little bit about the plunging

19    temperatures.  That's my only concern.

08:55 20         MR. FERNICH:  He won't be here when we play the other

21    half, for us to question him about it.  I have questions about

22    it.

23         THE COURT:  No, no, no.  Why can't you put it in as

24    part of your cross?

25         MR. FRANK:  It will be in evidence.

1              MR. FERNICH:  I can, but I don't think we're going to

2      get done.  I want to accommodate this witness, who I'm told is

3      a recent retiree and lives in Florida, but on the other hand,

4      you know, we --

5              THE COURT:  Oh, it sounds lovely.

6              MR. FERNICH:  It sure does, and your Honor knows that

7      better than anybody else.  So, honestly, I do want to

8      accommodate the man and not inconvenience him or his counsel,

9      but --

08:55 10              THE COURT:  I understand.

11              So how long do you think your examination will be?

12              MR. FRANK:  Less than an hour.

13              THE COURT:  All right, and so if he goes -- let's

14      assume we get the witness on time.

15              MR. FERNICH:  Yeah.

16              THE COURT:  I said that wrong.  The last juror on time

17      and --

18              What?

19              THE CLERK:  She's here.

08:56 20              THE COURT:  She's here.  Let's go.

21              MR. FERNICH:  Let's start it and see what happens.

22              THE COURT:  We're going to try and just finish this,

23      and then maybe you don't have to play every last second, and

24      then you can -- and then as soon as the witness is over, we'll

25      send them home, so we won't -- we'll get him on a plane home

1    and we'll -- but you're to some extent controlling this because

2    yesterday you went much longer than expected.

3          MR. FRANK:  That's true.  I anticipate this will be

4    less than an hour.  It's an hour and 40-minute recording, but

5    much of it is in Russian, so we're just playing the parts that

6    the witness actually understood because he doesn't speak

7    Russian.

8          MR. FERNICH:  Well, obviously the demeanor of the

9    declarants is quite important.  I mean, this is an important

08:56 10    piece of evidence because it's the only time the jury will hear

11    directly from Mr. Klyushin, in all likelihood.

12          THE COURT:  So is your interpreter going to be

13    interpreting it if it's in Russian?

14          MR. FERNICH:  Well, there is interpretation going on

15    throughout the tape.  And to be perfectly candid with the

16    Court, because it's partly in Russian, I'm dealing with the

17    transcript.  That's how I've been dealing with it so that I can

18    understand it.  But there are two Russian speakers on the phone

19    during the conversation that are contemporaneously interpreting

08:57 20    what Misters Klyushin and Rumiantcev are telling --

21          THE COURT:  And the gentleman from Saxo, he speaks

22    English, right?

23          MR. FRANK:  Correct.  So we have two transcripts.

24          THE COURT:  He's not -- what is it -- he's from

25    Denmark?  No.  He's American?

1          MR. FRANK:  He's American.  We prepared two

2     transcripts -- well, we prepared a transcript, but this witness

3     has only -- one with the Russian portions totally translated,

4     which he didn't understand, and one with those portions, the

5     translations redacted --

6          THE COURT:  What I'd like to have happen is, you go

7     from 9:00 to 10:00, and you go from 10:00 to roughly 11:30-ish.

8          MR. FERNICH:  I'll be done in that time frame.

9          THE COURT:  And then we're going to say "good-bye" to

08:57 10   this jury and come back because it's going to go really bad

11     really fast, so --

12          MR. FERNICH:  Understood.

13          THE COURT:  And I want to get you all home, and I want

14     to get Mr. Klyushin and the Marshal Service back.  So let's

15     bring them in.  And there's another issue that was briefed.  I

16     did read it, but let's not take the time now to argue it.  And

17     also I will be handing to you a draft jury instructions and a

18     verdict form, which is my first rough stab at it, just in case

19     you have nothing to do this weekend.

08:58 20        MR. FRANK:  I was going to go to the beach, but --

21          MR. FERNICH:  Another Polar Bear Plunge award.

22          THE COURT:  Can I say, the biggest problem I have with

23     the jury instructions was they were all so wordy, so I kept

24     trying to parse them down a little, but read them carefully to

25     see if I can -- I mean, like, some of them just didn't even

apply; they were form instructions.  I've tried to pare it down

some, but make sure I didn't drop anything that you think is

important, or maybe I can drop more.

MR. FERNICH:  Yeah, they look like they were written

in 17th century English half the time.

THE COURT:  I agree with that.

(Discussion between the Court and Clerk.)

THE CLERK:  All rise for the jury.

(Jury enters the courtroom.)

08:59  THE COURT:  Good morning to everyone.

THE JURY:  Good morning.

THE COURT:  It's not so bad yet.  So after we left,

the Boston Schools announced no school.  Many of the other

communities have not announced that, but, nonetheless, what

we're going to do is take witnesses out of order.  We're taking

the agent that you were listening to off the stand, and there's

one gentleman who's retired and is here from out of town, and I

didn't want to make him come back again.  We're going to do

him, and when we're done with him, we're going to send everyone

09:00  home.  That's how we're going to handle it, so it will

hopefully be a shorter day today.  And if worst comes to worst,

I'll send you home anyway because I don't want anyone to be in

danger from the freezing cold.  So as I saw the weather, it's

supposed to start plunging this afternoon, so I'm hoping to get

you out of here as soon as possible.  Okay, let's go.

```
 1              MR. FRANK:  Thank you, your Honor.  The government
 2    calls Jeffrey Zorek.
 3                        JEFFREY ZOREK
 4    having been first duly sworn, was examined and testified as
 5    follows:
 6              THE CLERK:  If you could spell and state your last
 7    name for the record.
 8              THE WITNESS:  Zorek, Z-o-r-e-k.
 9    DIRECT EXAMINATION BY MR. FRANK:
09:01 10   Q.   Good morning, Mr. Zorek.
11              MR. FRANK:  Your Honor, when we get to the recording
12    portion of the call, we have transcript binders for the Court
13    and for the jury.
14              THE COURT:  Fine.
15              MR. FRANK:  Should I introduce those now?
16              THE COURT:  Whenever you desire.
17              MR. FRANK:  Okay.  Thank you, your Honor.
18   Q.   Good morning, Mr. Zorek.  Where do you live?
19   A.   In Sarasota, Florida.
09:01 20   Q.   And how long have you lived in Sarasota?
21   A.   About a month and a half.
22   Q.   Where did you live before that?
23   A.   In Hellerup, Denmark.
24   Q.   I think you're going to have to spell that for the court
25    reporter.
```

```
 1   A.   Okay, sure.  H-e-l-l-e-r-u-p.

 2   Q.   Are you currently employed?

 3   A.   No, I'm not.  I'm retired.

 4   Q.   Prior to moving to Florida from Denmark, were you

 5   employed?

 6   A.   Yes, I was.

 7   Q.   Where did you work?

 8   A.   I worked at Saxo Bank.

 9   Q.   And could you tell us, what is Saxo Bank?

10   A.   Saxo Bank is an online brokerage platform with a European

11   banking license.

12   Q.   And I want to direct your attention to early 2020,

13   specifically April of 2020, if you could have that time period

14   in mind.  Were you employed by Saxo Bank at that time?

15   A.   Yes, I was.

16   Q.   Why are you here today?

17   A.   I'm here by subpoena.

18   Q.   What was your job at Saxo Bank?

19   A.   I had dual roles.  The first role was to act as an advisor

20   on the creation of commercial products, financing products for

21   the firm, and the second was to act as a resource to the firm

22   on financial and non-financial risks.

23   Q.   Primarily an advisory role?

24   A.   Primarily in providing, you know, information and guidance

25   based on experience.
```

1   Q.   Did you typically talk to clients in your role?

2   A.   I did not talk to retail clients.

3   Q.   And did you have operational responsibilities?

4   A.   No, I did not.

5   Q.   How long were you at the bank in that role?

6   A.   Six years.

7   Q.   Could you tell us how far you went in school.

8   A.   I received a master's in business administration, so a BA,

9   and then a master's in business administration.

09:03 10   Q.   Where were those from?

11   A.   The BA was from Wesleyan University in Connecticut, and

12   the master's was University of Pennsylvania's Wharton School.

13   Q.   What did you do between the time you graduated from

14   Wharton and went to work for Saxo Bank?

15   A.   I worked for several investment banks, including Goldman

16   Sachs, Lehman Brothers and Nomura International.

17   Q.   Now, you mentioned that Saxo is an online brokerage firm.

18   What companies would we be familiar with in the United States

19   that it's comparable to?

09:03 20   A.   Similarities to E-Trade, Interactive Brokers, Charles

21   Schwab.

22   Q.   Roughly how many clients did it have in the 2020 time

23   period?

24   A.   I believe it was about 500,000.

25   Q.   And were those mostly individuals or companies?

1    A.    Mostly individuals.

2    Q.    Where were they from?

3    A.    Their clients were resident globally with the exception of

4    the United States.

5    Q.    No clients in the United States?

6    A.    No.

7    Q.    Why not?

8    A.    The firm made a strategic decision not to make the U.S.

9    client base a priority.

09:04  10    Q.    Are you familiar with a product called SaxoTraderGO?

11    A.    SaxoTraderGO is the online platform that clients use to

12    access the markets.

13    Q.    So you could have it on your phone, for example?

14    A.    Yes.

15    Q.    And you could trade from it?

16    A.    Yes.

17    Q.    Are you familiar with a Saxo client by the name of

18    Vladislav Klyushin?

19    A.    Yes.

09:04  20    Q.    Have you ever met him face to face?

21    A.    No, I have not.

22    Q.    Do you know what he looks like?

23    A.    No.

24    Q.    I want to direct your attention to April 24, 2020.  Do you

25    recall having a conference call with Mr. Klyushin and others on

1    that date?

2    A.    Yes.

3    Q.    Who was on the call?

4    A.    From the Saxo side, it was myself, Vitali Butbaev, who was

5    the head of the Prague office that covered the region.

6    Q.    Could you spell that name, please.

7    A.    B-u-t-b-a-e-v, I believe it is.

8    Q.    Okay.

9    A.    And Sergiy Koval, K-o-v-a-l, I think, who was a

09:05 10   relationship manager on the account.

11   Q.    So Mr. Koval and Mr. Butbaev were both employees of Saxo?

12   A.    Correct.

13   Q.    And who was on the call?

14   A.    From the client's side, I was introduced to Mr. Klyushin

15   and Mr. Rumiantcev.

16   Q.    And had you previously spoken to or met with Mr. Rumiantcev?

17   A.    No.

18   Q.    What was the reason for the call?

19   A.    I was asked to join the call to get more information about

09:06 20   the client's trading strategies resulting from a number of

21   suspicious transactions that our compliance department had

22   highlighted.

23         MR. FERNICH:  Objection.

24         THE COURT:  Yes, I'll sustain that.  Why don't you ask

25   a different way.  I strike it.

1   Q.   There were some transactions that you were notified about

2   by your compliance department?

3   A.   A pattern of transactions.

4   Q.   What was the reason, in the wake of those transactions,

5   what was it about those transactions specifically that caused

6   the bank to want to have a call?

7            MR. FERNICH:   Objection.

8            THE COURT:   I'll ask -- he can answer, but what

9   concerned you?

09:06 10           THE WITNESS:   So the transactions yielded very high

11   profits in a very short period of time coincident with the --

12   with earnings releases, so companies announcing their earnings

13   coming out.

14   Q.   What was your role in the call?

15   A.   So my role was acting as a conduit for that information to

16   Saxo management.

17   Q.   Did you have any decision-making role?

18   A.   No.

19   Q.   Prior to the call, are you aware of whether the bank did

09:07 20   anything else because of those transactions?

21            MR. FERNICH:   Objection.

22            THE COURT:   Well, I'll allow with respect to anything

23   that you personally were involved with.  Did you do anything

24   else in connection with that information?

25            THE WITNESS:   I'm sorry.  That I'm aware of or that --

```
 1              THE COURT:  No.  That you were involved in.
 2              THE WITNESS:  No.
 3              THE COURT:  All right.
 4    Q.    Did you understand everything that was said on the call?
 5    A.    Uhm, not everything.
 6    Q.    Why not?
 7    A.    A part of the call was in Russian, and I don't speak
 8    Russian.
 9    Q.    Did you have an understanding of whether the other Saxo
10    Bank employees on the call, Mr. Koval and Mr. Butbaev, spoke
11    Russian?
12    A.    They did speak Russian.
13    Q.    So of all the people on the call, you were the only one
14    who didn't speak Russian?
15    A.    That's correct.
16    Q.    Who translated for you?
17    A.    Mr. Butbaev and Mr. Koval.
18    Q.    And prior to coming here today, have you had a chance to
19    review the call?
20    A.    Yes.
21    Q.    Have you reviewed the transcript of the call?
22    A.    Yes.
23    Q.    Was the transcript that you reviewed with the Russian
24    parts translated or just the English parts?
25    A.    Just the English parts.  The Russian parts were redacted.
```

| | |
|---|---|
| 1 | Q.   Approximately how long was the call, if you remember? |
| 2 | A.   About an hour and 40 minutes, I think. |
| 3 | Q.   Generally speaking, what happened on the call? |
| 4 | A.   We covered two areas.  So the first part was addressing -- |
| 5 | MR. FERNICH:  Objection. |
| 6 | THE COURT:  Overruled.  Just the general area. |
| 7 | A.   So two parts.  One was to respond to three requests that |
| 8 | the client had for enhancements on the product offering that |
| 9 | weren't standard to what we normally offer to retail clients, |
| 09:09 10 | and the other part was to ask more questions around the |
| 11 | strategy. |
| 12 | Q.   Around whose strategy? |
| 13 | A.   Around -- I'm sorry.  Around the client's strategy in |
| 14 | understanding -- this is like from what we discussed earlier -- |
| 15 | the use of suspicious transactions. |
| 16 | MR. FERNICH:  Objection. |
| 17 | THE COURT:  Overruled.  I'll just allow that as to his |
| 18 | concern, his state of mind. |
| 19 | Q.   And why did you want to understand the client's strategy? |
| 09:10 20 | A.   The firm has an obligation to know its clients, a KYC |
| 21 | obligation. |
| 22 | Q.   KYC refers to "know your client"? |
| 23 | A.   Correct. |
| 24 | Q.   What were the requests that the client had that you |
| 25 | discuss in the first part of the call? |

A.   There were three.  The first, Mr. Rumiantcev, who already

had a power of attorney on Mr. Klyushin's account, had

requested to also have power of attorney on two other

individuals.

Q.   And did you have an understanding of who those individuals

were?

A.   I was given the names.  I don't remember them.

Q.   Did you have an understanding of how, if at all, they were

related to Mr. Klyushin?

A.   Not exactly, no.

Q.   What were the other requests?

A.   The second request was.  The client requested the ability

to trade after normal market hours, so after the stock market

closes, to be able to trade on other trading venues that were

still open.

Q.   Well, does Saxo Bank offer its clients the ability to

trade after the market closes?

A.   In general, no.

Q.   What was the third request?

A.   The third request was to be able to increase the position

sizes that they took.

Q.   And what was your understanding of why?

A.   I guess so the positions -- they wanted to take bigger

positions where they had more conviction.

Q.   Were you able to resolve those issues on the call?

     1   A.    No.  We took the information down and, you know, left the

     2   call with follow-ups.

     3   Q.    And then in the second part of the call, you asked some

     4   questions and received some answers?

     5   A.    Correct.

     6          MR. FRANK:  We'd now like to offer Exhibit 70, which

     7   is the call, the recording of the entire call.

     8          And, your Honor, if I may distribute the transcripts.

     9   Thank you.

09:12 10          THE COURT:  You have one for me too?

    11          MR. FRANK:  Yes, I do.

    12          (Pause.)

    13          THE COURT:  We will be collecting these afterwards, so

    14   if you want to take notes, take it in your notebook.  But there

    15   will be a copy that comes with you into the jury room, so you

    16   don't have to get a word-for-word copy of it.  We'll have one

    17   copy in the jury room.

    18          MR. FRANK:  Your Honor, I'll just note for the record

    19   there are two tabs in the binder.  Tab A is the unredacted call

09:13 20   with the Russian portions translated, but right now, to begin

    21   with, we're going to turn to Tab B which has the Russian

    22   portions redacted.

    23          And if I could just ask you, Mr. Zorek and the members

    24   of the jury, to turn to Page 33 at Tab B.  Is everyone on

    25   Page 33?  Okay.  We're going to begin at 1:06:39 seconds.

```
 1              (Audio played.)
 2              THE COURT:  Wait.  What page are we on?
 3              MR. FRANK:  We're on Page 33 of Tab B.
 4              THE COURT:  Are you all there?  Okay.  All right, go
 5       ahead.
 6              (Audio played.)
 7       Q.   Okay, we're just going to stop it there for a moment,
 8       Mr. Zorek, just to orient everyone, if you turn to Page 33,
 9       there are initials right at the first section of the call
09:17 10       10:06:39 that we listened to.  VB, that's Mr. Butbaev?
11       A.   Correct.
12       Q.   And he works for --
13              THE COURT:  Well, it's hard to hear his name when you
14       said it, so how do you spell that?
15              MR. FRANK:  B-u-t-b-a-e-v.
16       Q.   And he's an employee of the bank?
17       A.   Yes, he is.
18       Q.   What is his role?
19       A.   He is the CEO of the Prague office.
09:17 20       Q.   Of the Prague office?
21       A.   Yes.
22       Q.   And then JZ, that's you?
23       A.   Yes.
24       Q.   Okay, then if we turn to the next page, NR, that's
25       Mr. Rumiantcev?
```

1    A.    Rumiantcev.

2    Q.    Okay.  And then SK, that's Sergiy Koval, K-o-v-a-l?

3    A.    Correct.

4    Q.    And who is he?

5    A.    He's the relationship manager on the account for Saxo.

6    Q.    So in this snippet that we just listened to, we haven't

7    heard yet from Mr. Klyushin?

8    A.    No.

9    Q.    And if I could direct your attention to the line in the

09:17 10   middle of Page 34, at 01:08:07 Mr. Rumiantcev says, "We use CFD

11   and shares," and I'd just like to ask if you could tell the

12   jury, "shares" refers to what?

13   A.    Stocks.

14   Q.    Okay.  And what are CFDs?

15   A.    CFDs are contract for differences.  They're financial

16   instruments that allow the client to mirror the performance of

17   the underlying stock, using leverage at the same time.

18   Q.    And what is leverage?

19   A.    Leverage is whereby Saxo would lend some portion of the

09:18 20   purchase price or the notional amount to the client.

21   Q.    And so you can take a bigger position with less money?

22          MR. FERNICH:  Objection.

23          THE COURT:  Overruled.

24   A.    Yes.

25          THE COURT:  Well, is that the same as shorting?

```
 1              THE WITNESS:  No.  No, it isn't.
 2    Q.   Can you use CFDs to short?
 3    A.   Yes, you can.
 4    Q.   And --
 5              THE COURT:  Could you explain how that works?
 6              THE WITNESS:  Sure.  So the CFD can be used for a long
 7    or for a short.  You know, you have the leverage that allows
 8    you to buy the performance on a stock or to sell the
 9    performance on a stock, so the benefit of the stock goes down.
10    And CFD can apply to either --
11              MR. FERNICH:  Judge, the objection to this is 702, for
12    the record.  I understand why --
13              THE COURT:  Overruled.  All right, thank you.  Did you
14    finish your answer?
15              THE WITNESS:  Yes.
16    Q.   So you can bet on a stock going down even if you don't own
17    the stock?
18    A.   That's correct.
19    Q.   And that's shorting?
20    A.   Yes.
21    Q.   And how do you, just if you could in a sentence, how do
22    you bet on a stock going down if you don't own it?
23    A.   You would put an order to sell the CFD, and the broker
24    who's executing whatever the hedge is to that CFD would need to
25    be able to first borrow the stock from someone else to be able
```

1   to deliver it to the buyer.

2   Q.   So you're borrowing the stock and selling it essentially,

3   not in the context of a CFD but --

4        THE COURT:   No.   Let him say it.   He's the guy who

5   does this.   So how does it work to those of us who didn't go to

6   Wharton, all right?

7        THE WITNESS:   The client placed a CFD order with us to

8   sell.   We place that order to a broker/dealer who would have

9   been in the U.S., to trade in the U.S.   They would have needed

09:20 10   to be able to borrow the shares to be able to give it to

11   whoever bought it in the U.S., and so the first thing is to

12   check to make sure you can borrow those shares.   So ultimately

13   the borrow is performed by whoever is actually selling the

14   physical shares.

15   Q.   And once you borrow the shares -- and we don't need to

16   talk about it in the context of a CFD, just shorting

17   generally -- once you borrow the shares, what do you do with

18   them when you're shorting?

19   A.   I'm sorry.   Can you clarify the question?

09:21 20   Q.   If somebody wants to short a stock, they borrow the

21   shares, and what do they do with them?

22   A.   So if you're shorting the shares, you're then delivering

23   the shares to the buyer of the shares.

24   Q.   And what happens next?   Do you sell the stock at that

25   point?

A.   You identify that you can borrow the shares, so that's

locating it.  Then you go sell the shares, and then the

delivery of the settlement two days later of those shares is

done with the stock that you've borrowed.

Q.   Okay.  And then how do you make money on a short?

A.   You would benefit if the stock went down.

Q.   Then buy it back and give it back?

          MR. FERNICH:  Objection.

          THE COURT:  Is that accurate?

          THE WITNESS:  Yes.

          THE COURT:  Could you just do a quick math.  How would

it work?  You borrow a share for -- you borrow it and it's

worth $10.

          THE WITNESS:  It's worth $10, one share.  If you

bought it back at $5, you would get $5 of profit.

Q.   Okay.  So here you're talking, and Mr. Rumiantcev says,

"We use CFDs and shares," and then he says, "Our company

specialized on the development, applications, analyzing

information, open --" and then there's some back-and-forth --

"open sources."

     Do you see that?

A.   Yes.

Q.   What is your understanding of what "open sources" refers

to?

A.   Open sources is information that's publicly available.

1   Q.   If we could resume at the top of Page 35, at 01:08:54.

2        (Audio played.)

3   Q.   Okay, we're just going to stop it there for a moment, and,

4   Mr. Zorek, if I could direct you to Page 35.  In the middle of

5   the page at 01:09:41 seconds, Mr. Rumiantcev refers to mass

6   media, he refers to social media, he refers to information in

7   investment sites, he refers to consensus earnings estimates;

8   and then he says, about five lines up from the bottom of that

9   paragraph, "Our system will create recommendations to buy or

09:30 10  sell some shares, and we have a financial analyst who sees mass

11  media or social media context and sees recommendations of our

12  system, and makes decisions to buy or sell some shares."

13       Do you see that?

14  A.   Yes.

15  Q.   When Mr. Rumiantcev told you that their system makes

16  recommendations to buy or sell shares and they have a financial

17  analyst who then makes decisions based on those recommendations,

18  what was your understanding of what he was telling you?

19  A.   He was telling me that they had a system that aggregated

09:30 20  data from a number of sources, applied some kind of a potential

21  secret sauce or some algorithm to it, came out with

22  recommendations that would say you need to buy or sell a

23  certain security, and that recommendation was then handed to

24  the analyst for further action.

25  Q.   Thank you.  And if we turn to Page 36, you can see at

1    01:11:19, Mr. Rumiantcev gives you an example in response to

2    your question, and about four lines down he says -- he's

3    talking about Tesla earnings, and he says, "After that one,

4    maybe one hour, it will be deleted from investing.com, but mass

5    media and social media have publications about it, and after

6    this publication, Tesla is to grow up on 20 percent in this

7    day."

8        What was your understanding of what he was telling you

9    about information that was published but then deleted after one

09:32 10    hour?

11   A.   Is that information that was published could have an

12   impact on the stock price, even though subsequently it may have

13   been deleted.

14   Q.   And then at the bottom of that page, at 01:13:42, you said

15   sort of toward the end of that first line, "Do you have any

16   filters?  Do you have any concerns about how you handle what

17   could be material nonpublic information?"

18       Why did you ask that question?

19   A.   If you have a systematic process of doing this analysis,

09:32 20   my question was driven as to whether there was a compliance

21   module so there was something on top that kind of was an extra

22   filter to, if possible, insure that you didn't trade on any

23   material nonpublic information.

24   Q.   On Page 37, you see there's a lot of redactions for the

25   Russian.  Do you see that Mr. Klyushin is speaking at the

1   bottom of that page?

2   A.   Yes.

3   Q.   And then if you flip the page, you see there's more from

4   Mr. Klyushin that's been redacted in Russian?

5   A.   Yes.

6   Q.   We're going to pick up after that on Page 38, at 01:17:54

7   with Mr. Butbaev.

8        (Audio played.)

9   Q.   All right, we'll just pause it right there for a minute.

09:35 10  If you could look at Page 38, Mr. Zorek, at 01:17:54,

11   Mr. Butbaev translates for Mr. Klyushin, and about four lines

12   down he says at the end of that line, "He reassured us that

13   they are not using any kind of insider information.  They only

14   use the -- what is available in public sources."

15        What did you understand Mr. Klyushin to be relaying to you

16   there?

17   A.   He was affirming that they did not use any inside

18   information in their trades, and only used the public source or

19   open source information in their decision-making.

09:36 20  Q.   And then on the next page at 01:19:06, you follow up with

21   the question, "Does M-13 actually run the fund itself, or does

22   it sell its services to other investors as well?"

23        You can see that Mr. Klyushin responds, and then Mr. Koval

24   at 01:19:50 translates, "They don't attract other state or

25   external client funds, and just last year they had a profit of

$10 million, and Vladislav is the sole owner/shareholder of

this company."

    What did you understand that to mean?

A.   That M-13 was not monetizing their system through

running --

        MR. FERNICH:  Objection.

        THE COURT:  Sustained.  It's not his understanding.

They speak for itself, so --

        MR. FRANK:  Yes, your Honor.

09:37 Q.   If we could flip ahead, we're going to pick up on Page 41

at 01:23:31 with Mr. Butbaev.

        (Audio played.)

Q.   If we could just pause it right there for a moment, at

01:23:31, Mr. Butbaev refers to Preston Software and says,

"They can actually give some access, so we can take a look and

see how it works.  It's not everything what they do but it's

part of."

    Did you know what you were being offered?

A.   This was the first mention of the Preston Software to me,

09:39 so I assumed it was an element of --

        MR. FERNICH:  Objection.

        THE COURT:  Sustained.

Q.   Did you understand yourself to be -- you referred earlier

to "secret sauce."  Did you think the defendant was giving you

his secret sauce?

```
 1   A.    No.
 2   Q.    Could we turn to Page 44, and you see that there's a long
 3   section that's in Russian there, and if you turn back to 43,
 4   you'll see that's Mr. Klyushin speaking?
 5   A.    Yes.
 6   Q.    Okay.  And returning to Page 44 and the translation
 7   beginning at 01:30:28.
 8            (Audio played.)
 9   Q.    Okay, we'll pause it there briefly.  If you look at the
10   top of Page 45, about four lines down, Mr. Butbaev translates,
11   "Vladislav highlighted that their task is not short-term gains,
12   so they want to create this for long-term, rather focus on the
13   long-term performance of the system, rather than short-term
14   quick gains."
15        What did you understand that to mean?
16            MR. NEMTSEV:  Objection.
17            MR. FERNICH:  Objection.
18            THE COURT:  Sustained.
19   Q.    Was that responsive to your question?
20            MR. FERNICH:  Objection.
21            THE COURT:  Sustained.
22   Q.    Did you know what he was talking about?
23            MR. FERNICH:  Objection.
24            THE COURT:  Sustained.
25            MR. FRANK:  Okay, we'll move on.
```

 1  Q.    If we could turn to Page 46, pick up at 01:34:40.

 2        (Audio played.)

 3  Q.    Stop right there for a moment.  At 01:35:07 you say, "You

 4  know, something more, you know, the idea of thinking the longer

 5  term, I can see that for the future, but in general we were

 6  talking about trades that were put on for a day or less, so how

 7  does -- how do we reconcile that because most of the activity

 8  was seen as relatively short-term?"

 9        Why did you ask that question?

09:44 10  A.    The trades that gave rise to my participation in the call

11  were short-term in nature.

12  Q.    And what was the defendant -- what did you understand him

13  to be telling you about?

14        MR. FERNICH:  Objection.

15        THE COURT:  Sustained.

16  Q.    Okay, could we move on to Page 48 at 01:38:18.

17        (Audio played.)

18        MR. FRANK:  Okay, we'll stop it right there, and,

19  Mr. Zorek, you can close your binder.  I'm going to ask you

09:46 20  some other questions.

21        THE COURT:  So you're done with the binder right now?

22        MR. FRANK:  I'm done for the moment, your Honor.

23  Thank you.

24  Q.    What was your reaction to the explanation Mr. Klyushin

25  gave you about his trading strategy?

A.   I thought that the process that was described in terms of

collecting the data, using it algorithmically, and then having

an analyst look at it is plausible.  I think that the

investments -- the color or information on the investment

strategy and its objectives was partial, there was a partial

nature to it.  So he described the strategy of trading around

earnings announcements, but did not talk about any other

strategies that would go part of a long-term strategy.  And

I --

                MR. FERNICH:  Objection.

                THE COURT:  Well, what's the next question?

Q.   Did you have an understanding, based on what he told you,

of how they were so successful on their trading?

                MR. FERNICH:  Objection.

                THE COURT:  Sustained.

Q.   Did it answer your questions that you came into the call

with?

A.   Partially.

Q.   Why do you say "partially"?

A.   I was still trying to reconcile the concept of any

long-term objectives with the pattern of short-term trades that

we had observed.

Q.   Did Mr. Klyushin say anything on the call that you thought

gave the bank a basis to terminate the relationship with him?

A.   So there was no definitive negative information, you know,

1    provided, so no definitive negative information provided.

2    Q.   What happened as a result of the call?

3    A.   The firm continued to do business, did not terminate the

4    relationship with Mr. Klyushin.

5    Q.   Were you involved in making that decision?

6    A.   No.

7    Q.   Following the call, did there come a time when Saxo was

8    offered more information about the Preston technology that the

9    defendant referenced?

09:48 10    A.   Yes.

11    Q.   Tell us about that.

12    A.   An e-mail was sent via one of our relationship managers

13    that included a log-in to the demo application of Preston.

14         MR. FRANK:   At this point, the government would offer

15    Exhibit 156.

16         MR. NEMTSEV:   No objection.

17         MR. FERNICH:   No objection.

18         (Exhibit 156 received in evidence.)

19    Q.   Do you recognize Exhibit 156?

09:48 20    A.   I'm sorry.  What's on the screen?

21    Q.   Yes.

22    A.   Yes.

23    Q.   What is it?

24    A.   It's an e-mail from Edgars Kuplais, who's a relationship

25    manager at Saxo, to myself, Mr. Butbaev, and a number of other

1    people.

2         MR. FRANK:  And, Ms. Lewis, if you could take us to

3    the very bottom of the chain.

4    Q.   You see that the e-mail chain starts with an e-mail from

5    Mr. Butbaev to Mr. Kuplais on June 10, 2020.  So those are both

6    Saxo employees, correct?

7    A.   Correct.

8    Q.   He writes, "Edgars:  It would be good to make introduction

9    call and follow up on some of the points from the call."

09:49 10        The first bullet is, "We would like/accept Klyushin offer

11   and take a look at the demo (Preston?)."

12        And the second bullet is, "We would like to ask if there

13   is a write-up of what this software does."

14         MR. FRANK:  And, Ms. Lewis, if you could scroll up

15   slowly.

16   Q.   You can see there's a series of follow-up e-mails

17   internally, and then it results in an e-mail to you from

18   Mr. Kuplais that we were just looking at.  He says, "Hi, the

19   client has provided demo access to Preston app.  It is

09:50 20   available via Apple Store, and there is a link, username, and

21   password.  It is beta version of the app, can be tested on up

22   to ten devices.  Demo access was provided for two weeks until

23   22/7.  From what I can see, it is configured purely to provide

24   an access to social and mass media publications in regards to

25   Tesla in realtime.  The application can be set up based on any

1  keywords or stocks.  Also, I was added to three test chat

2  groups in Telegram:  Tesla mass media, Tesla Telegram, Tesla

3  social media.  I have attached samples (Word docs) with

4  publications from yesterday.  Information available via Preston

5  app basically provides the same information but with more

6  user-friendly interfaces.  And I assume the full version allows

7  to filter by any keyword.  Please see screenshots attached." --

8          And if you see there, there is what appears to be a

9  screenshot to the right with some links, the last three of

09:51 10  which are "Tesla mass media, Tesla social media, and Tesla

11  Telegram."  Do you see that?

12  A.   Yes.

13  Q.   Based on what you were told about the app, did you have an

14  understanding of whether it actually explained the defendant's

15  investment success?

16          MR. FERNICH:  Objection.

17          THE COURT:  Overruled.  You need to lay a foundation.

18  Q.   Well, did you review this e-mail?

19  A.   Yes.

09:51 20  Q.   Okay.  Based on this email --

21          THE COURT:  Did you look at the app?  Did you go into

22  it?

23          THE WITNESS:  So I do not recall if I logged in or

24  not.

25  Q.   But you received this email describing it to you?

        1    A.    From Mr. Kuplais.

        2    Q.    And did you have an understanding of whether it explained

        3    his investment success?

        4          MR. FERNICH:  Objection.

        5          THE COURT:  Sustained.

        6    Q.    Did you see anything in the e-mail about how the app

        7    advised on making trading decisions?

        8          MR. FERNICH:  Objection.

        9          THE COURT:  Sustained.

09:52  10    Q.    Did you ultimately pursue the app any further?

       11    A.    Personally, no.

       12    Q.    Did the bank, to your knowledge?

       13    A.    No.

       14    Q.    Did you have any further involvement with this client

       15    after the call?

       16    A.    No.

       17    Q.    Did there come a time when the bank stopped doing business

       18    with the defendant?

       19    A.    Yes.

09:52  20    Q.    When was that?

       21    A.    Uhm, it was in mid to late 2021.

       22    Q.    Do you recall why that happened?

       23    A.    So after the call, the client was placed on enhanced

       24    ongoing due diligence, which would then call for the firm to

       25    periodically look at the client and, you know, at some point

1    make a decision whether they wanted to terminate the

2    relationship.  And they did it later; I think it was some

3    period after his arrest.

4    Q.   Did you have any further involvement, though, after this

5    call?

6              MR. FERNICH:  Objection, asked and answered.

7              THE COURT:  Well, no.  After this --

8              MR. FRANK:  Call.

9              THE COURT:  Which call?

09:53 10              MR. FRANK:  The one that we just listened to.

11              THE COURT:  All right.

12    A.   I did not have any further involvement with the client.

13              MR. FRANK:  Thank you.  No further questions.

14              THE COURT:  So you want them to keep the binder,

15    right, Mr. Fernich?

16              MR. FERNICH:  Yes.  We're going to use 70A, the full

17    unredacted version.

18              MR. FRANK:  I don't object generally to 70A, your

19    Honor, but I do object to it with this witness, who didn't

09:53 20    understand the redacted portion.

21              THE COURT:  Well, let me hear it.  I can't deal with

22    it right now.  I don't know what we're talking about right now.

23              MR. FRANK:  We're talking about the --

24              THE COURT:  I can't deal with it.  Let's get going,

25    and then as I see it, I'll know how to rule.

```
 1              Were you involved in the first part of this
 2    conversation?
 3              THE WITNESS:  Uhm, no, because I don't speak Russian.
 4              THE COURT:  So this was --
 5              THE WITNESS:  I don't speak Russian, so I didn't
 6    understand what was being said.
 7              THE COURT:  Well, you may need to lay a foundation for
 8    this then.
 9              MR. FERNICH:  I will.
09:54 10   CROSS-EXAMINATION BY MR. FERNICH:
11    Q.   Good morning, Mr. Zorek.  My name is Fernich.  I'm a
12    lawyer for Vlad Klyushin.  We don't know each other, do we,
13    sir?
14    A.   No, we didn't.
15    Q.   We've never met or spoken?
16    A.   No, we haven't.
17    Q.   You spoke with the government by video back in September
18    of last year; is that correct?
19    A.   That's correct.
09:55 20   Q.   And you spoke with the government again just a couple of
21    weeks ago?
22    A.   Yes.
23    Q.   Around January 13?
24    A.   I believe that's the date.
25    Q.   Have you spoken with the government again since that time?
```

```
 1    A.    Yes.
 2    Q.    And these prosecutors, Mr. Frank and Mr. Kosto, they
 3    participated in all those conversations, correct?
 4    A.    Yes.
 5    Q.    And an FBI agent?
 6    A.    Yes.
 7    Q.    David Hitchcock?
 8    A.    I don't know which agent.
 9    Q.    Fair enough.  And in all the conversations, the prosecutors
10    asked you some questions, and you gave them some answers?
11    A.    Correct.
12    Q.    And that was to prepare for your testimony here today,
13    correct?
14    A.    Correct.
15    Q.    Now, you told us on direct, sir, that you started working
16    at Saxo in around 2015; is that right?
17    A.    '16.
18    Q.    '16.
19    A.    Yeah.
20    Q.    So you spent roughly seven or eight years there, correct?
21    A.    Six years.
22    Q.    Six, sorry.  Math isn't as good without the Wharton
23    degree.  You retired a couple months ago, correct?
24    A.    Yes.
25    Q.    And that was in November of '22, last year, right?
```

A.    Correct.

Q.    Congratulations.  Enjoy it, and I'm looking forward to joining you.  Before Saxo, you spent some 30-35 years on Wall Street; is that right?

A.    That's correct.

Q.    And I got a little bit out of order.  You went to Wharton as well.  Yes?

A.    Yes.

Q.    And you worked at Goldman Sachs?

A.    Yes.

Q.    Lehman Brothers?

A.    Yes.

Q.    Barclays?

A.    Yes.

Q.    Basically the kind of banks and investment banks that were too big to fail.  Fair to say?

        MR. FRANK:  Objection.

        THE COURT:  Sustained.

Q.    By the way, have you ever testified in court before, sir?

A.    No.

Q.    Okay.  Turning to the years, let's say 2019 through 2020, you told us on direct -- let me see if I got this right -- that Saxo had about 500,000 clients back then?  Do I have that right?

A.    I think that's about right.

1 Q.   Half a million clients.  And its clients included

2 individuals with a few thousand dollars?

3 A.   Correct.

4 Q.   And traders with more experience?  Yes?

5 A.   Yes.

6 Q.   And also some high-net-worth individuals?

7 A.   Yes.

8 Q.   In April 2020 -- this is just to get us where we need to

9 go -- you testified on direct that you participated in a

09:57 10 conference call with Vlad and Nikolai Rumiantcev; is that

11 correct?

12 A.   That's correct.

13 Q.   And the excerpts or snippets the prosecutors reviewed with

14 you on direct, those were part of a much lengthier conversation;

15 is that correct?

16 A.   Uhm, including the Russian parts, I suppose.  There was a

17 call, and there were Russian parts I didn't understand, and

18 then the English parts that were here.

19 Q.   And the duration of the entire call, you told us on

09:57 20 direct, was about an hour and 41 minutes; is that correct?  And

21 you heard the name Kolya, Kolya mentioned on direct, k-o-l-y-a?

22 A.   I don't remember.  Sorry.

23         THE COURT:  Why don't you refresh his recollection.

24 Q.   Let's see how we're going to do this.

25         MR. FERNICH:  Tim, can you pull up a word search --

```
  1            THE COURT:  Well, do you remember Mr. Rumiantcev being
  2  called that?
  3            THE WITNESS:  I don't.  It may have been.  I don't
  4  remember.
  5            THE COURT:  He doesn't remember, okay.
  6  Q.   Okay.  If I call him Nikolai, that will work for you?
  7  A.   Yes.
  8  Q.   I'm going to call him Nik for short, okay?
  9  A.   Okay.
 10  Q.   Now, sir, in fact, the call was arranged due to client
 11  requests involving enhancements to Saxo services; isn't that
 12  correct?
 13  A.   Uh-huh.
 14            THE COURT:  Is that "yes"?
 15            THE WITNESS:  Yes.  Sorry.
 16  Q.   And it coincided with what you've describe as monitoring
 17  that flagged Klyushin-associated accounts for potential market
 18  abuse; is that correct?
 19  A.   It -- it was to -- with Mr. Klyushin's account.
 20  Q.   But to be clear, the call was arranged due to client
 21  requests for enhanced services; is that right?
 22  A.   I don't know the ordering of the request for the call.
 23  That would have been done by Mr. Butbaev.
 24  Q.   Okay.  You told us earlier that you spoke with the
 25  prosecutors and an FBI agent back on September 15, 2022?
```

09:58 (line 10)
09:59 (line 20)

```
 1   Correct?
 2   A.   It was early in September.  I don't remember the exact
 3   date.
 4   Q.   And as you sit here today, several months later, you don't
 5   remember everything that was asked of you during that
 6   conversation, do you?
 7   A.   No.
 8   Q.   And you don't remember everything that you said during
 9   that conversation, do you?
10   A.   During the conversation --
11   Q.   The discussion with the prosecutors back in September?
12   A.   No.
13             MR. FERNICH:  May I approach to refresh the witness's
14   recollection, please?
15             THE COURT:  Yes.
16   Q.   Sir, I'm going to show you a document.  You can read
17   whatever you want from it.  Particularly, I'm directing your
18   attention to the highlighted part there.  If you could just
19   read that and anything else that you want to, and when you're
20   done, turn it over and give it back to me.
21             (Witness examining document.)
22   A.   Uh-huh.
23   Q.   Thank you.
24   A.   Sure.
25   Q.   And having reviewed that document, is your recollection
```

  1    refreshed that the April 2020 call was arranged due to client

  2    requests involving enhancements to Saxo services?

  3    A.    Again, I don't know the ordering of what came first.

  4    Q.    Okay, but do you recall, having looked at what I showed

  5    you, making that statement during the September 2022 meeting

  6    with prosecutors?

  7    A.    I genuinely don't remember exactly.

  8    Q.    Okay, fair enough.  Good enough.  Let me ask you

  9    something.  During that meeting, you saw people taking notes?

10:01 10   A.    It was over Zoom, so I did not.

 11    Q.    I'm sorry?  Oh, you couldn't see, I see.  You couldn't see

 12    people's hands and what they were doing?

 13    A.    No.

 14    Q.    Okay.  Did you see the FBI agent over Webex or Zoom or

 15    whatever it was?

 16          MR. FRANK:  Objection, relevance.

 17    Q.    You couldn't see the FBI agent at all?

 18          THE COURT:  Could you?

 19    A.    No, I couldn't.

10:01 20   Q.    How did you know the FBI agent was on the call?

 21    A.    There was a -- you know, you see the avatar, whatever you

 22    want, of the person with the name --

 23    Q.    Okay, and it identified the individual as an FBI agent?

 24    A.    No.  It would have been introduced as an FBI agent at the

 25    beginning.

```
 1   Q.   Somebody said that there was an FBI agent on the call?

 2   A.   Uh-huh.

 3   Q.   Got it.  Thank you.  So at least part of the gist of the

 4   meeting was that Vlad and Nik wanted more or greater services

 5   from the bank, correct?

 6   A.   Yes.

 7   Q.   And that discussion occurred mainly during the first part

 8   of the call; is that right?

 9   A.   That's correct.

10   Q.   They wanted added or extra services?

11   A.   Yes.

12   Q.   They wanted to expand or extend their relationship with

13   the bank?  Fair to say?

14   A.   Yes.

15   Q.   And that's because they wanted to get bigger.  They told

16   you that, right, in words or substance?

17   A.   Uhm, generally speaking, it would be more business

18   specifically.  Yeah, more business.

19   Q.   The goal, in part at least, was to increase deposits.

20   That's what you were told, correct?

21   A.   No.

22   Q.   That's not correct?

23        MR. FERNICH:  Forgive me just a moment, please.

24        (Pause.)

25   Q.   Okay, let's try to lay the foundation for this, okay?
```

1    Now, you told us a bit earlier that there were parts of the

2    conversation in Russian that you could not understand, correct?

3    A.   That's correct.

4    Q.   And parts of the conversation in Russian were translated

5    contemporaneously by Saxo employees, and other parts were not;

6    is that correct?

7    A.   I don't know what was and wasn't translated, but I'm

8    relying on what was translated.

9    Q.   Did the prosecutors review with you, in preparation for

10:04 10   your testimony today, the full unredacted phone call, including

11   the Russian language attributions that were blacked out in the

12   exhibit they showed you?

13   A.   I'm sorry.  Repeat the question.

14   Q.   Did you -- have you ever seen the full transcript,

15   including the Russian stuff in translation?

16   A.   No.

17   Q.   You have not seen it?

18   A.   No, I have not.

19   Q.   They just showed you Exhibit B -- well, I should strike

10:04 20   that.  They just showed you the English version with large

21   blocks blacked out?

22   A.   That's correct.

23   Q.   Just showed you the large blocks blacked out?  When you

24   were sitting there in the meeting, you heard, though,

25   considerable amounts of Russian that were not contemporaneously

1   translated, correct?

2   A.   Yeah.

3   Q.   There were large swarths of that that you couldn't

4   understand?

5   A.   Correct.

6   Q.   Okay.  I'm going to show you right now --

7          MR. FERNICH:  Is A in evidence?

8          MR. FRANK:  I haven't offered it.

9          THE CLERK:  What did you say, A?

10:05 10          THE COURT:  I don't remember.  Did you offer B?

11          MR. FRANK:  I did, your Honor.  Just to clarify, B is

12   the portions that he understood because he spoke English.  A is

13   an FBI translation that he's never seen because he didn't

14   understand those portions.

15          THE COURT:  FBI translation of the entire

16   conversation, or just the first part having to do with enhanced

17   services?

18          MR. FRANK:  A and B are both the full conversation.  B

19   is redacted because that's what he understood.  A contains the

10:06 20   portions he didn't understand.

21          THE COURT:  And so who translated A?

22          MR. FRANK:  The FBI.

23          THE COURT:  All right.  So do you want to move it in?

24          MR. FERNICH:  I offer it.

25          THE COURT:  All right.  A is in.

| | |
|---|---|
| 1 | MR. FRANK:  That's fine, but this witness has never |
| 2 | seen it before. |
| 3 | THE COURT:  All right. |
| 4 | MR. FERNICH:  He's going to see it now. |
| 5 | THE CLERK:  70A, right? |
| 6 | MR. FERNICH:  Yes. |
| 7 | THE CLERK:  Thank you. |
| 8 | (Exhibit 70A received in evidence.) |
| 9 | MR. FERNICH:  May I approach, your Honor? |
| 10:06 10 | Or, Tim, do you want to put it up? |
| 11 | THE COURT:  I think that might be easier just to put |
| 12 | it up. |
| 13 | MR. FERNICH:  Tim, top of Page 44, Exhibit 70A. |
| 14 | THE COURT:  You want us to go where? |
| 15 | MR. FERNICH:  Page 44 -- |
| 16 | THE CLERK:  Is your monitor working, sir? |
| 17 | THE WITNESS:  It's working.  It's a little hard for me |
| 18 | to see.  Is it possible for me to get something in writing that |
| 19 | I can look at closer?  It's better, but I prefer just to have |
| 10:07 20 | something in front of me. |
| 21 | THE COURT:  That's fair.  So get to Page 44 in the |
| 22 | first tab.  Let's let him get oriented and all of you.  Do you |
| 23 | all have it?  Good. |
| 24 | Q.   Sir, are you with me? |
| 25 | A.   Yes, I am. |

```
 1    Q.    Can you read for the jury, please, the first full
 2    sentence -- and if this is not clear, tell me -- the first full
 3    sentence on the top of 44 until the first ellipses.  Do you see
 4    that there beginning with "The most important"?
 5    A.    I'm looking for "The most important --"
 6              THE COURT:  Do you want him to read it to himself or
 7    to the jury?
 8              MR. FERNICH:  He can read it to the jury.
 9              THE COURT:  Okay.
10    A.    And, I'm sorry, how far am I going?
11    Q.    Just by ellipses.
12              THE COURT:  Don't worry about --
13    Q.    Three dots, three dots.  You do the math; I do the
14    grammar, okay?
15    A.    Okay, okay.
16          "The most important part for us is not to be earning today
17    and right now.  Our goal is to advance slowly but steady
18    towards increasing our deposits and to widen our..."
19    Q.    Very good.  So in fact, although you didn't understand it
20    at the time, in fact, presuming the FBI translation is
21    accurate --
22              MR. FRANK:  I object, your Honor.
23              MR. FERNICH:  Well, the FBI translated it.
24              THE COURT:  It's in evidence.  So that's what's --
25    Q.    In fact he explained, Mr. Klyushin did, that their goal
```

1   was to increase our deposits over time; isn't that correct?

2   A.   That's what it says.

3   Q.   And you told us on direct that Vlad and Nik wanted to take

4   larger positions in their trades; isn't that correct?

5   A.   Yes.

6   Q.   And wanted bigger margins from Saxo?

7   A.   They wanted lower margins, more leverage.

8   Q.   Okay, got it.  Thank you.  And they told you that straight

9   up, didn't they?

10   A.   Yes.  That was one of the requests.

11   Q.   They wanted to open short positions all the way to

12   exposure limits.  They told you that directly also, didn't

13   they?

14   A.   I believe they wanted higher exposure limits on more than

15   what the current exposure limits allowed.

16   Q.   Okay, fair enough.  And one of the enhanced services they

17   wanted -- you discussed this on direct -- involved expanding

18   post-market or after-hour trading time; isn't that right?

19   A.   That's correct.

20   Q.   And that request didn't strike you as unusual, did it?

21   A.   No.

22   Q.   To the contrary, you'd heard other requests to extend

23   after-hours trading in your years of experience; isn't that

24   right?

25   A.   That's correct.

1    Q.   And that's because something beyond the press release can

2    cause a knee-jerk reaction in the market after hours; am I

3    right?

4    A.   That's correct.

5    Q.   And another enhanced service Vlad and Nik wanted involved

6    the ability to pre-borrow; isn't that correct?

7    A.   Yes.

8    Q.   Can you tell the jury briefly, very briefly, what

9    pre-borrowing is.

10:10 10   A.   Going back to what I've said earlier, is before you can

11   sell short a security, you need to go to somebody to borrow

12   that security, so you need to check that somebody will lend it

13   to you.  That's called a "pre-borrow."

14   Q.   And that request, the request to pre-borrow, that didn't

15   strike you as unusual either, did it, sir?

16   A.   No.

17   Q.   To the contrary, you told Vlad and Nik that you were

18   familiar with that concept; isn't that so?

19   A.   Yes.

10:10 20   Q.   Now, during the call, Vlad and Nik came right out and

21   said, "We are aware how we and Russia, in general, are

22   perceived in financial investment circles," isn't that right?

23   A.   I'm sorry.  Where does that say that?

24   Q.   Okay.  Line 1 -- you see the time stamps on the side, that

25   the attributions are prefaced by time?  Do you see that, all

1  the way on the left?

2  A.   Yes.

3  Q.   If you go to 122, meaning 01:22:35, please --

4        THE COURT:  We're going backwards.

5        MR. FERNICH:  We're going backwards.  We don't need

6  the video.  Go to Page 41.

7  Q.   Are you with me?

8  A.   Yes.

9  Q.   I won't call it a full sentence because it's kind of a

10:11 10  clause.  Can you read starting from the word "because" to the

11  next three dots.

12  A.   "Because, in we are aware how we and Russia, in general,

13  are perceived..."

14  Q.   And actually he was spot-on about that, wasn't he, sir?

15        MR. FRANK:  Objection.

16  Q.   You don't understand my question?  It's a bad question.

17        THE COURT:  Well, let me just ask you, is that how you

18  perceived Russia?

19        THE WITNESS:  Uhm, I -- I don't speak Russian, so I

10:12 20  don't know.

21  Q.   I'll fix it.  You know that Saxo conducted ongoing due

22  diligence dependent on a client's risk level; isn't that

23  correct?

24  A.   That's correct.

25  Q.   And it determined high risk partly by country of

1   residence?  Yes?

2   A.   Correct.

3   Q.   And Saxo actually did consider Russia to be high risk;

4   isn't that true?

5   A.   Yes.

6   Q.   Possibly because Russia didn't share information with

7   Denmark; is that right?

8   A.   I can't -- I'm not in a position to give an opinion on

9   why.

10:13 10        THE COURT:  Make sure you're talking into the mic.

11        THE WITNESS:  I'm sorry.  I'm not in a position to

12   guess why.

13   Q.   Okay, I'm not asking you to guess, sir.  We don't want you

14   to do that.

15        Going back to this September conversation with the

16   prosecutors, September, I guess 2022 conversation with the

17   prosecutors and the FBI agent, you've already told us, and I

18   don't want to belabor it, that you can't remember, as you sit

19   here today, everything that you were asked and every answer

10:13 20   that you gave at that meeting, can you?

21   A.   No, I cannot.

22        MR. FERNICH:  Okay.  May I approach?

23        THE COURT:  You may.

24   Q.   The same as before.  You can read anything you want in

25   here.  Take all the time you need, but I'm directing you

 1    specifically to one, two, three, four, the fourth full

 2    paragraph, sentence two.

 3              (Witness examining document.)

 4    Q.   When you've taken as much time as you need, give it back

 5    to me.

 6              (Witness examining document.)

 7    Q.   Having reviewed this document, do you remember telling the

 8    prosecutors or the government, as you sit here today, that a

 9    country might be deemed high risk depending if it shares

10:15 10   information with Denmark?

11    A.   Yes, I do, in connection with the rest of the sentence

12    that was there.

13    Q.   That's okay.  You're entitled to expand on it, but the

14    prosecutors --

15              THE COURT:  Anything else about it?

16              THE WITNESS:  Yes.  It's one of the factors that goes

17    into the calculation of whether a client is considered high

18    risk, and there's tax, and there are other considerations as

19    well.

10:15 20             THE COURT:  Thank you.

21    Q.   So, sir, Saxo considered Russia high risk even though its

22    own majority owner was a Chinese car company.  Do I have that

23    right?

24              MR. FRANK:  Objection.

25              THE COURT:  Sustained.

1    Q.   Now, during the call, Vlad spoke freely, openly, and

2    expansively?  Fair to say?

3            MR. FRANK:  Objection.

4    Q.   Your impression?

5            THE COURT:  Sustained.

6    Q.   Well, he spoke a lot, didn't he?

7    A.   Yes.

8    Q.   Okay.  And in fact, he spoke at such great length that a

9    translator said at one point, "It will not be an easy task to

10:16  10   interpret all of this."  Isn't that right?

11   A.   I don't remember the exact words, but something to that

12   effect.

13   Q.   Okay, so let's take a look at 01:38:15.  I'll try to get

14   you to the page.  Can you read to the jury -- it's actually the

15   second line on Page 48.

16   A.   Okay, this would have been something that was said in

17   Russian.

18   Q.   I understand.

19   A.   Okay.  "It will not be an easy task to interpret all of

10:17  20   this."

21   Q.   Vlad told you that he was ready to answer all questions

22   with pleasure; is that correct?

23   A.   Uhm, that was what was conveyed to me.

24   Q.   He told you he was open to any questions at any time and

25   will be happy to meet you live; isn't that right?

```
 1   A.   Uhm, that was what was conveyed.

 2   Q.   You found him courteous, polite, and professional?

 3   A.   Again, yes.

 4   Q.   He seemed forthcoming and transparent?

 5        MR. FRANK:  Objection.

 6        THE COURT:  I'm sorry, I -- what was the question?

 7   Q.   He seemed forthcoming and transparent?

 8        THE COURT:  Overruled.  Go ahead.

 9   A.   He offered to provide information.

10   Q.   Did he look like he had something to hide to you?

11        MR. FRANK:  Objection.

12        THE COURT:  Sustained.

13   Q.   Sir, even you didn't -- and you mentioned this term

14   "secret sauce" on direct.  The prosecutor got it out from you,

15   yeah?  Now, even you didn't expect Vlad to divulge what you

16   called the "secret sauce" of M-13's algorithms and trading

17   strategies, did you, sir?

18   A.   No, I did not.

19   Q.   But in fact he actually and Nik actually did explain

20   M-13's trading strategies and philosophy in some detail; is

21   that right?

22   A.   He described -- they described the process by which they

23   gathered the information and came up with it.  They did not

24   deliver the secret sauce or the investment objectives.

25   Q.   Well, again, and you didn't expect the algorithms, how the
```

1    machine actually does it, right?

2    A.   I did not expect the algorithms.  I did expect an element

3    of understanding of the investment strategies and objectives,

4    the subset of what they could be.

5    Q.   Okay, we'll get to that.  They -- I may lapse into "they."

6    It means the pair, okay, Batman and Robin?  They told you that

7    M-13 develops applications that analyze open source information,

8    including mass media, social media, and investment sites to

9    devise purchase and sale recommendations; isn't that correct?

10:19 10   A.   Yes.

11   Q.   A colleague of yours on the call described that as a

12   for-profit enterprise that a lot of companies in the U.S. do;

13   isn't that correct?

14   A.   Yes.

15   Q.   You yourself -- and this came out on direct -- called it a

16   viable business model that you'd seen in the past; isn't that

17   right?

18   A.   Yes.

19   Q.   In fact, sir, the power of information on social media can

10:20 20   drive price action and may be more meaningful than what an

21   analyst on Wall Street says.  You know that, don't you?

22   A.   It can drive price action.  I'm not going to opine as to

23   whether it's more or less important.

24   Q.   Okay, I'm going to dispense with the run-up to the

25   September meeting with the prosecutors, the government, and

```
 1   just assume that you don't remember verbatim what happened
 2   there.
 3            MR. FRANK:  Objection to what --
 4   Q.   You don't remember what happened there verbatim, do you?
 5   A.   I'm sorry.  The September --
 6   Q.   The September 15th meeting.
 7   A.   With the --
 8   Q.   Yeah.
 9   A.   I do not remember everything verbatim.
10   Q.   I've asked you that several times, and you --
11            THE COURT:  He doesn't remember.
12            Do you want to stay up there?  Do you want to stay up
13   there?
14            MR. FERNICH:  Yeah, sure.
15   Q.   The same caveats as before, okay?  This is what I'm
16   directing you to specifically.
17   A.   The whole paragraph?
18   Q.   You can read whatever you want, but this is basically what
19   I'm directing you to.
20            (Witness examining document.)
21            THE COURT:  Okay, so what's the question?
22   Q.   The question is, having read this document, is your
23   recollection refreshed that you told the government that "The
24   power of information on social media can drive price action --"
25            MR. FRANK:  I object to the reading.
```

Q.   "-- and what Wall Street says may not be as meaningful"?

          MR. FRANK:  Object to the reading.

          THE COURT:  What?

          MR. FRANK:  Objection to reading from a document
that's not in evidence.

          MR. FERNICH:  If I paraphrase the question --

          THE COURT:  Is that what you said?  Does it sound
right.

          THE WITNESS:  Uhm, that -- that it may impact it, not
absolute, but it may impact it.

Q.   It may not be as meaningful, correct?

A.   I'm sorry, I can't --

Q.   Sorry, sorry, sir.  It may not be as meaningful?  It
wasn't a definitive statement, but it may not --

A.   It may, it may.

Q.   And you know, don't you, sir -- well, strike that.  Do you
remember the GameStop frenzy from a few years ago?

A.   I'm familiar with it.

Q.   And that's sort of a prime example of the phenomenon of
the power of social media driving trading activity in a way
that diverges from that of Wall Street, correct?

A.   It's possible.

Q.   You're also familiar with a company called Estimize,
aren't you, sir?  Estimize?

A.   Peripherally, yes.

```
 1   Q.   To your knowledge, Estimize, E-s-t-i-m-i-z-e, used a
 2   similar sort of crowd-sourcing approach?  Yes?
 3   A.   Again, my limited understanding of Estimize is that they
 4   aggregated, they just pulled together earnings estimates from
 5   different sources, whether they be from the sell side or
 6   investment bank's resources, or any individual on the street.
 7   So it's just a collector of data.  That's my understanding.
 8   Q.   Fine.  And they take contributions and opinion from a lot
 9   of people to outperform Wall Street analysts a lot of times;
10   isn't that correct?
11   A.   Again, I don't have enough definitive information on what
12   Estimize does.
13   Q.   I'm going to show you a document to attempt to refresh
14   your recollection about what you may have told the prosecutors
15   and the FBI during that September meeting.  It's the same
16   paragraph, okay?
17   A.   Sure.
18        (Witness examining document.)
19   A.   Yes.
20   Q.   Sir, having reviewed this document, does it refresh your
21   recollection that you told the government during that meeting
22   that Estimize took contributions and opinion from a lot of
23   people, and it was better than Wall Street analysts a lot of
24   times?
25   A.   So not exactly, no.
```

```
 1   Q.   So if somebody wrote this down here, or I should say typed
 2   it up like that, you don't remember it, or this is not exactly
 3   right?
 4              MR. FRANK:  I object.
 5              THE COURT:  Overruled.
 6              What did you say?  What do you say now, more accurately?
 7              THE WITNESS:  Yeah, okay.  Sorry.  So it's a claim
 8   made by Estimize.
 9   Q.   It's a claim --
10   A.   It's a claim made by Estimize -- I believe it's a claim
11   made by Estimize, not a statement that comes from me.
12   Q.   Okay.  And how are you familiar with that claim made by
13   Estimize?
14   A.   Uhm, I remember speaking to somebody about it.
15   Q.   Did you ever look at Estimize's website in your years of
16   professional experience?
17   A.   It's possible when the person mentioned it, I looked at
18   it.  It's possible.
19   Q.   Okay, I'm going to show you what's marked currently as
20   defense's 410 only for identification.  Don't say anything
21   about it.  I'm going to put it in front of you, and just take a
22   look, and then I'll ask you questions, okay?  Take all the time
23   you need.
24              (Witness examining document.)
25              THE COURT:  While he's looking, can I see counsel at
```

1    sidebar.

2              It's a good chance for you to stretch.

3              MR. FERNICH:  Can I look and see where I am?

4              THE COURT:  What?

5              MR. FERNICH:  I think I know the -- can I look and see

6    where I am, please, in the examination?

7              THE COURT:  Yes, that's exactly right.

8    SIDEBAR CONFERENCE:

9              THE COURT:  This is nothing substantive.

10:26 10        MR. FERNICH:  I'm halfway.

11             THE COURT:  Huh?  So what does that mean?

12             MR. FERNICH:  How long have I taken?  About half an

13   hour.  I think it's going to be longer in total.

14             THE COURT:  But here's the thing:  It's now 17.  It's

15   dropping by a lot.  I'd love to get them out of here, and I'd

16   love to get him home.

17             MR. FERNICH:  I'll move it along, okay?

18             THE COURT:  Do what you need to do.  They took an

19   hour.  An hour is reasonable, if you need it, but I think we

10:27 20   all need to take a break.

21             You'll finish, but then what?  What do you have to

22   say?

23             MR. FRANK:  A brief redirect.

24             THE COURT:  Like five?

25             MR. FRANK:  At the moment, probably about five or

```
 1    seven.
 2              THE COURT:  Seven I'll give you.
 3              MR. FRANK:  Judge, I want to get him out of here as
 4    well.  I do have a concern that this is running long, partly
 5    because he's being shown things he has no familiarity with.
 6              THE COURT:  Can I just say, you had an hour; he gets
 7    an hour.  I'm more worried about the safety of everybody
 8    getting home.
 9              MR. FERNICH:  What do you want me to do?  I want to
10    get him out of here, but I want to --
11              THE COURT:  You have to do what you have to do.  So
12    you finish at 11:00.  My theory would be five and five for
13    redirect, recross, and then I just send them home.
14              MR. FRANK:  Your Honor, I have to be able to redirect.
15              THE COURT:  I understand, but I have to protect the
16    jurors.  So if we take a break, you know what that means, as a
17    practical matter.
18              MR. FERNICH:  I don't need the break.
19              THE COURT:  No, but they do.
20              MR. FRANK:  If he has an hour with questions --
21              THE COURT:  Excuse me.  I'm going to be pushing hard
22    after this, okay?
23              (End of sidebar conference.)
24              MR. FERNICH:  May I continue?
25              THE COURT:  Yes.
```

```
 1            MR. FERNICH:  I move it into evidence.

 2            MR. FRANK:  Objection.

 3            THE COURT:  Move what?

 4            MR. FERNICH:  Okay, there is an objection.

 5   Q.   So having reviewed this document, do you recognize it?

 6   A.   Uhm, I haven't seen that exact document, no, I have not.

 7   Q.   Well, you've seen it now, right?

 8   A.   Right.

 9   Q.   Do you know what it is?

10            MR. FRANK:  Objection, your Honor.  He's never seen

11   the document.

12            THE COURT:  Objection sustained.

13            MR. FERNICH:  Okay.

14   Q.   Now, sir, I'm going to try to accelerate this, okay?

15   Going back to the April 2020 conference call, Vlad and Nik

16   explained that M-13 used neuro networks, machine learning, and

17   artificial intelligence to analyze the vast amount of

18   information the company collected and to develop trading

19   decisions accordingly.  Fair statement?

20   A.   Yes.

21   Q.   And another element of their strategy involved comparing

22   the open source data gathered in realtime against past

23   predictions, forecasts, plural, and historical performance

24   patterns.  They told you that in substance?

25   A.   Yes.
```

1    Q.   The strategy also involved a human element whereby some of

2    M-13's 300 employees with ten years analytics experience

3    reviewed the robotics recommendations and made the ultimate

4    trading decisions.  Fair statement?

5    A.   I believe that was what was conveyed to me.

6    Q.   And you told them you were quite familiar with using

7    artificial intelligence to look at open source data; isn't that

8    right?

9    A.   If I said that --

10   Q.   I'm sorry?

11   A.   I have to look.  I don't remember exactly what I said,

12   but --

13   Q.   I'm going to try to move this.

14   A.   Okay.

15   Q.   If I told you that it's in that transcript, would you

16   accept my representation?

17   A.   In the English one, yes.

18   Q.   You'd seen a lot of guys in the states start to do that,

19   you said?  This is using AI to look at open source data.

20   A.   Yes.

21   Q.   And you used the word "plausible" on direct.  You thought

22   that the neuro network's capability was entirely possible,

23   correct?

24   A.   Yes.

25   Q.   In fact, you were separately familiar with AQR, a quant

           1   fund that also relied on machine learning to analyze large

           2   data; is that correct?

           3   A.    I'm aware of AQR, yes.

           4   Q.    Now, turning back to the April conversation, the recorded

           5   conversation that we heard.  I don't want to confuse it with

           6   September, okay?  One of your colleagues on the call found it

           7   quite important that the company was ten years old with 300

           8   people working and a rating system for market analysts and data

           9   sources.  Fair statement?

    10:31  10   A.    That's what he said.

          11   Q.    And, to your knowledge, based on what Vlad and Nik told

          12   you, M-13's neuro and manual modeling often led it to make

          13   short-term trades around earnings reports, correct?

          14   A.    I'm sorry.  Repeat the question, please.

          15   Q.    They often made short-term trades around earnings reports,

          16   correct?

          17   A.    Yes.

          18   Q.    They were right up front about that, weren't they, sir?

          19   A.    Yes.

    10:32  20   Q.    They made no bones about it?  No?

          21   A.    (No response.)

          22   Q.    Ninety-nine percent of the time, they said, we open a

          23   position in a trading session and close part or all of it in

          24   the post-market.  Fair enough?

          25   A.    I don't remember the percentage.

1    Q.   Let's take a look at 70A, which is the full transcript, at

2    28:13, please.

3    A.   I'm sorry.  What time?

4    Q.   I'll get you there.  The bottom of 14 over to 15.  That

5    was in Russian, so you didn't understand it at the time.

6    A.   Okay.

7    Q.   Do you want to read that attribution, please, just the

8    brief attribution from the bottom of 14 to the top of 15.

9    A.   I'm sorry.  So you're asking me to read the Russian -- the

10:33 10   translation of the Russian portion?

11   Q.   How about I read it, and you can see it in the book in

12   front of you?  Yeah?

13            THE COURT:  What page are we on?

14            MR. FERNICH:  Page 14 through 15.  There we are.

15   Q.   Do you see it at the bottom of the page, attribution

16   28:13?  Do you see that?  No?  Something is wrong.  I'll read

17   it to you, and you tell me if I'm reading it right.

18   A.   This is the Russian part?

19   Q.   We're reading the English translation by the FBI of the

10:33 20   Russian.

21        "Yeah, yeah, yeah.  We open, we uh...I think 99 percent of

22   the close; we open position in uh, as of a session, trading

23   session, and uh, close part-part of all position in the

24   post-market."

25        That's, in significant part, what they said according to

1    this transcript; what Rumiantcev said, more particularly?  Yes?

2    I read it accurately?

3    A.   Yes.

4    Q.   "We make our short position decisions at 4:00 in the

5    evening before the reporting publication date, or a day

6    earlier."

7    A.   I'm sorry.  Can you --

8    Q.   Go ahead.

9    A.   Can you just follow up on the screen, please, because I'm

10:34 10   having a hard -- yeah.

11   Q.   I'm going to get you there.

12         THE COURT:  I'm having a hard time finding it as well,

13   so --

14   Q.   I'm going to get you there.  Do you recall Vlad making

15   this statement:  "We make our short position decisions at 4:00

16   in the evening before the reporting publication date, or a day

17   earlier"?

18         THE COURT:  Now, where are you?

19         MR. FERNICH:  I'm going to take you there.  Let's take

10:35 20   a look at -- I'll move it, okay?  Let's take a look at 37:38,

21   attribution 37:38.

22   Q.   "Anyway, we together with you make our decision in regards

23   the position for the short, for example at 4 in the evening

24   of...prior the reporting publication date, for example.  Or a

25   day before that."

1       Have I read that accurately?

2   A.   That's what it says.

3   Q.   01:15:45, 70A, Exhibit 70A, 01:15:45.  Turn to Page 38.

4   If I can find what I'm talking about.  Ah, see the big capital

5   letters "TRY, TRY"?

6       "We compare all that with what would be out there now

7   against the data stored on our servers.  Right?  In our

8   [unintelligible], we can TRY, TRY...no more than just TRY, to

9   ponder with help of manual analysis...our analysts...to weigh

10:37 10   on how one or another security may behave a few days before

11   reports come out."

12       According to this transcript, that's what Vlad was also

13   telling you, albeit in Russian, correct?

14   A.   That's what's written.

15   Q.   01:37:26, "We believe that buying the security only hours

16   ahead of reporting is the most best option because doing so

17   makes it possible to receive maximum profits from it...why we

18   need post-market?  It is because we do not see ourselves as

19   long-term investors --" I'm going to skip over.

10:38 20       "We try to secure the profit or get rid of expense we have

21   now and we close positions.  This is because we believe that,

22   based on our analysis, the best money is cash..."

23       I read that properly?  Yes?

24   A.   That's what's written.

25   Q.   And it purports to be something that Mr. Klyushin, Vlad,

         1    told you in Russian, though not translated into English,
         2    correct?
         3    A.    Yes.
         4    Q.    14:43.  In fact, Vlad actually warned you and Saxo that
         5    M-13 was planning to make another large Tesla purchase the very
         6    next week; isn't that correct?
         7    A.    Yes.
         8    Q.    Well in advance, exactly what was about to happen.  He did
         9    the same with OLED and Roku, correct?
10:39   10    A.    Uhm, I don't know.  He mentioned the Tesla.  I don't know
        11    what other trades he did ahead of time.
        12    Q.    Take a look at 56:20.  Vlad Klyushin, 56:20:
        13        "Right, I just wanted to tell Sergiy that, besides Tesla,
        14    we, you and I, plan to have OLED, which is also a big one.  We
        15    also plan for Roku and if it is possible... First, if possible
        16    to have it ahead of time," correct?
        17    A.    That's what it says.
        18    Q.    Right out in the open.  Yes?
        19    A.    That's what it says.
10:40   20        MR. FRANK:  Objection.
        21    Q.    No bones about it?
        22        MR. FRANK:  Objection.
        23        THE COURT:  Sustained.
        24    Q.    And you even noted that M-13 had gotten a couple of trades
        25    wrong where, overnight, clearly it went in a different

1    direction.  "If you were short, it went way up on the opening

2    or whatever."  That's what you said, or you remember, or you're

3    familiar with what you yourself said in the meeting.  Yes?

4    A.    Uhm --

5    Q.    You don't remember?

6    A.    Yeah.

7    Q.    Let's go to 01:39:15.

8          "Do they use stop losses, or you know, if they're wrong.

9    Like I think they were a couple of trades where overnight

10:41 10    clearly it went in a different direction.  If you were short it

11    went way up on the opening or whatever."

12          You told them that during that meeting?

13    A.    Uh-huh, yes.

14    Q.    So Vlad even offered to let Saxo demo some software M-13

15    was developing to see how it analyzed open source information.

16    Isn't that a fact?

17    A.    The offer was for an app that provided information,

18    aggregated information.

19    Q.    Okay.  And that app, as you know, is called Preston,

10:42 20    right?

21    A.    Yes.

22    Q.    01:22:35, please.  Let's go to 41.  No need to repeat.

23          "In other words, we will be launching the

24    Switzerland-based analytical application owned by the Swiss and

25    Russian investors.  It is called Preston.  The product is an

1   analysis of media and social media.  I think Kolya --" which is

2   what I was trying to get at way before -- "will help to set

3   yours based on your Saxo Bank and will show you, for example,

4   how it works based on monitoring and analyzing banks."

5        They offered to do that for you; isn't that correct?

6   A.   Yes.

7   Q.   And that was no empty promise, was it, sir?

8   A.   No.

9   Q.   You were interested if the Preston software had value to

10:43 10   Saxo; isn't that correct?

11   A.   Yes.

12   Q.   And in June, 2020, roughly two months after the conference

13   call, some Saxo colleagues of yours -- and we had this on the

14   e-mail on direct -- decided to accept Klyushin's offer and take

15   a look at the demo Preston, correct?

16   A.   Correct.

17   Q.   And Vlad followed through on that, didn't he?

18   A.   He provided it, yeah.

19        MR. FERNICH:  Can we put up 156, government's 156 in

10:43 20   evidence, please.  I'm going to move this along, okay?

21   Q.   You read this or most of it on direct?  I don't recall.

22   Do you recall whether you read the entire first e-mail on

23   direct?

24   A.   The top e-mail?

25   Q.   Yes.

1    A.    Yes.

2    Q.    You read the first e-mail on direct?

3    A.    Yes.

4    Q.    So, by the way, there's no date on this e-mail, is there,

5    that I can see?  Other e-mails have a date; this one doesn't?

6    A.    I guess there doesn't appear to be.

7    Q.    Whenever that first e-mail was sent, whenever that date

8    that was, Preston was available on Apple's app store.  Do I

9    have that right?

10:44 10   A.    That's what it says.

11   Q.    Sir, you don't specifically recall today whether colleagues

12   at Saxo were impressed by the Preston algorithm for selecting

13   publications and mentions of Tesla, especially in the Telegram

14   group format, do you?  You don't specifically recall that as

15   you sit here today?

16   A.    I don't recall if they were impressed, no.

17   Q.    And you don't specifically recall that they referred

18   particularly to Tesla's sentiment analysis from Centrify, do

19   you?

10:45 20   A.    It does not ring a bell, no.

21   Q.    I'm going to show you two documents that are currently

22   marked for identification as the defense 327A and 328A.  I'm

23   going to ask you to take a look at them, and then I'm going to

24   ask you some questions, okay?

25   A.    Yes.

```
 1              MR. FRANK:  May I see the documents?
 2              MR. FERNICH:  Oh, I'm sorry.  And just for the record,
 3     you'll see that one is subsumed within two.
 4              (Witness examining documents.)
 5              THE COURT:  What are you asking now?
 6              MR. FERNICH:  Your Honor, I want to give him a chance
 7     to read it, and I'll ask if his recollection is refreshed.  I
 8     may attempt to lay a foundation to try to get it in.
 9              (Witness examining documents.)
10:47 10  A.   Okay.  Can I hold it while you ask?
11     Q.   Yeah, yeah.  Let's look at it together.
12              THE COURT:  You've got to speak loudly enough so she
13     gets it on the transcript.
14              THE WITNESS:  Here we go.
15     Q.   Do these documents reflect correspondence between Edgars
16     Kuplais and Nik Rumiantcev?
17              MR. FRANK:  I object, your Honor.
18              THE COURT:  I don't know what it is.
19              MR. FRANK:  It is the witness.
10:47 20         MR. FERNICH:  Well, we're getting there.
21     Q.   Do these --
22              THE COURT:  Have you ever seen these before?
23              THE WITNESS:  No, I have not.
24              THE COURT:  Is it anyone from Saxo Bank?
25              MR. FERNICH:  Yes.
```

```
 1   Q.   Edgars Kuplais worked at Saxo Bank, I think you said on
 2   direct, as a customer relations manager, something like that?
 3   A.   Yeah, a relationship manager.
 4   Q.   He took over for Sergiy K, whatever his last name was?
 5   And these documents appear to you to have been sent in the
 6   ordinary course of Saxo's business?
 7        MR. FRANK:  Objection, your Honor.
 8        THE COURT:  Overruled.  Do you know?
 9        THE WITNESS:  I have no way of knowing.  I've never
10   seen these documents.
11   Q.   Well, you did see government's 156 in evidence, correct?
12   A.   What is it?
13   Q.   The e-mail chain that the government moved in with four
14   e-mails among this Edgars fellow and yourself and Rumiantcev
15   and a bunch of other Saxo employees?
16   A.   Yeah.  I saw the ones that were up on the screen earlier.
17   Q.   Do these documents appear to be related to the same
18   subject matter as those exchanges?
19        MR. FRANK:  Objection.
20        THE COURT:  Overruled.
21        (Witness examining documents.)
22   A.   Yes.
23   Q.   And the purpose of the 156 chain that's already in
24   evidence was to follow up on the conference call from April of
25   2020 -- 2020, I think it was?
```

A.    Yes.

Q.    And one of the things that you all were following up on in that chain was the Preston service.  Am I correct?

A.    Yes.

Q.    And do these documents appear to concern the Preston service?

A.    They're about the Preston service.

MR. FERNICH:  I move these documents into evidence.

MR. FRANK:  Objection.

10:49    THE COURT:  I'll look at them when we take a break.

MR. FERNICH:  Okay.

THE COURT:  Just mark them for ID.  What are they?

MR. FERNICH:  Mark them for ID, 327 and 328A.

Q.    And having reviewed these documents, is your recollection refreshed that Edgars Kuplais -- well, that colleagues at Saxo first got acquainted and were impressed by the algorithm for selecting publications and mentions of the company, especially in the format of groups in Telegram?  Is your recollection refreshed as to that?

10:50    MR. FRANK:  I withdraw my objection, your Honor.

THE COURT:  All right.

THE CLERK:  They're in?

THE COURT:  They're in.

THE CLERK:  All right, that's 327A and 328A.

(Exhibits 327A and 328A received in evidence.)

1  Q.   Sir, Edgars Kuplais wrote to Nik Rumiantcev that

2  colleagues first got acquainted and were impressed by the

3  algorithm for selecting publications and mentions of the

4  company, especially in the format of groups and Telegram; isn't

5  that correct?

6  A.   I think that's what it says in the e-mail that you showed

7  me.

8  Q.   Yup.  And the e-mail says they referred to Tesla's

9  sentiment analysis from Centify (Sic).  Isn't that correct?

10:51 10  A.   It says that.

11  Q.   Let me --

12       MR. FERNICH:  One second, your Honor.  I'm trying

13  to -- this may accelerate things.

14  Q.   And in the end, Mr. Zorek, Preston didn't go anywhere with

15  Saxo, correct?

16  A.   That's correct.

17       MR. FERNICH:  One second, please.

18  Q.   Mr. Zorek, you participated in the April 20, '20

19  conference call with Vlad and Nik, partly to determine if Saxo

10:52 20  wished to maintain the relationship with M-13; isn't that

21  right?

22  A.   We did not have a relationship with M-13.

23  Q.   Okay.  Maintain the relationship with Mr. Klyushin?

24  A.   Yes.

25  Q.   And you and Saxo didn't end the relationship after that

1    call, did you, sir?

2    A.    That's correct.

3    Q.    To the contrary, the relationship continued unabated at

4    least for a period of time; isn't that right?

5    A.    That's correct.

6    Q.    You and Saxo kept Vlad, and I'll call him Kolya now, kept

7    them on as clients for almost another full year; isn't that

8    correct?  Actually, more than another full year, as you told us

9    on direct; isn't that right?

10:53 10   A.    That's correct.

11   Q.    And if anything, the relationship actually deepened during

12   that time; is that fair to say?

13   A.    I'm not in a position to say.

14   Q.    Well, let's take a look at 156 in evidence, Page 3.  You

15   read some of this on direct.  I apologize if you've read this

16   already.  Do you see where it says there "Below is a brief

17   summary," followed by a colon?

18   A.    I'm sorry.  I can't see where you --

19   Q.    You see -- yeah, no worries.  You see it's a little cut

10:54 20   off.  "Below is a brief summary" followed by a colon?

21   A.    Whoever is controlling the screen, is it what I'm looking

22   at right now?

23   Q.    Yeah.  At the top, it's a little cut off.

24   A.    It says "Below is a brief summary"?

25   Q.    Right under that, you see there's a list there of, like,

1   four or five things.  Read the first two lines after "Below is

2   a brief summary."

3   A.   Okay.  "US post-market session extended (approved by ADE)

4   by an extra 15 minutes (in total 1 hour for post-market trades

5   for all three accounts)."

6   Q.   So Saxo actually extended post-market or after-hours

7   trading for M-13; isn't that correct?

8   A.   By an extra 15 minutes.  Not by the full 90 minutes.

9   Q.   And extended post-market or after-hour trading was one of

10:55 10   the enhanced services Vlad and Kolya specifically requested in

11   the April 2020 conference call, correct?

12   A.   That's correct.

13   Q.   Their trading in the period after the conference call

14   raised no flags; isn't that correct?

15   A.   I'm not aware of any red -- any flags that were raised.

16   Q.   In general, the trading associated with Vlad was good for

17   Saxo, wasn't it?

18   A.   I'm sorry.  In what sense?  Explain the question, please.

19   Q.   That's the question.

10:56 20   A.   Good in what sense?

21   Q.   Good for Saxo.

22   A.   I mean, it was a business in which we generated conditions

23   and financing terms.

24   Q.   Vlad and Kolya were good clients overall, correct?

25   A.   Again, I didn't cover any, but I'm assuming, yes.

```
 1   Q.   Well, if I told you that you told the government in the
 2   September meeting that they were good clients, you wouldn't
 3   argue with me about that, would you?
 4   A.   No.  At the time we had the call -- you're referring to at
 5   the time we had the April '20 call, that's correct.
 6   Q.   Well, beyond the April 20th call.  It took over a year --
 7   the bank continued doing business with them for well over a
 8   year after the call; isn't that correct?
 9   A.   That's correct.
10   Q.   Now, during this -- I'm sorry.  I'll move it.  We're
11   almost done.  I promise.
12           (Pause.)
13           MR. FERNICH:  I wrote down a wrong number in my notes.
14   I apologize.
15           THE COURT:  Well, I mean, I'm gonna give -- if you're
16   done, I'll give the government --
17           MR. FERNICH:  Just a couple more.  I found what I
18   need.
19           THE COURT:  The government is going to do a little
20   redirect.  You can do it on recross if you can't find it.
21           MR. FERNICH:  I've got it.
22   Q.   During the 9/15/22 meetings, do you recall --
23           THE COURT:  You mean with the government?
24           MR. FERNICH:  Yes, with the government.  I apologize.
25   Q.   -- do you recall telling the government that the trades,
```

1    the pre-call trading in the trades that Vlad and Kolya made

2    before the call, that there were a few trades that were

3    anomalies?  Do you recall using that word, "anomalies"?

4    A.   I don't remember.

5    Q.   I'm going to show you a different document and ask you to

6    read it to yourself.

7         MR. FRANK:  Can I see the document?

8         MR. FERNICH:  Oh, sure.  I'm sorry.

9         MR. FRANK:  Oh, that?  Thank you.

10:59 10   Q.   I'm going to ask you to read this to yourself, the same

11   rigmarole.  Read as much as you want, take as long as you want,

12   and focusing you on this.

13   A.   Okay.

14        (Witness examining document.)

15        THE COURT:  And how much longer do you think you have?

16        MR. FERNICH:  This is it.

17        THE COURT:  This is it?  Good.

18        (Witness examining document.)

19   A.   Okay.

11:00 20   Q.   Sir, having looked at this document, does it refresh your

21   recollection that you told the government during that September

22   '22 meeting that there were a few trades that were anomalies?

23   A.   Uhm, I don't recall the use of the term "anomaly"

24   specifically.  I mean, I would have considered that the basis

25   for the conversation were a number of suspicious transactions

```
 1    that were brought up, you know, and not every transaction that
 2    the client had done.
 3    Q.   To your own understanding, is "anomaly" the same thing as
 4    "red flag"?
 5    A.   Not necessarily.
 6    Q.   So if somebody were transcribing these notes and they
 7    wrote, or they typed "a few trades associated with Klyushin --"
 8              MR. FRANK:  I object to reading.
 9    Q.   "-- raised red flags --"
10              MR. FRANK:  I object.
11              THE COURT:  Overruled.
12              Were those your words?
13              THE WITNESS:  I -- I don't remember using the word
14    "anomaly."
15              THE COURT:  Do you remember using the word "red flag"?
16              THE WITNESS:  I would have used the words "suspicious
17    transactions."  I may have used "red flags."  I don't know.
18              THE COURT:  Next question.
19              MR. FERNICH:  I'm done.
20              MR. FRANK:  Can we have 328A --
21              THE COURT:  Wait, wait.  How long do you think you are
22    going to be?
23              MR. FRANK:  Ten minutes.
24              THE COURT:  So here's the issue.  I want to get you
25    home, okay?  So let's say he's ten, and let's say he's, at
```

1    most, ten, in that vicinity, what I'm thinking of -- and I need

2    to ask Lee because she's the one who has to take it all down --

3            Lee, do you want to wait the 20 minutes and finish it,

4    or do you want to go out, have the break, a really quick break,

5    and then come back in?  I'm seeing if people prefer the latter.

6    So -- what?  All right.  So what we're going to have is not our

7    usual half hour, okay?  I think there's probably food out there

8    for you, but you don't have to wait to eat it because you can

9    grab it and go afterwards.  It's now 17.  So I'm eager to get

11:02 10   you out of here, but we are who we are, and we need our

11   humanitarian issues.

12           So as soon as everyone has used the facilities, we

13   will come back in here, and then you'll grab food afterwards,

14   all right?  So Maryellen will knock.  Thank you.

15               THE CLERK:  All rise.

16           (Jury excused.)

17           (A recess was taken, 11:02 a.m.)

18           (Resumed, 11:18 a.m.)

19           (Jury enters the courtroom.)

11:18 20            THE COURT:  Redirect.  Thank you.

21               MR. FRANK:  May I proceed, Your Honor?

22               THE COURT:  Yes.  They assured me this is very brief.

23   REDIRECT EXAMINATION BY MR. FRANK:

24               MR. FRANK:  Can we have Exhibit 328K in evidence.

25   Q.   Mr. Zorek, you were asked some questions by counsel about

1    this document that you had never seen before coming to court

2    today, correct?

3    A.    That's correct.

4    Q.    And you're not on this document, correct?

5    A.    No, I'm not.

6    Q.    I'd like to show you some parts of the document you were

7    not shown on cross-examination.  Could we go to page 4, please.

8          Do you see this is an email from Mr. Kuplais, and it's to

9    Mr. Rumiantcev?  If you could go up a little bit.

11:19 10         Do you see the email from Mr. Kuplais to Mr. Rumiantcev?

11   A.    Yes.

12   Q.    You were asked about the first part of the email where it

13   says, "Colleagues got acquainted and were impressed by the

14   algorithm for selecting publications."  Do you see that?

15   A.    Yes.

16   Q.    I'd like to show you the rest of the email.

17         MR. FERNICH:  Objection.

18         THE COURT:  Overruled.  It's in.

19         MR. FERNICH:  I understand.  I object to the question

11:19 20   because it mischaracterizes the record.

21         THE COURT:  I'm not sure I understand.  Excuse me.

22   Are you just striking, moving to strike the form of the

23   question?

24         MR. FERNICH:  Yes.

25         THE COURT:  All right.  So what's the question now?

1  Q.   Do you see, sir, where it says in the last sentence of the

2  email, "So I believe the question is related to the fact that

3  colleagues do not quite understand how analysis and trade

4  decisions are made based on the tools that you shared with us."

5       Do you see where it says that?

6  A.   Yes, I do.

7  Q.   I'd like to now direct you to Mr. Rumiantcev's reply.  Can

8  we go to page 1, please.  Do you see his reply there?

9  A.   Yes.

11:20 10  Q.   And if we could go to page 2 of the reply.  Do you see

11  where Mr. Rumiantcev says, "Vladislav approved the provision of

12  access only to the Preston tool.  We are not ready to comment

13  on our internal rules for making trade decisions.  This is a

14  trade secret."  Do you see that?

15  A.   Yes.

16  Q.   You may take that down.

17       Could we go to page 41 in the binders, please.  Exhibit

18  70A.  Is everyone at page 41?

19       You were asked some questions about --

11:21 20  A.   There's nothing up here yet.

21  Q.   Do you have the binder?

22  A.   I'm sorry, in the binder, I'm sorry.

23  Q.   70A.  That's 70B, I believe.  Could you go to page 41?

24  A.   Okay.

25  Q.   With respect to the Preston app, do you recall counsel

         1    asking you about the portion at the top of page 41 where

         2    Mr. Klyushin says in Russian, which, you did not understand it

         3    at the time, correct?

         4    A.   Correct.

         5    Q.   Mr. Klyushin says in Russian, "It's called Preston, the

         6    product is an analysis of media and social media I think.

         7    Kolya will help to set yours based on your SAXO bank and will

         8    show you, for example, how it works based on monitoring and

         9    analyzing banks.  Can you do this, Kol?"

11:21   10         Do you recall being asked to read that into the record?

        11    Do you recall being asked about that by counsel?

        12    A.   I definitely read the earlier section.  I can't remember

        13    if I read the lower part here.

        14    Q.   Okay.  I'm going to ask you about how Mr. Rumiantcev

        15    responded.  Do you see where it he says in Russian, "Well, one

        16    have to understand that the Preston application primarily based

        17    on news.  There is no, there is no financial information there,

        18    in other words, this is all about company image built based on

        19    mass and social media, and that is all."

11:22   20         Do you see that?

        21    A.   Yes.

        22    Q.   Counsel asked you some questions about what Mr. Klyushin

        23    told you about neuro networks and the 300 employees of his

        24    company and its robotics and the recommendations that its

        25    algorithm made.  Do you recall those questions?

```
 1    A.   Yes.

 2    Q.   Do you have any idea if any of that was true?

 3    A.   I do not.

 4    Q.   You were asked about Mr. Klyushin's statement that he had

 5    300 people working for him and ten years of experience.  Do you

 6    recall that?

 7    A.   Yes.

 8    Q.   How long did he have an account at SAXO Bank where he

 9    could trade?

10    A.   I think it was --

11              MR. FERNICH:  Objection.

12              THE COURT:  Do you know?

13    A.   It was opened in early 2019.

14    Q.   2019?

15    A.   Yeah.

16    Q.   So before that, you have no idea whether he did any

17    trading?

18    A.   No.

19    Q.   You were asked some questions about AQR Capital

20    Management.  Do you recall that?

21    A.   Yes.

22    Q.   That's one of the most respected algorithmic trading firms

23    in the industry?

24    A.   That's correct.

25    Q.   Have you ever heard of AQR or any other hedge fund making
```

1    a 900 percent return in two years?

2            MR. NEMTSEV:  Objection.

3            THE COURT:  Sustained.

4    Q.   Could we look at -- well, let me ask you this.  Do you

5    know based on what the defendant told you in that call whether

6    there actually was a secret sauce?

7            MR. NEMTSEV:  Objection.

8            MR. FERNICH:  Objection.

9            THE COURT:  Sustained.

11:23 10   Q.   Can you look at page 44 of Exhibit 70A, please.  Counsel

11   asked you about a couple of the sentences at the top of page 44

12   where Mr. Klyushin said in Russian, "The most important for us

13   is not to be earning today and right now; our goal is to

14   advance slowly but steady towards increasing our deposits and

15   to widen our... we should not put our entire volume only on one

16   stock today."

17           Do you recall that?

18   A.   Yes.

19   Q.   I'm going to ask you about the next portion where

11:24 20   Mr. Klyushin says, "So first we traded for a few years.  We've

21   been analyzing and following on what was going on with our

22   forecast for the past few years.  We have been planning and

23   slowly but steady we grow."

24           Do you see that?

25   A.   Yes.

1    Q.   And then he says, "In other words, first stage is neuron

2    networks, which is to say that certain robots, robots collect

3    and analyze information.  The following stage utilizes human

4    factor, meaning a number of people who make decisions, people

5    like myself and Nikolai.  This is when we look at all these

6    forecasts.  We look at analysts that provide recommendations.

7    If we come to understanding that everything leads to based on

8    these types of forecasts, based on these types of news, based

9    on those accounts on investing, on seeking and on analysis, we

11:25 10   have a lot going there.  We have Bloomberg and a lot of

11   opinions by various authoritative people who provide the

12   recommendations through confidential subscriptions.  When by

13   taking in consideration all this huge amount of information we

14   come to understanding that our system, just like your risk

15   management system, gives us a 100 percent indication to buy, we

16   can buy it with full leverage."

17        Do you have any idea whether any of that is true?

18             MR. NEMTSEV:  Objection.

19             THE COURT:  Sustained.

11:26 20   Q.   Were you ever able to confirm that?

21             MR. NEMTSEV:  Objection.

22             THE COURT:  I'll allow that.

23   A.   No.

24   Q.   Counsel asked you whether this account was flagged, in

25   substance, whether this account was flagged because the

```
 1  defendant was Russian.  Do you recall that question?
 2          MR. FERNICH:  Objection.
 3          MR. NEMTSEV:  Objection.  That was not a question he
 4  posed.
 5          THE COURT:  I don't remember that exact question, but
 6  you can ask.
 7  Q.  Do you remember being asked about whether red flags were
 8  related to people coming from Russia?
 9          MR. FERNICH:  Objection.
10          MR. NEMTSEV:  Objection.
11          THE COURT:  Why don't you just ask him the question.
12  Q.  Well, were you asked to be on this call because the
13  defendant is Russian or because there were trades of concern?
14          MR. FERNICH:  Objection.
15          THE COURT:  Sustained as asked.
16  Q.  Why were you asked to be on the call?
17  A.  Because of the number of suspicious transactions that the
18  compliance department had outlined.
19  Q.  And why did the bank keep Mr. Klyushin as a client after
20  the call but apply close monitoring?
21  A.  Because --
22          MR. FERNICH:  Objection.
23          THE COURT:  Overruled.
24  A.  Well, based on the information that was provided by the
25  client, there was no definitive negative information that would
```

1    cause us to terminate the relationship at that time.

2    Q.   You were asked whether Mr. Klyushin at the time of the

3    call was a good client.  Do you recall that?

4            MR. FERNICH:  Objection.

5            THE COURT:  Overruled.

6    A.   Yes.

7    Q.   In fact, SAXO Bank had referred him to regulatory

8    authorities, correct?

9            MR. NEMTSEV:  Objection.

11:27 10         THE COURT:  Sustained.

11   Q.   If you had been aware --

12           THE COURT:  You need to wrap it up.

13   Q.   If you had any information that this client was hacking

14   into filing --

15           MR. NEMTSEV:  Objection.

16           THE COURT:  Sustained, sustained.

17           All right.  Is there any recross?

18           MR. FERNICH:  Very quickly.

19   RECROSS-EXAMINATION BY MR. FERNICH:

11:27 20   Q.   Sir, you told us on direct that you didn't expect Vlad to

21   divulge what you called the secret sauce of M-13 algorithms and

22   trading strategies, correct?

23   A.   That is correct.

24   Q.   The call took place when Preston was discussed in April of

25   2020, correct?

```
 1   A.   I'm sorry, repeat the question.
 2   Q.   Yes.  The conference call --
 3           THE COURT:  You should probably -- how long do you
 4   have?
 5           MR. FERNICH:  A minute.
 6   Q.   The conference call occurred in April 2020?
 7   A.   I'm sorry, what's the question?
 8   Q.   Yes, the conference call occurred in April 2020?
 9   A.   Yes, that's correct.
11:28 10   Q.   The Preston demo was provided sometime after that,
11   correct?
12   A.   That's correct.
13   Q.   You don't know how if at all the Preston app evolved in
14   the interim, do you?
15   A.   No.
16   Q.   You told us on direct upon your recollection having been
17   refreshed that the April 2020 call was arranged due to client
18   requests involving enhancements to SAXO services.  That's what
19   you told us on direct, isn't that correct?
11:29 20   A.   I believe that's what I said.
21   Q.   And after the April 2020 call, you told us on direct that
22   you observed no flags in Mr. Klyushin's trading, correct?
23           MR. FRANK:  Misstates --
24           THE COURT:  Is that what you said?
25           THE WITNESS:  I believe I said I was not aware of any.
```

```
 1   Q.   Fair enough.  You were not aware of any flags in the

 2   interim?

 3   A.   Yes.

 4        THE COURT:  Wait a minute.  Is that right?

 5        THE WITNESS:  Yes.

 6   Q.   And of course the bank continued its relationship with

 7   Mr. Klyushin for well over a year after the April 2020 call,

 8   correct?

 9        MR. FRANK:  Objection, misstates.

10        THE COURT:  Overruled.

11   A.   That's correct.

12        MR. FERNICH:  Thank you.  Nothing further.

13        THE COURT:  Thank you.  Please enjoy your trip home.

14   I hope you get home.

15        THE WITNESS:  Thank you.

16        THE COURT:  We're going to stand in recess until

17   Monday.  I built in some time because it's February and weather

18   is bad, so this does not put us behind, but I think it's better

19   for you to get home now before it gets frigid this afternoon.

20   In fact, it's pretty frigid right now.  I don't know if anybody

21   has better temperature, but I think it's at 16, so go home.

22   Please don't speak about it and don't look at anything in the

23   press, and I'll see you Monday morning.  You've been terrific

24   at showing up on time.  Thank you.

25        THE CLERK:  All rise.
```

```
 1          THE COURT:  Could I add one other thing?  This is my
 2     bad.  The reason -- some of you called us about Boston.  If
 3     there's a big snowstorm and Boston is closed, that's because we
 4     think the streets are impassable.  But because this was just a
 5     cold, most of the surrounding neighborhood schools didn't close
 6     either, so if there is -- I want to make it clear, if there is
 7     a snowstorm over the weekend, which I'm not expecting, and
 8     Boston is closed, there will be no court.  Okay?  Thank you.
 9          (Jury exits the courtroom.)
10          THE COURT:  You can step down.  Have a nice trip home.
11          THE WITNESS:  Thank you.
12          THE COURT:  Just a few logistics, then I'll let you
13     all go home.  One is, I passed out a draft charge and verdict
14     form, and hopefully -- we may have to have a charge conference.
15     When do we have time, Tuesday afternoon?
16          THE CLERK:  No.  You have a judges' meeting, unless
17     you want to do it after.
18          THE COURT:  We can do it Tuesday or Wednesday
19     afternoon, depending on the timing of everything.  Second is, I
20     received a motion that was prepared last night about some of
21     the Threema excerpts.  Were you planning on opposing it, or did
22     you just want to argue it?
23          MR. NEMTSEV:  We could argue it, but Your Honor, I
24     believe you decided this issue.  All of this relates to the
25     blue conversations of an unidentified person that the
```

1    government has not identified to us or to Your Honor.

2            THE COURT:  Excuse me, there are two separate issues.

3    I am not prepared right now to say that he is a co-conspirator,

4    whoever this unidentified person is, but I am prepared to let

5    this in as context because he's part of the conversation, and I

6    will instruct them of that.

7            Okay.  Who's on Monday?  The rest of the agent.

8            MR. KOSTO:  Mr. Hitchcock will return and Mr. Frank

9    will finish.  There will be cross of Mr. Hitchcock.  And then

11:32 10   Karen Yanochko, a financial investigator for our office, has

11   some summary exhibits that she'll testify to.  We'll get the

12   numbers over to Mr. Fernich and Mr. Nemtsev.  And after Ms.

13   Yanochko, there is a forensic examiner named Eric Uitto who

14   looked at some of these virtual servers that the court has been

15   hearing about.

16           THE COURT:  The slicers?

17           MR. FRANK:  Slicers, exactly.  He'll have hopefully

18   another understandable explanation.

19           THE COURT:  So that should more than fill the morning

11:33 20   I think because you have quite a bit probably on cross, right?

21           MR. NEMTSEV:  I do, Your Honor.  I keep writing and

22   writing.  The direct is five hours at this point, so I need at

23   least an hour and a half I think on cross.

24           THE COURT:  All right.  So that will spin us over into

25   Tuesday anyway.  And then do we have --

1          MR. KOSTO:  We have the Bitcoin expert, Mr. Kenny,

2    Mr. Clarke, the SEC financial economist.  And depending on how

3    Mr. Nemtsev and Special Agent Hitchcock get along on the venue

4    issue, the government may have a ten-minute venue witness that

5    we will call that we just identified, and we will provide the

6    information over to the defense this afternoon.

7          MR. NEMTSEV:  What?

8          THE COURT:  Somebody brand new?

9          MR. KOSTO:  The person on the email, Ms. Shah, that's

11:34 10   in evidence --

11         THE COURT:  I'm asking you, is she on the witness

12   list?

13         MR. KOSTO:  No.  She was identified literally last

14   night.

15         THE COURT:  I'll reserve on that.  I usually ---

16         MR. KOSTO:  What we would propose to do is swap this

17   witness out for another witness on our list.  It won't lengthen

18   the trial.

19         THE COURT:  The issue is asking if the jury knows

11:34 20   anybody.  And also it's a surprise, so you better let them know

21   all about it.

22         MR. KOSTO:  That's why we're bringing it up.  But the

23   witness is from Raleigh, North Carolina.  Meaning, she's not

24   likely to know any of the members of the jury.

25         THE COURT:  Also the theory is I'm supposed to have a

```
 1   witness list beforehand.  So if they have all those witnesses,

 2   that pulls us through until Wednesday probably.

 3          MR. NEMTSEV:  Likely through Wednesday, Your Honor.

 4   And I anticipate calling two experts at this point, one

 5   relating to IPs and forensics relating to computers and one

 6   related to the trading who can summarize some of the

 7   transactions and some of the issues here.  I don't believe

 8   we'll need the statistician because that depends on

 9   Mr. Clarke's testimony.  And we might put in a summary witness

11:35 10   as well just to summarize --

11          THE COURT:  So we may well go into the third week.

12          MR. NEMTSEV:  Maybe.  I don't know.  I don't

13   anticipate being very long with all these witnesses.

14          THE COURT:  Okay.  I don't know.  So I'm just trying

15   to figure out when to do the charge conference.  We'll be ready

16   to go on Thursday or Friday if need be.  So I'm thinking we'll

17   have a charge conference Tuesday afternoon or Wednesday

18   afternoon.

19          All right.  And remember, I want from the government a

11:36 20   brief on the motion for directed verdict.  So what I am

21   repeating here is from a pedagogic point of view, not just to

22   mention my understanding of it, it's hard to remember all of

23   those IP addresses and what connects to what.

24          MR. KOSTO:  Of course, Your Honor.  Although the

25   directed verdict brief will address the sum of the evidence in
```

1      the case and not simply the IPs.  We heard a lot -- -

2            THE COURT:  I understand.  I'm just saying that unless

3      these people have photographic memories, they're not

4      remembering all these IP addresses and what's associated with

5      what.

6            MR. KOSTO:  Of course.

7            THE COURT:  So I need to understand it a little better

8      myself.  The one that was crystal clear was Mr. Ermakov and his

9      iTunes account, but the others were less clear as to how you

11:36 10    track from A to B to C to D.

11            Are you going to be doing some of this as well showing

12      the gaps?

13            MR. NEMTSEV:  I intend to at closing, Your Honor.

14            THE COURT:  Both of you in closing.  I just have to

15      make sure it's clear to the jury.

16            MR. NEMTSEV:  I just don't want to reveal my --

17            THE COURT:  I'm just asking.

18            MR. FRANK:  We don't particularly want to reveal our

19      closing either.

11:37 20          THE COURT:  I'm sorry.  I need to understand it.

21      Okay?  Everyone, my clerks, me, scribbling down numbers.  They

22      weren't even bothering.  Okay?

23            MR. FERNICH:  Because they're smarter than all of us.

24            THE COURT:  There was one guy right there who wrote it

25      down a little bit, but in any event, we need to understand it

1    and make sure that there's enough there.

2           MR. FERNICH:  Can I ask a question?  The motion from

3    last night, is that now resolved?

4           THE COURT:  Yes.  Don't spend time on it.

5           MR. FERNICH:  Thank you.

6           THE COURT:  Are you going back to New York?

7           MR. FERNICH:  No.  I'm around the corner.  I'm around

8    the corner with the government agent, believe it or not.

9           MR. FRANK:  They're not sharing a room.

11:37 10           MR. FERNICH:  He has a very high caloric content.

11           THE COURT:  Everyone, have a safe journey home.  Thank

12    you.

13           (Adjourned, 11:37 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E.

2

3

UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON                 )
5

6

7          We, Lee A. Marzilli and Kelly Mortellite, Official

8   Federal Court Reporters, do hereby certify that the foregoing

9   transcript, Pages 5-1 through 5-98 inclusive, was recorded by

10  me stenographically at the time and place aforesaid in Criminal

11  No. 21-10104-PBS, United States of America v. Vladislav

12  Klyushin, and thereafter by me reduced to typewriting and is a

13  true and accurate record of the proceedings.

14          Dated this 3rd day of February, 2023.

15

16

17

18          /s/ Lee A. Marzilli
            _____
19          LEE A. MARZILLI, CRR
            OFFICIAL COURT REPORTER
20

21          /s/  Kelly Mortellite
            _____
22          KELLY MORTELLITE, RMR, CRR

23

24

25