1         IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
2

3   UNITED STATES OF AMERICA,      )
                          )
4          Plaintiff        )
                          )
5      -VS-                )  Criminal No. 21-10104-PBS
                          )  Pages 6-1 - 6-160
6   VLADISLAV KLYUSHIN,        )
                          )
7          Defendant        )

8

9                **JURY TRIAL - DAY SIX**

10       BEFORE THE HONORABLE PATTI B. SARIS
           UNITED STATES DISTRICT JUDGE

11

12

13

14               United States District Court
                1 Courthouse Way, Courtroom 19
                Boston, Massachusetts  02210
15               February 6, 2023, 8:53 a.m.

16

17

18

19

20

21      LEE A. MARZILLI and KATHLEEN SILVA
          OFFICIAL COURT REPORTERS
22       United States District Court
        1 Courthouse Way, Room 7200
23         Boston, MA  02210
           leemarz@aol.com
24

25

1    A P P E A R A N C E S:

2        SETH B. KOSTO, ESQ. and STEPHEN E. FRANK, ESQ.,
     Assistant United States Attorneys, Office of the United States
3    Attorney, 1 Courthouse Way, Room 9200, Boston, Massachusetts,
     02210, for the Plaintiff.
4
         MAKSIM NEMTSEV, ESQ., 20 Park Plaza, Suite 1000,
5    Boston, Massachusetts, 02116, for the Defendant.

6        MARC FERNICH, ESQ., Law Office of Marc Fernich,
     800 Third Avenue, Suite Floor 20, New York, New York, 10022,
7    for the Defendant.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|

DAVID HITCHCOCK:

    By Mr. Frank:      12
    By Mr. Nemtsev:            75


| EXHIBITS | RECEIVED IN EVIDENCE |
|----------|----------------------|
| 268      | 27                   |
| 151E     | 33                   |
| 46       | 34                   |
| 50, 52   | 65                   |
| 245      | 68                   |
| 246      | 68                   |
| 12, 12A  | 69                   |
| 153      | 72                   |
| 416      | 123                  |
| 417      | 124                  |
| 418      | 125                  |

<u>P R O C E E D I N G S</u>

1

2          THE CLERK:  United States District Court is now in

3     session.

4          THE COURT:  We're waiting for one juror is the

5     situation.  So I am not prepared to rule on this flurry of

6     papers that came in, and I'm not going to right now.  I don't

7     even understand it.  Okay, let's start from basics.  What is

8     Exhibit -- it's on the front page -- 267?

9          MR. KOSTO:  Exhibit 267, your Honor, is an advisory

08:54 10     record from Cogent Corporation.  It's in evidence.  Cogent was

11     the Internet service provider to the datacenter in Boston.

12          THE COURT:  So when I asked for exhibits, I mean, it

13     wasn't such a mystery.  It's within the first three, four lines

14     of your motion.  So I don't have all the exhibits.  Where are

15     they?

16          MR. FRANK:  We can give your Honor a copy of

17     Exhibit 267.

18          THE COURT:  Yes, I need exhibits.  But let's go.  Is

19     this Shah woman, was she one of the authors of one of these

08:54 20     e-mails or exhibits?

21          MR. KOSTO:  She sent the email, yes.

22          THE COURT:  So why isn't it appropriate just to limit

23     her to the fact that she was the author of that email for

24     business records purposes, instead of this long, complex,

25     unintelligible 302?  Why don't I -- if there's a challenge to

1    the chain of business records --

2            MR. FRANK:  There isn't, your Honor.

3            THE COURT:  -- the reliability of them, I think it's

4    fair game for the government to put someone on to verify the

5    business record chain, but there's so much more that you're

6    asking to be put in, is my concern.  And so I don't know where

7    to go with this.  I'm really just starting to digest it all,

8    and I'm not prepared to rule before court today.

9            When were you thinking of putting this person on?

08:55 10         MR. KOSTO:  After Special Agent Hitchcock or after Ms.

11   Yanochko.  The hope would be to get her on and off so she can

12   return to North Carolina.

13           THE COURT:  You popped it on me at the end of trial

14   Friday.  I didn't even know who she was.  I thought she was

15   just going to be a business record chain-of-custody person,

16   which I thought was fair game because that is being challenged.

17   But it's so much more.  It's so much more.

18           MR. FRANK:  We anticipate her testimony being about

19   ten minutes.  She's going to testify --

08:55 20         THE COURT:  But they have to do their thing.

21           MR. FRANK:  Sure, that's true, but --

22           THE COURT:  They need to talk to their expert.  I

23   mean, this is just complicated.  And I keep asking for, you

24   know, all the different -- I was hoping for a, and I'm sure the

25   jury will need --

1          MR. FRANK:  We're prepared to do that this morning, to

2     review with the chalk that I used on Thursday --

3          THE COURT:  The numbers and where they go, and why is

4     this even necessary?  They're going to attack the Micfo files

5     because it was criminally convicted.  I understand that.

6     That's been their position all along.  I think the government

7     has a right, and it's not prejudicial, just to put in a chain

8     of custody.  But that's different than all that's in here.  So

9     let's see if we can work something out, and I'm just not --

08:56 10    whenever anyone says, "Rush, rush, rush, you need to rule," I

11    put the skids on, I put the brakes on, because I want to make

12    sure I understand it.  So I'm not prepared to rule on that.

13          Is there anything else?

14          MR. KOSTO:  Not from the government, your Honor.

15          THE COURT:  And can I have her email?  Where is her

16    email?  Is that 267?

17          MR. KOSTO:  Yes.  I'll email it to her right now.

18          MR. FRANK:  We might have a paper copy of it.

19          THE COURT:  What might solve some of this problem and

08:57 20    my ability to deal with things is, usually I get a courtesy

21    copy of all the exhibits, and I haven't been doing that because

22    there are so many, but it would be useful if -- do you have

23    physical paper copies of everything?

24          MR. NEMTSEV:  We do.

25          THE COURT:  So I'm the only one who doesn't, so it

1    would be useful to have that, and then I could have maybe made

2    more headway this morning.

3            Okay, we'll wait till the last juror comes.

4            MR. FERNICH:  Your Honor has made plenty of headway.

5    You understand it.

6            THE COURT:  From reading.

7            MR. FERNICH:  You've got it.

8            MR. FRANK:  My intention, your Honor, was to review

9    those IP addresses and put them on the chalk with the special

08:57 10    agent in about five minutes.  Thank you, your Honor.

11            THE COURT:  Good idea.

12            MR. FRANK:  We'll also address the juror question that

13    came in.

14            THE COURT:  What was that again?

15            MR. FRANK:  The juror had a question about whether IP

16    addresses could be traced to individuals by name.

17            THE COURT:  Oh, yes, so that's a fair question.  I

18    used to run into that in the child porn cases.  It's confusing,

19    not that this is, but, you know, what exactly does the IP

08:58 20    address denote?

21            Okay, there it is.  Thank you.  Perfect.  I'm just

22    going to sit and skim it until the first juror comes in.  How

23    long do you think your witness will be today on direct?

24            MR. FRANK:  I hope to do it in under 45 minutes.  He's

25    mostly reading the Threema chats into evidence.

          1            THE COURT:  And then how long -- you may go for a

          2    while.

          3            MR. NEMTSEV:  Maybe for a while.  I hope not to go

          4    more than an hour and a half, your Honor.

          5            THE COURT:  So who's next?

          6            MR. KOSTO:  Ms. Yanochko or Ms. Shah.

          7            THE COURT:  Both what?

          8            MR. KOSTO:  Both short witnesses.

          9            THE COURT:  Yanochko is who?

08:58    10            MR. KOSTO:  Ms. Yanochko is -- she prepared summary

         11    charts.  She's a financial investigator from our office.

         12            THE COURT:  Yes.  She's going to be the one who's next

         13    because I'm going to have to read this, but right now let me

         14    take a look at 267.

         15            MR. KOSTO:  Thank you, your Honor.

         16            (A recess was taken, 8:58 a.m.)

         17            (Resumed, 9:05 a.m.)

         18            THE COURT:  We have the last juror.

         19            THE CLERK:  The agents and the interpreters are still

09:06    20    under oath.

         21            THE COURT:  To the extent -- just hold on one second,

         22    okay?  Are we okay?

         23            To the extent I just read Exhibit 267, there is an

         24    email from Ms. Shah that's part of the chain of custody.  I

         25    allow her to verify it was her email and what she was doing,

1    but that's it.

2         MR. KOSTO:  That's what we proposed to introduce.

3         THE COURT:  Well, no, that's not what the 302 says.

4    The 302 is like, you know, I should be a computer science

5    major.  So, anyway, it's just you had wanted some notice

6    beforehand, so I'm likely to limit it to the chain of custody.

7         MR. NEMTSEV:  We don't challenge the email or the

8    chain of custody.  It's in evidence.

9         THE COURT:  I know, but they can put in their case.

09:06 10         One thing that the government's brief flagged -- and

11    indeed I've talked to several of my colleagues about this --

12    it's highly unusual to send venue to a jury.  It's been hard to

13    find any of my colleagues who have actually done it.  I'm not

14    saying never.  I'm just saying it's rare, so I'm not finding

15    much guidance in my colleagues' experiences on doing this.  You

16    know, we talk to each other about it.  Just I don't know if any

17    of you have done that before.  You did in *Varsity Blues*?  Is

18    that it?

19         MR. FRANK:  We did.  It wasn't an issue quite the way

09:07 20    it is here, but I did find that Judge O'Toole found that

21    because the evidence was reliable, it did not need to go to the

22    jury.

23         THE COURT:  Well, here it's contested, so I'm going to

24    allow it to go to the jury.  But I'm just saying, it's not such

25    a -- and that case going to the Supremes seems to have it.

1          MR. FERNICH:  Your Honor, at home, it's standard

2    practice, you know, and that's why there's a *Sand* instruction,

3    so I've never heard of it not going to the jury.

4          THE COURT:  I know, it's the first time you sort of

5    raised the -- can I use the word "balloon" after the

6    weekend? -- but, anyway, the first time you raised the balloon.

7    Anyway, at this point I'm trending towards allowing it to go to

8    the jury.  So, anyway, okay, let's get the jury.

9          Do you have to hit the button again?

09:08 10          THE CLERK:  Yes.  It dies out.

11          (Pause.)

12          THE COURT:  What's the issue?  Wouldn't you know, I

13    got a notice today the Health Unit is closed.

14          (Discussion between the Court and Clerk.)

15          THE COURT:  You know, while we're waiting for them, do

16    you have a sense of timing still as to when we need to do that

17    jury charge?  When do you think it's okay to --

18          MR. FRANK:  Wednesday might be good.

19          THE COURT:  When?

09:10 20          MR. FRANK:  Wednesday.

21          THE COURT:  I could go to the jury on Wednesday?

22          MR. FRANK:  No.  Wednesday would be a good time for

23    the charge conference.

24          THE COURT:  Okay.  So maybe it would go to the jury on

25    Friday maybe?

1          NEMTSEV:  I think that's right, that's reasonable, if

2     we close on Friday.

3          THE COURT:  All right, so I can at least do the charge

4     conference on Wednesday.

5          MR. NEMTSEV:  Yes.

6          THE COURT:  Fair enough.

7          One of the jurors says she has a doctor's appointment

8     Monday afternoon; does she need to postpone?  It's right on the

9     edge.

09:11 10          MR. FERNICH:  A week from today?

11          THE COURT:  Yes.

12          THE CLERK:  Juror Number 1.

13          THE COURT:  Next week, right?

14          THE CLERK:  I don't know.  He just handed it to me

15     and --

16          THE COURT:  So we'll let them go, if worst comes to

17     worst.  We'll break for half a day --

18          THE CLERK:  All rise for the jury.

19          (Jury enters the courtroom.)

09:11 20          THE COURT:  Good morning.

21          THE JURY:  Good morning.

22          THE COURT:  There we go.  We've got everybody.  Once

23     again, the most amazing jury.  You came on time.  I hope you

24     got home well on Friday.  It was cold as could be for 24 hours,

25     but then today is beautiful.  Did anyone speak about the case,

1    see anything in the press, do any social media research, anyone

2    try and communicate with you?  I find the jury has complied.

3          You know, just after I got the email this morning that

4    the Health Unit was closed today, Maryellen managed to have a

5    treasure trove of Band-Aids, so that's why I can count on her

6    for anything.

7          So, anyway, why don't you be seated, and I hope you

8    all have your notebooks.  We're going to go back to the agent.

9    We did get -- oh, my God, I forget his name -- the Saxo man

09:12 10   back on the plane, so thank you for coming in on Friday.

11          All right, go ahead.

12          MR. FRANK:  Thank you, your Honor.

13                          DAVID HITCHCOCK

14   having been previously duly sworn, was examined and testified

15   further as follows:

16   CONTINUED DIRECT EXAMINATION BY MR. FRANK:

17   Q.   Good morning, again, Special Agent.

18   A.   Good morning.

19   Q.   It's been a while.  Special Agent, when we broke last

09:12 20   Thursday, we received a juror question that I'm going to pose

21   to you now.  The question is this:

22          "For every IP address in the world, can you tell who the

23   person or persons are who are utilizing that particular IP

24   address?  For example, for my personal laptop, would that IP

25   address have my name associated to it?"

1    A.    So with an IP address, going back to an ISP where they

2    maintain records of who their customers are, then on a specific

3    day at a specific time, that IP address would be associated

4    with an individual, so there would be attribution in that case.

5    In other cases, say the use of a VPN, a virtual private

6    network, or otherwise an ISP that does not maintain records or

7    does not disclose the subscriber of a given IP address at a

8    specific date and time, then we would not have a name

9    associated with it.  So in that case, what we would do is, we

09:14  10    would see where --

11             MR. NEMTSEV:  Objection, your Honor.

12             THE COURT:  Excuse me?

13             MR. NEMTSEV:  I object to what "we would do."

14             THE COURT:  Yes, sustained.

15    Q.    Well, what would you do if you did not have a name

16    associated with an IP address?

17             MR. NEMTSEV:  Objection.

18             THE COURT:  Overruled.

19    A.    We would investigate where that IP address was used on and

09:14  20    around that specific date and time to include institutions

21    where you would have a real person's identity and name

22    associated with an IP address.  So a financial institution

23    would keep records like that.  Certain social media and email

24    accounts, Apple accounts would maintain records that go back to

25    a real person.

           1          MR. FERNICH:  I object to this, for the record, to the

           2    procedure and under 702.

           3          THE COURT:  Well, I think, yes, that was far beyond

           4    the question, so I'll strike that.

           5    Q.   Okay, I want to now -- we went through a lot of IP

           6    addresses quite quickly when you were last here on Thursday.  I

           7    want to go back to those IP addresses and give the jurors an

           8    opportunity, if they wish, to write those down and just quickly

           9    review how they were used.  So let me just -- we used this

09:15     10    chalk.  Do you recall testifying about this chalk, Special

          11    Agent?

          12    A.   Yes.

          13    Q.   Okay.  So I believe you testified you received some domain

          14    names from Toppan Merrill.  Do you recall that testimony?

          15    A.   Yes.

          16    Q.   Okay.  What did you do with those?

          17    A.   We went to Namecheap and inquired about those domains.

          18    Q.   And what did you learn from Namecheap?

          19    A.   That the accounts associated with the domain names were

09:16     20    subscribed to with "inbox.lv" email accounts, as well as there

          21    was at least one of three common IP addresses used to subscribe

          22    to the account.

          23    Q.   What were the three common IP addresses?

          24    A.   The first IP began with 89.238.

          25    Q.   Okay.  So I'll write that down.  I don't have very good

1    handwriting, but I'll do my best.

2    A.   We lost the visual.

3         THE COURT:  Did you lose your screen?

4         THE WITNESS:  Yes, ma'am.

5         THE CLERK:  I knew that was going to happen.  I don't

6    know why.

7         THE COURT:  Have you got your screens?  Yes, they do.

8    It's just the witness screen.

9         THE CLERK:  It's when I toggle back and forth, it's

09:16 10   just a problem with the witness stand.  No one seems to know

11   why.  It's back.

12        THE WITNESS:  Thank you, ma'am.

13   Q.   So that was one of the three, 89.238.166.235?

14   A.   Yes.

15   Q.   What was another?

16   A.   64.42.

17   Q.   Was that the second, 64.42.179.59?

18   A.   Yes.

19   Q.   Okay.  And what was the third?

09:17 20   A.   It was a 199.249.

21   Q.   Was that the third IP addresses, Special Agent?

22   A.   Yes.  Yes, it was.

23        THE COURT:  IP address for what?

24        THE WITNESS:  These were three common IP addresses

25   wherein each of the accounts associated with the domains that

```
 1   TM provided, at least one of these three IPs appears associated
 2   with each of those accounts.  So the domains were bought by way
 3   of Namecheap.  Namecheap maintains IP addresses of who bought
 4   them from what IP address at what date and time; and then, if
 5   you go into the account again to view or manipulate that
 6   account, they'll log those IP addresses and --
 7              THE COURT:  So these aren't Toppan Merrill's?
 8              THE WITNESS:  No.  These are the IPs associated with
 9   the individuals, or a group of individuals, that purchased the
10   domain names that were used in the intrusion into Toppan
11   Merrill.
12              THE COURT:  So these are the alleged intruder's domain
13   names?
14              THE WITNESS:  Yes.
15              THE COURT:  All right.
16   Q.   And all of those accounts were from an inbox.lv email
17   address?  They were all --
18   A.   That's correct.
19   Q.   When you had these IP addresses --
20              THE COURT:  Can I be clear about this.  You're not
21   getting this chart.  These look like -- you know, as I said,
22   it's quaintly called a "chalk" because we used to have
23   blackboards.  So I would suggest, because it's impossible to
24   memorize these numbers, you either write it down, but you're
25   not getting this chalk.
```

1    Q.   Special Agent, once you had the information that all of

2    the domains were associated with an inbox.lv email address and

3    with one or more of these IP addresses, what did you do then?

4    A.   We identified that these domains were hosted at two

5    different hosting providers, Vultr and DigitalOcean, which

6    you'll see to the right.

7    Q.   Okay.  And what did you do then?

8    A.   We asked about the subscriber information for those

9    accounts, and we identified that they were associated with

09:19 10  99Stack and BitLaunch, who are third-party resellers --

11         THE COURT:  Wait a minute.  Slow down.  So all three

12   domain names, how were they associated with Vultr and

13   DigitalOcean?

14   Q.   Well, there were more than three domain names, correct,

15   Special Agent?

16   A.   Yes, and so --

17         THE COURT:  Excuse me.  We just heard about these

18   three domain names, so let's just cabin what we're talking

19   about.  With these three domain names, how did they relate to

09:19 20  Vultr and DigitalOcean?

21         THE WITNESS:  Well, I'll take one step back.  So these

22   three IP addresses were associated with multiple domain names

23   that TM provided to the FBI.

24   Q.   So TM found multiple domain names associated with the

25   intrusion on its system?

1    A.    Yes.

2    Q.    Those domain names came back to Namecheap?

3    A.    Yes.

4    Q.    Those domain names were all associated with one of these

5    three -- one or more of these three IP addresses?

6    A.    Correct.

7    Q.    And with an inbox.lv email address?

8    A.    Correct.  Common use of inbox.lv to subscribe to the

9    Namecheap accounts used to purchase the domain names that were

09:20 10   used in the compromise.

11   Q.    Once you had that information, you went to Vultr and

12   DigitalOcean?

13   A.    Yes.

14   Q.    And once you had that information, you went to 99Stack and

15   BitLaunch?

16   A.    Correct.  Those domain names were hosted at 99Stack and

17   BitLaunch.

18   Q.    Got it.  So multiple domain names, but only these three

19   common IP addresses?

09:20 20   A.    Correct.

21   Q.    Got it.  And when you went to 99Stack and BitLaunch, what

22   did you learn?

23   A.    We learned that two of those same IP addresses that we

24   observed in the Namecheap records were used to access both

25   99Stack and BitLaunch.

1    Q.    Which of the two?

2    A.    That was the 89.238 and the 64.42.

3    Q.    And was there anything else that you learned from 99Stack

4    and BitLaunch?

5    A.    Yes.  The account at each, 99Stack and BitLaunch, was in

6    the name of an Andrea Neumann with an email address

7    neumann@dr.com for each, the 99Stack account and the BitLaunch

8    account.

9    Q.    I see.  So all of those domain names were hosted on

09:22 10   computers, computer servers associated with these companies?

11   A.    Yes.

12   Q.    And all were associated with a single registrant, Andrea

13   Neumann?

14   A.    Correct, with a unique neumann@dr.com email account.

15   Q.    And that account had been accessed by two of those same IP

16   addresses?

17   A.    Correct.

18   Q.    What did you do then?

19   A.    We had new information at this point, the neumann@dr.com

09:22 20   email.  We went back to Namecheap and inquired about that email

21   account and identified a new Namecheap account.

22   Q.    In the name?

23   A.    In the name of Andrea Neumann with the neumann@dr.com

24   email account.

25   Q.    So Neumann had a separate account at Namecheap in the name

```
 1    Neumann?

 2    A.    Correct.

 3    Q.    And what did you learn about that account?

 4    A.    That it was paid for by way of Bitcoin, and that it was

 5    also accessed by the same 89.238 IP address that we had already

 6    seen.

 7    Q.    So that Andrea Neumann account was also associated with

 8    the 89 IP address?

 9    A.    Correct.

10    Q.    That's my pathetic attempt at an arrow.  Okay.  So once

11    you had that information, you mentioned that you also had

12    Bitcoin information?

13    A.    Yes.  The Namecheap domains associated with the Neumann

14    account were paid for by way of Bitcoin.

15    Q.    What did you learn about that?

16    A.    There was a third-party payment processor called BitPay

17    that we see at the bottom of the chart.  BitPay was used to

18    facilitate that Bitcoin payment.

19    Q.    What did you learn from BitPay?

20    A.    That the payment for the Andrea Neumann, Neumann@dr.com

21    email account was --

22    Q.    Did you get those records from BitPay?

23    A.    Yes.

24    Q.    Did you get any other records from BitPay?

25    A.    We also got records for a Wan Connie account.
```

          1    Q.    Okay.  Now, we have not heard about the Wan Connie

          2    account.  Do you know if anyone else is going to be testifying

          3    about the Wan Connie account?

          4    A.    Yes.  Mr. Vincent Kenny.

          5    Q.    What did you learn about the Wan Connie account?

          6    A.    The Wan Connie account was accessed by the M-13 89 IP

          7    address ending in .42.

          8    Q.    So the Wan Connie account came back to 89.107.124.42?

          9    A.    Yes.

09:24    10    Q.    And that's M-13?

         11    A.    Correct.

         12    Q.    Okay.  Now we move to the second IP address.

         13          MR. FRANK:  Ms. Molloy, could we please go back to the

         14    trial record.

         15          THE CLERK:  Yes.  Give me a minute, and then I want to

         16    make sure your screen works when I switch back because that's

         17    been a problem.  Okay, I just switched over.

         18          MR. FRANK:  Thank you.

         19          And, Ms. Lewis, could we have Exhibit 218 in evidence.

09:25    20    Q.    Special Agent, do you recall looking at Exhibit 218?  Do

         21    you have it on your screen?

         22          (Pause.)

         23          THE COURT:  What's happening now?

         24          THE CLERK:  His screen, as usual, when I toggle back

         25    and forth with the doc camera, we lose the connection.  So

1    we're going to have to just use the flat screen for now.  This

2    is ongoing in this courtroom.  We don't know why.

3    Q.   Special Agent, do you see that Exhibit 218 on the screen

4    in front of you?

5    A.   Yes.

6    Q.   On the right-hand side of that screen is another IP

7    address, 185.228.19.147.  Where did you get that IP address

8    from?

9    A.   This IP address came from TM.

09:26 10   Q.   So TM found evidence that this IP address had been used in

11   the intrusion?

12   A.   Yes.

13   Q.   And what did you learn about that IP address?

14   A.   That on January 29 --

15   Q.   Before you get to the specifics, who operated that IP

16   address?  Where did it come back to?

17   A.   The 185 IP address was hosted here in the United States at

18   an ISP called DediPath.

19   Q.   Okay.  And was it associated with a VPN?

09:27 20   A.   Yes.

21   Q.   What was the VPN?

22   A.   Its subscriber was AirVPN in Italy.

23   Q.   So that's an AirVPN IP?

24   A.   Yes.

25   Q.   Okay.  And I believe you testified about obtaining a pen

1   register?

2   A.   Yes.

3   Q.   That's like caller ID?

4          THE COURT:  So it was hosted at where?

5          THE WITNESS:  It was hosted here in the United States

6   at an ISP DediPath.

7          THE COURT:  How do you spell that?

8          THE WITNESS:  D-e-d-i-P-a-t-h.

9   Q.   And I believe we looked at -- I believe it was

09:27 10   Exhibit 130.

11          Ms. Lewis, can we look at 130.

12          This is the DediPath record associated with that

13   185.228.19.147 IP?

14   A.   Correct.

15   Q.   And what does it indicate about who the client is?

16   A.   AirVPN in Italy.

17   Q.   And you testified on Thursday that you obtained a pen

18   register on this IP address in January and February of 2020?

19   A.   Yes.

09:28 20   Q.   That's like caller ID?

21   A.   Correct.

22   Q.   Could we go back to Exhibit 218, please.  What did you

23   learn about the access to the 185 AirVPN IP through the pen

24   register?

25   A.   On January 29, 2020, the M-13 89 IP ending in .42 accessed

1    this AirVPN IP at 4:59 Pacific time.

2    Q.   So the M-13 89 IP which we just saw on the chalk, that

3    same IP accessed the AirVPN IP on January 29 at 4:59 PST?

4    A.   Correct.

5    Q.   And the AirVPN IP was associated with the unauthorized

6    access on TM?

7    A.   Correct.

8    Q.   Okay.  What else did you learn -- well, let me call up

9    Exhibit 196A in evidence, please.

09:29 10         And can we do that on the right, Ms. Lewis, with 218

11   on the left?

12         What did you learn about the use of the M-13 89 IP?

13   A.   The M-13 89 IP ending in .42 was used that same day,

14   January 29, 2020, at 2:18.

15   Q.   Okay.  Now, who used it on January 29, 2020?

16   A.   Vladislav Klyushin.

17   Q.   And how did he use it?

18   A.   He used it to access the Russian Standard Bank .ru account

19   associated in this screenshot.

09:29 20   Q.   And in the screenshot there's a time, 14:18?

21   A.   Correct.

22   Q.   What is 14:18 Moscow time in Pacific Standard Time?

23   A.   3:18 Pacific Time.

24   Q.   And how does 3:18 Pacific Time compare with the time that

25   the 89 IP accessed the AirVPN IP?

```
 1            MR. FERNICH:  Objection.
 2            THE COURT:  Overruled.
 3   A.   That is 1 hour and 41 minutes apart.
 4   Q.   So 1 hour and 41 minutes after Mr. Klyushin used the M-13
 5   89 IP to access his bank account, the M-13 89 IP was used to
 6   access the AirVPN IP?
 7   A.   Correct.
 8   Q.   And that AirVPN IP was found on TM's system?
 9   A.   As attributed to the intrusion activity.
10   Q.   Okay, one last IP address.  Could we have Exhibit 221 in
11   evidence, please.  What is Exhibit 221?
12   A.   This is showing on May 9, 2018, at 12:44 Pacific daylight
13   time, the 119.204.194.11 IP was used to update Ivan Ermakov's
14   iTunes account.
15   Q.   Now, we looked at 221 on Thursday and it said "PST."  Have
16   you corrected the chalk, the exhibit?
17   A.   Correct.  The time is the same hours and minutes, but it
18   was a typo on the time zone.
19   Q.   Okay, so at 44 minutes after midnight PDT on May 9, 2018,
20   Ivan Ermakov used the IP 119.204.194.11 to update his iTunes
21   account?
22   A.   Correct.
23   Q.   And the iTunes account was in whose name?
24   A.   Ivan Ermakov's true name.
25   Q.   Could we now have on the right Exhibit 195A in evidence.
```

09:30 10
09:31 20

1          What is 195A?

2     A.    These are DFIN logs associated with a Julie Soma account

3     showing on May 9 the 119 IP address accessing certain files.

4     Q.    So at 48 minutes after midnight Pacific Time on May 9,

5     2018, how was the 119 IP used with respect to documents of

6     Horizon Pharma PLC?

7     A.    It was used to download records associated with Horizon

8     Pharma.

9     Q.    Using whose username?

09:32 10     A.    Julie Soma.

11     Q.    And how many minutes did that occur after Mr. Ermakov used

12     that exact same IP address to access his iTunes account?

13     A.    Four minutes later.

14     Q.    Okay.  And then there were other downloads in the minutes

15     afterwards?

16     A.    Yes.

17     Q.    Thank you, Special Agent.  You also testified on Thursday

18     about a 104 IP address.  Do you recall that testimony?

19     A.    Yes.

09:33 20     Q.    Could we have Exhibit 140 in evidence, please, and could

21     we go to Page 5.

22          Do you recall testifying about this invoice from Micfo?

23     A.    I do.

24     Q.    And the date on this invoice is November 24, 2018.  Do you

25     see that?

1    A.    Yes.

2    Q.    And the due date is December 1st, 2018?

3    A.    Yes.

4    Q.    Directing your attention to the first entry, do you see an

5    entry for an IP address 104.238.37.0/24?

6    A.    Yes.

7    Q.    And that refers to a block of IP addresses in that range?

8    A.    Yes.

9    Q.    Okay.  And where was that IP address, according to this

09:33 10   invoice, hosted?

11   A.    Boston, Massachusetts.

12   Q.    Okay.  And that's on Server 7?

13   A.    Yes.

14   Q.    Okay.  This invoice says "unpaid."  Do you see that?

15   A.    Yes.

16   Q.    And I believe you testified that you had reviewed

17   documents indicating it had been paid?

18   A.    Yes.

19          MR. FRANK:  Could we have on the right, please,

09:34 20   Exhibit 268, and I'd offer it.

21          (Exhibit 268 received in evidence.)

22   Q.    Do you see Exhibit 268?

23   A.    I do.

24   Q.    Whose bank statement is this?

25   A.    This is StackPath's.

1    Q.   And StackPath was the entity that owned that IP address at

2    this time?

3    A.   Correct.

4    Q.   Okay.  And you can see that the address for StackPath in

5    the bank statement is what?

6    A.   2021 McKinney Avenue.

7    Q.   Okay.  And how is StackPath related to Mudhook Marketing?

8    A.   It is a parent company of Mudhook Marketing, among other

9    VPN companies.

09:34 10   Q.   And Mudhook is also on McKinney Avenue in Dallas?

11   A.   Yes.

12   Q.   Okay.

13        MR. FRANK:  And could we go to Page 8 of the bank

14   statement, please.  Is that page 8?  Can you go to Page 9, a

15   little bit earlier.  Let's try Page 6.  No, one earlier.  And

16   one over.  Oh, I'm sorry.  There we go.

17   Q.   Okay.  Special Agent, do you see there's an entry in the

18   bank statement on December 2, 2018, for Micfo?

19   A.   I do.

09:35 20   Q.   What is the amount of the payment that StackPath made to

21   Micfo on December 2, 2018?

22   A.   $1,010.

23   Q.   Okay.  And how does that compare to the amount that it

24   owed on the invoice on the left?

25   A.   The same.

1    Q.   Okay, could we go to Page 7 of the invoice on the left,

2    and do you see there's another invoice to Mudhook Marketing

3    dated December 4, 2018, regarding that same 104 IP address in

4    Boston?

5    A.   Yes.

6         MR. FRANK:  And, Ms. Lewis, if you go to the next

7    page, could we just look at the total for that invoice.

8    Q.   What's the total amount for that invoice?

9    A.   $3,030.

09:36  10        MR. FRANK:  And could we advance, Ms. Lewis, on the

11   right, to December 12.  There we go.

12   Q.   And do you see that there's a payment to Micfo on

13   December 12, 2018?

14   A.   Yes.

15   Q.   And how does that amount compare to the amount of the

16   invoice?

17   A.   The same.

18   Q.   Thank you.

19        MR. FRANK:  Ms. Lewis, you can take that down.

09:36  20   Q.   Special Agent, before we broke on Thursday, you were

21   testifying about messages you obtained that were sent on the

22   Threema chat application.  Do you recall that?

23   A.   Yes.

24        THE COURT:  Can we just back up for a minute.  What's

25   the 104 address?

1          THE WITNESS:  This is the IP address that is

2    associated with Boston, and it was used to access one of the

3    two filing agents.

4          THE COURT:  One of the two --

5          THE WITNESS:  Filing agents, so to access the material

6    nonpublic information at one of the two filing agents.

7          THE COURT:  Not the list you gave us?

8          THE WITNESS:  We were referring to the 119 IP.  I

9    think that may be what you're -- oh --

09:37 10          MR. FRANK:  Give me one moment.

11          THE WITNESS:  I see.  You're referring to the chalk.

12          THE COURT:  Yes.

13    Q.   Could we look at Exhibit 191 in evidence, please.  What is

14    Exhibit 191, Special Agent?

15    A.   These are records associated with the same Julie Soma

16    account at DFIN where a 104 block of IPs were used to access

17    material nonpublic information at DFIN by way of a Julie Soma

18    account on October the 22nd and 23rd.

19    Q.   And this is that same 104.238 block of IP addresses that

09:38 20    we just looked at on the Micfo invoice?

21    A.   Correct.

22    Q.   That was owned by StackPath?

23    A.   Correct.

24    Q.   And you see that the first date of the download depicted

25    on this exhibit is on October 22nd?

1    A.    Yes.

2          MR. FRANK:  Can you go to the next page, Ms. Lewis.

3    Q.    And it continues later into October?

4    A.    Yes.

5    Q.    And the next page.

6    A.    And into November.

7    Q.    And the next page.

8          MR. FRANK:  Is this the last page, Ms. Lewis?

9    Q.    So this is the last page, and you can see that the use of

09:39 10   that IP address continued to November 8, 2018?

11   A.    Yes.  The use of this IP block, the 104.238.37 block of

12   IPs that goes back to StackPath at Micfo in Boston, is

13   represented here accessing the Julie Soma account between that

14   October-November time period for these company names.

15   Q.    Okay.  Okay, back to the Threema chat application.  What

16   is Threema?

17   A.    Threema is an encrypted chat application that can be used

18   to communicate between one or more people, so at least two

19   people are exchanging communications.

09:39 20   Q.    How does Threema compare to WhatsApp?

21   A.    It is very similar.  WhatsApp uses a telephone number to

22   distinguish who the counterparties are.  Threema uses an

23   alphanumeric string that is randomly created to be associated

24   with each of the individuals, a random string.

25   Q.    So it's more anonymous?

```
 1   A.    Correct.
 2   Q.    Are you able to identify who the individuals are who are
 3   associated with that alphanumeric string?
 4   A.    Yes.
 5   Q.    How do you do that?
 6   A.    By review of the context and content of the communications
 7   and compare it to other data.  You might have other
 8   communications where they might refer to that specific unique
 9   code, that alphanumeric code.
10   Q.    So in this case, where did you find an unencrypted version
11   of this Threema chat?
12   A.    Nikolai Rumiantcev's Apple account.
13   Q.    And were you able to associate one of the alphanumeric
14   strings to Nikolai Rumiantcev?
15   A.    Yes.
16   Q.    What else did you learn about the other alphanumeric
17   strings?
18   A.    That one of the accounts was associated with Ivan Ermakov,
19   and another account was associated with Vladislav Klyushin.
20   Q.    And how did you determine that?
21   A.    Ivan Ermakov and Vladislav Klyushin shared a WhatsApp
22   exchange where that unique random code associated with Threema
23   was shared.  So in a separate chat application, we see the
24   Threema unique secret code being exchanged at and around the
25   same time that that unique code enters into a multiparty
```

1    communication inside Threema.  In other words, you have to

2    share your code with someone so they know who you are or they

3    know to add you to a certain chat, and we saw it being shared

4    in WhatsApp.

5    Q.   Special Agent, we're going to call up an extract from that

6    Exhibit 151.  151 was the WhatsApp chat between Mr. Klyushin

7    and Mr. Ermakov.  Do you recall that?

8    A.   Yes.

9         MR. FRANK:  Can we have 151E, please, and I'd offer

09:42 10   it.

11        (Exhibit 151E received in evidence.)

12   Q.   Special Agent, what are we looking at on 151E?

13   A.   Vladislav Klyushin is transmitting to Ivan Ermakov via

14   WhatsApp a unique alphanumeric code that is associated with a

15   Threema account.

16   Q.   2JE3DWWU?

17   A.   Correct.

18   Q.   What is the date and time of this communication on

19   WhatsApp?

09:43 20   A.   On May 13, 2019, at 3:20 p.m. Eastern.

21        MR. FRANK:  Ms. Lewis, could we now put this on the

22   left, and on the right could we have Exhibit 46 -- oh, I'm

23   sorry.  That's Excel, so we can't do it side by side?  Okay.

24   Q.   So this was May 13, 2019, at 3:20 p.m., do you see that,

25   Eastern Time?

        1   A.   Yes.
        2        MR. FRANK:   Okay, could we now have Exhibit 46, and
        3   I'd offer it.
        4        (Exhibit 46 received in evidence.)
        5        MR. FRANK:   And, Ms. Lewis, if you could take us in
        6   Exhibit 46 to Line 2271.
        7   Q.   Why is this exhibit, Special Agent, in an Excel format?
        8   A.   This was the way it was extracted from the Threema
        9   database.
09:43  10   Q.   And you see that there are different -- the text entries
       11   are color-coded?  Some are red, some are blue, some are black,
       12   and I believe we'll see some that are green?
       13   A.   Correct.
       14   Q.   Who color-coded it?
       15   A.   The FBI.
       16   Q.   And what do the colors represent?
       17   A.   The individuals who are communicating.
       18   Q.   Okay.  So who is the individual that you identified in red
       19   text?
09:44  20   A.   Ivan Ermakov.
       21   Q.   Who is the individual in black text?
       22   A.   Nikolai Rumiantcev, the owner of this Threema account.
       23   Q.   Who's the individual whose text we'll see in green?
       24   A.   This is Vladislav Klyushin.
       25   Q.   And then there's an individual in blue.  Who's that?

```
 1    A.     An unidentified individual.

 2    Q.     Okay.  So directing your attention to Line 2271, could you

 3    read, identifying the speakers, from 2271 to 2288.

 4    A.     Ermakov --

 5           THE COURT:  Something just happened, so it's blurred

 6    and we can't read along.  Do you know?

 7           MR. FRANK:  Is that better, your Honor?

 8           THE COURT:  Can you blow it up a little bit?  Good.

 9    Thank you.

10    Q.     Special Agent, could you begin at 2271.

11    A.     "Ermakov:  Greetings!  I created a group and added here

12    another person.  I invite to write and discuss all issues

13    concerning trading and topics related to it here."

14    Q.     Continue.

15    A.     "An unidentified individual:  Hi.  OK.

16           "Rumiantcev:  Can you tell at least, in general, who is

17    this third person?

18           "Ermakov:  This is my colleague.  He is completely on top

19    of the subject.  You can trust him as you trust me, and if you

20    want, you can check with Vlad.

21           "Rumiantcev:  Add Vlad to the chat.

22           "Nikolai Rumiantcev:  Should all issues be addressed

23    there?

24           "Ermakov:  Do you think he needs that?

25           "Rumiantcev:  Yes, quite often we need to explain him
```

1    something that we have already discussed in the chat.  But this

2    way he will be reading it on his own.

3         "Ermakov:  Yes, for working issues, I do not always have

4    time and I'm not always available, so the colleague will be on

5    it.

6         "Rumiantcev:  One more question:  Is the mailbox one for

7    everyone, or a group one needs to be created?

8         "Ermakov:  This way it will be easier.  There is one email

9    and it is sufficient for now.

09:46 10         "Rumiantcev:  OK.  Will you add Vlad?

11         "Ermakov:  Added.

12         "Vlad:  A good name.  Greetings everybody."

13    Q.   Okay, and if we look at the time entry when Mr. Klyushin

14    joins the chat, you can see, if we move up a few lines,

15    Mr. Rumiantcev says, "OK.  Will you add Vlad?"  That's at 3:12

16    p.m.?

17    A.   Yes.

18    Q.   And Mr. Ermakov responds at 3:22 p.m. "Added"?

19    A.   Yes.

09:47 20    Q.   And do you recall that the time stamp on the WhatsApp chat

21    with the alphanumeric string was 3:20 p.m.?

22    A.   Correct.

23    Q.   So that's two minutes before this entry?

24    A.   Correct.

25    Q.   Thank you, Special Agent.  And there are a few spots here

1    I should just note, like on line -- the one that's marked 2281

2    where you see there's a prior communication, and then there's a

3    response to that?

4    A.    Yes.

5    Q.    What does that indicate, Special Agent?

6    A.    That's whenever an individual wants to reply, there may be

7    ten strings of chat, they want to reply to one of those ten

8    lines uniquely, and they will reply to that one out of the ten

9    lines, and it will be quoted --

09:48 10   Q.    If the chat is going back and forth and there's multiple

11   entries, this could reply to an earlier line in the chat?

12   A.    Correct, so it's clear what they're replying to.

13   Q.    Okay.  I want to now back up to the very top of the

14   Threema chat.  Was the Threema chat ongoing by the time

15   Mr. Klyushin joined on May 13?

16   A.    Yes.

17   Q.    Okay.  When is the date of the first entry of the Threema

18   chat?

19   A.    October 30 of 2018.

09:48 20   Q.    And who's involved in the chat as of that date?

21   A.    This is Rumiantcev and Ivan Ermakov.

22   Q.    Okay.  And if we could move to Lines 155 to 158.  The jury

23   will have the entire Threema chat in evidence.  I'm just going

24   to be directing you to certain lines to read them for the

25   record.  If we go to 155, could you begin reading there until

1    Line 158.

2    A.    "Ermakov:  Here's the situation.  SSNC is a problem stock.

3    Along with report they declared additional securities emission.

4    So far there is no information on the price numbers and this is

5    not good.  Close them in first place, for they most likely will

6    go down."

7    Q.    And what is the date of that communication?

8    A.    This is November 1, 2018.

9    Q.    Could we advance to Line 226, please.  And I'd ask you to

09:49 10   read from Lines 226 to 234 beginning with the date.

11   A.    November the 2nd, 2018.

12        "Ermakov:  Can you summarize results today?

13        "Rumiantcev:  What does it mean?  What is the earning?

14        "Ermakov:  Yes.

15        "Nikolai Rumiantcev:  I make a report for Vlad every

16   trading day, and the next trading day after 15, when reports

17   from the broker come.

18        "Ermakov:  I got it.  Can you cc it to me, as well?!

19        "Rumiantcev:  I will send information on trades."

09:50 20   Q.    Thank you, Special Agent.  And I neglected to ask you this

21   earlier:  These communications were originally in Russian,

22   correct?

23   A.    Yes.  The FBI translated what I am reading here.

24   Q.    Thank you.  Could we move ahead to Line 259, please.  And

25   what is the date of Line 259?

```
 1    A.    This is November the 8th of 2018.

 2    Q.    Could you read from 259 to 270.

 3    A.    "Rumiantcev:  What are you thinking to do with Roku?

 4          "Ermakov:  So far there is no reason for such a drastic

 5    fall.  I will put together results from trading and will

 6    decide.  The same with TRIP.

 7          "Nikolai Rumiantcev:  We acted too hastily about TDD.

 8          "Ermakov:  This was not us who were hasty.  It is market

 9    that is acting strangely.  Linked to a NASDAQ article about why

10    Roku stock was slammed Thursday.

11          "Rumiantcev:  I've read it.  Should we wait for comeback?

12          "Ermakov:  I think so.  Too big of a loss otherwise.

13    Let's see what's going to be happening today.  The market

14    situation is complicated.  Whatever should be going up, going

15    down, and vice versa.

16          "Rumiantcev:  Perhaps we should work with stops when

17    opening new positions?

18          "Ermakov:  We are talking about it.  Describe how you see

19    it.  I don't quite understand how to work with them on large

20    volumes."

21    Q.    Thank you, Special Agent.

22          Could we move, Ms. Lewis, to Line 375.

23          Special Agent, could you read from Line 375 to Line 382

24    and beginning with the date.

25    A.    November 19, 2018.
```

1          "Nikolai Rumiantcev:  Greetings.  There are two

2     corrections about the inquiry.  A different time we have

3     discussed with him three competencies.  1.  An experienced

4     trader able to maximize the profit.  2.  A work horse who will

5     simply be at the terminal at the specified time by you and will

6     act on instructions like me.  3.  An analytical machine who

7     will provide forecast on securities based on raw data, much

8     better than to what we have now.  What do you think, which

9     angle out of the current three is needed more?

09:53 10          "Ermakov:  Hello.  I apologize for not answering to the

11     Friday call.  Based on configuration we have now we would need

12     person No. 2.  Let us discuss this later on?

13          "Rumiantcev:  Okay.  What time should I write?

14          "Ermakov:  I'll write myself.

15          "Rumiantcev:  OK.

16          "Ermakov:  Should we post requests?"

17     Q.   You can stop there, Special Agent.  And could we move

18     ahead to Line 426, please.  What is the date of that?

19               THE COURT:  If I understand this correctly, is that

09:53 20     any one of the four you mentioned could be in here, but do we

21     have an indication that any of the other two were involved in

22     these chats?

23               THE WITNESS:  Well, where it's specified, they are,

24     but in these particular --

25               THE COURT:  They're not?

```
 1              THE WITNESS:  Not at this point.
 2              THE COURT:  And so what color is it that comes in when
 3    Mr. Klyushin allegedly is in it?
 4              THE WITNESS:  Green is Mr. Klyushin.
 5    Q.   So these early chats are between Mr. Ermakov and
 6    Mr. Rumiantcev?
 7    A.   Correct.
 8              THE COURT:  Only those two so far?
 9              THE WITNESS:  Correct.  Then there is a certain point
10    in time where the blue unidentified individual that is denoted
11    by blue font --
12              THE COURT:  Yes, and when the blue guy comes in, the
13    one we don't know, he's not charged in the conspiracy.  I'm
14    allowing it in not for the truth of anything he says but only
15    for the context of the conversation as it flows.  We don't know
16    about blue, all right?  So he's not a charged participant.
17    Q.   Mr. Klyushin joined in May of 2019?
18    A.   Correct.
19    Q.   And we're now looking at November of 2018, correct?
20    A.   Correct, correct.
21    Q.   Okay.  Could you pick up at Line 426, please, on
22    November 21, 2018 and read to line 456.
23    A.   "Rumiantcev:  Greetings.  Did you forget not about my
24    questions?
25              "Ermakov:  Hello.  No.  My opinion, we need a person who
```

will be ready to back us up.  At this time not always.  I can be at the terminal during the opening.  And all our closings need to be conducted at the trading opening.

"Rumiantcev:  What are the time frames for the person to be at the terminal?

"Ermakov:  Between 16:30 and 18:30.  This is a sufficient time frame if things go right.  An hour before and an hour during.  This is the maximum time frame.

"Rumiantcev:  In other words, 15:30 till 19:30?

"Ermakov:  Why?  The opening now is at 17:30.

"Rumiantcev:  Okay, this is clear.  Regarding the time, is this any working day?  Or we work 1.5 months every 3 months?  That or until the new year and we will see from there?  Or should I look for a person for the next quarter?

"Ermakov:  We work during the reporting period, but in reality it turns out that we work only 1.5 months during the reporting time frame.

"Rumiantcev:  In other words, we will need a person for that time frame.  November the 1st to December 15th, 2018; February 1st, 2019, to March 15th of 2019; May 1st, 2019, to June 15, 2019; August 1st, 2019, to October 15, 2019.

"Ermakov:  No.  Approximately from January 20 to March 10, April 20 to June 15 and so forth.

"Rumiantcev:  October 20, 2018, to October 10, 2018; January 20, 2019, to March 10, 2019; April 20, 2019, to

June 10, 2019; July 20, 2019 to September 10, 2019.  Is this

correct?

"Ermakov:  Reporting every three months starting the new

year.  The active phase begins in mid of the first month of

each reporting quarter.

"Rumiantcev:  Well, it seem I indicated correct time

frames for 2019, did I?

"Ermakov:  January 20, 2019, to March 10, 2019; April 20,

2019, to June 10, 2019; July 20, 2019, to November 10, 2019;

October 20, 2019, to October 15, 2019.

"Rumiantcev:  Okay.

"Ermakov:  Now, it's the end of the 4th quarter.  New

reporting period is starting.  January 1, 2019.

"Rumiantcev:  About the competency requirements.  QUIK.

1.  Can create/modify/cancel the order.  2.  Can

create/modify/cancel a stop bid.  3.  Understands the trading

windows, schedule, the order book, the condition of the

portfolio.  And I would gladly throw in my daily report.  Is

this enough for starters?

"Ermakov:  Enough, but this must be a trusted person, not

someone from the street."

And it repeats.

"Enough, but this must be a trusted person, not someone

from the street.

"Rumiantcev:  Yes, I understand.  There is one like that.

He just needs to be explained what exactly is required.  So I

want to form a set of requirements to estimate the approximate

cost, and write to Vlad, and then come to an agreement with the

person.  Generally, everything is clear.  About two other

competencies (professional trader and analyst) from your point

of view, we don't need these competencies, right?

    "Ermakov:  I don't have an answer to this question.  It

all depends on what we want to have in the end.

    "Rumiantcev:  I think that Vlad, just like any other

person in his shoes, wants approximately same thing as others,

spend less, earn more.  Therefore, we need to have understanding.

What can make more profits for us.  Options:  1.  We can't

implement a lot of trading ideas because of the broker" -- and

there's an arrow -- "we look for another broker.  2.  We

implement poor trading ideas, due to low level competencies as

traders (do not know some tricks, do not know how to use bots,

we suck in placing stops and take profits).  We are looking for

a trader.  3.  We analyze poorly the data we have.  We generate

poor trading ideas because of that," and there's an arrow, "we

look for an analyst.  4.  We can attract more money for the

management.  It needs a broker for a legal entity.  I do not

have enough time for this task, but within a couple of months,

we will resolve this issue."

Q.   Thank you, Special Agent.  And there is a reference in

there to QUIK.  What is QUIK?

1    A.   QUIK is an application, rather than an online portal, it's

2    an actual application that you would install on a computer to

3    automate your trading.

4    Q.   And there were two references in there to Vlad.  What is

5    the defendant's first name?

6    A.   Vladislav, and Vlad for short.

7    Q.   Could we go to Line 531, please.  What is the date of

8    Line 531?

9    A.   January 29, 2019.

10:01 10   Q.   And could you read until Line 537.

11   A.   "Rumiantcev:  Vlad asked to clarify the situation with

12   ADTN.  Why one account has short and another has long?

13        "Ermakov:  This is because when I was closing I purchased

14   400 more by mistake.  But I already closed them in plus.

15        "Rumiantcev:  Okay, got it.  Why did you decide to leave

16   it at Vlad's?

17        "Ermakov:  Did not have time to close.

18        "Rumiantcev:  It's a pity.  It went way down.

19        "Ermakov:  I agree."

10:01 20   Q.   Thank you, Special Agent.  Could we move ahead to

21   Line 565, please.  What's the date?

22   A.   February 1, 2019.

23   Q.   And you see that here there's an inquiry posed by

24   Mr. Ermakov?

25   A.   Yes.

1          MR. FRANK:  Can you just enlarge that box a little

2    bit, Ms. Lewis.

3    Q.   What's the inquiry?

4    A.   Ermakov asks, "What thoughts you have regarding bringing

5    in analysts?"

6    Q.   And there appears to be some coding in there that is

7    erroneously appearing, but could you just read the text that is

8    Mr. Rumiantcev's response.

9    A.   Rumiantcev replies, "Three options.  Number 1:  We need

10:02 10   operators who will trade based on recommendations and would

11   push those buttons that you will direct to just be on a safe

12   side.  There is such a person.  Number 2:  We need a trader to

13   whom we will give securities and directions for the position.

14   He will further decide on where to put stop bids and take

15   profits.  Number 3:  We need an analyst who will study the

16   materials you have and will give the signals by himself."

17   Q.   Continue.

18   A.   "What option we are talking about now?

19          "Ermakov:  We are talking about option 3.

10:02 20          "Rumiantcev:  Thoughts are we have a system for the mass

21   media analysis, which collects data from the media and social

22   networks.  We will modify it somehow so that a third-party

23   analyst would think the materials have been found in an open

24   source.  Then we will look for an analyst through our

25   acquaintances and will try to offer him to make a forecast,

1    perhaps on ten securities, in case he will work well -- we will

2    lure him in to work for us.  We will be adapting the raw

3    material while preserving the essence, but there would be no

4    chance of passing it as is.  I think that it may work out that

5    we will produce a test system in a couple of months.

6        "Ermakov:  The main problem here is that should he realize

7    that the data is real, he would not start using it on the side

8    or be selling it.

9        "Rumiantcev:  I don't think one can hedge of all risks

10:04 10   100 percent.  A broker resolves similar issues by signing

11   confidentiality agreements.  In fact, there are managers who

12   see all of the transactions of all customers.  And if we want

13   to really protect ourselves, we can create fake documents to

14   mix with the real or just old ones -- in this case, they would

15   lose their values.  After all, only we will know what forecasts

16   are based on real data."

17   Q.    And, Special Agent, what is the date on which

18   Mr. Rumiantcev proposes creating fake documents to mix with the

19   real?

10:04 20   A.    February 1, 2019.

21   Q.    Thank you.  Could we move ahead to Line 609, please.  What

22   is the date of Line 609?

23   A.    February the 5th, 2019.

24   Q.    Could you read 609 and 610, please.

25   A.    "Rumiantcev:  Aren't you ready yet for a new broker?

1        "Ermakov:  While choosing a new broker it is very
2   important for us not to raise suspicion.  In spite that not all
3   our trades are profitable, our yesterday's trade scheme may
4   play against us, even though our volumes are not that great.
5   Just to think."
6   Q.   What is the date that Mr. Ermakov says that, "When
7   choosing a broker, it's important not to raise suspicion"?
8   A.   That is February the 5th, 2019.
9   Q.   Could we move ahead to the Line 1001, please.  What is the
10:05 10   date?
11   A.   This is March 21, 2019.
12   Q.   Could you read from Line 1001 to Line 1013, please.
13   A.   "Rumiantcev:  Good news.  Cyprus moves to the interactive
14   broker.  Most likely it will be better there with shorts.
15        "Ermakov:  The issue is that the interactive brokers
16   demands information on transactions and on the end
17   beneficiaries because this broker is monitored by the SEC.
18        "Rumiantcev:  We'll discuss it.
19        "Ermakov:  Please try your best on CRON.
10:06 20        "Rumiantcev:  Greetings!  Although the CRON security is
21   sufficiently liquid, it is not in the upstream brokers' (LEK
22   Securities) the easy-to-borrow list, therefore we can't do
23   anything."
24        There was a website for leksecurities.com sent.
25        "This is the current upstream broker.  It is also an

1    American one.  In this regard, replacing LEK with interactive

2    brokers, or IB, may not be creating additional risks.  However,

3    I will try to work on the architecture of interaction with the

4    upstream broker, including on what information he has and what

5    he can acquire about us."

6         A link to FINRA.org for a broker check.

7         "If you want" --" this is still Rumiantcev -- "If you want

8    you can investigate him in order to understand whether OBL,

9    which is also Otkrite, currently carries any risks working

10:07 10   through him.  I will inform you later separately about my

11   conversation with OBL about the sharing of our information.

12        "Ermakov:  Hello.  Thanks for information.  I will

13   definitely investigate it.

14        "Rumiantcev:  Hello.  Tentatively on Tuesday I will visit

15   Otkrite to discuss the security issues (which our data is out

16   there and what is accessible to the upstream broker, what

17   happens in case SEC comes in, what will change when the

18   upstream broker is changed, et cetera).  If you have questions,

19   you may ask."

10:08 20   Q.   And, Special Agent, it appears that this chat extended

21   over several days.  What is the date when Mr. Rumiantcev said,

22   "What happens in case SEC comes in"?

23   A.   This is March 24, 2019.

24   Q.   Okay, could we move ahead to Line 1069.  The next extract

25   is a little longer.  And could you tell us what date it starts

1    on 1069.

2    A.    April the 12th, 2019.

3    Q.    Could you read from 1069 to 1123, please.

4    A.    "Rumiantcev:  Taxi booking service Uber filed a $1 billion

5    initial public offering with the US Securities Commission on

6    April 11.  The placement will take place on the New York Stock

7    Exchange in May.  The initial share price will be announced a

8    few days before the start of trading.  In its bid, Uber

9    presented the financial figures for 2018.  The company's

10:09 10   revenue for the year rose 42 percent to $11.3 billion.  Every

11   month 91 million people use taxi services in more than 700

12   cities.  Should we participate?  Usually the price jumps big

13   one way or another at the IPO.

14        "Ermakov:  Hello.  Is this open source information?

15        "Rumiantcev:  Yes."

16   Q.    And then you see that there are certain attachments that

17   are sent?

18   A.    Yes.

19   Q.    And then at Line 1074, what does Mr. Rumiantcev say?

10:09 20   A.    "Greetings."

21   Q.    Okay.  And then pick up at Line 1078.

22   A.    "Will such an information be any of use for you, or we

23   only look at our data?

24        "Ermakov:  Hello.  We have this info.  We don't need this.

25   We need people that are based on our introductory information.

1      "Nikolai Rumiantcev:  Need to do a test.  But we have to

2    figure out how to do it, so that it is not clear where the

3    source of information comes from.  Possibly, distort some data

4    but keep the general essence.  And to ask to do the prediction

5    about security.  Then to see how well does the person make this

6    prediction.

7      "Ermakov:  Hello.  We have this info.  We don't need this.

8    We need people who, on our mission, for example, a week before

9    the planned reporting date of a particular company, the company

10:10 10   or the company we give will analyze these companies on the

11   basis of information from open sources.  They would study the

12   situation with previous reports, forecasts of analysts, funds,

13   and so on, and give their forecast for these companies.  Based

14   on all that and our own vision, we make the final decision.

15   Often, we do not have enough hands to analyze the situation in

16   depth, to understand the analyst's opinions, to understand the

17   expectations, whether the security is overvalued or vice versa.

18   This is precisely what type of analytics we need.

19      "Rumiantcev:  Okay, I will think.  The main emphasis is to

10:11 20   have the person 'a trusted one' who won't start leaking the raw

21   material when he or she gets access to it."

22   Q.   And let me just stop you right there.  That appears to be

23   some inadvertent green in there, but that should be all black?

24   A.   All black, yes.

25   Q.   Okay.

A.   "Ermakov:  He will not get access to anything.  He will

only provide analytics from open sources and a conclusion.  We

will make decisions on our own based also on our own analysis.

     "Rumiantcev:  That or should we bring in a person from the

street and he will be giving us only preliminary predictions,

and only your colleagues will be working with the raw material

based on predictions from specialist?  Got it.  Well, then in

this case we can find one on the oil market, for what it's

worth."

     Correction to spelling "find."

     "Ermakov:  What is needed is experience in company

analysis, financial reporting, and decision-making.  These are

usually bank workers and credit inspectors, but in principle

they can be from other areas as well.

     "Rumiantcev:  Got it.  I will get down to work with this.

Is there understanding about conditions?  Will there be any

fix?

     "Ermakov:  For now, I suggest we try 1-2 people on fix,

and then we'll see.  In fact, the work is big, complex, huge

volume to understand.  It is necessary to analyze 200-300

potential targets per quarter -- but that is in the future.

Now we have to try on a small selection sample and see how this

may simplify and help solve our task.  What is the situation

with our accounts now?

     "Rumiantcev:  VK01, AV, BV, VK02 (new account) ready for

battle, money is there.  NR (mine) - still under the control of

a partner.  SA - open, no money yet, but there is no QUIK yet

but should be there in week if documents will be quickly

signed.  USS - in the process of opening a new account, there

will be 300,000 U.S. dollars, time frame, two weeks."

Q.   Let me stop you right there, Special Agent.  We see some

initials.  Whose initials are VK?

A.   Vladislav Klyushin.

Q.   And then you see AV, BV?

A.   Yes.  AV appears to be a typo for AB, AB being Alexander

Butbaev, which we were looking at the other day.  Boris

Varshavksiy is BV, and then the VK01 and VK02 are references to

numbered accounts associated with Vladislav Klyushin.

Q.   Whose initials are NR where it says "mine"?

A.   Nikolai Rumiantcev.

Q.   And then SA?  Is that a name we haven't heard yet?

A.   Correct.

Q.   And then there's USS?

A.   These are the initials for Sergey Uryadov.

Q.   Thank you.  And then there's a reference in the next line

which you haven't read yet.  Mr. Rumiantcev says, "The trust

manager is holding back a bit -- time frame beginning of May."

     Do you have an understanding of what "trust manager"

refers to?

A.   Trust manager --

1          MR. FERNICH:  Object.

2          THE COURT:  Sustained.

3     Q.   Okay, can you continue the reading.

4          THE COURT:  How much more of the reading is there?

5          MR. FRANK:  Probably about ten minutes, your Honor.

6     A.   "The trust manager is holding back a bit -- time frame

7     beginning of May.  My principal problem is bureaucracy, new

8     clients would not sign paperwork in a speedy manner while those

9     are needed in large quantities.  Each needs to be explained, as

10:15 10    what this is and why this is needed.  Plus signing.  It takes a

11    very long time for Cyprus to create the trust manager and we

12    are not the only ones they have in this regard.  Ready to help

13    with trading until the trust, but let know ahead of time when

14    you need help.

15         "Ermakov:  Send me the accounts, the new ones, so that we

16    install them all for ourselves there.

17         "Rumiantcev:  VK2 is already accessible from Vlad's QUIK.

18    There is no QUIK for SA for now.  I am working on it.  But of

19    course I will send over everything when it's done.

10:16 20         "Ermakov:  In other words, there are two accounts via the

21    QUIK?

22         "Rumiantcev:  No.  Just switch the account in the combo

23    box.  The trust enables sending one task to multiple accounts

24    at once.  Can't do that for now.  For different individuals

25    different terminals need to be used, switching accounts of the

1    same person need to be done within one terminal.

2        "Ermakov:  Got it.  Good morning.  What is the situation

3    with accounts?  The coming week will be very busy.  I'd like to

4    be able to work at maximum.

5        "Rumiantcev:  Greetings!  So far it is the same.

6    Regarding the others, what's left to do is to connect the QUIK

7    and deposit the money.  One sent yesterday.  I don't know about

8    when the other will send it.  Otherwise the accounts are opened

9    for everyone.  They give QUIK only after the first deposit.

10:16 10       "Ermakov:  What is the problem with deposits?

11       "Rumiantcev:  This perhaps is a question for Vlad.  I

12   don't tell the client 'give me money.'  Right now 4 accounts

13   are ready, the 5th I think will be ready on Tuesday, the 6th by

14   Wednesday or Thursday, though I can't guarantee for that one.

15       "Ermakov:  Will the money for the 5th one be in on

16   Tuesday?  What are the sums for the 4 accounts?  You can give

17   me the approximate.

18       "Rumiantcev:  Right now all the accounts that are AB, BV,

19   and two Vlad's accounts in total have $2.7 million.  The

10:17 20   best-case scenario, the 5th should be ready by Tuesday and will

21   have about $400,000.  We expect the trust manager by May 1, and

22   perhaps another week in order to connect the accounts to it.

23       "Ermakov:  When the money will come there?

24       "Rumiantcev:  Already sent.  I think Monday-Tuesday, but

25   still needs the QUIK to get hooked up.  They give QUIK only

1    after the first deposit."

2    Q.   Thank you, Special Agent.  Could we jump ahead to 1470.

3         THE COURT:  What dates are we on now?

4    Q.   What is the date of Line 1470, Special Agent?

5    A.   April 27, 2019.

6    Q.   Could you read from 1470 to 1472.

7    A.   "Rumiantcev:  Hello.  Vlad asked to tell him what happened

8    to the GRUB," G-R-U-B "and I will do the report today, not on

9    monday (I downloaded the deals from the terminals at night

10:18 10   before closing).  I did not quite understand why you were

11   buying GRUB expensive (75 plus) on AB and BV?  Is this an

12   error, a wrong choice, or was there some idea behind it?

13        "Ermakov:  This was an erroneous trade."

14   Q.   Could we jump ahead to 2174, please.  What is the date of

15   2174?

16   A.   May 9, 2019.

17   Q.   Could you read the next four lines, please.

18   A.   "Ermakov:  Have you seen SAIL?

19        "Rumiantcev:  No.  What's up with it?

10:19 20        "Ermakov:  These are the two positions that we could not

21   short this week, but really wanted.  INGN and SAIL, S-a-i-l.

22        "Rumiantcev:  I just wrote a letter about this to Vlad.

23   The problem is in the work."

24   Q.   Could we move ahead to 2908, please.  What's the date of

25   2908?

1    A.    June 6, 2019.

2    Q.    And could you read from 2908 to 2911.

3    A.    "Ermakov:  Check out HOME, H-O-M-E, which we could not

4    short but really wanted to.

5          "Rumiantcev:  We will resolve this issue very soon.

6          "Ermakov:  Summarizing results for the quarter, for sure,

7    we have fucked up three good opportunities:  INGN, SAIL, and

8    HOME, 30, 30, 33 percent respectively.  Here is for today."

9    Q.    And, actually, if we could go back briefly to 2353.

10:20 10   Special Agent, if you could tell us what the date is of 2353.

11   A.    May 13, 2019.

12   Q.    That's the day that Mr. Klyushin joined the chat?

13   A.    Correct.

14   Q.    Could you read from 2353 to 2374.

15   A.    "Klyushin:  Kolya, why don't we open our interactive

16   brokers by ourselves?  Just for information.

17         "Rumiantcev:  To be brief, because the support is

18   practically absent in Russia.

19         "Klyushin:  Practice your English.

10:21 20         "Rumiantcev:  And the broker will see all our

21   transactions.  We don't fucking need it."

22         Rumiantcev continues:  "Language is not the problem here,"

23   replying to the "Practice your English."

24         Klyushin replying to Rumiantcev saying, "And the broker

25   will see all our transactions, we don't fucking need it," says,

1    "I was told that all Otkrite does is, it steals clients'

2    trading deals and copies it.  Fine.  We'll go far this way.  I

3    will discuss this with Kolya verbally.

4         "Rumiantcev:  The issue is that there are a bunch of

5    people involved in our day-to-day problems, but their

6    motivation to help and resolve matters is even less than what

7    Katusha Developers have."

8         The individual in blue unidentified:  "Most likely --"

9    Q.   Who is he responding to?

10:22 10   A.   He's responding to Vladislav Klyushin saying, "Kolya, why

11   don't we open an interactive brokers by ourselves just for

12   information."

13        "Individual in blue:  Most likely from fear of direct

14   trading and client visibility.  For SEC."

15        "Rumiantcev --

16        THE COURT:  Now, remember, he's not a charged person,

17   so that you can't take the truth of what he's saying.  Just to

18   understand the flow of the conversation, it puts it in context.

19   Thank you.

10:22 20        THE INTERPRETER:  Your Honor, may the Interpreter

21   respectfully request to see the Russian version of the text

22   because it doesn't make sense to interpret from English back to

23   Russian when the original version is in Russian.

24        MR. FRANK:  Your Honor, the translation has not been

25   disputed, and we're --

1          THE COURT:  I think we need to stick with what we

2     have, but we can -- I'm sorry.  Are we going too quickly for

3     you?

4          THE INTERPRETER:  Yes.

5          MR. FRANK:  We'll slow it down.

6          THE COURT:  Slow it down.  Thank you.

7     Q.   Could you pick it up, Special Agent, at 2363 and read it a

8     little more slowly.

9     A.   Yes.

10:23 10        2363, "Rumiantcev:  It's that it's not obvious for you

11    that there is so much attention around you.

12        "Individual in blue:  Via the American trader."

13        Rumiantcev responding to individual in blue who said "via

14    the American trader," Rumiantcev replies, "I mentioned it

15    earlier.  And the broker will see all our transactions.  The

16    fuck we need this.

17        Ermakov replying to Rumiantcev who said that "It's not

18    obvious for you that there is so much attention around you,"

19    smiley face, Ermakov responds:  "Not yet," smiley face.

10:23 20        "Rumiantcev:  Now all our transactions are blended among

21    all OBL, which is Otkrite clients."

22        Ermakov replying to Rumiantcev who said, "I mentioned it

23    earlier, and the broker will see all our transactions.  We

24    don't freaking need it," Ermakov replies, "Broker sees it even

25    now and can follow up on it.  The regulator is much more

1   important here."

2       Vlad replying to Rumiantcev who said, "It's that it's not

3   obvious for you that there is so much attention around you,"

4   smiley face, Vlad replies, "You just keep sending the reports

5   as you love to do on what was done and then everything will

6   become obvious."

7       Individual in blue:  "Here is a bit more about brokers --

8   where I saw about Saxo Bank," and there's a link to a Russian

9   website.

10:25 10    Individual in blue continues:  "Europe in this regards is

11  probably more preferable -- though the question remains to what

12  extent they cooperate with the American SEC.

13      "Rumiantcev:  Created the trust manager, they rewrote

14  their regulations to be fit for us.  This is a very difficult

15  thing to do.  They are making a mobile QUIK, lots of fucking

16  work with them.  Soon they will start working on data retrieval

17  API," which stands for application programming interface.

18      "Vlad, complained about lots of documents they are

19  bringing for signing.  The manager created 200 plus pages of

10:25 20    documents for us, which we have to fill out ourselves."

21      Vlad responds to individual in blue who said, "Europe in

22  this regards is probably more preferable -- though the question

23  remains to what extent they cooperate with the American SEC,"

24  Vlad replies, "Our people from Switzerland say that they're

25  blocking accounts with no questions asked for six months if the

1    profits are above 20 percent."

2    Q.   And, Special Agent, what is the date when Mr. Klyushin

3    says that "In Switzerland they're blocking accounts with no

4    questions asked if the profits are above 20 percent"?

5         MR. NEMTSEV:  Objection.

6         THE COURT:  Overruled.

7    A.   The date is May 13, 2019.

8    Q.   Can we move ahead to Line 3216, please.  What is the date

9    of Line 3216?

10:26 10   A.   June 13, 2019.

11   Q.   Could you read the next 16 lines, please.

12   A.   "Nikolai Rumiantcev:  Hello.  We need to record the profit

13   on AB and BV, want to transfer our part to VK1.  This takes up

14   some time on partners' end, up to 3 weeks.  We want that the

15   money is ready on VK1 by the start of trading.  What to do

16   about open positions on CARG and TLRY?  Are we recording the

17   profit by the estimated value of the portfolio?

18        "Ermakov:  What are the losses on each account should they

19   be closed now?

10:27 20        "Rumiantcev:  BV, negative 22,397.  AB, negative 24,164.

21        "Ermakov:  How much income was there for them per day?

22        "Rumiantcev:  For today?  Or yesterday?

23        "Ermakov:  Yesterday and today?!

24        "Vladislav:  For a month earned approximately 460 on

25   Sasha's and 260 on Boris'."

1    Q.    That's Mr. Klyushin?

2    A.    Correct.

3          Klyushin continues:  "425 Sasha.

4          "Rumiantcev:  What the hell is this de-anonymization?  How

5    do you suppose one would trust you enough to go with you on a

6    covert mission?"

7    Q.    And what names has Mr. Klyushin used in the prior two

8    lines?

9    A.    Sasha and Boris.

10:28 10   Q.    Okay, can you continue after "covert mission."

11   A.    Klyushin replies to Rumiantcev's question, "How do you

12   suppose one would trust you enough to go with you on a covert

13   mission," Vlad replies, "This is not about me.

14         "Rumiantcev:  And who do you suppose publishes screenshots

15   with full names?  Smiley face.

16         "Vladislav:  I'm about finances.  It was an accident."

17   Q.    Do you have the date on which Mr. Klyushin says "It was an

18   accident"?

19   A.    June 13, 2019.

10:29 20   Q.    Could we move ahead to 3585, please.  There's just two

21   left.  What is the date of 3585?

22   A.    3585 is July 8, 2019.

23   Q.    Could you pick up at 3585 until 3589.

24   A.    "Ermakov:  Hi.  What other options for brokers are there?

25         "Rumiantcev:  I haven't researched.  We have even open an

1    IB, or interactive broker account.  Finding pitfalls when

2    working with a broker is quite a long process.  I would not

3    like to be spread thin.  Vlad did not yet deposit the money in

4    Saxo.  I am ready to move on when we get a decision from him

5    (like it or not).

6        "Ermakov:  I already told Vlad, need to think about

7    reducing accounts.  Such a number of accounts with the same

8    securities with the same broker is a bad idea.

9        "Rumiantcev:  I think the goal was to 'collect 10 million

10:31 10   U.S. dollars."  Quote/unquote around the "collect 10 million

11   U.S. dollars."

12       "We can open all other accounts with another broker, but

13   first we need to work with him for a while.

14       "Ermakov:  Okay, we need to talk together and assess the

15   risks.  To collect 10 million is not a problem.  The problem is

16   to manage them without risks and safe for everyone without

17   arousing suspicion."

18   Q.   Okay, we don't see Mr. Klyushin in this exchange, but by

19   this date, was he involved in this chat?

10:31 20   A.   Yes.

21   Q.   Could we move ahead to the last section, 3980, please.

22   What is the date of 3980?

23   A.   July 18 of 2019.

24   Q.   You know, I apologize, Special Agent.  Before we get to

25   3980, could we do 3687.  There's one entry I forgot.  3687 is

1    which date?

2    A.    This is July 13, 2019.

3    Q.    Okay.  And could you read 3687 to 3690, please?

4    A.    "Nikolai Rumiantcev:  It is generally hard to analyze the

5    status of a security based on the social media networks.  We

6    have the TSLA," or Tesla, "collection set in Twitter at

7    100 percent.  Based on the ticker only, we get 18,000 messages

8    per week.  I can download into XLSX," or Excel.  "You can try

9    looking through it with your own eyes, maybe something will

10:32 10   catch your eye in case you are interested.  I'm not giving up

11   my hopes that our capabilities to collect news and posts in

12   social media may help us somehow."

13        Vlad replies to Rumiantcev saying, "I'm not giving up

14   hopes that our capabilities to collect news and posts in social

15   media may help us somehow," smiley fact, Vladislav Klyushin

16   replies, "We are trading only due to these opportunities, all

17   newer networks need monitoring as well."

18   Q.    Okay, thank you.  And now can we move to 3980, please.

19   And this date is?

10:33 20   A.    This is July 18 of 2019.

21   Q.    Would you begin with 3980.

22   A.    "Vladislav Klyushin:  So what did we earn today?"

23   Q.    And then there's an attachment?

24   A.    Correct.

25   Q.    And then he says what?

1    A.    Ermakov responds:  "About 350 and another 350 in the mind.

2    Sasha the most among the rest.

3        "Klyushin:  Our comrades are wondering."

4        MR. FRANK:  Could we stop right there, and I realize

5    it's hard, Ms. Lewis, because we're in the Excel, but could you

6    please display Exhibits 52 and Exhibit 50.

7    Q.    Those are the attachments, Special Agent.  Have you had an

8    opportunity to review those?

9    A.    Yes.

10:34 10   Q.    Who's depicted in Exhibits 52 and 50?

11   A.    On the left, 52 is Sergey Uryadov.  On the right is Boris

12   Varshavksiy in Exhibit 50.

13       MR. FRANK:  I offer 52 and 50.

14       (Exhibits 50 and 52 received in evidence.)

15   Q.    Okay.  So those are the two attachments Mr. Klyushin has

16   just transmitted in the chat?

17   A.    Yes.

18   Q.    Can we go back to the chat and pick up where we left off.

19   So Mr. Klyushin says, "What did we earn today?  Our comrades

10:34 20   are wondering."  Could you continue, please, at 3987.

21   A.    After sending those pictures we just looked at, Ermakov

22   replies:  "Vlad, you are exposing our organization.  This is

23   bad.

24       "Nikolai Rumiantcev:  Vlad, stop sending to Threema."

25       Klyushin replies, "So sorry."

1      "Ermakov:  And that's how they get you and you end up as a

2  defendant in a courtroom."

3  Q.    How does Mr. Klyushin respond?

4  A.    Klyushin responds, "Removed.  Open a chat with us already.

5      "Ermakov:  Go ahead and create.  It was a bad move now.

6      "Klyushin:  Sorry.  Did a dumb thing.

7      "Rumiantcev:  I suggest to recreate the chat with the

8  deletion of attachments in Threema, or switch to ours if ready.

9      "Klyushin:  I will delete this one on my end."

10:36 10  Q.    Special Agent, when Mr. Rumiantcev says, "I suggest to

11  recreate the chat with the deletion of attachments in Threema

12  or switch to ours if ready," earlier you testified about an

13  M-13 chat application?

14  A.    Yes.

15  Q.    And whose iCloud accounts did you find the M-13 chat

16  application in?

17  A.    Vladislav Klyushin, Nikolai Rumiantcev, and Igor Sladkov.

18  Q.    Did you find the substance of any of those communications

19  over that M-13 chat application?

10:36 20  A.    No content, no.

21  Q.    And you found an image associated with the chat

22  application?

23  A.    Yes.

24  Q.    And the image had a --

25          NEMTSEV:  Objection.

```
 1   Q.   What was the symbol of the image?
 2              THE COURT:  I'll allow it.  What was the image?
 3              THE WITNESS:  The image depicted two chat bubbles with
 4   a lock inside the chat bubble.
 5   Q.   Mr. Klyushin says at Line 3998, "I Will delete this one on
 6   my end."  Did you find the Threema application on Mr. Klyushin's
 7   iCloud?
 8   A.   Yes.
 9   Q.   Did you find this chat on Mr. Klyushin's iCloud account?
10   A.   No.
11   Q.   Where did you find it?
12   A.   In Nikolai Rumiantcev's Apple account.
13   Q.   Thank you.  You can take this down.  Who was it in this
14   chat who said --
15              THE COURT:  How are we doing timing-wise?
16              MR. FRANK:  I'm just wrapping up, your Honor.
17              THE COURT:  All right, thank you.
18              MR. FRANK:  And if you could just go back one moment.
19   Q.   You see in Line 3990, Mr. Ermakov says, "And that's how
20   they get you and you end up as a defendant in a courtroom"?
21   A.   Yes.
22   Q.   And that's July 18, 2019?
23   A.   2019, yes.
24   Q.   Did there come a time when the defendant was arrested?
25              MR. FRANK:  You can take that down.
```

1    A.    Yes.

2    Q.    Where was that?

3    A.    On an airport tarmac in Sion, Switzerland.

4          MR. FRANK:  Could we have Exhibit 245, please, and

5    I'll offer it.

6          (Exhibit 245 received in evidence.)

7    Q.    This is a stipulation, and I'll read it into evidence.

8          "Stipulated:  The parties hereby stipulate and agree

9    that the Defendant, Vladislav Klyushin, was arrested in Sion,

10:38 10  Switzerland, on March 21, 2021, at approximately 13:30 local

11   time, which was 12:30 UTC time."

12         That's Zulu time?

13   A.    Yes.

14   Q.    "This stipulation is admissible in evidence."

15         Earlier, Special Agent, you testified about obtaining

16   a pen register for an IP address.  Did you also obtain other

17   pen registers in this case?

18   A.    Yes.

19   Q.    Are you familiar with an individual by the name of

10:38 20  Zhannetta Klyushina?

21   A.    I am.

22         MR. FRANK:  If I could have Exhibit 246, and I offer

23   it.  This is another stipulation.

24         (Exhibit 246 received in evidence.)

25         MR. FRANK:  "The parties hereby stipulate and agree

1  that Defendant Vladislav Klyushin was married to Zhannetta

2  Klyushina, who is also known as Zhanna Klyushina, at all times

3  relevant to the charges in the indictment.  This stipulation is

4  admissible in evidence."

5  Q.   Did there come a time when you obtained a pen register

6  pertaining to Zhannetta Klyushina?

7  A.   Yes.

8  Q.   For what?

9  A.   For a WhatsApp account for Zhanna's WhatsApp account for a

10:39 10  telephone number.

11  Q.   How did you determine it was Ms. Klyushina's WhatsApp

12  account?

13  A.   The telephone number associated with this WhatsApp account

14  was found in Ivan Ermakov's contacts in his Apple account.

15        MR. FRANK:  Could we have Exhibit 12 on the left and

16  12A on the right, please, and I'd offer them.

17        (Exhibits 12 and 12A received in evidence.)

18  Q.   What is Exhibit 12?

19  A.   The Russian language version of the contact card for

10:39 20  Zhanna Klyushin -- or Klyushina.

21  Q.   This was obtained where?

22  A.   From Ivan Ermakov's Apple account, and you'll see the

23  number plus 7-985-233-1413.

24  Q.   Okay.  And we have the English translation on the right?

25  A.   Yes.

1    Q.   And the last four digits of Ms. Klyushina's phone number

2    are 1413?

3    A.   Yes.

4         MR. FRANK:  And if we could have Exhibit 11 in

5    evidence.

6    Q.   What is Exhibit 11, Special Agent?

7    A.   This is the subscriber information for the Ivan Ermakov

8    Apple account.

9    Q.   And could we look on the right side of this exhibit, the

10:40 10   last four digits of Mr. Ermakov's phone number right there in

11   the column under Facetime?

12   A.   00085.

13        MR. FRANK:  Could we have Exhibit 153, please.

14   Q.   What is Exhibit 153?

15   A.   These are certain rows of the pen register, which is the

16   caller ID for the WhatsApp account associated with -- for

17   Zhanna Klyushina, Vlad's wife.

18   Q.   Okay, I want to direct your attention to the entries on

19   the date of Mr. Klyushin's arrest, March 21, 2021, and in

10:41 20   specific, I want to direct you to a communication at 12:28.

21   And that's UTC time?

22   A.   Correct, Universal Coordinated Time.

23   Q.   Okay.  Do you see that there's an exchange there between a

24   number ending in 1413?  Whose number is that?

25   A.   Zhanna.

```
 1    Q.    Ms. Klyushina?

 2    A.    Ms. Klyushina.

 3    Q.    And on the right?

 4    A.    Mr. Ermakov.

 5    Q.    Okay, so that exchange between Ms. Klyushina and

 6    Mr. Ermakov was at 12:28 Universal Time?

 7    A.    Yes.

 8    Q.    Okay.  Then we see a series of exchanges beginning at

 9    12:30 UTC with a 0944 number?  Do you see that?

10    A.    Yes.

11    Q.    And when do those exchanges end with the 0944 number?

12    A.    At 12:34 is the last exchange with 0944.

13    Q.    And do you see, Special Agent, that after 12:34 --

14          MR. FRANK:  Ms. Lewis, if you could just go down one

15    line.  No.  If you could go up a little bit and just move

16    your -- highlight down one line.

17    Q.    That's the final exchange with the 0944 number?

18    A.    Yes.

19    Q.    And then there's a gap.  Do you see that?

20    A.    I do.

21    Q.    How long is the gap after 12:34 Universal Time?

22    A.    24 minutes.

23    Q.    What happened at approximately 12:30 Universal Time?

24    A.    Mr. Klyushin was arrested on the tarmac at the Sion

25    airport in Switzerland.
```

```
 1    Q.   What happened after the 24-minute gap at 12:58 Universal
 2    Time?
 3    A.   The first communication is with Mr. Ivan Ermakov.
 4              MR. FRANK:  Thank you.  No further questions.
 5              THE COURT:  Why don't we stand and stretch for a
 6    second.
 7              (Discussion between the Court and Clerk.)
 8              MR. FRANK:  Ms. Molloy, did I offer 153?
 9              THE CLERK:  If that's the one you were just speaking
10    about?  No.
11              MR. FRANK:  I offer it.
12              (Exhibit 153 received in evidence.)
13              (Discussion off the record.)
14              THE COURT:  Why don't we take our break now, and then
15    try to come back at 11:15, I think is a good time for everyone.
16    It's been a lot of testimony for the interpreters and the court
17    reporter and all of us, the rest of us, so -- not to mention
18    the witness.
19              (Jury excused.)
20              THE COURT:  You're estimating about an hour and a
21    half?
22              MR. NEMTSEV:  I hope to be an hour and a half.
23              THE COURT:  I understand.  So 11:15, 12:15, quarter of
24    1:00, you'll start with your summary witness.
25              MR. KOSTO:  Could we perchance get Ms. Shah on after
```

         1   Special Agent Hitchcock?

         2          THE COURT:  If it's literally --

         3          MR. KOSTO:  Ten minutes.

         4          THE COURT:  Not even ten minutes because she's just

         5   going to verify her e-mail.

         6          MR. KOSTO:  What she sent and where she sent it.

         7          THE COURT:  That's all, so that should be five

         8   minutes.

         9          Do you feel prepared for that?

10:46   10          MR. FERNICH:  I don't think there's any dispute as to

        11   that.

        12          MR. NEMTSEV:  There's no dispute as to the email, your

        13   Honor, but I have a feeling they're going to ask her, "Why did

        14   you send it?  What did they do?  What do they typically do?"

        15          THE COURT:  I told you what I said.  I mean, she could

        16   potentially come back as a rebuttal, but the question is really

        17   on cross whether or not you're going to ask about the

        18   conviction of the company; and if you do, it may take longer

        19   than 15 minutes, so that's the one thing I'm playing in my

10:46   20   mind.

        21          MR. FERNICH:  Well, that wouldn't be a rebuttal

        22   witness.  I mean, that would be --

        23          THE COURT:  It just may take longer.

        24          MR. FERNICH:  Oh, you mean crossing her?

        25          THE COURT:  Yes.

1          MR. NEMTSEV:  I don't intend to -- if she's just going

2     to come in and say "This is the e-mail that I sent --"

3          THE COURT:  "This is practice why I sent it," that

4     should take three minutes.

5          MR. FERNICH:  Judge, just one thing quickly on the

6     venue that we were talking about before.  In the *Timothy Smith*

7     merits brief, all of this is set out very extensively, filed

8     last week, Pages 36 through 37 and Note 13:  "Federal Courts

9     uniformly recognize that the government bears the burden of

10:47 10     proving venue to the jury if venue is an issue," and there's a

11     footnote citing cases from every circuit, including *US v.*

12     *Scott*, 270 F. 3d 3430 at Pin Site 34, First Circuit, 2001.

13     So --

14          THE COURT:  Can I just ask you, is that briefed, the

15     one that went to the Supreme Court?

16          MR. FERNICH:  Yeah.  So what your Honor read from the

17     USG was the opposition brief to the cert petition since

18     *Smith* --

19          THE COURT:  In that case?

10:47 20          MR. FERNICH:  Yes.

21          THE COURT:  The one you just read.  We'll look.  Okay,

22     thank you.

23          (A recess was taken, 10:47 a.m.).

24          (Resumed, 11:21 a.m.)

25          THE CLERK:  All rise.

```
 1                (Court and Jury enter.)

 2                THE COURT:  It's cross.  Time for cross.  You may be

 3        seated.  Thank you.

 4                MR. NEMTSEV:  May I proceed, Your Honor?

 5                THE COURT:  Yes, go right ahead, Mr. Nemtsev.

 6                     DAVID HITCHCOCK, Previously sworn

 7                          CROSS-EXAMINATION

 8        BY MR. NEMTSEV:

 9        Q.   Good morning, Special Agent Hitchcock.

11:21 10   A.   Good morning.

11        Q.   Outside of the courtroom, you and I have never met or

12        spoken before, correct?

13        A.   Exchanged emails, but I don't believe we've spoken, no.

14        Q.   Maybe we said hello to each other across the hall but

15        never actually sat down and spoken about this case or any other

16        substantive matters, correct?

17        A.   Yes.

18        Q.   You and Mr. Frank and Mr. Costa, the prosecutors in this

19        case, have worked very closely together on this investigation,

11:22 20   correct?

21        A.   Yes.

22        Q.   Over the course of the last four and a half years,

23        correct?

24        A.   Since the fall of 2019.

25        Q.   Which is approximately four and a half years; would you
```

```
 1    agree?

 2    A.    Since the fall of 2019.

 3    Q.    And in preparation for your testimony today before the

 4    jury or your preparation for the testimony over the course of

 5    three days that you gave, you and Mr. Frank rehearsed, correct?

 6    A.    No.

 7    Q.    You didn't rehearse some or all of the parts of your

 8    testimony?

 9    A.    We prepared, but there was no rehearsing.

11:22  10   Q.    Did he ask you questions, did you give him answers?

11    A.    Yes.

12    Q.    Were those questions the same or similar to the ones that

13    he gave to you over the course of three days?

14    A.    Similar, yes.

15    Q.    You also worked with Mr. Frank and Mr. Kosto to narrow

16    down the millions of documents in this case, did you not?

17    A.    Yes.

18    Q.    And then the documents that you narrowed down to were the

19    documents that assisted, helped your case, correct?

11:23  20   A.    They were some of the documents that we relied upon.

21    Q.    You and I have never rehearsed, correct?

22    A.    We have not spoken about the case, no.

23    Q.    You and I have never sat down to select documents that

24    assist Mr. Klyushin in connection with his litigation

25    positions, have we?
```

```
 1   A.   We have not met, no.
 2   Q.   And you've been sitting in court since the beginning of
 3   this trial, correct?
 4   A.   On and off, yes.
 5   Q.   And you've been listening to the testimony of witnesses,
 6   correct?
 7   A.   On and off, yes.
 8   Q.   And you've previously interviewed many or most of these
 9   witnesses; is that correct?
11:23 10   A.   A majority, yes.
11   Q.   And it did not come as a surprise to you what these
12   witnesses testified to, correct?
13   A.   Correct.
14   Q.   You testified that you've been a special agent with the
15   FBI since March of 2019.  Is that accurate?
16   A.   March of 2009.
17   Q.   I'm sorry.  March of 2009.  Is that accurate?
18   A.   Yes.
19   Q.   So approximately fourteen years at this point?
11:24 20   A.   Yes.
21   Q.   And what does it mean to be a special agent?
22   A.   I investigate crimes, usually falling under Title 18 of
23   the U.S. Code.
24   Q.   What does the designation "special" mean?
25   A.   I'm an investigator.  My title is special agent, but the
```

1    special portion doesn't have significance.

2    Q.    Isn't it a fact that every agent at the FBI is a special

3    agent?

4    A.    Correct.

5    Q.    And you testified that you co-led a team to investigate

6    Mr. Klyushin since the fall of 2019; is that correct?

7    A.    Yes, sir.

8    Q.    And am I correct that the team was also co-led by

9    Special Agent Kang?

11:24 10    A.    Yes.

11    Q.    And am I correct that Special Agent Kang retired on

12    September 30th, 2022?

13    A.    Approximately, yes, that's correct.

14    Q.    And you testified that the team that you co-led consisted

15    of FBI agents, computer experts, linguistic experts; is that

16    correct?

17    A.    Yes, I did.

18    Q.    And it's fair to say that it was a large team of people?

19    A.    Yes.

11:25 20    Q.    More than a dozen?

21    A.    Throughout the course of the investigation, yes.

22    Q.    More than two dozen?

23    A.    I don't believe so.

24    Q.    And you also received assistance in your investigation

25    from the SEC; is that correct?

```
 1   A.   Assistance?

 2   Q.   Yes.

 3   A.   Could you clarify?

 4   Q.   Did the SEC provide you with documents and other

 5   assistance?

 6   A.   They provided us with information, yes.

 7   Q.   And did you discuss with agents of the SEC details about

 8   this case?

 9   A.   At various points, yes.

11:25 10   Q.   Did they provide you help, assistance in your

11   investigation?

12   A.   They provided us information such as the information that

13   the filing agents involved in the case were both Toppan Merrill

14   and Donnelley Financial, things like that, yes.

15   Q.   And you also received assistance from international law

16   enforcement; is that correct?

17   A.   Yes.

18   Q.   Including Switzerland, correct?

19   A.   Correct.

11:26 20   Q.   And am I correct it was an SEC subpoena that was issued in

21   November of 2019 that triggered the two filing agents in this

22   case, DFIN and Toppan Merrill, to investigate the potential for

23   intrusion?

24   A.   There was a subpoena from the SEC around that time frame,

25   yes.
```

1    Q.    Did you or anyone at the FBI assist with drafting or

2    formulating the subpoena requests that went out from the SEC to

3    these two filing agents?

4    A.    No.

5    Q.    And as part of your investigation of this case, you

6    obtained search warrants and issued subpoenas, correct?

7    A.    Yes.

8    Q.    And am I correct that you issued 43 search warrants?

9    A.    I don't know the exact number, but that sounds plausible.

11:26 10    Q.    And those warrants were for, amongst other things, email

11    accounts, iCloud accounts, Facebook accounts, correct?

12    A.    Yes, sir.

13    Q.    You also issued dozens of subpoenas, correct?

14    A.    Yes.

15    Q.    And among the 43 search warrants that you issued in this

16    case, at least two related to Mr. Klyushin's iCloud; is that

17    correct?

18    A.    That sounds correct.

19    Q.    If I remember correctly, at least one search warrant

11:27 20    related to Mr. Klyushin's email account, correct?

21    A.    That sounds correct.

22    Q.    And isn't it a fact that iCloud is a backup on the cloud,

23    on the Internet, a repository for information from a person's

24    iPhone and MacBook, correct?

25    A.    For their Apple account which can be associated with those

1    devices, yes, that's correct.

2    Q.    So it is associated with all the Apple devices that they

3    have, which could include a MacBook, an iPhone, an iWatch, an

4    iPad, or any other device?

5    A.    If I could clarify, the devices that they choose to attach

6    to a particular Apple account, yes.

7    Q.    And it could be multiple devices and multiple versions of

8    iPhones and MacBooks, correct?

9    A.    One to many, yes, that's correct.

11:28 10   Q.    As a result of the iCloud backups, and I believe you

11   testified to this, the iClouds could contain messages, emails,

12   pictures, videos, documents, and any other information,

13   correct?

14   A.    It can contain those types of documents, yes.

15   Q.    And in connection with your search warrant of

16   Mr. Klyushin's account, is it fair to say that you received a

17   tremendous amount of information?

18   A.    Yes, over the course of the investigation, we received a

19   volume of information.

11:28 20   Q.    But specifically from his iCloud account, you received a

21   tremendous amount of information; is that correct?

22   A.    There were gigabytes, yes.

23   Q.    You received 130,000 messages?

24   A.    I don't have an exact count, sir.

25            MR. NEMTSEV:   Your Honor, could I approach the

```
 1  witness?
 2            THE COURT:  Well, does that sound about right?
 3            THE WITNESS:  It is possible.  We collected a lot of
 4  messages.  And to be clear, are you referring to a type of
 5  messages?  Emails, chats?
 6  Q.   Messages, meaning instant messages, SMS messages, iCloud
 7  messages, Threema messages, WhatsApp messages.
 8  A.   It's possible.  There were quite a few.
 9  Q.   And the messages that you collected, did they not begin in
10  September of 2014 and end in October of 2020?
11  A.   The scope of the warrant would not have covered anything
12  before a certain time period, but it is possible that the
13  provider did provide that date range.  I don't recall.
14  Q.   Did you also receive 95,000 pictures from Mr. Klyushin's
15  iCloud account?
16  A.   Again, I know it was in the tens of thousands, but I don't
17  recollect an exact number.
18  Q.   You also received location records, calendar entries --
19  A.   Yes.
20  Q.   -- contact information, correct?
21  A.   Yes.
22  Q.   Call logs?
23  A.   That sounds accurate.
24  Q.   WiFi connection records?
25  A.   That's possible.
```

```
        1   Q.   Voicemails, audio recordings?

        2   A.   It's possible.

        3   Q.   Videos?

        4   A.   Videos, yes.

        5   Q.   Emails?

        6   A.   Yes.

        7   Q.   Other documents, including business records that you've

        8   put into evidence?

        9   A.   Yes.

11:30  10   Q.   And Mr. Klyushin's iCloud, it included pictures of his

       11   wife, his kids, correct?

       12   A.   That is correct.

       13   Q.   It also included messages between his wife and his

       14   children; is that correct?

       15   A.   That is correct.

       16   Q.   Sir, isn't it a fact that despite all of the information

       17   that you obtained from Mr. Klyushin's iCloud, you didn't locate

       18   a single earnings report or a single picture of an earnings

       19   report on his iCloud account?

11:31  20   A.   I don't recall finding any prepublication information on

       21   Mr. Klyushin's account.

       22   Q.   So you found nothing that you would consider suspicious in

       23   terms of earnings reports or pictures of earnings reports on

       24   his iCloud; is that correct?

       25   A.   No specific pictures on Mr. Klyushin's account, no.
```

1   Q.   And isn't it a fact that you didn't locate a single

2   picture including Mr. Klyushin and Mr. Sladkov together?

3   A.   Together, no, but we have discussed some pictures that we

4   did find.

5   Q.   But it was not a picture of Mr. Klyushin and Mr. Sladkov

6   in one picture that was located on his iCloud, correct?

7   A.   We did not, no.

8   Q.   And you didn't find a picture of Mr. Klyushin and

9   Mr. Sladkov together on any other ones -- any other iClouds

11:32 10   that you searched, correct?

11   A.   No, we didn't.

12   Q.   And you similarly didn't locate any pictures with

13   Mr. Klyushin and Mr. Irzak, correct?

14   A.   No, we did not.

15   Q.   For that matter, you didn't locate a single picture with

16   Mr. Sladkov's cohabitant, I believe that you labeled her,

17   Ms. Olga Opukhovskaya, correct?

18   A.   No, we did not.

19   Q.   Similarly, isn't it a fact that you did not locate a

11:32 20   single communication between Mr. Klyushin and Mr. Sladkov?

21   A.   We did not find communications between the two, no.

22   Q.   And am I correct you found no communications between

23   Mr. Klyushin and Ms. Opukhovskaya; is that correct?

24   A.   No communications directly, no.

25   Q.   And you also didn't locate a single communication between

1  Mr. Klyushin and Mr. Irzak, correct?

2  A.   We did not find any communications between Mr. Klyushin

3  and Mr. Irzak, no.

4  Q.   And you testified that you received authorization to get a

5  pen register and a tap-and-trace device on Mr. Sladkov's

6  WhatsApp; is that correct?

7  A.   Yes.

8  Q.   At the time that the device was active and collecting

9  information, you still didn't locate any communications between

11:33 10  Mr. Klyushin and Mr. Sladkov; is that correct?

11  A.   Directly, no.

12  Q.   And isn't it a fact that Mr. Sladkov and Mr. Irzak reside

13  in St. Petersburg?

14  A.   That is correct.

15  Q.   Mr. Klyushin, Mr. Ermakov, Mr. Rumiantcev reside in

16  Moscow; is that correct?

17  A.   Yes, that is correct.

18  Q.   And isn't it a fact that St. Petersburg and Moscow is

19  approximately 450 miles away?

11:33 20  A.   I don't know the distance, sir.

21       MR. NEMTSEV:  Judge, may I approach the witness?

22       THE COURT:  Yes.

23  Q.   Sir, the document I've handed to you, does that look like

24  a Google Maps printout?

25  A.   It does.

1    Q.    And it shows a route from Moscow to St. Petersburg; is

2    that correct?

3    A.    It does.

4    Q.    What's the distance there?

5    A.    It's in kilometers.  It's 704 kilometers.

6    Q.    And do you know the conversion rate from kilometers to

7    miles?

8    A.    Approximately 2.2.

9    Q.    Do you have a phone?

11:35 10    A.    I do not.

11    Q.    Is it fair to say 100 kilometers is about 62 miles?

12    A.    Your approximation earlier sounds like it's likely

13    accurate.

14    Q.    So approximately 450 miles, approximately the distance

15    from Boston to Washington, D.C. where your office is, correct?

16    A.    Approximately, yes.

17    Q.    Now, isn't it a fact that you also didn't locate any

18    communications or emails between Mr. Rumiantcev and the other

19    individuals that reside in St. Petersburg, including

11:35 20    Mr. Sladkov, Mr. Irzak, and Ms. Opukhovskaya?

21    A.    If you could repeat the question.  That was a lot of

22    names.

23    Q.    Isn't it a fact that you didn't locate any communications

24    or emails between Mr. Rumiantcev and the other individuals that

25    reside in St. Petersburg, including Mr. Sladkov; Mr. Irzak; and

1    Mr. Sladkov's cohabitant, Ms. Opukhovskaya?

2    A.    That is correct.

3    Q.    And as part of your testimony, you showed us videos, did

4    you not, of Mr. Ermakov's birthday?

5    A.    Yes.

6    Q.    And that was, I believe, Exhibit 110?

7    A.    I don't know the number, sir.

8    Q.    The video was taken on April 10th, 2018; is that correct?

9    A.    Yes, that's correct.

11:36  10    Q.    And Mr. Sladkov and Mr. Irzak were not in attendance; is

11    that correct?

12    A.    That is correct, but those pictures related to that same

13    event were sent and communicated with Mr. Sladkov, of the event

14    of the birthday celebration on the top of the mountain,

15    helicopter skiing.

16    Q.    And the pictures that you say were communicated to

17    Mr. Sladkov --

18    A.    Yes.

19    Q.    -- they didn't come from Mr. Klyushin, correct?

11:36  20    A.    I know that they were transmitted between Mr. Ermakov and

21    Mr. Sladkov.

22    Q.    So those pictures came from Mr. Ermakov to Mr. Sladkov,

23    correct?

24    A.    I don't know where they originated.  I know they were

25    communicated between Mr. Ermakov and Mr. Sladkov.

1    Q.   You also testified concerning pictures of dinners and

2    other events that Mr. Klyushin attended with Mr. Ermakov,

3    correct?

4    A.   Correct.

5    Q.   And Mr. Sladkov was similarly not in any of those

6    pictures; is that correct?

7    A.   Mr. Sladkov, no.

8    Q.   Mr. Irzak was not in those pictures, correct?

9    Ms. Opukhovskaya?

11:37 10    A.   No.

11    Q.   Isn't it a fact, sir, that the April 10th, 2018 video was

12    one of the first pictures or videos that you located of

13    Mr. Ermakov and Mr. Klyushin being together?

14    A.   Together, yes.  I believe there was an earlier one in

15    March where it was Mr. Ermakov that we found in Mr. Klyushin's

16    account.  So March of 2018.

17    Q.   And isn't it a fact that Mr. Klyushin only added

18    Mr. Ermakov to his phone book on March 17th, 2018?

19    A.   They were close enough to go helicopter skiing and

11:38 20    celebrate a birthday.

21              MR. NEMTSEV:  I object.  Nonresponsive.

22              THE COURT:  Sustained.

23              MR. NEMTSEV:  Move to strike.

24              THE COURT:  I strike it.

25              So listen to his question.

```
 1    Q.   Isn't it a fact that Mr. Ermakov was only added to
 2    Mr. Klyushin's phone book on March 17th, 2018?
 3    A.   I don't have the exact date.
 4    Q.   Isn't it a fact that the earliest picture that you located
 5    of them two being together was March of 2018?
 6    A.   March or April of 2018, yes, that's correct.
 7    Q.   And you have no evidence that they knew each other prior
 8    to March of 2018, correct?
 9    A.   I do.  They celebrated a birthday together, quite
11:38 10  lavishly, in April of 2018.
11    Q.   I said -- no, I said you have --
12            MR. NEMTSEV:  Your Honor.
13            THE COURT:  What's the question?
14    Q.   My question was:  You have no evidence that they knew each
15    other before March of 2018; is that correct?
16    A.   The picture in April of 2018 is evidence itself that they
17    likely knew each other.
18            MR. FERNICH:  Objection.
19            MR. NEMTSEV:  Objection.  Move to strike.
11:39 20           MR. FRANK:  I object to counsel --
21            THE COURT:  Excuse me.  He disagrees with your
22    analysis.  What's the next question?
23    Q.   Is April after March or before March?
24    A.   April is after March.
25    Q.   After March.
```

 1          And I'm asking you for a time period before March of 2018;

 2     is that correct?

 3     A.    Could you repeat the question, sir?

 4     Q.    My question is:  Did you find any evidence prior to March

 5     of 2018, before March of 2018, that they knew each other?

 6     Mr. Ermakov and Mr. Klyushin, that is.

 7     A.    Outside of the birthday celebration, no, sir.

 8     Q.    Isn't it a fact that you didn't locate any contact

 9     information for Mr. Sladkov or Mr. Irzak in Mr. Klyushin's

11:40 10     iCloud account?  Yes or no, sir?

11     A.    No, I did not find any.

12     Q.    And isn't it a fact, sir, that you didn't find the words

13     "DFIN Solution" or "Toppan" in any of Mr. Klyushin's

14     communications or pictures?

15     A.    No.  These are sophisticated actors.

16          MR. NEMTSEV:  Objection.

17          THE COURT:  No, no.  Strike that.  This is his turn

18     for cross.  So I strike the "sophisticated."

19     BY MR. NEMTSEV:

11:40 20     Q.    Sir, you obtained a tremendous amount of IP data, correct?

21     A.    Yes.

22     Q.    And some of that data came directly from Mr. iCloud's

23     account?

24          THE COURT:  Mr. iCloud's account?

25     Q.    I'm sorry, Mr. Klyushin's iCloud account.

1    A.    I apologize.  Could you repeat the question?

2    Q.    Some of the IP data that you obtained came directly

3    from Mr. Klyushin's iCloud account; is that correct?

4    A.    Yes.

5    Q.    Other IP data came from various other sources like

6    brokerage accounts, correct?

7    A.    Yes.

8    Q.    DFIN and Toppan provided you with a significant number of

9    IP addresses; is that correct?

11:41 10    A.    Yes.

11    Q.    Isn't it a fact, sir, that DFIN produced log files

12    containing over 10,000 IP addresses?

13    A.    I don't have an exact number or even a rough estimate.

14    Q.    Was it more than 100?

15    A.    Yes.

16    Q.    Was it more than 1,000?

17    A.    I don't have an estimate of the number of unique IPs.

18    Q.    And Mr. Hartvigsen, he testified that he identified for

19    you specifically 110 IP addresses from 26 different ISPs; is

11:41 20    that correct?

21    A.    Yes.

22    Q.    And in fact, sir, not one of those 110 addresses

23    overlapped with any IP address used by Mr. Klyushin; is that

24    correct?

25    A.    I don't have that information in front of me, sir.

1    Q.    If Mr. Klyushin was directly linked to one of the IP

2    addresses located on DFIN or Toppan Merrill's server, would you

3    have put that in as an exhibit, sir?

4    A.    We did put in evidence about the 185 AirVPN IP.

5    Q.    Did you locate a 185 AirVPN IP on Mr. Klyushin's iCloud

6    account?

7    A.    No, we did not.

8    Q.    Now, sir, a VPN is a service provider, correct?

9    A.    It is, yes.

11:42 10    Q.    You testified about AirVPN.  You testified about another

11    company called StackPath; is that correct?

12    A.    Yes.

13    Q.    Those are not free services; is that correct?

14    A.    I don't know if they offer free services in addition to

15    their paid services or not, sir.

16    Q.    And in order to use a VPN, you have to create an account,

17    correct?

18    A.    Again, I know that for the paid version you do, because

19    you have to pay for it, but if they offer free services, I

11:43 20    don't know.

21    Q.    Do you know if StackPath or AirVPN offer free services?

22    A.    I do not.

23    Q.    Did you ask StackPath or AirVPN to locate any accounts

24    with them belonging to Mr. Klyushin, Mr. Ermakov, or

25    Mr. Rumiantcev?

1    A.    StackPath, no.

2    Q.    And AirVPN?

3    A.    We did not approach AirVPN for that information, no.

4    Q.    Now, you testified regarding three pictures of earnings

5    reports that you located on Mr. Sladkov's iCloud account,

6    correct?

7    A.    Could you please repeat the question, sir?

8    Q.    You testified regarding three pictures of earnings reports

9    that you located on Mr. Sladkov's iCloud account; is that

11:44 10   correct?

11   A.    Yes.

12   Q.    And you testified that the earliest picture you located

13   was from October 19th, 2017, and it was located on the account

14   of Ms. Opukhovskaya; is that correct?

15   A.    Could you repeat the date again, sir?

16   Q.    October 19th, 2017, sir.

17   A.    Yes, that's correct.

18   Q.    And there was an additional picture from February of 2018

19   that you located on Mr. Sladkov's iCloud; is that correct?

11:44 20   A.    That sounds correct, yes.

21   Q.    Isn't it a fact, sir, Mr. Klyushin, Mr. Ermakov, and

22   Mr. Rumiantcev did not have any brokerage accounts that you

23   located in existence in 2017?

24   A.    We don't know what other accounts they may have had

25   outside of the ones we identified, that is correct.

1    Q.   You did not locate any accounts that they had that were

2    open in 2017; is that correct?

3    A.   We did not locate any other accounts than what we've

4    discussed.

5    Q.   And you also didn't locate any brokerage accounts that

6    were open under Mr. Rumiantcev's name, Mr. Ermakov's name, or

7    Mr. Klyushin's name in February of 2018; is that correct?

8    A.   That is correct.

9    Q.   And isn't it a fact that the first transaction that you

11:45 10   located being placed in the account of Mr. Klyushin was July of

11   2018?

12   A.   That sounds accurate, yes.

13   Q.   And you would agree that July of 2018 is approximately

14   nine months before that you found the first photo in October of

15   2017 and about five months after the photo that was taken in

16   February of 2018?

17   A.   I would agree with that date -- date analysis.

18   Q.   Isn't it a fact, sir, that you found no evidence that any

19   of those three pictures were transmitted to Mr. Klyushin?

11:46 20   A.   The three pictures that were sent between who?

21   Q.   You found no evidence that Mr. Sladkov or Ms. Opukhovskaya

22   transmitted the pictures that we just discussed to

23   Mr. Klyushin; is that correct?

24   A.   We identified trading that occurred at the same time.

25   Q.   Special Agent, I'm not asking you about trading.  I'm

1    asking you about pictures.

2        You have no evidence that those three pictures were ever

3    transmitted to Mr. Klyushin; is that correct?

4    A.   Directly to Mr. Klyushin, no.

5    Q.   And you have no evidence that Mr. Klyushin transmitted

6    those pictures to either Mr. Sladkov or Ms. Opukhovskaya; is

7    that correct?

8    A.   No direct evidence, no.

9    Q.   Sir, isn't it a fact that the only individual of the five

11:46 10   that you named here that you allege are criminally responsible,

11   only one individual had a trading account in 2017; is that

12   correct?

13   A.   As I indicated before, I have to be careful answering that

14   question because a lot of these accounts are behind omnibus

15   accounts.  Right?  You can't see who the beneficiaries are.

16   Q.   Special Agent, yes or no, did you locate --

17            THE COURT:  Why don't you ask the question again.

18            To your knowledge, what you could see.  Go ahead.

19   Q.   To your knowledge, what you saw, what you located, what

11:47 20   you presented as evidence, there was only one individual that

21   had a trading and brokerage account in 2017; is that correct?

22   A.   At least one, that is correct.

23   Q.   And that individual was Mr. Sladkov; is that correct?

24   A.   Correct.

25   Q.   Sir, you testified regarding a picture of a boat that you

```
 1    located on Mr. Sladkov's iCloud account, correct?

 2    A.    Did you say Mr. Sladkov?

 3    Q.    Yes.

 4    A.    Yes.

 5    Q.    And that was a picture that was transmitted from

 6    Mr. Klyushin to Mr. Ermakov, correct?

 7    A.    Yes.

 8    Q.    And you testified that there were several other pictures

 9    of boats that were located on Mr. Sladkov's iCloud account,

 10   correct?

 11   A.    Yes.

 12   Q.    Isn't it a fact that there's no evidence that Mr. Klyushin

 13   sent those pictures to Mr. Sladkov; is that correct?

 14   A.    Not directly, no, that's correct.

 15   Q.    And, in fact, you testified that the pictures were sent

 16   from Mr. Ermakov to Mr. Klyushin, correct?

 17   A.    They were in the WhatsApp folder for media items exchanged

 18   between Sladkov and Ermakov, yes.

 19   Q.    And you testified that you located a significant amount of

 20   messages between Mr. Klyushin and Mr. Ermakov; is that correct?

 21   A.    Yes.

 22   Q.    And you did not find any message where Mr. Klyushin asks

 23   Mr. Ermakov to submit those pictures to Mr. Sladkov; is that

 24   correct?

 25   A.    I did not find that, no.
```

11:48 (lines 10, 20)

1    Q.   And you similarly testified that you located a slide deck

2    for one of the M-13 products; is that correct?

3    A.   Yes.

4    Q.   That was also located in Mr. Sladkov's iCloud account?

5    A.   Yes.

6    Q.   And isn't it a fact that you found no evidence that

7    Mr. Klyushin asked Mr. Ermakov to send that to Mr. Sladkov?

8    A.   I found no evidence of that, no.

9    Q.   You also testified that you located application data for

11:49  10   the M-13 application on Mr. Sladkov's iCloud; is that correct?

11   A.   Yes.

12   Q.   Isn't it a fact, sir, that the application was only

13   installed on November 26, 2019?

14   A.   November 26th?

15   Q.   2019.

16   A.   It was in November of -- actually, no.  Whose account are

17   we talking about?

18   Q.   Mr. Sladkov's iCloud.

19   A.   No, there was evidence it was there as early as September

11:50  20   of 2019, several weeks after the slide deck you were just

21   referring to.

22   Q.   You reviewed metadata for files associated?

23   A.   I have.

24   Q.   Did you review a metadata file associated with the M-13

25   chat application found on Mr. Sladkov's iCloud?

1    A.    Yes.

2              MR. NEMTSEV:  Could we pull up Exhibit 351.

3              MR. FRANK:  I don't believe this is in evidence.

4              THE CLERK:  Oh, we can't pull it up then yet.  351,

5    did you say?

6              MR. NEMTSEV:  Yes.

7              THE CLERK:  I have to check.  Sorry.

8              MR. FRANK:  This is not in evidence.

9              MR. NEMTSEV:  And I don't believe that this is the

11:50 10    exhibit that I requested.  Mr. Picard, 351.  Could you take

11    that down, please.

12    Q.    Isn't it a fact that you found no evidence that

13    Mr. Sladkov ever used that application?

14    A.    I don't believe we had any evidence to show one way or the

15    other, but we did have evidence that the application was

16    installed on an Apple device associated with the Sladkov Apple

17    account.

18    Q.    And Mr. Frank, on your direct examination, he reviewed an

19    employee list that you located on Mr. Klyushin's iCloud in

11:51 20    April of 2020; is that correct?

21    A.    I believe it was March.

22    Q.    Early 2020; is that correct?

23    A.    Early 2020, yes.

24    Q.    And that list contains 46 employees; is that correct?

25    A.    Could you repeat the number?

```
 1   Q.   46.

 2   A.   I believe it was more.  Do you have the list?

 3   Q.   Sure.

 4        MR. NEMTSEV:  Mr. Picard, could we please pull up

 5   Exhibit 58A.

 6        THE CLERK:  I'm sorry.  I didn't hear that.

 7        MR. NEMTSEV:  58A.

 8   Q.   Is this the list that you testified about?

 9   A.   Is there more than one page?

10        MR. NEMTSEV:  Mr. Picard, could we turn to the next

11   page.

12        THE COURT:  Is there another page, can you tell?

13   A.   The question -- was it 47 or --

14   Q.   46 employees related to M-13.

15   A.   I would have to count them up since the count is for all

16   the employees on the list.

17   Q.   Would you agree that it's more than 20?

18   A.   Yes.

19   Q.   More than 30?

20   A.   Yes.

21   Q.   Somewhere in the range of 40 to 50?

22   A.   If I could review both pages together, I would probably

23   agree to that.

24        MR. NEMTSEV:  Mr. Picard, could you please pull up the

25   first page.
```

11:52 (line 10)
11:53 (line 20)

```
     1              THE COURT:  This is confusing.  It's up on a double

     2    screen here.

     3              MR. NEMTSEV:  We're having some technical

     4    difficulties, Your Honor.

     5              THE COURT:  It can't be that difficult.  Doesn't it

     6    have the numbers of employees?

     7              MR. NEMTSEV:  It does.

     8              THE COURT:  All right.  So why don't you just ask him.

     9    On the exhibit, what does it say?

11:53 10              MR. NEMTSEV:  Your Honor, it's 46 employees related to

    11    M-13.

    12    Q.   The remaining employees are related to a different

    13    company; is that correct?

    14    A.   There were two companies listed.  Again, I don't have the

    15    exact count, and I can't see, but --

    16    Q.   But fair to say it's about 40 to 50; is that correct?

    17    A.   There were dozens of M-13 employees listed, yes.

    18    Q.   And as far as you know, those employees were only assigned

    19    to one specific project, correct?

11:54 20    A.   As the caption indicated, yes.

    21    Q.   And the list contains engineers, IT professionals, other

    22    IT personnel; is that correct?

    23    A.   That is my recollection, yes.

    24    Q.   Mr. Klyushin was designated the first deputy director

    25    general; is that correct?
```

1    A.    Yes.

2    Q.    Mr. Ermakov was designated a deputy director general,

3    correct?

4    A.    Again, that's my recollection.  I don't have anything on

5    the screen here.

6    Q.    Do you recall that Mr. Rumiantcev was designated deputy

7    director?

8    A.    Yes.

9    Q.    Isn't it a fact, based on the document alone, none of

11:54 10   those individuals were designated as IT or cyber security

11   professionals?

12   A.    The company is an IT company.

13   Q.    But they weren't designated as the techs performing the

14   work; is that correct?

15   A.    I believe their executive role was listed in lieu of

16   something like that.

17   Q.    You also testified about a proposal that was located on

18   Mr. Klyushin's iCloud account, correct?

19   A.    I did.

11:55 20        MR. NEMTSEV:  Could we pull up 141A.

21   Q.    And Mr. Frank asked you to read one portion of one page of

22   this proposal; is that correct?

23   A.    That is correct.

24   Q.    Would you agree that it's a very detailed proposal?

25   A.    Yes, that was accurately described in that exchange we

1   read.

2   Q.   That it spanned 16 pages; is that correct?

3   A.   Yes.

4        MR. NEMTSEV:  Mr. Picard, could we turn to the last

5   page.

6   Q.   This is the last page of the proposal, correct?

7   A.   The red team proposal, which was a penetration testing

8   proposal, yes.

9   Q.   And it lists four employees that would be assigned to this

11:56 10   specific contract, correct?

11  A.   I see four names, yes.

12  Q.   Mr. Klyushin, Mr. Ermakov, and Mr. Rumiantcev are not on

13  this list; is that correct?

14  A.   No.  There were many employees at the company.

15       MR. FRANK:  Objection, Your Honor, and I'd ask for a

16  sidebar.

17       THE COURT:  Well, are you desperate for one right now?

18       MR. FRANK:  This strays into a pretrial ruling, Your

19  Honor, and I'm concerned that there is a door being opened.

11:56 20       THE COURT:  All right.  Let me see you at sidebar.

21  **(SIDEBAR CONFERENCE AS FOLLOWS:**

22       THE COURT:  What's the question and...

23       MR. FRANK:  Pretrial, the Court ruled that we could

24  not introduce the evidence of the FBI poster which identified

25  Mr. Ermakov as a hacker because --

```
 1              THE COURT:  Yeah, but what was the question?

 2              MR. NEMTSEV:  The question was -- there were four

 3    names listed on that document.  Mr. Ermakov, Mr. Klyushin, and

 4    Mr. Rumiantcev were not one of the four names.

 5              MR. FRANK:  He's attempting to establish that

 6    Mr. Ermakov was not a technical employee.  In other words, he

 7    didn't do technical work in his work for M-13.  In other words,

 8    he wasn't one of the employees who did the hacking for M-13

 9    when they did the --

11:57 10              THE COURT:  I do remember why I ruled you couldn't say

11    that, but I'm not sure why this question invokes that.

12              MR. FRANK:  Because he's establishing that Mr. Ermakov

13    has an executive title but is not one of the employees who does

14    the hacking that M-13 does when they do the pen testing.  He's

15    not an employee with the technological expertise --

16              THE COURT:  I don't think that intrudes into my

17    ruling.

18              MR. NEMTSEV:  I asked him about what the document

19    says, Judge.  I didn't ask him --

11:58 20              MR. FRANK:  He's misleading the witness.

21              THE COURT:  Overruled.  Can I just say -- so

22    timing-wise -- let me just say this guy has an amazing memory,

23    this agent, I mean -- but I don't have a problem with him

24    having notes to answer some of these questions.  I mean, like

25    some of the ones he says "I don't remember," if he has, like,
```

1   302s or something, I don't care if he needs to refresh his

2   recollection.

3        MR. FRANK:  It's up to counsel if he wants --

4        MR. NEMTSEV:  I'd prefer him to not have notes.

5        THE COURT:  Okay.  I'm just saying some of it is --

6   was it in November or September?

7        MR. FERNICH:  Oh, I think he knows the answers.

8        THE COURT:  So far he does.  I'll give you that.  So.

9   **END OF SIDEBAR CONFERENCE.)**

11:59 10   BY MR. NEMTSEV:

11   Q.   Sir, you testified that the 89.107.124.39 IP address and

12   the 89.107.124.43 address belong to M-13; is that correct?

13   A.   I'm not certain we've got the IP address right.

14   Q.   89.107.124.39.

15   A.   Yes.

16   Q.   As well as 89.107.124.43?

17   A.   43 or 42?

18   Q.   43.

19        MR. FRANK:  Objection, misstates.

11:59 20   Q.   42, would you agree?

21        THE COURT:  You know it's okay if you say, "I don't

22   remember exactly."

23        THE WITNESS:  Oh, I do remember.  That was the wrong

24   IP address, ma'am.

25        THE COURT:  Okay.  That's the answer.

1   Q.   89.107.124.42 belongs to M-13; is that correct?

2   A.   Correct.

3   Q.   And that did not personally belong to Mr. Klyushin,

4   Mr. Ermakov, or Mr. Rumiantcev; is that correct?

5   A.   That is correct.

6   Q.   They were assigned to the M-13 offices and the

7   addresses -- address of the office; is that correct?

8   A.   The organization itself, yes.

9   Q.   Isn't it a fact, sir, that every person who was using the

12:00 10  Internet from the office would be associated with those IP

11  addresses?

12  A.   I don't know how it was configured, sir.

13  Q.   But you would agree, would you not, that in an office

14  environment where an organization has an IP address, everyone

15  within that organization who is working from that office would

16  have the same IP address?

17       MR. FRANK:   Objection, calls for speculation.

18       THE COURT:   Do you know?

19       THE WITNESS:   I don't.

12:01 20       MR. NEMTSEV:   Can we pull up Exhibit 195A.

21  Q.   Sir, this is a document of the files that were downloaded

22  from the 119.204.194.11 IP; is that correct?

23       MR. FRANK:   This is not the document that was

24  introduced into evidence.  We can call it up on our computer if

25  you'd prefer.

1          THE COURT:  I could not hear a word you just said.

2          MR. FRANK:  I apologize, Your Honor.  This document is

3     marked "draft."  It is not the exhibit that's in evidence.

4          THE COURT:  So where's the exhibit -- what number is

5     it, the one that was in evidence?  Does Ms. Lewis know?

6          MR. NEMTSEV:  195A.

7          MR. FRANK:  It's 195, and we're happy to call it up if

8     you don't have it.

9          THE COURT:  Do you want to do that?  Is it the same?

12:01 10          MR. NEMTSEV:  Absolutely.

11          Ms. Lewis, could you please pull it up.  Thank you.

12          THE CLERK:  Let me just switch.  Just give me a

13     second.  Okay.  I've switched.

14     Q.   This is a list of downloads from the DFIN server using the

15     IP address 119.204.194.11, correct?

16     A.   Correct.

17     Q.   And that was the same IP address that you testified was

18     located on Mr. Ermakov's iCloud account, correct?

19     A.   It was used for iTunes updates on Mr. Ivan Ermakov's Apple

12:02 20     account, yes.

21     Q.   He updated certain apps, to your memory, correct?

22     A.   iTunes.

23     Q.   Only one update, or more?

24     A.   At least one, within four minutes of one of these

25     accesses.

1    Q.   And isn't it a fact that there's no evidence that

2    Mr. Klyushin, Mr. Ermakov, or Mr. Rumiantcev traded any of

3    these eight companies in April or May in their accounts?

4    A.   I don't have the trading of their --

5    Q.   You have no evidence that says that they traded in any of

6    these companies in April or May in their own names, correct?

7    A.   I didn't analyze the trading for those accounts.

8    Q.   You did not review brokerage records for Mr. Klyushin,

9    Mr. Ermakov, or Mr. Rumiantcev?

12:03 10  A.   I do not have a recollection of if they traded these names

11   or not.

12        MR. NEMTSEV:   Could we pull up exhibit -- Ms. Lewis,

13   can we pull up Exhibit 191A.

14   Q.   And this is a list of downloads from the 104.238.37 IP

15   range; is that correct?

16   A.   Yes.

17   Q.   And it spans from, I believe, October 22nd, 2018, to

18   November 8th of 2018; is that correct?

19   A.   Yes, it is.

12:04 20  Q.   And isn't it a fact that that IP range was never located

21   in Mr. Klyushin's iCloud's account or Mr. Ermakov's iCloud

22   account or Mr. Rumiantcev's iCloud account?

23   A.   I don't believe it was.

24   Q.   And, sir, would you agree that this is only a list of

25   companies and documents that was being downloaded?

1    A.    I don't understand the question.

2    Q.    Meaning, in order to make it onto the summary list that

3    you introduced into evidence, the file had to be downloaded

4    from the server of DFIN, correct?

5    A.    Yes, with this download, that ASPX page, being listed.

6    Q.    Do you agree that there were significantly more companies

7    that were viewed but not downloaded?

8    A.    That is correct.  From this IP block; is that the

9    question?

12:05 10   Q.    From this IP block and in general, from the DFIN servers?

11   A.    Yes, that's correct.

12   Q.    Is it fair to say about a thousand different companies

13   were viewed or downloaded from DFIN's server?

14   A.    There were a lot.  As to the exact number, I don't know.

15   Q.    And isn't it a fact, sir, that Mr. Klyushin only traded

16   about 140 of those companies?

17   A.    Yes.  We reviewed -- well, yes.

18   Q.    And you testified that you located a Namecheap account

19   belonging to Wan Connie that was at one point accessed by one

12:05 20   of the M-13 IP addresses; is that correct?

21   A.    Yes.

22   Q.    And isn't it a fact, sir, that there's no evidence that

23   Mr. Klyushin, Mr. Ermakov, or Mr. Rumiantcev were the

24   individuals that accessed that account?

25   A.    We do have evidence that suggests that, sir, yes.

1  Q.   You have no evidence that they accessed that account from

2  that IP address on that date, correct?

3  A.   On that day, no.

4       THE COURT:  Well, could you bring us back?  Who's

5  the -- who's Wan Connie -- the name?  Wan Connie?

6       THE WITNESS:  It's one of the Namecheap accounts

7  associated with the domains we were discussing earlier.

8       THE COURT:  With what company?

9       THE WITNESS:  Namecheap.

12:06 10     THE COURT:  DFIN?

11      THE WITNESS:  No, the Wan Connie account is a separate

12  but related Namecheap account to the Namecheap accounts that

13  are associated with the domains that go back to Toppan Merrill.

14      THE COURT:  Toppan Merrill?

15      THE WITNESS:  Correct.  And also to DFIN as well

16  because all of the Namecheap accounts were related.  They were

17  overseen by the same individual or group of individuals based

18  on the evidence that we obtained.

19  Q.   And, sir, isn't it a fact that Wan Connie did not purchase

12:07 20  any domain that was located on DFIN or Toppan servers?

21  A.   I do not have evidence to suggest that.

22      MR. NEMTSEV:  Ms. Lewis, can we take that down,

23  please.  Thank you.

24  Q.   Sir, you read an article that Mr. Frank showed to you that

25  was located on Mr. Klyushin's iCloud account, correct?

1    A.   Do you have more specifics?

2    Q.   It was an article about a hacker that pled guilty and was

3    sentenced to two and a half years.  Do you remember that?

4    A.   Yes, for insider trading.

5    Q.   And isn't it a fact, sir, that Mr. Klyushin has asserted

6    his innocence and pled not guilty in this case?

7         MR. FRANK:  Objection, Your Honor.

8         THE COURT:  Overruled.

9    A.   Yes, he has pled not guilty.

12:08 10   Q.   And he's been waiting for 22 months to have his case heard

11   by --

12        MR. FRANK:  Objection, Your Honor.

13        THE COURT:  Sustained.

14   Q.   Sir, you testified that the Threema communications that we

15   looked at at the last portion of your testimony, they run from

16   approximately October 2018 to July of 2018 -- 2019; is that

17   correct?

18   A.   That's what we reviewed.  If we could pull them back up, I

19   would like to refresh my recollection on the end date.

12:09 20   Q.   Do you remember when Mr. Klyushin was added to the chat?

21   A.   Yes, May 13.

22   Q.   Of 2019?

23   A.   Right.

24   Q.   Towards the end of all the communications; is that

25   correct?

A.    Yes, he was referenced throughout the larger collection,
but he was added in May, that's correct.

Q.    And prior to May of 2019, the only two individuals in that
group were Mr. Rumiantcev and Mr. Ermakov; is that correct?

A.    And an unidentified individual in blue.

Q.    But he was added, was he not, on May of 2019?

A.    That sounds accurate.

Q.    And at that point in time, prior to the addition of
Mr. Ermakov -- of Mr. Klyushin and the other individual in
blue, the communications about trading, about profits were
exclusively between Mr. Rumiantcev and Mr. Ermakov; is that
accurate?

A.    Those were the two that we were reviewing earlier, yes.

Q.    Sir, you testified that Mr. Klyushin was arrested in March
of 2021; is that correct?

A.    Yes, March '21.

Q.    Did you review his trading accounts after March of 2021?

A.    I didn't personally, no.

Q.    Are you aware that accounts in his name continued trading
post his arrest?

A.    There was power of attorney in his accounts, so that would
make sense to me.

Q.    And you have no evidence that Mr. Klyushin, while he was
in custody, had access to a laptop to conduct trades?

A.    I have no evidence one way or the other, sir.

1          MR. NEMTSEV:  Ms. Lewis, could we pull up Exhibit 145.

2     Q.   Sir, you testified that this is a letter from Web2Objects,

3     correct?

4     A.   Yes, I did.

5     Q.   And it says, "Web2Objects authorizes Micfo to announce or

6     readvertise the following IP addresses," correct?

7     A.   Yes.

8     Q.   And it lists an IP address, 104.238.37, correct?

9     A.   Yes.  Yes, it does.

12:11 10    Q.   And it states, "Boston," correct?

11    A.   Boston, yes.

12    Q.   This does not necessarily mean that the IP address was in

13    Boston, correct?

14    A.   This document --

15         MR. FRANK:  Object to what it means, Your Honor.

16    Q.   Is it fair to say that Micfo would have to take additional

17    steps in order to place this IP address on a server in Boston?

18    A.   Yes.

19         MR. NEMTSEV:  Can we go to Exhibit 176.

12:11 20    Q.   And this is a record from the entity ARIN; is that

21    correct?

22    A.   It is.

23    Q.   And it's an entity that you testified that it gives out IP

24    addresses; is that correct?

25    A.   It does not give them out.  It's a registry.  So it shows

1    who owns what and whom -- to whom these blocks are assigned.

2         MR. NEMTSEV:  Can we go to page 2, please.

3    Q.    And it says, "On June 18, 2018, Web2Objects reassigned

4    this IP range to the following organization," correct?

5    A.    June 18, 2018, that's correct.

6    Q.    And the organization name is Strong Technology, LLC; is

7    that correct?

8    A.    It is.

9    Q.    And you are aware from your investigation that Strong

12:12 10   Technology operates a VPN service called StrongVPN?

11   A.    That is correct.

12   Q.    And isn't it a fact, sir, that StrongVPN never offered a

13   server from Boston, Massachusetts, during this relevant time

14   period?

15   A.    I don't know when they began advertising their services in

16   Boston, but they did offer services in Boston.

17   Q.    Sir, are you familiar with the Wayback Machine?

18   A.    I am.

19   Q.    And what is the Wayback Machine?

12:13 20   A.    The Wayback Machine is a repository of certain snapshots.

21   And I say "certain" very loosely because I don't know when they

22   go out and crawl the Internet, but at certain times they obtain

23   snapshots of certain websites.

24   Q.    Sir, you're aware that StrongVPN has a website; is that

25   correct?

          1    A.   I would assume that they do, yes.

          2         MR. NEMTSEV:  Madam Clerk, could I have the document

          3    camera, please.  Thank you.

          4         MR. FRANK:  I object to this being displayed to the

          5    jury.  It's not in evidence.

          6         THE COURT:  Are you moving it in?

          7         MR. NEMTSEV:  I'll move it in, Your Honor.

          8         MR. FRANK:  I object.  The witness hasn't identified

          9    it.

12:13    10         THE COURT:  Let's see if he can identify it.

          11         MR. FRANK:  Well, can we be shown the document without

          12    it being displayed?

          13         THE COURT:  Yes.  Can you show it to him.

          14         MR. FRANK:  I object on hearsay grounds, Your Honor,

          15    and authenticity.

          16         THE COURT:  Well, do you want to show it to him?

          17         MR. NEMTSEV:  Yeah.

          18         THE COURT:  I don't even know what it is.  Let's start

          19    there.

12:14    20         THE WITNESS:  I don't either.

          21    A.   I see what it appears to be, but I can't attest to the

          22    accuracy or validity of it.

          23    Q.   Sir, do you have any reason to doubt the accuracy of the

          24    archives of the Wayback Machine?

          25    A.   I didn't pull that document, so I don't know where it came

```
 1   from, sir.
 2   Q.   Do you have any reason to doubt the accuracy of the
 3   Wayback Machine, sir?
 4           MR. FRANK:  Objection, asked and answered.
 5           THE COURT:  No.  Sustained.  It's sustained.  You'll
 6   have to do it a different way.
 7           MR. NEMTSEV:  Your Honor, I'd move to introduce these
 8   as 412, 413.
 9           MR. FRANK:  Object, Your Honor.
10           THE COURT:  Sustained, if he doesn't know what they
11   are.
12           MR. NEMTSEV:  Madam Clerk, could we please have
13   Ms. Lewis's computer again.  Thank you.
14           THE CLERK:  Yeah, I can switch back.  Mm-hmm.  Okay.
15   Switched.
16           MR. NEMTSEV:  I'd like to bring up Exhibit 142.
17           Madam Clerk, it doesn't seem to be working.
18           MR. FRANK:  Is this in evidence?
19           THE CLERK:  It's up on my end.
20           MR. NEMTSEV:  Yes, this is -- can everybody see this
21   document?
22           THE CLERK:  I switched.  Do you want me to go back to
23   the government's?
24           MR. NEMTSEV:  Okay.
25   Q.   This is a contract between Markley Boston and Micfo, LLC;
```

1    is that correct?

2    A.    It is.

3    Q.    And the contract, to your knowledge, is to lease space in

4    Markley's building, correct?

5    A.    In Boston, yes.

6    Q.    It's not a contract to lease any sort of server; is that

7    correct?

8    A.    That is correct.

9    Q.    And is it your understanding that Micfo was renting a

12:16 10   cabinet from Markley in which it was going to place one of its

11   own servers?

12   A.    I don't recall what it was going to place there, but I

13   know it was a contract for real estate within the Markley

14   datacenter here in Boston.

15           MR. NEMTSEV:  Can we turn to page 7, please,

16   Ms. Lewis.

17           THE CLERK:  I have it on your side.  So if it works --

18           MR. NEMTSEV:  Perfect.  Thank you.

19   Q.    And the contract is signed by Amir Golestan, do you see

12:17 20   that, on behalf of Micfo?

21   A.    Yes.

22   Q.    And you are aware, are you not, that Mr. Golestan, at the

23   time, was the owner of Micfo, LLC?

24   A.    Yes.

25   Q.    And you've previously shown us that the invoices from

         1    October 2018, the invoices from Markley to Micfo, were paid,

         2    correct?

         3    A.   Those were StackPath invoices I believe we were looking

         4    at.

         5    Q.   Did you, sir, not testify about any Markley invoices?

         6    A.   Could you refresh my memory on what we're referring to?

         7    Q.   Would you agree, ultimately, that Micfo did not live up to

         8    its financial commitments to Markley?

         9    A.   I have no evidence to suggest that.

12:18   10         MR. NEMTSEV:  Could we turn to page 13, please.

        11    Q.   This is a letter to Micfo, LLC, from July 10th, 2019, is

        12    it not, sir?

        13    A.   At the very end of the relationship, yes.  I misspoke.

        14    Yes, at the very end, they stopped paying for services.  This

        15    was in the 2019 time frame, based on the letter, not during the

        16    time period in question.

        17    Q.   The letter advises that, "As of the date of this letter,

        18    your account is severely overdue"; is that correct?

        19    A.   That is correct.

12:18   20    Q.   "As of the date of this letter, your account is $9,573.92

        21    overdue"; is that correct?

        22    A.   That is what it says.

        23         MR. NEMTSEV:  Can we turn to the next page, please.

        24    Q.   And this is an additional invoice.  The statement is dated

        25    August 20th, 2019; is that correct?

1    A.    Yes, 2019, that's correct.

2    Q.    And, again, there's a balance due that's $14,185.88; is

3    that correct?

4    A.    For services in 2019, that's correct.

5    Q.    And the first invoice that was unpaid was April 1, 2019;

6    is that correct?

7    A.    That's what it appears to be, yes.

8    Q.    Sir, do you know if Micfo ever compensated Markley for its

9    overdue invoices?

12:19 10   A.    From 2019, no, I never investigated that.

11   Q.    Sir, isn't it a fact that Micfo and its owner, Amir

12   Golestan, were convicted in a federal court of fraud in

13   connection with conduct that occurred between February 2014 and

14   May 14th, 2019?

15   A.    Unrelated to the services rendered to StackPath.

16   Q.    Isn't it a fact?

17         THE COURT:  Is that a "yes"?

18         THE WITNESS:  There was a conviction in 2019.

19   Q.    For conduct that occurred between February of 2014 and May

12:20 20   of 2019?

21   A.    I have no knowledge of the exact date -- date, time

22   related to the offenses.

23   Q.    If I represent to you that the conduct was between

24   February 2014 and May of 2019 --

25   A.    I don't know, sir.  I have no idea.

1    Q.   You've never looked at any of the Micfo documents related

2    to the conviction?

3    A.   I do not recall the date range of the offenses that you

4    are referring to, sir.  I don't.

5    Q.   You also testified about a picture of a server at Markley;

6    is that correct?

7    A.   Yes.

8    Q.   And the server had a little tag beginning with the letters

9    ST; is that correct?

12:20 10    A.   Yes.

11    Q.   And you don't know what ST stands for, do you?

12    A.   I do not know specifically, no.

13    Q.   You guessed that it stands for StackPath; is that correct?

14    A.   It's possible it stands for StackPath.

15    Q.   It's also possible that it's an internal designation by

16    the manufacturer of the server; is that correct?

17    A.   It is possible.

18    Q.   It's also possible that it relates to Strong, StrongVPN;

19    is that correct?

12:21 20    A.   Yes, that's possible.

21    Q.   ST could relate to absolutely anything, correct?

22    A.   Yes, that is possible.

23         MR. NEMTSEV:  Can we please pull up Exhibit 140.

24    Q.   These are the Micfo invoices that you testified about,

25    correct?

1   A.   This appears to be one of them, yes.

2   Q.   And Micfo is a company that owns the server equipment on

3   which the 104 IP address may or may not have been placed?

4   A.   We have evidence that suggests that it, indeed, was placed

5   there.

6   Q.   You would agree, wouldn't you, that the 104 IP address

7   only accessed DFIN servers from approximately October to very

8   early November; is that correct?

9   A.   This 104 block?

12:22 10   Q.   Yes.

11   A.   Accessed the filing agent, yes.

12   Q.   October to November is the time period that we're

13   concerned with, correct?

14   A.   Correct.

15        MR. NEMTSEV:  Mr. Picard, can we go a little lower.

16   Yeah, down.  Further down, to the November 24, 2018 invoice.

17   Should be Exhibit 140.

18   Q.   You testified that the earliest invoice, it's a November

19   24, 2018 invoice, correct?

12:22 20   A.   What is on the screen?

21   Q.   On the screen is a June 24th, 2019 invoice.  Do you see

22   that?

23   A.   I do.  What was your question?

24   Q.   The earliest invoice that you located featuring this IP

25   range was from November 24, 2018; is that correct?

A.    Yes, I believe that's correct.

Q.    And that was an invoice to host this IP range from
December 1, 2018, to December 31st, 2018; is that correct?

A.    I believe there was one that referenced a time period that
spanned in the second or third week of November.  So that would
predate the date range you just referenced.

Q.    The time period was -- the November 24 invoice was the
date of the invoice.  It was not the date of the time period
that was listed?

A.    Do you have it?  We could take a look at it.

        MR. NEMTSEV:  Mr. Picard.

Q.    Is this the invoice that you recall testifying about?

A.    Yes, this is one of them.

Q.    And it's an invoice dated November 24th, 2018, with the IP
range 104.238.37, correct?

A.    That is correct, yes.

Q.    And the dates of service are December 1, 2018, to December
31, 2018, correct?

A.    That is correct, yes.

Q.    And the location is listed as Boston, correct?

A.    That is correct, yes.

Q.    And it's listed as -- the server is listed as U-07; is
that correct?

A.    Number 7, yeah, that is it, sir.

Q.    And this invoice doesn't say anything directly about where

1    this IP or the server were in October of 2018, correct?

2    A.   It does not say, no, it doesn't.

3    Q.   And you testified that you'd not located an earlier

4    invoice, correct?

5    A.   Yes, certain record retention policies, they provided what

6    they could find.

7    Q.   You testified that you couldn't find an invoice earlier

8    than this one associated with this IP range, correct?

9    A.   Correct.

12:25 10   Q.   But you did receive invoices from StackPath that were

11   earlier in time than this, correct?

12   A.   That is accurate.

13   Q.   And you received, did you not, sir, invoices earlier than

14   November of 2018 indicating that the U-07 server was dedicated

15   to a different IP address?

16          THE COURT:  When?

17          MR. NEMTSEV:  Prior to November of 2018.

18   A.   It is possible.

19          MR. NEMTSEV:  Madam Clerk, could I please have the

12:25 20   document camera.

21          THE CLERK:  Yes.

22   Q.   This is another invoice that you received from StackPath;

23   is that correct?

24          MR. FRANK:  It's not in evidence, Your Honor.

25          MR. NEMTSEV:  I'll move it in as Exhibit 416.

1          THE CLERK:  416?

2          MR. NEMTSEV:  Yes.

3          (Exhibit No. 416 received into evidence.)

4   Q.   Do you see that invoice, sir?

5   A.   I do.

6   Q.   And this is an invoice dated October 25th, 2018, correct?

7   A.   October 25th, 2018, yes.

8   Q.   And it specifies an IP range of 104.156.206; is that

9   correct?

12:26 10  A.   It does.

11  Q.   And it specifies that between the period of November 1,

12  2018, to November 30th of 2018, this was going to be the IP

13  address that was going to be located on server space 7.

14       Do you see that?

15  A.   I see that, yes.

16  Q.   And StackPath produced to you additional invoices, did it

17  not, relating to this IP address and its location on server 7?

18  A.   I don't know.

19  Q.   You would agree that this IP range is not the one that

12:27 20  we're concerned about, the one that accessed DFIN's servers,

21  correct?

22  A.   That is correct.  I was searching for the IP range in

23  question.

24          MR. NEMTSEV:  Your Honor, I would move this in as

25  Exhibit 417.

```
 1              THE COURT:  All right.

 2              (Exhibit No. 417 received into evidence.)

 3              THE CLERK:  The next one?  Because I just gave you

 4    416.

 5              MR. NEMTSEV:  Yes.  Can I have 417?

 6              THE CLERK:  Mm-hmm.

 7              MR. NEMTSEV:  Thank you.

 8    Q.   This is another invoice, this one dated July 25th, 2018.

 9         Do you see that?

10    A.   I do.

11    Q.   And it contains the same IP range that we just discussed,

12    the 104.156.206; is that correct?

13    A.   It does.

14    Q.   This is an invoice for services between August 1, 2018,

15    and August 31, 2018; is that correct?

16    A.   Correct.

17    Q.   And it lists, again, that this is the IP address that's

18    going to occupy server 7, correct?

19    A.   It is a range that is going to be associated with that

20    server, yes.

21    Q.   And this invoice is marked as paid, correct?

22    A.   Correct.

23              MR. NEMTSEV:  I'd move to admit Exhibit 418.

24              THE COURT:  I think we just did that, didn't we?

25              THE CLERK:  That was 417.
```

1           MR. NEMTSEV:  417, Your Honor.  This is 418.

2           THE COURT:  418.  All right.

3               (Exhibit 418 received into evidence.)

4    Q.   This is another invoice dated August 25th, 2018, correct?

5    A.   It is, yes.

6    Q.   And, again, this features the IP block 104.156.206,

7    correct?

8    A.   It does, yes.

9    Q.   This one is to provide services between September 1, 2018,

12:29 10   and September 30, 2018, correct?

11   A.   Correct.

12   Q.   And, again, it lists this IP address being associated with

13   server 07, correct?

14   A.   That is correct.

15           THE COURT:  So as I understand it, there are different

16   104 IP addresses, some of which were associated with the

17   intrusion, but some of which are not?

18           THE WITNESS:  That is correct, yes, ma'am.

19   Q.   And the ones that are unassociated with the intrusion,

12:29 20   according to these invoices, were located on the U-7 server

21   between September 1 and September 30th and between November 1

22   and November 30th, correct?

23   A.   That's what the invoices suggest, yes.

24           THE COURT:  And just remind us, where did the 104

25   track back to?

 1          THE WITNESS:  This was DFIN's access -- unauthorized

 2     access to a DFIN employee's comprised --

 3          THE COURT:  But whom did the alleged intruding 104

 4     track back to?  Was that --

 5          THE WITNESS:  The --

 6          THE COURT:  Who owned it?

 7          THE WITNESS:  The 104 came back to StackPath, so to a

 8     VPN provider.

 9          THE COURT:  To a VPN provider?

12:30 10          THE WITNESS:  Yeah.  I apologize.

11          THE COURT:  And that's where it stops?

12          THE WITNESS:  As far as who owns it, that's correct.

13          THE COURT:  Thank you.

14     BY MR. NEMTSEV:

15     Q.   And you have no evidence that that same IP range was

16     located in Mr. Klyushin's iCloud account?

17     A.   We did not find that IP address in Mr. Klyushin's iCloud

18     account, no.

19     Q.   And you did not find that IP range in Mr. Ermakov or

12:30 20     Mr. Rumiantcev's iCloud account; is that correct?

21     A.   That is correct.

22     Q.   You testified that the first person that Mr. Klyushin's

23     wife sent a message to following his arrest was to Mr. Ermakov,

24     correct?

25     A.   Yes.

1   Q.   And you put a tap on Mr. Klyushin's wife's WhatsApp; is

2   that correct?

3   A.   A pen-trap, the caller ID.

4   Q.   And you would agree, would you not, sir, that Mr. Klyushin

5   was arrested without notice while he was going on a family trip

6   with his wife and his kids?

7   A.   He was wanted by U.S. authorities, that's correct.

8   Q.   And Ms. Klyushin, Mr. Klyushin's wife, she contacted many

9   people, correct?

12:31 10   A.   The first person she contacted was Ivan Ermakov.

11   Q.   On her WhatsApp.

12       What about her instant messages?

13   A.   I don't know.

14   Q.   Do you know who she called?

15   A.   I do not.

16   Q.   Special Agent Hitchcock, is it fair to say your job

17   involves interviewing individuals and witnesses in connection

18   with your investigations?

19   A.   That is a piece of it, yes.

12:32 20   Q.   And in interviewing witnesses, you take notes; is that

21   correct, sir?

22   A.   Yes.

23   Q.   And you were taught the importance of keeping accurate and

24   detailed notes at the FBI Academy?

25   A.   Yes.

```
 1    Q.   And that's because you may be a witness in a criminal
 2    case; is that correct?
 3    A.   Yes.
 4    Q.   Fair to say that you try to capture as much as of the
 5    conversation in the statement as you can?
 6    A.   It depends on the situation, sir, but, yes, I take notes.
 7    Q.   In this instance, you interviewed Mr. Zorek on September
 8    15, 2022, correct?
 9    A.   That sounds approximately the date.
12:32 10   Q.   And, to your knowledge, you kept accurate and detailed
11    notes of the interview?
12    A.   Not every word that was spoken.
13    Q.   You later put your notes into a memo; is that correct?
14         MR. FRANK:  I object to this line unless there's a
15    proffer about where we're going with this.
16         THE COURT:  Well, what's the question?
17         MR. NEMTSEV:  The inconsistent statement between --
18         THE COURT:  I know.  Well, ask him.
19         MR. NEMTSEV:  Could I show him the notes, Your Honor?
12:33 20   THE COURT:  Yeah.
21         MR. NEMTSEV:  Thank you.
22         THE COURT:  Maybe show Mr. Frank where you're going
23    with this too.
24         MR. FRANK:  There's no inconsistent statement, Your
25    Honor.  We object.
```

1          THE COURT:  Well, why don't you ask -- this is only

2     for purposes -- not for the truth of it, but whether or not

3     this is inconsistent or not.  I'll let the jury's memory

4     control as to what was said.

5          THE WITNESS:  Do we have an unredacted version of the

6     notes?

7          MR. NEMTSEV:  The portion that's unredacted is the one

8     that's relevant.

9          MR. FERNICH:  Give him the whole thing.

12:34 10          THE COURT:  Well, do you have your own notes here?

11          THE WITNESS:  Not in front of me, no, ma'am.

12          THE COURT:  I mean in the room.

13          THE WITNESS:  I --

14          THE COURT:  Do you have the full notes, either of you?

15          MR. FRANK:  Not sitting right here right now, Your

16     Honor.

17          THE COURT:  So what's the question?  And if he can't

18     answer it based on the redactions, then that's the answer.

19     BY MR. NEMTSEV:

12:34 20     Q.   There's a difference, correct, between an anomaly and a

21     red flag?

22     A.   Let me refresh my recollection here --

23          THE COURT:  Just read it.  Take your time.  Read it.

24          THE WITNESS:  I would like to see the rest of the

25     notes.

 1             THE COURT:  Well, I haven't heard the question yet.

 2   So what's the question?

 3   Q.   There's a difference between an anomaly and a red flag, is

 4   there not, sir?

 5   A.   It depends on the context.  I would like to see the rest

 6   of my notes.

 7             THE COURT:  Do you have the full version?

 8             MR. NEMTSEV:  I believe Mr. Picard may have them, Your

 9   Honor.

12:35 10             THE COURT:  Are you almost done with this exam?

11             MR. NEMTSEV:  Very close.

12             THE COURT:  What?

13             MR. NEMTSEV:  Very close, Your Honor.

14             THE COURT:  While he's looking for it, can you move on

15   to another topic?

16             MR. NEMTSEV:  Of course.

17             THE COURT:  So we don't waste time.  Thank you.

18   Q.   Sir, you testified, did you not, that you reviewed the

19   M-13 website only after Mr. Klyushin's arrest?

12:36 20   A.   That is correct.

21   Q.   And is it your understanding that other members of your

22   team, similarly, did not review the M-13 website until after

23   Mr. Klyushin's arrest?

24   A.   Yes, that's correct.

25   Q.   And Mr. Klyushin was arrested on March -- in March of

1    2021, correct?

2    A.    That's correct.

3    Q.    And you testified that Special Agent Kang co-led the

4    investigation with you, correct?

5    A.    Correct.

6    Q.    And Special Agent Kang submitted certain affidavits, did

7    he not, in connection with search warrants?

8    A.    Correct.

9          MR. NEMTSEV:  May I approach the witness, Your Honor?

12:37 10         THE COURT:  Yes.

11   Q.    Sir, do you see that that is a January 29, 2021 affidavit

12   from Special Agent Kang?

13   A.    It appears to be.

14   Q.    Signed under the pains and penalties of perjury?

15   A.    It appears to be signed.

16         THE COURT:  Have you seen this before?

17         THE WITNESS:  This particular printout?  No.

18   Q.    You have seen affidavits in --

19         MR. FRANK:  This is not his affidavit.

12:37 20   A.    I have, but I have not seen this particular printout.  I

21   don't know where this came from, other than I assume it was

22   printed out.

23         THE COURT:  This isn't his affidavit.  So what's the

24   question?

25   Q.    Would you turn to the page with the orange sticky, and can

```
  1   you read Section 9A.

  2          THE COURT:  To yourself.

  3   Q.   To yourself.

  4          MR. NEMTSEV:  Thank you, Judge.

  5   A.   Yes.

  6   Q.   Isn't it a fact, sir, that in this January 29, 2019

  7   affidavit --

  8          MR. FRANK:  Objection to reading the affidavit, Your

  9   Honor.  If he has a question about that --

 10          THE COURT:  Do you have a question?

 11          MR. NEMTSEV:  Yes.  Special Agent Kang specifically

 12   and explicitly --

 13          MR. FRANK:  Objection.

 14          THE COURT:  I don't know what you're going to say, so

 15   maybe I should see it.

 16          MR. NEMTSEV:  -- refers to --

 17          THE COURT:  No.  Let me see it.

 18          MR. FRANK:  I haven't seen it either.

 19   (SIDEBAR CONFERENCE AS FOLLOWS:

 20          THE COURT:  What are you looking at, Mr. Nemtsev?

 21          MR. NEMTSEV:  He testified that no one on his team

 22   reviewed this website until after Mr. Klyushin's arrest.

 23   Special Agent Kang quotes from this website and specifically

 24   says, according to M-13's website, the company --

 25          THE COURT:  All right.  So just ask if this refreshes
```

```
 1    his recollection.  That's not a big deal.  All right.  How much

 2    longer do you have?  Mr. Nemtsev --

 3              MR. NEMTSEV:  Yes.

 4              THE COURT:  -- about how much longer do you have?

 5              MR. NEMTSEV:  Ten, 15 minutes, Judge.

 6              THE COURT:  What's -- did you find -- I don't want to

 7    bring him back here just for a little snippet.  Did you find

 8    his notes?

 9              MR. FERNICH:  I have it digitally.

12:40 10              THE COURT:  Why don't you show us what this is all

11    about so I don't have to come back here a second time.

12              MR. FERNICH:  All right.  So in the 302 that he wrote

13    a week later, he wrote the words "red flag," and in his notes

14    of the meeting, he wrote "anomalies."  That's all.

15              MR. FRANK:  There's no inconsistency, Your Honor.

16              MR. FERNICH:  No, it's for bias and motive.  It's not

17    being offered for an inconsistency.

18              MR. FRANK:  That's what he offered it for, a prior

19    inconsistent statement.

12:40 20              THE COURT:  Why it is a bias or a motive?

21              MR. FERNICH:  Because he changed the word -- as I

22    started to lay the foundation with Zorek yesterday, he changed

23    the word in his notes from "anomalies" to "red flags" a week

24    later when he typed it up.  Straight up bias and motive.

25              MR. FRANK:  The witness testified that he used the
```

word "red flag."

        MR. FERNICH:  No.  The witness testified that he couldn't remember.

        THE COURT:  Ask him what he said.  I don't -- I know what Zorek said, but ask him what he said.

        MR. FERNICH:  That's fine.

        THE COURT:  All right.  I'm going to let you do it. If it's ten or fifteen minutes, how much longer do you have on --

        MR. FRANK:  I'll have probably a ten- or fifteen-minute redirect.  But what I'm wondering is whether we can get Ms. Shah in and out so that she can go back home.

        THE COURT:  Not if we're at five of 1:00, unfortunately.

        MR. FRANK:  Her testimony is going to be brief. Otherwise, she has to spend a whole night here.

        THE COURT:  It's warm today.

**END OF SIDEBAR CONFERENCE.)**

BY MR. NEMTSEV:

Q.   Sir, does Agent Kang's affidavit refresh your recollection regarding whether agents or anyone else in the FBI team reviewed Mr. Klyushin's company's website prior to his arrest?

A.   I don't know the underlying basis for the --

        THE COURT:  Do you know one way or the other?

        THE WITNESS:  I don't.

```
 1              THE COURT:  All right.  Next question.
 2    Q.   Sir, you asked to review your notes of Mr. Zorek's
 3    interview, correct?
 4    A.   Yes, sir, I did.
 5              MR. NEMTSEV:  Mr. Fernich, could you please -- thank
 6    you.
 7              May I approach, Your Honor?
 8              THE COURT:  Yes.
 9              MR. NEMTSEV:  Thank you.
12:43 10   A.   I've got 16 pages here.  May I review surrounding --
11              THE COURT:  Could you give him -- the big question is
12    focused on two specific -- three specific words.  Why don't you
13    show it to him.
14              THE WITNESS:  The circled portion?
15              MR. NEMTSEV:  This portion, yes (indicating), and this
16    portion.
17              THE WITNESS:  If I could ask the Court to review some
18    of the surrounding pages of notes to ensure that --
19              THE COURT:  Yes, you can, but I think he's only asking
12:43 20   you about a snippet.
21              MR. NEMTSEV:  Your Honor, maybe I can ask him to read
22    that portion out loud.  It's one sentence.
23              THE COURT:  Let him orient himself.
24              MR. NEMTSEV:  Thank you, Judge.
25    A.   Could you repeat the question, please?
```

1          THE COURT:  Okay.  He's ready.

2     Q.   Your notes say "anomaly" when your memorandum says "red

3     flags" --

4          MR. FRANK:  Object to the reading of the notes, Your

5     Honor.

6          THE COURT:  Excuse me.  Why don't you -- are you at

7     the point where it says the word "anomaly"?

8          THE WITNESS:  I am, and I'm also looking at page 7,

9     and it says "monitoring flagged accounts for potential market

12:44 10   abuse."

11          THE COURT:  All right.  So now what's the question?

12    Q.   The question is:  Page 15, directly, is associated with

13    page 5 of your notes, correct, of your memorandum?

14    A.   Page 7 and page 15 appear to be referring to the exact

15    same period of time.  Do you understand what I'm saying?

16          THE COURT:  In your own words, what does anomaly mean?

17          THE WITNESS:  An anomaly is something that is

18    suspicious, and monitoring it was flagged -- flagging it --

19          THE COURT:  So that's what his understanding of the

12:45 20   word means.

21    Q.   Suspicious, but a red flag?

22    A.   On page 7 of 16 pages of notes, I wrote "monitoring

23    flagged accounts for potential market abuse."  On page 15, "a

24    few trades" --

25          MR. NEMTSEV:  I object to the reading of the

1    affidavit -- of the notes.  I'm sorry.

2              THE COURT:  I mean, you've asked him.

3              THE WITNESS:  You opened the door, sir.

4              MR. NEMTSEV:  I object, Your Honor.

5              MR. FERNICH:  Objection.  There's a judge in the

6    courtroom.  This is the second time now.

7              MR. FRANK:  I object to Mr. Fernich objecting to --

8              THE COURT:  This has been so nice.  We're just going

9    to leave it alone --

12:46 10         MR. FERNICH:  We have a judge who instructs jurors on

11   the law, so I object --

12             MR. FRANK:  Objection, Your Honor.

13             THE COURT:  I do -- all right, let's just -- now I

14   forget where we were.  So you had said that you had flagged

15   certain trades as suspicious.  And then on the other page, what

16   did you say?

17             THE WITNESS:  So if the Court will allow it, I'll read

18   from page 7, the snippet that also --

19             MR. FERNICH:  Objection.  Objection.

12:46 20         THE COURT:  No, no.  Then you said something about an

21   anomaly later on.  What were you referring to?

22             THE WITNESS:  This same reference on page 7.

23             THE COURT:  That's the end of it.  What's the next

24   question?

25             MR. NEMTSEV:  Nothing further, Your Honor.

```
 1              THE COURT:  Nothing further.  All right.
 2                      REDIRECT EXAMINATION
 3    BY MR. FRANK:
 4    Q.   What was it you were going to read, Special Agent?
 5              MR. FERNICH:  The documents should be returned.
 6    They're not in evidence, and we'll conduct the examination.
 7              MR. FRANK:  It's my redirect.
 8              THE COURT:  The document will be returned, but he's
 9    allowed to put in context.
10              MR. FERNICH:  And he's going to read the full
11    document.
12              THE COURT:  Excuse me, Mr. Fernich.  Please sit down.
13              All right.  You're doing redirect.  Now, what is -- he
14    can't just read.
15              MR. FERNICH:  No, that's why we should have the
16    document back.
17              THE COURT:  Excuse me.  What is the question?
18    BY MR. FRANK:
19    Q.   Special Agent, does that document refresh your
20    recollection about what you wrote about Mr. Zorek's interview?
21              MR. FERNICH:  Objection.
22              THE COURT:  Overruled.
23    A.   It does refresh my recollection.
24    Q.   Without looking at the document, could you tell the jury
25    about what you recorded about Mr. Zorek's interview?
```

1    A.    Mr. Zorek provided that the accounts in question were

2    flagged for potential -- "flagged" being the key word -- for

3    potential market abuse.

4          THE COURT:  All right.  Next question.

5    Q.    Did Mr. Zorek tell you there were red flags in the

6    account?

7    A.    Yes.

8    Q.    You were asked some questions about a server in Boston.

9          Do you recall those questions?

12:47 10   A.    I do.

11   Q.    Can a server host multiple IP addresses?

12         MR. NEMTSEV:  Objection.

13         THE COURT:  Overruled.

14   A.    Yes, it can.

15   Q.    So the fact that a server hosts one version of a 104 IP

16   doesn't mean that it can't also host another version of a 104

17   IP, correct?

18   A.    That is correct.

19   Q.    What did StackPath --

12:48 20        THE COURT:  Can a slice of a server serve -- you know,

21   I'm thinking a slice of pie.  Right?  Can a slice of a server

22   serve more than one IP address?

23         THE WITNESS:  Well, the point of the slice is to be

24   able to do things like, say, slice number 1 is this IP block,

25   and slice number 2 would be another IP block.  That is --

1   exactly.

2           THE COURT:  So if you have slice number 7 --

3           THE WITNESS:  Well, 7 is a dedicated server that has

4   slices inside of it.  So it is very possible that server number

5   7 --

6           THE COURT:  Do you know that, one way or another, as

7   to how many IP addresses slice 7 served?

8           THE WITNESS:  I don't know specifics.

9   Q.  But you know that it was used for multiple IP addresses,

12:48 10  correct?

11  A.  Yes.

12  Q.  Okay.  And you were asked some questions -- well,

13  withdrawn.

14      What do you know about StackPath's document retention

15  policy?

16  A.  It was three years.

17  Q.  And when did you ask for these invoices?  Was it more than

18  three years?

19  A.  It was.

12:49 20  Q.  So they had some documents but not others?

21  A.  Correct.  Some were attached to emails, for instance, but

22  not retained in other places, or they were in a file store

23  rather than email.

24  Q.  You were asked some questions about whether there was any

25  evidence of the 104 Boston IP address in Mr. Klyushin's iCloud

        1   account.

        2       Do you recall those questions?

        3   A.   I do.

        4           MR. FRANK:  Could we look at Exhibit 195A, please.

        5           THE CLERK:  Hold on.  I have to switch up.

        6           MR. FRANK:  Oh, sorry, Ms. Molloy.

        7           THE CLERK:  It's okay.  You should be reconnected now.

        8           MR. FRANK:  Is this 195A?  Sorry, I'm looking at --

        9   191.  I apologize.

12:49  10   Q.   What is 191?

       11   A.   This is the 104.238.37 Boston IP block accessing the Julie

       12   Soma DFIN account to download certain MNPI before it was

       13   released.

       14           MR. FRANK:  Could we call up 195A next to it, please.

       15   Q.   Now, you recall you were also asked about these downloads

       16   from the 119 IP?

       17   A.   Yes.

       18   Q.   And these were downloads from the 119 IP four minutes

       19   after Mr. Ermakov used that IP address?

12:50  20   A.   That's correct.

       21   Q.   And this was in May of 2019, correct?

       22   A.   Correct -- or May of 2018.

       23   Q.   2018.  There's a typo in the heading, but on the left it

       24   said May of 2018?

       25   A.   Correct.

```
 1   Q.   And Mr. Nemtsev asked you whether Mr. Klyushin traded in
 2   those particular stocks.
 3        Do you recall that question?
 4        MR. NEMTSEV:  Objection.  That's misstating my
 5   question.  I asked whether he traded in April and May, those
 6   stocks.
 7        THE COURT:  All right.  So let's --
 8   Q.   Do you recall being asked if Mr. Klyushin traded in those
 9   stocks?
12:50 10   A.   I do.
11        MR. NEMTSEV:  Objection, Your Honor.
12        THE COURT:  Overruled.
13   Q.   Mr. Klyushin didn't open his brokerage account until two
14   months later, correct?
15   A.   That is correct.
16   Q.   Okay.  But if we look at 191 on the left, that same Julie
17   Soma user ID was used to download documents via the 104 IP,
18   correct?
19   A.   That is correct.
12:51 20   Q.   Looking at that list, Mr. Klyushin did trade in those
21   stocks -- some of those stocks, correct?
22   A.   That is correct.
23   Q.   For example, Capstead Mortgage, we see it right there on
24   the first page, Mr. Klyushin traded, in October of 2018, in
25   shares of Capstead Mortgage, correct?
```

```
 1   A.   Correct.

 2   Q.   Elsewhere in this document there's reference to Tesla and

 3   Roku documents being downloaded?

 4   A.   That's correct.

 5   Q.   Did Mr. Klyushin trade in those stocks at that time?

 6   A.   He did.

 7        MR. FRANK:  You can take that down.

 8   Q.   You were asked some questions about the M-13 89 IP.

 9        Do you recall those questions?

10   A.   I do.

11   Q.   And you were asked whether that IP address personally

12   belonged to Mr. Klyushin.

13        Do you recall that?

14   A.   I do.

15   Q.   Who did M-13 belong to?

16   A.   Mr. Klyushin.

17   Q.   You were asked some questions about whether you found

18   evidence of the AirVPN 185 IP on Mr. Klyushin's iCloud account.

19        Do you recall those questions?

20   A.   I do.

21   Q.   What did you learn about the connection between the AirVPN

22   185 IP and the hack?

23   A.   That it was observed by Toppan Merrill in the hack.

24        MR. FRANK:  And could we have Exhibit --

25   Q.   And did you also -- what did you learn about the use of
```

1   the 185 IP in connection with the M-13 89 IP?

2   A.   On January 29th of 2020, it was accessed -- the AirVPN IP

3   was accessed by way of the M-13 IP address on January 29th.

4   Q.   And what did you learn about who used that same M-13 89 IP

5   one hour and 41 minutes before the M-13 89 IP accessed the

6   AirVPN IP?

7   A.   Mr. Klyushin accessed his Russian Standard Bank account.

8   Q.   You were asked some questions about whether there were any

9   accounts with AirVPN in the names of Ivan Ermakov or

12:53 10   Mr. Klyushin.

11      Do you recall those questions?

12   A.   Yes.

13   Q.   Special Agent, you've investigated sophisticated hackers

14   throughout your career?

15      MR. NEMTSEV:  Objection.

16      THE COURT:  Sustained.

17   Q.   Would you have expected to find accounts in their personal

18   names?

19      MR. NEMTSEV:  Objection.

12:53 20      THE COURT:  Sustained.

21   Q.   Did you find accounts in the name of Andrea Neumann at

22   Namecheap and at BitLaunch and at other -- and at BitLaunch?

23   A.   Yes.

24   Q.   And were you able to trace the Andrea Neumann -- the

25   Andrea Neumann Namecheap account using Bitcoin tracing?

1           MR. NEMTSEV:  Objection.

2    A.   I wasn't personally, but an expert did, yes.

3    Q.   Is that Vincent Kenney?

4    A.   Yes.

5    Q.   And he's going to be testifying in this case, correct?

6    A.   Yes.

7    Q.   And through that tracing, what company did that Bitcoin

8    transaction come back to via IP addresses?

9           MR. NEMTSEV:  Objection.

12:54 10        THE COURT:  Sustained.  Hearsay.

11   Q.   Well, you were asked some -- the Andrea Neumann account

12   was -- the Andrea Neumann account -- withdrawn.

13        The various Namecheap accounts, they were all registered

14   with what kind of an email address?

15   A.   inbox.lv.

16   Q.   The Wan Connie account was registered with what kind of

17   email address?

18   A.   inbox.lv.

19   Q.   What IP address was used to access the Wan Connie account?

12:54 20   A.   The M-13 89 IP address.

21   Q.   You were asked some questions about when Mr. Ermakov was

22   added to Mr. Klyushin's iCloud account when you first found

23   evidence of him in the iCloud account?

24   A.   Yes.

25   Q.   When did they go helicopter skiing together --

```
 1              MR. NEMTSEV:  Objection.
 2    Q.    -- for Mr. Ermakov's birthday?
 3              THE COURT:  Overruled.
 4    A.    In April of 2018, on his birthday -- Ermakov's birthday.
 5    Q.    You were asked some questions about whether you found
 6    pictures of Mr. Sladkov and Mr. Klyushin together.
 7          Do you recall that?
 8    A.    Could you repeat the question?
 9    Q.    You were asked some questions about whether you found
10    photographs of Mr. Sladkov in the same photograph with
11    Mr. Klyushin.
12          Do you recall that?
13    A.    Yes.
14    Q.    What did you find with regard to Mr. Klyushin on
15    Mr. Sladkov's iCloud account?
16    A.    The product slide deck in September of 2019 --
17    Q.    That was the LAVR product?
18    A.    Yes.
19    Q.    And you found it in September?
20    A.    September.
21    Q.    2019?
22    A.    Correct, September 4th.
23    Q.    When was it publicly announced?
24    A.    It was the following year, if I recall.
25    Q.    What else did you find in Mr. Sladkov's iCloud account?
```

```
 1    A.    The M-13 chat application was identified.
 2    Q.    And who else had the M-13 chat application in their iCloud
 3    accounts?
 4    A.    Nikolai Rumiantcev and Vladislav Klyushin.
 5    Q.    And who owns M-13?
 6    A.    Vladislav Klyushin.
 7    Q.    What else did you find in Mr. Sladkov's iCloud account?
 8    A.    Reference to the trading activity in Kohl's.
 9    Q.    We'll come back to that in a moment.
10    Did you find photographs of Mr. Klyushin's yacht?
11    A.    Yes.
12    Q.    One photograph or more than one?
13    A.    More than one.
14    Q.    Did you find photographs taken on Mr. Klyushin's vacation
15    to the Maldives?
16    A.    Yes.
17          MR. NEMTSEV:  Objection.
18    Q.    With respect to the Kohl's --
19          THE COURT:  You're going a little too fast for me.
20          MR. FRANK:  I'll ask it again more slowly, Your Honor.
21    I'm trying to get done by 1:00.
22    Q.    Did you find photographs in Mr. Sladkov's iCloud account
23    that Mr. Klyushin took on a vacation to the Maldives?
24          MR. NEMTSEV:  Objection.
25    A.    Yes.
```

1          THE COURT:  What date?

2          THE WITNESS:  The date was surrounding the time that

3    the vacation was occurring.  It was January 2nd and 3rd of a

4    particular year.  If I could refresh my recollection.

5          MR. FRANK:  I don't have that document right here.

6    Q.   You don't remember the exact date; is that right?

7    A.   Correct.

8    Q.   But they were Mr. Klyushin's photographs?

9    A.   Correct.

12:57 10   Q.   Did you find photographs of the ski trip that Mr. Ermakov

11   took with Mr. Klyushin for his birthday?

12         MR. NEMTSEV:  Objection.

13         THE COURT:  Overruled.

14   A.   Yes.

15   Q.   Those were in Mr. Sladkov's account as well?

16   A.   They were.

17   Q.   Did you find a contact card for Mr. Ermakov?

18         THE COURT:  Where?

19   Q.   In Mr. Sladkov's iCloud account.

12:57 20   A.   Yes.

21         MR. FRANK:  Could we have 171A, please.

22   Q.   What is the date listed at the bottom of -- oh, I'm sorry.

23   This is the contact card for Mr. Sladkov?

24   A.   It is.

25   Q.   And whose iCloud account was this in?

1    A.    This was in Ivan Ermakov's account.

2    Q.    And what's the date that Mr. Sladkov's contact card was in

3    Mr. Ermakov's iCloud account?

4    A.    November 16th, 2016.

5    Q.    You just referenced a moment ago a photograph of trading

6    in the stock of Kohl's.

7          Do you recall that?

8    A.    Yes.

9    Q.    And where did you find that photograph of trading in the

12:58 10    stock of Kohl's?

11    A.    That was in Sladkov's Apple account.

12    Q.    And how did it get there?

13    A.    It was transmitted between Ivan Ermakov and Igor Sladkov.

14    Q.    Who traded in Kohl's?

15    A.    Vladislav Klyushin.

16    Q.    You were asked some questions about the Threema chat.

17          Do you recall those questions?

18    A.    Yes.

19    Q.    And you were asked whether Mr. Klyushin would have -- was

12:59 20    part of the Threema chat before he joined it or whether he

21    would have seen it.

22          Do you recall a question along those lines?

23    A.    Yes.

24          MR. FRANK:  Could we have Exhibit 46, please.  And

25    could you go, please, to line 2276.

1    Q.   Could you read from 2276 to 2279, identifying the speaker.

2    A.   Nikolai Rumiantcev, in response to Ivan Ermakov, saying,

3    "This is my" --

4    Q.   I'm sorry.  Actually, could you go back one line to 2275.

5    A.   Yes.  Nikolai Rumiantcev, "Add Vlad to the chat."  Nikolai

6    Rumiantcev, in response to Ivan Ermakov, saying, "This is my

7    colleague.  He is completely on top with the subject.  You can

8    trust him as you trust me.  And if you want, you can check with

9    Vlad."

01:00 10        Rumiantcev's response, "Should all issues be addressed

11    there?"  In response to Nikolai Rumiantcev saying "Add Vlad to

12    the chat," Ermakov responds, "Do you think he needs that?"

13    Rumiantcev replies, "Yes.  Quite often we need to explain him

14    something that we have already discussed in the chat.  But this

15    way, he will be reading it on his own."

16    Q.   Thank you, Special Agent.

17        You were also asked some questions about a photograph of a

18    Reuters article regarding a Ukrainian hacker engaging in

19    insider trading.

01:00 20        Do you recall those questions?

21    A.   Yes.

22        MR. FRANK:  Ms. Lewis, could we have Exhibit 34 in

23    evidence, please.

24        THE COURT:  How much longer do you have?

25        MR. FRANK:  I'm wrapping up, Your Honor.

1    Q.    This is that photograph?

2    A.    Yes.

3    Q.    And this photograph in Mr. Klyushin's iCloud account was

4    from August of 2018, correct?

5    A.    2018, yes.

6    Q.    And this article, "Ukrainian hacker gets prison in U.S.

7    insider trading case," was --

8              THE COURT:  Remember, this has nothing to do with this

9    case.  This is just a clip.

01:01  10    Q.    This photograph that Mr. Klyushin saved to his iCloud

11    account was from August of 2018, correct?

12    A.    Yes.

13    Q.    And the article is in a plastic protective sleeve.

14          Do you see that?

15    A.    Yes.

16    Q.    And you located that article, correct?

17    A.    Yes.

18              MR. FRANK:  Could we have Exhibit 150 on the right,

19    please.

01:01  20    Q.    And this is that article, correct?

21    A.    It is.

22              MR. FRANK:  And, Ms. Lewis, if you could enlarge it so

23    we could see the date at the top.

24    Q.    What is the date of the article?

25    A.    May 22nd, 2017.

```
 1   Q.   And Mr. Klyushin took a photograph of it in August of 2018
 2   in a protective plastic sleeve?
 3   A.   Yes, over a year later.
 4   Q.   Could you read the first sentence of the article?
 5             MR. NEMTSEV:  Objection, Your Honor.
 6             THE COURT:  Sustained.  Let's finish.
 7   Q.   The article is about insider trader based on
 8   yet-to-be-published corporate news releases?
 9             MR. NEMTSEV:  Objection.
10             THE COURT:  Sustained.
11             MR. FRANK:  I'm wrapping up, Your Honor.
12             THE COURT:  Move on.
13   Q.   What is the article about, Special Agent?
14             MR. NEMTSEV:  Objection.
15             THE COURT:  Generally, what's the topic?
16   A.   It's about trading -- hackers having access to
17   preannouncement information.
18             THE COURT:  Thank you.  What's the next question?
19             MR. FRANK:  No further questions.
20             THE COURT:  Okay.  So do you have any --
21             MR. NEMTSEV:  Maybe a brief follow-up.
22             THE COURT:  What does "brief" mean?
23             MR. NEMTSEV:  Five minutes, maybe less.
24             THE COURT:  No.  It's a long day.  I'll see you
25   tomorrow and -- and I'll see counsel at sidebar for a second.
```

1          See you tomorrow morning.  Thank you.

2          THE CLERK:  All rise.

3    (Jury exits.)

4    **(SIDEBAR CONFERENCE AS FOLLOWS:**

5          THE COURT:  Five or ten more minutes, right?

6          MR. NEMTSEV:  Yes.

7          THE COURT:  And that woman whose name is --

8          MR. FRANK:  Ms. Shah.

9          THE COURT:  Ms. Shah.  Then who?

01:03 10          MR. FERNICH:  Ms. Yanochko.

11          THE COURT:  A summary witness.  How long does she

12    take?

13          MR. KOSTO:  Half an hour on direct, at most.

14          THE COURT:  How long?

15          MR. NEMTSEV:  Five, ten minutes.

16          THE COURT:  Okay.  We are now in the vicinity of still

17    around 10:00.

18          MR. KOSTO:  Then Mr. Uitto, U-i-t-t-o, forensic

19    examiner from the FBI, with the computers.

01:04 20          THE COURT:  How long is he?

21          MR. FERNICH:  Again, about 35 minutes or so on direct.

22          THE COURT:  He's a 702 witness.  He's been disclosed?

23          MR. FERNICH:  Yes, he has.

24          THE COURT:  So now we're pulling into, let's say,

25    noon.  Cross?

```
 1              MR. NEMTSEV:  15 minutes.

 2              THE COURT:  15.  Then --

 3              MR. KOSTO:  And then Mr. Kenney, the Bitcoin expert.

 4              THE COURT:  How long is he?

 5              MR. KOSTO:  Again, about 30 minutes.  Maybe a little

 6     more.

 7              THE COURT:  That pretty much finishes off the day.  Is

 8     that right?

 9              MR. KOSTO:  I think that's fair, Your Honor.

01:04 10              THE COURT:  Then you have the statistics man.  Is that

11     right?  Or is there someone else?

12              MR. KOSTO:  There's one other witness from StackPath

13     on our list, Your Honor.  We'll make a decision after Ms. Shah

14     testifies.

15              THE COURT:  Let me just say, you're likely to rest on

16     Wednesday?

17              MR. KOSTO:  On Wednesday, yes.

18              THE COURT:  So you're going to start your case then?

19              MR. NEMTSEV:  Yes, ma'am.

01:05 20              THE COURT:  So who do you have first?

21              MR. NEMTSEV:  Two witnesses.  First is Mr. Robert, an

22     expert witness in computer forensics, IT, et cetera; and the

23     second witness, Mr. Tawil, who will testify regarding trading

24     and trading strategies, all the subject matter that's been

25     disclosed in his expert disclosure.
```

1          THE COURT:  So you're likely to be done Thursday,
2   Friday?
3          MR. NEMTSEV:  Yes.
4          THE COURT:  Okay.  So -- and I understand you're super
5   busy and it's really stressful being on trial, so I'm not --
6   when will I be able to get objections to the jury instructions?
7   I think there's some chance this would go to the jury on
8   Friday.  More likely on Monday.  But it's soon, depending on
9   how things go.
01:05 10          MR. FERNICH:  Do you want written objections to
11   instructions, or we do that at the conference?
12          THE COURT:  I've done it both ways.  Honestly, I don't
13   require a brief.  I don't require -- I sometimes do -- if you
14   have suggestions, like handwritten over the top -- let me be
15   quite clear.  I've given the first part of that jury
16   instruction, what's reasonable doubt, I've given that
17   instruction maybe 30 years.  So I'm not likely to change a lot
18   there.  And the end is just jury deliberations.  It's the
19   middle part I'm most interested in.  Some of them are new
01:06 20   instructions for me.  And -- in particular, I didn't like
21   either of your instructions on venue.  So I went back actually
22   to eBay, an opinion I wrote, and tried to go back to some of
23   the case law on it.  So that's what I focused on because
24   neither of you sort of gave me that.  And --
25          MR. FERNICH:  So I'll have a look through the

1    instructions tonight, and I'll let you know first thing in the

2    morning if I need to write anything.  And if I do, I'll have it

3    in by the end of the day.

4         THE COURT:  Okay.  And maybe a supplemental

5    instruction.  I don't think either of you -- maybe I'm wrong --

6    submitted one on expert testimony.  Maybe that's something I

7    should add.  Those are the generic ones.  But what I've been

8    giving is essentially boilerplate, for want of a better word,

9    pattern jury instructions kinds of things from wire fraud,

01:07 10   securities fraud, computer fraud, and conspiracy, primarily,

11   and some of it -- it gets wordy.

12        MR. FERNICH:  Mm-hmm.

13        THE COURT:  So, you know, I'm happy to be instructed

14   on that, but when in doubt, I'll stick with the pattern

15   instructions.

16        MR. FERNICH:  Mm-hmm.

17        THE COURT:  Have you looked at them at all?

18        MR. KOSTO:  I expect we'll have a short submission,

19   Your Honor, with a couple of requests for extra definitions and

01:07 20   a request to strike some surplusage, but not much.

21        THE COURT:  Okay.  All right.  So when you're thinking

22   about a charge and a conference -- Mem, how much time do we

23   have Wednesday afternoon?

24        THE CLERK:  We do not have anything scheduled right

25   now.  So I think you're good.  I have to look at your personal

 1   calendar too.

 2         THE COURT:  We'll have to take a look at that.  But it

 3   will be Wednesday afternoon.  Ideally, you'll have lunch, since

 4   you don't want to starve to death, and do something around 2:00

 5   so you can have the rest of the day.  I can't remember if I

 6   have anything.

 7         THE CLERK:  I don't have it up yet.

 8         THE COURT:  And I'm assuming, just for purposes of

 9   prepping, that the earliest we would go to the jury would be

01:08 10   Friday.

 11         MR. FRANK:  So closings, potentially, on Friday.

 12         THE COURT:  What?

 13         MR. FRANK:  So closings, potentially, on Friday.

 14         THE COURT:  Potentially.  It may also be Monday.  And

 15   the reason I do that is a juror asked about a doctor's

 16   appointment.  It's really right on the edge.  I think the

 17   closing wouldn't be any later than Monday, right, at this

 18   point?

 19         MR. FRANK:  Yes, Your Honor.

01:08 20         THE COURT:  Unless there's a snowstorm or someone gets

 21   sick or something.  I think I'd say to that juror -- what do I

 22   say to her?  She wants the doctor's appointment Monday

 23   afternoon.  It's right on the edge.

 24         MR. KOSTO:  Can she do it after 2:00?

 25         THE COURT:  I'll just say to her or him, if it's

```
 1    urgent, we'll respect it.  If it can be --
 2              THE CLERK:  Juror No. 1.
 3              THE COURT:  -- moved --
 4              MR. FRANK:  I think we're going to wrap up on
 5    Thursday, Your Honor, based on what Mr. Nemtsev is telling me.
 6              THE COURT:  That's both sides?
 7              MR. FRANK:  Yes.  I mean, not closings, but witnesses.
 8              THE COURT:  I'm a little reluctant to say that,
 9    because, of course, you never know what happens -- and, of
10    course, Mr. Klyushin always has the right, if he wants to -- so
11    I'm not going to give a definitive time, but that's useful.
12    I'll say it's right on the boundary.  Okay.  That's good to
13    know.
14              THE CLERK:  Wednesday looks okay for you, Judge, right
15    now.  Yeah, there's nothing on.  We had a case on, but we moved
16    it.  So it's open.
17              MR. KOSTO:  Should we plan for 2:00 on Wednesday?
18              THE COURT:  I think that's currently what I would
19    suggest.  And I'm planning on -- unless there's something
20    massive, that it's probably going to be no longer than two
21    hours, and my guess is an hour.
22              MR. FERNICH:  I don't think it will be very long.
23              THE COURT:  Yes.  That's right.
24              Now, Mr. Frank, I used to think I was a fast talker
25    until I met you.
```

1          MR. FRANK:  I was trying to just get done by 1:00.

2          THE COURT:  You were so slow at the start of his

3    testimony, and then that redirect went --

4          MR. FRANK:  I'm sorry, Your Honor, I was trying to get

5    done by 1:00.

6          THE COURT:  I understand.  I'm not faulting you.  But

7    it was a little hard to follow, so I'm going to take a look at

8    the transcript.

9          MR. FRANK:  I'm happy to have another go at it.

01:10 10          THE COURT:  I'm still wanting a -- I'm assuming there

11   will be a motion for directed verdict which will spell out the

12   grounds and an opp which will spell out the grounds.  If 104

13   stops at the VPN -- you're saying no, it doesn't, but I lost

14   the stream after that.

15          MR. FRANK:  104 is part of the conspiracy, Your Honor.

16   The conspirators used the same tactics --

17          THE COURT:  Excuse me.  I just want to understand --

18          MR. FRANK:  We'll explain it.

19          THE COURT:  -- where the numbers track back to.

01:10 20          MR. FRANK:  We'll explain it, Your Honor.

21          THE COURT:  You tracked back the 89 one and the 119

22   one.  104 stopped, according to the agent, with the VPN.

23          MR. FRANK:  Right.

24          THE COURT:  I just need to understand the basis where

25   you think you're going to --

1            MR. KOSTO:  Your Honor, what I think we'll --

2            THE COURT:  -- meet both the elements and the venue.

3    I'm sure you're all going to explain it to me with clarity, but

4    Mr. Frank went at the end so fast I wasn't sure I caught it.

5    So I'm just flagging that.

6            MR. KOSTO:  Thank you, Your Honor.

7    (Court exits.)

8    (Proceedings adjourned at 1:11 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2


3

UNITED STATES DISTRICT COURT )
4   DISTRICT OF MASSACHUSETTS    ) ss.
CITY OF BOSTON               )
5

6


7           We, Lee A. Marzilli and Kathleen Silva, Official

8   Federal Court Reporters, do hereby certify that the foregoing

9   transcript, Pages 1 through XX inclusive, was recorded by us

10  stenographically at the time and place aforesaid in Criminal

11  No. 21-10104-PBS, United States of America v. Vladislav

12  Klyushin, and thereafter reduced by us to typewriting and is a

13  true and accurate record of the proceedings.

14          Dated this 6th day of February, 2023.

15

16

17

18

19

    /s/ Lee A. Marzilli
20  _____
    LEE A. MARZILLI, CRR
21  OFFICIAL COURT REPORTER

22
    /s/ Kathleen Silva
23  _____
    KATHLEEN SILVA, RPR, CRR
24  OFFICIAL COURT REPORTER

25