1          IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
2

3  UNITED STATES OF AMERICA,      )
                        )
4          Plaintiff      )
                        )
5      -VS-            )  Criminal No. 21-10104-PBS
                        )  Pages 9-1 - 9-157
6  VLADISLAV KLYUSHIN,        )
                        )
7          Defendant      )

8              **JURY TRIAL - DAY NINE**

9

10       BEFORE THE HONORABLE PATTI B. SARIS
          UNITED STATES DISTRICT JUDGE
11

12

13
                  United States District Court
14               1 Courthouse Way, Courtroom 19
                 Boston, Massachusetts  02210
15               February 9, 2023, 9:01 p.m.

16

17

18

19

20

21      LEE A. MARZILLI and KATHLEEN SILVA
          OFFICIAL COURT REPORTERS
22       United States District Court
        1 Courthouse Way, Room 7200
23         Boston, MA  02210
           leemarz@aol.com
24

25

1    A P P E A R A N C E S:

2         SETH B. KOSTO, ESQ. and STEPHEN E. FRANK, ESQ.,
     Assistant United States Attorneys, Office of the United States
3    Attorney, 1 Courthouse Way, Room 9200, Boston, Massachusetts,
     02210, for the Plaintiff.

4
          MAKSIM NEMTSEV, ESQ., 20 Park Plaza, Suite 1000,
5    Boston, Massachusetts, 02116, for the Defendant.

6         MARC FERNICH, ESQ., Law Office of Marc Fernich,
     800 Third Avenue, Suite Floor 20, New York, New York, 10022,
7    for the Defendant.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                              I N D E X

WITNESS                    DIRECT   CROSS   REDIRECT   RECROSS

J-MICHAEL ROBERTS
      By Mr. Nemtsev:        12
      By Mr. Kosto:                   43
      By Mr. Nemtsev:                             60

DAVID TAWIL
      By Mr. Nemtsev:        61
      By Mr. Frank:                   76




EXHIBITS                RECEIVED IN EVIDENCE

367                          27
351                          29
352                          30
353                          30
359                          31
360                          31
363                          31
352                          32
450                          40
350                          68
375                          70
14                           76
281                         103
282                         103
```

<u>P R O C E E D I N G S</u>

1

2          THE CLERK:  All rise.

3          THE COURT:  Good morning to everyone:

4          MR. FRANK:  Good morning, your Honor.

5          NEMTSEV:  Good morning, your Honor.

6          THE COURT:  I'm late for you all because I keep

7     getting paper.  The last juror just arrived, so this needs to

8     be quick with respect to the exhibits today, and I also want to

9     quickly address venue because it may affect how today goes,

09:01 10    so -- you can be seated.  It doesn't matter.  I'm sorry.

11          I've been reading a lot of the same cases you've been

12    citing to us.  My law clerks and I were here figuring it out,

13    trying to.  It's very complicated.  I'm not committing myself

14    to anything now, but I'm starting to form an opinion, and I

15    haven't seen the last thing that I've heard that defendant is

16    filing.  Isn't there something else coming in the door?

17          MR. NEMTSEV:  Going to come.

18          THE COURT:  What?

19          MR. NEMTSEV:  Going to come.

09:02 20    THE COURT:  Okay.  So I'm not going to rule on it.

21    Unfortunately for you all, we'll have to spend some time

22    probably this afternoon talking about it again, but at least

23    primarily, my view is the following:  I have to consider this

24    count by count.  I also have to consider essential conduct.

25    I'm actually blending that back into the jury instructions.

1    That's the way the Supreme Court says:  Where's the essential

2    conduct?  Where did the crime happen, the address?

3            With respect to three of the four charged crimes, it's

4    quite clear that the crime happened, essential conduct, in the

5    United States and not abroad, securities fraud hacking and wire

6    fraud; and for that, I don't think that the statute applies,

7    the new statute.  What is it, 3728?

8            MR. FERNICH:  38.

9            THE COURT:  What?

09:03 10        MR. FERNICH:  38.

11           THE COURT:  Yes, 38, that just doesn't apply.  I am

12    persuaded by the *Miller* case, which the government cites, as

13    well as the *Mallory* case, which the defense relies upon, that

14    you have to look at where did the essential conduct happen?

15    The hackings or the computer hack happened in the United

16    States; the securities fraud happened mostly in the United

17    States; and the wire fraud happened mostly in the United

18    States.

19            But what I'm stuck on and thinking about is the

09:03 20    conspiracy charge, and since I have to do this -- and, by the

21    way, I agree with the government that it's not either/or; it

22    can be both.  That's the *Miller* case, and it makes sense.

23            I don't know what to do about the conspiracy.  I need

24    to think about that.  It's possible I will be charging the

25    alternative theory on the conspiracy count.  That wouldn't be a

1    prejudice to you all for mentioning it because it applies to

2    three of the four counts.

3         The reason I'm stuck, and I just have to make a

4    decision, and I wanted to focus you on it, what's stopping me

5    is, it's an unusual situation.  About half of the overt acts

6    happened in the United States and about half happened in

7    Russia.

8         So in addition, the objects of the conspiracy were all

9    in the United States, and it presents a closer question than in

09:04 10   most of the cases you all cited to me.  It potentially -- the

11   law is quite clear that if I give an alternative theory of

12   venue and I'm wrong, it will deep six this verdict; and I could

13   easily see a circuit coming out either way on that issue.  So

14   I'm worried about it, I'm just saying.

15        Now, I'm thinking about it.  I haven't seen your last

16   memo.  That's how I'm currently thinking.  But since conspiracy

17   is still in play for the application of that venue provision, I

18   thought we could do this by stipulation, or I could quickly

19   reopen the evidence just as to the fact he was transported from

09:05 20   Switzerland to Massachusetts.  How do you want to do it?  I'll

21   just have a record on it.  I don't even know if it's true.  I

22   haven't thought it --

23        MR. FERNICH:  I think that I'd like to obviously --

24   this is a quick piece of work and it's very short -- I'd like

25   your Honor to reserve pending the receipt of this.

```
 1              THE COURT:  I know, but by the time I discuss it, the
 2    case will be closed.  So I don't want to bring him back sort of
 3    as a rebuttal.  It isn't technically a rebuttal.
 4              MR. FERNICH:  I would say, if we lose, I'd rather do
 5    it by stip, obviously.
 6              THE COURT:  Well, I can't do it in a iffy way.  If in
 7    fact I say that on conspiracy we can apply the alternative
 8    theory, or at least the jury, not me, the jury can apply the
 9    alternative theory, will you stipulate --
 10             MR. FERNICH:  Let me kick it over to --
 11             THE COURT:  Absolutely.  That's why I'm doing it now
 12    because we have to decide it by the end of the day.  You'll
 13    just all have to think about that.
 14             MR. FRANK:  And, your Honor, we may want to take one
 15    last stab at briefing this briefly.
 16             THE COURT:  Can I also say, there's a really solid
 17    argument you've waived it by not submitting jury instructions
 18    on it.  So I'm trying to do what's fair and consistent with the
 19    law.  The case that you cited to me yesterday is not on point.
 20    It was treason.  It was wholly abroad in *Chandler*.  This is
 21    primarily designed to deal with crimes committed against the
 22    United States that were abroad, like treason or piracy or high
 23    seas.  It wasn't primarily designed for this, and yet you're
 24    right, that has the word "begun" in it, which the Second
 25    Circuit has said, and other circuits have said, is cryptic as
```

1    to what they were trying to get at, and there's not much

2    description in the legislative history.  But you're raising it

3    so late, I take your good faith that you just thought about it.

4    I'm doing catch-up, as we all are.  So that's how I'm currently

5    thinking.

6          I don't think it's a crazy way to approach this.  It

7    eliminates any prejudice from the opening statement on point,

8    since three of the four are there, and it might leave it with

9    the jury.  But I just want to make sure, after you've discussed

09:07 10    with your client, whether you want to reopen the case or

11    whether you do it by stip, stipulation.

12          Okay.  Now, next thing, what's the problem with their

13    chalk?  I'm sorry.  I'm jumping to today's --

14          MR. FRANK:  This chalk was handed to me 15 minutes

15    ago, your Honor.  There's no sourcing on it.  We've had no

16    opportunity to do anything with it.  It completely lacks --

17          THE COURT:  Well, we'll see what the foundation is.

18    It's a chalk; it's not an exhibit.  It's just, like, as if the

19    guy was writing on a chalkboard.

09:08 20          MR. NEMTSEV:  Yes, it's what the government did

21    yesterday with Mr. Clarke.

22          THE COURT:  I agree.  It just depends on what he says.

23    Okay, I'll allow it.

24          All right, secondly, I'm not sure why I am being

25    prepped on Exhibit 413 to introduce it.  I don't know what I'm

1    going to hear, but this is a -- just like you protested

2    MaxMind, I don't know that I'll be --

3            MR. NEMTSEV:  But this isn't MaxMind-related.  This

4    is --

5            THE COURT:  I understand.  This is just another one,

6    but it's some random software program.  Maybe I'll allow the

7    expert to say that there's no evidence on the Internet that it

8    was in Boston at that time, but that's different than

9    introducing this exhibit.

09:08 10         MR. NEMTSEV:  Your Honor, that exhibit is just the

11    advertisement page from StackPath.

12            THE COURT:  But no one is verifying that and the

13    timing of it.

14            MR. NEMTSEV:  Our expert, who we also noticed as a

15    summary witness, will say, "I went to the Wayback Machine,

16    which is an Internet archiver, and this is what the website

17    that was available on this day."

18            THE COURT:  I will certainly allow him to give an

19    opinion on it.  I don't know that I'll allow the exhibit in.

09:09 20         MR. NEMTSEV:  Okay.

21            THE COURT:  I said that yesterday basically.

22            MR. KOSTO:  What your Honor said yesterday, that if it

23    wasn't in the disclosure that he'd be talking about the Wayback

24    Machine, that you wouldn't allow him to issue an opinion.

25            MR. NEMTSEV:  Your Honor, he's not opining.  He was

1    also listed as a summary witness.  He can be a summary witness

2    for records.  He doesn't have to opine on this.  He's not

3    opining on anything.  This is what is in the records on the

4    Internet, what StackPath advertises.  This isn't even

5    technical.  This is an advertisement.  This is something you

6    would see in the newspaper.

7         THE COURT:  I know, but you can't put this in the

8    record.

9         MR. NEMTSEV:  That's fine, but can I ask him whether

09:09  10   he checked it back then, whether StackPath had a status page,

11   and what it said?

12        MR. KOSTO:  It would require him to say what the

13   Wayback Machine is and how it works, which is the same

14   objection he raised with respect to MaxMind.

15        THE COURT:  I'll decide as we go.  I don't know.  As

16   far as I'm concerned, they need to be able to put on their

17   case, but I am worried it wasn't in the report.  On the other

18   hand, it's --

19        MR. NEMTSEV:  It's not opinion at all.

09:10  20        THE COURT:  Well, it is because it's opinion about

21   whether or not that's a reliable methodology for figuring out

22   what happened in history on these Web pages.

23        MR. NEMTSEV:  But it's the equivalent of the

24   newspaper, except it's digital, Judge.

25        THE COURT:  What?

1          MR. NEMTSEV:  You know, it's the equivalent of the

2     advertisement section of a newspaper.  You go back to the

3     library.  You see what the New York City Times published in

4     2019, for example.  This is exactly what this service does for

5     the Internet.  It's uncontested.  It's been used widely by

6     everyone.

7          THE COURT:  I know, but the question is, we have

8     Rule 16 for a reason.  On the other hand, it is your defense,

9     and we've known about it now for several days.  And I've

09:10  10     allowed them to put in people, like that woman from North

11     Carolina, so I may allow the question but not the exhibit.

12          MR. NEMTSEV:  Thank you, Judge.

13          THE COURT:  Let's bring everyone in.  Is the sketch

14     artist here?

15          THE CLERK:  No.

16          THE COURT:  Do you need these back again?

17          THE CLERK:  Do you need the exhibits back?

18          MR. NEMTSEV:  Sure.  I'll take them just in case he

19     needs to refresh his recollection.

09:11  20          THE COURT:  Are you all available to finish the charge

21     at 2:00 o'clock, a charge conference?

22          MR. FERNICH:  Yes, your Honor, sure.

23          (Discussion off the record.)

24          THE CLERK:  All rise for the jury.

25          (Jury enters the courtroom.)

| | |
|---|---|
| 1 | THE COURT:  Hello. |
| 2 | THE JURY:  Hello. |
| 3 | THE COURT:  Thank you again.  You're just amazing. |

Anybody speak to anyone, see anything in social media, see
anything in the press?  Anyone try and contact you?  All right.

6          We're going to continue with this witness.  Thank you
7     very much.  Remember, speak loud right into that mic.

8          THE WITNESS:  Yes, your Honor.

9          THE COURT:  Soccer field voice, okay?

09:12 10   THE CLERK:  Sir, you're still under oath.

11          THE WITNESS:  Understood.  Thank you.

12          MR. NEMTSEV:  May I proceed, your Honor?

13          THE COURT:  Yes.

14                    J. MICHAEL ROBERTS

15     having been previously duly sworn, was examined and testified

16     further as follows:

17     CONTINUED DIRECT EXAMINATION BY MR. NEMTSEV:

18     Q.   Good morning, Mr. Roberts.

19     A.   Good morning.

09:13 20   Q.   So we left off, I believe you testified about the number
21     of IP addresses that are available, the IP 4 addresses, but
22     there's just not enough to go around for all the electronic
23     devices and all the people in the world?

24     A.   Correct.

25     Q.   So what's an Internet service provider?

```
 1   A.   So Internet service providers essentially act as the
 2   on-ramp for most people --
 3   Q.   Can you move a little bit closer.
 4   A.   Yeah, a little bit louder.  Sorry.  Internet service
 5   providers essentially act as the on-ramp for the Internet for
 6   most people.  Verizon is an example.  If you order home
 7   Internet service, they are the Internet service provider --
 8            THE COURT:  Can you just pull the mic right in?  So
 9   what is the ISP?  You hear me?
10            THE WITNESS:  Internet service provider.
11            THE COURT:  Beautiful, all right.
12            THE WITNESS:  I apologize.  I can hear myself.  The
13   acoustics in this room are very --
14            THE COURT:  You can hear it catch.
15            THE WITNESS:  YES.
16   A.   So Internet service providers, as an example, they're the
17   on-ramp for the Internet.  So if you have service through
18   Verizon or Comcast -- pick your provider -- they are
19   responsible for getting your home or your business access to
20   the Internet, and that's that first hop on.  That's where you
21   plug in your home router, and then you get access to the
22   Internet at large, and they're responsible for routing up into
23   the greater Internet.
24   Q.   And when they provide Internet service to your home, to
25   your office, what IPs do they use typically?
```

09:14 (line 20)

```
 1   A.   It depends what kind of service you have.  For a typical
 2   residential service, because there aren't enough IP addresses
 3   for everyone to have a static IP address, they provide a
 4   dynamic IP address that is assigned typically to a larger block
 5   of homes or residences or neighborhoods.  So the address that
 6   is given to a home router is part of a larger subset.  They
 7   basically do the greater private network that is not routable
 8   to the general Internet, and that goes up to a router that has
 9   the public IP address that is reachable from the Internet.  So
10   it's something called NATing, or network address translation.
11   You can't run a server because the general Internet can't reach
12   your computer at home, but that's how you get around having an
13   IP before exhaustion --
14           THE COURT:  Can I just -- you're talking to them.
15           THE WITNESS:  Yes.
16           THE COURT:  Okay, so please explain.  All right, so
17   for those of us, we have Comcast, we have Verizon; that's our
18   Internet provider.  Now, what are you describing now?
19           THE WITNESS:  Well, you have that service, but out of
20   your home you don't have a static IP address like, say, a
21   business would, where you can run email servers, Web servers,
22   other things that are reachable via the Internet.  So because
23   there is this NATing, you can't run a server --
24           THE COURT:  Because there is this --
25           THE WITNESS:  NATing.  N-A-T is short for network
```

```
 1   address translation.
 2            THE COURT:  See, we don't know that.  Okay, so for a
 3   business, what happens?
 4            THE WITNESS:  So a business, they have a static IP
 5   address, but everything inside of that business, it is possible
 6   to have enough IP addresses for the business every -- sorry.
 7   Too loud?  Too quiet?
 8            (Discussion off the record.)
 9            THE COURT:  So, all right, a business has a static IP
10   address?
11            THE WITNESS:  Status IP address.
12            THE COURT:  And in that static IP address, you do
13   something called NATing?
14            THE WITNESS:  Yes, network address translation.
15            THE COURT:  All right, and what's a NAT, other than
16   what's annoying during the summer?
17            THE WITNESS:  That is just an acronym for network
18   address translation, and it acts as a translation protocol
19   between the public IP address and the private IP addresses
20   inside of the network of the home neighborhood or with inside
21   the business.
22            THE COURT:  We're talking about a business in this
23   case at this point?
24            THE WITNESS:  As an example, yes.  So inside of your
25   business, each of the systems can talk to each other easily
```

1   because they know each other's addresses; but if they need to

2   go out to the Internet, they have to go back up to the router,

3   and then go out to the Internet to communicate.

4   Q.   So just to quickly summarize, in the case of a home, all

5   of the neighborhoods potentially are grouped, and then they

6   have one access to the Internet from one IP address; is that

7   correct?

8   A.   Correct.

9   Q.   In the case of a business, the business may have one IP,

09:17 10   but then within the business, there could be many, many users,

11   many servers, computers, et cetera, and they would also have

12   one IP?

13   A.   Assuming in this example, if a business has one IP address

14   assigned to it, everything behind that, the only way it can get

15   on the Internet and for then it working to work inside, it

16   needs to have separate IPs that are part of its network, the

17   private network.  It's the same example for a residence with a

18   bunch of neighborhoods and a business with many users inside of

19   it.

09:18 20   Q.   But the exit point to the Internet would only be one IP?

21   A.   It could be more, but for this example, yes.

22   Q.   So what's unfortunately complicated a little more, what is

23   a VPN?

24   A.   So a VPN is short for virtual private network, and that is

25   something that's become rather ubiquitous lately.  I feel like

1    everyone is providing it as a service.  That is a tunnel from

2    one place to another, is the best way I can describe it, where

3    it creates a virtual IP address on the client machine that

4    tunnels through the Internet to another server where it ends up

5    to route the traffic, basically routing the traffic and routing

6    that traffic directly to the VPN server.

7    Q.   And am I correct that many people could be connected to

8    that VPN server from various parts of the world?

9              MR. KOSTO:  Objection.

09:19 10              THE COURT:  Overruled.

11   A.   Yes.

12   Q.   And at the exit point, you would only see the one IP

13   address?

14              MR. KOSTO:  The same objection, your Honor.

15              THE COURT:  Is it just leading?

16              MR. KOSTO:  Yes.

17              THE COURT:  Yes, sustained.

18   Q.   Okay.  After users connect to the VPN server, what would

19   you see if -- would they exit from one IP?

09:19 20   A.   So you can have more than one IP on a server, just to be

21   clear.  But typically the way the routing would work is, you

22   connect to the VPN, you connect to the server, and your traffic

23   is routed to that server.  That new VPN server is now acting as

24   your on-ramp to the Internet.  So everywhere that that

25   connection goes to from that point are going to appear to be

1    coming from that server.

2    Q.   And what are the reasons that you can't accurately say

3    whether a --

4              MR. NEMTSEV:  Yes, Mr. Kosto?

5              MR. KOSTO:  Objection.

6              THE COURT:  I haven't heard the question.

7    Q.   What are the reasons why you can't associate one IP

8    address with one computer or one person?

9              MR. KOSTO:  Foundation, your Honor.

09:20 10              THE COURT:  Overruled.

11    A.   So we've run out of IP addresses, and we need to obviously

12    share them and have people sharing devices to get onto the

13    Internet with IPV4.  That's what we're talking about in this

14    case.

15              THE COURT:  What are we talking about?

16              THE WITNESS:  IPV4.  I discussed yesterday the two

17    different Internet protocols.  IVP4 is the --

18              THE COURT:  So it's I-P V as in Victor 4?

19              THE WITNESS:  Yeah.  V is short for version, and IPV6,

09:21 20    which fortunately has not exhausted yet.

21    A.   So to answer your question about why you can't associate a

22    person, because there aren't enough IPs and we have multiple

23    people sharing IPs and sharing services, and potentially

24    multiple people connecting through a business address or

25    through a VPN in the same example, you can only say "There's

the server," but we don't necessarily know how many different
people are all routed through it unless we go to that server
and see who's connecting to it at that time from the inbound
side essentially.

Q.   And are there a lot of VPN providers available, commercial
VPN providers?

A.   Now there are, yes.

Q.   It's a popular service these days?

A.   It seems to be.

Q.   StackPath is, for example, a VPN service provider?

A.   Yes.  StackPath, AirVPN.  Even antivirus companies like
Norton provide a service, a VPN service packaged with their
software.

Q.   And what are the reasons that people or businesses use
VPNs?

A.   I mean, businesses have always made use of them very
frequently to connect two offices together so that it's a
seamless connection between two endpoints, or between multiple
endpoints.  Recently the VPN has made a huge impact in letting
us all make it through the pandemic, in that we're all able to
connect remotely to our offices and work from our homes
flawlessly, or with minimal hiccups.  So that was a very
important feature to have, and it also secured all of that
traffic between all of our homes and our businesses so that we
could all conduct our business securely.  At the same time, you

```
         1   have other reasons.  People may want to make sure their
         2   communications are secured, if you're on an unfamiliar network
         3   staying in a hotel perhaps, and you don't want anyone
         4   potentially getting your traffic.  Or there's even the example
         5   of if you want to watch -- this happens all the time -- a
         6   sporting event that's in another country, in another area that
         7   you can't access locally, or if that content is blocked unless
         8   you're in a particular country, that is a way to get around a
         9   network restriction.
09:24   10   Q.   And the content would be blocked because of something
        11   called "geolocation blocking"?
        12   A.   That is --
        13            MR. KOSTO:  Objection.
        14            THE COURT:  Sustained, leading, and I'm not sure what
        15   the relevance is.
        16            (Discussion off the record.)
        17            THE COURT:  It's a perfect science getting it so Lee
        18   can hear and the rest of us can.
        19            THE WITNESS:  How about here?  I moved it over a
09:25   20   little.  Is this good?  Just let me know.
        21            MR. NEMTSEV:  Pretend I'm deaf and you've got to
        22   really scream to me because I'm pretty close to being deaf at
        23   this point.
        24            THE COURT:  An interesting comment for the record.
        25            (Laughter.)
```

1    Q.   So let's say you end up on one of these VPN servers and

2    you want to check where you're projecting your location out of,

3    how would you do that?

4              MR. KOSTO:   Objection, relevance.

5              THE COURT:   Overruled.

6    A.   So a lot of VPN pages actually will show you what your IP

7    is when you first go there and connect, but if I wanted to

8    verify what my public IP address is when I get there, the

9    public IP address being is how my IP would appear to all the

09:26 10   services I'm connecting to, and one way I would do that is --

11   sort of the simple way is people open up their Web browser and

12   type in the search "What is my IP address?"  And most of the

13   time the first response is going to be the website

14   whatismyIPaddress.com, which will show you very prominently at

15   the top what your IP address is.

16   Q.   And these types of websites, they are IP geolocation

17   services; is that right?

18   A.   They're not IP geolocation services.  They are services

19   that make use of IP geolocation, if they are telling you where

09:26 20   the IP is reporting to be geographically, but all they're

21   telling you is "This is your IP address."

22   Q.   And you don't know whether those services are accurate or

23   what information they're based on and whether they're --

24   whatever --

25              THE COURT:   It's all leading.  Excuse me.  Ask him the

1    question.

2    A.    So --

3         THE COURT:  No.  There's no question in front of you.

4    Q.    Do you know whether the information that was provided by

5    whatismyIP.com is accurate?

6         MR. KOSTO:  Objection, relevance.

7         THE COURT:  Sustained.

8    Q.    Do you know what these IP geolocation services said about

9    the 104.238 IP address?

09:27 10        MR. KOSTO:  The same objection, your Honor.

11        THE COURT:  Yes or no, during the relevant time

12   period.

13   A.    Can you repeat?

14   Q.    Do you know what these IP geolocation services said about

15   the 140.238 IP address during the relevant time?

16        MR. KOSTO:  Objection.

17        THE COURT:  Overruled.

18        MR. KOSTO:  Rule 16.

19        THE COURT:  Do you know?

09:27 20        THE WITNESS:  For the relevant time period?

21        THE COURT:  Yes.

22        THE WITNESS:  I do not know what it was at the

23   relevant time period.

24   Q.    Do you remember Microsoft --

25        THE COURT:  By which I mean the charged period in the

1    indictment that you've been hearing about, 2018 to 2020.

2    Q.   Do you remember seeing Microsoft --

3         THE COURT:  By the way, do I have that time right?  I

4    think I do.  The charged indictment period, 2018 to 2020.

5         MR. KOSTO:  September 30, 2020, yes.

6         THE COURT:  Yes.  September 20 is when it stopped.

7    All right.

8    Q.   Do you remember seeing Microsoft ISS logs from DFIN's

9    server?

09:28 10        MR. KOSTO:  Objection, foundation.  The witness said

11   he didn't know.

12        THE COURT:  Excuse me.  It's a separate question.

13        Do you remember seeing those?

14        THE WITNESS:  Yes, I do.

15   Q.   Do you remember there was a column there with IP

16   geolocation data?

17        MR. KOSTO:  Objection, leading.

18        THE COURT:  Overruled.

19   A.   Yes, I do.

09:28 20   Q.   Do you remember what that column said about the 104.238

21   server?

22        THE COURT:  Yes or no.

23   A.   I want to say "yes," but may I ask a clarifying question

24   to --

25        THE COURT:  He doesn't know.  Why don't you re-ask it.

```
 1    Q.    That's the one from October to November, if you remember.

 2          MR. KOSTO:  Objection.

 3    A.    Yes.

 4    Q.    Do you remember?

 5    A.    Yes.

 6    Q.    What did it say?

 7          MR. KOSTO:  Objection, your Honor.

 8          THE COURT:  Sustained.

 9    A.    As I recall --

10          THE COURT:  No.  That's called "sustained," that you

11    don't answer.

12          THE WITNESS:  Oh, I'm sorry.

13          MR. NEMTSEV:  May I ask if he recalls if it was Boston

14    or not.

15          MR. KOSTO:  Objection, your Honor.

16          THE COURT:  I couldn't even hear what you said, so ask

17    another question.

18    Q.    Do you know whether it said Boston or not?

19          MR. KOSTO:  Objection.

20          THE COURT:  Sustained.  He doesn't remember.

21    Q.    Do you remember what it said?

22          MR. KOSTO:  Objection.

23          THE COURT:  Excuse me.  Do you remember what it said?

24          THE WITNESS:  I'm sorry.  With yes or no?

25          THE COURT:  Yes.  Or no.
```

1          THE WITNESS:  Not specifically, no.

2          MR. NEMTSEV:  Can I refresh his recollection?

3          THE COURT:  You cannot put it in unless he says that

4    it is reliable.

5    Q.   You don't know whether that is reliable, correct?

6    A.   The geolocation reliability?

7    Q.   From the Microsoft ISS logs, Do you?

8    A.   The problem I have with --

9          THE COURT:  Yes or no, do you know whether it's

09:30 10    reliable or not?

11          MR. KOSTO:  Objection.

12          THE WITNESS:  I'll go with "yes."

13          THE COURT:  So is it reliable?

14          THE WITNESS:  In my experience, using geo-IP location

15    services, they are not one hundred percent reliable.

16          THE COURT:  All right, that's the answer.  What's the

17    next one?

18    Q.   Knowing that they're not a hundred percent reliable and

19    that they may not necessarily match the actual server location,

09:30 20    you do recall, do you not, sir, the geolocation that was

21    featured in the Microsoft ISS logs from October to November

22    with the 104.238 IP addresses?

23          MR. KOSTO:  Objection, leading.  Objection,

24    foundation.

25          THE COURT:  Sustained.  Asked and answered.

```
 1   Q.   Sir, you received a lot of discovery from this case; is
 2   that right?
 3   A.   Yes.
 4   Q.   I think you testified yesterday it was about 6 terabytes'
 5   worth?
 6   A.   Over 6.
 7   Q.   Over 6.  You reviewed a lot of that discovery?
 8   A.   Yes.
 9   Q.   Did you review Mr. Klyushin's iCloud account?
10   A.   I believe so, yes.
11   Q.   And how was it produced?
12   A.   That was produced as the result of a subpoena sent to
13   Apple requesting his data.
14   Q.   Do you know if it was a subpoena or a search warrant?
15   A.   I believe it was sent as a search warrant.
16   Q.   And how was it produced to the defense and produced to you
17   subsequently?
18   A.   It was produced in a -- I believe the original container
19   they sent it in was a zip file, which contained the contents of
20   the iCloud as produced by Apple.
21   Q.   Did you take a look at the contents of the iCloud?
22   A.   So everything that was loaded and was received was
23   indexed, and being --
24            THE COURT:  Can you hear?
25            THE WITNESS:  Can you hear?
```

1          THE JURY:  Yes.

2          THE COURT:  Yes, they can.

3   A.   Being human, I can't really go through 6.6 terabytes of

4   data on my own, so there's a lot of indexing and technical help

5   that goes into it.  So if something is relevant or comes up as

6   a search, or something I need to review in depth, that is

7   reviewed, but did I review every single document in there?

8   Likely not.

9   Q.   Did you review document counts and approximate dates from

09:33 10   when to when documents were produced?

11          THE COURT:  Why don't you just ask him the question?

12          MR. NEMTSEV:  I'm sorry.  Can I pull up Exhibit 367,

13   and I move to admit it.

14          THE CLERK:  What number?

15          MR. NEMTSEV:  367?

16          THE COURT:  It's in evidence?

17          MR. NEMTSEV:  I move to admit it, your Honor.  It's

18   uncontested.

19          THE COURT:  Okay, fine.

09:33 20          (Exhibit 367 received in evidence.)

21   Q.   Is this what you saw when you reviewed Mr. Klyushin's

22   iCloud account?

23   A.   Yes.

24   Q.   And these are the date ranges that were available for

25   messages, pictures, location records, calendar entries, call

```
 1    logs, WiFi connection records, audio records, videos, emails,
 2    documents?
 3              MR. KOSTO:  I'm sorry, Ms. Molloy.  We don't have it
 4    yet.  I'm not sure Mr. Klyushin does either.
 5              THE CLERK:  Does the witness have it?
 6              THE WITNESS:  I see it.
 7              THE COURT:  I see it.  Do you all see it?
 8              (Discussion off the record.)
 9              MR. KOSTO:  Your Honor, if the jury has it, we know
 10   the document.  We can go ahead.
 11             THE COURT:  Okay, I just wanted to make sure
 12   Mr. Klyushin and Mr. Fernich can see it.
 13             (Discussion off the record.)
 14             THE COURT:  Okay.  I'm sorry to the public here, but
 15   it's necessary, and then maybe we can call IT to figure out
 16   what's going on.
 17             Why don't you keep asking questions, as long as
 18   Mr. Klyushin can see it.
 19   Q.   This is an accurate description of what you located in
 20   terms of dates and quantities for --
 21   A.   Yes.
 22   Q.   And do you recall that the iCloud was produced in
 23   Cellebrite?
 24   A.   It was run through Cellebrite as part of their processing,
 25   yes.
```

```
 1   Q.    And what is Cellebrite?
 2   A.    Cellebrite is software produced by Cellebrite.  It's a
 3   company that handles -- their origins are really in imaging --
 4   phone forensic preservation software, so they produce, among
 5   other things, phone preservation software to pull data out of
 6   phones.  Be it Apple, Android, Motorola, name your phone, they
 7   probably do it, and also the software to analyze it.  They
 8   also, through their physical analyzer software, when it comes
 9   to iCloud and other things, handle -- can process search
10   warrant returns that come back from Apple and other providers
11   to review them in the same manner you would content from the
12   phone.
13   Q.    And it allows you to run searches?
14   A.    Yes.
15   Q.    And did you run some searches as part of reviewing the
16   iCloud account?
17   A.    I did.
18         MR. NEMTSEV:  Can we have Exhibit 351, please, and I'd
19   move to admit it.
20         (Exhibit 351 received in evidence.)
21   Q.    Did you run a search for Mr. Sladkov and Mr. Irzak's
22   telephone numbers in Mr. Klyushin's iCloud account?
23   A.    Yes.
24   Q.    Did you get any hits?
25   A.    No.
```

```
  1              MR. NEMTSEV:  Can we have Exhibit 352, and I'd move to

  2       admit it.

  3              (Exhibit 352 received in evidence.)

  4              MR. NEMTSEV:  Your Honor, we seem to be having a lot

  5       of tech issues today.

  6              THE COURT:  Did we pull it up?

  7              (Discussion off the record.)

  8              THE CLERK:  So I just switched it over to document

  9       camera, so let's see if that works.

09:38  10              MR. NEMTSEV:  And this is Exhibit 353, and I'd move to

 11       admit it, your Honor.

 12              (Exhibit 353 received in evidence.)

 13       Q.   Did you run searches for Mr. Irzak by name in Mr. Klyushin's

 14       iCloud?

 15       A.   Yes.

 16       Q.   Did you get any hits?

 17       A.   No.

 18       Q.   And it's the same with Mr. Sladkov, correct?

 19       A.   Correct.

09:38  20              THE COURT:  You're all getting that, right?  I have

 21       that.  Do you still not have it on the attorneys' screen?

 22              MR. KOSTO:  It's still not on these, no.

 23              THE COURT:  All right.

 24              THE CLERK:  I'll email IT right now.

 25              MR. NEMTSEV:  And this is 359, and I move to admit
```

```
  1    this.
  2              THE CLERK:  I'm sorry.  3 what?
  3              MR. NEMTSEV:  59.
  4              (Exhibit 359 received in evidence.)
  5    Q.   Did you run a search for Toppan?
  6    A.   Yes.
  7    Q.   Did you locate anything?
  8    A.   No.
  9              MR. NEMTSEV:  And this is 360, and I move to admit
 10    this.
 11              (Exhibit 360 received in evidence.)
 12    Q.   Did you run a search for DFIN Solutions?
 13    A.   Yes.
 14    Q.   And did you find any results?
 15    A.   No.
 16    Q.   Sir, did you find a contact card associated with Ivan
 17    Ermakov?
 18    A.   I want to say "yes."
 19              MR. NEMTSEV:  This is 363, and I'd move to admit this.
 20              (Exhibit 363 received in evidence.)
 21    Q.   And can you tell us when it was created?
 22    A.   According to the date displayed, it is -- those numbers
 23    are a little odd on the year.  It's not a clear number.  I
 24    would -- it's a printed copy and --
 25    Q.   I understand.  Does 2018 seem correct?
```

```
 1   A.    It appears to me that it says March 17, 2018.
 2   Q.    Thank you.  Did you also review Mr. Sladkov's iCloud
 3   account?
 4   A.    Yes.
 5   Q.    Did you review any metadata associated with the M-13 chat
 6   application?
 7   A.    Yes.
 8         NEMTSEV:  And, your Honor, this is 352, and I would
 9   move to admit this.
10         THE COURT:  All right.
11         (Exhibit 352 received in evidence.)
12   Q.    And this is the metadata file that's associated with that
13   application?
14   A.    Yes.
15   Q.    Moving to Page 2, there's metadata time stamp information
16   that you located?
17   A.    Yes.
18   Q.    And what is that number?
19   A.    So that number is a Unix timestamp.  Computers use a
20   sequence of numeric numbers.  A Unix time stamp begins on --
21   starting from zero on January 1, 1970, at midnight, and then
22   increments every second forward thereafter, so it's constantly
23   increasing and adding.  That particular number I believe is
24   microseconds since January 1, 1970, at midnight.
25         So if you do some math, you can figure out what day
```

1    that it actually represents, and helpfully on this exhibit that

2    has been done by looking it up in the Unix time stamp

3    conversion tool, that time displayed is Tuesday, November 26,

4    2019, 8:19:50 a.m. GMT or UTC, or Zulu time, depending on what

5    you like to call it.

6    Q.   Thank you.  And, sir, are you familiar with the Wayback

7    Machine?

8    A.   I am.

9    Q.   And what is it?

09:43 10         MR. KOSTO:  Objection, Rule 16.

11         THE COURT:  Overruled.

12   A.   So the Wayback Machine is an Internet archiving solution

13   that was established by archive.org, which is a nonprofit that

14   was established to preserve a lot of digital content from all

15   around the Internet.  I've actually been fortunate to --

16         THE COURT:  Period.  What's the next one?

17   Q.   What did you do with the Wayback Machine?

18         THE COURT:  In this case.

19   A.   In this case?

09:43 20  Q.   Or your experience, in general, with the Wayback Machine.

21         MR. KOSTO:  Objection.

22         THE COURT:  Sustained.

23   Q.   What did you do with the Wayback Machine in this case?

24   A.   In this case, the Wayback Machine was used to view --

25         THE COURT:  When you say "was used," you used it?

```
 1              THE WITNESS:  I used the Wayback Machine in this
 2    matter to go and view preserved copies of specific Internet
 3    pages as they existed at the time they were preserved by
 4    archive.org.
 5    Q.   Did you review a Web page strongVPN.com/locations?
 6              MR. KOSTO:  Objection.
 7              THE COURT:  Overruled.
 8    A.   Yes.
 9    Q.   And you reviewed it during two times in history.  One was
09:44 10   in March 8, 2019?
11              MR. KOSTO:  Objection, your Honor.
12              THE COURT:  Rule 16?
13              MR. KOSTO:  Yes.
14              THE COURT:  Overruled.
15    A.   Yes.
16    Q.   And another time you viewed it was on September 9, 2018?
17    A.   Yes, as in the date of the capture, yes.
18    Q.   And that Web page showed what servers were available for
19    StrongVPN at the time?
09:44 20              MR. KOSTO:  Objection, hearsay.
21              THE COURT:  Sustained.
22    Q.   Was that an advertisement that StrongVPN projected to the
23    rest of the world about what servers were available, to your
24    understanding?
25    A.   My understanding is, that was what they were telling the
```

```
 1   world that was available as far as their servers.
 2   Q.   And was Boston listed on there?
 3            MR. KOSTO:  Objection.
 4            THE COURT:  Overruled, overruled.
 5   A.   Yes.
 6   Q.   Boston was listed on there?
 7            MR. KOSTO:  Objection, asked and answered.
 8            THE COURT:  So the answer is "yes."
 9            THE WITNESS:  May I restate?
10            THE COURT:  If you were wrong, you can restate.  Do
11   you remember?
12            THE WITNESS:  I am completely at the mercy of the
13   evidence that I believe would show exactly what was there.
14            THE COURT:  All right, next question.
15   Q.   Did StrongVPN advertise that it had a Boston server on its
16   Web page?
17            MR. KOSTO:  Objection, asked and answered.
18            THE COURT:  Sustained.
19            MR. NEMTSEV:  Your Honor, may I approach the witness?
20            THE COURT:  Yes.
21            MR. NEMTSEV:  Thank you.
22   Q.   So does that refresh your recollection regarding --
23   A.   Yes.  Thank you.
24   Q.   It's a list alphabetically, correct?
25            MR. KOSTO:  Objection, leading.
```

```
  1              THE COURT:  Overruled.

  2    A.   Yes.

  3    Q.   It goes from A to C on that list?

  4    A.   It does.

  5    Q.   Is there Boston listed under B?

  6              THE COURT:  Do you recognize it?

  7              THE WITNESS:  Do I recognize this document?  Yes.

  8              THE COURT:  Have you ever seen it before?

  9              THE WITNESS:  No, I've seen this.  My confusion was

09:47 10    which of the pages I was looking at specifically.  There are a

 11    number of VPN pages.

 12              THE COURT:  All right, so that refreshes his

 13    recollection, so what's the next question?

 14              MR. NEMTSEV:  Thank you.

 15    Q.   Did StrongVPN advertise to the world that it offers a

 16    Boston server at the time that you reviewed those Web pages?

 17              MR. KOSTO:  Objection, 802.

 18              THE COURT:  Sustained.  You need to establish the

 19    reliability of that.

09:47 20    Q.   Sir, have you had any reliability issues with the Wayback

 21    Machine?

 22    A.   I have not.

 23    Q.   And you testified that it archives Internet Web pages?

 24    A.   Yes.

 25    Q.   And that is an archive, one you looked at for March of
```

```
        1   2019, the other one you looked at from September of 2018?
        2   A.    Yes.
        3         MR. KOSTO:   Objection.
        4   Q.    And you believe the Wayback Machine is reliable?
        5   A.    Yes, and I haven't seen otherwise yet.
        6   Q.    And according to what you saw when you reviewed the
        7   StrongVPN status page for its servers, was Boston listed on
        8   there?
        9   A.    It is not, and was not.
09:48  10   Q.    It was not either in September of 2018 and both March of
       11   2019?
       12   A.    Correct.
       13   Q.    Sir, did you review pen register data in this case?
       14   A.    I did.
       15         MR. NEMTSEV:   Your Honor, could we check if the screen
       16   is working?
       17         THE CLERK:   I emailed IT, and they're coming up, and I
       18   want to make sure that the blue light's on because if the blue
       19   lights are on -- this has no connection.
09:48  20         (Discussion off the record.)
       21         THE CLERK:   It has no signal, Judge.
       22         THE COURT:   Well, all right, we'll just have to keep
       23   going.  Is it on any of these computers?
       24         THE CLERK:   Anyone else have the white screen?
       25         THE COURT:   They all have it.  It's not on mine.
```

```
  1              THE CLERK:  All right.  There's no signal.  On these
  2    two, it says "no signal."
  3              THE COURT:  How about the government?  Do you have it?
  4              MR. KOSTO:  We do not, your Honor.
  5              THE COURT:  Do you have anything in paper?  Do you
  6    have it on paper?  I'm ready to go back to paper.
  7              (Discussion off the record.)
  8    Q.    Sir, I'm showing you what is Government Exhibit 218.  Do
  9    you see it?
09:50 10              THE COURT:  I've got it again.  Does everyone?  Well,
 11    it's up on the screen there.
 12    Q.    And this is a summary chart of connections between
 13    89.107.124.42 IP and the IP address 185.228.19.147?
 14    A.    Correct.
 15    Q.    And did you look at the underlying data that this chart is
 16    based on?
 17    A.    I did.
 18    Q.    And where does that data come from?
 19    A.    So as part of the pen register that was ordered by the
09:51 20    investigators and sent to the company that hosted the
 21    destination IP, the company was ordered to perform a limited
 22    capture of the traffic transiting between that .147 IP and
 23    everyone communicating with it on the Internet.  It doesn't
 24    capture the content.  It only captures the header of the data.
 25    So it will catch the time stamps, the inbound, the outbound.
```

       1    It can tell you directionality.  It can tell you what IP

       2    addresses are communicating with, but you don't have any

       3    context as to what's being discussed, what kind of traffic is

       4    there.

       5    Q.   And do you recall what the 89.107.124.42 IP is?

       6    A.   That is associated with M-13's Juniper hardware switch on

       7    the Internet.

       8         THE COURT:  Wait.  I can't hear, and I don't

       9    understand.  So -- so --

09:52 10         THE WITNESS:  The .42 address is associated with M-13.

      11         THE COURT:  The 89 address is what?  We probably don't

      12    remember because there have been so many IP addresses.  So

      13    which one?  Why don't you give us foundation for it.

      14    Q.   The 89 IP on top --

      15    A.   Yes.

      16    Q.   -- that is associated with M-13?

      17    A.   Yes.

      18    Q.   And you said it's associated with a Juniper switch?  What

      19    is that?

09:52 20    A.   Specifically it's a -- the P-caps, or the network captures

      21    that were part of the pen register data contained hardware

      22    information about what was communicating, it was communicating

      23    to; and I found that that device it was actually communicating

      24    with was a Juniper switch.  Juniper is a company that makes

      25    network fire walls, networking switches, and other network

```
 1    appliances.
 2    Q.   And do you remember --
 3              THE COURT:  The IP address for M-13 was communicating
 4    with something called a Juniper switch?  Is that what you're
 5    saying?
 6              THE WITNESS:  The IP address that is associated with
 7    M-13 that starts with .89 on this chart --
 8              THE COURT:  Yes, yes.
 9              THE WITNESS:  -- is assigned to a piece of hardware or
10    a computer.  That computer that it's ultimately connecting to,
11    the endpoint is a switch made by Juniper.
12              THE COURT:  Okay.
13              THE WITNESS:  That's the name of the company that
14    manufacturers --
15              THE COURT:  Okay.  Next question.
16    Q.   Do you remember what the 185.228.19.147 address is
17    associated with?
18    A.   That's associated with a Supermicro brand computer which
19    was hosted by the AirVPN provider.
20              MR. NEMTSEV:  And this is Exhibit 450, your Honor, and
21    I move to admit it.
22              (Exhibit 450 received in evidence.)
23              THE CLERK:  Just touch the wheel.  Don't touch the
24    other button because you'll lose the focus.
25              MR. NEMTSEV:  So far, so good.
```

1          THE CLERK:  450, did you say, 450?

2          MR. NEMTSEV:  450.

3          THE CLERK:  Thank you.

4    Q.    And once you went into the actual pen register data that

5    the government produced to us, what did you see?

6    A.    So the data that ultimately created the -- contained all

7    of the connections between those two IP addresses were in six

8    packet captures in total.

9    Q.    And what is a packet capture?

09:54 10   A.    So as part of the pen register, they set up a packet

11   capture.  Typically what happens is, they will tell the switch

12   to send traffic both to the server it needs to go to, and also

13   to send a copy off, of the same data, off to another system

14   that will preserve that data.  In the packet captures I

15   reviewed, each one was about 80 megabytes in size, so it just

16   kept rolling and filling up 80 megabytes and rolls to the next

17   one, keeps going, until the -- you know, for the duration of

18   their pen register authorization.

19   Q.    And you listed packet 1 through packet 20.  Some are noted

09:55 20   as retransmissions?

21   A.    Yes.

22   Q.    What is a retransmission?

23   A.    So when -- the important thing to explain going into this

24   is, there are two protocols at hand that we're working with,

25   UDP, user datagram protocol, if I'm remembering right, and TCP,

1    traffic control protocol.  The names aren't really important.

2    The important thing to understand is, UDP packets are sent and

3    there's no reply expected or necessary to come back.  TCP, in

4    order for it to work, there must be a transaction that has to

5    go back and forth, and they have to talk to each other.  So the

6    UDP packets go off, and if they're lost in transit, it's not a

7    problem; more data will come.  It's typically used in streaming

8    services, Zoom calls, streaming audio data, because it's just

9    more efficient and faster.  TCP needs to establish that

09:56 10  communication, and the reason for the retransmission is,

11   packets were sent --

12              MR. KOSTO:  Objection, your Honor.  Lost the question.

13              THE COURT:  Excuse me?

14              MR. KOSTO:  There's no question pending.

15              THE COURT:  Why don't you finish the sentence.

16   A.   They have to have the reply come back.  Because a reply

17   did not come back, the system then automatically retransmits

18   the TCP packet, trying to determine if there can be a response

19   that comes back from the other side.

09:57 20            THE COURT:  Stop.  It can't be a narrative.

21              What's the next question.

22   Q.   Packets 1 through 19, that was AirVPN attempting to

23   communicate with the M-13 server?

24              MR. KOSTO:  Objection, leading.

25              THE COURT:  Yes, but at least I understand it.  So is

| | |
|---|---|
| 1 | that correct? |
| 2 | THE WITNESS:  That is correct. |
| 3 | Q.   And the time stamps are from 12:11 to 12:21:55 seconds in |
| 4 | milliseconds? |
| 5 | A.   Microseconds. |
| 6 | Q.   Microseconds.  I'm sorry.  And then there was one response |
| 7 | from the M-13 server to the server of AirVPN? |
| 8 | A.   I don't know if it's a response or not, and I say that |
| 9 | because there's a significant amount of time between the |
| 09:58 10 | last -- packet 19 and packet 20. |
| 11 | Q.   And packet 20, do you remember what size it was? |
| 12 | A.   No.  All the packets are truncated as part of the packet |
| 13 | capture, so you don't have the content, but packet size is -- |
| 14 | there are ways they can be larger, but typically they do not |
| 15 | exceed 64 kilobytes. |
| 16 | Q.   Is that a lot of information? |
| 17 | A.   Not really. |
| 18 | Q.   Not for a picture? |
| 19 | A.   No.  Well, a small picture, a very small icon. |
| 09:58 20 | MR. NEMTSEV:  Nothing further, your Honor. |
| 21 | MR. KOSTO:  May I proceed, your Honor. |
| 22 | THE COURT:  Yes. |
| 23 | CROSS-EXAMINATION BY MR. KOSTO: |
| 24 | Q.   Good morning, Mr. Roberts. |
| 25 | A.   Good morning. |

```
 1   Q.   My name is Seth Kosto.  I'm one of the prosecutors in the

 2   case.  You give a list of reasons that people would subscribe

 3   to a VPN in your testimony.  Do you remember that?

 4   A.   Yes.

 5   Q.   And specifically we're talking about private VPNs here,

 6   commercially available, but not the ones that businesses

 7   provide for their employees to get online, okay?

 8   A.   Well, commercial services do provide company VPN access as

 9   an alternative.

10   Q.   And they also provide access to subscribers for long-

11   distance purposes, correct?

12   A.   Yes.

13   Q.   Kind of a retail ability to get onto the Internet through

14   that on-ramp you describe?

15   A.   Correct.

16   Q.   And one of the reasons that people use that on-ramp is to

17   maintain a degree of anonymity on the Internet, correct?

18   A.   That is what they advertise.

19   Q.   And in your experience, that's one of the things that

20   people use private VPNs for, correct?

21   A.   That is the reason for wanting to use it, yes.

22   Q.   Yes.  And you can hide behind a VPN in order to avoid

23   being detected, right?

24   A.   It depends.

25   Q.   It depends on the efforts of the investigators and
```

1    Internet response professionals, right?

2    A.    Correct.

3    Q.    And before you started your own firm, you worked at Stroz

4    Friedberg, correct?

5    A.    Yes.

6    Q.    For about six years?

7    A.    Yes.

8    Q.    And you were an incident response specialist, right?

9    A.    A response examiner, yes.

10:00 10    Q.    And you led several incident responses involving large

11    suspected data breaches, right?

12    A.    Correct.

13    Q.    One of them was a network breach at an international

14    financial and research analysis company.  Do you remember that?

15    A.    Yes.

16    Q.    Okay.  And one was at an international nonprofit that got

17    hacked, right?

18    A.    Yes.

19    Q.    And one was at a large government contractor's network?

10:01 20    A.    Yes.

21    Q.    And part of your work was trying to secure your client's

22    networks at the time, right?

23    A.    I was not tasked with securing the network.  I was tasked

24    with investigating a data breach.

25    Q.    And in those investigations, you gave regular briefings to

1 U.S. federal law enforcement who were also responding to the

2 incident, right?

3 A. My team did, yes.

4 Q. The team that you ran?

5 A. Well, it depends on the case you're talking about, but,

6 yes.

7 Q. But in those engagements, you describe yourself in your

8 resume as the leader of those engagements, right?

9 A. Yes, but it depends on which one you're talking about.

10:01 10 Q. Well, let's say the government contractor network.

11 A. Okay.

12 Q. Did you provide briefings to the federal government about

13 your findings?

14 A. My supervisor did.

15 Q. And in the activist attack, in the hack attack on the

16 nonprofit, was that you briefing the government?

17 A. Yes.

18 Q. And you'd agree with me, based on your experience,

19 Mr. Roberts, that an IP address is actually a very important

10:01 20 part of addressing a suspected intrusion, isn't it?

21 A. Well, it's important in understanding the intrusion.

22 Q. That's because what happens over a particular IP address

23 can tell you a lot about your adversary, right?

24 A. So you're getting into attribution?

25 Q. Yes.

```
 1   A.   This is where we get into VPN's anonymity obviously.
 2   Q.   Well, let's start with the IP address itself, sir.  If you
 3   saw the same IP address doing the same thing to different
 4   victims, that would tell you something about your attacker,
 5   wouldn't it?
 6   A.   It would tell me it's an attack source, yes.
 7   Q.   And if you saw different IP addresses, a hundred of them,
 8   doing the same thing to the company that you responded to, that
 9   would tell you something about your attacker, wouldn't it?
10   A.   Yes.
11   Q.   And if you saw different IP addresses doing the same thing
12   on different companies' networks, that would tell you something
13   about the attacker?
14   A.   Correct.
15   Q.   Even if someone was going through a private VPN, right?
16   A.   Well, if you're talking about the activity that you're
17   seeing as the bad activity that you know about originating from
18   that same point, yes, it's potentially associated with the same
19   attacker.
20   Q.   And it's a data point that you would use in your
21   investigations, right?
22   A.   One of many.
23   Q.   It's one of many data points that you'd pass along in your
24   law enforcement briefings, right?
25   A.   Correct.
```

1    Q.    Now, there's more than 3 billion IPV4 addresses, you

2    testified yesterday, right?

3    A.    I think it comes out to 3.7 billion if you take what could

4    actually be routable.

5    Q.    So seeing a number of IP addresses in a single attack out

6    of those 3.7 billion is a data point that you'd use in your

7    investigation?

8    A.    Yes.

9    Q.    And that's even before you set out to specifically try to

10:03 10   figure out who your adversary was, right?

11    A.    Well, I don't necessarily -- we never really put a lot of

12    weight into attribution.  So we understand where are the IPs,

13    where are they coming from, what kind of sources are these; but

14    ultimately attribution as to who it is, can we put a name on

15    it, can we put even a country on it, that's where we understand

16    there's more than one way on the Internet, and that is

17    something that ultimately goes back to law enforcement to make

18    that determination because --

19    Q.    So you pass those data points on to law enforcement?

10:04 20   A.    That respond, but we don't do the attribution.

21    Q.    Correct, because law enforcement has tools that in your

22    capacity at Stroz, for example, or in your current employer,

23    you wouldn't have access to those tools?

24    A.    Correct.

25    Q.    You wouldn't have access to getting search warrants from

1  judges, right?

2  A.   Correct.

3  Q.   Or getting subpoenas issued by the grand jury?

4  A.   Typically not.

5  Q.   Or you wouldn't have access to being able to apply for and

6  receive the contents of a pen register like the one you were

7  talking about, right?

8  A.   Right.

9  Q.   Now, you would agree with me also, Mr. Roberts, that the

10:04 10  use of a private VPN itself as part of an attack is an

11  important piece of information that an incident response

12  professional would want to know?

13  A.   Yes.

14  Q.   And you testified a little bit about the challenges of

15  getting behind a VPN and figuring out who it is, right?

16  A.   Right.

17  Q.   So that's because private VPNs don't always attribute to a

18  single user, right?

19  A.   They attribute to the company hosting them.

10:05 20  Q.   And those private VPN services aren't always known for

21  keeping the best records of who their subscribers are?

22       MR. NEMTSEV:   Objection.

23       THE COURT:   Sustained.

24  Q.   You're familiar with AirVPN, correct?

25  A.   Yes.

```
 1    Q.    Are you familiar with Atlas VPN?

 2    A.    It's a name I know.

 3    Q.    How about AVG Secure?

 4    A.    Also sounds like one I've heard of.

 5    Q.    I think you testified early on your direct that everyone

 6    is providing these private VPN services these days; is that

 7    right?

 8    A.    Right.

 9    Q.    So you'd be familiar with Bitdefender out of Romania?

10:05 10   A.    Bitdefender is an AV company, but, yes, that's another

11    thing that I --

12    Q.    And they offer private VPN, don't they?

13    A.    I'll take your word for it.

14    Q.    How about CyberGhost?

15    A.    I believe so.

16    Q.    And Easy-Hide-IP?

17    A.    Is that the company name for it?

18    Q.    Do you know that VPN service out of the Seychelles?

19    A.    Yes.

10:06 20   Q.    How about ExpressVPN?

21    A.    Uh-huh.

22    Q.    Out of the British Virgin Islands?

23    A.    Yes.

24    Q.    How about F-Secure Freedome VPN out of Finland?

25    A.    I believe, yes.
```

```
 1   Q.   How about GOOSE VPN out of the Netherlands?

 2   A.   I don't know that one.

 3   Q.   How about hide.me out of Malaysia?

 4   A.   Yes.

 5   Q.   How about hidemyass.com out of the United Kingdom?

 6        MR. NEMTSEV:  Objection, your Honor.

 7        THE COURT:  I don't know.  I'll remember that name.

 8   It sorta blends, right?

 9        THE WITNESS:  I thought that was related to one you

10   mentioned earlier.

11        MR. KOSTO:  Forgive my language.

12   Q.   How about Hotspot Shield?

13   A.   Yes.

14   Q.   Another VPN product?

15   A.   Yes.

16   Q.   IPVanish, of course?

17   A.   Yes.

18   Q.   And Ivacy out of Singapore?

19   A.   Ivacy?

20   Q.   Not that one?

21   A.   Don't know it offhand.

22   Q.   Does Mozilla offer a private VPN service?

23   A.   Do they still?

24        THE COURT:  Do you know?

25        THE WITNESS:  I don't know.
```

10:06  (line 10)
10:07  (line 20)

```
 1    Q.   Perfect Privacy out of Sweden?

 2    A.   I don't know that one.

 3    Q.   Proton VPN out of Switzerland?

 4    A.   That one I know.

 5    Q.   You know that one?

 6    A.   Uh-huh.

 7    Q.   TorGuard VPN out of the United States?

 8    A.   Yes.

 9    Q.   Trust.Zone out of the Seychelles?

10:07 10    A.   Yes.

11    Q.   Tunnel Bear out of Canada?  That's a colorful one.

12    A.   Oh, yes, yes.

13    Q.   VPN Book out of Switzerland?

14    A.   I don't know that one.

15    Q.   VPN Unlimited from the United States?

16    A.   Yes.

17    Q.   And VPN.AC?

18    A.   Don't know that one.

19    Q.   Viper VPN out of Switzerland?

10:07 20    A.   Yes.

21    Q.   Windscribe out of Canada?

22    A.   I did not know they did that.

23         THE COURT:  Are you objecting?

24         MR. NEMTSEV:  Yes.  I'm objecting to the relevance of

25    every single VPN on the list.
```

```
         1              THE COURT:  You've made the point.  What's the next
         2    issue?
         3    Q.    Some of those are actually what are called "no-log VPNs,"
         4    right?
         5    A.    I don't know which ones, but, yes.
         6    Q.    And what's a no-log VPN?
         7    A.    So most -- I feel like almost every VPN provider out there
         8    these days will advertise that they do not maintain logs,
         9    meaning they do not keep copies of what users are doing on
10:08   10    their system, where they're going to, what accesses they're
        11    making.
        12    Q.    And it's for those reasons that hackers sometimes like to
        13    use private VPNs, right?
        14              MR. NEMTSEV:  Objection.
        15              THE COURT:  Overruled.
        16    A.    I can't talk about what hackers might be doing with them,
        17    but anyone that does not want their activities tracked would
        18    try to select a no-log VPN server.
        19    Q.    Okay.  And if the hacker were outside the United States,
10:08   20    would a private VPN allow them to appear as if they were inside
        21    the United States in making a computer connection?
        22    A.    Yes.
        23    Q.    And if you saw the same private VPN, as an incident
        24    response professional, if you saw the same private VPN hitting
        25    your client from different IP addresses, that would be a data
```

1    point for your investigation, wouldn't it?

2    A.   If I was able to determine what VPN provider was hosting

3    it and that all of those source VPNs were from -- the source IP

4    addresses were from the same VPN provider, that would be a data

5    point.

6    Q.   And you could look those kind of things up on domain

7    tools, for example?

8    A.   You can try.  One thing I've found in my experience is,

9    there's often a lot of overlap between VPN providers.  So some

10:09 10   of the list that you gave is there may be more than one VPN

11   provider or more than one brand associated with a particular IP

12   address.

13   Q.   So that's another reason that --

14   A.   It's not always clear.

15   Q.   So that's another reason that hackers like to get behind

16   private VPNs; they're complicated to trace through, right?

17   A.   VPNs in general can be complicated because it's just an

18   endpoint.

19   Q.   But if you saw several from, say, AirVPN hitting your

10:10 20   network from different IP addresses, that would be a data point

21   you'd pass along to investigators, right?

22   A.   Yes.

23   Q.   I assume when you ran into a private VPN at your incident

24   response, you didn't pack up and end the engagement?

25   A.   No.

```
 1    Q.    You didn't say, "Sorry, guys.  It's a private VPN.  We
 2    can't help you anymore"?
 3    A.    No.  I would never do that.
 4    Q.    Okay.  You followed up on that and passed it along to law
 5    enforcement?
 6    A.    Yes.
 7    Q.    Because law enforcement had tools that might be able to
 8    address the identification issues that you were describing as
 9    challenges?
10    A.    Yes.
11    Q.    And you'd agree with me that if a user of a private VPN
12    used the private VPN to log into, say, their Apple account
13    several times over a week, that would tell you something about
14    the user of the private VPN, even though there's no record of
15    their name?
16          MR. NEMTSEV:  Objection.
17          THE COURT:  Overruled.
18    A.    So you have many people potentially on that VPN.  How do I
19    know the attacker and the iCloud log-in are the same person?
20    Q.    You'd agree with me that if Apple accepts the subscriber
21    information in someone's true name -- let's start with that
22    premise, okay -- and that the private VPN over the course of a
23    month is used to log into that particular account at Apple,
24    that would tell you something about the user of the private VPN
25    customer, right?
```

10:10

10:11

1    A.   Tell me something about a user of the private VPN.

2    Q.   And that user, in particular, would be someone with access

3    to the Apple account?

4    A.   Yes.

5    Q.   And if one of the IP addresses that hit your private VPN

6    came back to a company that advertised to emulate hacking

7    services, that would be a data point that you'd pass on --

8            Mr. NEMTSEV:  Objection.

9            THE COURT:  Sustained.

10:11 10   Q.   Were you here yesterday for the testimony of Mr. Wall?

11   A.   No.

12   Q.   You don't have any idea what his testimony was about the

13   Strong VPN Web page, do you?

14   A.   No.

15   Q.   And are you aware that Strong VPN operates with other

16   subsidiaries along with StackPath and IPVanish, for example?

17   A.   Yes.

18   Q.   Okay.  And so IPVanish is their flagship brand?

19   A.   Uh-huh.

10:12 20   Q.   And did you use the Wayback Machine to look up IPVanish?

21   A.   I did.

22   Q.   Did you use the Wayback Machine to look up StackPath?

23   A.   Uhm, StackPath, yes.

24           MR. KOSTO:  Could we have Exhibit 250, please,

25   Ms. Lewis.

```
 1              THE CLERK:  It should be working now.
 2              THE COURT:  Are you all getting it now on your screen?
 3     You all are?
 4              MR. KOSTO:  450.  I'm so sorry.  I was only 200 off.
 5              THE CLERK:  What did you say?
 6              MR. KOSTO:  450.  This is in evidence.
 7     Q.   So this is your table of communications between the M-13
 8     IP and the AirVPN, I believe you said Juniper router, right?
 9     A.   No.  The M-13 has the Juniper router.
10:13 10    Q.   I'm sorry, between M-13 and the AirVPN --
11     A.   Supermicro server.
12     Q.   Yes.  And so what your chart here shows is communications
13     in both directions, right?
14     A.   Yes.
15     Q.   And you testified that we can't know the content of the
16     communications, right?
17     A.   Correct.
18     Q.   Those are secure.  That's not something the pen register
19     actually shows?
10:13 20    A.   It's what the pen register did not capture.
21     Q.   And the packets are all fairly small, right?
22     A.   Yes.
23     Q.   And that's not something that's atypical for the
24     transmission of data over the Internet, right?
25     A.   Yeah, I mean, packets typically aren't exceeding 64K, as I
```

1    said earlier, so they're typically very small.

2              THE COURT:  I couldn't hear a word of that.

3              THE WITNESS:  Sorry.  Packets are typically 64

4    kilobytes or less, so they're very small.

5    Q.   So the Internet has to break up even something like an

6    email into a large number of packets for it to be able to go

7    across the cloud, across the network?

8    A.   Correct.

9    Q.   And what you've shown here is that there were communications

10:14 10   between the AirVPN computer and M-13, not on one instance but

11   twenty, correct?

12   A.   It shows it between the AirVPN server.

13   Q.   Yes.

14   A.   Yes, and M-13, yes.

15   Q.   And date and timewise, is the very first one of those on

16   January 29, 2020, at 12:11 Zulu?

17   A.   Yes.

18   Q.   Would you agree that's about 50, 5-0 minutes before the

19   communication in row 20 at 12:59 Zulu?

10:15 20   A.   I'll go with that's close, sure.  It would be 48 minutes

21   between?

22   Q.   Sounds fair.  You testified on direct that you reviewed

23   the contents of Mr. Klyushin's iCloud account and of

24   Mr. Sladkov's iCloud account, correct?

25   A.   Yes.

1    Q.    On both of them, did you find files related to an M-13

2    chat app?

3    A.    Yes.

4    Q.    And with respect to the contents or the M-13 chat

5    application data on Mr. Klyushin's account, you didn't find any

6    content related to the use of that app, correct?

7    A.    Correct.

8    Q.    That was an encrypted app?

9    A.    Yes.

10:15 10    Q.    There was no data about what was being said over that app

11    on Mr. Klyushin's iCloud, correct?

12    A.    Yes.

13    Q.    And similarly, when you looked at Mr. Sladkov's account,

14    you found the same M-13 chat app, correct?

15    A.    Yes.

16    Q.    And that application on Mr. Sladkov's computer was also

17    encrypted, correct?

18    A.    Right.

19    Q.    And you were not able to see what the content of

10:16 20    communications over that chat app was either?

21               MR. NEMTSEV:   Objection.

22               THE COURT:   Overruled.

23               MR. KOSTO:   No further questions, your Honor.

24               THE COURT:   He didn't answer.

25               THE WITNESS:   I said "correct."

```
 1              THE COURT:  Oh, all right.
 2   REDIRECT EXAMINATION BY MR. NEMTSEV:
 3   Q.   Just very quickly, the AirVPN in your chart, 450, was
 4   connecting to the M-13 IP; is that right?
 5   A.   Yes.
 6              MR. KOSTO:  Objection, misstates.
 7              THE COURT:  So go back to that exhibit.
 8   Q.   Packet number 1, the source is AirVPN; the destination is
 9   M-13?
10   A.   Correct.
11   Q.   And that's the same from packets 1 through 19?
12   A.   Yes.
13   Q.   Only packet 20 is M-13 to AirVPN?
14   A.   Correct.
15              MR. NEMTSEV:  Nothing further.
16              THE COURT:  Anything else?
17              MR. KOSTO:  No.  Thank you, your Honor.
18              THE COURT:  Thank you very much.  You may step down.
19              (Witness excused.)
20              THE COURT:  Your next witness?
21              MR. NEMTSEV:  Mr. Tawil, your Honor.  We call
22   Mr. David Tawil.
23                         DAVID TAWIL
24   having been first duly sworn, was examined and testified as
25   follows:
```

```
 1              THE CLERK:  You can be seated.  Could you please state
 2    and spell your last name.
 3              THE WITNESS:  Sure.  My name is David Tawil.  Last
 4    name is spelled T as in Tom, a-w-i-l.
 5              THE COURT:  All right, so I do this with everyone.  We
 6    can't hear you.
 7              THE WITNESS:  Oh, I'm sorry.
 8              THE COURT:  It's a big room.
 9              THE WITNESS:  Oh, I'm sorry.
10:18 10         THE COURT:  It's a big room.
11              THE WITNESS:  My name is David Tawil, the last name
12    spelled T as in Tom, a-w-i-l.
13              THE CLERK:  Thank you.
14              THE WITNESS:  Is that better, Judge?
15              THE COURT:  Much.
16              THE WITNESS:  Okay.
17              MR. NEMTSEV:  May I proceed, your Honor?
18              THE COURT:  Yes.
19    DIRECT EXAMINATION BY NEMTSEV:
10:18 20    Q.   Good morning, Mr. Tawil.
21    A.   Good morning.
22    Q.   Could you tell us about your educational background.
23    A.   Certainly.  I studied business management as an
24    undergraduate at Yeshiva University in New York City, and then
25    I spent three years at the University of Michigan Law School.
```

1    Q.    And where did you work after law school?

2    A.    At first, I interned for a Second Circuit judge.  I worked

3    at Skadden Arps, a large firm in New York, and thereafter I

4    worked for a number of years at Davis Polk & Wardwell, another

5    large New York City firm.

6    Q.    Did you transition to the investment industry?

7    A.    I did.

8    Q.    And when was that transition?

9    A.    In 2005 I departed from Davis Polk and went to Credit

10:19 10    Suisse.

11    Q.    And what did you do at Credit Suisse?  I'm sorry.  What is

12    Credit Suisse?

13    A.    Credit Suisse is a worldwide investment bank, and I went

14    there in order to found and build a credit-trading business for

15    them specifically focused on bankruptcy and distressed debt.

16    Bankruptcy and restructuring was my specialty as a lawyer.

17    Q.    And for Credit Suisse, did you have the opportunity to

18    trade equities?

19    A.    Yes.

10:20 20    Q.    And are you familiar with various analyses and trading

21    strategies for equities?

22    A.    Very much so.  My time at Credit Suisse, I traded all cash

23    instruments, stocks, bonds, secured debt, derivatives as well;

24    and since my time at Credit Suisse, over the past fifteen

25    years, I've traded as a investment manager.

         1    Q.   And following Credit Suisse, where did you go, sir?

         2    A.   I founded my own firm by the name of Maglan Capital.

         3    Q.   And what is Maglan Capital?

         4    A.   It is a hedge fund.

         5    Q.   And is it still active today?

         6    A.   It is in wind-down.  It is almost closed.

         7    Q.   And when was Maglan Capital first founded?

         8    A.   2009.

         9    Q.   And for those fourteen years at Maglan, what did you do?

10:21   10    A.   Generated investment ideas, structured investment

        11    strategies, executed on those investment strategies.  And

        12    oftentimes we were active in our investments, meaning we would

        13    talk to the board of directors or the company management, and

        14    sometimes we were a little bit forceful with our views on what

        15    we thought the company should do.

        16    Q.   And as part of Maglan Capital, you had the opportunity to

        17    trade equities and --

        18    A.   Largely, largely equities.

        19    Q.   And you know the various strategies that brokers and

10:21   20    traders employ?

        21    A.   Quite well.

        22    Q.   And where are you employed currently?

        23    A.   I'm employed at my own firm by the name of ProChain

        24    Capital, which is a cryptocurrency-focused hedge fund.  And I

        25    am also the CEO of a public oil and gas company by the name of

1    Centaurus Energy.  The stock is listed both in Canada and in

2    the United States, and the company, up until two days ago,

3    operated exclusively in Argentina.  Two days ago we announced

4    the sale of our Argentine operations.

5             MR. NEMTSEV:  Your Honor, I'd move to qualify

6    Mr. Tawil as an expert under 702.

7             THE COURT:  On what, crypto?

8             MR. NEMTSEV:  On -- no, trading and --

9             THE COURT:  All right, that's fine.

10:22  10             MR. NEMTSEV:  Thank you, your Honor.

11   Q.    Mr. Tawil, did you review the trading records in this

12   case?

13   A.    Yes, I did.

14   Q.    And when was Mr. Klyushin trading, approximately, the

15   months and year?  From when until when?

16   A.    I think from about 2018 to 2020.

17   Q.    Does 2021 sound right?

18   A.    Yes.

19   Q.    And as part of your engagement, did you review certain

10:23  20   stock transactions?  Did you focus on certain ones?

21   A.    I did.

22   Q.    Do you remember focusing on a transaction in Tesla stock

23   around October 24th of 2018?

24   A.    I did.

25   Q.    Did you review the surrounding news and circumstances

1    regarding Tesla at that point in time?

2    A.    Yes.

3    Q.    And do you remember what was happening approximately in

4    October of 2018?

5    A.    Yes.  To say it succinctly, there was euphoria surrounding

6    the company, and it was principally initiated by the CEO and

7    founder of Tesla.  A gentleman by the name of Elon Musk, who is

8    a very public figure, made his thoughts on the company and his

9    expectations and predictions for the company's growth very well

10   known.

11   Q.    Do you remember Tesla had positive news early in October

12   of 2018?

13   A.    Yes.

14   Q.    What was that news?

15   A.    The company was going to go ahead, if I recall correctly,

16   exceed their expectations in terms of number of automobiles

17   produced and sold, and therefore their earnings were going to

18   be quite strong.

19   Q.    And did they do something with their earnings release

20   date?

21   A.    They did, and it wasn't the first time that they did that.

22   They moved up their earnings date so -- excuse me.  Let me step

23   back.  Earnings come out quarterly.  Public companies are

24   required to go ahead and, on a quarterly basis, update the

25   public regarding their financial results for the prior three

months, and those earnings are published very often on a very
set timeline, set by the company, but nevertheless they don't
deviate much from the dates from year to year; and Tesla was
expected to go ahead and report results on a date a couple
weeks out.

     And then all of a sudden -- and, again, this was not
the first time -- they pushed up or released their earnings
earlier.  They told the market that they were going to release
it earlier, and in fact they only, if I recall correctly, they
only gave the market two days' notice before releasing those
earnings, and that's very abnormal.

Q.   And as an investment professional, what did that signal to
you, sir?

A.   Well, since they had done it before and they had done it
to go ahead and release good news, it was widely anticipated
that it was going to be another similarly positive
announcement, especially since Elon Musk, the founder and CEO
of the company, had previously made predictions about how good
the quarter would be.

     MR. NEMTSEV:  Is there an objection?

     THE COURT:  What's the next question?  I haven't heard
anything.

Q.   Did you review communications of the defendant and his
trades?

A.   I did.

1    Q.   And did you review communications between Mr. Ermakov and

2    Mr. Rumiantcev regarding their analysis of Tesla?

3    A.   I did.

4    Q.   And do you remember if their analysis was consistent with

5    what you just testified to?

6              MR. FRANK:  Objection.

7              THE COURT:  Sustained.  I think you'd have to show a

8    communication, or at least reference them specifically.

9              (Pause.)

10:27 10   Q.   There's a July 13, 2019 communication that is part of

11   Exhibit 46, a much longer --

12             MR. FRANK:  Your Honor, July 13, 2019, is nine months

13   or eight months after this trade.  Relevance.

14             (Pause.)

15             THE COURT:  Are we waiting for something?

16             Mr. NEMTSEV:  Mr. Frank objected.

17             MR. FRANK:  I objected, your Honor.

18             THE COURT:  I don't know what you're objecting to.

19   He's looking at some communications.

10:28 20             MR. FRANK:  Yes, but he was referencing communication

21   with respect to this trade, and those communications were nine

22   months later, so my objection is relevance.

23             THE COURT:  I haven't heard a question about these

24   communications.

25   Q.   Did you review communications between Mr. Ermakov and

|  | |
|---|---|
| 1 | Mr. Rumiantcev concerning their analysis of Tesla stock in July |
| 2 | of 2019 that is consistent with your analysis of the Tesla |
| 3 | stock in October 24, 2018? |
| 4 | MR. FRANK:  Objection. |
| 5 | THE COURT:  Sustained because of the timing. |
| 6 | MR. NEMTSEV:  Can we have Exhibit 350, and I would |
| 7 | move to admit this, your Honor. |
| 8 | THE CLERK:  350? |
| 9 | MR. NEMTSEV:  Yes, 350. |
| 10:29 10 | (Exhibit 350 received in evidence.) |
| 11 | Q.   Sir, do you remember this is trading in Tesla stock |
| 12 | from -- in all of the accounts of Mr. Klyushin, M-13, and the |
| 13 | investors?  Is that correct? |
| 14 | A.   Yes. |
| 15 | Q.   Do you remember, in all of the Tesla trading, how much |
| 16 | money the investors lost, or gained? |
| 17 | A.   I think there's a total on the final page. |
| 18 | Q.   Can we go to the final page.  What's that total? |
| 19 | A.   A loss of $3.6 million. |
| 10:30 20 | Q.   And can we put up -- |
| 21 | THE COURT:  And what's the time span? |
| 22 | MR. NEMTSEV:  This is a time span from July of 2018 to |
| 23 | September of 2020. |
| 24 | THE COURT:  Is that what you're saying was the loss of |
| 25 | $3.6 million? |

1           THE WITNESS:  That is correct.

2           THE COURT:  Okay.

3           MR. NEMTSEV:  And can we pull up Exhibit 191.

4    Q.    Sir, you've seen this chart before?

5    A.    I have.

6    Q.    This is a chart of downloads from the Julie Soma account

7    from the IP block 104.238.37 from October of 2018 until

8    November of 2018, correct?

9    A.    That is correct.

10:31 10   Q.    Did you review transactions in Mr. Klyushin's accounts

11   during that time period?

12   A.    I did.

13   Q.    Do you recall -- well, let me ask you this:  Did

14   Mr. Klyushin have more or less transactions than the ones on

15   this list, or did he transact in more or less stocks?

16   A.    He transacted in a smaller set of stocks than is on this

17   list.

18   Q.    And do you remember --

19          THE COURT:  I want to understand.  A smaller set of

10:31 20   stocks, but stocks on this list?

21          THE WITNESS:  Yes, they're on this list, but a much

22   smaller number than the --

23          THE COURT:  Not all of them?

24          THE WITNESS:  Correct.

25   Q.    And you remember that there's a longer list of stocks that

1    were viewed but not downloaded?

2    A.    Correct.

3    Q.    And do you remember how many stocks Mr. Klyushin's

4    accounts transacted during this time period?

5    A.    Somewhere in the 20s.

6    Q.    And do you remember how many stocks he did not transact

7    that were viewed or accessed during this time period?

8    A.    The total number of companies that were either downloaded

9    or viewed I think is somewhere in the 150s.

10:32  10    Q.    So Mr. Klyushin's accounts only traded in 22 out of the

11    150 or so?

12    A.    Correct.

13    Q.    Do you remember his profit or loss from those transactions,

14    sir?

15    A.    I don't recall offhand.  Would you be able to pull up the

16    exhibit?

17            MR. NEMTSEV:  Your Honor, may I approach the witness?

18            THE COURT:  Yes.

19            (Discussion off the record between attorneys.)

10:33  20            (Witness examining document.)

21    A.    Roughly $28,000 in total was gained.

22    Q.    Thank you.  Sir, I'm going to put up a --

23            MR. NEMTSEV:  Can we also put up Exhibit 375, and I

24    would move to admit this.

25            (Exhibit 375 received in evidence.)

1    Q.   And this is just a summary of the stocks that were not

2    traded by Mr. Klyushin during this time period?

3    A.   That's correct.

4         MR. NEMTSEV:  Madam Clerk, may I have the document

5    camera, please.

6         THE CLERK:  Sure.

7         MR. NEMTSEV:  Thank you.  Actually, I don't think I

8    need it.  Can you pull up a chalk that's listed as 450, or 451?

9    Thank you.  And we're not moving to admit this.

10:34 10   Q.   Sir, did you look at certain trading metrics related to

11   Mr. Klyushin, M-13, and the investor-related accounts?

12   A.   Yes.

13   Q.   And this is metrics before -- trades before August 20th of

14   2020 and trades between August 2020 and Mr. Klyushin's March

15   2021 arrest date, right?

16   A.   Correct.

17   Q.   And in the first period, there's 26 months' worth of

18   trading?

19   A.   Yes.

10:35 20   Q.   In the second period, there's seven months' worth of

21   trading?

22   A.   Yes.

23   Q.   The traded volume, meaning not the amount of money that

24   was managed but the amount of money that was traded, meaning

25   you put in a million, you take out a million, was --

          1              MR. FRANK:  Object to the leading.

          2              THE COURT:  I couldn't hear you now, Mr. Frank.

          3              MR. FRANK:  Oh, I'm sorry.  That's rare.  I object to

          4     the leading, your Honor.

          5              THE COURT:  All right, sustained.

          6              Don't forget, this isn't an exhibit.  It's like what

          7     happened in the government's case.  It's the experts are

          8     summing things up, but it's not an expert document.  It's just

          9     a chalk about the expert's testimony.

10:35    10              MR. NEMTSEV:  Thank you, your Honor.

         11     Q.   How much did Mr. Klyushin make in terms of profit or loss

         12     on trade transactions before August 20, 2020?

         13     A.   Roughly $41 million.

         14     Q.   And those transactions took place over the course of how

         15     many months?

         16     A.   Uhm...26 months.

         17     Q.   And the next column over, how much did he make in

         18     transactions between August 21, 2020, and his March 2021 arrest

         19     date?

10:36    20     A.   Roughly $4.9 million.

         21     Q.   And that's over the course of how many months?

         22     A.   Seven months.

         23     Q.   And what's the calculated win rate for both?

         24     A.   The win rate is almost dead even.

         25              MR. NEMTSEV:  We can take that down.  Thank you.

1    Q.   Sir, you've been an industry professional for many years?

2    A.   Yes.

3    Q.   How does a 63 or mid-60s win rate percentage compare to

4    what you've seen in the industry?

5    A.   It's a decent hedge fund win rate.  You have to be right

6    more than 50 percent of the time in order to make money,

7    assuming that all the, you know, the size of the bets are even,

8    and in the 60s is -- it's okay.  It's not great.

9    Q.   It's okay but not great?

10:37 10    A.   (The witness nodded negatively.)

11    Q.   Sir, assume you had, during the January 2018 to the

12    September 2020 time period, access to three and a half thousand

13    earnings reports prior to their release, how difficult is it to

14    analyze an earnings report and determine whether the stock is

15    likely to go up or to go down?

16    A.   If I had access to reports like this and I wasn't under

17    any pressure to go ahead and invest in a particular name or a

18    particular number of investments, and I could pick and choose

19    which ones I would go ahead and deploy capital in, and how

10:38 20    large those deployments would be, I think I'd be able to bat

21    probably around 90 to 95 percent.

22              MR. FRANK:  Objection.  He's totally speculating now.

23              THE COURT:  Sustained.

24              MR. FRANK:  I move to strike as well.

25    Q.   Sir, are you familiar with the companies DFIN Solution and

1    Toppan Merrill?

2    A.    Donnelly and Toppan Merrill, yes, very familiar.

3    Q.    So what are they?

4         MR. FRANK:  Beyond the expert report, your Honor.

5         THE COURT:  Overruled.

6    A.    They provide a lot of business services, very wide-

7    ranging.  Amongst the services that they both provide is

8    services surrounding public companies' dissemination of

9    information and shareholder services.  And in particular, with

10:39 10   respect to this matter, they handle the publication of

11   companies' press releases and quarterly earnings and other

12   types of public disseminations of information.

13   Q.    Is it fair to say that they're fairly large companies?

14   Are they publicly traded companies?

15   A.    They are very large companies.  They are the result of

16   numerous mergers of smaller companies into those companies,

17   and, in my experience, they handle the overwhelming --

18        MR. FRANK:  Objection.  Objection.  This is well

19   beyond the expert report.

10:39 20        THE COURT:  What's the next question?  What's the

21   question?

22   Q.    How does Donnelly's and Toppan's, in your observations,

23   how does their market size -- what is their market size

24   compared to other --

25        THE COURT:  Evidence, are you familiar with their

```
  1    shared market share of the earnings report publications?

  2            THE WITNESS:  I know that they command north of

  3    75 percent of the S&P 500.

  4            MR. FRANK:  I object.  This is not the subject of his

  5    testimony.

  6            THE COURT:  Overruled.

  7    Q.   And what is the S&P 500?

  8    A.   It is an index of 500 companies, very large companies.

  9    Q.   The biggest companies in the --

 10    A.   In the S&P.

 11    Q.   In the S&P?

 12    A.   In the Standard & Poor's index, yes.

 13    Q.   Some of the biggest companies that are publicly traded

 14    anywhere?

 15    A.   That's correct.

 16    Q.   Sir, have you researched or heard of strategies relating

 17    to analyzing market sentiment?

 18    A.   Absolutely.

 19    Q.   And what is that?  What is market sentiment analysis?

 20    A.   So I think with the advent of social media, this has taken

 21    on a higher profile and more meaningful --

 22            MR. FRANK:  I object.  He's not an expert on market

 23    sentiments.

 24            THE COURT:  Is that in the expert report?

 25            MR. FRANK:  No.
```

```
 1              THE COURT:  All right, sustained.
 2   Q.   Sir, did you review a website called Estimize?
 3   A.   I did.
 4              MR. NEMTSEV:  Could we have Exhibit 14, and I'd move
 5   to admit it.
 6              MR. FRANK:  I -- actually, I don't care.  I'll move
 7   on.
 8              (Exhibit 14 received in evidence.)
 9   Q.   Is this one of these types of services that analyzes news,
10   analysts' reports, market sentiments?
11   A.   It does.
12   Q.   Can we go down one page.  This one advertises a 70 percent
13   win rate?
14              MR. FRANK:  Could we ask the witness if he has a
15   foundation for Estimize?
16              THE COURT:  Do you know anything about it?  Have you
17   ever used it?
18              THE WITNESS:  I have not used it.
19              THE COURT:  All right, sustained.
20              MR. NEMTSEV:  Nothing further.
21   CROSS-EXAMINATION BY MR. FRANK:
22   Q.   Good morning, Mr. Tawil.
23   A.   Good morning.
24   Q.   You came up from New Jersey where you live?
25   A.   I did.
```

 1   Q.   Did you come up yesterday or today?

 2   A.   Last night.

 3   Q.   Welcome.

 4   A.   Thank you.

 5   Q.   Would you agree that earnings news is important to

 6   investors?

 7   A.   It is.

 8   Q.   Quarterly earnings are catalysts for companies' stock

 9   prices?

10:42 10   A.   Amongst other things.

11   Q.   Would you agree that quarterly earnings events are an

12   almost certain catalyst for a company's stock price?

13   A.   No.

14   Q.   Are you aware that that quote is from your signed expert

15   report?

16   A.   Yes.

17   Q.   But you disagree with it?

18   A.   I -- I -- I can't say that it's always a catalyst.

19   Q.   Did you make that statement in your expert report?

10:42 20   A.   Can you pull up the expert report for me, please?

21   Q.   Sure.

22   A.   Thank you.

23        MR. FRANK:  Mr. Kosto, can you help me track down the

24   expert report?

25   Q.   Did you prepare the expert report, Mr. Tawil?

1    A.    I did, yes.

2    Q.    Did you review it?

3    A.    Certainly.

4    Q.    Did you sign it?

5    A.    I did.

6    Q.    Were you being truthful when you signed it?

7    A.    Yes, I was.

8    Q.    So if that statement, "Quarterly earnings events are an

9    almost certain catalyst for a company's stock price," if that

10:43 10   statement is in your expert report, was it incorrect when you

11   signed it?

12   A.    No.  It was correct.

13   Q.    So you do stand by that statement?

14   A.    I'm sorry.  I didn't hear the word "almost."

15   Q.    "An almost certain catalyst for a company's stock price.

16   A.    Yes.

17   Q.    So that's true?

18   A.    Yes.

19            MR. FRANK:  Mr. Kosto, you can stand down.  Thank you.

10:43 20   Q.    And would you agree with me that traders care about

21   earnings?

22   A.    They do.

23   Q.    Would you agree with me that having earnings information,

24   actual earnings information, before anybody else in the stock

25   market does would be a huge advantage for an investor?

```
 1              MR. NEMTSEV:  Objection.

 2              THE COURT:  Overruled.

 3    A.   It could be.

 4    Q.   Well, you trade stocks, correct?

 5    A.   I do.

 6    Q.   Would it be helpful to you to know what a company is going

 7    to report before anybody else?

 8    A.   It could be.

 9    Q.   And there's other information in earnings releases as well

10:44 10   besides bottom-line earnings, correct?

11    A.   There could be other information.

12    Q.   Is there other information in earnings releases?

13    A.   There could be other information.

14    Q.   Well, is there sales information in earnings releases

15    typically?  Revenues?

16    A.   That is part of the financial information that's included

17    in the earnings report.

18    Q.   So it's in there?

19    A.   Yes, but that's all part of --

10:44 20   Q.   Profit margins?

21    A.   Those are all part of earnings.

22    Q.   Yes.

23    A.   Yes.

24    Q.   Not just the bottom-line number, but all sorts of other

25    information about how a company is performing, correct?
```

A.   Correct, all the details of what yields the earnings of
the company for the quarter.

Q.   Sometimes there's guidance about future quarters?

A.   That is correct.

Q.   And you would agree that that would give you important
information, if you had it, before the rest of the market
correct?

A.   Not necessarily.

Q.   You don't agree that it would be important?

A.   If it does not in any way exceed expectations or
underperform or come short of expectations in a meaningful way,
I don't think it would provide an advantage.

Q.   So you would agree that if a company exceeds the market's
expectations in a meaningful way, its stock is likely to react
to that news?

A.   It could.

Q.   And if a company is going to fall short of expectations in
a meaningful way, its stock could react to that news?

A.   It could.

Q.   And having information about whether a company is doing
either of those things would be important to you as an
investor?

A.   It could be.

Q.   It's like having tomorrow's news today, right?

          MR. NEMTSEV:   Objection.

|      |                                                              |
|------|--------------------------------------------------------------|
| 1    | THE COURT:  Sustained.                                       |
| 2    | Q.   And you worked at Credit Suisse, correct?               |
| 3    | A.   I did work there.                                        |
| 4    | Q.   And at Credit Suisse, there is a compliance department, |
| 5    | correct?                                                      |
| 6    | A.   Yes.                                                     |
| 7    | Q.   And the reason there's a compliance department --       |
| 8    | MR. NEMTSEV:  Objection.                                      |
| 9    | Q.   -- is to make sure that everyone follows the rules,     |
| 10   | correct?                                                      |
| 11   | MR. NEMTSEV:  Objection.                                      |
| 12   | THE COURT:  Overruled.                                        |
| 13   | A.   Yes, many rules.                                         |
| 14   | Q.   And one of those rules is to make sure --               |
| 15   | MR. NEMTSEV:  Objection.                                      |
| 16   | THE COURT:  Sustained as to what the compliance rules        |
| 17   | at Credit Suisse is.                                          |
| 18   | Q.   When you were at Credit Suisse, did you trade on material |
| 19   | nonpublic information?                                        |
| 20   | MR. NEMTSEV:  Objection.                                      |
| 21   | THE COURT:  Sustained.                                        |
| 22   | Q.   Were you allowed to trade on an MNPI?                    |
| 23   | MR. NEMTSEV:  Objection.                                      |
| 24   | THE COURT:  Sustained.                                        |
| 25   | Q.   You were subject to rules, correct?                      |

10:46 (line 10)
10:47 (line 20)

```
 1   A.    Yes.
 2   Q.    Which precluded you from doing it, correct?
 3              MR. NEMTSEV:  Objection.
 4              THE COURT:  I will allow you to explain what the rules
 5   are for the industry with respect to material nonpublic
 6   information.  What practice did the industry follow?
 7              MR. NEMTSEV:  Your Honor, I don't -- that sounds like
 8   he's going to give an opinion about the law.
 9              MR. FRANK:  I'm not asking about the law.
10   MR. NEMTSEV:  The rules?
11   Q.    Were you allowed to do it?
12              THE COURT:  By whom?
13   Q.    By Credit Suisse?
14              MR. NEMTSEV:  I'll object, your Honor.
15              THE COURT:  Sustained.
16   Q.    Well, you have your own trading firm, correct?
17   A.    I do.
18   Q.    Do you trade on MNPI?
19              MR. NEMTSEV:  I object.
20              THE COURT:  Overruled.
21   A.    I don't.
22   Q.    Why not?
23              MR. NEMTSEV:  Object.
24              THE COURT:  I'll allow you to talk about industry
25   practice with respect to material nonpublic information.  What
```

```
 1    is your understanding?
 2              THE WITNESS:  It is avoided.
 3              THE COURT:  It's what?
 4              THE WITNESS:  Avoided.
 5    Q.   And earnings releases are MNPI, correct?
 6              THE COURT:  Don't use the abbreviations.
 7    Q.   Earnings releases can have material nonpublic information
 8    in them, correct?
 9              MR. NEMTSEV:  Objection, the time span.
10    THE COURT:  Overruled.
11              MR. NEMTSEV:  No earnings release -- I'm sorry.
12              THE COURT:  Earnings releases?
13    Q.   Before they are released, earnings releases can contain
14    material nonpublic information; isn't that true?
15    A.   It could be argued.
16    Q.   It could be argued?
17    A.   Yes, if it's material.
18    Q.   But stocks react to them when they're announced, correct?
19    A.   Not always.
20    Q.   They're an almost certain catalyst; wouldn't you agree?
21    A.   That is correct.
22    Q.   Thank you.  You testified about trading in Tesla in
23    October of 2018.  Do you recall that testimony?
24    A.   I do.
25    Q.   And you testified that there was euphoria in the market
```

1      for Tesla's shares because of statements that Elon Musk made.

2      Do you recall that testimony?

3      A.    I do.

4      Q.    And one of those statements was his statement that the

5      stock price would go to 420.  Isn't that true?

6                  MR. NEMTSEV:  Objection.

7                  THE COURT:  Do you know?

8                  THE WITNESS:  Not offhand, but I didn't testify to

9      that.

10:49  10    Q.    Wasn't one of the statements that caused euphoria

11     Mr. Musk's reference to 420?

12                 Mr. NEMTSEV:  Objection.

13                 THE COURT:  Do you know?

14                 THE WITNESS:  I don't know offhand.  If you'd like to

15     pull up an exhibit --

16                 THE COURT:  He doesn't know.  What's the next

17     question?

18     Q.    Well, what was the basis for your testimony about euphoria

19     in Tesla's stock relating to statements?

10:49  20    A.    That Musk spoke about the production numbers and the

21     deliveries of automobiles that were going to exceed

22     expectations.

23     Q.    When?

24     A.    In that time frame.

25     Q.    When?

1    A.    July of 2019, I think.

2    Q.    You're talking about statements in July 2019 that caused

3    euphoria in October 2018?

4    A.    I'm sorry.  Could I trouble you to pull up my --

5    Q.    Mr. Tawil, it's your testimony, sir.

6    A.    Yes, sir.

7    Q.    I'm asking you what your basis is for testifying that

8    there were statements by Elon Musk that caused euphoria in

9    Tesla's stock price in October of 2018.  What is your basis,

10:50 10    sir?

11    A.    Excuse me.  It was my recollection that it was around that

12    time frame that he had spoken about the deliveries and

13    production numbers.

14    Q.    Do you recall what statement he made and when?

15    A.    I don't recall offhand.

16    Q.    Would you agree with me then that you do not have a basis?

17          MR. NEMTSEV:  Objection.

18          THE COURT:  Sustained.

19    Q.    Did you come up with those statements now or in October of

10:51 20    2018?  Were you aware of them back then?

21          MR.  NEMTSEV:  Objection.

22          THE COURT:  Overruled.

23    A.    In October of 2018, was I aware of them?  The same way I

24    guess anybody may have been aware of them:  listening and

25    watching the popular press.

```
 1    Q.    Were you aware of them?

 2    A.    Yes.

 3    Q.    Did you trade on them?

 4    A.    I don't --

 5          MR. NEMTSEV:  Objection.

 6    A.    I don't trade Tesla.

 7    Q.    So you didn't trade on them?

 8          MR. NEMTSEV:  Objection.

 9          THE COURT:  Sustained.

10:51 10  Q.    And you testified that Tesla moved up its earnings date.

11    Do you recall that testimony?

12    A.    I do.

13    Q.    And that was a bullish thing for investors?

14    A.    Correct.

15    Q.    And that happened two days before the earnings

16    announcement.  Would you agree?

17          MR. NEMTSEV:  Objection.

18    Q.    Wasn't that your testimony?

19          THE COURT:  Overruled.  Is that your testimony?

10:51 20  A.    My testimony was that the earnings date was moved up, and

21    it was -- there was only two days of notice given to the market

22    between the announcement of when the earnings date would be,

23    when the earnings would be released, and when they were

24    actually released.

25    Q.    So would you agree with me that the earnings were
```

 1    announced on October 24, 2018?

 2              MR. NEMTSEV:  Objection.

 3              THE COURT:  Do you know?

 4              THE WITNESS:  I think that's what I testified to.

 5    Q.   So the earnings release date was moved up two days earlier

 6    on October 22, 2018?  Is that your testimony?

 7    A.   If I recall correctly.

 8              MR. NEMTSEV:  Objection.

 9              MR. FRANK:  Could we have 201B in evidence, please.

10:52 10   Q.   Have you taken a look at 201B before today, sir?

11    A.   I have not.

12    Q.   This is in evidence.  Do you see that the buying among

13    these traders began pre-market at 5:47 a.m. that day?

14    A.   Yes.

15    Q.   Do you see that there was a download --

16              MR. NEMTSEV:  Your Honor, I object.  He testified he's

17    never seen this document.

18              MR. FRANK:  It's in evidence, your Honor.

19              THE COURT:  Overruled.

10:53 20        MR. FRANK:  Thank you.

21    Q.   Do you see there was a download of Tesla's files from the

22    DFIN database half an hour earlier at 5:18 a.m.?

23    A.   Yes.

24    Q.   Do you see that Mr. Klyushin started trading shortly

25    thereafter along with Mr. Sladkov and Mr. Irzak?

A.    Yes, that's what it seems to show.

Q.    And that the earnings release was not announced until after the market closed that same day?  Do you see that?

A.    Yes.

Q.    Could we look at 191 in evidence, please.  You testified about this download chart, correct?

A.    Yes.

Q.    And you testified that Mr. Klyushin didn't trade on every stock that was downloaded over the 104 IP.  Do you recall that?

A.    Yes.

Q.    Could we look at Page 2, please.  Would you agree with me, sir, that there was a download of Tesla reflected in this chart over the 104 IP at 2:18 Pacific Time on the morning of October 24?

A.    That's what it indicates.

Q.    5:18 Eastern Time, before the market opened?

        MR. NEMTSEV:  I object.

        THE COURT:  Overruled.

A.    Yes.

Q.    So he did trade on Tesla after a download over the 104 IP, correct?

        MR. NEMTSEV:  Object.  He doesn't know.

        THE COURT:  The documents speak for themselves. They're in evidence.

Q.    This is one he did trade on, correct?

1           MR. NEMTSEV:  I object.

2    A.    Did trade on --

3    Q.    You testified there were many he didn't trade on.  This

4    was one he did, correct?

5    A.    Oh, no, no.  This is one of the names which he did trade

6    where there was a download.

7    Q.    Thank you.  Could we look at 201A, please.  Do you see

8    what happened to Tesla's stock price after that news was

9    released on October 24?

10:55 10   A.    I do.

11   Q.    Now, you testified that the company moved up its earnings

12   announcements two days earlier on October 22?

13   A.    Correct.

14           MR. NEMTSEV:  Objection.

15   Q.    Do you recall that?

16           MR. NEMTSEV:  That's not what he testified to.

17           THE COURT:  Was that your testimony?

18           MR. NEMTSEV:  He said two days earlier from the

19   previous date, not two days --

10:55 20           THE COURT:  I can't understand what you're saying.

21           MR. FRANK:  Is he testifying, or is the witness

22   testifying?

23           MR. FERNICH:  Are you testifying?

24           THE COURT:  All right, start again.

25           THE WITNESS:  It is my understanding or it is my

1  recollection that the company, on the 22nd, announced that they

2  would be moving up their earnings to 10/24, and only gave the

3  market, therefore, between that announcement and that in fact

4  earnings release, only two days' time, which is a truncated

5  period of time between the announcement of the earnings date

6  and the actual earnings release.

7  Q.  And you see that after that announcement on the 22nd,

8  Tesla's stock moved up?

9  A.  Yes, correct.  After the announcement that they would go

10:56 10  ahead and release early, it moved up.

11  Q.  Right.  And then it went back down?

12  A.  Slightly.

13  Q.  Yes.  And then your client bought shares?

14       MR. NEMTSEV:  Object.

15       (Laughter.)

16       THE COURT:  Sustained as worded.

17       MR. FERNICH:  Oh, my God.

18       THE COURT:  Sustained as worded.  Ask it differently.

19  Q.  Then Mr. Klyushin bought shares?

10:56 20  A.  He bought there, but I think he bought in a lot of other

21  places too.

22  Q.  We're talking about this trade, Mr. Tawil.  Are you with

23  me?

24  A.  I am.

25  Q.  He bought on the 24th, not after the news announcement,

1    the preannounce on the 22nd, correct?

2    A.   I don't know if he didn't buy before the 22nd, but, yes.

3    Q.   Do you want to go back to 201B?

4    A.   Yeah.  Let's go through all the Tesla trades.

5    Q.   Right, let's go back to 201B.  You see that he bought 30

6    minutes after the download on the 24th?

7    A.   No, I don't want to see 201B.  I want to see all the Tesla

8    trades.

9    Q.   Well, you'll have your opportunity --

10:57 10        THE COURT:  Never mind.  We're not having this

11   discussion.  What's the next question?

12   Q.   He didn't buy after the announcement on the 22nd, correct?

13   A.   I don't recall.

14        MR. FRANK:  You can take this down, Ms. Lewis.

15        THE COURT:  How much longer do you have?

16        MR. FRANK:  I have a bit, your Honor, probably 10, 15

17   minutes.

18        THE COURT:  When you hit a good place to stop --

19        MR. FRANK:  We can stop right now.

10:57 20        THE COURT:  Okay.  Thank you.

21        (Jury excused.)

22   SIDEBAR CONFERENCE:

23        THE COURT:  So you have about 15 minutes?  Say quarter

24   of 12:00 you're done.  How much on redirect?

25        MR. NEMTSEV:  Ten minutes maybe.

```
 1              THE COURT:  And then you'd be ready to rest?

 2              MR. NEMTSEV:  Well, the only thing is, your Honor, we

 3     want potentially a paralegal to just read in some of

 4     conversations for the record.

 5              THE COURT:  Fine.  All right, so you'll read in some

 6     of the conversations.

 7              MR. FRANK:  He wants to read in from a document that's

 8     in evidence already, so I'm not sure --

 9              MR. FERNICH:  Just like you did with your witness.

10     MR. FRANK:  When we put it in.

11              MR. FERNICH:  And this is our case.

12              THE COURT:  They're allowed to do that.

13              So 20 minutes?

14              MR. NEMTSEV:  I don't think much longer than that, and

15     then --

16              THE COURT:  And then?

17              MR. NEMTSEV:  It's either Mr. Klyushin or not, and I'd

18     just ask to talk to him for maybe five minutes so he can make

19     an intelligent decision.

20              THE COURT:  Well, what I'd like you to do is do that

21     right now during the break, and then you can talk to him again

22     for a few minutes.

23              MR. NEMTSEV:  Just to confirm essentially.

24              THE COURT:  No, absolutely, absolutely.  And I think

25     by then we will have a charge, which does not include this
```

1    alternative venue theory.  I'm not there yet.  I haven't

2    even -- every time I tried to read the new memo, someone

3    objected, so I just gave up.

4         MR. FERNICH:  It's not that complicated.  It's not

5    like what we were doing yesterday.  It's much, much more

6    straightforward.

7         MR. FRANK:  We're likely to have something short as

8    well.

9         THE COURT:  Well, that may be, and I am simply saying,

11:00 10  what you got is what we discussed yesterday without this

11   alternative venue theory.  Okay, that's what you got.

12        And then the other thing you need to discuss with your

13   client is whether or not I allow him to reopen his case with

14   respect to that he was brought to Boston or whether or not that

15   will be done by stipulation.

16        MR. NEMTSEV:  And if the case is reopened, what would

17   the testimony be?

18        THE COURT:  "Where were you arrested?  Switzerland.

19   Where were you brought to?  Boston."

11:00 20       MR. KOSTO:  "Did you stop anywhere in between?"

21        THE COURT:  Oh, good.  All right, three questions.

22   I'll give you that.  I'll give you that.  So do you have the

23   stipulation written?

24        MR. KOSTO:  It wouldn't be Mr. Klyushin saying that.

25   It would be Agent Hitchcock.

           1            THE COURT:  Of course.  Do you have a stipulation
           2   written?
           3            MR. KOSTO:  We're happy to propose one over the break
           4   if --
           5            THE COURT:  Just you have to talk about it with your
           6   client, so do that over the break.
           7            MR. KOSTO:  Whichever they prefer.
           8            THE COURT:  And then I will send the jury home,
           9   assuming that that's somewhere around noon-ish, and I'm
11:01  10   assuming he decides not to testify when all is said and done,
          11   and then we'll do closings, et cetera.  But I'm hoping, if we
          12   finish around noon, that we will finish up the debate about
          13   venue.  And, also, I didn't like the way the instruction read
          14   on material nonpublic information because it was cobbled
          15   together from the omission piece of the instruction.  I've
          16   redone it, and it just didn't read right.  So I know that's not
          17   what's in the heart of everyone right now, but I just want to
          18   make sure at least what I've got is what you were intending and
          19   thinking about yesterday, okay?
11:02  20            MR. KOSTO:  Thank you, your Honor.
          21            THE COURT:  And I don't think anything else is of huge
          22   significance, except I did reject it.  But in rereading a lot
          23   of the venue cases, I think you have to talk about the
          24   essential conduct.  I think that comes from -- that was the
          25   defendant's request, and it's gleaned from Supreme Court case

              1    law, as well as every circuit discussing this issue, so I

              2    referenced it back in.  So, anyway, those are the two things I

              3    think you should look for, and then of course we'll talk about

              4    venue.  Okay?  Thank you.

              5             (End of sidebar conference.)

              6             (A recess was taken, 11:02 a.m.)

              7             THE CLERK:  All rise.

              8             (Court enters.)

              9             THE COURT:  Can I please have -- my law clerk

    11:39  10    delivered to you a red-lined version?  Do you both have it?

             11             MR. FRANK:  Yes.

             12             MR. NEMTSEV:  Yes.

             13             THE COURT:  Perfect.  And you should also have a

             14    verdict form.  So I don't expect you to read it now.  I know

             15    you're busy with other things.  What we'll do is we'll finish

             16    up the trial this morning, and then, ideally speaking, have the

             17    remainder of the charge conference this morning just so you can

             18    go back and practice your closings in front of the mirror.

             19             But I do need to understand the story about whether

    11:40  20    there will be a stipulation or reopening.

             21             MR. NEMTSEV:  We'll stipulate.

             22             THE COURT:  Have you handed him the stipulation?

             23             MR. KOSTO:  We drafted one, and I think Mr. Nemtsev is

             24    holding it in his hand.

             25             THE COURT:  Is that acceptable?

1          MR. NEMTSEV:  If you want, you can put the date of

2     when he arrived.

3          MR. KOSTO:  Sure.

4          MR. FRANK:  All right.  We'll submit it to the Court.

5     Actually, if we're closing right now, then we don't have time

6     to revise it.

7          MR. KOSTO:  I don't think we're closing.  Oh, if

8     they're resting.  Mr. Nemtsev asked that we add the date that

9     he arrived here to the stipulation.  We can have that done

11:41 10   right now.

11          THE COURT:  You can handwrite it in.  After this

12     trial, I think I'm going to use paper forever.

13          MR. NEMTSEV:  You what?

14          THE COURT:  I think I should only use paper forever.

15          MR. NEMTSEV:  When the systems work, they work really

16     well and I actually enjoy using them.

17          THE COURT:  I meant more broadly.

18          MR. NEMTSEV:  Yeah.  But when they don't, it's

19     impossible.

11:41 20        THE CLERK:  The government just filed that.  I just

21     handed back to the judge what you filed.

22          MR. FRANK:  Thank you.

23          THE COURT:  I should add, I've not had a chance to

24     read all the corrections.  My judicial assistant was doing it

25     while we were down here.  I think she captured everything we

 1  wanted.

 2          Okay.  What do you want to do with that?

 3          MR. KOSTO:  My handwriting is pretty bad.  I'll fix it

 4  on the computer and email it to Ms. Molloy.

 5          THE COURT:  Then what?  Are you going to introduce it

 6  and read it in front of the jury?  I want to understand it.

 7          MR. FRANK:  Yes, Your Honor, if Ms. Molloy would be so

 8  kind as to print it.

 9          THE CLERK:  I will as soon as I get it.

11:42 10         THE COURT:  And I deem the stipulation as part of the

11  government's case.  Let's just finish with this expert, and

12  let's call the jury in.  Thank you.

13          THE CLERK:  All rise for the jury.

14  (Jury enters.)

15          THE COURT:  You may be seated.

16          MR. FRANK:  May I proceed, Your Honor?

17          THE COURT:  Thank you.

18          We're going to keep going on the cross.

19          MR. FRANK:  Thank you, Your Honor.

11:43 20         Could we have, Ms. Lewis, Exhibit 350.

21  BY MR. FRANK:

22  Q.   Mr. Tawil, this is Exhibit 350.  Do you recall this

23  exhibit?

24  A.   I do.

25  Q.   Did you prepare this exhibit?

```
 1   A.   I did not.

 2   Q.   Who prepared it?

 3   A.   I don't know.

 4   Q.   Did you review it for accuracy?

 5   A.   I reviewed it for summary purposes.

 6   Q.   To ensure that it was accurate?

 7   A.   I did not cross-check it against any other documentation.

 8   Q.   Do you recall that you introduced this exhibit with

 9   Mr. Nemtsev moments ago?

11:44 10   A.   Mr. Nemtsev introduced this exhibit.  I did not prepare

11   this exhibit.

12   Q.   But you don't know who prepared it, and you don't know if

13   it's accurate?

14   A.   I don't know if Mr. Nemtsev or one of his colleagues

15   prepared it.  It was furnished to me by Mr. Nemtsev as a

16   summary of the trading in Tesla.

17   Q.   You asked to know whether there were trades in advance of

18   that October 24th earnings announcement.

19        Do you recall that?

11:45 20   A.   I do.

21   Q.   Do you see any other trades in October prior to October

22   24th?

23        MR. FRANK:  And, Ms. Lewis, perhaps you can make that

24   a little larger.

25   A.   There are trades on October 23rd and October 28th in the
```

```
 1  month of October.
 2  Q.   You see a trade there on October 23rd of 2018?
 3  A.   Oh, I'm sorry, of 2018.  Apologies.  Yes, correct, October
 4  24th, 2018.
 5  Q.   Just the trade on October 24th, 2018?
 6  A.   Yes.
 7  Q.   Correct?
 8  A.   Yes.
 9  Q.   That's the trade that we looked at earlier, correct?
10  A.   Correct.
11  Q.   So there was no trade after Tesla moved up the date of its
12  earnings announcement, correct?
13  A.   Correct.
14  Q.   And there was no trade after any statement by Elon Musk,
15  correct?
16       MR. NEMTSEV:  Objection, Your Honor, asked and
17  answered.
18       THE COURT:  Overruled.
19  A.   Correct.
20  Q.   It was just the trade on October 24th after the download
21  from the DFIN system, correct?
22       MR. NEMTSEV:  Objection, Your Honor.
23       THE COURT:  Overruled.
24  A.   There's one trade on October 24th.
25  Q.   And that was the one we looked at after the download,
```

1    correct?

2    A.    Correct.

3    Q.    Now, did you compare this to any underlying brokerage

4    records for accuracy?

5    A.    I did not.

6    Q.    I'd like to direct your attention to January 29th of 2020.

7          MR. FRANK:  And, Ms. Lewis, could you expand all of

8    the January 29th trades.

9    Q.    Do you see the trading on January 29th, 2020?

11:46 10    A.    I do.

11    Q.    Do you see any trades in the BCSKV288 account reflected in

12    this chart?

13    A.    I do not.

14    Q.    Are you aware that Mr. Klyushin bought 10,500 shares of

15    Tesla on January 29th, 2020, in the BCSKV288 account?

16    A.    I'm not aware.

17    Q.    Are you aware that those purchases were before Tesla's

18    earnings announcement?

19    A.    I'm not aware.

11:47 20    Q.    Are you aware that Mr. Sladkov bought Tesla's shares that

21    same day?

22          MR. NEMTSEV:  Objection.

23          THE COURT:  Overruled.

24    A.    I am not aware.

25          MR. FRANK:  Could we look at Exhibit 255, please, in

1    evidence.  Could we go to page 6.  Could we go to -- is this

2    page 6?  Could we go to the next page.

3            Just a moment, Mr. Tawil.

4    Q.   Do you see the trade in Tesla?

5            MR. FRANK:  Ms. Lewis, could you blow that up, with

6    the part at the top as well, please.

7    Q.   Do you see the trade in Tesla on January 29th, 2020, right

8    there?

9    A.   I see the data.

11:48 10   Q.   Well, you don't dispute that this is accurate, do you?

11           MR. NEMTSEV:  Objection.  He doesn't know anything

12   about it.

13           THE COURT:  Do you know one way or another?

14           THE WITNESS:  I don't.

15   Q.   I'll represent to you that this document is in evidence.

16           MR. NEMTSEV:  Objection.

17           THE COURT:  Overruled.

18   Q.   Do you see that Mr. Klyushin, according to this chart,

19   traded on January 29th, 2020, in Tesla?

11:49 20   A.   That's what --

21           MR. NEMTSEV:  Objection, Your Honor.

22   Q.   Do you see it, sir?

23   A.   I see the data on the page.

24   Q.   So is the answer "yes"?

25           MR. NEMTSEV:  Objection, Your Honor.

```
 1            THE COURT:  What are you asking him?  That's what the
 2    document says.  So what's the next question?
 3    Q.   And do you see that Mr. Sladkov and Mr. Irzak also traded
 4    in shares of Tesla on that same day?
 5            MR. NEMTSEV:  Objection.
 6            THE COURT:  Overruled.  You know, not every question.
 7    He's just reading the document.
 8            MR. NEMTSEV:  I know.
 9    A.   But I can't answer as to the evidence of whether there was
10    a trade.
11    Q.   I'm asking you what you see, Mr. Tawil.
12            THE COURT:  You don't have to verify the information.
13    What are you seeing on the chart?
14            THE WITNESS:  I see that it says that Klyushin was
15    long.  Sladkov, Irzak were long.
16    Q.   Rumiantcev was also long, correct?
17    A.   That's what it says.
18    Q.   Borodaev was also long, correct?
19    A.   That is what it says, correct.
20    Q.   Uryadov was also long, correct?
21    A.   That's what it states.
22    Q.   And M-13 was also long, correct?
23    A.   Correct.
24    Q.   And you don't know whether this chart is accurate because
25    you didn't review it, correct?
```

A.   Correct.

Q.   But you also don't know whether Exhibit 350 is accurate because you didn't check that either, did you, sir?

        MR. NEMTSEV:  Objection.

        THE COURT:  Overruled.

A.   I did not look at the underlying trade documentation confirmations.

Q.   Have you ever reviewed the underlying trade documents in this case, Mr. Tawil, before coming to court?

A.   No, I did not.

        MR. FRANK:  Could we have Exhibits 281 and 282, the BCS trading records, and I'd offer them.

        **(Exhibits Nos. 281-282 received into evidence.)**

Q.   Do you see that this is a BCS statement for Vladislav Klyushin for the month of January 2020?

A.   I do.

        MR. FRANK:  Could we go to the tab marked "Securities."  Could you go to the left, please.

Q.   Do you see that there are ten and a half thousand shares of Tesla in the account in the month of January?

A.   That is what it indicates.

        MR. FRANK:  Could we look at 282, please.  Could we look at --

Q.   Do you see that there's trading in the KV288 account reflected here in Column E?

```
 1    A.   Yes.

 2    Q.   Do you see that there's purchasing of securities reflected

 3    in Column F?

 4    A.   Yes.

 5    Q.   Do you see that the trade date is January 29, 2020, in

 6    Column H?

 7    A.   That is what it says.

 8    Q.   Do you see that the security is Tesla in Column G?

 9    A.   I do.

11:52 10   Q.   Do you see there's a whole bunch of purchases?

11    A.   Yes.

12    Q.   And if you look down Column H, the trade date, if we

13    proceed down, do you see there are purchases all the way

14    through January 29th, and then the following day there are

15    sales of Tesla?

16         Do you see that?

17    A.   Yes.

18    Q.   And we can agree, sir, that these are not reflected in

19    Exhibit 350?

11:52 20        THE COURT:  What's 350?

21             MR. NEMTSEV:  Objection, asked and answered.

22             THE COURT:  What's 350?

23             MR. FRANK:  The exhibit the defense put in.

24             Could we call up Exhibit 350, Ms. Lewis.

25             THE COURT:  I -- is this the chalk?
```

1          MR. FRANK:  No, this is in evidence.

2     Q.   You see those aren't reflected there, correct, Mr. Tawil?

3     A.   It doesn't seem to be so.

4     Q.   Would you agree with me that this chart is inaccurate?

5          MR. FERNICH:  Objection.  It's been asked and answered

6     about seven times that he didn't check the chart for accuracy.

7          MR. FRANK:  I'm asking a different question.

8          THE COURT:  Now that you've seen all of this, do you

9     have an opinion as to whether it's accurate?

11:53 10        THE WITNESS:  The previous exhibit showed numerous

11    transactions of small lots, hundred shares or so.  I don't know

12    if this is a representation of aggregation of that.

13    Q.   Well, do you see the account numbers on the left, sir?

14    A.   I do, sir.

15    Q.   Do you see KV288?

16    A.   I do not.

17    Q.   Would you agree that the trading in KV288 is not reflected

18    in Exhibit 350?

19         MR. NEMTSEV:  Objection, asked and answered.

11:53 20        THE COURT:  No.  Do you need more time to look at the

21    two charts?

22         THE WITNESS:  I do not.  It doesn't say KV288 here,

23    but I don't --

24    Q.   The chart --

25    A.   I'm sorry?

1             THE COURT:  Let him finish the answer.

2             MR. FRANK:  Yes, Your Honor.

3    A.   It doesn't say KV288 here, but I don't know if these

4    numbers are indicative of maybe the same account or a different

5    account.

6    Q.   Would you agree that the account naming convention is

7    totally different for the accounts that are named?

8    A.   Correct.

9    Q.   Would you agree that this chart, 350, is inaccurate?

11:54 10   A.   Under the assumption that K- --

11   Q.   Yes or no, Mr. Tawil, is it inaccurate?

12             MR. FERNICH:  Objection, Your Honor.

13             THE COURT:  No.  Let him answer it.

14   A.   I did not prepare these exhibits.  I do not -- these

15   accounts are not under my dominion.  I don't know the

16   underlying ownership of these accounts.  I don't know if these

17   accounts go by multiple names.  So I can't opine.

18             THE COURT:  He has no opinion.  What's the next one?

19             MR. FRANK:  Could we go to the bottom of this exhibit.

11:55 20   Q.   You had no problem on direct examination --

21             MR. FERNICH:  Objection, argumentative.

22             THE COURT:  Sustained.

23   Q.   You testified on direct examination that this chart

24   reflected Mr. Klyushin's trading and his loss of 3.6 million

25   dollars in trading Tesla; isn't that true?

A.   That is correct.  That is what this chart reflects.

Q.   But you didn't bother checking whether it was accurate

before --

          MR. FERNICH:  Objection.  Time number 7.

          THE COURT:  Excuse me.  Let him finish the question.

A.   It is quite accurate as to the summary of this log.

Q.   But if there was anything not on the log, it's not

reflected here, correct, in your numbers?

A.   I will say it again.  The point that I made regarding the

11:55 total loss was the sum total of this log of trades.

          THE COURT:  All you did was add them up.

          THE WITNESS:  That's correct.

          THE COURT:  Like, with an adding machine or whatever

you use now.

          THE WITNESS:  I did not add it.  I trusted that the

Excel was accurate.

          THE COURT:  All right.  So you didn't personally

compile all the trades?

          THE WITNESS:  That is correct.

11:56 THE COURT:  Next question.

Q.   If I understand you correctly, sir, you didn't even check

the addition.  You just trust that it was accurate?

A.   That is correct, yes.

Q.   And if Mr. Klyushin made $620,000 overnight on January

29th, 2020, that's not in that minus 3.6-million-dollar number?

1          MR. NEMTSEV:  Objection.  Asked and answered.

2          THE COURT:  Overruled.

3     A.   Assuming those trades are not reflected here, I guess the

4     answer is yes, you're correct.

5     Q.   Did you study which of these trades were earnings trades

6     and which of these trades were non-earnings trades?

7     A.   I did not.

8     Q.   So you don't know that of this amount, 3.6 -- on this

9     chart -- 3.6 million dollars of profit comes from earnings

11:57 10    trades?

11          MR. NEMTSEV:  Objection.  He testified he doesn't

12    know.

13          THE COURT:  Overruled.

14    A.   Could you restate the question?

15    Q.   The total on this chart is a loss of 3.6 million dollars.

16    Do you see that?

17    A.   I do.

18    Q.   You don't know whether there was a profit on the trades

19    reflected in this chart, a profit of 3.6 million dollars on

11:57 20    earnings trades?

21    A.   I do not.

22    Q.   And you don't know if there was a loss on the trades

23    reflected in this chart of 7.3 million dollars on non-earnings

24    trades?

25    A.   I do not.

```
 1    Q.   Because this chart just lumps everything together,
 2    correct?
 3    A.   This chart has many trades.  Some of them must be not on
 4    earnings announcements, because there are trades, seemingly,
 5    almost every month, and earnings are quarterly.
 6    Q.   So if the defendant was trading on material non-public
 7    information about earnings, this chart would not be
 8    particularly helpful in distinguishing his results on that
 9    trading from his non-earnings trading; isn't that true?
11:58 10          MR. NEMTSEV:  Objection, Your Honor.
11                THE COURT:  Overruled.
12    A.   This chart would be incredibly helpful to prove --
13    Q.   Can you answer my question?
14    A.   I'm going to answer my question.
15                THE COURT:  No.
16                MR. FRANK:  No, sir.  That's not how it works.
17                THE COURT:  That would be a very different kind of
18    trial.  Please listen to his question again.
19    A.   So if we were looking to isolate only earnings trades,
11:59 20    which this chart does not, and which, seemingly, the trader in
21    this did not isolate their trading to just earnings
22    information, this log does not summarize only earnings-related
23    trading -- or earnings-timeline-related information -- or --
24    excuse me.  Let me restate that.
25          This chart does not only reflect trades around earnings
```

1   releases.

2   Q.   Well, you're aware that Mr. Klyushin is charged with

3   trading improperly around earnings releases?

4   A.   Yes, I understand that's the charge.

5   Q.   Not around other forms of trades?

6        MR. FERNICH:  Objection.  Objection.

7        THE COURT:  Overruled.

8   Q.   Are you aware of that?

9   A.   I am.

12:00  10        MR. FRANK:  You can take that down, Ms. Lewis.  Thank

11   you.

12   Q.   You testified --

13        THE COURT:  How much more time do you have?

14        MR. FRANK:  Ten more minutes, Judge.  I'm trying to

15   move it along.

16   Q.   You testified that there were many stocks downloaded over

17   the 104 IP addresses that Mr. Klyushin did not trade?

18   A.   Correct.

19   Q.   Can we agree that he did trade numerous stocks that were

12:00  20   reflected on that download chart?

21   A.   Roughly -- yeah, during a certain period of time --

22   Q.   Is the answer "yes"?

23   A.   -- 20.

24   Q.   He did?

25   A.   Roughly 20 during the period of time we analyzed.

1   Q.   Have you done an analysis of all of the earnings

2   announcements around which he did not trade that were reflected

3   on that chart?

4   A.   No.

5   Q.   Do you know how many of the ones he did not trade simply

6   met expectations?

7   A.   I do not.

8   Q.   Do you know how many of the ones he did not trade reported

9   mixed results like an earnings loss but better-than-expected

12:01 10   guidance or an earnings beat and worse-than-expected guidance?

11   A.   I did not perform that analysis.

12   Q.   Would you agree that it's harder to predict how a stock

13   will move if it just meets expectations or if the results are

14   mixed?

15   A.   I would.

16          MR. FRANK:  Could we have the chalk -- is it 451?

17          Mr. Nemtsev, I might need -- oh, actually, do we have

18   a copy?

19          Ms. Molloy, could I have the --

12:02 20          THE CLERK:  Doc camera?

21          MR. FRANK:  -- ELMO?  Thank you.

22          THE CLERK:  Yeah, hold on.

23          MR. FRANK:  I'm not referring to a stuffed animal.

24   It's actually called an ELMO.

25          THE CLERK:  Is it up?

```
         1              MR. FRANK:  I think it is, yes.

         2              MR. KOSTO:  Yes.

         3    Q.   Did you prepare this chalk, sir?

         4    A.   I did not.

         5    Q.   Did you check it for accuracy?

         6    A.   I did not.

         7    Q.   Do you know what records were used in preparing it?

         8    A.   I trust that the trading records --

         9              THE COURT:  Well --

12:02   10              THE WITNESS:  I'm sorry?

        11    Q.   Do you know?

        12    A.   It says at the top what it is reflective of.

        13    Q.   Do you know if it's accurate?

        14    A.   I did not check the accuracy.

        15    Q.   Do you know what records it's based on?

        16    A.   Again, other than what's written at the top and what's

        17    been represented to me by the attorneys --

        18    Q.   So you just sat there and testified about this chart on

        19    direct examination, and you have no idea if the numbers here

12:02   20    are correct or not; is that correct?

        21    A.   I have not done the calculations myself.

        22    Q.   You don't know whether the chart reflects trades that were

        23    opened before August 21st and closed afterwards, do you?

        24    A.   Opened before, closed afterwards.  Assuming that most of

        25    the trades --
```

```
 1  Q.   I'm not asking you to assume anything.  I'm asking you
 2  about the chalk that you testified about.  Do you know?
 3            MR. FERNICH:  He's badgering the witness.
 4            THE COURT:  No.  This is fair cross-examination.
 5            Do you personally know whether this chalk is accurate
 6  or not?
 7            MR. FERNICH:  That's asked and answered.
 8  A.   I trust that it was done -- it was prepared properly.
 9  Q.   The answer is you don't know, correct?
12:03 10  A.   I know in the sense --
11  Q.   Do you know whether it is accurate, sir?
12  A.   I did not prepare the summary.
13  Q.   Can you answer --
14            THE COURT:  Enough.  We've gone through it.  Move on.
15  Q.   Now, there was another chalk, an exhibit, that you were
16  prepared to testify about today; isn't that true?
17            MR. NEMTSEV:  I object.
18  A.   Another --
19  Q.   There was another exhibit of post-September 2020 trading
12:04 20  that you were prepared to testify about today?
21            MR. NEMTSEV:  I object, Your Honor.  In his
22  preparation to testify?
23            MR. FRANK:  No, it was an exhibit that was marked by
24  the defense --
25            THE COURT:  Excuse me.  Sustained.
```

        1   Q.   Are you aware that the defense marked as an exhibit and

        2   disclosed --

        3           MR. NEMTSEV:  Objection.

        4           MR. FERNICH:  It's the same question.

        5           THE COURT:  Sustained.  Sustained.  Move on.

        6           MR. FRANK:  Could we call up Exhibit 309, and I'd

        7   offer it.

        8           MR. NEMTSEV:  Then I object.

        9           MR. FRANK:  It's a defense exhibit that was disclosed

12:04 10   to us as one they were going to put in today.

       11           MR. NEMTSEV:  No, it's that he disputed.

       12           THE COURT:  Sustained.

       13           MR. FERNICH:  Ask a question.

       14           THE COURT:  Sustained.  What's the next question?

       15   Q.   You have no idea whether Mr. Klyushin made money or lost

       16   money on earnings trades after the charged conspiracy period;

       17   isn't that true?

       18   A.   I know it --

       19           MR. NEMTSEV:  Object.

12:05 20   Q.   Can you answer my question, sir?

       21           THE COURT:  Overruled.  Do you know -- give him the

       22   date.  9/30, right?

       23   Q.   After 9/30, do you know whether Mr. Klyushin made money or

       24   lost money on earnings trades?

       25   A.   I know it to the extent of the information that was

 1    provided to me and that I reviewed.

 2    Q.   Do you know --

 3         THE COURT:  Right.  So the answer is "yes"?  We need

 4    to finish this.  So you say you do know after 9 --

 5         THE WITNESS:  I'm sorry, Judge, excuse me.  With due

 6    respect, I don't know what the word "know" means, k-n-o-w.  I

 7    know to the extent that the data was provided to me.  I'm not

 8    Mr. Klyushin, so I certainly don't know his trading records.

 9    As I've said --

12:05 10        THE COURT:  All right.  He doesn't know his trading

11    records.  What's the next question?

12    Q.   You don't know what the word "know" means?

13    A.   We're playing a semantic game.

14    Q.   What does the word "know" mean, sir?

15         MR. FERNICH:  Objection.  Come on.

16         THE COURT:  Sustained.  What's the next question?

17    A.   Do I know it to be unavoidable truth from God?

18         MR. NEMTSEV:  Object, Your Honor.

19    Q.   Are you aware that after September 30th of 2020,

12:06 20    Mr. Klyushin lost $441,000 on earnings trades?

21         MR. NEMTSEV:  I object.  He said he didn't know.

22         THE COURT:  Overruled.

23    A.   If you're saying so, that is what I now know.

24    Q.   Are you aware that after September 2020, Mr. Klyushin's

25    win rate on earnings trades dropped to approximately 41

1    percent?

2    A.    I do not know that.

3    Q.    You testified that DFIN and Toppan Merrill represent about

4    75 percent of the companies in the S&P 500.

5          Was that your testimony?

6    A.    That is correct.

7    Q.    Do you know which of the earnings releases filed between

8    January 1, 2018, and September 30, 2020, were actually handled

9    by DFIN or Toppan Merrill?

12:07 10    A.    Except for what I've read in the pleadings, I do not know.

11    Q.    And you're aware that the S&P 500 represents 500 companies

12    with large market capitalizations, right?

13    A.    I am aware of that.

14    Q.    You're aware that Mr. Klyushin traded companies of all

15    different sizes, correct?

16    A.    He traded many large-cap companies, and yes, he did trade

17    some other companies.

18    Q.    Small companies as well, correct?

19    A.    I don't know what the definition of small is.

12:07 20    Q.    Not S&P 500.

21    A.    No, not in the S&P 500 doesn't necessarily mean that it's

22    not large.

23    Q.    Did he trade companies that were not in the S&P 500?

24    A.    He did.

25    Q.    Did he trade companies across sectors?

1    A.    He did.

2    Q.    You testified that earnings information could be useful if

3    you had it ahead of time, correct?

4    A.    Correct.

5    Q.    You testified that if you had it, you'd be right 90 to 95

6    percent of the time, correct?

7              MR. FERNICH:  That was stricken.

8              THE COURT:  Yes, I think I did.  Sustained.

9    Q.    Are you aware that a paper published by Professor William

12:08 10   Kinney at the University of Texas at Austin found that if a

11   trader had advance knowledge of the earnings of an individual

12   stock --

13             MR. NEMTSEV:  I object, Your Honor.

14             THE COURT:  Sustained.

15             MR. FRANK:  He's an expert, Your Honor.

16             THE COURT:  Sustained.

17             MR. NEMTSEV:  Give him the paper.

18             MR. FRANK:  I'm happy to.

19             MR. NEMTSEV:  We'll be here all day.

12:08 20        MR. FRANK:  May I approach?

21   Q.    Are you familiar with this paper, sir?

22             THE COURT:  No, don't put it up there, if you're using

23   a learned treatise.  Show it to him and see if he agrees with

24   the statement.  Show him a statement and ask him if he agrees

25   with it.

```
 1   Q.   Do you see that?
 2   A.   Yes.  Could I hold on to this for a second?
 3   Q.   Are you familiar with this paper, sir?
 4   A.   I know of it.
 5   Q.   Thank you.
 6        Are you aware that Professor Kinney found that for an
 7   individual firm, the maximum probability of a gain from trading
 8   on prior knowledge of any surprise is 62 percent?
 9   A.   That is what it says in the paper.
12:10 10  Q.   And you testified that Mr. Klyushin had it right about 63
11   percent of the time during the charged conspiracy period,
12   correct?
13   A.   That is correct.
14   Q.   That's about right on target with what the academic
15   research would suggest --
16             MR. FERNICH:  Objection.
17             THE COURT:  No.  Do you agree with his statement?  Do
18   you agree with Professor Kinney's statement?
19             THE WITNESS:  Professor Kinney's statement is being
12:10 20  presented in a very limited manner.
21             My statement was --
22             THE COURT:  All right.  So -- no.  You know, you're
23   not allowed to do your thing.
24             THE WITNESS:  No, no, no, I'm sorry.  Judge, in other
25   words, he asked me what did I say prior --
```

```
 1              THE COURT:  Excuse me.  I'm the judge.

 2              THE WITNESS:  Sorry.

 3              THE COURT:  Do you agree with Professor Kinney, yes or

 4    no?

 5              THE WITNESS:  I agree with the data.

 6              THE COURT:  Okay.  So now what's the question?

 7    Q.   You testified that your client's results --

 8              MR. FERNICH:  Objection.

 9              MR. NEMTSEV:  Objection.

12:11 10         MR. FRANK:  I'm sorry.  Withdrawn.

11    Q.   You testified that Mr. Klyushin's results of a win rate of

12    approximately 63 percent was okay, but not great.

13    A.   Correct.

14    Q.   Do you recall that?

15    A.   Yes, I do.

16    Q.   Had you reviewed the Threema chats when you made that

17    statement?

18              MR. FERNICH:  Objection, foundation.

19              MR. NEMTSEV:  Objection.

12:11 20         THE COURT:  Overruled.

21    Q.   Well, did you testify on direct --

22              THE COURT:  Did you see those Threema chats?

23              THE WITNESS:  Yeah, I saw some chats.

24    Q.   Had you reviewed them when you made the statement that his

25    results were okay, but not great?
```

```
 1   A.   Yes.
 2            MR. FRANK:  Ms. Lewis, could we have Exhibit 46 in
 3   evidence, please.
 4            MR. NEMTSEV:  I object, Your Honor.  He didn't
 5   review -- that's 4,000 chats.
 6            MR. FRANK:  He testified that he reviewed them, Your
 7   Honor.
 8            THE COURT:  No.  Excuse me.  It was like -- show it to
 9   him first, ask him if he's reviewed it.
10            MR. FRANK:  Okay.  I will do that.
11            Ms. Lewis, could we have 46 in evidence at line 456.
12            I think we're still on the document camera, Ms.
13   Molloy.  Sorry.
14            THE CLERK:  Hold on, I can switch it.  Just give me
15   one second.
16            Okay.  It should be okay.
17   Q.   Were you aware of this statement in the chat at line 456,
18   "We implement poor trading ideas due to low-level competencies
19   as traders.  Do not know some tricks, do not know how to use
20   bots, we suck in placing stops and take profits," and then the
21   next -- at Section 3, "We analyze poorly the data we have.  We
22   generate poor trading ideas because of that."
23            Were you aware of that statement?
24   A.   I was not.
25            MR. FRANK:  Could we look at line 1407, please.
```

```
     1    Q.    Were you aware of this statement at line 1472, "This was

     2    an erroneous trade"?  Were you aware of that?

     3    A.    No.

     4    Q.    Were you aware that they complained about making erroneous

     5    trades?

     6    A.    No.

     7    Q.    Were you aware --

     8            THE COURT:  Is this leading up to a question?

     9            MR. FRANK:  Yes.

12:13 10   Q.    Were you aware that they discussed whether the brokerage

    11    firms they used cooperated with the SEC?

    12            MR. NEMTSEV:  Objection.

    13            THE COURT:  Sustained.  Lead up to something.

    14            MR. FRANK:  Could we look at 3584, please.

    15    Q.    Were you aware, when you opined that 63 percent was not

    16    great, that Mr. Ermakov wrote at line 3587, "I already told

    17    Vlad need to think about reducing accounts, such a number of

    18    accounts with the same securities with the same broker is a bad

    19    idea."  And at line 35 --

12:14 20           MR. NEMTSEV:  Objection.

    21            MR. FERNICH:  Objection.

    22            THE COURT:  Sustained as to all of this at this point.

    23    Ask him a question.

    24    Q.    Were you aware of this?

    25            MR. FERNICH:  Objection.  It's a complete non
```

1    sequitur.

2              THE COURT:  Sustained.  Sustained.

3    Q.   Were you aware that they wanted to diversify brokerage

4    accounts to avoid arising suspicion?

5              MR. FERNICH:  Objection.  It has nothing to do with

6    the win rate, nothing.

7              THE COURT:  Sustained.

8    Q.   Were you aware that Mr. Klyushin --

9              MR. FERNICH:  Objection.

12:14 10         MR. FRANK:  I haven't even asked a question.

11              THE COURT:  Sustained as to this line of questioning,

12   so --

13              MR. FERNICH:  It's more of the same.

14              MR. FRANK:  I'm moving on.

15              THE COURT:  Thank you.

16              MR. FRANK:  You can take that down, Ms. Lewis.

17              THE COURT:  Thank you.

18   Q.   Were you aware that Mr. Klyushin did not even open a

19   brokerage account before July of 2018?

12:14 20  A.   No.

21   Q.   Were you aware that none of the traders, other than

22   Mr. Sladkov, ever had a brokerage account before 2018?

23   A.   No.

24   Q.   Were you aware that Mr. Klyushin made 21 million dollars

25   in the two years after July of 2018 --

```
 1            MR. FERNICH:  Objection.  Is he giving a mini
 2   summation now?
 3            THE COURT:  Is that an objection?
 4            MR. FERNICH:  Yes.
 5            THE COURT:  Overruled.
 6   Q.   Were you aware that Mr. Klyushin made over 21 million
 7   dollars after opening his first brokerage account in July of
 8   2018 on an investment of about 2.1 million dollars?
 9            MR. FERNICH:  Objection, form.
10            THE COURT:  Overruled.
11   A.   I was aware.
12   Q.   You were?
13   A.   I was told that he started with a small amount of money
14   and made a considerable amount of money.
15   Q.   Were you aware that he also turned 4.2 million dollars
16   into about 23 million dollars for his investors over an even
17   shorter period of time?
18   A.   I don't know the exact numbers, but, again, it was my
19   understanding that he started with a small amount of money and
20   made a considerable amount of money.
21   Q.   Were you aware that he all but stopped trading on earnings
22   after September of 2020?
23   A.   No.
24   Q.   You're being paid $750 an hour for your testimony today,
25   sir?
```

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | How much have you billed so far? |
| 3 | A. | $12,000. |
| 4 | Q. | That was as of December, correct? |
| 5 | A. | Correct. |
| 6 | Q. | You haven't billed since December? |
| 7 | A. | Correct. |
| 8 | Q. | You've done work since December? |
| 9 | A. | That is correct. |

12:16 10   Q.   How much work have you done -- how many hours have you

11   spent on this case since December?

12   A.   Roughly 20.

13   Q.   Roughly 20.

14        So that's another $15,000?

15   A.   That's correct.

16   Q.   Does that include your travel yesterday?

17   A.   Yes.

18   Q.   Does that include your time today?

19   A.   Yes.

12:16 20   Q.   So all told, you stand to make close to $30,000 for your

21   testimony today, correct?

22             MR. FRANK:  No further questions.

23             MR. NEMTSEV:  Nothing further from the defense.

24             THE COURT:  Thank you.

25             Should we --

```
 1              MR. NEMTSEV:  Take the --
 2              THE COURT:  -- take, like, a three-minute break or
 3     something?  Five-minute break?
 4              MR. NEMTSEV:  Yes.
 5              THE COURT:  Okay.  We'll take a five-minute break.
 6              THE CLERK:  All rise.
 7     (Jury exits.)
 8              THE COURT:  Do you need a few minutes?
 9              MR. NEMTSEV:  Yes, if I can.
12:18 10         THE COURT:  Five minutes, maybe?
11              MR. NEMTSEV:  That's fine.  Five minutes is good, Your
12     Honor.
13              THE COURT:  Okay.  And then if you and your client
14     agree, at that point, you'll decide whether to rest in front of
15     the jury, and I then will let the government read the
16     stipulation, and then I'd send them home.
17              MR. NEMTSEV:  Okay.  Can we just double-check the
18     exhibits before we rest?
19              THE COURT:  Well, no, because I'm not going to have
12:18 20   them sit there.
21              MR. NEMTSEV:  Okay.  Fine.
22              MR. FRANK:  Your Honor, in light of this testimony,
23     we'd move to strike any reference to Exhibit 451 in closing,
24     the chalk that was marked for identification, that this witness
25     did not know whether it was accurate or not.
```

```
 1                THE COURT:  It was just a chalk, right?

 2                MR. FRANK:  Right, but I'm concerned about testimony

 3       about it.

 4                THE COURT:  I think it was an effective cross.  No.

 5                MR. FRANK:  I appreciate that.

 6                THE COURT:  Okay.  Five minutes.  And then my theory

 7       is, if things go as we sort of expected yesterday, you'll say

 8       what you need to say.  You will read the stipulation.  You may

 9       need to remove, do you know what I mean?

12:19 10                MR. FERNICH:  After they -- after we rest.  Yeah, I

11       know.

12                THE COURT:  Five minutes.

13                (A recess was taken.)

14                (Court entered.)

15                THE CLERK:  All rise.

16                MR. NEMTSEV:  He will not be testifying.

17                THE CLERK:  Hold on.  The door's open.  You can shut

18       the door.

19                THE COURT:  That's okay.

12:27 20                Have you had a chance to talk to him over the break?

21                MR. NEMTSEV:  Yes.

22                THE COURT:  All right.

23                Okay.  Bring them in.

24                THE CLERK:  All rise for the jury.

25       (Jury enters.)
```

         1              THE COURT:  Please be seated.

         2              MR. NEMTSEV:  Your Honor, the defense rests.

         3              THE COURT:  The defense rests?

         4              MR. NEMTSEV:  Yes.

         5              THE COURT:  All right.

         6              MR. KOSTO:  May I proceed, Your Honor?

         7              THE COURT:  Yes.

         8              MR. KOSTO:  I'd like to read a stipulation between the

         9    parties.  This is stipulation number 3.  "The parties hereby

12:28   10    stipulate and agree that Defendant Vladislav Klyushin,

        11    following his arrest in Seon, Switzerland on March 21, 2021,

        12    was flown directly on December 18th, 2021, from Zurich,

        13    Switzerland to Logan International Airport in Boston,

        14    Massachusetts," signed by both parties, and, Your Honor, I

        15    would offer it as Exhibit 283.  We'll make sure it gets a

        16    sticker.

        17              THE COURT:  Okay.  Thank you.

        18              All right.  The evidence is now closed.  Tomorrow we

        19    will hear closing arguments and the instructions of law.  I

12:28   20    have to confer with counsel about the instructions and the

        21    closing arguments.  But if we finish, we're going to stay until

        22    4:00.  So let's assume for a minute there's some extra time.

        23    You'd go back and deliberate, and then you'll come back on

        24    Monday and every day subsequent until you reach a verdict, and

        25    we'll be sitting from 9:00 until 4:00.  We will, I remind you,

         1    be providing lunch tomorrow.  I will also say that it's almost

         2    hard not to talk about this case with anyone or look at

         3    anything, but you can't, because it would ruin the whole case.

         4    So please refrain from talking about the case.  I guarantee

         5    you, you'll be talking about it all you want and then some when

         6    I send you back to deliberate.  So it's a little bit of an

         7    early day today.  We'll be working on the charge right now, and

         8    we'll see you tomorrow morning.  Thank you.

         9              THE CLERK:  All rise.

12:29   10    (Jury exits.)

        11              THE COURT:  I know that you've only briefly had the

        12    charge, but I've read --

        13              MR. FERNICH:  Judge, should I renew the motion?

        14              THE COURT:  Yes, please do.

        15              MR. FERNICH:  At the close of all evidence, I renew

        16    our motion for a judgment of acquittal on the same grounds that

        17    I argued earlier.

        18              THE COURT:  And can I also say that I view the

        19    stipulation as reopening the government's case.  So do you want

12:30   20    to renew that motion for directed verdict that you --

        21              MR. FERNICH:  Well, yeah, then also after the

        22    government's rebuttal case.

        23              THE COURT:  Yes.  Okay.  I just want to make sure

        24    everything's done, because I viewed the reading of the

        25    stipulation not as part of your case, but as part of their

1    case.

2         MR. FERNICH:  Fine.  Yes, doubly renewed.

3         THE COURT:  All right.  Have you -- I think we've --

4    Maya's done a great job here, and I think everything at this

5    point is redlined and lined so that we don't have some of the

6    problems finding the passages that we did before.  But I would

7    like to try and finish this before you -- and then you can just

8    leave.  Do you need a few minutes, or do you want to go through

9    them as we go through it?

12:31 10        MR. FRANK:  Is this with the exception of the venue

11   issue?

12        THE COURT:  Yes.  Yes.

13        MR. KOSTO:  Could we take two minutes and look at the

14   redline?

15        THE COURT:  Yeah.  I've just given it to you.  That's

16   fair enough.  Do you want to take a quick break now?

17        MR. FRANK:  Yes, Your Honor.

18        THE COURT:  So I'll come back in ten minutes.

19        MR. KOSTO:  Thank you.

12:31 20        THE COURT:  And ideally speaking, at that point,

21   you'll agree to what I did, but then we can talk about the

22   venue issue.

23        MR. FERNICH:  Thank you, Your Honor.

24        MR. FRANK:  Thank you, Your Honor.

25        THE CLERK:  All rise.

1               (A recess was taken.)

2               THE CLERK:  All rise.

3               (Court enters.)

4               THE COURT:  Let's start with the verdict form.  You

5      can be seated for this.  You've had a hard morning.

6               MR. KOSTO:  Thank you.

7               THE COURT:  The verdict form, is there a problem?  I

8      took out the a/k/a.  I think I added the disjunctive.  Anyone

9      see a problem with that?

12:50 10               MR. FRANK:  No.

11               MR. FERNICH:  No.

12               THE COURT:  Okay.  Along the easy lines, anyone see a

13      problem -- did you all -- and I know you're really, really

14      busy, but we do have to at this point do it -- make any edits

15      to the indictment?

16               MR. FERNICH:  Yeah, we just talked about it.  I think

17      we're just going to send back -- I think everybody's in

18      agreement that we're just going to send back Counts One through

19      Four, not the whole speaking part of it.

12:51 20               THE COURT:  The only issue I have with that is we have

21      to list the overt acts.

22               MR. FRANK:  I don't believe we have to prove any of

23      the specific overt acts that we've alleged.  We can prove any

24      overt act.

25               THE COURT:  I don't know that that's true.

1           MR. FERNICH:  I agree with him.

2           THE COURT:  What?

3           MR. FERNICH:  I agree with him.

4           MR. KOSTO:  He agrees with us, I think.

5           MR. FERNICH:  Yeah, I agree with the government.

6           MR. KOSTO:  A rare moment of agreement.

7           MR. FERNICH:  No, they don't have to prove any -- they

8      can prove any overt act, including one that's not listed in the

9      indictment.

12:51 10           MR. KOSTO:  Our preference would be all or none, but

11      not just the substantive counts.

12           THE COURT:  Okay.  I mean, I'm -- if you agree, I

13      agree, but I'm less -- I've never hit that issue.  Let me put

14      it that way.

15           MR. FERNICH:  I think I've just done what we call --

16      we used to call a true waiver.  So it's not going to come back

17      to bite me.

18           THE COURT:  I guess that's right.

19           All right.  Did you have a chance to look through

12:52 20      the --

21           MR. FERNICH:  I'm sorry?

22           THE COURT:  Before we get to the venue issue, have you

23      had a chance to look at the drop-and-add, the underlined

24      version of the jury instructions?

25           MR. FERNICH:  Yeah, it looked good to me.  I didn't

1    see anything wrong.

2          MR. FRANK:  With the exception of venue, we have no

3    issues.

4          THE COURT:  Same with you, Mr. Fernich?

5          MR. FERNICH:  Same thing.

6          THE COURT:  Oh, my gosh.

7          Okay.  Let's get to venue.  To recap, the question is

8    the government's requested jury instruction for an alternative

9    venue instruction 3238, which was raised for the first time

12:52 10    after the defense rested.

11          MR. KOSTO:  After the government rested, Your Honor.

12          THE COURT:  Excuse me.  After the government rested.

13    And there were no submitted jury instructions until last night

14    on them.  That said, I think we all did a flurry of research in

15    the area.  So I gave you a quick indication of what I was

16    thinking, but I didn't allow you all to argue, and you've now

17    submitted miscellaneous briefs on the subject.  So does the

18    government want to start?

19          MR. FRANK:  Well, Your Honor, we think the statute is

12:53 20    clear on its face and the case law that we've cited supports

21    the reading of the statute that there are two possibilities:

22    That the conduct began outside the United States, or that the

23    conduct was committed inside the United States -- outside the

24    United States.  And so whereas here, the government 's argument

25    is the conduct began outside the United States.  We think the

           1    inquiry begins and ends there.  We don't think that the
           2    essential element inquiry applies to that prong of the statute,
           3    and that's -- we've cited case law for that proposition.
           4           That only comes in where --
           5           THE COURT:  Excuse me.  What case are you referring
           6    to?  Because *Miller* doesn't say that.  *Miller* uses that, as
           7    does *Mallory*.  So I'm just trying to figure out what case says
           8    that -- if it was begun there, but it was trivial or
           9    insignificant, that you get to get the alternative theory.
12:54    10    *Miller*, which was an incredibly good opinion, very well
          11    researched and erudite --
          12           MR. KOSTO:  Did you notice it was --
          13           THE COURT:  I've seen the Fourth Circuit.  I've seen
          14    the Second Circuit.  I've seen *Mallory*.  The First Circuit
          15    case, as it turns out, is quite off the point.  It's -- but --
          16           MR. FERNICH:  Well, it may not be off point.  I mean,
          17    the First Circuit --
          18           THE COURT:  All right.  Fair enough.  But it's not
          19    what I view this case as, where there is substantial conduct
12:55    20    abroad and substantial conduct in the United States.
          21           MR. FRANK:  We believe *Miller* stands for the
          22    proposition that the use of the word "begun," in addition to
          23    the word "committed," suggests that the statute encompasses
          24    offenses begun outside the borders of the United States, but
          25    ending within our country's borders.  And that is clear on the

face of the statute, and we believe no further inquiry is
required.  That statement would have no meaning if we then had
to --

THE COURT:  Excuse me.  Did you read the question
presented by Judge Carney?  The question it was answering was,
on page 609 -- excuse me -- "In this appeal, we consider
whether venue for a criminal prosecution may lie pursuant to 18
U.S.C. 3238, the 'high seas' venue statute, when certain
essential offense conduct is committed outside of the
jurisdiction of the United States, but other offense conduct is
committed within."

In addition, the jury instruction that was affirmed
refers to something like that, essential conduct.  I would be
committing error if I simply said any trivial act beginning an
offense would trigger that alternative theory.  And I'm not
giving it.

So *Mallory* was very helpful.  Some judge in EDVA, I
think, was a helpful opinion.  But essentially -- even if I
disregard all of that, because to a person, the judges are
saying this is a difficult question.  Even if I were to -- I
have the constitutional background to the whole thing in
Article III.  So if the bulk of the crime or the essential part
of the crime was committed here in the United States, I'm not
sure that that statute, if I construed it otherwise, would
comply with the Constitution.

1        So I'm understanding that this is late arising, but

2   *Miller* is not as bare bones as you make it out to be.

3        MR. FRANK:  Our position, Judge, is that -- and I

4   don't have the decision right in front of me, but --

5        THE COURT:  Do you want it?

6        MR. FRANK:  Sure.

7        THE COURT:  I've underlined question, that's how I use

8   Q.

9        MR. FRANK:  Our position is that that's really talking

12:57 10   about preparatory acts as opposed to anything more than that.

11        THE COURT:  Do you want this case reversed on appeal?

12        MR. FRANK:  Well, I'd like to get there first, Judge.

13        THE COURT:  I understand that.  But I'm going to do,

14   given the short tether that you have given me, the best that I

15   can do on the law, on a subject that two circuits have already

16   said was extremely difficult.

17        MR. FRANK:  So --

18        MR. FERNICH:  I'm sorry.  Go ahead.

19        THE COURT:  Do you want to take a look at that too?

12:57 20        MR. FERNICH:  I remember having read it the first

21   time, and --

22        MR. FRANK:  Could I have --

23        MR. FERNICH:  -- when it came out, the slip opinion.

24   And then looking at it last night, my skin started to crawl

25   reading it last night.  So I remembered it, yeah.

1          MR. FRANK:  Okay.  May I have three minutes, Your

2     Honor?

3          THE COURT:  No, because we need to get out of here.

4          MR. FRANK:  I believe what this decision, in that

5     portion, is talking about is not the "begun" prong.  It's the

6     "committed" prong.

7          THE COURT:  All right.

8          MR. FRANK:  And that's why it says -- and in this

9     case -- in the case -- in this particular case, the case

12:58 10     involved a child being taken from the United States outside the

11     United States.

12          THE COURT:  That's why they said the essential offense

13     conduct was outside of the United States.

14          MR. FRANK:  But it's not a begun case, is my point,

15     Your Honor.  The conduct began inside the United States.

16          THE COURT:  I'm going to rule against you on that

17     legal theory under both the Constitution and the case law, but

18     I will -- but assuming that I need some essential offense

19     conduct, the issue that I'm having a problem with is that three

12:58 20     of the four counts, the essential offense conduct happened in

21     the United States of America.  We can debate which district

22     it's in, where was the server, where was the hack.  We can have

23     that debate.  But with securities fraud, computer fraud, and

24     wire fraud, it wasn't even, in my opinion, a close question

25     about where the essential offense conduct was, and that is the

1    analysis Judge Carney went through -- and I think it was a

2    unanimous opinion -- and so -- as well as the other circuits,

3    is where is the essential offense conduct, and that's what the

4    Supreme Court started talking about, albeit under the other

5    venue statute.

6         So that's where I want to understand it.  Let's assume

7    for a minute that I say only 3237 for the three underlying

8    ones --

9         MR. FERNICH:  Well, Judge, technically, there's a

12:59 10   separate venue statute for the stock fraud count.

11        THE COURT:  You know, I saw that.  I hadn't even

12   noticed that, and no one mentioned that to me.  No one

13   submitted a jury instruction on that.

14        MR. FERNICH:  Yeah.  I'm aware of that.

15        MR. FRANK:  It's a civil standard, Your Honor.  I

16   don't believe that applies here.

17        THE COURT:  Is that so?

18        MR. FRANK:  Yes, that is my belief.

19        THE COURT:  I haven't had a chance to even look at it.

01:00 20   MR. FRANK:  The 3237 supplies the definition --

21        THE COURT:  Would you just check it out with the --

22        MR. FRANK:  I believe I have, but I will do it again.

23        THE COURT:  I didn't -- I hadn't been aware of it or

24   alerted to that, so I didn't know.

25        MR. FRANK:  I checked it when I was submitting the

1    jury instructions, but we'll do it again.  We'll double-check.

2              THE COURT:  Thank you.

3              MR. FERNICH:  It comes up in *Royer*, a criminal case,

4    where they say that.

5              MR. FRANK:  But 3237 supplies the applicable

6    definition of essential element, and we believe that that

7    should be provided to the jury as well.  It says, "Any offense

8    involving the use of the mails, transportation in interstate or

9    foreign commerce, or the importation of" -- that section is not

01:00 10   applicable -- "may be inquired of and prosecuted in any

11   district from, through or into which such commerce, mail

12   matter, or imported object or person moves."

13             THE COURT:  So you would want that statutory language

14   added into the 3237 instruction?

15             MR. FRANK:  If Your Honor is going to use this

16   essential conduct language in the charge, we believe the jury

17   needs a definition of what that means.

18             MR. FERNICH:  No, that's not the definition of

19   essential conduct.  The cases are very clear that you have to

01:01 20   analyze it by the nature of the crime alleged and where the

21   essential --

22             MR. FRANK:  And that where --

23             MR. NEMTSEV:  Wait.

24             MR. FERNICH:  Wait, wait.

25             MR. FRANK:  -- through the use of the mail --

 1          THE COURT:  Let him finish his sentence.

 2          MR. FRANK:  He interrupted me constantly, Your Honor.

 3          THE COURT:  That may be true, but I'm trying to stop

 4    that.

 5          MR. FERNICH:  It comes from *Cabrales* and *Anderson* and

 6    *Rodriguez-Moreno*.  It's very clear.  Each crime committed has

 7    to be analyzed individually to ascertain the nature of the

 8    alleged offense and where the essential offense conduct

 9    particular to that offense occurred.

01:01 10          The continuing offense doctrine doesn't supply any

11    definition of what --

12          THE COURT:  I'll look at 3237, but since I received no

13    brief and no objections to the charge under 3237, at this point

14    I'm not going to change it.  I'm on 3238 right now, the

15    alternative theory.  And this is why I'm looking at you,

16    because, to some extent, this is late arising, and if I get

17    this alternative instruction wrong, you lose conspiracy,

18    because they will reverse it on appeal and it will be, most

19    likely, double jeopardy.

01:02 20          MR. KOSTO:  Your opinion, just reading from --

21          THE COURT:  No.  I'm --

22          MR. KOSTO:  I hear you.

23          THE COURT:  And --

24          MR. KOSTO:  Let me offer that both Judge Sorokin and

25    Judge Stearns have spoken to this question with respect to the

1    wire fraud statute.  And Judge Sorokin, as recently as last

2    year in the *Abbas* case, said, quote, "In a wire fraud case,

3    venue is established 'where the wire transmission at issue

4    originated, passed through or was received, or from which it

5    was orchestrated.'"  We're obviously in a pass-through

6    jurisdiction here in Massachusetts on the evidence in the case.

7    Judge Stearns -- that was the *Abbas* decision --

8         THE COURT:  I'm confused.  I thought you were

9    satisfied with the instructions except with respect to 3238.

01:03 10        MR. KOSTO:  We simply don't want the Court to define

11   essential conduct and then leave that to the jurors'

12   imagination, lest there be argument that the only place the

13   essential conduct --

14        THE COURT:  I'm sorry, I'm not an ATM machine.  I

15   can't make -- you haven't submitted an instruction on 3237,

16   other than what I've got.  And so I'm now focused on 3238.  And

17   so the question, really, is:  Do you -- is there any argument,

18   other than the use of the word "begun," very broadly, that

19   pulls those three into the -- that alternative theory?

01:04 20        MR. FRANK:  The law is clear that the essential

21   element of any statute that -- where the statute provides for

22   the use of the wires or the mails or a facility of interstate

23   commerce, is that.

24        THE COURT:  All right.  I overrule that.  I think that

25   that is inconsistent with the case law and the Constitution.

1    Because that would mean any trivial use of the wires abroad

2    into the United States would be enough to trigger that.

3              MR. FRANK:  If it's in furtherance of the scheme,

4    that's what --

5              THE COURT:  Of course, in furtherance of the scheme.

6    But I don't think that that's what the law is if the essential

7    conduct, i.e. the hacking, the actual hacking, happens either

8    on a server or on a company here.

9              So on conspiracy, which is sort of where I'm heading

01:04  10    to, the issue that I have is when I looked at the overt acts

11    alleged, the majority of them were in Russia, which supports

12    your theory.  The minority of them were in the United States,

13    and some scattered amount because you -- I don't know why you

14    did it this way, with sub a, sub b, sub c, sub d, have Denmark

15    in them.  So I think that supports your position that you could

16    say the essential conduct came out of Russia.

17              But then what's confusing me is the objects of the

18    conspiracy -- the securities fraud, the computer and the

19    wire -- are in the United States.  This is the closest case we

01:05  20    were able to find, in a conspiracy context, where it was so --

21    there was such strong connection to both locations, for one.

22    Such a meaningful connection to both locations.  That was not

23    the case in the Fourth Circuit case.  It was not the case in

24    the ED case, and Judge Carney felt that there wasn't -- that

25    the essential conduct was outside the U.S. in the child

1    kidnapping case.

2          So I'm just trying to figure out, and maybe it's just

3    for an appellate court to answer, do you compare the essential

4    conduct in both locations?  Do you say if the essential conduct

5    was mostly in Russia -- I'm trying to figure out how to word

6    it.  It can't just be any trivial conduct.  I think that's

7    unconstitutional.

8          MR. FRANK:  Well, the crime of conspiracy is the

9    agreement, Your Honor.  So we believe it should be the

01:06 10   formation of the agreement.

11          THE COURT:  That may be right.  I've been thinking

12    that way.

13          MR. FERNICH:  That's half the crime of conspiracy.

14    The other element is an overt act.

15          THE COURT:  Yes.

16          MR. FERNICH:  The overt act principally contemplated

17    by the agreement is the one that Your Honor charged under

18    *Dorozhko* and *Khalupsky*.  That's the gist of the whole case, is

19    that they were hacking into these servers and deceiving not the

01:07 20   market, but deceiving the holders of the confidential

21    information, the targets.

22          THE COURT:  This is what's been holding me up, trying

23    to think about it, is the --

24          MR. FERNICH:  Right.

25          THE COURT:  -- just sort of -- I think I took it down.

1   The overt acts are multiple and in subparts.  They go from

2   Count 15 to Count 41 -- excuse me, paragraph 15 to paragraph

3   41, and the majority of them are in Russia.  But, as you point

4   out, there are at least three that are in Boston and multiple

5   others that are in the United States.

6           MR. FERNICH:  I think that --

7           THE COURT:  So I'm trying to figure out what to tell

8   the jury.

9           MR. FERNICH:  Well, I wouldn't instruct on this

01:07 10   theory, and here's why I wouldn't instruct on it:  For all the

11   reasons that I've articulated in the papers, but let's just --

12   let's just get down to the simplest, Occam's razor.  There's no

13   First Circuit case that says anything other than *Chandler*, and

14   *Chandler* interprets the statute.  The purpose of the statute is

15   to implement Article III of the Constitution.  And Article III

16   is crystal clear.  It says that "It shall be tried in the state

17   and district where the crime shall have occurred unless" --

18   unless it hasn't occurred in any district.  And that's when you

19   go to 3238.  And that's exactly what *Chandler* says.

01:08 20           And what the Second Circuit case says is -- and to

21   some extent, I agree with what Mr. Frank is saying about the

22   Second Circuit case -- I think the Second Circuit case is all

23   wet, which is why I said --

24           THE COURT:  It's all --

25           MR. FERNICH:  All wet, that it gave me hives when it

          1    came out.  Especially because they say right in there that this
          2    is ambiguous, that the word "began" crept into the legislative
          3    history in 1940 -- in the '40s, and we don't know what it
          4    means.  It's cryptic.  It's not clear.  And that Second Circuit
          5    case is not the law in the First Circuit, and typically, when
          6    there's ambiguity, it goes to us, it goes in our favor under
          7    the rule of lenity, and, also, under The doctrine of
          8    constitutional avoidance.  To me, none of the cases that the
          9    government cites, none of the cases that I've found, nobody
01:09    10    tackles and tries to reconcile this insertion of the "began"
         11    word and harmonize it with Article III of the Constitution.
         12    And if you think about it, they are completely opposite.
         13    They're irreconcilable, and the --
         14         THE COURT:  Well, I agree that a very broad reading of
         15    the word "begun" would be unconstitutional.
         16         MR. FERNICH:  Yeah.
         17         THE COURT:  On the other hand, since much conduct is
         18    continuing, if the bulk of the conduct was somewhere else, but
         19    only trivial or small portions were somewhere else or -- at
01:10    20    least that far, I'll go -- then it's quite clear that it would
         21    not be violating the Constitution.  In other words, a
         22    conspiracy is complete upon the agreement and the commitment of
         23    one overt act.  So --
         24         MR. FERNICH:  Well, I think that's right.  But I think
         25    that you look at it holistically.  If you look at these cases,

1    you look at it holistically.  If your Honor is going to get

2    into this -- and I think it's a thicket, candidly, that they

3    don't need.  I agree with the Court's assessment of it.  They

4    have a lot of evidence under 3237.  I don't know why we're

5    getting into this can of worms.  It's dangerous.  It's not the

6    law in the First Circuit.  They don't need this.

7          THE COURT:  Well, the First Circuit really hasn't

8    jumped in other than that trader case.

9          MR. FERNICH:  But they said yesterday that *Chandler*

01:10 10   remains controlling the law here.

11          THE COURT:  That was based on 30 minutes of research

12   at lunch.  So I'm giving them a little --

13          MR. FERNICH:  But I don't know how it can be squared

14   with Article III.  I mean, it says --

15          THE COURT:  Well, I've got to make sure it is.  What

16   I'm struggling right now -- as I said, I'm leaning towards

17   giving it with respect to the agreement, which really was

18   completed upon the -- upon the -- essentially, the use of the

19   agreement being made and one overt act, so -- but if all of

01:11 20   that took place in Russia, then I don't think that would

21   violate the Constitution.

22          MR. FRANK:  May I just add to this, Your Honor?

23          MR. FERNICH:  Go ahead.

24          THE COURT:  Okay.

25          MR. FRANK:  In the *Miller* case -- I'm looking at it --

1     it says, "The use of the word 'begun,' in addition to the word

2     'committed,' suggests that the statute encompasses offenses

3     begun outside the borders of the United States, but ending

4     within our country's borders."  And then it says, "We, thus,

5     agree with the *Pendleton* court that the word 'committed' in

6     3238 encompasses crimes like Lisa's" -- at issue in this

7     case -- "that begin inside the United States but that in their

8     essence are committed abroad."

9               THE COURT:  Yeah, yeah, in their essence.

01:12 10          MR. FRANK:  Right.  For crimes that begin here, but

11    are then committed, in their essence, abroad.

12               In our case, we have the reverse scenario.

13               THE COURT:  Sure.

14               MR. FRANK:  Which is a crime that began there, but

15    that touched this venue and other venues.

16               THE COURT:  But if you look at the jury instructions

17    given in that case which were affirmed and the question posed,

18    you have to do something with essential conduct.  It can't be a

19    trivial beginning in Russia.

01:12 20          MR. FRANK:  We agree that it can't be mere

21    preparation, but --

22               THE COURT:  Anyway, I'm going to just -- I haven't --

23    you've given me 24 hours.  The best I'm going to do -- I don't

24    want to say something that's legally incorrect, and I think I

25    have to accommodate for --

1          MR. FRANK:  We think that the way to approach that, in

2     that case, would be to say -- and there's a quote in here that

3     I'm not now finding -- that "begun" has to be more than mere

4     preparation, but not to get into the essential conduct analysis

5     when we're under the "begun" prong.  Because this case is a

6     different fact pattern.  This case is -- under *Miller*, the

7     "begun" prong was not at issue because the conduct began here

8     and was --

9          THE COURT:  I agree.  It wasn't an issue.  I'm just

01:13 10    saying, as far as I'm concerned, they do affirm -- I'm going to

11    do something along the lines of essential conduct, and it's

12    more than just preparatory.  I think you're going to have to

13    prove that in the alternative -- as an alternative theory.  And

14    that's -- unfortunately, I don't have the exact language, and

15    I'll be working on it this afternoon.

16          I don't find there's any prejudice to the defendant on

17    it because they did open with it, but that's going to be

18    applicable to three of the four, and the jury's understanding

19    would not be that nuanced at that phase.  I also don't think

01:14 20    that there's any new evidence necessary.  I don't think this is

21    a variance issue, although I may be stand to be corrected on

22    that.  The case cited was one where there was a fatal variance

23    between the elements and the indictment.  Here there was no

24    charged venue provision.  There were essentially something

25    like --

1        MR. FERNICH:  That's why, Judge, I'm not arguing -- I

2  thought about it, and I'm not arguing that it's a constructive

3  amendment, because venue is such an odd duck --

4        THE COURT:  Yes.

5        MR. FERNICH:  -- where it's an essential element of

6  their burden of proof, but not, at this point, an essential

7  offense element.  So if they materially broadened an essential

8  offense element, then it would be a constructive amendment

9  arguably, and a per se reversible error.  So Your Honor has

01:14  10  made a finding that there's no prejudice from the variance,

11  which is not helpful to me in the event that the case is

12  appealed, but they listed three specific overt acts that are

13  plainly, as I wrote in the papers, trying to lay a

14  conduct-based venue charge here, and they didn't give us a hint

15  as to 3238 coming in, which I think is another big factor

16  weighing against giving this very dicey charge in the

17  circumstances of this case.

18        And I will say that with respect to the qualitative

19  analysis of what the offense -- essential offense conduct is, I

01:15  20  think you have to look at the whole conspiracy and its objects.

21  And *Miller* is a good example of that, because the objective

22  there was to take a kid and move the kid across international

23  borders.  That was what they called the gist of the crime.  So

24  by definition, the object of that conspiracy was multinational.

25        Here, the object of the offense, you know, they're

1    parroting the *Dorozhko* and *Khalupsky* theory.  The object of the

2    offense here, the principal object, was to hack into those

3    computers and steal -- well, fraudulently obtain their

4    confidential information.

5         In the Second Circuit, you know, they also incorporate

6    the substantial contacts test under *Reed*, which is sort of like

7    a minimum contacts test in the due process --

8         THE COURT:  Well, I sort of capture that -- I'm not

9    sure the First has done that by using "a meaningful

01:16 10   connection."  I used the words "meaningful connection."

11        MR. FERNICH:  I like that charge, the meaningful

12   connection charge, but -- so if you're -- you know, the Second

13   Circuit is -- it's weird.  *Miller* is not a good decision for

14   us.  But on the other hand, the way that the Second Circuit

15   generally approaches venue is much more favorable to us because

16   it uses the foreseeability requirement and incorporates a

17   minimum or substantial contacts with the forum test.  So

18   they're targeting the United States forum.  The effects of

19   their conduct are here, and the object of the scheme is here.

01:16 20   So while the agreement, undoubtedly, is formed

21   extraterritorially, that would be the case of any agreement

22   formed overseas.

23        THE COURT:  That might be, but take the case of

24   someone who's selling fentanyl.  I know that's very different

25   from here, but if you make the fentanyl somewhere else and then

1    you -- and then you sell it here --

2         MR. FERNICH:  Well, certainly, I've had clients who

3    have done stuff like that, but --

4         THE COURT:  Didn't you have that big case?

5         MR. FRANK:  And, frankly, Your Honor, in terms of the

6    conspiracy, because an overt -- a single overt act is enough to

7    complete the crime, the crime was complete before anything

8    touched the United States.  There were numerous overt acts that

9    they took overseas.

01:17 10        MR. FERNICH:  But this is not what the case --

11        MR. FRANK:  The rental of the domains, the typing at

12   their keyboards, all of those things are overt acts.

13        THE COURT:  That supports your claim.

14        MR. FERNICH:  If Your Honor looks at the Third Circuit

15   case, which I keep harping on because it's a good analysis,

16   under *Rodriguez-Moreno*, which is the Supreme Court's last

17   pronouncement on this, the case makes very clear that you have

18   to take care not to conflate the elements of the offense with

19   essential offense conduct.  Mr. Frank is right, it could be any

01:18 20   overt act just for purposes of proving the elements of the

21   offense, but that's not the venue inquiry.  The venue inquiry

22   is it has to be essential offense conduct.  And Your Honor is

23   right, every court that's considered this says that.  And they

24   can't say otherwise because of *Rodriguez-Moreno*.  So it's a

25   more holistic, a more qualitative analysis, and it's

1    case-by-case.  It makes some sense, if the object of the scheme

2    is to cross state lines with a child, that's a borderless

3    crime, quintessentially international in nature.  That is not

4    this.  They targeted the forum.  They targeted protected

5    American computers and they stole, on the government's theory,

6    through fraudulent means --

7            THE COURT:  On the other hand, I was persuaded by some

8    of it.  Once you have hacked --

9            MR. FERNICH:  Once what?  I'm sorry?

01:18 10         THE COURT:  If a hacker from somewhere outside the

11   United States targets our computers or servers or companies

12   here, I don't see that there's any difference in a venue or any

13   additional hardship --

14           MR. FRANK:  Agreed, Your Honor.

15           THE COURT:  -- as between Massachusetts or -- where

16   are they from?  Minnesota, Chicago.

17           MR. FRANK:  Agreed, Your Honor.

18           THE COURT:  There's no hardship.  There's no

19   unfairness.

01:19 20         MR. FRANK:  Agreed, Your Honor.  And the other

21   point --

22           THE COURT:  But I still have the basic Constitution,

23   and I know you're trying -- it shows up twice in the

24   Constitution and once in the rules.  And so it's not such an

25   unimportant right, so --

1    MR. FRANK:  But --

2    THE COURT:  I am going to do the best I can.  I'm

3  telling you what I'm likely to do.  I'll get you -- I'm not

4  going to change my instructions that I've already given you at

5  this point, but I am going to -- unless I catch a typo or

6  something.  I read it to them, and then I have the court

7  reporter -- and I'll have a copy of the final charge for both

8  the interpreters and the court reporter when it I do it

9  tomorrow -- I don't do it exactly like I do it.  I do --

01:20 10    MR. FERNICH:  I understand.

11    THE COURT:  I have my way of doing it, but the middle

12  portion will be exact, of the elements of the crime, and --

13    MR. FRANK:  Does Your Honor --

14    THE COURT:  -- eventually, I'll have to give you the

15  language of the alternative theory of conspiracy.

16    MR. FERNICH:  Well, basically, whatever the language

17  is going to be, the Court's ruling at this point is that the

18  Court will instruct on 3238 as an alternative venue basis for

19  Count One, but not as to Counts Two through Four.  Do I have

01:20 20  that right?

21    THE COURT:  You do.

22    MR. FERNICH:  Okay.

23    MR. KOSTO:  Your Honor, if we understand you

24  correctly, you're not going to change your 3237 instruction to

25  include essential conduct language in that one?

1          THE COURT:  I think it's already in there.

2          MR. FERNICH:  Essential conduct applies to both --

3          THE COURT:  I think it's in there.  I mean, that's

4   what you just got.

5          MR. KOSTO:  I don't believe we have -- do we have --

6          THE COURT:  I haven't double-checked it, but --

7          MR. FRANK:  It's undefined, is the problem, and the

8   statute itself supplies a definition.

9          THE COURT:  Well, I'm saying I'm -- I think it's in

01:21 10   there.

11          MR. FERNICH:  You know, I'll poke around and see if I

12   can find a definition of essential conduct.

13          THE COURT:  Maybe, but I'm not an ATM machine, as I

14   keep saying, and so I'm not going to be up at 3:00 in the

15   morning getting language.

16          MR. FERNICH:  I know.  I've been there, done that.

17          THE COURT:  So at least at this point, I believe I

18   used the words "essential conduct" somewhere in there.

19          MR. FERNICH:  No, you did.  I was going to see if I

01:21 20   could poke around and find a definition of essential conduct.

21          THE COURT:  And then you can object, if you want, or

22   if somebody has an agreed-upon definition from a case, I'd

23   consider it.

24          But at this point, I think we're all tired.

25   Congratulations, you finished the evidence.  Let me ask the

1  government, how much time do you think you'll need?

2          MR. KOSTO:  I'm going to try to make it shorter, but

3  90 minutes.

4          THE COURT:  Okay.  It's a big case.  Okay.

5          Let's assume people come on time.  90 minutes.  We

6  will take a break at that point, because it's too much to then

7  start listening to the defense.

8          How long does the defense think it will be?

9          MR. FERNICH:  Max is going to do it.  We switched.  So

01:22 10  I'll have to ask him.

11          What did he say yesterday, an hour, hour and a half?

12          MR. KOSTO:  I don't remember, Your Honor.

13          MR. FERNICH:  I think it will be an hour.  That's my

14  guess.

15          MR. KOSTO:  Does the Court give preliminary

16  instructions first?

17          THE COURT:  No.  Well, I say to them, this is the

18  closing arguments, and it's not evidence, but I don't do

19  anything else.

01:22 20          And then let's say we take a break -- an hour and a

21  half, let's say we take a 15-, 20-minute break -- I'm just

22  trying to script it.  Let's then say we're roughly at noon.

23  Let's say we finish the charge at --

24          MR. FRANK:  Rebuttal.

25          THE COURT:  Oh, yeah.  You're absolutely right.

1          MR. FRANK:  30 minutes.

2          THE COURT:  30?

3          MR. FRANK:  No more than that.

4          THE COURT:  All right.  So let's say we finish in the

5    vicinity -- in the closings, in the vicinity of 12:30, break

6    for lunch.  I'm giving them lunch, so bring your lunch in a

7    little paper bag because I don't even know what the line will

8    be like downstairs.  But it won't be a full hour, because my

9    charge is massive.  I mean, I think the charge will take an

01:23 10   hour and a half.  So I think it will bring them into maybe an

11   hour's worth of deliberation where they can set up, get a

12   foreperson, I can eliminate the alternates, and they'll just

13   start getting organized.  How are we doing the document

14   delivery?  Have you reviewed them yet?  Are you satisfied with

15   the form that they're in?

16         MR. KOSTO:  I think Ms. Lewis was going to have a look

17   with us.  We were talking about a laptop going back to the jury

18   with all the evidence in it, and nothing else, obviously.

19         THE COURT:  I think we have paper.

01:24 20         THE CLERK:  Both.  We send back both, even when we do

21   electronic.

22         THE COURT:  We're going to do paper and JERS, which is

23   --

24         THE CLERK:  Not JERS.  We can't use it because it

25   won't recognize Excel.  We're doing a laptop, which they agreed

1    to, both sides, because it has all the Excel and all the

2    exhibits on it, plus paper.

3              THE COURT:  Plus paper?

4              THE CLERK:  Yes.

5              THE COURT:  Have you looked through to make sure you

6    have everything you're supposed to?

7              MR. FERNICH:  We're going to take a look afterwards,

8    right now.

9              THE COURT:  Because at the end, I ask, Is the

01:24 10   government satisfied with the form of the exhibits?  Is the

11   defense satisfied with the form of the exhibits?

12             MR. FERNICH:  Tim, are you listening to this, buddy?

13             THE COURT:  And then I will let you -- and then --

14   we'll send them home at about 4:00.  My anticipation is that

15   there's so much here that they will be coming back Monday

16   morning just -- I'm just hoping no one gets sick.  We've been

17   very lucky so far.  But assuming we have everybody, my guess is

18   it will take at least a day or two to deliberate based on the

19   volume of the documents.

01:25 20            So unless something else comes up, that's what we're

21   going to do.  Anything else at this point, other than practice?

22             MR. FRANK:  Does Your Honor anticipate that we'll get

23   the revised instructions --

24             THE COURT:  No.  I'm just going to work on it this

25   afternoon.  I mean, you'll get it, but you'll probably get it

1    tomorrow morning.  If I can get it this afternoon, I'll just

2    send you out the brief little supplemental one, just on venue

3    kind of thing.  Okay.  Thank you very much.  Have a lunch.

4    Thank you.

5              THE CLERK:  All rise.

6              THE COURT:  I do have one more question.  I'm sorry.

7    I have one more thing.  This is an unusual case because you all

8    ordered daily copy.  It's my practice not to just pile the

9    transcripts in the jury room.  But if requested, I will give it

01:27 10    to them.  But we would have to go through them to make sure

11    that sidebars, et cetera were deleted.  I didn't know what you

12    thought about that, but just something to chew over because we

13    usually don't have it -- we actually don't have it, but we do

14    this case.  So I'm planning on not giving them -- I think it's

15    very thick, but if they ask for a particular witness, I would

16    give it to them.

17              MR. FERNICH:  Yeah.  I like the old-fashion way where

18    they send a note and we can --

19              THE COURT:  Yeah, they ask for it.  I agree.  Okay.

01:27 20    Thank you.

21              (Proceedings adjourned at 1:27 p.m.)

22

23

24

25

1                   C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS    ) ss.
   CITY OF BOSTON               )
5

6

7           We, Lee A. Marzilli and Kathleen Silva, Official

8  Federal Court Reporters, do hereby certify that the foregoing

9  transcript, Pages 9-1 through 9-157 inclusive, was recorded by

10 us stenographically at the time and place aforesaid in Criminal

11 No. 21-10104-PBS, United States of America v. Vladislav

12 Klyushin, and thereafter reduced by us to typewriting and is a

13 true and accurate record of the proceedings.

14          Dated this 9th day of February, 2023.

15

16

17

18

19
   /s/ Lee A. Marzilli
20 _____
   LEE A. MARZILLI, CRR
21 OFFICIAL COURT REPORTER

22
   /s/ Kathleen Silva
23 _____
   KATHLEEN SILVA, RPR, CRR
24 OFFICIAL COURT REPORTER

25