<pre>
 1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS
 2

 3       UNITED STATES OF AMERICA,          )
                                            )
 4                    Plaintiff             )
                                            )
 5            -VS-                          )  Criminal No. 21-10104-PBS
                                            )  Pages 10-1 - 10-153
 6       VLADISLAV KLYUSHIN,                )
                                            )
 7                    Defendant             )

 8

 9

10

11                         JURY TRIAL - DAY TEN

12

13            BEFORE THE HONORABLE PATTI B. SARIS
                  UNITED STATES DISTRICT JUDGE

14

15

16                              United States District Court
                                1 Courthouse Way, Courtroom 19
17                              Boston, Massachusetts  02210
                                February 10, 2023, 9:09 a.m.
18

19

20

21

22

23            KATHLEEN SILVA and LEE A. MARZILLI
                 OFFICIAL COURT REPORTERS
24              United States District Court
               1 Courthouse Way, Room 7200
25                  Boston, MA  02210
                      leemarz@aol.com
</pre>

A P P E A R A N C E S:

    SETH B. KOSTO, ESQ. and STEPHEN E. FRANK, ESQ.,
Assistant United States Attorneys, Office of the United States
Attorney, 1 Courthouse Way, Room 9200, Boston, Massachusetts,
02210, for the Plaintiff.

    MAKSIM NEMTSEV, ESQ., 20 Park Plaza, Suite 1000,
Boston, Massachusetts, 02116, for the Defendant.

    MARC FERNICH, ESQ., Law Office of Marc Fernich,
800 Third Avenue, Suite Floor 20, New York, New York, 10022,
for the Defendant.


I N D E X

CLOSING ARGUMENTS                    PAGE

    By Mr. Kosto:                    6
    By Mr. Nemtsev:                  49
    By Mr. Frank:                    78

JURY INSTRUCTIONS:                   99

P R O C E E D I N G S

1

2          THE CLERK:  All rise.

3          (Court enters.)

4          THE COURT:  Everyone may be seated.  The last juror

5    just arrived.  I have handed out a complete version -- almost

6    complete version of the jury instructions.  There was a

7    suggestion for an edit made by the defense, which I'm told the

8    government agreed to, which I will incorporate, but it's not in

9    that draft that you just got.  It involves the word "entirely."

09:10 10   So I will do that orally.

11          I think at this point, unless there's anything else --

12   you're about an hour and a half; is that right?

13          MR. KOSTO:  A little less.

14          THE COURT:  Okay.  Well, at about an hour and a half

15   I'll give you the -- sort of the "eh," you know, because we

16   have to just get this going.  People can't listen after a

17   certain point.  We'll take a break after the openings so that

18   they're fresh when they come in and hear you.  How long do you

19   think you'll be?

09:10 20         MR. NEMTSEV:  45 minutes to an hour.

21          THE COURT:  Okay.  And we'll take either a break or

22   lunch and we'll go into my charge, which I think is actually

23   quite long.

24          MR. FRANK:  Judge, you forgot my rebuttal again.

25          THE COURT:  I keep forgetting your rebuttal.  Yes,

1    your rebuttal, and then we'll go into the charge.

2           Okay.  There we go.  I think we'll bring the jury in.

3           MR. FRANK:  So we'll go straight into the rebuttal

4    after the defense?

5           THE COURT:  If it's only 45 minutes, yeah.  I do

6    usually make a practice of handing out the verdict form for the

7    jurors so they know what counts that you're addressing.  So

8    I'll give this now to MaryEllen.  Do we have a form of the

9    indictment?  We don't have to deal with that right now.  I'm

09:11 10   not going to give that to anyone right now, but do we have it

11   here in the courtroom, the indictment everyone agreed on?

12          MR. FRANK:  We do not, but we'll get it during the

13   break.  It's just the --

14          THE CLERK:  Just one minute --

15          THE COURT:  Oh.  Never mind.  Then we won't hand it

16   out.  It's not essential.

17          THE CLERK:  They can run up and get a copy.

18          THE COURT:  I know, but we're not waiting for it.

19          MR. FRANK:  We had agreed to just put in the counts.

09:11 20   Did we agree to leave it out entirely?

21          (Discussion held off the record.)

22          MR. FRANK:  So we'll just put in the counts, Your

23   Honor.

24          THE COURT:  Excuse me?

25          MR. FRANK:  The parties have agreed to just send back

1    the counts.

2              THE COURT:  Yes, on the indictment.  Yes, yes.

3              THE CLERK:  All rise for the jury.

4    (Jury enters.)

5              THE COURT:  Good morning to everyone.  Anyone speak

6    about the case, see anything in the press, social media, anyone

7    try and get in touch with you?  Okay.  Good.  We're going to

8    hand out right now a blank, obviously, verdict form.  These are

9    all so that you understand the counts that will be addressed in

09:13 10   the closing arguments.  Obviously, at the end of the case,

11   we'll only want one official form, but you can take notes on

12   this if you choose to.  The verdict form needs to be unanimous.

13              We'll first hear the government's closing.  Remember,

14   it's not evidence.  It's just the government's opportunity to

15   sum up the evidence.  Then we'll take a brief break, not a

16   full-blown break.  And then we'll go to defense closing

17   argument.  Then there'll be a brief opportunity for rebuttal

18   and then we'll take a break, and then it will be the closing

19   instructions that I'll give you about the law that applies in

09:13 20   this case.  It's going to be a long day.  We'll feed you well.

21   But we're going to get going right now.  I'm not sure what's

22   that -- what's over there.

23              MR. FERNICH:  Just one of the chalks, Your Honor.

24              THE COURT:  That we've already seen?

25              MR. FERNICH:  Yes.

1    THE COURT:  Fine.  Good.  Okay.  Have you shown to

2    them what it is?  Because it's not visible from here.

3    MR. FRANK:  It's the same chalks we've been using with

4    the photographs.

5    THE COURT:  Okay.  Good.  Let's be seated.  Let's get

6    going.  If you're taking notes, please mark down this is --

7    MR. FERNICH:  May it please the Court?

8    THE COURT:  Yes.

9    MR. FERNICH:  Counsel.

09:14 10   CLOSING ARGUMENT BY MR. KOSTO:

11    MR. KOSTO:  Good morning.  The defendant, Vladislav

12   Klyushin, the owner of a company that advertised its ability to

13   hack into computer networks at will, opened a brokerage account

14   for the first time in July 2018.  Even though he was a beginner

15   at trading, he quickly made nearly 21 million dollars betting

16   on earnings announcements, an almost 900 percent return.  The

17   stock market's return for that same period was only 25 percent.

18    The defendant also traded on behalf of three

19   investors -- Alexander "Sasha" Borodaev, Boris Varshavsky, and

09:15 20   Sergey Uryadov -- making another 23 million for them in even

21   less time, and taking a cut of as much as 60 percent of that

22   money for himself.

23    One of the defendant's employees involved in this

24   trading, Nikolai Rumiantcev, made millions more, even though he

25   had never had a brokerage account before either.  Two other

1   associates, Igor Sladkov, the guy with the M-13 chat app in his

2   iCloud account, and Mikhail Irzak, took home 50 million.  They

3   were connected to the defendant through his friend and employee

4   Ivan Ermakov.  For this whole group, a cool 90 million dollars.

5        But here's the thing:  The defendant was a one-trick

6   pony.  He and his crew were good at only one thing.  Somehow

7   they only managed to make money on quarterly earnings

8   announcements, and not just any quarterly earnings

9   announcements, they traded the earnings of companies that filed

09:17 10   their earnings reports using one of two filing agents,

11   Donnelley Financial and Toppan Merrill, two companies that, it

12   just so happens, were hacked at the exact time that the

13   defendant and his crew started making money hand over fist.

14        But as it turns out, the defendant wasn't even a

15   one-trick pony, because in January 2020 when TM reset its

16   passwords and kicked the hackers out, the defendant basically

17   stopped trading earnings in companies that filed their reports

18   through TM, and he stopped making money on it.  And in August

19   2020, when DFIN got the hackers out of its network, the

09:17 20   defendant and his crew all but abandoned ship on trading

21   earnings.  When they didn't have tomorrow's news today, they

22   went from trading earnings 78 percent of the time to less than

23   7 -- or barely 7 percent of the time.  And their win rate

24   dropped from 68 percent to 42 percent.  Now they were getting

25   earnings calls wrong more often than they were getting them

1    right.  And they started losing money on earnings trades.

2            Now that you've seen and heard the evidence, you know

3    why.  The defendant and his associates were trading on stolen

4    information, information they obtained by hacking into DFIN and

5    TM's computer networks using the same techniques that the

6    defendant advertised to his cyber security clients.  At the

7    beginning of this case, we told you that the evidence would

8    prove beyond a reasonable doubt that the defendant did exactly

9    what he's charged with doing, scheming with Ivan Ermakov,

09:19 10    Nikolai Rumiantcev, and others to hack into Internet-connected

11    computers, to steal information from those computers, and to

12    use that information to make money by trading stocks for

13    themselves and M-13's clients.

14            You know now that the evidence has shown exactly that.

15    For his actions, the defendant is charged with four crimes:

16    Wire fraud, securities fraud, unauthorized access to computers,

17    and conspiracy to commit those crimes.  Over the next hour or

18    so, I'm going to walk you through the evidence of these crimes

19    in four basic parts.  First, that TM and DFIN were hacked.

09:20 20    Second, that the defendant, his co-conspirators, and his

21    company, M-13, were behind those hacks.  Third, that the

22    confidential information that they stole from TM and DFIN

23    related to their purchase and sale of securities.  And fourth,

24    that from the moment Vladislav Klyushin joined this conspiracy,

25    he was all in.  He knew what he was doing was wrong.

1           So let's start with the hack.  There's no serious

2    dispute in this case that the filing agents, DFIN and TM, were

3    hacked.  The hackers used the Internet to download the

4    confidential business information belonging to TM and DFIN's

5    publicly traded clients.  Every employee who testified told you

6    that both the companies kept the information confidentially

7    online and under digital lock and key with usernames and

8    passwords.  Of course they did.  This was information that the

9    public didn't have yet.  This was tomorrow's headlines.  Julie

09:21 10   Soma called it confidential and sacred.  Hyeyoung Han told you

11   employees couldn't trade on this because it was inside

12   information, information that could affect the price of the

13   client company's stock when it was released, information that

14   these clients hadn't yet filed with the SEC's EDGAR system.

15           This was also a sophisticated and coordinated hack.

16   But even so, the hackers left a trail for you to follow.  These

17   attacks both hit at the same time, February 2018 or a little

18   bit earlier for DFIN.  And later the same year for TM.  You

19   remember the testimony about DirBuster hitting those computers

09:22 20   every second in November of 2018.

21           There were similar IP addresses that hit both

22   companies, like ones from AirVPN, assigned IP addresses

23   starting with 199.249.230 on your screen from Julie Soma's DFIN

24   account and Arthur Smallman's account at Toppan Merrill.  These

25   weren't the VPNs that companies offered their employees to get

1    online.  These were commercial VPNs that helped the hackers

2    hide their location.

3         There were other IPs common to both victims too,

4    including one you'll recognize, 89.238.166.235.  The hackers

5    harvested the same kinds of information from both companies,

6    earnings reports filed with the SEC in those forms, 10-K, 10-Q,

7    8-K, and the exhibits, like Exhibit 99.1, all taken shortly

8    before they were to be filed.

9         Just from the Boston IP address alone, 104.238.37,

09:23 10    there were 113 different downloads in over three weeks, and you

11   saw when Ms. Yanochko testified, all in, basically,

12   alphabetical order, between 1:00 a.m. and 7:00 a.m. on the left

13   of Exhibit 195 there.  That just so happened to be in the

14   middle of the business day in Moscow.  Ms. Han from Korea, she

15   didn't even deal in Exhibit 99s, and her downloads also came

16   when she was sleeping, but in the middle of the Moscow

17   afternoon.  Pacific time on the left, Moscow time on the right.

18   And you know that the downloads over Jason Lewis's accounts

19   weren't his.  You know that DFIN salesmen didn't even access

09:24 20    live data.  The hackers burned through his credentials after

21   DFIN reset Ms. Soma's credentials and then reset Ms. Han's

22   credentials in April of 2020.  There he is in purple on that

23   bar graph in May 2020.

24        The FBI caught a real break with these logs.  The logs

25   didn't capture every single download that took place, but the

DFIN logs showed what the hackers were up to.  TM, for its
part, only had about 90 days of logs, but the ones they did
have told the exact same story.  Ben Oliver took one look at
his user log from Toppan Merrill.  Remember, he shook his head
no.  He barely used the Bridge system for his job, and he
certainly didn't use it like that, opening file after file, one
at a time, in the middle of the night, Pacific time, over a
computer that had the wrong name, USLEDGE.  And there was the
same kind of malware found at both companies, tools to steal
usernames and passwords like Mimikatz, tools to make secure
connections between computers, like PowerShell, malware renamed
to hide itself on those victim companies' networks.

DFIN's incident response professional told you that
one of the pieces of malware on DFIN's network was so
sophisticated that it was programmed to delete its own logs so
they couldn't be found.  And the victims' computers at both
companies phoned home in the exact same way, both companies'
computers reached out to Internet domains with bizarre-sounding
names like cloudapifinance.info for TM or investmentcomp.com or
finauditsolutions from DFIN.  These were the digital clues that
led to the defendant's doorstep.

You saw the patient and painstaking work that the FBI
did -- and I'll admit it was painful for all of us at times --
tracing these attacks back to M-13's computer network, to the
defendant, and to his co-conspirators.  Painstaking because

these were sophisticated hackers, hackers that used the same
advanced hacking techniques that the defendant advertised on
his company's website and in his pitches to clients.
Exploitation of the most dangerous vulnerabilities in order to
breach the network perimeter, obtaining credentials to access
servers, identification of sensitive data stored in open form.
And remember how sophisticated those attacks were.  They
involved dozens of IP addresses, those private VPNs, domain
accounts rented by the dozen, each from a separate email
address.  Bitcoin to pay for them.  Hacker computers protected
by gatekeeping software.  Malware renamed so that IT folks at
the companies wouldn't spot it.  PowerShell software that
encrypted the communications between the victim computers and
the hacker computers so that no one could see what was leaving
the building.

         This is exactly what the defendant offered his
customers.  Our experts imitate a full-scale targeted attack
during which the attacker, while trying to conceal his
presence, uses a wide range of actions against the
organization's infrastructure.  This is literally what the
defendant did for a living.  But despite that sophistication,
you know that there's no such thing as a perfect crime.  And
you saw three different ways that the FBI was able to trace
these hacks back to the defendant by following the clues in the
digital evidence.

1          First, you know that all ten of those strange-sounding

2     Internet addresses coded into the malware at Toppan Merrill and

3     DFIN came from the Namecheap, the domain company.  You saw the

4     pattern in the signup emails, first name, last name, sometimes

5     digits @inbox.lv.  Nine of those ten domain accounts were

6     accessed by a single IP address in yellow there,

7     89.238.166.235.  And you know that that was one of the same IP

8     addresses that hit both DFIN and TM directly.

9          AirVPN and other IP addresses from the hack in blue

09:30  10    and green here had accessed Namecheap too.  You learned that

11    those Namecheap domains were assigned to Digital Ocean and

12    Vultr, Internet companies that rented out those virtual servers

13    through their resellers, BitLaunch for Digital Ocean and

14    99Stack for Vultr.  And you know that IP addresses used at

15    BitLaunch were also some of the same IP addresses that hit

16    Toppan Merrill.  Exhibit 178 on your left is from BitLaunch's

17    records, and Exhibit 77A on the right was the information from

18    Toppan Merrill, blue to blue, yellow to yellow.

19          And you saw the same kinds of common IP addresses that

09:30  20    hit both 99Stack, the Vultr reseller, and Toppan Merrill.

21    99Stack on the left, Toppan Merrill on the right, same IP

22    addresses.  Here's what else you know:  Both the BitLaunch and

23    the 99Stack virtual server accounts had the same subscriber,

24    someone using the name Andrea Neumann and the email address

25    neumann@dr.com.  And the Neumann account at Vultr was accessed

1  by that familiar IP address again, 89.238.166.235.

2       You also know how those rented computers were used

3  because the FBI forensic examiner told you.  These were the

4  hacking computers that hit TM.  He found Mimikatz, the same

5  password-stealing software that TM's consultant told you was

6  found at TM.  He found renamed PowerShell.  Remember rdtevc?

7  That's the same software name that TM found on its computers.

8  On the hacker computers, he found the names of TM computers,

9  like USD for U.S.desktop 10846, and TM employees that Ben

09:32 10  Oliver told you about, Rayna Behm and Jerome Taylor.

11       And he found evidence of that gatekeeper program,

12  NGINX, which hid the hacker's command computer behind a

13  protective shield of seven gateway computers so that anybody

14  from TM who was looking into all this traffic leaving their

15  network would be directed somewhere else.  When they went

16  looking for cloudapifinance, they would end up at a completely

17  different website.  They wouldn't be allowed through.

18       And you know that from those hacker computers, the

19  trail led right back to the defendant's company.  Namecheap

09:33 20  records showed that neumann@dr.com, the email that was used to

21  rent the hacker servers, was also associated with another

22  Namecheap account.  This one too had been accessed by that

23  familiar IP address, 89.238.166.235, that had attacked TM and

24  DFIN and that was associated with so many of those other

25  Namecheap accounts that you've seen already in this case.  And

1        the Neumann account was paid with Bitcoin.

2                You know from the FBI's cryptocurrency expert, whose

3        testimony was virtually unchallenged, that the Bitcoin used to

4        pay for the Neumann Namecheap account led right back to the

5        defendant's company.  First, the change from the Neumann

6        transaction -- that's Namecheap domain 1 -- went to Namecheap

7        domain 2 under the name kavin.sspender@mail.com.  And the

8        change from kavin.sspender was used within just about two hours

9        to pay for a third Namecheap account.  That one was paid for

09:34 10  and registered with an inbox.lv email address,

11       wan-connie909@inbox.lv, just like all the Namecheap accounts

12       that were used in the attack on DFIN and TM.  You know from all

13       this evidence that Namecheap accounts, Neumann, sspender, and

14       Wan Connie were paid for and controlled by the same people.

15               And here's what else you know, that the Wan Connie

16       account leads right back to M-13, right back to the defendant's

17       company.  You can see it right there in the BitPay records.

18       This is Government Exhibit 181, Column S, 89.107.124.42.

19       That's the M-13 IP address, the defendant's company, the one

09:35 20  that tells its customers it can imitate the very same hacking

21       techniques that were used on TM and DFIN, the same M-13 IP

22       address that the defendant, Nikolai Rumiantcev, and Ivan

23       Ermakov all used regularly.  It's right there in the Namecheap

24       records too.  89.107.124.42.

25               But you know that's not the only connection between

M-13 and the hacks.  There were all those AirVPN IPs that were
used to hit both victims.  You know the FBI got a pen register,
that caller ID for computer connections, on one of those AirVPN
IPs.  That was the one that hit Benjamin Oliver's account at
Toppan Merrill, 185 -- you can see it there -- .228.19.147.
Exhibit 130 tells you this is an AirVPN IP address.  Somewhat
unsurprisingly, there were dozens of hits on that caller ID
from the 89 IP, 89.238.166.235, that familiar IP address that's
all over these attacks, at Namecheap, at Digital Ocean, at
Vultr, at DFIN, at Toppan Merrill.

        And here's who else showed up using that exact same
AirVPN IP, including on that same day, January 29th, 2020, the
very first day that the FBI had its pen register up and
running, the defendant's company, M-13.  You know that there
are a lot of VPN companies out there, and literally billions of
IP addresses.  The defendant's own witness, Mr. Roberts, told
you so.  It just so happens that the defendant's company chose
this VPN provider, and not just this VPN provider, but this VPN
provider's IP address that was used to attack TM.  And here's
what else you know.  The defendant was at the office that day,
because within an hour of the AirVPN computer hitting M-13's IP
addresses, the defendant was logging into his Russian Standard
Bank account from the very same IP address.

        Ivan Ermakov was no stranger to AirVPN either.
Despite all of the VPNs out there and the 3.7 billion IP

addresses, he'd been using that same AirVPN IP to update his
iTunes account for years.  Members of the jury, that's no
coincidence.  That is a mistake that led you right to him.

The M-13 IP addresses here at Government's Exhibit 186
and 187 were totally wrapped up in this hack-to-trade scheme.
They came back to Namecheap.  They came back to AirVPN.  And
the defendant, Rumiantcev, and Ermakov used that same IP in
their own names all but daily.  In fact, it was the M-13 IP
address that Ermakov used to download the SaxoTraderGO app, the
one he used to trade in the defendant's Saxo accounts.  They
used the M-13 account to access WhatsApp, Facebook, Apple.
They also used it to access Rumiantcev's trading accounts, the
defendant's trading accounts, and the trading accounts of those
three investors, Alexander Borodaev, Boris Varshavsky, and
Sergey Uryadov, which tells you who was managing the investors'
accounts, by the way, the same accounts that engaged in all of
the suspicious trading.

It's no accident that the defendant and his associates
used AirVPN because you know that they were obsessed with
anonymity, just as you would expect hackers to be.  That's why
they used encrypted apps like WhatsApp.  And even more secure,
Threema chat, and eventually a completely impregnable chat that
M-13 built for itself, that even the defendant's own expert,
Mr. Roberts, couldn't read.  It was their own hidemyass.com.

The third forensic connection to M-13 was another Ivan

1  Ermakov mistake.  You know that Ermakov connected to Apple to

2  update his iTunes account, in his own name, over the IP address

3  194.204.194.11 three times at about 7:44 in the morning, Zulu,

4  on May 9th, 2018.  The IP address number itself isn't so

5  important, but you know that four minutes later, that same IP

6  was used to attack DFIN over Julie Soma's account in the middle

7  of the night on the West Coast of the United States.  Ivan

8  Ermakov might as well have signed his name in DFIN's logs.  And

9  here's what else you know.  The defendant actually did sign his

09:41 10  name to this crime, because you know what you can't do

11  anonymously?  You can't buy and sell stocks.  And this is how

12  you know to a certainty that the defendant was involved in this

13  scheme.

14       In fact, you could convict the defendant based on his

15  trading activity alone.  For starters, you have to remember who

16  the defendant and these other traders were.  He didn't even

17  have a brokerage account before July 2018.  Neither did

18  Mr. Rumiantcev, neither did M-13, neither did Mr. Irzak or any

19  of the investors.  The defendant told Saxo Bank that M-13 had

09:42 20  ten years of analytics experience.  But here's what he didn't

21  say:  He didn't tell the bank he'd only been trading since July

22  2018.  These men, this group, they were stock-trading nobodies.

23       Take a look at M-13's website when you get back to the

24  jury room, Exhibits 60 through 64A, they're there in

25  translation for you.  You'll find a lot of information about

hacking.  You will not see one word about trading.  And then

all of a sudden, just as DFIN and TM get hacked, the defendant

became the G.O.A.T. of earnings trading, the greatest of all

time.  And here's what else you know.  The defendant may not

have joined the scheme until mid-2018, a few months after it

started with Sladkov and Irzak, but once he was in, he was very

much in charge, telling Ermakov and Rumiantcev exactly what to

do.  He didn't do the day-to-day trading, but you'll see that

he was very much in the weeds.  One way you know that is from

the way he took charge in that Saxo Bank meeting in April of

2020.  You remember the call where the bank wanted answers to

questions about the defendant's suspicious trading.  Jeffrey

Zorek told you about it.  There's a name from a while ago.

Listen to the second half of that call.  There's a

moment where Rumiantcev can't handle the most simple question.

"I have simply almost no recollection of this.  I don't

remember that situation."  And it's the defendant who jumps in

to answer Mr. Zorek's questions about trading, the strategy

behind it, and the specifics of the trades they made.  The

defendant recited those details off the tip of his tongue --

the date of the Tesla trade, the price, the amount of the

trade, when it was in relation to the earnings report, how the

stock reacted.  Over and over in that meeting, the defendant

demonstrated an almost encyclopedic knowledge of his own

trading in Ulta, in Roku, in Tesla.  Look at the transcript.

And you know from the supersecret Threema chat that he was a demanding boss.

When Ermakov traded both long and short in the same stock, the defendant immediately asked to clarify the situation.  Later, a year before that Saxo call, the defendant was demanding to know what went wrong with a single trade. Vlad has to tell him what happened to the Grub.  Ermakov had screwed it up.  And when Ermakov and Rumiantcev weren't trading, the boss needed to know.  "Vlad needs information from which date and to which date we do not trade."

When Ermakov and Rumiantcev talked about hiring a trusted analyst -- and these are the reports that the defendant was asking after -- when Ermakov and Rumiantcev talked about hiring a trusted analyst they could use to help them without revealing their secrets, Rumiantcev said he would need to estimate the cost and write to the defendant before they could make the hire.  And you saw what happened when Ermakov wanted to add someone else to the secret chat, a colleague, Ermakov said, who was completely on top of the subject.  "You can trust him as you trust me."  But that wasn't good enough for Rumiantcev.  He wanted to make sure that the defendant had given the okay.  And in May 2019, the defendant joined the Threema chat so that Ermakov and Rumiantcev wouldn't have to keep going to him with all their questions and updating him. They could all just discuss the trading together in one place.

1   He'll be reading it on his own.  And look at how he traded.

2          Max Clarke from the SEC told you there were about

3   38,000 earnings filings the defendant could have traded on

4   between July 2018 and September 2020.  DFIN and TM handled

5   about 16,800 these, or 44 percent.  Given that market share, if

6   the defendant's trading were unrelated to who the filing agent

7   was, you would expect him -- you would expect to see him

8   trading in DFIN and TM only about 44 percent of the time.

9   Instead, the defendant traded in the earnings of DFIN and TM

09:47 10   clients 96 percent of the time, 343 out of the 356 trades he

11   made during that period.  Mr. Clarke told you that that was

12   like flipping a coin 356 times and getting heads on 343 of the

13   flips.  No trading strategy would yield choices like that,

14   other than a trading strategy based on who the filing agent

15   was.

16          And you know that makes no sense.  These companies

17   aren't doing anything that affects the company's stock price.

18   They're service companies.  They format earnings filings, and

19   they ship them off to the SEC, just like FedEx and DHL deliver

09:48 20   packages.  You don't pick stocks based on who the filing agent

21   is either.  There's really no dispute about that in this case,

22   but Mr. Clarke's statistical analysis said that if there was no

23   relationship between the filing agent and the defendant's

24   trading choices, you would see trading like this less than one

25   time in a trillion.  In a trillion.

1          But here's how you know to a certainty that the

2     defendant's trading was based on the hacks at DFIN and TM,

3     because when he and his fellow hackers were locked out of those

4     companies, they stopped making money, and they stopped trading

5     earnings releases, going from trading earnings about three

6     quarters of the time to just about 7 percent of the time.  You

7     didn't leave your common sense at the door to this courthouse

8     when you came in to serve as jurors, and your common sense

9     tells you what that means.  The hacks were the defendant's

09:49 10     secret sauce.  The stolen information was the key to his

11     trading success, not that ridiculous app he described on the

12     call with Saxo.

13          You remember that.  They called it Preston.  He

14     claimed it could review social and mass media and spit out

15     stock recommendations, the same cover story that Rumiantcev and

16     Ermakov discussed when they were thinking about that analyst

17     that they wanted to hire.  And remember how Rumiantcev reacted

18     when his boss offered to let Saxo try this app out?  He

19     panicked.  He got tongue-tied.  He told Saxo it wasn't ready.

09:50 20     Well, one would have to understand that the Preston app's

21     primarily based on news.  There is no financial information

22     there.  This is all about company image built on mass and

23     social media.  That's all.

24          The defendant jumped in and insisted, and when Saxo

25     did get its hands on Preston a few months later, the bank

1    didn't see any stock recommendations.  And when it asked to see

2    how the app recommended those stocks, Rumiantcev claimed that

3    part was a trade secret.  How could an app that was barely

4    ready in July of 2020 be helping make stock picks all the way

5    back to July of 2018?

6         Mr. Clarke also showed you that the defendant and his

7    traders had the most uncanny ability to predict market

8    surprises, those times when analysts expected a strong earnings

9    number, but the company underperformed, what Mr. Clarke called

09:51 10    a miss.  Or where analysts expected weak earnings, and the

11    company's numbers turned out to be really strong, that was the

12    beat.  Whether earnings would be a miss or a beat was

13    confidential.  That's what was sitting on the servers at DFIN

14    and TM.  That's what made them surprises to the stock market.

15    The biggest surprises were the outcomes that should have been

16    the least predictable.  But big surprises were what the

17    defendant and his trading partners seemed to do best.  86

18    percent of the time -- and that's on the right in Exhibit

19    210 -- when there was a big and good-news surprise sitting on

09:52 20    DFIN or TM's servers, the defendant bet the stock would go up.

21    And when the surprise was disappointing, he consistently, 85

22    percent of the time, went short, betting the stock would go

23    down.  But you know these weren't bets at all, because the

24    defendant already knew the answers.

25         Mr. Clarke told you that if there was truly no

1    relationship between surprise information being stored at DFIN

2    and TM, and the defendant's pattern of trading in the direction

3    of that surprise, you'd see this trading less than one time in

4    a trillion.

5           Take a look at Skechers in the second quarter of 2019.

6    That surprise was positive.  The company was going to beat

7    earnings by about 15 cents per share, 34 and 49, you have it

8    there.  All the traders, starting with Sladkov, started buying

9    Skechers, betting the price would go up.  And when the release

09:53 10    came out, that big black bar, the whole group, including the

11   defendant, made more than a million dollars on that single

12   trade.

13          Kohl's, in the third quarter of 2019, was a big miss.

14   The company missed its number by about 12 cents a share.  But

15   bad news for Kohl's was good news for the defendant and his

16   co-conspirators.  Following a download from DFIN's servers, he

17   had jumped into the market in a short position, betting the

18   price would go down.  Here, again, the defendant in that third

19   row made more than $600,000 predicting the most unpredictable

09:54 20    of surprises.  It happened again with Ulta Beauty.  Ulta was a

21   TM client, so there are fewer logs here to show you.  The

22   earnings were a miss, and what's worse, the company's Exhibit

23   99.1 updated its financial guidance downward, how much money

24   the company was expecting to take in.  Ulta's price plummeted

25   by 30 percent when that news came out.  But a man who was brand

new to securities trading, who had no brokerage account until
July 2018, bet the price would go down, and he made almost
2 million dollars overnight on a single trade.

Now, you've also heard of examples on trades where the
defendant lost money, and we showed you several.  You also know
why.  Having earnings information ahead of everybody else is
absolutely a huge advantage, an unfair advantage, but it
doesn't guarantee success a hundred percent of the time.
Mr. Clarke told you that.  Sometimes the market reacts in
unexpected ways.  Sometimes companies announce other news, like
that guidance from Ulta or the issuance of additional stock.
That can offset even a really good earnings number.  And
sometimes the defendant and his associates simply didn't know
what to make of the reports that they had downloaded.  And you
know that from the Threema chat.  Rumiantcev admitted to
Ermakov in 2018 that the two implement poor trading ideas, that
they have low-level competencies as traders, and that they
actually sucked at certain trading strategies.  That's exactly
why they wanted to hire an analyst to help them, because they
needed someone who knew what they were doing, but they also
needed to keep the analyst in the dark.  And that's why they're
talking about hiding the true source of the information by
mixing in fake documents with the real information.

Ermakov told Rumiantcev that he made mistakes buying
and selling shares on the exact same time.  Another time

Ermakov had to explain to the boss that he had made an
erroneous trade in Grubhub.  And once, Ermakov, in his own
words, was upset that he F'd up 30 to 40 percent wins that this
group could have had.

There was also a lot of information to sift through.
You saw how many downloads there were.  There were
approximately 2,300 from Ms. Soma's account alone.  And in this
chat, Ermakov estimates 200 to 300 potential choices, trading
choices, per quarter, and not all of them would be surprises.
Sometimes companies just meet earnings.  They don't beat them,
they don't miss them.  And that's not a company it would make
sense to place a bet on.  There simply wasn't enough time to
digest all this information, and that's another reason they
needed to bring in an analyst to help them out, to get through
all the information that they were stealing.

But bad as they were at trading, the defendant and his
associates still managed to make astounding amounts of money.
The defendant personally turned that 2.1 million dollars into
21 million.  He turned 4.5 million of his investors' money into
25 million, and kept 60 percent of that for himself.  You saw
that at Exhibits 55, 56, and 57.  These are the emails that
Rumiantcev sent to the defendant updating him on what the
investors were making and how much of that would stay with
M-13.  "Client receives 40 percent net profit."  "Client
receives 40 percent net profit."  That's 60 percent right back

1    to the defendant.  All told, with Irzak and Sladkov, these

2    traders turned about 9 million dollars into 90 million dollars

3    in a little over two years.

4        And that brings us to Sladkov and Irzak and the

5    devastating evidence that the FBI found on their computer

6    screens.  Pictures stored in Sladkov's iCloud account, the same

7    account that had the M-13 chat app in it.  Pictures that

8    matched up word for word with the earnings releases those

9    companies would later file.  Take a look at Exhibit 24.  This

09:59 10   is Snap's information, the company that makes -- or produces

11   Snapchat.  It's the laptop with the Russian Olympic Committee

12   sticker, and that photo was taken on February 6th, 2018, at

13   8:13 a.m.  You know that information, the same information we

14   did the bullet-by-bullet analysis -- we won't do it here --

15   wasn't filed until eight hours later, at 4:20 p.m.  Sladkov and

16   Irzak should not have had that picture when they did, and you

17   now know where it came from.  DFIN's consultant showed you the

18   log, a download over Julie Soma's account, rr52260, on February

19   5th, 2018, in the top left corner there, just one day earlier.

10:00 20   Sladkov and Irzak did it again with an 8-K for the third

21   quarter of 2018.

22       For SS&C Technologies, another DFIN client, here's the

23   SS&C data on Sladkov's laptop.  It's in Exhibit 99.  Agent

24   Hitchcock told you the photo was dated 1:42 p.m. on October

25   31st, 2018.  Exhibit 82 is the 8-K and the Exhibit 99.1 that

1   SS&C actually filed with the SEC.  That's a mouthful.  It

2   didn't go to the SEC, though, for another two and a half hours,

3   at 4:13 p.m.  Sladkov and Irzak should not have had that photo

4   on their laptop either.  But you know who traded this time?

5   The defendant traded SS&C.  And miracle of miracles, he bet the

6   exact same way that Sladkov and Irzak did.  The defendant

7   didn't make any money on this deal, and you can see why in the

8   Threema chat.

9           On November 1, 2019, the day after Halloween, the day

10:01  10   after that announcement, Ermakov reported to Rumiantcev, "SS&C

11   is a problem stock."  The men had missed that SS&C Technologies

12   would be issuing more stock, something that would drive the

13   company's share price down, even though the earnings

14   information had been a beat.  And you heard from Mr. Clarke

15   that's exactly what happened.  Ermakov thought SS&C was a

16   problem stock because he had expected the stock to go the other

17   way, because he had the earnings information that suggested it.

18   He had that earnings information because Sladkov and Irzak had

19   a picture of that 8-K before it was announced.  And you know

10:02  20   where this information came from, a download of an Exhibit 99.1

21   over Julie Soma's account, from an IP address that came back to

22   Boston, 104.238.37.195.

23           Sladkov's companion, Olga, had a Tesla 8-K from

24   October 19th, 2017.  The 8-K that was publicly filed the next

25   day on the right concerned entry into a material definitive

agreement.  And here's what else you know.  Sladkov and the
defendant's right-hand guy, Ivan Ermakov, the one who traded
the defendant's accounts using the SaxoTraderGO account,
communicated about the defendant's trading -- about the
defendant's stock trading.

On May 20th, 2019, at 7:29 a.m. Eastern, while Julie
Soma was still fast asleep on the West Coast, a hacker was
using her credentials to take a 99.1 of Kohl's, the department
store company.  Mr. Clarke showed you that Sladkov and Irzak
started selling short about two hours later, at 9:50 a.m.
Rumiantcev started shorting 90 minutes later, and the defendant
and the three investors, a little bit after that.  By the time
the market closed on May 20th, 2019, all eight traders,
including the defendant, were betting that Kohl's would go
down.  Kohl's released its disappointing earnings the next day
at 7:00 a.m.  The store missed estimates by 7 cents, and the
market did shoot down by about 12 percent.  Bad news for
Kohl's, good news for the defendant, for Sladkov, Irzak, and
the others.  That morning, after the news hit, the defendant
bought the shares back at a low price and made himself a tidy
$51,000 on his short position.  Sladkov, Irzak, and the others
who bet short along with the defendant made money too,
including Rumiantcev, the employee, and the investors.  And you
know who else was communicating about Kohl's that day, sharing
screenshots that were tracking Kohl's market price?  Ivan

1    Ermakov and Igor Sladkov, the defendant's best buddy and the

2    guy with the pictures of the confidential information on his

3    laptop.

4            And that was far from the only connection between

5    Sladkov and the defendant.  Do you remember Avnet?  Ermakov had

6    this image of Defendant's SaxoTraderGO app on his iCloud

7    account.  It was an earnings miss, and if you look at

8    Exhibit 197B, all of the men started building their short

9    positions, the beginning of the chart, at the same time.  This

10:05 10   was just a few days after a download of Avnet's information

11   from an AirVPN IP address from TM.  Over and over and over

12   again, Sladkov, Irzak, the defendant, and his investors traded

13   the same stocks, in the same direction, at the same time.  They

14   were in lockstep.

15           Between 97 percent and 100 percent of the time they

16   traded the same stocks, it was in the same direction.  And you

17   have Exhibit 255 here to show you.  This is a chart showing all

18   of the defendant's trading positions, short and long, on

19   earnings events, compared to the other traders, including

10:06 20   Saxo -- excuse me, including Sladkov and Irzak, who also traded

21   at Saxo along with the defendant, with Rumiantcev, and the

22   investors.  When the defendant flips from green long to blue

23   short, blue short to green long, so does everyone else.  They

24   all trade in the same direction together.  That, members of the

25   jury, is a plan.  That is an agreement.

And here's what else you know.  On his iPhone, Sladkov had the defendant's superencrypted chat app, the M-13 chat app, so did Rumiantcev, and, of course, so did the defendant himself.  That's the defendant's company.  You can't just go to the App Store and get it.  Someone gave Sladkov access to that encrypted app.  Sladkov also had documents about an M-13 product known as LAVR on his iCloud account, but he had it more than a year before that product was announced publicly.  What was that product about that Mr. Sladkov had on his iCloud account?  Not just any product, a hacking product about those RedTeam campaigns that the defendant was pitching to his clients.

And if you look carefully back at Exhibit 255 on the top of your screen, you're going to see something interesting.  Start at the bottom of page 1 of Exhibit 255 when you get back to the jury room, on October 24th, two from the bottom of the page, and read along.  Capstead, Tesla, Snap, Apteo, Medpace, MGM Resorts International, McGrath Rental Corp., PJT Partners, Stifel Financial, Hess Corp., SS&C Technologies.  Not only did the defendant trade those in the same way as Sladkov and Irzak, you will find a download over the Boston IP, 104.238.37, for every single one of those companies.

And Judge Saris will instruct you that an Internet communication from one computer to another is a wire in interstate and foreign commerce.  They were all there.  The

1    defendant, Sladkov, and Irzak were trading on the same

2    information stolen over Julie Soma's account over a Boston IP

3    address.  And Mr. Clarke's statistics back up this same

4    direction, same way, same time as well.  He told you that

5    nearly every time that the defendant, Sladkov, Irzak, M-13,

6    Rumiantcev, and the investors traded on earnings, and there was

7    a download from DFIN, the download came first.  When there was

8    trading with DFIN clients, it always came after a download from

9    DFIN.  And Mr. Clarke told you that if there was no

10   relationship between those downloads and the defendant's

11   trading choices, you would not see a pattern like that,

12   download first, trade second more than a few times in a

13   million.

14        But you don't need a statistical expert to tell you

15   that, because your common sense tells you the same thing.

16   There is, in fact, a relationship between the downloads and the

17   trading, and you know what the relationship is.  It was the

18   downloads that caused the trading.  It was the downloads that

19   caused the defendant and his team to trade in the exact ways

20   that they did.  The hacks and the downloads were the secret

21   sauce.

22        Take a look at the Tesla earnings announcement for the

23   second quarter of 2020.  This is Exhibit 260B.  The defendant,

24   Sladkov, and M-13 were all originally short on July 22nd, 2020.

25   That's at the left.  They were betting the Tesla share price

would go down.  And suddenly, in the middle of the day, at 1:12
in the afternoon on the 22nd, they reversed course.  They
started buying Tesla.  What caused the defendant and Sladkov to
switch direction?  Well, you know that there was a download
from DFIN at 12:04 p.m.  Just one hour and eight minutes later,
the defendant stopped betting against Tesla and started betting
for it.  And Sladkov did the exact same thing at the exact --
almost exact same time.  And you know what that download told
him.  The earnings announcement made at 4:23 p.m. was a massive
win, a huge beat.  Instead of that 18 cents per share loss that
the market was expecting, Tesla reported a $2.18 profit.  News
that would definitely cause the price to go up, and it did.

When the market opened on July 23 at 9:30 a.m., the
price was up 5 percent.  The defendant, Sladkov, and their
associates started selling quickly, and they made good money.
161,000 for the defendant, 1.3 million for Sladkov, and money
for a few of the investors too.  The same thing happened again
in January 2020.  That's Exhibit 270A.  There's another big win
for Tesla.  The earnings were $2.06 a share when the estimate
was only $1.72.  The stock shot up, that red spot there after
the earnings release, and the defendant and his team made big
money.  1.2 million dollars for himself, 4 million dollars for
Sladkov, and 1.6 million dollars for the investors, which you
know was another $960,000 for the defendant.

Take a look at Exhibit 270B.  Once again, on January

1    27th, 2020, the defendant and M-13 were selling short.  They

2    were betting that Tesla's share price was going to drop, and

3    you can see that all day on January 27th and January 28th.  But

4    then on the 29th, right in the middle of the day, just hours

5    before the market closed, the defendant changed his mind.  He

6    starts buying Tesla.  Sladkov, Rumiantcev, Borodaev, and

7    Uryadov also started buying, but switched the defendant from

8    short to long in the space of a few hours, another download.

9    This time, the day before he changed his mind and the day

10:14 10   before Sladkov joined him.  Members of the jury, this is

11   devastating evidence of the scheme and devastating evidence of

12   a conspiracy.

13          Sladkov, the man with the M-13 chat app in his iCloud

14   account and pictures of confidential preannouncement earnings

15   information on his computer, and the defendant trading in the

16   same stocks, on the same days, in the same direction.  They

17   even go from short to long together.  And they do it, almost

18   each and every time, right after a download of confidential

19   information.  This was a group of traders making money on the

10:14 20   same scheme.  This is an agreement.

21          And since we're talking about the 104 IPs, let me

22   pause for a second on venue.  Judge Saris will instruct you

23   that it's the government's burden to show venue by a

24   preponderance of the evidence.  Our burden for everything else

25   is beyond a reasonable doubt, but here, more likely than not.

You've probably heard more than you will ever want to know
about IP addresses and data centers.  Right?  But here's what
you know.  There were 113 downloads over IP addresses starting
with that 104.238.37 block, many of them in alphabetical order
while Julie Soma was sleeping, Ulta, Aquantia, BPC, Biomarin,
Bioline.  The defendant traded in many of the companies whose
financials were downloaded over this very IP address.  You
remember the list.  Manhattan Associates at the top, Tesla,
Roku, Capstead Mortgage, and many others.  We went down his
list of trades and down the list of downloads back and forth
with Mr. Frank and Mr. Clarke.

Jacob Wall, the now-pilot who used to work at
StackPath, he told you that StackPath leased that 104 block of
IPs from Web2Objects as part of StackPath's expansion into
Boston and other cities to get closer to their clients, to give
them faster Internet connections.

Mr. Wall took that authorization and sent it to Micfo,
a company that he'd worked with in many cities.  He told you he
did it right away because those IP addresses were expensive and
time was money.  That's where the network engineer -- do you
remember Aditi Shah? -- that's where she worked.  And she told
you she sent that authorization right on to Cogent, the
Internet service provider for the datacenter here in Boston,
with instructions to direct the traffic to the IP prefix
104.238.37 in the location Boston.  And Cogent wrote back the

same day.  You know what they said?  Done.  The date was May 30th, 2018, five months before all of those downloads and all of the defendants trading over that same IP address.  And you saw the record from ARIN, the Internet registry, putting the IP just a couple blocks from here, 1 Summer Street, Boston, Massachusetts.

And you saw paid invoices for that IP just two weeks after the dates in October and November of those downloads. You even saw a picture, from September 2018, from Markley's datacenter where Micfo was storing server number 7.  You see the label there, BOS-SVR-7, which is where the invoice said was where the computer was.  And Mr. Wall told you that his customers' experiences would have been bad if the IP address wasn't in Boston, and he never had a single complaint.

The IP addresses are not part of some grand conspiracy to try the defendant here in Boston.  This was business as usual.  The testimony of those two witnesses, Jacob Wall and Aditi Shah, tells you that those IP address were in Boston in October and November of 2018, and all the documents from all of those companies with absolutely no interest in the outcome of this litigation support that testimony.  And you know that, from those IP addresses, the defendant and his crew used Julie Soma's stolen account credentials to impersonate her and to hack into DFIN's servers to steal the confidential earnings information that was stored there, about Tesla, about Capstead

1      and dozens of other companies, and to trade on that

2      information.

3            And here's what else you know:  The parties have

4      agreed that after his arrest, the defendant was brought

5      straight to Boston from Switzerland in December of 2021.  In

6      the context of the conspiracy charge only, where the defendant

7      and his co-conspirators reached their agreement and executed so

8      much of it from outside the United States, that fact alone,

9      that he was brought here, is enough to satisfy the venue

10     requirement on Count One, the conspiracy charge.

11           And the evidence from those downloads and from the

12     defendants trading on those stocks and all the other evidence

13     in this case, including his own words and those of his

14     co-conspirators, tell you that the defendant joined this

15     conspiracy knowingly, intentionally, and willfully.  He knew

16     what he was doing, and he knew that it was wrong.

17           For starters, while we're on the subject of the theft

18     of Tesla's information over the Boston IP, take a look at

19     Exhibit 152A where the defendant is talking to his two

20     investors, Borodaev and Varshavsky.  Hours before the market

21     closes on October 24th, 2018, about 1:28 in the afternoon, the

22     defendant tells them to take a look at Tesla stock now and

23     tomorrow after 16:30 and how much it grows once the market

24     opens in the U.S.  The defendant knows how much the stock was

25     going to grow because just as in those other trades in 2019 and

2020, there was a download of Tesla's Exhibit 99 over Julie

Soma's account earlier that morning, using the 104 IP addresses

in Boston.  This was a deal that the defendant was trading on,

and he wants to prove to Borodaev and to Varshavsky that he

knew what was about to happen.

But those are far from the only statements that you

have in this case, and not the only ones you have from the

defendant and from his co-conspirators.  When you go back to

that jury room, take a good look at Exhibit 46, the Threema

chat between Ermakov and Rumiantcev, and later with the

defendant and the unidentified man in blue.  A chat that

participants thought no one would ever read.  In it, the

defendant's two employees, Ermakov and Rumiantcev, discuss

their access to raw data and the need to hide it from the

analyst they hope to hire.

Take a look at this snippet from February 1, 2019,

where they're setting up the cover story.  Mr. Ermakov -- I'm

sorry, Mr. Rumiantcev.  "We will modify it somehow so that a

third-party analyst would think the materials have been found

in open source."  Members of the jury, there's no need to make

someone think things have been found in open source unless they

didn't come from open source.  And Rumiantcev confirms that for

you.  It was raw material that would need to be adapted, and it

can't be passed as is.  What kind of data can't be passed as

is?  You know the answer.  Data that's real.  Data they were

1    afraid an analyst would start using on the side and profiting

2    from.

3         So Rumiantcev talks about creating fake documents to

4    mix in with the real ones.  "Only we will know what forecasts

5    are based on real data."  The real data and the raw materials

6    that they are talking about here were the data that they were

7    taking from DFIN and Toppan.  And you know that the defendant

8    and Rumiantcev gave the same story to Saxo's Jeff Zorek in

9    April 2020.  Mr. Zorek told you the defendant's trading was

10:23 10    suspicious because it was largely around quarterly earnings and

11   it was amazingly profitable, too successful.

12        At the meeting, the defendant and Rumiantcev told him

13   that bogus story about M-13's financial analysts and its magic

14   app, Preston.  And the defendant falsely told the bank that he

15   didn't trade on any kind of confidential information.  And Jeff

16   Zorek told you that the bank let the defendant continue trading

17   for months.  Remember his words?  He said there was no

18   definitive negative information that the bank could point to.

19   That Saxo call might have gone a lot differently if Jeff Zorek

10:24 20    had had a chance to read the defendant's supersecret Threema

21   chat.  Lying to banks is not good faith.

22        In that same supersecret chat, Ermakov and Rumiantcev

23   talked about diversifying their trades across brokers so that

24   it would look less suspicious, and they talked about discussing

25   that concept with the defendant.  "I already told Vlad, need to

talk about reducing accounts.  Such a number of accounts with
the same securities, with the same broker is a bad idea."

         And they worried that the SEC could end up monitoring
their trades.  Look at what Ermakov said.  The issue is that
the interactive broker demands information on transactions, and
the end, beneficiaries, because this broker is monitored by the
SEC.  It continues.  The defendant, in green, asked Rumiantcev,
"Why won't we open on interactive brokers by ourselves, just
for information?"  The response?  "Most likely from fear of
direct trading and client visibility for SEC."  Rumiantcev
chimes in, "I mentioned it earlier, and the broker will see all
our transactions.  The fuck we need this?"  Ermakov's response,
"Broker sees it even now and can follow up on it.  The
regulator," the SEC, "is much more important here."  Ermakov
responds, "Europe in this regard" -- excuse me, the response,
"Europe in this regard is probably more preferable, though the
question remains to what extent they cooperate with the
American SEC."  That's the speaker in blue.  And then the
defendant responds, but he doesn't say, Hey, why are we worried
about the SEC?  What's going on here?  No.  He says, "Our
people from Switzerland say that they're blocking accounts with
no questions asked for six months if the profits are above 20
percent."  Keep in mind that the defendant was on a run that
would net him 900 percent.

         Members of the jury, the SEC should not be a problem

1    for a company with a legitimate trading strategy.  And hiding

2    from the SEC is not good faith.  This exchange is more

3    devastating evidence of the defendant's knowledge that what he

4    was doing was wrong.  And it's not just the Threema chat

5    either.  Take a look at his WhatsApp conversations with

6    Ermakov.  This is Exhibit 151.  Right from the start, you know

7    this isn't some ordinary chat between friends.  It begins with

8    them testing each other before they'll actually say anything in

9    writing.

10:27  10           The defendant wants to know, "What did Igor bring me

11    as a present?"  And actually says, "I am testing you."  It's

12    only when Ermakov tells the defendant that Igor brought him a

13    Tesla T-shirt that the defendant will even speak to Ermakov.

14    You know that conversations that start with strange passwords

15    and tests are not legitimate conversations.  But, of course,

16    these weren't ordinary friends.  They were so close they went

17    helicopter skiing together in April 2018 for Mr. Ermakov's

18    birthday, three months before the defendant started trading.

19    And to the World Cup together with the investors.  So close

10:27  20    they went to dinner after dinner after dinner.  So close that

21    the defendant shared with Ermakov pictures of the yacht that he

22    planned to buy and gave him a 100-million-ruble loan.  That's

23    about a million and a half dollars at the time.  So close that

24    the defendant bought Ermakov an apartment in August 2020, an

25    apartment that, as this chat makes clear, Ermakov was going to

own on paper.  The defendant would be the real owner, and the records would be destroyed.  In addendum, it'd say I am the signer and you are the owner.  It will be destroyed on the signing.

They were so close that Ermakov, Ivan Ermakov alone, among the hundreds of employees at M-13, got a car matching the boss's with a license plate with the company's number on it. Think about that.  An apartment, a 1.5-million-dollar loan, and a matching car.  Just Ermakov, who had no trading account, was a lousy trader.  You know exactly what Ivan Ermakov brought to the defendant's table.  They were so close that he even made Ermakov blush when he said stuff like this, "Honestly, I get a bigger kick when I check apartments for you with you.  The fact that we can walk home together and have a beer or play golf or simply send everyone to hell knowing that you are close."

The response, "This truly sounds like a nice declaration of love, like a declaration of love to a girl." And they were so close that the defendant gave Ermakov the key to his brokerage account at Saxo Bank with millions of dollars in it.  And he confided in his friend that his life's greatest pleasures were his boat and trading.  In the WhatsApp chat there's talk about things exceptionally close friends do together like going to the sauna and shopping for real estate, but they also talk about their scheme.  About the bonkers profits that they're making for Borodaev and Varshavsky through

that scheme.  Sasha, 693K on one million.  That's one of them.

Boris earned 999K on 500K.  Those are huge returns in seven

months.  And the defendant's comment, "They don't even ask why

anymore."

Who asks a question like that?  You know who.  Someone

who knows why they're making that kind of crazy money, someone

on the inside.  They even talk about watching the television

show "Billions."  And they even joke about hacking.  Here they

are talking about buying an apartment and that they're going to

earn the money, and then we can buy, which -- and that's in

June 2020, just a few months before he actually does buy him

that apartment.  You just saw those texts.

And when Ermakov comments that he had better get to

work, the defendant says, "No need to.  Just turn on the

computer" -- or "just turn the computer on and think a little

bit," to which Ermakov replies, "I already gave it a thought

yesterday.  I will be thinking more today."  Tears of joy

emojis.  You know what turn on the computer and think a little

bit means:  Hack and trade.

And here's how you know to a certainty that the

defendant knew what he was doing and that it was wrong.  Take a

look at what the defendant saved to his iCloud account.  This

is Exhibit 150 on the left, and 34 is the photo on the right.

A picture of an article in a protective plastic sleeve, the

kind that people use to keep important documents.  Special

1    Agent Hitchcock told you that the article was printed in May of

2    2017, but the photograph was taken more than a year later, in

3    the summer of 2018.  And you know what this article is about,

4    hacking into corporate networks, stealing the information in

5    them and making millions trading in the stolen securities

6    information.

7         Ask yourselves, members of the jury, who saves a

8    newspaper article about hacking and trading?  Who puts it into

9    a protective sleeve?  Who saves it to their iCloud account?

10:32 10   You know who does that.  Someone who that summer, that same

11   summer, has started doing the exact same thing.  Someone who

12   knows what he is doing is wrong, and not just wrong, criminal.

13   And that's why the defendant, Ermakov, and Rumiantcev could

14   speak freely with each other on a Threema chat when they

15   thought they were just a string of numbers and letters, and

16   they thought no one would ever read what they wrote.  And

17   that's also why Ermakov and Rumiantcev got angry when the

18   defendant slipped up and used the investors' names.

19   Rumiantcev, "What the hell is this deanonymization?"  That time

10:33 20   the defendant apologized and they went back to their chat.

21        But then he did it again, and this time it was worse.

22   He sent pictures of Varshavsky and Uryadov, the investors, to

23   the chat.  Photos that anyone who got access to that anonymized

24   chat would be able to identify.  He wrote, "What did we earn

25   today?  Our comrades are wondering."  And you remember what

happened next.  "Vlad, you are exposing our organization.  This is bad," said Ermakov.  Rumiantcev, "Vlad, stop sending to Threema."  The defendant, "So sorry."  Ermakov, "And that's how they get you and you end up as a defendant in a courtroom."

Members of the jury, the defendant knew he had screwed up.  He did a dumb thing, and he went on to delete the whole chat.  When Agent Hitchcock searched the defendant's iCloud account, the Threema app was there, but this supersecret chat was gone.  No discussions of raw materials, fake documents, finding brokers who wouldn't cooperate with the SEC.  No discussion of all their trading and spreading it among different brokerages so that people wouldn't get suspicious.  It was all gone because the defendant didn't want you to see it, because he knew, just like you know as you're sitting here today, exactly what it meant.

For his actions, the defendant is charged with four crimes.  In Count One, he's charged with conspiracy to obtain unauthorized access to commit wire fraud or to commit securities fraud.  In Count Two, he's charged with wire fraud.  In Count Three, unauthorized access to computers in furtherance of fraud.  And in Count Four, he's charged with securities fraud.

Judge Saris will give you the instructions.  Always follow hers, but to prove conspiracy, the government does not need to prove that the defendant actually committed the three

1    crimes with which he's charged, only that he agreed with one

2    other person to commit one or more of them.  Conspiracy is an

3    agreement.

4         Wire fraud -- and those are the elements there -- an

5    agreement that the defendant willfully joined and the

6    commission of one overt act by any of the co-conspirators.

7         Wire fraud has four basic elements, and elements 1, 3,

8    and 4 on your screen here aren't seriously in dispute in this

9    case.  First, there was a scheme to obtain confidential

10:36 10   information from TM and DFIN.  Second, that scheme involved a

11   download of confidential information from Capstead and Tesla

12   and other companies using Julie Soma's user credentials.

13   Third, there were interstate wires, over the Boston IPs and

14   others, to DFIN and TM.  But you know by now that the defendant

15   was a leader of this scheme who did have the intent to defraud.

16        Unauthorized access in furtherance of fraud has five

17   similar elements.  Here again, four of which are not seriously

18   in dispute.  Again, there was access to DFIN and TM's computers

19   over that 104 block of IP addresses here in Boston, using Julie

10:37 20   Soma's stolen user credentials, which were connected to the

21   Internet.  The hackers took things of value, the confidential

22   business information of the publicly traded companies, and that

23   furthered this hack-to-trade scheme.  So, again, as to his

24   intent, you know that the defendant was a leader of this scheme

25   who had the intent to defraud.

1            Because the indictment also charges aiding and

2     abetting, the government does not need to prove to you that the

3     defendant was sitting behind the keyboard for any of the

4     substantive counts.  We have proven that he aided and abetted

5     others, like Ermakov, by participating in this scheme that he

6     wished to bring about.

7            And finally, securities fraud, four elements with only

8     one seriously in dispute.  There were purchases and sales of

9     hundreds of stocks and securities as part of this hack-to-trade

10:38 10    scheme.  The scheme involved interstate wires, the download of

11    material nonpublic information over those same 104 IP addresses

12    here in Boston, with the same misrepresentation about Julie

13    Soma's identity, the theft of her user credentials.  You know

14    that the defendant here too had the intent to defraud as one of

15    the ringleaders of this scheme.

16            Common sense told Jeff Zorek that something was off

17    with the defendant's business.  Zorek just didn't have that

18    Threema chat.  He didn't have the Threema chat.  He didn't know

19    about M-13's hacking credentials.  He didn't have the full

10:39 20    picture of the defendant's trading.  But you do.  And like Jeff

21    Zorek, you also have your common sense.  Common sense tells you

22    that no brand-new trader brings home 900 percent returns

23    trading only on earnings events and only in the stocks of

24    companies whose information has been hacked and only at the

25    time that those companies have been hacked, common sense tells

1    you that amazing trading run would not simply stop on its own

2    when the hacks were fixed.  And common sense tells you that

3    it's wrong to hide from the SEC, and it's wrong to lie about

4    what you're doing.

5         Now that you've seen and heard all the evidence, you

6    know that the defendant did those exact things.  He broke the

7    law.  All the evidence in this case, the records and documents,

8    the chats and the testimony, lead to a single inescapable

9    conclusion:  The defendant is guilty, beyond a reasonable

10:40 10   doubt, of each count in the indictment.  Thank you.

11         THE COURT:  Thank you.  I think this would be a good

12   time for us to take our morning break.  I'll see you back here

13   at 11:00.

14         THE CLERK:  All rise.

15         JUROR:  Still no talking about it?

16         THE COURT:  Don't talk about it.  Don't talk until

17   you've heard everything.

18   (Jury exits.)

19         THE COURT:  Let me just say this -- we'll come back at

10:41 20   11:00, but you're ballpark, an hour?

21         MR. NEMTSEV:  Hope to be less.

22         THE COURT:  Totally up to you.  Let's say an hour.  So

23   that's 12:00.  Let's say no longer than half an hour, 12:30.

24   That's when Mem ordered lunch for them.  We'll have a brief

25   lunch and then come back around 1:00, probably, for the charge.

```
 1    Okay?  That's subject to change.  Thank you.  We'll just take a
 2    quick 20-minute break.
 3              (Court exits.)
 4              (A recess was taken, 10:42 a.m.)
 5              (Resumed, 11:03 a.m.)
 6              THE CLERK:  All rise for the jury.
 7              (Jury enters the courtroom.)
 8              THE COURT:  Great.  You may be seated.  Mr. Nemtsev.
 9              MR. NEMTSEV:  May I proceed?
10              THE COURT:  Yes, you may.
11              We need another notepad.  Are you completely out?
12              (Discussion off the record.)
13              THE COURT:  Great.  We are all ready.
14    CLOSING ARGUMENT BY MR. NEMTSEV:
15              MR. NEMTSEV:  Good morning, ladies and gentlemen of
16    the jury.  We met two weeks ago when we started this case, and
17    I want to thank you from the defense team for sitting here and
18    listening to this evidence.  I know that you all have
19    commitments at work and at home.  I want to thank you for
20    taking the time to listen to this case.  We all understand that
21    you're sacrificing a lot by devoting your time to being here,
22    and for that, we thank you.
23              The openings that we gave you was a preview, a promise
24    of what evidence either the government or the defense expected
25    to produce during the trial case, during the trial part of the
```

11:06 (line 10)
11:08 (line 20)

evidence.  Mr. Frank said the government will prove that
Mr. Ermakov, a friend of Vlad's, was the hacker, that he stole
confidential information from two major United States-based
filing agents, and gave Vlad access to that information about
the financial performance of companies that those filing agents
serviced so that Vlad can trade on the basis of that information.

I promised you that there would be gaping holes in the
government's case, that there would be no witness, no message,
no email that shows that Vlad knew anything about a hack or the
fact that any trading was based on confidential, stolen
information.  And in fact you didn't see a single message, a
single picture, a single earnings report, or even the words
"DFIN" or "Toppan" in any conversation with Vlad, including the
130,000 ones that they seized through his iCloud.

Many legal systems around the world presume that if
the government brings an accusation, then a defendant is
guilty.  That's the presumption of guilt, that a defendant in
these legal systems must prove his or her innocence to the
prosecutor.  Not in this country, not in this courtroom.  The
government failed to prove what they promised, that Vlad
knowingly, willfully, and intentionally engaged in hacking or
trading on the basis of nonpublic material information as a
result of these hacks.  The most sacred principles that make
our legal system the envy of the world is that the accusations
are not evidence.  Vlad is presumed innocent.

1          I told you at the beginnings of this case, and I'll

2    tell you now, we have no burden to produce any evidence, no

3    burden to testify, no burden to prove his innocence when the

4    prosecutors and agents of the most powerful federal law

5    enforcement agencies have failed to prove their case with

6    convincing quality evidence, like witnesses and documents, not

7    theories and inferences, sufficient to prove each and every

8    element of every charge beyond a reasonable doubt.  These

9    principles are the very foundation of freedom from reckless and

11:11 10   false accusations.  These are the principles that protect

11   someone from the ultimate horrors of our legal system, that an

12   innocent man or woman will be convicted of a crime that they

13   did not commit.  We'll navigate through the evidence and see

14   whether it creates one or many reasonable doubts based on the

15   government's failure to prove to support their claim that Vlad

16   is guilty of hacking and trading based on hacked information.

17          If Vlad wasn't a Russian citizen, I would have said

18   that he accomplished the American dream.  He grew up poor.  He

19   worked since the age of thirteen.  He worked his way through

11:11 20   law school and then business management in school, and started

21   a successful tech company that provided media monitoring

22   services, cybersecurity services.  That's all that we strive to

23   be, to be innovators, to start and run successful businesses.

24          There's no dispute that M-13 was a functioning,

25   successful business.  No dispute that it was in operation for

1    ten years.  There's no dispute that it had more than 300

2    employees.  There's no dispute that Vlad was overseeing major

3    projects and staffing them with dozens of engineers and other

4    IT professionals that worked for M-13.  There's no dispute that

5    M-13 had private and government contracts.  There's no dispute

6    that the company's main product line was a media monitoring

7    service that reviewed, categorized, and analyzed 40,000 media

8    publications at a given moment.

9         The government doesn't even dispute that Vlad

11:12 10  continued to innovate and break into the fintech space; one way

11   through Preston, a system designed to analyze and trade stocks

12   based on market sentiment.  The government doesn't dispute that

13   the system was available on the Apple Store, that it was tested

14   by Saxo Bank employees, who openly told Vlad and his company

15   that they liked it.  There's no dispute that what Vlad was

16   building with Preston was something unheard of.

17        Mr. Zorek, one of the only unbiased witnesses in this

18   case, who was dragged from his retirement home in Florida to

19   testify before you, testified to you that he believed Vlad's

11:13 20  Preston application was viable, that others on Wall Street have

21   been working on what he was doing for years, and he even

22   compared Preston to a different product that he was familiar

23   with, Estimize.

24        The government argued to you just now that Preston is

25   a cover, but during the Saxo call, Vlad was the one who

insisted that access be given to the Saxo Bank employees.  Who
creates an app, puts it on the Apple Store, who spends those
resources in order to create a cover?  Who creates a cover app
that they don't intend to use that Saxo Bank employees actually
liked and considered using internally?  That's one hell of a
coverup.  It wouldn't make any sense.

You heard that the information generated by social
media is potentially a more powerful predictor of the stock's
price movements than even the fundamentals.  A tweak from Elon
Musk could send the stock flying or falling.  An investor's
belief in a stock like Gamestop could shoot its price through
the stratosphere.  This is the new age of securities
investment, and Vlad was seeking to be at its forefront.

There's no dispute that Vlad strived to compete
against the largest companies in the world, to grow, to expand.
His company, like Kroll and StoneTurn and many other companies,
provided penetration testing as one of its many services.
There's nothing illegal about it.  It's standard practice in
the cybersecurity industry.  And, of course, having a media
monitoring application gives you an edge in this informational
race.  Obviously Vlad would have explored these additional
business opportunities.  It's not criminal.  This is what
capitalism and entrepreneurship is built upon, innovation and
disruption.  M-13 was not a cover, and Vlad was not motivated
by greed.  He had wealth and success long before a single stock

transaction was placed in his accounts.  He didn't need the

money.

But M-13's prominence in the tech sphere unfortunately

also made him a convenient government target.  He's wealthy,

he's Russian, and he owns an IT company that provides media

monitoring and cybersecurity service to the Russian government.

And as I said at the start, there's nothing illegal

about any of those things, but those were the reasons that the

government targeted him.  They predetermined that a hack means

that it must have come from Russia, regardless of whether it's

true or not.  They worked to fill that story, that theory, and

no one more conveniently fit that theory than Vlad, the wealthy

Russian IT professional.

The government tried to deny it.  Agent Hitchcock

testified that he and his colleagues didn't look at M-13's

website until Vlad's arrest.  If you believe him, you have to

ask, what were dozens or almost two dozen agents doing for

these year and a half or two years that they were investigating

this case?  The truth is, Vlad and M-13 are such a convenient

target that the government didn't even bother to think about

any other explanation.  Since the start of this criminal

investigation, the government has been pursuing the theory that

it was either Vlad or someone close to him that has to be the

hacker and there's no other explanation, ignoring all the

evidence that points in the other direction; but as we go

through the evidence together, you will hopefully see what I
see.

I do want to bring up one important point.  Our legal
system is adversarial.  The prosecutors in this case, the FBI,
the SEC, and every other government agent, is not here to help
the defense.  They're not here to present facts that are
favorable to both sides.  They're here to win their case as
much as I am here to win mine.  They believe in Vlad's guilt
since the day they learned of him.  They've been working
tirelessly to convict him.  We saw this during questioning, and
no one, not a single agent, would give me a straight answer.
It's not because they don't know how to, it's because they
don't want to, because giving a clear and accurate answer would
hurt their positions.

For starters, there's no evidence that Vlad engaged in
any hacking.  The evidence was conclusive.  Mr. Hartvigsen
testified to you that he had a team of twelve people responding
to DFIN's data breach.  The earliest evidence of a hack that
they located was from September of 2017 with more complete log
files dating back to February of 2018, and he testified
conclusively that the dates of the last intrusion was
August 20, 2018.

Vlad had no motive, no incentive to engage in a
hacking in September of 2017, given he didn't have a trading
account for almost ten months.  And the government doesn't

allege that Vlad hacked anything himself.  There's no evidence

that he had the technical skills to personally do a hack.  He's

the person at M-13 responsible for attracting capital and

investors and getting business.  He's not the technical

director of M-13, nor is he himself the person who knows how to

pick and trade stocks.  It was Ermakov and Rumiantcev who had

the exclusive decision-making power to buy or sell stocks in

Vlad's account, and obviously he wanted updates.  It was his

money that was being invested.  You don't give someone millions

of dollars of your money and not ask for updates as to what is

happening with it, but there's no evidence that he was deeply

involved in the research or the trading.

In its opening argument, the government promised to

you to prove that Ermakov was the hacker.  These are the words

from just two weeks ago.  There's no dispute that Ermakov

worked for M-13.  This is an employee list of all M-13

employees assigned to just one single project.  It includes 46

people, nearly 20 engineers, 20 other professionals.  There's

no dispute that what's listed in this document is true.  M-13

was a large company.  It had many employees, both technical and

administrative.  They worked on large projects.  There's no

dispute that Ermakov was the Deputy Director General of M-13.

There's no dispute that Mr. Rumiantcev was the Deputy Director.

They were clearly part of the management team.  But there's no

evidence that Ermakov had the level of sophistication and

computer wizardry necessary to pull off this complicated

computer intrusion.  If he was sophisticated, he would have

been prominently featured amongst the various IT professionals

that M-13 had at its employment.

This is a proposal that Agent Hitchcock read a portion

of.  It's Exhibit 141.  This is the last page.  This is a

proposal that Vlad submitted to a major company to provide

penetration testing services.  You can read it.  It's 16 pages.

It's detailed and extensive and includes all of the information

about their services.  The last page includes a list of experts

that are assigned to the project.  Ermakov is not the head of

the Informational Security Department, or the head of the

Penetration Testing Unit, or the head of the Security Analysis

Unit, or the head of Audit and Consulting Unit.  The only

evidence that Ermakov is responsible for hacks is in one IP

address that overlaps with DFIN logs and was located on his

iTunes application.

This is the log file showing that the IP address in

May 9th of 2018 was used by Mr. Ermakov to update his Mac apps.

We know from Mr. Roberts' testimony that there's simply not

enough IPs in the world to accommodate every person, every

business, every internet-connected device.  We have to share

them with our neighbors, with our friends, with strangers, and

everybody else.  He testified there could be thousands, tens of

thousands, hundreds of thousands of people using the same IP

address every day.  You and I likely have the same IP address.

It's not strange.  It's just the way the Internet works.

So what do we know about this IP address specifically?

Nothing.  You didn't receive any information about it.  You

have not heard any testimony about who it belongs to, who

serviced it, or whether it was associated with any VPN.  You

know it was an AirVPN address; it was not a StackPath address.

The evidence relating to this IP address is just absent.  Why

didn't the government present any evidence about the IP?  I

don't know.  Ask yourself, though, was it likely that this IP

was shared by hundreds of thousands of people at the same time?

And based on Mr. Roberts' testimony, I believe it's an

affirmative "yes."

There's another hole in the evidence that I don't

understand and I can't even begin to explain to you.  We all

know that iTunes means you have a Mac.  You can't update an

Android or a Windows from the Apple iTunes store.  It's common

knowledge.  It makes perfect sense.  You're talking about two

completely different programming ecosystems.  Just like an

iPhone user doesn't update their phone from a Google Playstore,

PC users don't update their applications from iTunes.

Mr. Brawner from Kroll and Mr. Hartvigsen from

StoneTurn, whose twelve-person team investigated the intrusions

at DFIN, they both told you that the intrusions took place

using a Windows computer.  The computer intruding and Ermakov's

1    Mac are completely two different computers.  There's no

2    evidence that Ermakov ever used a Windows laptop.  The only

3    people in this case that used a Windows computer are people who

4    took selfies of themselves with earnings reports on their

5    Windows laptop, Mr. Sladkov and Mr. Irzak.

6         If there's a person that the government wants to point

7    the finger at as the hacker, as the perpetrator, they shouldn't

8    point the finger at Ermakov or Vlad.  They should point the

9    finger at Sladkov.  He's the only person in this case to use a

11:26 10    PC, the only person to have an earnings report prior to its

11    release, not on one occasion, not on two occasions, but on

12    three occasions.  He's the only person to have a trading

13    account in 2017, which is the start of the intrusions.  This is

14    reasonable doubt about the government's theory.  Their theory

15    is dependent on Ermakov being the hacker because he is close to

16    Vlad, but the evidence doesn't support it.

17         Mr. Hartvigsen told you that they don't have log

18    files, but they did have some evidence that the intrusions

19    started as early as September of 2017.  The only person who

11:26 20    could have done anything with that information was Sladkov.

21    The only person who had any motive to hack a filing agent at

22    the time was him.  Vlad didn't have a trading account for

23    almost a year from then.  Ermakov never had a trading account.

24    The only trading that Ermakov did was in Vlad's accounts and

25    the accounts of Vlad's investors.  And as you review the 4,000

1    Threema messages, you'll see that it's Ermakov and Rumiantcev
2    discussing what trades to place and what to place them on.
3           It wouldn't make sense for Vlad to hack or order
4    somebody to hack the filing agents in this case and not do
5    anything with that information for almost a year.
6           There's another important fact.  Vlad only met Ermakov
7    in March of 2018.  That was the first time that Ermakov was
8    added to his contact list on his phone.  The first time that
9    they went anywhere together, you saw, was April of 2018, and
11:28 10  even after they met, Vlad still had no trading accounts until
11   many months later.
12          And you heard that Vlad and Ermakov were close.  They
13   went to the sauna together; they had deep conversation.  It was
14   a bromance, clear and simple.  But look at the dozens of charts
15   that Mr. Clarke created.  In almost every single instance, the
16   first person to place any transaction following a download is
17   Mr. Sladkov, at times not by hours but by entire days.  If
18   Mr. Ermakov was the hacker, if he was the one that obtained the
19   reports, ask yourself, why would Sladkov be the first person to
11:28 20  know?  Ermakov was close to Vlad, not to Sladkov.  It wouldn't
21   make any sense for Ermakov to prioritize Sladkov over Vlad with
22   this information if he had it.  Vlad was his employer.  He paid
23   him.  There's no evidence that Ermakov received a birthday
24   card, let alone a payment from Sladkov.  There's just no
25   evidence that Ermakov ever hacked or had an earnings report in

1    his possession.

2            And what else do we know about Sladkov and Irzak?  Not

3    much, in all honesty.  We spent more time talking about yachts

4    and vacations to the Maldives than these two key individuals in

5    a five-person conspiracy.  All we know is that Sladkov and

6    Irzkov lived in a different city 450 miles away.  Sladkov knew

7    Ermakov, but that was the extent of the evidence.  Evidence of

8    their friendship was essentially nonexistent.  They messaged on

9    WhatsApp, sent each other pictures.  Some of those pictures

11:29 10   were ones that Vlad sent to Ermakov, although there's no

11    evidence that Vlad ever asked or knew that Ermakov forwarded

12    those pictures to Sladkov.  That's the entire extent of the

13    friendship between Ermakov and Sladkov.  Sladkov never attended

14    his birthday party -- we watched a video of it -- or other

15    events that Ermakov and Vlad attended together.  The other

16    pictures that you saw shared between Ermakov and Sladkov were

17    the ones that were put into evidence, a handful of pictures at

18    best, and none of them include a picture of an earnings report.

19            The overlap in trading is a red herring.  Sladkov and

11:30 20   Irzak traded many more companies and events than Vlad.  Irzak

21    had 484 trades around earnings, but they overlapped only a

22    little more than half the time.  This is Mr. Clarke's charts.

23    You can see trading episodes for Mr. Sladkov are 375?  His

24    chart 255 only indicates that 227 of Sladkov's trades were in

25    the same stocks in the same direction out of the 343

1    earnings-based trades that Vlad made.  It's not that every

2    single transaction in every single stock overlaps.  It's a

3    little more than half.

4         Sladkov and Irzak are also the only ones with

5    five-figure returns.  Sladkov made more than 11,000 percent

6    return.  Irzak made more than 21,000.  That's an outlier

7    compared to every single other person that traded based on

8    earnings in this case and this time period.

9         And I don't know whether Sladkov and Irzak had DFIN or

11:32 10   Toppan or purchased this information from somewhere else.  It's

11   not my job to investigate that, but the evidence in this case

12   tends away from the government's theory that Ermakov was the

13   hacker and Vlad was his supporter.  The evidence does not

14   compellingly demonstrate that Vlad, or anyone else on his

15   behalf, hacked these two filing agents, or that he or Ermakov

16   ever had possession of an earnings report, or that Vlad had

17   knowledge that any transaction was based on material nonpublic

18   information.

19        There's also no tie to M-13 and the alleged hacking.

11:32 20   Again, there's no evidence that M-13 or Vlad were involved in

21   any intrusions when they started ten months prior to Vlad's

22   opening up a trading account.  The intrusions didn't change

23   over time.  It was the same Julie Soma account that was being

24   accessed in early February, pre-Vlad's opening of the trading

25   account and through January, 2020.

1              The government tries to tie M-13 to AirVPN addresses.

2       That's such a stretch of the facts.  Mr. Roberts expressly told

3       you that the records show that it wasn't M-13 that was

4       connecting to AirVPN; it was AirVPN that was trying to connect

5       to M-13 in January of 2020.  There was one sole response from

6       the M-13 server.  I don't know what it is.  It's not my job to

7       investigate it.  All I can say is, there's no evidence that the

8       short communication transmitted data so small, it could hardly

9       contain a tiny picture.  It could have been related to any

11:34 10    intrusion, given how much information was purportedly downloaded

11      and obtained from these two filing agents.

12             Mr. Hartvigsen testified to you that AirVPN was just

13      one of the 26 ISPs and one of 110 IP addresses that matched to

14      intruders.  There's no evidence that Vlad or M-13 used any

15      single one of them.

16             With all its enormous power to get documents and bring

17      witnesses before you, which you saw when they took Ms. Shah

18      from North Carolina, located her and placed her before you in

19      the matter of a day, the FBI didn't even attempt to ask AirVPN

11:34 20    and StackPath, or any of the other 24 ISPs, whether Vlad or

21      Ermakov or M-13 had an account there.  Mr. Wall, the individual

22      from StackPath, he testified to you that there was no free

23      service back then.  In order to get onto StackPath's servers,

24      you needed a name, an address, a credit card.  When I asked

25      him, "Did you check your records for Mr. Ermakov, or

1    Mr. Klyushin, or Mr. Rumiantcev, or M-13?" he said, "The FBI

2    never asked me that question."

3         They put in a statistician to confirm their theories.

4    Mr. Clarke's job was not to analyze the data and independently

5    determine whether they had made the correct decision.  They

6    gave him the data that they wanted him to use.  They told him

7    the dates that they wanted to use.  The dates that they told

8    him don't match the testimony of the witnesses that testified

9    to you about the intrusion.  I told him to statistically prove

11:35 10   that this trading wasn't random.  Why randomness is the

11   baseline for trading in stocks and making decisions to buy or

12   sell stocks is beyond me.  The stock market is not random.

13   Selecting stocks and deciding to buy or sell is not random.

14   You know that.  I know that.  Otherwise, thousands of hedge

15   funds and investment banks and money managers, they'd be out of

16   work.

17        The government had a predetermined conclusion that

18   they had to use math to try to satisfy.  They're hoping that

19   the confusing, incomprehensible interpretation of what a

11:36 20   p-value is was enough to convince you that there could be some

21   possibility that Vlad's trading was related to a hack.

22        A while back I read a book.  It was called

23   "Freakonomics."  It was an economist using statistical models

24   to tie the most random events in the world, and it just went to

25   prove that correlation isn't causation.  And that's the same

1    thing that Mr. Clarke did:  He used statistics to create a

2    piece of evidence to present to you because they lack all other

3    actual evidence.  They had to fill their holes, and they used

4    math to do it.  But math and statistics are not the direct

5    evidence that you would expect to see in order to deprive a

6    person of their liberty and their innocence.  The issue is not

7    that Vlad made a lot of money.  It's why.

8          The question is what direct evidence they have that he

9    knew that any transaction was placed on the basis of material

11:37 10    nonpublic information.  This isn't a civil case where someone

11    is suing someone.  This is a criminal case.  What distinguishes

12    a criminal case is not that just the act of buying the right

13    stock, but that the act was done with knowledge that Vlad

14    actually and knowingly possessed confidential information,

15    meaning the stolen earnings reports.  It's the pivotal element

16    in this case.

17          They seized his iCloud.  He wasn't expecting a

18    seizure.  He was thousands of miles away from the

19    investigation.  Think of what they would find if they had

11:38 20    seized your iCloud and searched your iCloud.  And despite that,

21    there's not one scintilla of evidence that Vlad had any access

22    to the hacked confidential information.

23          And as you saw, begrudgingly, Agent Hitchcock

24    confirmed that to you.  Mr. Roberts confirmed that to you.

25    Hundreds of thousands of texts, phone logs, Web searches,

pictures, and there is nothing.  The fallback is that this is
sophisticated actors, but this is just another way of saying
that they didn't find anything that they expected, and don't
want to blame themselves for pursuing the wrong guy.  It's
inconsistent with their arguments that Vlad's team was so
incompetent, they couldn't figure out which of the 3,000
earnings reports that were serviced by the filing agents to
trade in.  They couldn't figure out apparently whether the
numbers were better or worse.  They couldn't read a couple of
lines down to see what the guidance was.  If Vlad wanted to
trade on the basis of material nonpublic information, he could
have dedicated 10 percent of the resources of M-13 to review
and check and analyze every single earnings report that was
contained within the files of the two filing agents.

        The government also presented a chain of inferences
that took days to explain about how the Wan Connie account and
its Bitcoin transactions tracked back to other Namecheap
accounts that purchased domain names.  I can't begin to explain
to you how attenuated that connection is, but I can tell you
one thing, and it's something that we all know:  Every person
in this room is connected by 6 degrees of separation.  It's a
common fact.  If you go six steps out, everyone is connected to
each other in the world, and the digital world is no different.
If we had Bitcoin accounts and the government tracked back far
enough, you would probably be able to link every single one of

1      us to those same domain names.

2           When you start off with predetermined conclusions,

3      you're seeking to confirm that conclusion, not evidence to

4      contradict it, and that's what they did in this case.  They

5      started off with a predetermined conclusion that the hacker

6      must be Vlad or someone very close to him, and every other

7      single part of their investigation was intended to confirm that

8      initial belief rather than contradict it.

9           It's no hidden secret.  You have the Threema chat.  It

11:41 10     wasn't deleted by Mr. Rumiantcev.  You can review all of it.

11     You can see that the Threema chats span almost a year of

12     trading.  From the start of the chat group in October of 2018,

13     it was solely Mr. Ermakov and Mr. Rumiantcev discussing which

14     positions to open and which positions to close.  The only

15     updates that they ever sent Vlad were the financial ones

16     relating to trading profits and losses.

17          Vlad was brought into the chat in May of 2019, almost

18     seven months after it was created, and even after he was added

19     to the chat -- and you could look for yourselves -- he

11:41 20     participated very minimally.  He tells the group openly that

21     he's unable to help in active trading.  It was a different chat

22     in the WhatsApps where Vlad asked Ermakov, "Do you need help

23     with Saxo?" and Ermakov tells him "No."  He tells the group

24     openly what he believes his trading is based on:  It's based on

25     his monitoring system, 18,000 messages per week.

1           These are chats, July of 2019.  I showed them to you

2   during the opening.  They're chats between Mr. Rumiantcev and

3   Mr. Klyushin discussing the difficulties of collecting and

4   analyzing data from Twitter.  Mr. Rumiantcev says, "We have the

5   Tesla collection set in Twitter at 100 percent.  It's under

6   tickler only.  We get 11,000 messages per week."  They

7   discussed the difficulties of analyzing all of that

8   information, and Vlad tells him, "We're trading thanks to this

9   know-how only.  Everything is done by neuron networks plus

11:43 10   monitoring."

11           This isn't a coverup.  This is months.  This is July

12   of 2019.  The conversation with Saxo Bank takes place in April

13   or March of 2020.  This is many months before that.  This isn't

14   in preparation for any call.  This is what Vlad believes.  This

15   is what is in his mind.  No one tells Vlad in that chat, none

16   of the other participants tell him, "What are you talking

17   about?  This isn't how we do it.  Why are you making us analyze

18   all of these Twitter messages?  We trade on hacked reports.

19   You know that."

11:44 20           And Vlad had no reason to lie to a single person in

21   this chat.  The government will tell you that he had a reason

22   to lie in this chat:  All of the people in this chat are

23   supposedly his coconspirators.  They are alleged to be active

24   participants in this hacking and trading scheme.  Why would

25   Vlad say this unless he believed that it was true?  If Vlad was

trading based on hacked information and he knew it, why would 30 percent of his trades in the period of the hack be in non-earnings-related events?  Why would he not stop his team from trading after the hacks end?  The only explanation is that he is not basing his trading on the existence of the hacks, that he did not know that any material nonpublic information was being used to place his trades.

Another issue:  If Vlad was the one that was making investment decisions and purchasing and selling, why is there trading in his accounts after his arrest?  Agent Hitchcock did not tell you that he had Internet access or a computer from a Swiss prison.  Those trading decisions were being made by somebody else.  It's not enough that transactions took place. It's not enough that money was made.  You'll hear that Vlad had to know that the information that was being used to trade came from the results of a hack, and there's no witness, no email, no message that confirms that critical fact.  The government obtained 43 search warrants, had assistance from the SEC, had international law enforcement assistance, issued dozens of subpoenas, had assistance from Saxo Bank, and there's not a single piece of evidence that Vlad knew that the basis of any stock transaction was hacked information.

Vlad's iCloud, like all our iClouds, are repositories for virtually limitless amounts of information.  There's no evidence that he was hiding anything.  It was all out in the

open.  The government found his most intimate conversations
with his wife, his children.  Where is the communication or
email or picture that shows that Vlad possessed, reviewed, or
used material nonpublic information?  Nothing out of the 95,000
pictures or the 130,000 messages proves it.  This was confirmed
by the FBI and Mr. Roberts, who conducted his own searches of
Vlad's iCloud.  Where's the proof that anyone told him that the
source is insider or hacked information?  There simply isn't
any.  Where's the information that Sladkov told Ermakov that
the source of information was a hack?  Where is the evidence
that Ermakov told anything to Vlad?  Where's the proof that
Vlad, who told one of the investors about Tesla going up on
October 24, 2018, related to material nonpublic information
rather than something else, including potentially a deep dive
in a market study?  There's nothing.

        The government admits that Vlad did not hack himself.
They guessed that someone told him something, but you don't
guess people into prison.

        Vlad wasn't hiding his strategy either.  The Saxo call
that we listened to was a call that was initiated by Vlad and
his trading team to get enhanced services.  The first part of
the call they asked for more leverage, wanted larger trade
windows; they wanted to get additional power of attorneys over
accounts.  You don't get on a call with a major investment bank
in order to get enhanced services when you're trying to hide

the fact that you're trading on insider information or hacking major U.S. filing agents.

When it's not proven, it's not guilty.  The government can't prove its case through possibilities or probabilities. Even proof by clear and convincing evidence, a different legal standard, is not enough.  You must prove these allegations beyond any and all reasonable doubts.  That is what is required under the law.  It has to be a smooth ride, not filled with gaping holes.

11:48  The government showed you chats about picking a brokerage to reduce the scrutiny of the SEC, puts a lot of weight on it, I get it.  But you heard it yourself:  In the securities industry, the SEC is the IRS.  An audit from the SEC to a trader is the same as an audit from the IRS to us.  Nobody wants to be part of an audit.  The same way that I tell my accountant to make sure that I don't get audited, that's the same reason that traders and trading firms try to minimize their scrutiny by the SEC.  You can go to State Street downtown or Fidelity.  I don't think a single banker or employee will 11:49 tell you that they welcome the SEC to come in and look at their transactions.

Mr. Zorek told you that Saxo Bank did not take on U.S. clients for that very reason.  The regulation and scrutiny it brings is too inconvenient to justify the costs.  The nine most terrifying words in the English language are "I'm from the

government and I'm here to help."  And imagine hearing that if
you're Russian.

Their transactions were already scrutinized.  They
were already designated as being from a high-risk country.
They had difficulty getting access to Bloomberg terminals
because they were Russian.  Why wouldn't they attempt to find a
broker that reduced their chances of getting audited?  Vlad
knew that 20 percent returns on the transactions would mean an
automatic closure just because he was Russian.  Why would
anyone want to deal with that?

And even then he says that the SEC, in that chat, that
the Interactive Broker complies with the SEC, gives them the
information.  But you know what?  He still used Interactive
Broker.  It was one of the trading accounts that was open in
his name.  It was one of the accounts that trades got placed
in.  It wasn't so much about evading detection as it was making
sure that his business runs smoothly.

The last message in the Threema chat was about
supposedly exposing the organization, but it was not exposure
of criminality that they were discussing.  It was exposure
about the identities of the investors.  That last chat was not
the only time that it happened.  Take a look.  Months earlier
they had the same thing where Vlad disclosed the names of the
investors in the chat group, and they yelled at him for doing
that, and he said, "I'm so sorry.  I'm just here for finances."

1   And Rumiantcev did not believe that chat, despite what he said.

2          There's an additional constitutional issue that you

3   will need to resolve.  It's important.  It goes to the heart of

4   protections that a person cannot arbitrarily be put on trial in

5   any place that the government wants.  As Judge Saris will tell

6   you, Vlad can only be tried in a place that has a meaningful

7   connection to the allegations.  There's no dispute that Vlad

8   was not in Massachusetts at the time of the charged conduct.

9   There's no dispute that the two filing agents are headquartered

11:52 10   outside of Massachusetts or that their servers are located in

11   other states.  The only meaningful connection alleged is the

12   use of this Boston IP address in connection with an intrusion

13   into DFIN's servers from October to early November of 2018.

14   It's the 104.238 IP address that no one can prove was in

15   Boston.

16          This constitutional protection goes to the very heart

17   of the establishment of the United States.  It emanates from

18   wanting to protect American citizens and others from the

19   arbitrary decision of governments to pluck individuals from

11:53 20   their homeland and try them thousands of miles away.  And it

21   was what the British before the Revolution used to do, and it

22   was for those reasons that these constitutional protections

23   were put in place.

24          I promised you that you will not hear, and you did not

25   hear, any evidence that Vlad used that IP address.  Despite

1    Mr. Wall from StackPath telling you that you needed to sign up

2    with your name, address, and credit card information, the FBI

3    made no effort to obtain any user data or confirm that Vlad or

4    M-13, or anyone else involved, had an account there.  There's

5    no evidence that the Boston IPs, the 104.238 IPs, overlap with

6    any of the IPs that were used by Vlad or Ermakov or Rumiantcev

7    or M-13.

8            There's also no clear evidence that the server was in

9    Boston.  This IP address was registered to a StackPath

11:54 10   subsidiary called StrongVPN.  You heard testimony that

11   StrongVPN has a status page where it indicates where servers

12   are available.  That page contained no reference to a Boston

13   server in September of '18 or March of 2019.  Of course there

14   was no complaint about the server; there was no server.  It was

15   never offered as one of the services by StrongVPN.  But the

16   matter is more complicated.  It's that the company that

17   actually owned the server, Micfo, had committed a fraud during

18   the exact time period when it was supposed to provide server

19   space to StackPath.  The government tosses its credibility

11:55 20   behind StackPath, who just three years ago convicted of fraud,

21   saying that they provided what they promised.

22           MR. KOSTO:  Objection.

23           THE COURT:  I think you just may have misspoken.

24           MR. NEMTSEV:  That's how badly they want to convict

25   Vlad.  They're willing to ignore a fraud committed by Micfo

that they just prosecuted three years ago.  The larger issue

is, it's unclear what Micfo promised.  As you saw from the

invoices, the very first time that Micfo promised to host that

IP address in Boston for a 30-day period was between

December 1, 2018, and December 30, 2018.  The IP address was

supposed to be hosted on server 7, but as you saw from the

other invoices, server 7 was occupied by a different IP address

since September and November of 2018.

There's no evidence that the IP that we care about was

hosted in Boston during this pivotal October to early November

period.  There's no evidence that Micfo would provide its

services for free, and there's no evidence that they put those

IPs on that server.  And this is not a technicality.  This is a

major constitutional problem.  It undermines everything that

the government promised to prove in their indictment and

undermines the entire premise of arresting Vlad in Switzerland

and forcing him to stand trial in Massachusetts, a place that

he's never visited, a place where he could never in a million

years imagine being placed on trial.

It's this constitutional protection that protects you

and me from being placed on trial in Alaska for conduct that we

committed elsewhere.  By putting Vlad on trial here, the

government has undermined our future rights that the founders

of this country guaranteed us.  This is the United States.  We

treat everyone equal.  All the rights that are conferred on you

and me are also conferred on Vlad as well.  Our legal system is
the model for democracies around the world.  Vlad is entitled
to the same right as somebody born on Beacon Hill who went to
Harvard.  The burden is solely on the government to expunge his
presumption of innocence.  Without actual direct evidence that
Vlad engaged or asked someone to engage in hacking of the two
filing agents, and that he knew the stock tips that he had were
based on those hacks, there's no crime.

The key, as Judge Saris will tell you, is in knowing
an intentional violation of the law.  You can't violate the law
by accident.  You can't violate the law when you have a
good-faith belief that your team is trading based on information
produced by Preston.  This isn't a movie or a game.  This isn't
Rocky 4.

You're about to deliberate over the fate and freedom
of a man that is only presumed innocent, but based on the
evidence you received, actually innocent of this gravely
serious charge.

There's a repeated saying in the lawbooks that "Better
ten guilty go free than one innocent be convicted."  That's why
our founding fathers, when they established our legal system,
they fought so bravely to put the burden squarely on the
government and made the burden very high.  But even a juror,
especially if a juror suspects a defendant may have done the
crime, they said it's possible that the defendant did the

1   crime, thinks it's probable, that's not nearly enough to

2   convict.  They must convince you, each of you, unanimously that

3   there's no reasonable explanation of the evidence, no

4   reasonable doubt of guilt, by credible, convincing, even

5   unimpeachable evidence, a very high standard that has preserved

6   all our freedom since the brave citizens of Boston fought just

7   outside the back door of our courthouse 250 years ago.

8          His fate, his freedom, his future are in your hands.

9   He's not seeking sympathy.  He sat here facing false

12:00 10   accusations.  I'm asking you to lift the cloud, the burden of

11   this painful and false accusation that has weighed on him and

12   his family for 22 months.  He's a good man, a man you may not

13   have heard of do anything wrong.  So I ask you to deliberate,

14   discuss, weigh the evidence against this high standard, and

15   tell Mr. Klyushin and the world that when the government does

16   not prove what it promises, does not prove each element of the

17   crime charged, that the only verdict that is appropriate is

18   "not guilty."  Thank you for your time.

19          THE COURT:  Thank you.  You want to stand and stretch

12:00 20   for a few minutes, and we'll have the rebuttal.

21          (Pause.)

22          THE COURT:  This should be about a half an hour.  Is

23   anyone desperate right now?  Okay, and then we'll break.  All

24   right, thank you.  Let's be seated.

25

1    REBUTTAL ARGUMENT BY MR. FRANK:

2         MR. FRANK:  Good afternoon, ladies and gentlemen.  I

3    am acutely aware that I am the third lawyer to speak to you

4    over the last several hours, and I am the only lawyer that came

5    between you and lunch, which is a place no lawyer wants to be,

6    but I'll be brief, and then you can go on your way.

7         I want to start with what's not in dispute based on

8    what Mr. Nemtsev just told you.  What's not in dispute is that

9    there was a hack on DFIN and Toppan Merrill.  What's not in

12:02 10   dispute is that the hackers were sophisticated; they were

11   experts.  What's not in dispute is that the hackers stole

12   confidential earnings information of dozens of companies right

13   before those companies announced those earnings to the SEC and

14   to the world.  What's not in dispute is that this defendant

15   runs a company that simulates hacking, this kind of hacking,

16   for its clients; that he has hacking experts who work for him.

17   What's not in dispute is that the defendant and his associates

18   traded in the exact same stocks that were hacked at the exact

19   same time of the hack, right before those earnings announcements

12:02 20   were actually announced.

21        What's not in dispute is that this defendant, despite

22   never having a brokerage account before these hacks, somehow

23   over the next two years made a stunning amount of money from

24   trading around earnings announcements, tens of millions of

25   dollars.  So did Sladkov, so did Irzak, so did Rumiantcev; so

1    did the defendant's investors, who gave him a 60 percent cut, a

2    60 percent cut to a man who didn't even have a brokerage

3    account before 2018.

4          And what's not in dispute, members of the jury, is

5    that after the hack ended in August of 2020, his earnings

6    trading fell off a cliff, and he started losing money on

7    earnings trades.  Even their own expert, Mr. Tawil, their

8    expert, didn't dispute that.

9          For a man who made that much money in that short a

10   period of time, I submit to you, he must be the unluckiest man

11   in the world.  He's the unluckiest man in the world to start

12   his trading career right around the time of a major hack at

13   DFIN and TM.  He's the unluckiest man in the world to have

14   96 percent of his earnings trade in the shares of the companies

15   whose earnings announcements were hacked at DFIN and Toppan

16   Merrill.  He's the unluckiest man in the world that his trading

17   invariably happens after the hacks and before the news is

18   announced.  He's so unlucky that the hacks can be traced back

19   through VPNs and Bitcoin transactions to the IP address of his

20   company that specializes in imitating hackers; on one occasion,

21   right back to his best friend, the guy he regularly goes to the

22   sauna with, Ivan Ermakov, within four minutes of one of those

23   hacks.  Of all the billions of IP addresses in the world and

24   the dozens of VPNs, somehow they come back to him and his wife.

25          He's so unlucky that on the computer of one of his

1    fellow traders, Igor Sladkov, a man who trades in lockstep with

2    him and has his company's super-encrypted chat apps on his

3    phone -- you didn't hear that from the defense, but the M-13

4    chat app on Igor Sladkov's phone, the man who trades in

5    lockstep with him, that man has the stolen MNPI, the stolen

6    earnings information actually on his computer screen.  The FBI

7    found it, and we showed it to you.

8          He's so unlucky, this man, that he actually has a

9    newspaper article saved in his iCloud account of an article in

12:05 10   a protected sleeve, a year after it was published, about a

11   hacker who trades on stolen earnings information to make

12   millions of dollars.  Lo and behold.

13         He's so unlucky that his remarkable beginner's luck at

14   trading runs out at precisely the time that the hackers get

15   locked out of DFIN and Toppan Merrill.

16         Oh, I almost forgot.  He also happens to be involved

17   in a Threema chat where they're talking about avoiding the SEC

18   and ending up as a defendant in a courtroom.  What are the odds

19   of that?

12:06 20         What do you do when your luck is that bad?  You do

21   what you see.  You throw everything up against the wall to see

22   if something sticks:  The FBI and the SEC jumped to

23   conclusions.  They targeted him because he's Russian.  The

24   witnesses, you heard every one of them asked, the witnesses

25   were rehearsed.  It wasn't Klyushin because he didn't trade in

the shares of each and every stock whose earnings were
downloaded, just some of the stocks, just 356 of them.  It
wasn't Klyushin because he had a magical app, Preston, that
told him what to buy.  That's why he was so successful.  It
wasn't his buddy Ermakov, but if it was his buddy Ermakov, he
didn't know about it.  No one told him.

        If it was anybody, it was Sladkov, and he doesn't know
Sladkov, and he has nothing to do with him, and never mind the
M-13 chat app on his phone and all the other evidence of
connections to the defendant on his phone.  But, really, it was
the victims' fault because they didn't have multifactor
authentication and they had poor password hygiene.  You heard
that as well.

        And whatever happened, whatever happened, it
definitely didn't happen in Boston.  Micfo is the real fraud.
It's Aditi Shah.  She's behind the scheme.  She's the real
fraudster.

        And a personal favorite, that chat about ending up as
a defendant in a courtroom?  That's about investor privacy.
Let's quickly take a look at a few of those.

        Preston, the social media software that the defendant
wants you to believe was the fuel for his investment success,
the magical app that he supposedly wanted Saxo to try, the app
that even Nikolai Rumiantcev said didn't help pick stocks, you
saw it in the Threema chat, the one that counsel just showed

1    you.  But he didn't read you the part where Rumiantcev says,

2    "It's generally hard to analyze the status of a security based

3    on social media networks."  That's line 36-87.

4         And then he goes on to say, "I'm not giving up my

5    hopes that our capability to collect news and posts in social

6    media may help us somehow," smiley face.  And in response to

7    that smiley face, the defendant makes a sarcastic response

8    about how "This is the only reason we have this know-how."

9         By the way, that was in July of 2019.  That was in

12:09 10   July of 2019 that Rumiantcev said, "Social media doesn't help

11   us pick stocks."  That was one year after the defendant started

12   trading.  And you heard that Saxo Bank had the same reaction a

13   full year later in 2020.  When Rumiantcev sent him the access

14   to the app, Saxo wrote back, in so many words, "Nice app, but

15   where's the part about how trading decisions are made?"  You

16   have that in evidence too.  That's Exhibit 328A.  Rumiantcev's

17   answer?  "Sorry, trade secret."

18        Counsel asked who creates a cover story about an app?

19   Who does that?  Who goes to those lengths?  Well, ladies and

12:10 20   gentlemen, you know who does that.  You actually saw them

21   discussing this exact cover story in the Threema chat, Ermakov

22   and Rumiantcev discussing how they would tell the trader they

23   wanted to hire, the analyst, that they had an app that analyzes

24   social and mass media; and they would slip in the real data so

25   the analyst wouldn't know that it was real data that he was

1  looking at, that they would mix it up with fake documents so

2  the analyst wouldn't know.  They actually discussed the exact

3  cover story.

4      But here's the thing, another question about Preston:

5  If it was so good, why did Preston only work on earnings?  Why

6  didn't it analyze social media and come up with stock

7  recommendations that worked on other kinds of trades, the ones

8  where they lost money?  If it was so good at analyzing earnings

9  trades, why did it only work on the earnings trades of

12:11 10  companies that filed their earnings announcements with DFIN and

11  Toppan Merrill?  And if it was so good, why did it break in

12  August of 2020, just stop working right around the time the

13  hackers got locked out?  Because it wasn't, because it's a

14  smoke screen, it's a cover story.  And whatever it is, whatever

15  it was -- and really there's no evidence about it other than

16  what I've just described to you -- whatever it was, it wasn't

17  the reason the defendant and his associates made $90 million

18  trading in the shares of companies that filed their earnings

19  via DFIN or Toppan Merrill.

12:11 20      The defendant argues it could have been anybody

21  because there's so many IPs in the world, and that just because

22  Ivan Ermakov was on the 119 IP within four minutes of the hack

23  on DFIN using that same IP address, "We don't know anything.

24  It could have been anybody using those IP addresses.  There's

25  so many IPs.  There's so many VPNs."

1          Their defense expert, Mr. Roberts, even suggested to

2   you yesterday it could have been somebody else using the M-13

3   IP address.  Think about that.  Who would that person have

4   been?  What, somebody driving by and using the M-13 WiFi?

5   Boloney, ladies and gentlemen.  The IPs come back to his

6   company.  The Bitcoin tracing does the same.

7          Ivan Ermakov's use of the 119 IP within four minutes

8   of that IP being used to hack DFIN is devastating evidence.

9   And, of course, it's his company that specializes in hacking.

12:12 10   And, of course, it's the defendant who traded in all of those

11   DFIN and Toppan Merrill stocks, not somebody driving by his

12   company and using the company WiFi.  And it's the defendant who

13   had the great misfortune of being caught on a Threema chat

14   talking about avoiding the SEC, and ending up as a defendant in

15   a courtroom.

16          He wants you to believe that there's no evidence that

17   Ivan Ermakov had the sophistication and wizardry to pull this

18   off.  Seriously?  You saw him advertise what his people could

19   do on his own company's website.  You saw the brochures.  You

12:13 20   saw him proposing to his clients that they could simulate

21   exactly this kind of hack.  Their argument is that he didn't

22   put his head of pen testing on it; he only put Ivan Ermakov on

23   this.  You know why he put Ivan Ermakov on this; because they

24   were besties.  He didn't go to the sauna with the head of pen

25   testing.  He went to the sauna with Ivan Ermakov.  That's the

guy he bought an apartment for.  That's the guy who had the car

that matches the boss's car with the matching license plates.

Of all the employees at M-13, it was Ivan Ermakov who had the

matching car and who got the apartment and who got the

million-and-a-half-dollar loan from the boss.

He argues that there's no evidence that he did the

hack personally.  Well, first of all, that's not true.  He's on

the M-13 IP within one hour of it hitting the AirVPN IP that

was used in these hacks.  But you also know he doesn't have to

be the guy behind the keyboard.  Mr. Kosto told you he's

charged with conspiracy; he's charged with aiding and abetting.

He doesn't have to have done it personally.  He ran the hacking

company; he was in charge; he's the guy who made the money.

And he knew everything about this scheme.  Listen to

that Saxo call.  Look at the way he takes charge in that Saxo

call and knows about every trade.  Look at the Threema chat

where he is filled in each and every step of the way.  They

actually say on the Threema chat, "Let's just bring him in so

we don't have to keep going back to him and telling him what

we're talking about and asking for his permission.  Let's just

bring him into the chat."

One of the sillier arguments you've heard is that

because Ivan Ermakov had an iTunes account and used a Mac, it

couldn't have been Ivan Ermakov because we know that it was

Windows operating systems that were somehow involved in the

hack.  Well, you know why that is:  because he didn't do it

directly from his laptop.  He went through the virtual servers

at DigitalOcean and Vultr, and those virtual servers can host

all kinds of different software.  They can have multiple

different operating systems operating on them at the same time.

He says there's no evidence that M-13 was involved in the

intrusion.  I'm not sure if Mr. Nemtsev was at the same trial

that we all were, but I submit to you there was plenty of

evidence that came directly back to M-13.

12:16      He is the one who called the shots, ladies and

gentlemen.  He is the one who was the boss of Ivan Ermakov and

Nikolai Rumiantcev.  He is the one whose company chat app was

on Igor Sladkov's phone.  He is the one who is so tight with

Ermakov.  He is the one telling Saxo exactly how this works and

how their trading works, and, of course, he's the one who made

$21 million.

      You also heard the argument that:  It wasn't the

defendant.  It wasn't Ermakov.  If it was anyone, it was

Sladkov.  And Sladkov started trading earlier, and so that's

12:16  how you know the defendant wasn't involved.

      We told you that Sladkov started trading earlier.

There's no dispute about that.  You don't have to join a

conspiracy at the very beginning to be part of a conspiracy.

You don't have to join a scheme at the very beginning to be

part of a scheme.  And PS, there can be more than one hacker

1    involved.  It doesn't have to be only Ivan Ermakov.  It wasn't

2    only Ivan Ermakov.  He was the defendant's close buddy.  He was

3    the hacker involved in this scheme.  So was Igor Sladkov.

4    That's why he had the confidential earnings information on his

5    computer screen.  That's why sometimes he traded first and

6    sometimes the defendant traded first.  There was a lot of work

7    involved in this hack, ladies and gentlemen.  There was a lot

8    of work.  They were hacking each of those networks using Julie

9    Soma's user ID and the other user IDs we talked about again and

12:17  10    again and again.  And they had to read all those earnings

11    reports and try and figure out what they were saying and figure

12    out which ones to trade off.  They were busy.  This was not a

13    one-man job.

14            Now, the Judge will instruct you that in a conspiracy,

15    the defendant doesn't have to know each and every conspirator.

16    He doesn't have to be involved in each aspect of the scheme.

17    He just has to have a general understanding of the scope of the

18    conspiracy.  But you know that he actually does know Igor

19    Sladkov.  Sladkov had pictures of his yacht on Sladkov's phone,

12:18  20    not just one picture, lots of pictures.  Sladkov had

21    pictures -- you heard this from Agent Hitchcock -- of his

22    vacation in the Maldives in Sladkov's phone.  Why?  Do you have

23    pictures of random other people's vacations that you don't know

24    on your phone?

25            Sladkov has his chat app, his super-secret encrypted

1    chat app that even his own expert couldn't get into, on his

2    phone.  Sladkov has a proposal from his company a year before

3    that product was announced on his phone.

4          Sladkov and Ermakov are talking about trading in

5    Kohl's, trading screenshots of what's going on in the market in

6    Kohl's, on the very same day that Sladkov and the defendant are

7    trading in Kohl's, after a download, before the news is public.

8          Sladkov and the defendant and Sladkov's buddy, Irzak,

9    trade in the same direction on the same stock over and over and

12:19 10   over and over again, and 97 percent of the time when they're

11   trading the same stocks, they're trading in exactly the same

12   direction.  It's Exhibit 255.  That alone is devastating

13   evidence of the conspiracy.

14         And, of course, it's the same Julie Soma user ID

15   that's used to get that information over the 104 IP.  All those

16   different companies over the 104 IP who had their earnings

17   downloaded, Sladkov and the defendant trade on those companies

18   in the same direction at the same time, after the information

19   is downloaded over an IP that's right here in Boston.  133

12:20 20   earnings releases are downloaded over the 104 IP right here in

21   Boston, and Sladkov and the others and the defendant trade on a

22   bunch of those stocks.

23         You'll also learn that whether they knew each other,

24   of course, doesn't matter.  It's not necessary to prove that

25   all the conspirators knew each other, and, frankly, you don't

1    even have to find that Sladkov was part of the conspiracy.  All

2    you have to find --

3            MR. FERNICH:  Objection, objection.

4            MR. FRANK:  -- is that he --

5            THE COURT:  I'll give you the law.  Thank you.

6            MR. FRANK:  -- he conspired with one other person.

7            MR. FERNICH:  Objection.

8            THE COURT:  We'll deal with that later.

9            MR. FRANK:  And somebody took a single step in

12:20 10   furtherance of it.

11           There was a challenge to Mr. Clarke's testimony, that

12   he only looked at what we asked him to look at; he only looked

13   at the dates that the government asked him to look at.  Well, I

14   submit to you that Mr. Clarke's testimony is essentially

15   unchallenged, that there's a one-in-a-trillion chance that this

16   man would trade the way he did if there was no relationship

17   between his trading and the identity of the filing agent, there

18   is a one-in-a-trillion chance that he would trade long where

19   there were earnings surprises and short there were earnings

12:21 20   surprises on the downside, if there was no relationship between

21   those two things.  There's a few-in-a-million chance that he

22   would trade the way he did if there was no relationship between

23   the time of his trade and when there was a download from the

24   DFIN servers.  You've heard no serious challenge to any of

25   that.

1           But that brings me to Mr. Tawil.  Poor Mr. Tawil.

2    Well, not so poor, Mister 30K.  You heard counsel talk about

3    that tweet from Elon Musk and how that could have driven stock

4    prices.  Mr. Tawil told you about that, except he didn't know

5    that the tweet was months after the defendant's trading in an

6    earnings announcement.  Mr. Tawil, the man who came in here to

7    talk about documents he knew nothing about and didn't bother to

8    check, whose source he didn't even know, who didn't even want

9    to stand by his own expert report.  And, of course, the

10   documents he did testify about weren't accurate.

11          Members of the jury, the defense has no obligation to

12   put on a case, none.  They can sit here and put us to our

13   burden of proof.  But when they do put on a case, you have the

14   right to examine it.  Their first witness, Mr. Roberts,

15   confirmed that when hackers behave the way the hackers behaved

16   here, united by common IP addresses and common VPN services and

17   common behavior, that suggests that they are acting as a group.

18   And their second expert witness, Mr. Tawil, showed you how

19   desperate the defendant is to get away from the numbers, from

20   his own trading record, because his trading record is

21   devastating evidence of his fraud, when it started, when it

22   stopped, and the concentration in the earnings announcements of

23   DFIN and Toppan Merrill clients.

24          And that brings me to venue.  The defendant wants you

25   to believe that he didn't do it and Ermakov didn't do it, and

1  if anyone did it, it was Sladkov; but whatever you believe, he

2  wants you to think it didn't have anything to do with Boston.

3  This is grasping at straws, members of the jury, trying to

4  confuse because there is no defense to the crime itself.

5       The Judge will instruct you that for the conspiracy

6  count, all we have to prove is that it is more likely than

7  not -- it's a different standard that applies to venue, it is

8  not beyond a reasonable doubt -- all we have to prove is that

9  it is more likely than not that the offense began outside the

12:24 10  United States, that the essential conduct of the conspiracy

11  took place outside the United States, and that the defendant

12  was first brought to Boston after he was arrested in

13  Switzerland.  That point is not even disputed.

14       There's a stipulation in evidence.  He was brought

15  straight to Boston after his arrest in Switzerland.  And you

16  know that the agreement began outside the United States in

17  Russia where all the conspirators live.  And you know that

18  everything they did to set this conspiracy in motion, they did

19  from Russia.  In fact, the crime of conspiracy was complete in

12:24 20  Russia.

21            MR. FERNICH:  Objection.

22            MR. FRANK:  All they had to do was --

23            MR. FERNICH:  Objection.

24            THE COURT:  Overruled.

25            MR. FRANK:  -- was take one overt act after that

agreement was made, and the crime of conspiracy was complete.
And there were dozens of overt acts.  Every single time
somebody sat down at a computer to hack into DFIN and Toppan
Merrill, that was an overt act.  Every single time someone sat
down at a computer or picked up their phone to trade on the
SaxoTraderGo app, or any one of the other brokerage accounts,
that was an overt act in furtherance of the conspiracy.  So
that is venue for the conspiracy.

For the other counts, all you need to find is that
it's more likely than not that some essential conduct happened
here.  That's why we spent so much time talking about the 104
IP, the 104 IP that they now claim you have no evidence that it
was in Boston.  Members of the jury, where were they?  You have
so much evidence about this one IP address.

Mr. Wall they claim was making it up.  That's
essentially their argument:  It wasn't on the StrongVPN
website, even though Mr. Wall told you he didn't know how often
that website was updated, and, in any event, it didn't matter
because those IP addresses were used across the various brands
that StackPath had, including companies like IPVanish.

Mr. Wall told you that that IP address was up and
running the minute they got it on May 30th of 2018, and Aditi
Shah corroborated that.  She told you the same thing, and you
saw the documents where she notified Cogent, "We want to put
this IP address in Boston," and asked Cogent to direct the

1    internet traffic here.  And you saw the response from Cogent,

2    "Done," May 30, 2018.  And then you saw the invoices from

3    months later, in November and December of 2018, billing

4    StackPath for that IP address in Boston.  And you saw the

5    picture of the computer server in Boston as of September, 2018,

6    where that IP address resided.  And, yes, there were other IP

7    addresses also on that server because you heard evidence that

8    many IP addresses can reside on a single server.

9         There is abundant evidence, way, way, way more likely

12:27 10   than not, I submit to you, that that IP address was in Boston

11   at the relevant time.  It is conclusive evidence, and it is

12   from that computer, that IP address, just a few blocks from

13   this courthouse, that 133 earnings reports were downloaded

14   using Julie Soma's user ID from DFIN.  That is the deceptive

15   device, using Julie Soma's identity to get into DFIN and get

16   access to those earnings reports.  That's the deceptive device

17   for securities fraud.  That's the essence of that crime, and it

18   happened from here in Boston.  That's the wire for the wire

19   fraud.  That's the unauthorized access for the charge of

12:28 20   unauthorized access, and it happened as to those 133 earnings

21   announcements from right here in Boston.  And you know that the

22   defendant and Sladkov and the others traded in so many of those

23   stocks that were downloaded from right here in Boston in

24   October and November of 2018.

25         That gives you venue over Counts 2, 3, and 4, and it

1    gives you another ground for venue over Count 1.  And,

2    remember, this is not beyond a reasonable doubt.  This is only

3    more likely than not.

4         I'm going to wrap up, ladies and gentlemen, because I

5    know you're hungry and you've heard a lot of speaking.  You

6    walked into this courthouse with your common sense and you will

7    leave it with your common sense, and in between you will take

8    that common sense with you into the jury room for your

9    deliberation, because common sense is all you need to decide

12:29 10   this case.

11        There was a hack.  He ran a hacking company.  The IP

12   addresses associated with the hack lead back to his hacking

13   company and his close friends.  He traded in the shares of the

14   company whose earnings information was stolen.  He made a

15   fortune, and he stopped making money when the hackers were

16   locked out.  He did it.  He did it using an IP right here in

17   Boston just a few blocks from this courthouse.  That was part

18   of the scheme, and the evidence is overwhelming, mountains and

19   mountains of evidence.  He is guilty beyond a reasonable doubt,

12:30 20   exactly as charged.  Thank you for your time.

21        THE COURT:  We stand in recess.  As soon as you're

22   done with lunch, which I hope is there -- we'll monitor it --

23   we'll come back in, but not a full hour.  We're hoping to sort

24   of give counsel the opportunity for lunch as well and then come

25   back here.  You know, I'm hoping 1:00 o'clock, give or take.

```
 1    She's going to check out the food.  Otherwise, she'll make the
 2    sandwiches, right?
 3              (Laughter.)
 4              (Jury excused.)
 5              THE COURT:  Can I see counsel at sidebar for one
 6    second.
 7    SIDEBAR CONFERENCE:
 8              THE COURT:  Do we need the white noise on?  I think we
 9    have some press back there.
12:31 10         So let me say, there were two objections Mr. Fernich
11    made which I'm not sure I totally understood, but if it's the
12    issue of whether or not Mr. Sladkov was involved with the
13    conspiracy or not, the sanitized indictment doesn't do much.
14    In other words, the unindicted, unnamed coconspirators were
15    mentioned in the rest of it.  So I don't think what -- and
16    maybe I'm wrong but I'm just -- I don't think what Mr. Frank
17    said is wrong.  They only need to prove the conspiracy,
18    Klyushin, Ermakov, and Rumiantcev.  That's all they need to
19    prove beyond a reasonable doubt is an understanding between
12:32 20    them.  So I wasn't sure I understood your objection.
21              MR. FERNICH:  They have to prove a single conspiracy
22    charged in the indictment.
23              THE COURT:  Right, I hear that, but they're never
24    going --
25              MR. FERNICH:  I wouldn't send it back.  I don't think
```

```
 1    it's necessary.  I think your Honor would avoid this problem by

 2    not sending it back.  Your Honor is going to instruct them and

 3    summarize --

 4              (Cross-talk.)

 5              MR. FERNICH:  I don't remember what I said.  Oh, so

 6    your Honor is going to instruct and summarize the indictment,

 7    and if they want it, they can ask for it.

 8              THE COURT:  I think I'm not going to send it in.

 9              MR. FERNICH:  Yes, I think not.

10              THE COURT:  It's confusing.  They don't know what

11    you're talking about.

12              MR. FERNICH:  It's a real speaking indictment.

13    There's too much to --

14              THE COURT:  Okay.  Next one.

15              MR. NEMTSEV:  Were there any other objections to the

16    jury instructions?

17              MR. FERNICH:  He thinks there's a special preservation

18    requirement here, so for the record, we just reiterate

19    everything that was previously lodged in terms of objections.

20              THE COURT:  I have no idea what you just said.

21    Objections to the -- I heard no objections --

22              MR. FERNICH:  No, just everything -- formally, to the

23    extent that we have to, we just formally, without elaborating,

24    renew every charge objection.

25              THE COURT:  Can I say, you can't do that.
```

1          MR. FERNICH:  I can't?  Okay.  No, we don't have to do

2     that.

3          THE COURT:  Let me put it this way:  When I'm done

4     with the charge, at that point you preserve.

5          MR. FERNICH:  All right.

6          THE COURT:  Okay?  There was another objection, but I

7     do think Mr. Frank was right that the overt -- that the

8     conspiracy was complete, or could have been complete, if there

9     was an agreement and an overt act in Russia.

12:34  10          MR. FERNICH:  If there was an overt act, yeah, and

11     then he added that afterward.

12          THE COURT:  I just wanted to make sure -- you know, we

13     had a long day -- that I'm understanding it.  Enjoy, have a

14     wonderful lunch, and then I'll bore everyone to tears and just

15     read this instruction, and then you will preserve.  All right.

16          In the meantime, let me just ask, are the two

17     paralegals going to be assisting to make sure that the

18     documents are all in good shape to go back?

19          MR. KOSTO:  Yes.

12:34  20          THE COURT:  Okay.  I plan on leaving here around 4:00

21     today.  They may have to leave a little on the early side, but

22     it's my practice to send them home.  In other words, I'll see

23     them when they go home.  And I'm sort of going to assume that

24     if you're all here, the defendant should be here.  If you don't

25     all want to be here, none of you should be here to say good

```
 1   night.
 2           MR. FRANK:  Okay.  We'll be here.  What's your
 3   pleasure, your Honor?
 4           MR. FERNICH:  This is home for them.
 5           THE COURT:  My point is only, I say "good-bye."  I
 6   don't just dismiss them out of the courtroom.  I say "good-bye"
 7   and remind them not to talk about the case or look at social
 8   media, dah-dah-dah.  So do you all want to be here?  Think
 9   about it.
12:35 10         THE CLERK:  If there's a question, Judge, don't forget
11   I need numbers --
12           THE COURT:  My charge that is going to put everyone to
13   sleep is coming next.
14           MR. FERNICH:  What time do you want to start here?
15           THE COURT:  I'm going to say 1:00.  It's my practice
16   to send back a transcript of the charge as soon as it's
17   available, so Monday morning some time, and I'll ask you to
18   proof it to make sure.
19           (End of sidebar conference.)
01:11 20         (A recess was taken, 12:36 p.m.)
21           (Resumed, 1:11 p.m.)
22           (Jury enters the courtroom.)
23           THE COURT:  The jury shall remain standing.  Everybody
24   else in the courtroom shall be seated.  Thank you.
25
```

<u>JURY INSTRUCTIONS</u>

THE COURT:  Good afternoon.  There's an old tradition in the courts of our Commonwealth and in this Federal Court that at this stage of the proceeding, the judge stands and faces the jury and the jury faces the Judge.  This is the best way that I know how to symbolize the important role we both play at this trial.

My job has been threefold:  First, my job was to impanel a fair and impartial jury.  You are that fair and impartial jury.  You swore to be fair and impartial, and you've been amazing at showing up on time and paying attention.  On behalf of everyone in this room, we thank you for your service.

The second job was to rule on evidentiary objections and make certain rulings of law, and now my third and final task is to give you these instructions of law.  You must follow these instructions whether you agree with them or not.  To the extent I say something differently from what the attorneys say, you shall follow these instructions of law.

These instructions will be divided into three parts. The first part is very general but extremely important.  It will set forth the constitutional principles that govern this case, and I remind you that all of you swore that you could follow these constitutional principles.  In addition, it will go through what are Rules of Evidence and what are the differences between openings and closings and that sort of

1    thing.

2             The middle portion of the charge is very specific to

3    the specific crimes with which Mr. Klyushin has been charged,

4    and I gave you a verdict form.  I will be going through the

5    elements that must be proven beyond a reasonable doubt.

6             And my third and final task will be what I call the

7    "mechanics" of getting this case out to you to deliberate,

8    about choosing a foreperson, about the role of alternates,

9    about deliberations.

01:13 10          Now, at this point I am going to encourage you to at

11   least take some barebones notes about this charge.  Please

12   don't take it all down.  It's impossible.  It's very long and

13   really boring, but it's important, okay, for you to follow.

14   It's not as exciting as what you heard this morning, but it's

15   important for you to follow the law.

16            In order to make sure you get it correctly, I have an

17   old-fashioned tape recorder playing right here, which I will

18   bring back into the jury room, and on Monday you'll have a

19   transcript of the full charge.  But the only reason I ask you

01:14 20   to take notes is so you can remember exactly where in the

21   charge I may have discussed a particular issue.  But don't try

22   and transcribe everything that I say.  You'll get it, both on

23   the tape recording and in the transcript.

24            All right, so let's sit down and get going.

25            Let me begin with the role of the Court.  These

instructions are about the law you must apply.  I don't mean
any of my instructions to be understood by you as a comment by
me on the facts or on the evidence in the case.  You are the
judges of the facts and the sole judges of the credibility of
the witnesses.  You must be guided only by my instructions on
the law as I state them.  You should consider them as a whole.
I may repeat some portions, but that does not mean that they
are more important.  All the instructions are equally
important.

Even if you disagree with some of the rules of law or
don't understand the reasons for them, you are bound to follow
them as jurors in this case.  This is a fundamental part of our
system of government by law rather than by the individual views
of the judge and jurors who have responsibility for deciding a
specific case.

To the extent I say something differently from what
the attorneys said, follow my instructions of law.  However, I
am not the judge of the facts.  I have no opinion as to the
appropriate outcome of the case.  You must disregard any facial
expressions you think I might have had.  Also, if during the
course of these instructions, or at any other time, I have
stated the evidence differently than you remember it, you must
disregard my memory of the evidence.  It is your memory that
counts.

What is your job as the jury?  Your function as jurors

1   is to determine the facts.  You are the sole and exclusive

2   judges of the facts.  You decide the weight, effect, and value

3   of the evidence.  You also decide the credibility or

4   believability of the witnesses.  Once you determine the facts,

5   it is your duty to apply those facts to the law as I explain

6   it.  You must decide whether the defendant is guilty or not

7   guilty of the charges that the United States has brought

8   against him.

9         You must determine the facts without prejudice, fear,

01:17 10   favor, bias, or sympathy.  You also may not consider any

11   personal feelings you may have about the race, religion,

12   national origin, sex, or age of the defendant, or any witness

13   who testified during trial.  You must determine the facts

14   solely from a fair consideration of the evidence.  If you were

15   to allow prejudice, fear, favor, bias, or sympathy to enter

16   into your deliberations, there's a great risk that you will not

17   arrive at a true and just verdict.

18         The issue before you is not whether you are for or

19   against the crime charged.  Rather, the issue is whether the

01:17 20   government has proven beyond a reasonable doubt that the

21   defendant is guilty of the crime charged.

22         You should also not be influenced by the fact that the

23   United States of America has brought this case.  All parties,

24   the government and Mr. Klyushin, stand as equals before the

25   Court.  So when you go back to the jury room, the question must

never be, will the government win or lose this case?  You

represent the people of the United States, and the people of

this country always win when justice is done.

You are not to decide the case based on what you may

have heard or read outside the courtroom.  You cannot speculate

or guess as to what might or might not have happened.  You

cannot allow yourselves to be influenced by your view of the

nature of the crimes with which the defendant has been charged

or the consequences of the verdict.  Instead, you must confine

your deliberations to the evidence and nothing but the

evidence.

The lawyers were allowed to comment during the trial

both on the evidence and the rules of law, but if what they say

about the evidence differs from your memory, let your

collective memory control.  And if what they have said about

the law seems to you to have a different meaning in any way

from my instructions on the law, be guided by these instructions.

What is evidence?  We discussed this briefly way back,

but we're going to go through it now.  The evidence from which

you are to decide what the facts are consists of sworn

testimony of witnesses, both on direct and cross-examination,

regardless of who called the witness, and the exhibits that

have been received in evidence.

You are not limited solely to what you see and hear as

the witnesses testify.  You are permitted to draw from facts

1    you have found to have been proven such reasonable inferences

2    you believe are justified in light of common sense and personal

3    experience.

4         The mere number of witnesses, the length of the

5    testimony, or the number of exhibits have no bearing on what

6    weight you give to the evidence or whether you find the

7    government's burden of proof has been met.  Weight does not

8    mean the amount of the evidence.  Weight means your judgment

9    about the credibility and importance of the evidence.

01:20 10        Certain things are not evidence.  Opening statements

11   that you heard, the closing arguments you heard today made by

12   the lawyers are not evidence in the case, nor are the questions

13   of counsel evidence.  Only the witness's answers are evidence.

14   Questions that were not answered or to which objections were

15   sustained also are not evidence in the case.  The function of

16   the lawyers in making their arguments is to point out those

17   things that are most significant or most helpful to their side

18   of the case, and, in so doing, to call your attention to

19   certain facts or inferences that might otherwise escape your

01:21 20   notice.  In the final analysis, however, it is your own

21   recollection and interpretation of the evidence that controls

22   in the case.

23         At times during the trial -- at many times during the

24   trial, you heard the lawyers make objections to questions asked

25   by the other lawyers or to the answers by the witnesses.  This

simply meant that the lawyers were requesting that I make a
decision on a rule of law.  Don't draw any conclusion from such
objections or my rulings on them.  These rulings only relate to
the legal questions that I had to determine and should not
influence your thinking.  When I -- you know this by now, but
when I sustained an objection to a question, the lawyer (Sic)
was not allowed to answer it, and don't try to guess what might
have been the answer had I allowed the question to be answered.
Similarly, when I told you not to consider a particular
statement -- maybe someone flipped it in before I could rule --
because I struck it, you were told to put that statement out of
your mind, and you may not refer to that statement in your
deliberations.

     Also, if I received evidence but told you it was
received for a limited purpose -- remember several times I
interjected and I said, you know, "I'm limiting what you can do
with this" -- or if I tell you now that you can only use some
of the evidence in a particular way, consider those
instructions, and you are bound by that limitation.

     During the trial I occasionally may have made comments
to the lawyers, asked questions of a witness, or admonished a
witness concerning the manner in which he should respond to
questions or counsel.  Do not assume from anything I may have
said that I have an opinion concerning any of the issues in
this case.  Except for my instructions to you on the law, you

1  should disregard anything I have said during the trial in

2  arriving at your own findings of the facts.

3        I want to go through again what the difference is

4  between direct and circumstantial evidence.  There are two

5  types of evidence which you may use to determine the facts of

6  the case:  There's direct evidence and circumstantial evidence.

7  Direct evidence is direct proof of a fact, such as the

8  testimony of an eyewitness that the witness saw something.

9  Circumstantial evidence is indirect evidence; that is, it is

01:23 10  proof of a fact or facts from which you could draw the

11  inference, by reason and common sense, that another fact

12  exists, even though it has not been proven directly.  Any

13  inferences or conclusions that you draw must be reasonable and

14  natural, based on your common sense and experience of life.  In

15  a chain of circumstantial evidence, it is not required that

16  each one of your inferences and conclusions be inevitable, but

17  it is required that each one of them be reasonable.

18        Direct and circumstantial evidence have equal standing

19  in the law.  That is, with respect to what weight shall be

01:23 20  given to the evidence before you, the law makes no distinction

21  between direct and circumstantial evidence.  Also, no greater

22  degree of certainty is required of circumstantial evidence than

23  that of direct evidence.  In reaching your verdict, it is

24  permissible to draw and rely upon inferences from the evidence.

25  You are to consider all the evidence in this case and give each

1    item of evidence the weight you believe it deserves.

2         Whether the evidence is direct or circumstantial, the

3    government must prove the defendant's guilt beyond a reasonable

4    doubt from all the evidence in the case.

5         I would like to now address the issue of credibility

6    of witnesses.  As jurors, your function is to evaluate the

7    exhibits that have been introduced and determine the

8    credibility of the witnesses' testimony.  "Credibility" is

9    simply another word for believability.  It is your function to

01:24 10    determine the believability of the witnesses who testified.

11    You're free to decide that you believe all of what a witness

12    told you, none of what a witness told you, or some of what a

13    witness told you.  You are free to do so in accordance with

14    your collective judgment as to the believability of what it was

15    that the witness told you while testifying.

16         Neither I nor anyone else can tell you all of the ways

17    that you go about making this important judgment about

18    credibility.  That's why we have you, the jury.  However, I can

19    suggest to you some of the things that you should consider in

01:25 20    making that judgment as to credibility.  You should consider

21    the conduct and demeanor of the witness while testifying; how

22    the way the witness testified on direct compared to how he

23    testified on cross; the frankness or lack of frankness that the

24    witness showed while testifying; the reasonableness or

25    unreasonableness of the witness's testimony; the probability or

improbability of that testimony; the opportunity or lack of
opportunity that the witness had to see and know the facts
about which he or she was testifying; the accuracy of the
witness's recollection; the degree of intelligence shown by the
witness; the witness's prior conduct for truthfulness; and
whether the witness has attempted to fill in gaps in his memory
of events with information he or she obtained after the event.

You may also consider whether the witness has a motive
for testifying and the interest or lack of interest that the
witness may have in the outcome of the case.  You may take into
consideration the character and the appearance of the witness
at trial and any bias he or she has shown in his testimony.
This list is not exhaustive but rather a list of examples of
the factors you may take into account, and should take into
account, in making a credibility judgment.

You may consider inconsistencies in the evidence or
differences as you weigh evidence, but you do not have to
discredit testimony solely because there are inconsistencies or
differences in the testimony of a witness or between the
testimony of different witnesses.  Two or more persons
witnessing an incident or a transaction may see or hear it
differently.  In weighing the effect of any inconsistency or
difference, you may consider whether it concerns a matter of
importance or an unimportant detail and whether it results from
innocent error or intentional falsehood.

1          You are not required to accept testimony, even if it

2     is uncontradicted.  You may decide, because of the witness's

3     bearing and demeanor, or because of inherent improbability, or

4     other reasons sufficient to you, the testimony is not worthy of

5     belief.

6          Let me talk to you for a minute about law enforcement

7     agents.  You have heard the testimony of law enforcement

8     officials.  The fact that a witness may be employed by the

9     federal government as a law enforcement official does not mean

01:27 10    that his or her testimony is necessarily deserving of more or

11    less consideration or greater or lesser weight than that of an

12    ordinary witness.  It is your decision, after reviewing all the

13    evidence, whether to accept the testimony of the law enforcement

14    witness and to give that testimony whatever weight, if any, you

15    find it deserves.

16          It is also appropriate to consider whether, in his or

17    her investigation, the particular law enforcement witness acted

18    in accordance with the standards of the department or agency.

19    If you find any omissions in the investigation were significant

01:28 20    and not adequately explained, you may consider whether the

21    omissions tend to affect the quality, reliability, or

22    credibility of the evidence presented by the government.

23          Now, I just finished what I'll call the very broad

24    evidentiary instructions.  Let's stand up and stretch because

25    I'm about to hit the very important area of the constitutional

1      principles here.

2              (Pause.)

3              THE COURT:  All right, let's hit the Constitution.

4      Let's go, the constitutional principles.  Let's begin with the

5      presumption of innocence.  It is a cardinal principle of our

6      system of justice that every person accused of a crime is

7      presumed to be innocent unless and until his guilt is

8      established beyond a reasonable doubt.  This presumption is not

9      a mere formality.  It is a matter of the most important

01:29 10    substance.

11              The presumption of innocence alone may be sufficient

12     to raise a reasonable doubt and to require the acquittal of the

13     defendant.  The defendant before you has the benefit of that

14     presumption throughout the trial, and you are not to convict

15     him of a particular charge unless you are persuaded of his

16     guilt of that charge beyond a reasonable doubt.

17              The presumption of innocence until proven guilty means

18     that the burden of proof is always on the government to satisfy

19     for you that the defendant is guilty of the crimes with which

01:30 20    he is charged beyond a reasonable doubt.  It is a heavy burden,

21     but the law does not require that the government prove guilt

22     beyond all possible doubt.  Proof beyond a reasonable doubt is

23     sufficient to convict.

24              This burden never shifts to the defendant.  It is

25     always the government's burden to prove each of the elements of

1    the crimes charged beyond a reasonable doubt by the evidence

2    and the reasonable inferences to be drawn from the evidence.

3    The defendant has the right to rely upon the failure or

4    inability of the government to establish beyond a reasonable

5    doubt any essential element of a crime charged against him.

6         If, after fair and impartial consideration of all the

7    evidence, you have a reasonable doubt as to the defendant's

8    guilt of the crime charged, it is your duty to find him not

9    guilty of that crime.

01:30  10         On the other hand, if, after fair and impartial

11    consideration of all the evidence, you are satisfied beyond a

12    reasonable doubt of the defendant's guilt of the crime charged,

13    you should vote to convict him.

14         What is the burden of proof?  The United States has

15    the burden of proving beyond a reasonable doubt that the

16    defendant is guilty of the crime charged by the indictment.

17    This burden of proof rests on the United States and never

18    shifts to the defendant.  The defendant is not required to

19    prove anything to you or to present any evidence.  Because of

01:31  20    the constitutional right to the presumption of innocence, the

21    government has the burden of proof beyond a reasonable doubt on

22    every essential element of the crime charged.

23         What is proof beyond a reasonable doubt?  What is

24    proof beyond a reasonable doubt?  Reasonable doubt is a doubt

25    based on reason and common sense.  The law does not require

1    that the government prove guilt beyond all possible doubt --

2    little in life can be proven to an absolute certainty -- but

3    the law does require that the government prove each of the

4    elements of the crime charged beyond a reasonable doubt.

5            It is not sufficient for the government to establish a

6    probability, though a strong one, that an element of a crime

7    charged is more likely to be true than not true.  That is not

8    enough to meet the government's heavy burden of proof beyond

9    reasonable doubt.  A reasonable doubt may arise not only from

01:32 10   the evidence produced, but also from a lack of evidence.  Of

11   course, a defendant never is to be convicted based on suspicion

12   or conjecture.

13           If after a fair and impartial consideration of all of

14   the evidence you have a reasonable doubt, it is your duty to

15   acquit.  On the other hand, if after fair and impartial

16   consideration of all the evidence you are satisfied that the

17   government has proven each of the elements in the indictment

18   beyond a reasonable doubt, you should vote to convict.

19           It is not necessary for you to conclude that the

01:33 20   defendant is factually innocent in order to return a "not

21   guilty" verdict.  A "not guilty" verdict means only that the

22   prosecution has not met its burden of proving the defendant

23   guilty beyond a reasonable doubt.

24           Mr. Klyushin has not testified in this trial.  It is

25   the law of the United States that a defendant has an absolute

1    right not to testify.  The defendant is under no obligation or

2    need to do so.  There are many reasons for not testifying,

3    reasons that are quite consistent with innocence.  Therefore,

4    you are not to speculate or engage in conjecture as to those

5    reasons, and, as I have said, you are to draw no adverse

6    inference whatsoever from the defendant not testifying.  If you

7    were to do so, you would be doing our nation and our body of

8    law a disservice and an injustice.  Moreover, you would be

9    violating your solemn oath as jurors.  Once again, it is the

01:34 10   burden of the United States to prove all elements of the

11   charges beyond a reasonable doubt.  The defendant has no burden

12   whatsoever.

13        Let me speak to you briefly about the question of

14   punishment.  The question of possible punishment of a defendant

15   is of no concern to you, the jury, and should not in any sense

16   enter into or influence your deliberations.  The duty of

17   imposing the sentence rests exclusively upon the Court.  Your

18   function is to weigh the evidence in this case and to determine

19   whether or not the defendant is guilty beyond a reasonable

01:34 20   doubt solely upon the basis of such evidence.  Under your oaths

21   as jurors, you cannot allow a consideration of the punishment

22   which may be imposed upon the defendant, if he is convicted, to

23   influence your verdict in any way or enter into your

24   deliberations in any sense.

25        All right, now I'm going to go into the specific

1    instructions.  Remember I told you there was a middle portion?

2    And I'm going to go into the specific crimes that are alleged/

3    charged in the indictment.

4         You've heard the term "indictment."  I remind you that

5    an indictment is not evidence of any kind against the

6    defendant, Vladislav Klyushin.  It's just an accusation in a

7    document filed with the court to bring a criminal charge

8    against a defendant.

9         The number of charges against Mr. Klyushin is not

10   evidence of guilt and should not influence your decision in

11   this case in any way.  It is your duty to separately consider

12   the evidence that relates to each charge and to return a

13   separate verdict for each one.  For each charge, you must

14   decide whether the government has presented proof beyond a

15   reasonable doubt that Mr. Klyushin is guilty of that particular

16   charge.  You must consider them separately.  Your decision on

17   one charge should not influence your decision on the other

18   charge.

19        For each count, the government must prove several

20   things, and those things that the government has to prove we've

21   been referring to as "elements."  You've heard that.  The

22   government must prove the elements of each crime beyond a

23   reasonable doubt.  You must give separate consideration to each

24   of the counts and to the elements in each count.

25        Also, you've heard evidence that certain acts occurred

on or about certain dates.  It does not matter if the
indictment charges that a specific act occurred on or about a
certain date and the evidence indicates that, in fact, it was
on another date.  The law only requires a substantial
similarity between the dates alleged in the indictment and the
dates alleged by the testimony or exhibits.

All right, so I'm going to go through -- you have the
verdict in front of you -- the different counts.  In Count One,
the government contends that Mr. Klyushin committed the crime
of conspiracy to obtain unauthorized access to computers or to
commit wire fraud or to commit securities fraud.

In Count Two, the government alleges that Mr. Klyushin
committed wire fraud and aiding and abetting.

In Count Three, the government alleges that
Mr. Klyushin committed the crime of unauthorized access to
computers and aiding and abetting.

In Count Four, the government alleges that
Mr. Klyushin committed the crime of securities fraud and aiding
and abetting.

Mr. Klyushin has pled not guilty to these charges, and
the government must therefore prove them all by proof beyond a
reasonable doubt with respect to all of the elements of a given
offense charged in the indictment against Mr. Klyushin before
you can find Mr. Klyushin guilty of that particular offense.

You've heard the term "venue," and I'll be getting

1       into that in much greater detail.  The government must also

2       prove by a preponderance of the evidence that venue is proper

3       in order for you to convict.

4               So I'm going to Count One, conspiracy.

5               What's a conspiracy?  Count One charges Vladislav

6       Klyushin with conspiring with Ivan Ermakov, Nikolai Rumiantcev,

7       and others to commit federal crimes; specifically, the crimes

8       of unauthorized access to computers with the intent to defraud,

9       wire fraud, or securities fraud.  It is against federal law to

01:39 10   conspire with someone to commit these crimes.

11              The government does not have to prove that the

12      defendant agreed to commit all three of these crimes in order

13      for you to find him guilty of the conspiracy charge.  The

14      government must, however, prove that the defendant agreed to

15      commit at least one of these three crimes, and you must

16      unanimously agree on which one.  You cannot find the defendant

17      guilty of conspiracy unless you unanimously agree that the same

18      federal crime or crimes was the object of a conspiracy.  So, in

19      other words, you must all unanimously agree as to what crime or

01:39 20   crimes were committed.  It can't be six agreeing to one and six

21      as to another.  You have to be unanimous.

22              For you to find the defendant guilty of conspiracy,

23      you must be convinced that the government has proven each of

24      the following things beyond a reasonable doubt:

25              First, that the agreement specified in the indictment,

and not some other agreement or agreements, existed between at

least two people to commit unauthorized access to computers

with the intent to defraud, wire fraud, or securities fraud.

I'll repeat that.

First, that the agreement specified in the indictment,

and not some other agreement or agreements, existed between at

least two people to commit unauthorized access to computers

with the intent to defraud, wire fraud, or securities fraud.

Second, that the defendant willfully joined in that

agreement.  Second, that the defendant willfully joined in that

agreement.

And, third, that one of the conspirators committed an

overt act in an effort to further the purpose of the

conspiracy.

A conspiracy is an agreement, spoken or unspoken.  The

conspiracy does not have to be a formal agreement or plan in

which everyone involved sat down together and worked out all of

the details.  It is not necessary to show that the participants

directly, by spoken or written word, stated among themselves

exactly what their object or purpose was, or exactly what the

details of the scheme were, or exactly what means they would

adopt to achieve their goals.  A conspiracy is, by its very

nature, usually secret in its origin and in its execution.

Because of the secretive nature of the crime of conspiracy, the

agreement between two or more people may be express or tacit.

It is sufficient if the government demonstrates conduct evidencing a silent understanding to share a purpose to violate the law.

Because a conspiracy by its very nature is often secret, neither the existence of the agreement nor the fact of the defendant's participation in it must be proved by direct evidence but may be proved by circumstantial evidence.

Mere similarity of conduct among various people or the fact that they may have associated with each other or discussed common aims and interests does not necessarily establish proof of the existence of a conspiracy, but you may consider such factors.

To act willfully means to act voluntarily and intelligently and with the specific intent that the underlying crimes of unauthorized access to computers, wire fraud, or securities fraud be committed.  And I'll be instructing you on those later, but you have to have the specific intent that the underlying crimes of unauthorized access to computers, wire fraud, or securities fraud be committed.  That is to say, the government must prove that the defendant acted with bad purpose, either to disobey or disregard the law, not to act by ignorance, accident, or mistake.

The government must prove two types of intent beyond a reasonable doubt before the defendant can be said to have willfully joined the conspiracy:  an intent to agree and an

intent that the underlying crimes be committed.  Mere presence
at the scene of a crime, even when combined with knowledge that
the crime will be committed, is not alone enough, but you may
consider it among other factors.

Intent may be inferred from the surrounding
circumstances.  Proof that the defendant willfully joined in
the agreement must be based upon evidence of his own words
and/or actions.  You need not find that the defendant agreed
specifically to or knew about all the details of the crime, or
knew every other coconspirator, or that he participated in each
act of the agreement, or played a major role, but the
government must prove beyond a reasonable doubt that he knew
the essential features and general aims of the venture.

Even if the defendant was not part of the agreement at
the very start, he can be found guilty of a conspiracy if the
government proves that he willfully joined the agreement later.
On the other hand, a person who has no knowledge of the
conspiracy, but simply happens to act in a way that furthers
some object or purpose of the conspiracy, does not thereby
become a conspirator.

The third element that the government must prove is
that one of the conspirators committed an overt act to further
the purpose of the conspiracy.  An overt act is any act
knowingly committed by one or more of the conspirators in an
effort to accomplish some purpose of the conspiracy.  Only one

overt act has to be proven.  The government is not required to
prove that the defendant personally committed or knew about the
overt act.  It is sufficient if one conspirator committed one
overt act at some time during the period of the conspiracy.
The overt act need not be illegal.

The government does not have to prove that the
conspiracy succeeded or was achieved.  The crime of conspiracy
is complete upon the agreement to commit the underlying crime
and the commission of one overt act.

Whether there existed a single unlawful agreement or
many such agreements, or indeed no agreement at all, is a
question of fact for you, the jury, to determine in accordance
with the instructions I'm about to give you.

When two or more people join together to further one
common unlawful design or purpose, a single conspiracy exists.
By way of contrast, multiple conspiracies exist when there are
separate unlawful agreements to achieve distinct purposes.

The government must prove the existence of the
conspiracy charged in the indictment.  If you find that the
conspiracy charged does not exist, you cannot find the
defendant guilty.  This is so even though you find that some
conspiracy other than the one charged in the indictment
existed, even though the purposes of both conspiracies may have
been the same, and even though there may have been some overlap
in membership.

1        If Mr. Klyushin acted in good faith, he cannot be

2   guilty of the crime of conspiracy.  If Mr. Klyushin had a

3   good-faith belief that he was not violating the law, even if

4   that belief was mistaken, he did not have the necessary intent

5   to commit conspiracy or any of the crimes charged.  In other

6   words, with respect to all of the charges, not just the

7   conspiracy that we're discussing now, good faith is simply

8   inconsistent with the element of willfulness.

9        While the term "good faith" has no precise definition,

01:46  10   it means, among other things, an honest belief, a lack of

11   malice, and lacking in intent to violate the law.  A person who

12   acts on an honestly held belief is not punishable merely

13   because that honest belief turns out to be incorrect or wrong.

14   The law subjects to prosecution and punishment only those

15   people who act willfully and with an intent to violate the law.

16        The burden is on the government to prove the required

17   intent and consequent lack of good faith beyond a reasonable

18   doubt.  Mr. Klyushin is under no obligation to prove good

19   faith.

01:47  20        Now I'm going to move on to Count Two which is wire

21   fraud.  I'm seeing after-lunch a little bit effects here.  Why

22   don't we stand and stretch to make sure I'm holding you.

23        (Pause.)

24        THE COURT:  I'm talking about wire fraud right now.

25   Okay.  I elevated the voice a bit just to wake you up.  All

1    right, there you are, got smiles.

2         Count Two of the indictment charges Mr. Klyushin with

3    wire fraud.  For you to find the defendant guilty of wire

4    fraud, you must be convinced that the government has proven

5    each of the following things beyond a reasonable doubt:

6         First, a scheme, substantially as charged in the

7    indictment, to defraud or to obtain money or property by means

8    of materially false or fraudulent pretenses.  First, a scheme,

9    substantially as charged in the indictment, to defraud or to

01:48 10   obtain money or property by means of materially false or

11   fraudulent pretenses.

12        Second, the defendant's knowing and willing

13   participation in the scheme with the intent to defraud.

14        And, third, the use of wire communications in

15   interstate or foreign commerce, on or about the date alleged,

16   in furtherance of the scheme.

17        Wire communications in interstate or foreign commerce

18   include telephone communications, emails, Internet-based

19   communications from one state to another, or between the United

01:49 20   States and another country.

21        A scheme includes any plan, pattern, or course of

22   action.

23        The term "defraud" means to deprive another of

24   something of value by means of deception or cheating.  A scheme

25   to defraud is ordinarily accompanied by a desire or purpose to

1     bring about some gain or benefit to oneself or some other

2     person or by a desire or purpose to cause some loss to some

3     person.

4           The term "money or property" includes confidential

5     business information.  The term "false or fraudulent pretenses"

6     means any false statements or assertions that concern a

7     material aspect of the matter in question that were either

8     known to be untrue when made or made with reckless indifference

9     to their truth and that were made with the intent to defraud.

01:49 10     They include actual, direct false statements as well as

11     half-truths and a knowing concealment of facts.

12           The deception need not be premised upon spoken or

13     written words alone.  To meet its burden under the wire fraud

14     statute, the government must prove beyond a reasonable doubt

15     that the defendant knowingly and willfully participated in a

16     scheme that involved the defendant or another involved in the

17     scheme misrepresenting his identity online to defraud or to

18     obtain money or property like confidential business

19     information.

01:50 20           To satisfy its burden of proof that a fact or matter

21     is material, the government is not required to show that the

22     fact or matter in fact influenced or deceived the decision-maker

23     to whom it was addressed.  Rather, a fact or matter is material

24     if it has a natural tendency to influence or is capable of

25     influencing the decision-maker to whom it is addressed.

To act with intent to defraud means to act willfully and with the specific intent to deceive or cheat for the purpose of causing some financial loss to another or to bring about some financial gain to oneself.  Thus, if the defendant acted in good faith, he cannot be guilty of the crime.  The burden to prove intent, as with all other elements of crime, rests with the government.

Intent or knowledge may not ordinarily be proven directly because there's no way of directly scrutinizing the workings of the human mind.  In determining what the defendant knew or intended at a particular time, you may consider any statements made or acts done or omitted by the defendant and all other facts and circumstances received in evidence that may aid in your determination of the defendant's knowledge and intent.  You may infer, but you certainly are not required to infer, that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted.  It is entirely up to you, however, to decide what facts are proven by the evidence received during the trial.

You've heard several times, and you saw that in the closings, the terms "aiding and abetting."  What does that mean?  What does to aid and abet mean?  To aid and abet --

And you'll notice that aiding and abetting comes with Count Two, Count Three, and Count Four involved also the allegation of aiding and abetting.

1          To aid and abet means intentionally to help someone
2     else commit a crime.  To establish aiding and abetting, the
3     government must prove beyond a reasonable doubt that someone
4     else committed the charged crime, and that the defendant
5     willfully participated in it as he would in something he wished
6     to bring about.
7          This means that the government must prove that the
8     defendant consciously shared the other person's knowledge of
9     the underlying criminal act, intended to help him, and
01:53 10  willfully took part in the endeavor, seeking to make it
11    succeed.  The defendant need not perform the underlying
12    criminal acts, be present when it is performed, or be aware of
13    the details of its execution to be guilty of aiding and
14    abetting.  But a general suspicion that an unlawful act may
15    occur or that something criminal is happening is not enough.
16    Mere presence at the scene of a crime and knowledge that the
17    crime is being committed are also not sufficient to establish
18    aiding and abetting.
19         I think I'll move at this point on to Count Three.
01:53 20  And, remember, all these counts have an aiding and abetting
21    with it.  I won't repeat that instruction.
22         The defendant is charged in Count Three of the
23    indictment with computer fraud.  For the defendant to be found
24    guilty of that charge, the government must prove each of the
25    following elements -- here we are going through the elements

1   again -- beyond a reasonable doubt.  All right, what does the

2   government have to prove?

3          First, that the defendant, or someone he aided and

4   abetted, knowingly accessed without authorization a computer

5   used in or affecting interstate or foreign commerce or

6   communication.  First, that the defendant, or someone he aided

7   and abetted, knowingly accessed without authorization a

8   computer used in or affecting interstate or foreign commerce or

9   communication.

01:54 10          Second, the defendant did so, or aided and abetted

11   another's doing so, with the intent to defraud.  Second, that

12   the defendant did so, or aided and abetted another's doing so,

13   with the intent to defraud.

14          Third, by accessing the computer without

15   authorization, the defendant, or someone he aided and abetted,

16   furthered the intended fraud.  Third, by accessing the computer

17   without authorization, the defendant, or someone he aided or

18   abetted, furthered the intended fraud.

19          And, fourth, that the defendant, or someone he aided

01:55 20   and abetted, by accessing the computer without authorization

21   obtained something of value.  Fourth, that the defendant, or

22   someone he aided and abetted, by accessing the computer without

23   authorization obtained anything of value.

24          A person uses a computer without authorization when a

25   person accesses a computer without any permission at all.  A

computer used in or affecting interstate and foreign commerce

includes computers connected to the Internet.

To act with intent to defraud means to act willfully

and with the specific intent to deceive or cheat for the

purpose of either causing some financial loss to another or to

bring about some financial gain to oneself.  You may consider

any statement made or acts done or omitted by the defendant and

all of the facts and circumstances received in evidence that

may aid you in determination of the defendant's knowledge or

intent.  You may infer, but you are certainly not required to

infer, that a person intends the natural and probable

consequences of his acts knowingly done or knowingly admitted.

Finally, Count Four, securities fraud.

In order to find the defendant guilty of securities

fraud, you must find that the government has proven each of the

following elements beyond a reasonable doubt.  Here we go,

there are four elements:

First, the government must prove that in connection

with the purchase or sale of one of the securities -- of

securities specified in Count Four -- I'm sorry.

First, that in connection with the purchase or sale of

one of the securities specified in Count Four.

Second, the defendant employed any manipulative or

deceptive device or contrivance; any device, scheme or artifice

to defraud; or engaged in any act, practice, or course of

business that operated, or would operate, as a fraud or deceit

upon a purchaser or seller of the specified security.  Second,

that the defendant employed any manipulative or deceptive

device or contrivance or any device, scheme or artifice to

defraud, or engaged in an act, practice, or course of business

that operated, or would operate, as a fraud or deceit upon a

purchaser or seller of the specified security.

Third, that the defendant acted willfully, knowingly,

and with the intent to defraud.  Third, that the defendant

acted willfully, knowingly, and with the intent to defraud.

Fourth, that the defendant used, or caused to be used,

any means or instruments of transportation or communication in

interstate commerce, or used the mails, or any facility of any

national securities exchange, in furtherance of the fraudulent

conduct.  Fourth, that the defendant used, or caused to be

used, any means or instruments of transportation or

communication in interstate commerce, or used the mails, or any

facility of any national securities exchange in furtherance of

the fraudulent conduct.

Now, let me go through the elements in greater detail.

The first element of the offense requires the government to

prove beyond a reasonable doubt that the alleged device,

scheme, or artifice to defraud be in connection with the

purchase or sale of the security.

Fraudulent conduct may be in connection with the

1    purchase or sale of a security if you find that the alleged

2    fraudulent conduct in some way touched upon a securities

3    transaction.

4         Second, the second element of the securities fraud

5    that the government must establish beyond a reasonable doubt is

6    that in connection with the purchase or sale of securities, the

7    defendant did any one of the following things:

8         One, employed a device, scheme, or artifice to

9    defraud, or made any untrue statement of a material fact, or

01:59 10  omitted to state a material fact necessary in order to make the

11   statements made, in light of the circumstances under which they

12   were made, not misleading; or engaged in an act, practice, or

13   course of business that operated, or would operate, as a fraud

14   or deceit upon the purchaser or seller.

15        It is not necessary for the government to establish

16   all three types of unlawful conduct.  Any one is sufficient for

17   a conviction, if you so find, but you must be unanimous as to

18   which type of conduct the defendant engaged in.

19        A device, scheme, or artifice to defraud means the

01:59 20  forming of some plan or design to trick or to deceive in order

21   to obtain money or something of value.  The words "fraud" or

22   "defrauding" means to trick, deceive, injure, or damage in some

23   way.  "Fraud" is a general term embracing all efforts and

24   methods people use to take advantage of others.

25        If you find that the scheme involved the defendant or

another participant in the scheme misrepresenting his or her
identity online to access computer systems to obtain material
nonpublic information to trade on the confidential information,
then you may find that conduct is a deceptive device or
contrivance, or a device, scheme or artifice to defraud within
the meaning of the securities fraud statute.

The government must prove the nonpublic information
accessed is material.  A fact is material if it has a natural
tendency to influence, or is capable of influencing, the
decision-maker to whom it is addressed.

A statement, claim or document is fraudulent if it was
false when it was made, or if it was made with reckless
indifference as to its truth or falsity, and made or caused to
be made with intent to deceive.  A deceitful statement of
half-truths or the concealment of material facts may also
constitute fraud under the statute, if such omission or
concealment was intended to be misleading.

The government need not prove that the defendant
personally made a misrepresentation or that he omitted a
material fact.  It is sufficient if the government establishes
that the defendant caused the statement to be made or the fact
to be omitted.

If you find that the government has established beyond
a reasonable doubt that a statement was false or fact
fraudulently omitted, you must next determine whether the fact

1   stated was material under the circumstances.

2        I've defined, for you, the word "material."

3        It does not matter whether the alleged unlawful

4   conduct was successful or not, or whether the defendant

5   profited or received any benefits as a result of the alleged

6   scheme.  Similarly, the government is not required to prove

7   that the victim or victims of the fraud were actually

8   defrauded.  It is enough to prove that the defendant engaged in

9   such a scheme to defraud.

02:02 10        Success or a benefit is not an element of the crime

11   charged.  However, if you find the defendant did expect to

12   benefit from the alleged scheme, you may consider that in

13   relation to the third element, intent, which I will discuss

14   with you in a moment.

15        So the third element involves intent.  Everything I've

16   been telling you thus far about Count Four relates to the first

17   and second elements of the crime of securities fraud; that is,

18   the existence of a fraudulent scheme in connection with the

19   purchase or sale of a security.

02:02 20        The third element of the crime charged in Count Four

21   that the government must prove beyond a reasonable doubt is

22   that the defendant participated in a scheme to defraud

23   knowingly, willfully, and with the intent to defraud.  As I

24   personally noted, an act is done knowingly if it is done

25   purposefully and deliberately and not because of a mistake,

accident, mere negligence, or some other innocent reason.  And

a person acts willfully if he acts deliberately and with the

intent to do something wrong; that is, with a bad purpose to

disobey and disregard the law.  I told you that instruction

before.  The defendant need not to have known that he was

breaking any particular law or any particular rule.  The

defendant need only to have been aware of the generally

unlawful nature of the acts.

And, as I have noted, for the defendant to have acted

with a specific intent to defraud means that he must have known

of the fraudulent nature of the scheme and acted with the

intent that it succeed.  In other words, to act with an intent

to defraud means to act knowingly and with a specific intent to

deceive, ordinarily but not necessarily for the purpose of

causing some loss to another person to bring some gain to

himself.

The government is not required to show that the

defendant, in addition to knowing what he was doing and

deliberately doing it, also knew that he was violating some

particular federal statute.  However, he must have acted with

the intent to help carry out some essential step in the

execution of the scheme to defraud that is alleged in the

indictment.

The question of the defendant's intent is, again --

I've discussed with you intent before -- it's a question of

fact that you are called upon to decide, just as you determine

any other fact in the case.  Intent to defraud involves the

state of a person's mind and the purpose with which he acted at

the time the acts in question occurred.  Direct proof of

knowledge and fraudulent intent is rarely available, and you

are not required to find that such proof existed.  It would be

a rare case where it could be shown that a person wrote or

stated that as of a given time in the past he committed an act

with fraudulent intent.  Such direct proof is not required.

02:04     The ultimate facts and knowledge and criminal intent,

though subjective, may be established by circumstantial

evidence based upon a person's outward manifestations, his

words, his conduct, his acts, and all of the surrounding

circumstances disclosed by the evidence and the rational or

logical inferences that may have been drawn from them.

Circumstantial evidence, if believed, is of no less value than

direct evidence.

     Since an essential element of the crime charged is

intent to defraud, it follows that the government must prove a

02:05  lack of good faith on the part of the defendant.  I've talked

to you about good faith before.  It is for you to decide

whether the defendant acted in good faith or not.  If you

decide that he at all relevant times acted in good faith, it is

your duty to acquit him.  That is because, however misleading

or deceptive conduct may have been, the law is not violated if

the defendant acted in good faith and held an honest belief
that his actions were proper and not in furtherance of any
illegal venture.

If you find that the defendant was not a knowing
participant in the scheme, or lacked the intent to deceive, you
must acquit him.  Conversely, if you find that the government
has established beyond a reasonable doubt not only the first
two elements of Count Four -- that is, the existence of a
scheme to defraud in connection with the purchase and sale of a
security -- but also this third element, that the defendant was
a knowing participant and acted with intent to defraud, then
you would move on to the fourth element which I'm about to
discuss.  If the government establishes the fourth element as
well, then you would have a sufficient basis upon which to
convict the defendant on Count Four of the indictment.

So now I'm discussing the fourth element of the fourth
count.  The fourth and final element that the government must
prove beyond a reasonable doubt with respect to Count Four is
that the defendant knowingly used, or caused to be used,
either, A, any instrumentalities in interstate commerce, or, B,
a facility of a national securities exchange in furtherance of
the scheme to defraud.

The term "instrumentalities" in interstate commerce
means any number of instruments, devices, and means of
conducting trade, commerce, transportation, or communication

1    among one or more states, including interstate wire

2    communications such as telephone calls, emails, faxes, and the

3    use of computers connected to the Internet.  Instrumentalities

4    of interstate commerce include the use purely within one state

5    of a telephone call, email, fax, or a computer connected to the

6    Internet, or any other instrument used to conduct interstate

7    communication.

8         The government need not prove that the defendant was

9    directly or personally involved in using an instrumentality of

02:07 10   interstate commerce or a facility of a national securities

11   exchange.  It is enough if you find that he, by his actions,

12   directly or indirectly initiated steps or induced others to

13   initiate steps that resulted in a chain of cause and effect

14   resulting in the use of an instrumentality of interstate

15   commerce.  This use could mean something like placing a

16   telephone call, sending an email, or using a computer connected

17   to the Internet.

18        With regard to using instrumentalities of interstate

19   commerce like phone calls, emails, or computers connected to

02:08 20   the Internet, it is not necessary that whatever was

21   communicated was fraudulent, otherwise criminal, or

22   objectionable.  The matter communicated may be entirely

23   innocent so long as it is in furtherance of the scheme to

24   defraud.

25        The use of any instrumentality of interstate commerce

1    also need not be central to the execution of the scheme.  All

2    that is required is that the use of any instrumentality of

3    interstate commerce bear some relation to the object of the

4    scheme or fraudulent conduct.

5         So I've now gone through all the elements of all

6    counts, but let's stand and stretch because I've got to talk to

7    you about venue, all right?

8         (Pause.)

9         THE COURT:  Venue, what's venue?  Please be seated.

02:10 10   The Constitution and federal law require that a criminal

11   defendant must be tried in the state or district in which the

12   offense is committed.  Where an offense spans multiple

13   jurisdictions or where a crime consists of distinct parts which

14   have different localities, the whole may be tried where any

15   part can be proved to have been done.  Continuing offenses that

16   are committed in more than one district may be prosecuted in

17   any district which such offense was begun, continued, or

18   completed.  A defendant must be charged in a district that has

19   a meaningful connection to the allegations.  To determine

02:11 20   whether a meaningful connection exists, you must consider the

21   nature of the crime alleged and identify the crime's essential

22   conduct elements, essential conduct elements.  You must also

23   consider the locations where the criminal acts were committed.

24   The government must prove for each offense -- so each one of

25   those counts we just went through -- that venue is proper in

1    the District of Massachusetts.

2         Unlike all of the other elements that we talked

3    about -- remember I said "proof beyond a reasonable doubt"

4    numerous times -- but unlike all the elements that I previously

5    described, the government has to prove venue by a preponderance

6    of the evidence.  That's a legal term, "preponderance of the

7    evidence."  That means, to establish venue by a preponderance

8    of the evidence, the government must prove that the fact is

9    more likely true than not true, more likely true than not true.

02:12 10        To establish venue in this district, the government

11   need not prove that the crimes themselves were committed

12   entirely in this district, or that the defendant himself was

13   present here.

14        I'm now going to focus you on conspiracy.

15        With regard to the conspiracy charged in Count One,

16   there's no requirement that the entire conspiracy took place

17   here in Massachusetts, or that the agreement was formed here.

18   But for you to return a guilty verdict on the conspiracy charge

19   in Count One, the government must prove by a preponderance of

02:12 20   the evidence that any overt act in furtherance of the agreement

21   took place here in Massachusetts.

22        Alternatively -- now, I just want you to focus only on

23   the conspiracy count with respect to what I'm about to tell

24   you.  Alternatively, with respect to the conspiracy count only,

25   the government has this alternative theory of venue.  Under

1   federal law, where an offense is begun or committed outside the

2   jurisdiction of any particular state or district, venue for

3   prosecution of the offense is established in the district where

4   the defendant is arrested or is first brought.  For venue to be

5   established for the conspiracy count under this alternative

6   theory, the government must prove that it is more likely true

7   than not true that the offense was begun or committed outside

8   of the United States, and that the defendant was first brought

9   to the District of Massachusetts.  The government must also

02:13 10   prove that the essential conduct elements of the conspiracy

11   took place outside of the United States.

12          If the government fails to prove venue by a

13   preponderance of the evidence with respect to any count, you

14   must find the defendant not guilty of that count only.  So for

15   every single one of these verdict slips, you also have to find

16   not only that the government proved the elements beyond a

17   reasonable doubt, but also that it proved venue by a

18   preponderance of the evidence, more likely true than not true.

19          I am now at the end of the middle section of this

02:14 20   charge.  The hard part has been completed, and now I want to

21   talk to you about the mechanics of deliberation.

22          Okay, so let me talk to you about going back into that

23   jury room.  The first thing that you should do upon going to

24   the jury room is to choose a foreperson.  When I was a brand-

25   new young judge, which I no longer am, I used to look at you

1   all and try to figure out who would be the best foreperson, but

2   you all have been together for a long time now, two weeks, and

3   you know better than I do about who would make a good

4   foreperson.  So the first thing that you should do when you go

5   back there is to choose a foreperson.

6       The foreperson is not more equal than the rest.  You

7   heard them say it.  The government said, "We're content with

8   this jury."  The defendant said, "We're content with this

9   jury."  You are all equal back there in the jury room.

02:15 10   However, the foreperson has certain responsibilities to me.

11       First of all, the foreperson must fill in the verdict

12   slip.  I only want one.  I don't need twelve floating around,

13   one official verdict slip.  And the foreperson will count and

14   will insure that it's unanimous.  It must be unanimous "not

15   guilty," unanimous "guilty."  It's got to be unanimous either

16   way.

17       The second thing that the foreperson does will be to

18   ask me questions.  I've given you a lot really quickly.  You'll

19   be getting a tape recording; you'll be getting a transcript.

02:16 20   But it may be that you have questions about the law and it

21   would be helpful for me to clarify.

22       So the foreperson should -- Maryellen will give you a

23   piece of paper.  Oh, jury question.  You'll write down what the

24   question is and give it to the court officer, who will give it

25   to Maryellen.  All the lawyers and I will huddle and try and

1    answer that question.  But it's not like it will come back like

2    that, like an ATM machine, because sometimes it takes a while

3    for all of us to gather and come up with the right answer.  So

4    the foreperson will write down the question.

5          The foreperson shouldn't just ask the court officer,

6    or ask Maryellen, or ask the court reporter, because then it's

7    like a game of telephone; I don't really exactly get what you

8    want.  It's better for you to write it down.

9          The third thing the foreperson does will be to

02:17 10   announce the verdict in court.  You'll hear us say, "So say

11   you, Mr. Foreperson?  So say you, Madam Foreperson?  So say

12   you, all members of the jury?"  All of you have to stand and

13   ratify that it is a unanimous verdict.

14         The foreperson should never ask me what my memory of

15   the evidence is.  I took, really, notes, sometimes on some days

16   better than others.  Maybe some of you did; some of you didn't.

17   I can't tell you what so-and-so said on such and such a day.

18   You should use your collective memory, your collective notes.

19   If you get really stuck and you want the transcript, we can do

02:17 20   that, but it sometimes takes a while and might hold up the

21   deliberations.  So please use your notes and your memory first.

22   If you need it, we can get it to you.  All right?  So that's

23   what's going on there.

24         We're going to bring in exhibits into the jury room in

25   a couple of minutes.  The exhibits are paper and a computer so

1    that you can do it both ways, and we will bring those in.  And

2    I hope we get everything to you.  We're going to go through

3    them right after we send you out with all the lawyers to make

4    sure we get you everything.

5         Now let me discuss for a minute the role of the

6    alternates.  I've never been a juror in a case.  I've been

7    called, but I've never been a juror.  But I'm sure if I sat

8    through this whole trial, I would have really not liked the

9    fact that I was an alternate.  But that is the way our system

02:18  10    works.  The last four jurors chosen are alternates, and so

11    today you go home, but I am going to ask you not to do any

12    research about the case or talk about the case until a verdict

13    is reached.  You can call in and check.  The reason I say that

14    is -- I'm really impressed with this jury, I have to say, and

15    I've been doing juries throughout COVID, and we always lost --

16    it sounds like a terrible example -- we've always had a few

17    people who couldn't continue deliberating for one reason or

18    another, and also there are snowstorms and no school and all

19    that.  You stuck with it all the way through.  But we chose

02:19  20    alternates if somebody were not able to continue.  We may need

21    to call you in if over the weekend -- I hope this doesn't

22    happen -- something happens.  So we may still need to call in

23    the alternates, so please don't discuss the case.

24         We will be sitting on every day or days from 9:00 to

25    4:00 until you reach a verdict.  You have your room for as long

1   as you want it.  We will feed you, treat you with TLC, and it's

2   not in any way designed to rush you at all.  Today we were

3   thinking that it might be a bit of a tiring day.  We were

4   thinking we'd leave at 4:00, and every day we'll leave at 4:00.

5          And the last and final thing I really want to talk to

6   you about is deliberating.

7          As I mentioned, I've never been chosen for a jury, but

8   I've always been impressed with my juries.  You know, I get

9   very excited talking about my juries.  I'm always impressed

02:20 10  with how seriously you all take your task.  I mean, everything

11  done so far has been spot on.

12         When you go back there, everyone has a sense of what's

13  fair and just, what witnesses you believe, what witnesses

14  didn't you believe.  Everyone goes back there with their sense

15  of what they think about this case.  But the beauty of

16  deliberations is, you need to stay open-minded to hear what

17  other people from other walks of life with different experiences

18  also think about the evidence.  So feel free, and you must, to

19  be open to changing your mind if there's a good reason for

02:21 20  doing that, if someone has a good point and someone has more

21  experience.

22         On the other hand, no one should change their mind

23  because you've been here long enough, you're ready for spring,

24  it's Valentine's Day.  Whatever reason it is, no one should

25  change their mind unless you've got a principled basis for

1    doing it, because at the end of this, I am going to ask you to

2    stand up and agree with that verdict.  So change your mind if

3    there's a reasoned basis for doing so, but don't change it just

4    because you disagree with other people, all right?  So make

5    sure you own it essentially.

6         I need to talk to the attorneys for a few minutes

7    about any objections that they may have.  I think I'll send you

8    back there to start talking.  The four alternates should take

9    their things and leave.  I may have to call you back in here if

02:22 10   the attorneys have any points that I need to address.  There's

11   a lot in there.  Maybe I misread something or they think

12   something is necessary to clarify something, but I think I'm

13   going to send you out there, and then I may call you back in a

14   few minutes.  But otherwise, I'll call you back in here at 4:00

15   if I don't need to see you again.

16        So the four alternates at this point should just

17   leave, I think.  So let me ask -- actually, let me ask the

18   lawyers, is there anything quick that you need to see me about

19   right now?

02:22 20        MR. FERNICH:  Can you just instruct the alternates not

21   to do any research or look at social media.

22        THE COURT:  Good point.  The alternates shouldn't look

23   anything up on social media or the Internet, or whatever, about

24   the case because I might need you if someone isn't able to come

25   in on Monday.  Okay.  Okay?  Other than that, no one needs to

```
 1    see me right now?  Good.  All right, see you at 4:00.
 2              (Jury excused.)
 3              THE COURT:  I'll see counsel at sidebar just for a
 4    minute.
 5    SIDEBAR CONFERENCE:
 6              THE COURT:  Let me start off by saying, we had an
 7    extremely brief discussion after the closings about sending in
 8    the indictment, and I didn't quite focus on how many times I
 9    mentioned the indictment.  I think I need to send it in.
02:24 10           MR. FRANK:  I agree.
11              THE COURT:  I don't think it harms you.  I just -- I
12    don't see how else -- the whole set of instructions mentions
13    the indictment.  I think I need to do that.
14              The government, any objections?
15              MR. FRANK:  No, your Honor.
16              THE COURT:  Defense?
17              MR. FERNICH:  None beyond formally reiterating all of
18    those previously lodged.
19              THE COURT:  You can't do that broadly.  You mean the
02:24 20    brief you filed in writing?
21              MR. FERNICH:  Yes, that, Judge, sure.
22              THE COURT:  So I fixed a fair amount of those, so I'm
23    just --
24              MR. FERNICH:  I need to discuss it for the record here
25    exactly what --
```

```
 1              THE COURT:  I don't want to tell you how to do your
 2     job, but --
 3              MR. FERNICH:  All objections previously filed with
 4     particular reference to venue and 3283, the high seas venue
 5     statute in particular.
 6              THE COURT:  Okay, okay.
 7              MR. FERNICH:  Those are the main ones.  And, of
 8     course, we object to the charging on the Khalupsky/Dorozkho
 9     theory.  That was a big one.
02:25 10              Is there anything else?
11              MR. NEMTSEV:  No.
12              MR. FERNICH:  I think those are the most major ones.
13              THE COURT:  The alternative theory of venue.
14              MR. FERNICH:  Yes.
15              THE COURT:  Dorozkho.
16              MR. FERNICH:  Yes.
17              THE COURT:  And -- I can't remember.
18              MR. FERNICH:  That's it.
19              THE COURT:  Okay, so --
02:26 20              THE CLERK:  You just need to go over and put on the
21     record --
22              THE COURT:  You need to put on the record that you're
23     content with the exhibits.
24              For the U.S. Marshals, we need him back here at 4:00,
25     okay?  All right, thank you.
```

```
 1                THE CLERK:  Just need to know if the government is
 2      content.  Are you?
 3                MR. KOSTO:  We are content.
 4                THE CLERK:  So that's on the record.
 5                MR. KOSTO:  Regarding the exhibits?
 6                THE CLERK:  Regarding the exhibits.  I'm sorry.
 7                MR. KOSTO:  Yes.
 8                MR. FERNICH:  Let me see if there's anything glaring I
 9      left out.
02:26 10                THE COURT:  Mr. Nemtsev, are you happy with the
11      exhibits?
12                MR. NEMTSEV:  Yes.
13                THE COURT:  And can I be clear that the laptop is not
14      going -- it doesn't go outside here?  It just has documents on
15      it, right?  It's not Internet-connected?
16                MR. FERNICH:  It's like a jail laptop, you know?  Two
17      seconds, okay?  I'll get there fast.
18                THE COURT:  Of course.
19                MR. KOSTO:  The laptop was erased in its entirety, and
02:27 20      then the exhibits were saved to it electronically, so that's
21      all that is on the laptop.
22                MR. FERNICH:  Yeah, I think I said specifically on the
23      venue stuff, the reasonable foreseeability charge, the absence
24      of that.
25                THE COURT:  Yes.
```

1        MR. FERNICH:  And particularly all the written

2   instructions that I submitted in the last three days with

3   regard to venue, I would say I incorporate all that by

4   reference, in addition to the things I said five minutes ago.

5        THE COURT:  Okay, thank you.

6        MR. FERNICH:  You're welcome.

7        THE COURT:  I'm glad you caught the foreseeability.

8        MR. FERNICH:  Yes, I think you got it by saying

9   everything that I submitted in writing, but the writings of the

02:28 10   last two and three days will suffice.

11        THE COURT:  Okay, thank you.

12        (End of sidebar conference.)

13        THE COURT:  Okay, so we'll see you back here at 4:00?

14   Although I do need Mr. Nemtsev to --

15        MR. NEMTSEV:  We're satisfied with the exhibits.

16        THE COURT:  And in particular, since I may not be

17   seeing you again on this, I want to thank very much; one, the

18   paralegals for making this very smooth with a lot of documents;

19   and, second, counsel, because this could have been very

02:29 20   tedious, and I actually think it went very smoothly.

21        MR. FERNICH:  A pleasure to try the case before you.

22   Thank you.

23        (Discussion off the record.)

24        THE COURT:  All right, here's the indictment,

25   everyone.

        1          THE CLERK:  Make sure there's nothing else attached to

        2     that.  I get nervous about -- okay.  Got it.  Thank you.  So

        3     this is going back in.  Do you want this marked as something or

        4     just the indictment?

        5          MR. KOSTO:  We're okay with it as is.

        6          (A recess was taken, 2:30 p.m.)

        7          (Resumed, 3:23 p.m.)

        8          THE COURT:  I received a question from the jury

        9     foreman:  "All three defendants --"

03:23 10          You know what?  He isn't here.

       11          MR. FERNICH:  We waive his presence for this.  Sorry

       12     about that.

       13          THE COURT:  "All three defendants, Klyushin, Ermakov

       14     and Rumiantcev, does the verdict apply to each defendant or

       15     just Mr. Klyushin?"

       16          I think I just say "Just Mr. Klyushin."

       17          MR. FRANK:  Judge, we had asked for an instruction on

       18     other individuals not on trial.  We think it's appropriate in

       19     this circumstance.  It's a little more than what you just said.

03:23 20     It says, "Some of the people who may have been involved in

       21     these events are not on trial.  This does not matter.  There's

       22     no requirement that all participants in a crime should be

       23     charged and prosecuted or tried together in one proceeding.

       24     You may not draw any inference, favorable or unfavorable,

       25     towards the government or the defendant from the fact that

```
 1    those individuals are not on trial.  Your task is limited to

 2    considering the charges contained in the indictment and the

 3    defendant before you."

 4             MR. NEMTSEV:  I think it's so long, we can just say

 5    deciding concerning Mr. Klyushin.

 6             THE COURT:  I'm going to say "Just Mr. Klyushin."

 7             MR. FRANK:  I think that the question suggests some

 8    confusion on their part about why there are other defendants

 9    named.

10             THE COURT:  It's obvious to us because I read a whole

11    charge involving Mr. Klyushin, but all three are named, so I

12    think that's the confusion.

13             MR. FRANK:  Exactly, which is why --

14             MR. FERNICH:  And the indictment with all three

15    defendants on it.

16             MR. FRANK:  Which is why I think that telling them

17    that the others --

18             THE COURT:  I'm going to say, "The verdict only

19    applies to Mr. Klyushin."

20             (Pause.)

21             THE COURT:  I said, "The verdict only applies to

22    Mr. Klyushin."  Okay.  I mean, I don't want him to be found

23    guilty based on the others.  I mean, if they find that Ermakov

24    and Rumiantcev are guilty, they can't --

25             MR. FRANK:  That's why we think the --
```

          1          MR. KOSTO:  We're asking that they be instructed that
          2    they shouldn't be deliberating at all, either way, as to those
          3    two individuals.
          4          THE COURT:  Well, I think they're all relevant.  Once
          5    they get into it, then they have to -- I mean, we included it
          6    in the indictment we sent in, we included it in the verdict
          7    form, but I think they need to understand --
          8          Yes, just run it in.
          9          THE CLERK:  And then we can meet -- should I see if a
03:26    10    follow-up comes out or no?
         11          THE COURT:  No.  Send them home.  I'm tired.
         12          THE CLERK:  Would you like a copy of this?  She put it
         13    on the record what she wrote.  I'm just going to give it back
         14    to them, and then I'll have Al give it back to me after they
         15    read it, and then I'll give it to you.  So don't go too far.
         16          (A recess was taken, 3:26 p.m.)
         17          (Resumed, 3:43 p.m.)
         18          THE COURT:  I understand that Mr. Klyushin isn't here,
         19    but --
03:43    20          MR. FERNICH:  Yeah, we waive.  We waive.
         21          THE COURT:  -- the thought occurred to me upstairs,
         22    just to clarify this thing by just putting only Mr. Klyushin's
         23    name on the verdict form.  It never occurred to me they would
         24    think otherwise, but I think this will just make it crystal
         25    clear, and I'll hand it to them when I send them out.  Does

 1    that seem like an appropriate solution to you?

 2              MR. FRANK:  Yes.  Yes, your Honor.

 3              MR. NEMTSEV:  Yes, absolutely.

 4              THE COURT:  Okay, so we will wait until -- I'm not

 5    going to bring them out now.  I'll bring them out in a few

 6    minutes.  As soon as he gets up here, we'll send them home, and

 7    everyone can have a long weekend and relax.

 8              Are you going home?

 9              MR. FERNICH:  No.  We're going to go to the Bruins

03:44 10    game tomorrow.

11              THE COURT:  I thought this was a crystal-clear way of

12    dealing with the question.

13              (Discussion off the record.)

14              (A recess was taken, 3:44 p.m.)

15              (Resumed, 3:51 p.m.)

16              THE CLERK:  All rise for the jury.

17              (Jury enters the courtroom.)

18              THE COURT:  Okay, please remain standing.  This will

19    take ten seconds.  I'm going to send you home for the day.  I

03:53 20    remind you not to talk about this case with anybody.  It's

21    almost going to become irresistible.  They're going to say,

22    "What's it about?  What's going on?  Just don't talk to anyone,

23    and I'll ask you about that Monday morning.

24              When you come in Monday morning, don't start

25    deliberating until all -- I'm going to bring you in Monday

morning -- till I count to twelve, you know, that everybody is

here, so please don't start deliberating until I send you out

in the morning.

Now, you asked a very good question which I clarified

in an answer, but to make it crystal clear, I have a verdict

form that just mentions his name so that there's nothing left

that's confusing.  So basically the verdict is only with

respect to Mr. Klyushin.

Okay, I think that's it, and I'll see you Monday

03:54 morning.  Have a lovely weekend.

Would you give that to them, Clary.  Okay.

No, no, not copies.  Just one, that's fine.  Just give

it to the Foreperson.  Good-night.

(Jury excused.)

THE COURT:  And I ask you, do you want to be here

Monday morning when I send them out?  I do make it a practice

to count, make sure there are twelve, and send them out, and

make sure no one has spoken about the case.

MR. NEMTSEV:  Yes, Judge.

03:55 THE COURT:  I only care that all of you are here or

none of you are here.

MR. NEMTSEV:  We'll be here.

MR. FRANK:  We'll be here.

THE COURT:  Good.

So please tell them I want Mr. Klyushin here in the

1    morning at 9:00.  Okay, thank you very much.  See you all then.

2    You deserve a nice restful weekend.

3              (Adjourned, 3:56 p.m.)

4              C E R T I F I C A T E

5

6

     UNITED STATES DISTRICT COURT )
7    DISTRICT OF MASSACHUSETTS    ) ss.
     CITY OF BOSTON               )
8

9

10             We, Lee A. Marzilli and Kathleen Silva, Official

11   Federal Court Reporters, do hereby certify that the foregoing

12   transcript, Pages 10-1 through 10-153 inclusive, was recorded

13   by us stenographically at the time and place aforesaid in

14   Criminal No. 21-10104-PBS, United States of America v.

15   Vladislav Klyushin, and thereafter reduced by us to typewriting

16   and is a true and accurate record of the proceedings.

17             Dated this 11th day of February, 2023.

18

19

20
     /s/ Lee A. Marzilli
21   _____
     LEE A. MARZILLI, CRR
22   OFFICIAL COURT REPORTER

23
     /s/ Kathleen Silva
24   _____
     KATHLEEN SILVA, RPR, CRR
25   OFFICIAL COURT REPORTER