

Joel A. Sickler, Founder
jsickler@justiceadvocacygroupllc.com

**April 19, 2023**

Maksim Nemtsev
20 Park Plaza, Suite 1000
Boston, MA 02116

**RE: Vladislav Klyushin**

Dear Mr. Nemtsev,

You have asked that I provide an assessment of the inequality and difficulties your client, Mr. Vladislav Klyushin, will face as a non-U.S. Citizen if he is sentenced to a term of imprisonment and committed to the custody of the federal Bureau of Prisons ("BOP").

I head the Justice Advocacy Group LLC, a group of professionals, including sentencing experts, sentencing mitigation investigators, physicians, former corrections officials, criminal justice research specialists and the formally incarcerated. I, myself, have worked consistently since 1980 on federal sentencing and federal prison-related matters and have experience as a correctional counselor in the District of Columbia's Department of Corrections and with prior tenure as Director of Client Services at the National Center on Institutions & Alternatives in Washington, DC.

I have dealt with inmates and officials who have worked with or been confined in BOP facilities at every level of the federal prison system. I have worked with both staff and inmates at corrections facilities from the most severe (penitentiaries) to the least restrictive (minimum-security camps). I have worked with inmates and staff at detention facilities utilized by the BOP and the U.S. Immigration and Customs Enforcement ("ICE") facilities for deportable aliens who are either detained pre-trial or awaiting deportation back to their home country. Based on more than four decades of experience assisting clients who have been committed to the care and custody of the BOP, I have extensive knowledge of the BOP and its stated mission, services, policies, program statements, regulations, institutions, and standard practices.

I have reviewed and am thoroughly familiar with the following Program Statements of the federal Bureau of Prisons: *Inmate Security Designation & Custody Classification* (P.S. 5100.08, September 4, 2019) and *First Step Act of 2018 – Time Credits: Procedures for Implementation of 18 U.S.C. §3632(d)(4)* (P.S. 5410.01, November 22, 2022; CN-1, February 6, 2023 & CN-2, March 10, 2023). I have spoken on numerous occasions with personnel at the Bureau's Designation and Sentence Computation Center ("DSCC")[1] and regional and central office officials in the correctional programs administration when seeking clarification about a specific policy/program statement.

---

[1] The DSCC is an office within the BOP's Office Complex located in Grand Prairie, Texas. All facility designations (the term used for selecting a location of placement) or assignments and inter-facility transfers are processed and made by the DSCC.

I have additionally conferred with defense counsel about Mr. Klyushin and reviewed case materials regarding the defendant's case including his Presentence Investigation Report (PSR).

This correspondence will address the following issues, which would arise should Mr. Klyushin be sentenced to a term of imprisonment: 1) Mr. Klyushin, due to his status as a sentenced alien, although initially classified minimum-security, will be assigned to a secure prison and not a minimum-security "camp"; 2) he will likely serve a period beyond his actual sentence in ICE custody as he awaits deportation; 3) he will be denied the opportunity to participate and receive the sentence reduction available through the BOP's Residential Drug Abuse Program (RDAP); 4) he will be denied the full benefits of the First Step Act's (FSA) Federal Time Credits (FTCs) available to non-violent U.S. prisoners; 5) he will be denied pre-release to the community (to a community-based option such as home confinement like most U.S. prisoners who pose no public safety risk), toward the end of his sentence; and 6) Mr. Klyushin's ability to communicate will be severely hampered as he does not speak English.

### I. Mr. Klyushin Will Be Imprisoned in a Secure Institution – Not a Prison Camp

Ordinarily, after the imposition of sentence of imprisonment, a defendant with Klyushin's offense (non-violent), who has no history of violence, no prior criminal record, and no outstanding detainers would be eligible to be designated by the BOP to a minimum-security prison "camp."[2] However, BOP designators also use Management Variables (MGTV) and Public Safety Factors (PSF) to account for security considerations not included in their numeric security point system. In Mr. Klyushin's case, if he is sentenced to a term of imprisonment, although he will have a total of only six (6) security level points, a PSF of "Deportable Alien" will be assigned to his security classification which will necessarily result in a prison assignment above the "minimum" (or camp) range.[3] Mr. Klyushin will be designated as a low-security inmate, rather than as a minimum-security one. Low-security prisons generally have security protocols and living conditions far different than what exists at the minimum-security, camp level. There are four main differences between a minimum-security camp versus a low-security prison.

The first difference is the perimeter security and other forms of heightened security. Federal Prison Camps (FPCs) are fenceless compounds that have the appearance and feel of an austere college campus. Camps do not have "controlled movements." A Federal Correctional Institution (FCI) is surrounded by barriers to prevent escape: walls, fencing with concertina wire, secured and defensible main gates, security lighting, motion sensors, and roving patrols. Remotely controlled doors, CCTV monitoring, alarms, cages, restraints, nonlethal and lethal weapons, riot-control gear, and physical segregation of units are used within the facility. Inmate movement throughout the facility is highly controlled, with access from one location to the other allowed only for 10 minutes at the top of each hour. Mass body checks where groups of inmates are strip searched so officers

---

[2] Mr. Klyushin's BOP security level scoring utilizing the BP-A337.051 (Inmate Load and Security Designation Form) is estimated to be as follows: he will not be allowed to surrender voluntarily (0 pts.); his offense (property offense > $250,000) severity will be rated "Moderate" (3 pts.); he has no prior criminal history (0 pts.); no history of prior violence (0 points); no history of escape (0 pts.); no outstanding detainers (0 pts.); he is 42-years old (2 pts.); he has graduated high school (0 pts.); and he has a history of substance abuse within the last five years (1 pt.). Therefore, his total security designation points are *six* (6) yielding a security level of "**Minimum**." Per BOP P.S. 5100.08 (September 4, 2019) at Table 5-2, Security Point Totals of 0-11 equate to an Inmate Security Level of Minimum.

[3] *Inmate Security Designation & Custody Classification* (P.S. 5100.08, September 4, 2019), p. 9 (CODE G).

can inspect their bodies for bruises or lacerations indicating violence, or fresh tattoos indicating gang involvement, are sometimes conducted for cause. Such assembly searches are not ordinarily done at the camp level. Housing units are searched far more frequently than at the camp level.

The second difference is the institution's size, mindset and crowding: FCIs are five to ten times larger than camps. As a rule, the bigger the institution, the more stressful it is on the general population in the prison. Large FCIs have cramped housing quarters where 90-100 inmates sleep in small cubicles with four or more bunk beds and compete for use of the dozen or so showers, sinks, and toilets. Most BOP facilities house more inmates than they are designed for; however, the camps are less crowded than the low-security FCIs. For instance, the closest low-security FCI to New York City (for ease of deportation to Russia) which is recommended for deportable aliens is FCI Allenwood (current population of 1,052 is 6.0 percent above the rated capacity of 992). FCI Danbury in nearby Connecticut has a current population of 957 which is 72.7 percent above the rated capacity of 554. In contrast, the three camps located in the Northeast Region close to New York City (Otisville, NY; Fairton, NJ; and Canaan, PA) currently house anywhere from 73 to 91 inmates – all three camps are operating under capacity.[4]

Overcrowding results in cubicles that are quadruple bunked, and in some facilities, inmates are placed on mattresses on the floor in "overflow units." Sleep disturbances (resulting from sleeping on thin mattresses, snoring, constant light, and movement) are common. Noise is incessant in a secure correctional facility, and in some (those that have cubicles, for example), there is little to absorb or otherwise block nighttime noise. Inmates may be awakened repeatedly for late night head counts.

Other problems exist in the more crowded FCIs. For instance, there are longer lines to use the telephone, to see a member of your unit team, for medications and checkups, or to use the library. During mealtime, the busy, noisy cafeteria serves institutional food, pre-packaged, pre-made, sometimes days before it is served. Inmates eat in shifts (each housing unit is called in an ever-changing rotation), and if your unit is called last, most of the edible food is gone. Naturally there are also long lines to use toilets, sinks, and showers.

The third difference between an FPC and an FCI is the type of inmate. The camps house generally younger offenders principally caught up in the War on Drugs who are serving short sentences (less than 10 years) and have often cooperated with the government. The inmates generally are first-time offenders who have committed nonviolent crimes, have minor to no criminal history, and pose no public safety or flight risk. They tend to generally behave well out of fear they will end up in a higher security institution (infractions can penalize a camp inmate with a transfer to a low-security facility, although, if sentenced to a term of imprisonment, Mr. Klyushin will automatically end up in a low-security facility). Otherwise, camps house "white-collar" property offenders convicted of offenses such as those Mr. Klyushin was convicted of. Inmates at low-security facilities (which also house poor minority drug offenders, but those of the more serious kind), are serving sentences greater than 10 years, likely have a prior record involving a gun or violent offenses, may be gang-affiliated, or are otherwise security or flight risks. FCIs also house all deportable aliens, members of organized crime, drug cartel leaders, and all serious sexual offenders. Statistically, there is a 143 percent greater chance of being assaulted at an FCI as

---

[4] All population figures are current as of April 13, 2023 (updated by the BOP weekly each Thursday). See, https://www.bop.gov/about/statistics/population_statistics.jsp.

opposed to a camp.[5] Furthermore, the rate of "serious assault" is 553 percent higher in low-security institutions than minimum-security camps.[6]

The last difference is about visitation. At a camp, an inmate's family can drive up to the compound, park in a lot next to the visiting hall, walk in unescorted, show ID and then their incarcerated loved-one appears. At an FCI, visitors must proceed to a guarded gate to access the facilities parking area. They are observed by officers on patrol in the parking lot. Once inside the prison, they pass through metal detectors, are subjected to random pat down searches (with vehicles on the property also subject to inspection), their hands are tested for drug use, they are escorted through several check points and they wait interminably for their friend or family member to be brought to the visiting room (a crowded indoor environment). Meanwhile, the average camp has an outdoor picnic area for visitation during warm months, which means a great deal to the family of someone inside.

The unfortunate result in Mr. Klyushin's case if he is sentenced to a term of imprisonment is that someone who would otherwise be designated to a minimum-security camp will instead, based on the nature of his citizenship, now be housed in a significantly harsher institution, next door or in a bed adjacent to someone with a much more serious criminal background. Prison is hard enough for even the toughest of souls. Mr. Klyushin's is 42-years old and has no prior criminal history or experience with criminal activity. His family lives an ocean and more than 4,600 mile away. And he will be imprisoned in a crowded, noisy prison, which employs security measures far beyond what is required for his care and custody.

## II.     Added Punishment of ICE Detention and Deportation

Mr. Klyushin's post incarceration return home will be further complicated by the difficulty of a U.S. Immigration and Customs Enforcement (ICE) detainer that will be placed on him (upon incarceration) to eventually accommodate the process of deporting a foreign national at the completion of his sentence. ICE's Criminal Alien Program (CAP) is responsible for identifying, processing, and removing criminal aliens incarcerated in federal, state, and local prisons and jails - the enforcement of removal is overseen by ICE's Office of Detention and Removal Operations (DRO).

When the prisoner's sentence is complete, they are placed in ICE custody and their status is changed from "prisoner" to "detainee." Armed ICE agents would transport Mr. Klyushin (probably by bus) to another detention center once he is formally released from BOP custody to await the process of being physically removed from the U.S. Unfortunately, this involves further incarceration at what are typically county jails (contracted by ICE) to further wait on processing to finally be sent home.

Another disturbing result of the formal ICE deportation process is the length of time one can be

---

[5] This percentage is based on the average rate per month (per 5,000 inmates) of "inmate on inmate" assault (serious and less serious) from 2008-2017. *See* Federal Bureau of Prisons, Office of Research and Evaluation (data files on assault from 2008-2017) (on file with the affiant).
[6] Id. Serious assault is defined in the *Inmate Discipline Program* (P.S. 5270.09, August 1, 2011), page 44, Table 1 (CODE 101 - Assaulting any person, or an armed assault on the institution's secure perimeter (a charge for assaulting any person at this level is to be used only when serious physical injury has been attempted or accomplished)).

held after their sentence has been satisfied. It can take up to six months for arrangements (internally within the U.S. and with officials of one's home country) to finalize the details necessary to complete this process. All the while an individual who should have been released from custody continues to languish in a strange and dangerous place while bureaucratic paperwork is half-heartedly shuffled between U.S. government agencies (no doubt the rising tension between the U.S. and Russia will further complicate and delay the process for Mr. Klyushin). Then there is the paperwork processed by the home country in coordination with the U.S. All of this is very time consuming and shows that an incarceratory sentence would impose a more substantial hardship on Mr. Klyushin than it would upon a similarly situated U.S. person.

### III.     Compromised Pre-Release and Re-Entry Transitioning

Mr. Klyushin's access to pre-release re-entry transitioning and a productively structured return to his community will also be compromised because of his immigration status. Normally, an inmate would be accorded a portion of their sentence for community re-entry through one of the BOP's Residential Re-Entry Centers (RRC). Toward the end of Mr. Klyushin's sentence, for a period determined as required by his transitional needs, he would usually be pre-released to an RRC—likely between six and twelve months before his release date (18 USC § 3621). Further, most minimum- and low-security inmates are also pre-released (in addition to their RRC or halfway house time) to home confinement for the last 10% of their sentence up to a maximum of six months (18 USC § 3624). Instead of any normal transitional benefits afforded other inmates via pre-release, Mr. Klyushin will be held beyond the length of his sentence when he would be transferred to the custody of ICE officials upon formal BOP release. In effect, this will add *over a year* to his sentence (minimum of 6 months in the community lost; at least 6 months spent in detention following service of sentence awaiting deportation).

Additionally, the rehabilitative programming and related incentives afforded to inmates via the BOP's RDAP program will be conceded. A review of Mr. Klyushin's PSR section on Substance Abuse reveals that he both is in need of the rehabilitative benefits and is qualified for the RDAP.[7] Eligible U.S. prisoners will receive up to a year off of their sentence for successful completion of the RDAP program.[8] Because the RDAP program contains a Transitional Drug Abuse Treatment (TDAT) component which is completed at the end of the program, first at an RRC followed by home confinement, which are unavailable to non-U.S. Citizens, Mr. Klyushin will not be able to avail himself of the time saving component of the RDAP.

And lastly, the rehabilitative programming and related incentives afforded to inmates via the First Step Act will also be compromised.[9] The incentives include the ability to earn "time credits" towards early pre-release to an RRC or home confinement – neither of which are available to non-U.S. citizens. While Mr. Klyushin can conceivably "earn" these FSA time credits until such time as a Judicial Removal Order is in place, they will not avail him of any pre-release relief. Non-U.S. citizens may however utilize FSA time credits to reduce the length of their sentence. Not

---

[7] Presentence Investigation Report for Vladislav Klyushin prepared by U.S. Probation Officer Martha C. Victoria on April 12, 2023, ¶181-182, p. 19-20.
[8] The amount of early release is determined by sentence length (less than 31 months = no more than 6 months; 31 to less than 37 months = no more than 9 months; and 37 months or more = no more than 12 months). See, P.S. 5331.02; *Early Release Procedures under 18 U.S.C. § 3621(e))* effective March 16, 2009.
[9] *First Step Act of 2018 – Time Credits: Procedures for Implementation of 18 U.S.C. §3632(d)(4)* (November 22, 2022; CN-1, February 6, 2023 & CN-2, March 10, 2023),

dramatically, but in small increments. However, given Mr. Klyushin's limited ability to communicate (speak and write in English), it is doubtful he will be able to 1) complete the extensive paperwork involved to qualify for FSA credits (the SPARC-13 "needs assessment" (i.e., a self-audit inmates much complete to identify the areas of self-improvement they "need" such as drug treatment, education, vocational training, how to stay away from anti-social peers, etc.)[10]; and 2) effectively participate in the programming offered at BOP facilities. If the needs assessment is not completed, the inmate does not qualify to earn FSA time credits. I do not see this program reducing Mr. Klyushin's sentence in any significant way.

### IV.    Impact on Sentence Length

As noted above, Mr. Klyushin's sentence length will be impacted by the fact he is a non-U.S. Citizen. Let's take the example of a 5-year term of imprisonment.

A U.S. Citizen who received a 5-year (60-month) sentence for a non-violent offense who was eligible for the RDAP, successfully completed the program, met the requirement for minimum or low on the PATTERN score and worked and programmed consistently throughout the term of their sentence could end up serving 24-months in a prison camp and serve the final 6-months in a community setting (1 month at an RRC; 5 months on home confinement).[11] Therefore, the total in custody period would be 24 months.

For a non-U.S. citizen who met the same requirements as noted in the above example, if there was no Judicial Order of Removal filed, the *best case scenario* would result in 39 months served at a low-security facility followed by transfer to ICE custody in a detention center for potentially up to at least a 6-month deportation process. Therefore, the total in custody period would be 45 months.[12]

### V.    Summary

In summary, if Mr. Klyushin is sentenced to a term of imprisonment he would be assigned to a prison beyond his security needs solely because of his immigration status. He will be placed at unnecessary risk. At a low-security assigned facility, he will be subjected to a more hostile environment and more unsanitary conditions than he would be subjected to in a minimum-security facility. The daily personal stress of incarceration in a higher than necessary security level, will be palpable for Mr. Klyushin, who has never spent any time in prison. He will be denied the time savings and opportunity for substance abuse treatment of the BOP's RDAP. His ability to avail

---

[10] Details of the SPARC-13 (Standardized Prisoner Assessment for Reduction in Criminality) can be viewed on the BOP Website. It requires that the inmate assess their own needs in the following 13 areas: Anger/hostility; Antisocial peer associations; Cognitions; Dyslexia; Education; Family/parenting; Finance/poverty; Medical; Mental Health; Recreation/Leisure/fitness; Substance use; Trauma
See, https://www.bop.gov/inmates/fsa/docs/bop_fsa_needs_validation_report_2021.pdf.

[11] Breakdown is as follows: 60 month sentence is reduced by Good Time Credits (60 mo. - 270 days = 51.1mo.). Year 1 earn 3 mo. Reduction of Sentence from FTCs (51 mo. – 15 mo. = 36 mo.); Year 2 earn 6 mo. Reduction of Sentence from FTCs (36 mo. – 18 mo. = 18 mo.); Less 12 mo. RDAP Reduction leaves 6 months for TDAT (RRC of 1 mo. Followed by 5 mo. Home Confinement).

[12] Breakdown is as follows: 60 month sentence is reduced by Good Time Credits (60 mo. - 270 days = 51.1mo.). Year 1 earn 3 mo. Reduction of Sentence from FTCs (51 mo. – 15 mo. = 36 mo.); Year 2 earn 6 mo. Reduction of Sentence from FTCs (36 mo. – 18 mo. = 18 mo.); Year 3 earn 3 mo. Reduction of Sentence from FTCs (18 mo. – 15 mo. = 3 mo.); Maximum 365 days of FTCs Reduction of Sentence has been earned in year 3. Year 4 serve final 3 months. Transfer to ICE custody estimated 6-month deportation process.

himself of the FSA's Federal Time Credits will be hampered. He will also serve a period significantly beyond his actual sentence in ICE custody as he awaits deportation - and he will be denied an otherwise standard transfer to a community re-entry opportunity at the end of his sentence. In comparison to a U.S. citizen with a 60-month sentence, Mr. Klyushin would serve an in-custody period 87.5 percent longer than a comparable U.S. citizen.

Sincerely,

/s/ Joel A. Sickler
_____

Joel A. Sickler, Founder
*Justice Advocacy Group, LLC*